## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Lisa Jobe, as guardian and on behalf of K.J., )
a minor; Amy Gage, as guardian and on )
behalf of B.G., a minor; Crystal Cuyler, )
as guardian and on behalf of D.M., a minor; )
Chanda Hughes, as guardian and on behalf )
of J.B., a minor; Brenda Sheffield, as )
guardian and on behalf of J.D., a minor; )    Case No. 8:12-cv-00568-SDM-MAP
Violene Jean-Pierre, as guardian and on )
behalf of F.J.P., a minor; and Michelle )
Minor, as guardian and on behalf of J.P., )
a minor; on behalf of themselves and all )
others similarly situated, )
          )
    Plaintiffs, )
          )
v. )
          )
GRADY JUDD, Polk County Sheriff, in )
his official capacity; KIM MARCUM, )
Captain, in her official capacity; and )
MICHAEL ALLEN, Major, in his official )
capacity, )
          )
    Defendants. )
_____)

## VERIFIED AMENDED COMPLAINT – INJUNCTIVE RELIEF SOUGHT

1.    This is a class action filed on behalf of the children imprisoned at the Central

County Jail in Bartow, Florida ("Polk County Jail"), to protect them from abusive and

unconstitutional conditions of confinement.  The vast majority of children incarcerated at the

Polk County Jail have been accused of non-violent offenses.  They are held at the jail while they

await their court dates.

2.    Recently, as a cost savings measure, Polk County officials opted to cease housing

all children in a designated juvenile detention center and transferred custody of these children to

1

Sheriff Grady Judd.  In the Fall of 2011, Sheriff Judd moved all children in his custody to the Polk County Jail, which primarily houses adults.

3.      According to both the U.S. Centers for Disease Control and Prevention and the Office of Juvenile Justice and Delinquency Prevention, youth who are held in adult facilities are approximately 34 percent more likely than youth in juvenile facilities to be re-arrested another crime.[1]  Ignoring the adverse public safety consequences of housing children in an adult jail, Sheriff Grady Judd trumpets the tax dollars he saves[2] by subjecting children to violence, abuse and violations of their fundamental constitutional rights.  Unfortunately, any short-term savings Polk County generates by housing children—some as young as eight years old—in the adult jail is offset by the tremendous cost borne by the children who languish in Sheriff Grady Judd's custody.

4.      Defendants expose the children incarcerated in the Polk County Jail to dangerous conditions.  Rather than provide engaged staff to supervise children, Defendants rely on cameras and remote supervision, frequently leaving children unattended.  Defendants' constitutionally deficient staffing policies and practices allow fights regularly to occur.  As a result, youth live with a constant threat of violence.  Several youth have sustained injuries that have required medical attention.  When children are injured, Defendants routinely fail even to notify their

---

[1] Centers for Disease Control and Prevention, *Effects on Violence of Laws and Policies Facilitating the Transfer of Youth from the Juvenile to the Adult Justice System*: *A Report on Recommendations of the Task Force on Community Preventive Services*. MMWR 2007; 56 No. RR-9 (2007); Richard E. Redding, *Juvenile Transfer Laws: An Effective Deterrent to Delinquency?*, Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention (2010), https://www.ncjrs.gov/pdffiles1/ojjdp/220595.pdf.

[2] See Press Release, Polk County Sheriff's Office, *Polk County Sheriff's Office on pace to save between $1.6 to $2.4 million through operation of the PCSO Juvenile Detention Facility compared to Department of Juvenile Justice cost* (available at http://www.polksheriff.org/NewsRoom/News%20Releases/Pages/02-21-2012.aspx (last accessed March 20, 2012)).

parents.    Because the Defendants refuse to protect children from harm, in order to protect themselves, some youth stay confined to a cell for 23 hours a day—deprived of regular human contact, educational services and recreation.

5.      When Sheriff Judd's employees decide to pay attention to the children in their custody, it is too often for the sole purpose of meting out abuse.  Polk County Jail guards employ a deliberately cruel use of chemical restraints (also known as mace or pepper spray).  Guards frequently spray children in the face with a substance that causes an excruciating burning sensation in the eyes and on the skin, and restricts the ability to breath.  Guards are known to subject children to this punishment for minor infractions such as singing, talking back or getting dressed too slowly.

6.      Polk County Jail staff frequently curse at the children in their care, including by using the racial slur "n*gger" and telling children that they do not give a f*ck about them.  Staff have referred to the girls housed at the Polk County Jail as "little b*tches."

7.      The United States Department of Justice has concluded that children housed in adult jails are 36 times more likely to commit suicide than children housed in a juvenile detention facility.[3]  Like many adult facilities that house children, the Polk County Jail responds to children who manifest an intent to harm themselves with cruelty and deliberate indifference. Sheriff Grady Judd's employees force children who need suicide protections to strip naked in view of their peers and then wear a "suicide suit" a short, sleeveless garment that leaves children's bodies exposed.  These children are then placed in the "cage"—a kennel-like structure that is empty with the exception of a hard, wooden bench. These children are deprived of

---

[3] McGowan, A., Hahn, R., et.al., *Effects on Violence and Laws and Policies Facilitating the Transfer of Juveniles from the Juvenile Justice System to the Adult Justice System: A Systematic Review*. 32 AMERICAN JOURNAL OF PREVENTATIVE MEDICINE, No.4 Supplement, 2007 at  S7-S28.

adequate mental health care and are prohibited from participating in education, recreation or from communicating with their families.

8.      In 2011, the Florida Legislature passed Senate Bill 2112 (SB 2112), a law that for the first time authorized Counties to house children facing juvenile charges in county jails rather than in the custody of the Florida Department of Juvenile Justice (DJJ). Polk County Officials made the decision to expand the number of children in Sheriff Judd's custody pursuant to this law.

9.      Polk County is the only county in Florida to have taken over the detention of pre-adjudicated juveniles under jail standards based on an adult correctional model rather than the protective juvenile justice standards developed over the years by professionals with expertise working with children.

10.      Defendant Judd has boasted that his objective in incarcerating these children at the jail is to save the county large sums of money. Defendants' cost-cutting measures, however, have come at the expense of the children's safety and well-being. Today, all children who are incarcerated while pending the resolution of charges against them in Polk County, whether charged as juveniles or adults, are jailed at the Polk County Jail.

11.      All children in Sheriff Grady Judd's custody are deprived of the education, individualized treatment and rehabilitative services that are reasonably calculated to help youth make positive life decisions once they are released from custody. Unless children are protected from these abuses and removed from Sheriff Judd's custody, they will likely cycle in and out of his facilities—creating a public safety crisis that exposes Polk County taxpayers to tremendous legal liability.

12.     Plaintiff minors K.J., B.G., D.M., J.B., J.D., F.J.P., and J.P., who are children presently or recently incarcerated at the Polk County Jail, seek injunctive and declaratory relief on behalf of themselves and all other similarly situated.

## JURISDICTION

13.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## VENUE

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in this district.  This Court is authorized to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

15.     Plaintiffs are children who are or were incarcerated at the Polk County Jail at the time of filing this action and who are subject to conditions of confinement that violate their rights under the U.S. Constitution.

16.     Plaintiff K.J. is 15 years old. He is incarcerated at the Polk County Jail awaiting sentencing.

17.     Plaintiff B.G. is 17 years old. He is incarcerated at the Polk County Jail pending resolution of the charges against him.

18.     Plaintiff D.M. is 16 years old. He is incarcerated at the Polk County Jail pending resolution of the charges against him.

19.     Plaintiff J.D. is 17 years old. He is incarcerated at the Polk County Jail pending resolution of the charges against him.

20.     Plaintiff J.B. is 15 years old.  He was incarcerated at the Polk County Jail at the time this action was filed on an allegation that he had violated juvenile probation.

21.     Plaintiff F.J.P. is 17 years old.  He was incarcerated at the Polk County Jail for a juvenile probation violation at the time this action was filed.

22.     Plaintiff J.P. is 17 years old.  He is incarcerated at the Polk County Jail pending resolution of the charges against him.

23.     Defendant SHERIFF GRADY JUDD is the duly elected Sheriff of Polk County, Florida. As Sheriff, Defendant oversees law enforcement in the county.  Defendant is responsible for the administration and every day operation of the Polk County Jail.  Defendant is responsible for ensuring that the Polk County Jail operates in compliance with the laws of the State of Florida and the United States Constitution. He is the final decision maker for the Polk County Jail.  Defendant is sued in his official capacity.

24.     Defendant KIM MARCUM is the Captain and Facility Commander at the Polk County Jail. She is responsible for the administration of the Polk County Jail and has the duty to supervise staff at the jail. She is sued in her official capacity.

25.     Defendant MICHAEL ALLEN is the Major in command of the security division for the Polk County Sheriff's Office. He is responsible for overseeing the daily operation of detention facilities in Polk County, including the Polk County Jail.  He is sued in his official capacity.

## CLASS ACTION ALLEGATIONS

26.     The named Plaintiffs bring this suit on their own behalf and on behalf of all children who are, or will in the future be, incarcerated at the Polk County Jail.

27.     Plaintiffs seek to certify a class defined as:

All individuals who are under the age of 18, and all individuals who are under the jurisdiction of the juvenile court regardless of age, who are or who will in the future be incarcerated at the Polk County Jail.

28.     Plaintiffs seek to certify a subclass defined as:

All individuals under the sole jurisdiction of the juvenile court who are or who will in the future be incarcerated at the Polk County Jail.

29.     This suit is properly maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

30.     The class is so numerous that joinder of all members is impractical.  Upon information and belief, Polk County Jail currently houses approximately 70 to 80 children. Children are incarcerated at the jail for varying lengths of time, ranging from days to months, and the population changes on a daily basis.

31.     The class also includes future members whose names are not known, as the facility regularly admits new children who are members of the class.

32.     There are questions of law and fact common to all class members, including but not limited to whether conditions of confinement of children incarcerated at the Polk County Jail violate their rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

33.     Because the policies, practices and customs challenged in this complaint apply with equal force to the named Plaintiffs and the other members of the class, the claims of the named Plaintiffs are typical of the class in general.

34.     The named Plaintiffs will fairly and adequately represent the interests of the class. They possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in class action prison conditions litigation in federal court. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

35.     Defendants have acted or refused to act on grounds generally applicable to the class: their policies, practices, acts and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## STATEMENT OF FACTS

## BACKGROUND—THE POLK COUNTY JAIL

36.     The Polk County Jail was built nearly 30 years ago to house adults. Its capacity has been expanded over the years to house up to 800 individuals. Today, the vast majority of the jail's population continues to be adults.

37.     Upon information and belief, Polk County Jail currently houses approximately 70 to 80 children. Although youth are kept in separate dorms, they are housed in a building that also houses adults.

38.     In August 2011, the Florida Sheriff's Association (FSA), of which Defendant Polk County Sheriff Grady Judd was and is an officer, adopted new standards governing the treatment of children held in jails. These were modeled on the treatment of incarcerated adults and were adopted over the objection of child advocates. Among other objectionable provisions, the FSA standards permit the use of chemical agents and tasers on children, something strictly prohibited by juvenile justice standards.

39.     In September 2011, Polk County Sheriff Grady Judd began housing children charged as adults at the Polk County Jail.  On or about October 1, 2011, Sheriff Judd transferred all pre-adjudicated juvenile detainees from the Department of Juvenile Justice detention facility to the Polk County Jail.  Since that time, Defendants have incarcerated children as young as eight years old at the Polk County Jail pending resolution of juvenile charges against them.

## UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

### Failure to Provide Rehabilitative Services to Juveniles

40.     Florida's juvenile justice system is charged with administering a system of "prevention, early intervention, control, and rehabilitative treatment of delinquent behavior." Fla. Stat. § 985.601(1) (2011).  The express purpose of Florida's juvenile justice system is rehabilitation, not punishment.  For this reason, the State of Florida is not required to afford children with the full panoply of due process safeguards that are provided in adult criminal proceedings.  For example, there is no right to a jury trial for children in the juvenile justice system, nor do children have a right to bail.  Where, as in Florida, the purpose of detaining and imprisoning children is treatment and rehabilitation, due process requires that the conditions and programs in facilities that house children must be reasonably related to that purpose.

41.     Although the Florida juvenile justice system is premised on providing rehabilitation to children charged with delinquency, Defendant Judd has publicly described these children as "incorrigible"— which means incapable of correction—and treats them punitively in accordance with that attitude .

42.     As described throughout this complaint, Defendants have a policy and practice of subjecting children to punitive, adult correctional conditions in violation of the U.S. Constitution.

43.     Defendants have a policy and practice of depriving children in their custody of developmentally appropriate interventions and rehabilitative services that the juvenile justice system is intended to provide.  Instead, Polk County Jail staff routinely treat children punitively, using violence, taunts, and threats.

44.     Polk County guards routinely use foul language with the children, saying things such as "shut the f*ck up" when a child complains, "f*ck you, I ain't giving you sh*t or "I don't give a flying f*ck what you need" when a child makes a request, and have even referred to African-American children as "n*ggers," and girls on the girls' unit as "little b*tches."

45.     Despite state and federal requirements to provide education, children are offered inadequate educational services.  Rather than provide an appropriate education, Defendants lump children of different ages and grades together in a makeshift classroom at the jail, without any regard to a child's individual learning needs.

46.     Children are often forced to eat in their cells, where their toilets are located. These toilets are rarely cleaned; to clean the toilet, the children must use the shower soap they receive for their personal hygiene.

47.     The children are sometimes deprived of outdoor recreation and, depending on the whim of the guards, may be confined to their living unit for days at a time.

48.     Despite the rehabilitative purpose for which these children are detained, Defendants have a pattern and practice of denying them rehabilitative services, such as counseling, treatment, and developmentally appropriate activities that are reasonably related to the purpose of their detention.

**Failure to Protect from Harm**

49.     Rather than provide engaged staff to supervise children, Defendants rely on cameras and remote supervision, frequently leaving children unattended at the Polk County Jail.

50.     Defendants implement a policy and practice of 1) failing to provide adequate staffing and staff training; and 2) failing to adequately supervise and protect children from harm.

51.     Defendants fail to protect the youth from harm by refusing to provide appropriate supervision. As a result, children predictably fight among themselves—creating a substantial risk of serious harm to each other.  Defendants allow these fights to occur and do nothing to prevent the conflict that is inevitable when multiple teenagers are confined in close quarters.  Staff do nothing to prevent these fights, but instead respond punitively once the fights are over by spraying dangerous chemical agents that cause burning, choking, difficulty breathing and vomiting.

52.     Rather than maintain a professional adult presence where children are housed, Polk County Jail guards monitor children through the use of remote cameras that capture only parts of the jail.  As a result, children engage in fights that could have been avoided had the jail maintained an adult presence or adequate supervision of the areas where children are incarcerated.  Defendants know that these fights do, and will, occur as a result of inadequate training and staffing, yet disregard the substantial risk these failures pose to children's safety.

53.     Defendants' pattern and practice of failing to provide adequate adult supervision and failing to protect youth from harm continues to endanger the lives and safety of all children detained at the jail.

54.     Since October 2011, Defendants' failure to provide adequate training and supervision has resulted in numerous, preventable fights among children.  Defendants know that

11

incarcerated children engage in "test of heart" fights to challenge newcomers, yet do nothing to prevent these fights from occurring.  Defendants know that older children may demand food trays from younger, more vulnerable children, who risk physical injury if they refuse.  This is known throughout the facility as "payroll." Despite the fact that this practice is widely known, the Defendants have failed to protect youth from victimization.

55.    As recently as March 1, 2012, the Sheriff's Office reported that three youths at the Polk County jail have been charged with attempted felony murder for the "test of heart" beating and torture of T.W., another youth incarcerated at the jail, over a period of several hours, despite guards' knowledge and duty to protect all youth at the jail and prevent such incidents from happening on their watch.[4]

56.    These incidents reflect Defendants' systemic failure to implement the necessary training, staffing patterns and supervision in order to protect children from harm.

**Unlawful Use of Dangerous Chemical Restraints**

57.    Defendants promulgate a policy and practice of permitting Polk County Jail guards to carry dangerous chemical agents at all times on their person, including when guards are interacting with incarcerated children, creating the substantial risk of serious injury to children.

58.    Guards routinely use these dangerous chemical agents to punish children—not to maintain a secure environment or prevent harm.  Defendants allow their employees to spray children with chemicals that cause an excruciating burning sensation and difficulty breathing as punishment for perceived minor rule violations, including for failing to follow orders that do not

---

[4]    Pleasant, Matthew, *Questions Surround Teen Jail Beating*, The Ledger (March 1, 2012) (available at  http://www.theledger.com/article/20120301/NEWS/120309935?p=2&tc=pg (last accessed March 20, 2012)).

implicate facility security, and for engaging in behavior guards deem annoying like singing or not moving quickly enough to get dressed.

59.     When there are fights, guards indiscriminately spray children in the area with chemical agents—including children not involved in the fight, children who have stopped fighting, children who have already been disabled, and children the Sheriff's Office has described as the victim of the fight.

60.     Defendants authorize and permit guards' punitive use of chemical agents in these situations.  There is no security, rehabilitative or penological justification for the Defendants' use of chemical agents.

61.     Defendants' policies and practices constitute a continuing threat of irreparable injury to the named Plaintiffs, and all children similarly situated.

62.     Defendant Judd has claimed publicly that the use of chemical agents against children at the Polk County Jail is "rare."  In fact, since October 2011, Sheriff's guards have used pepper spray punitively against several children charged as juveniles, including S.R., A.M., M.C.1, M.C.2, D.J., D.G., J.D., , and Plaintiffs K.J. and J.P., and against several children charged as adults, including L.M., D.M., S.W., J.C., M.H., and Plaintiffs K.J. and B.G.

63.     In October 2011, for example, S.W. was among several children who were pepper sprayed following a fight, even though S.W. was not among those fighting.  After S.W. was disabled by the chemical agent, which made his eyes burn and took his breath away, he tried to crawl on the floor to the shower to wash it off, but a guard sprayed him again.

64.     In January 2012, guards pepper sprayed six children following a fight, including Plaintiff J.P., whom the Sheriff's Office has described as the victim of the fight.

65.     In January 2012, D.D., one of the incarcerated girls witnessed guards pepper spray a mentally ill girl on suicide watch for sitting on a table instead of on her bed and refusing to move to her bed when told, leaving her crying and screaming in pain.

66.     In March 2012, M.H. was pepper sprayed after manifesting an intent to hang himself by his sheet.

67.     Children at the jail, including B.G., J.D., D.G. and K.J., have been pepper sprayed simply for failing to follow an order such as to move from one area to another or to cease singing.

### Punitive Isolation and Suicide Prevention Policies

68.     The Defendants have a policy and practice of subjecting children who are placed on suicide watch to punitive isolation, forced idleness and sensory deprivation, inflicting wanton and unnecessary discomfort, pain and humiliation.  Once children are placed on suicide watch, they are forced to strip naked in front of their peers and then wear a "suicide suit" which is a short, sleeveless garment that leaves children's bodies exposed.  Children placed on suicide watch are then placed in the "cage"—a kennel-like structure that is empty with the exception of a hard, wooden bench.  Children are confined to this cage for 23 or 24 hours a day, denied physical exercise or recreation, and provided with limited opportunities to care for their personal hygiene needs.  Children receive little to no human interaction and are not allowed to receive mail, make phone calls, have visitation, or receive any of their property, including canteen food, pictures, eyeglasses, paper, or pens.

69.     These suicide prevention policies and practices are so cruel and abusive that staff have placed non-suicidal youth on "suicide watch" in order to inflict punishment on them.

Indeed, the kennel-like cages are used both for children who have expressed suicidal ideation and for children who are alleged to have broken facility rules.

70.     Once a child is designated by a staff member as suicidal, he must remain in isolation until he is evaluated by a mental health professional who can determine whether the child remains a suicide risk. However, children who are on suicide watch do not receive any mental health services, treatment or interventions. The Defendants exhibit deliberate indifference to the serious mental health needs of the youth who are placed on suicide on watch.

71.     Defendants enforce isolation and suicide prevention policies that are not calculated to stop people from harming themselves, but instead inflict cruelty and assault the human dignity of children.

### Plaintiffs' Statement of Facts: Illustrative Incidents of Abusive Treatment

**Plaintiff B.G. – Inadequate Suicide Response, Prevention**

72.     On February 10, 2012, Plaintiff B.G. was placed in a "cage" for suicide watch after telling a nurse that he felt depressed.  When questioned by the nurse as to why he felt depressed, B.G. told her it was because he had been incarcerated for so long. The nurse asked if he ever had suicidal thoughts.  B.G. responded that sometimes he thought about what life would be like if he were not present. The nurse replied that she probably had no choice but to put B.G. on suicide watch, which meant moving him to the cage.  B.G. was not offered any mental health counseling or services.

73.     The cage is a box-like enclosure made with metal grates on all sides.  It is empty, except for a narrow hard bench against one side.

74.     While in the cage, which is visible to other youth, B.G. was made to strip naked and put on a suicide gown, known in the jail as a "turtle suit."  The experience was humiliating and degrading.

75.     B.G. was allowed nothing but a mat approximately one-inch thick. To use the bathroom, he had to ask a guard for permission and be transported to another area of the facility. He was not allowed to keep his eyeglasses, which he wears all the time.

76.     B.G. remained in the cage until February 13, 2012.  During this entire time, no medical personnel met with him.  B.G. passed the time by singing to himself.  Until another youth was placed in a nearby cage, he was not able to have contact with other children other than brief conversations as they walked by where he was caged.  Guards brought his food to the cage and left it for him to eat alone.

**Plaintiff K.J. – Punitive Use of Suicide Watch**

77.     On February 12, 2012, Plaintiff K.J. was placed in a cage near B.G.'s cage, approximately 10 feet away, as punishment for engaging in horseplay.  As K.J. was not in the cage for suicide watch, he was allowed to bring the mat from his room.

78.     Upon being placed in the cage, K.J. began kicking the cage.  A guard responded by entering the cage and pushing K.J. against the wall, placing his arm against K.J.'s neck.

79.     Later in the evening, K.J. called out to B.G. in the other cage.  K.J. asked B.G. why he was on suicide watch.  Overhearing the conversation, the guard called out to K.J., jokingly asking him if he was suicidal, and stating that he must be, since he heard K.J. utter the word "suicide."  K.J. responded "no" many times, clearly stating he was not suicidal.

80.    Nevertheless, guards brought a second turtle suit and made K.J. change into it, requiring him to strip naked in front of the others.  The experience was humiliating and degrading.  The guards then moved K.J. into the "suicide" cage with B.G.

**Plaintiffs B.G. and K.J. – Punitive Use of Pepper Spray**

81.    The night of February 12, 2012, when all other children were in their cells, B.G. and K.J. were talking in the cage.  They began singing.

82.    The guards told B.G. and K.J. that they needed to stop singing and go to sleep. The boys, however, continued singing.

83.    One of the guards went into the control room and returned with a large can of chemical agent.  The guard placed the can on the desk nearby and sat down.

84.    The guard again told B.G. and K.J. to go to sleep. They continued singing.

85.    The guard then walked over to the cage where Plaintiffs B.G. and K.J. were being held, with the large can of chemical agent in his hand.  He sprayed around all three sides of the cage (the fourth being a wall), at the point where the cage meets the floor.  Then he doubled back and sprayed the same area a second time.

86.    Plaintiff B.G. immediately felt pain in his eyes and on his skin from the burning of the chemical spray.  Plaintiff K.J. immediately started choking, and felt his eyes and skin burn.  Neither child could avoid or escape the chemical agent as they were trapped in the cage without even clothes with which to shield their faces.  They tried to pull their turtle suits over their heads so they could breathe better.  The bottoms of K.J.'s feet also burned because he had been forced to go barefoot in the cage.  The chemical agent burned all over because his skin was exposed in the turtle suit.  K.J. vomited from the chemicals.

87.     While the guard was spraying the cage, three other guards were nearby laughing. They did nothing to intervene.

88.     Plaintiffs B.G. and K.J. were left in that cage for at least 10 minutes suffering painful symptoms from the chemical agent, and were eventually moved to the other cage. Plaintiffs B.G. and K.J., however, were not given any opportunity to shower, no opportunity to wash their faces, no new turtle suit and no new blanket.  In the second cage, B.G. and K.J. could still smell the pepper spray and continued to feel some of its effects.  They remained in that cage until the next morning.

89.     Based on all of their experiences, Plaintiffs B.G. and K.J. continue to feel unsafe at the Polk County Jail and fear that they will continue to be similarly mistreated in the future.

**Plaintiff J.D. – Failure to Provide Rehabilitation, Punitive Use of Chemical and Other Restraints**

90.     Plaintiff J.D. is 17 years old.  He is a junior in high school.  Plaintiff J.D. is not receiving, and has not received, the rehabilitative services to which he is entitled under federal law.  Instead, he spends his days enduring a punitive environment.

91.     On March 5, 2012, guards sprayed Plaintiff J.D. in the face with a chemical agent after they ordered him to get dressed for school more quickly. After macing him, the guards forced him to the ground.  One of the guards twisted his arm behind him; another had his knee in J.D.'s back.  One guard stated, "We're going to break it [your arm], b*tch."  This occurred in view of most of the children on the unit, who were watching from either directly outside J.D.'s cell door or downstairs, where they had a clear view of the room.

92.     Plaintiff J.D. experienced burning in his eyes, in his mouth and on his skin as a result of being sprayed with the chemical agents.

93.     The guards forced J.D. down the stairs. Once outside of the dorm area, they forced him to the ground again.  J.D. was crying.  J.D. was put in the cage for approximately 90 minutes.  He was not allowed to wash his face or shower during that time.  As a result, during this time he experienced extreme discomfort and pain.

94.     Following the incident, a guard warned the other children to behave, implying that if they failed to do so, they would suffer J.D's fate.

95.     J.D. was placed on lockdown for the rest of the day. His lunch tray was put in front of his door, and a guard told him that he could eat it if he could access it through the locked door.  This was of course impossible, so J.D. went without lunch.  He was similarly denied access to his dinner tray.  During the entire day on lockdown, J.D. was only able to eat a snack that he was able to slide through the crack between the locked door and the floor.  He did not eat again until breakfast the next day.

96.     J.D. continues to feel unsafe and in fear that he will continue to be similarly mistreated in the future.

**Plaintiff D.M. – Punitive Use of Pepper Spray**

97.     On or about September 2011, Plaintiff D.M. was involved in a fight in his unit. Guards were just outside the dorm area where some children were fighting.  When the guards decided to respond, they ran into the dorm and ordered all the children onto the ground.  The children complied, and so were on the ground and no longer fighting.  Despite the fight being over, guards sprayed all of the youth in the dorm with chemical restraints chemical agent to spray, including children who were not involved in the fight.  Plaintiff D.M. was sprayed in the face.

98.     In January 2012, Plaintiff D.M. was walking on his unit as a guard was passing out mail and a nurse was delivering medication.  The guard said to D.M., "Do you hear me boy, talking to you?" and D.M. responded, "No." The guard pulled D.M. by the shirt, and D.M. asked the guard why he was shoving him.

99.     The guard shoved D.M. to the wall and sprayed him with a chemical agent.  He then banged D.M.'s head against the wall, which caused a bump to develop there.  D.M. was taken to the nurse, who asked him about the knot in his head.  D.M. reported that the guard had shoved him into the wall.  The guard said, "stop lying" and told the nurse that D.M. was banging his head against the window.

100.    D.M. continues to feel unsafe and in fear that he will continue to be similarly mistreated in the future.

**Plaintiff J.P. – Failure to Protect from Harm, Punitive Use of Chemical Agents**

101.    In January 2012, Plaintiff J.P. arrived at the Polk County Jail.  In his first week at the jail, he was subjected to a fight by a few other children in the day room on his unit.  The fight did not last long, and J.P. did not suffer any injuries.

102.    The fight ended when guards, who had been outside of the dorm area where the fight occurred, ran into the area.  By the time the guards arrived, the fight was over.

103.    Upon arrival, many of the children had already run to their room.  J.P. and another youth were still in the dorm area.  Guards arrived and immediately began spraying the children with chemical agents.

104.    J.P., whom the Sheriff's Office has described as the victim in the fight, was the first child to be sprayed with chemical agent.  While he was being sprayed, he yelled for the

guards to stop because he he could not breathe.  J.P. suffers from asthma.  His mother had previously notified Polk County Jail of his condition.

105.    After being sprayed in the face with the chemical agent, J.P. was thrown into the cage. He was left there for at least 30 minutes before being allowed to wash his face. As J.P. screamed for help from the cage, a guard taunted him with, "Oh, you want some more?"

106.    J.P. continues to feel unsafe and in fear that he will continue to be similarly mistreated in the future.

**Plaintiff J.B. – Failure to Provide Rehabilitative Services**

107.    Plaintiff J.B. is 15 years old.  He is in the eighth grade. Plaintiff J.B. is not receiving, and has not received, the rehabilitative services his detention is supposed to provide as a child in the Florida juvenile justice system.  Additionally, J.B.'s education has been interrupted by his detention in the Polk County Jail, where he does not receive appropriate educational services.  Staff have taunted J.B. with foul language and gestures and used hurtful and demeaning terms, including calling J.B. a "fat head."  They have placed him on lockdown in his cell for no apparent reason and have repeatedly threatened to do so on other occasions.

**Plaintiff F.J.P. – Failure to Provide Rehabilitative Services**

108.    Plaintiff F.J.P. is 17 years old.  He is a senior in high school. He intends to pursue a college education.  Despite the fact that he was serving a juvenile sentence at the jail for a probation violation, he was not receiving, and did not receive, the rehabilitative services to which he was entitled under federal law.  Instead, he spent his days enduring a punitive environment where he witnessed staff pepper spray youth and was threatened with lockdown or isolation. Staff also used degrading language towards F.J.P. and foul language around him and other

children.   Additionally, Plaintiff F.J.P.'s education was interrupted by his detention in the Polk

County Jail, where he did not receive appropriate educational services.

### Lack of Training

109.    Although Defendant Judd boasts of the hundreds of hours of "training" his guards

have, Polk County guards lack any meaningful training and experience in working with children.

Defendants do not require guards to have any training or experience in working with children in

order to be hired as guards in the youth units.   As a result of Defendants' actions and omissions,

the named Plaintiffs and all those similarly situated, are being subjected to unconstitutional and

unsafe conditions of confinement.

### EXHAUSTION

110.    Plaintiffs have exhausted all available administrative remedies.

### CAUSES OF ACTION

### Count 1

### Eighth and Fourteenth Amendment Violation:
### Failure to Provide Rehabilitative Services

111.    Defendants' policies and practices of failing to provide Plaintiffs J.B., J.D., and

F.J.P., and all those similarly situated, with rehabilitative services violate the Eighth and

Fourteenth Amendments.

### Count 2

### Eighth and Fourteenth Amendment Violation:
### Dangerously Violent Conditions of Confinement

112.    Defendants' policies and practices of failing to protect Plaintiffs K.J., B.G., D.M.,

J.P., J.B., J.D., and F.J.P., and all those similarly situated, from harm, and treating children with

unlawful force and subjecting them to unreasonable restraints, create dangerously violent conditions of confinement in violation of the Eighth and Fourteenth Amendments.

**Count 3**

**Eighth and Fourteenth Amendment Violation:**
**Punitive Isolation and Deliberate Indifference**

113.    Defendants' policies and practices of subjecting the Plaintiffs on suicide watch and all those similarly situated to punitive isolation without penological justification and the Defendants' deliberate indifference to the mental health needs of children who are placed on suicide watch violate the Eighth and Fourteenth Amendments to the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Honorable Court grant the following relief:

a.    Assume jurisdiction over this matter;

b.    Certify this matter as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) consisting of a class of all individuals who are under the age of 18, and all individuals who are under the jurisdiction of the juvenile court regardless of age, who are or who will in the future be incarcerated at the Polk County Jail; and a subclass of all individuals under the sole jurisdiction of the juvenile court who are or who will in the future be incarcerated at the Polk County Jail;

c.    Declare that the acts and omissions of Defendant violate the U.S. Constitution;

d.    Enter a preliminary and permanent injunction requiring the Defendant, his agents, employees and all persons acting in concert with Defendant to cease their unconstitutional and unlawful practices;

e.    Award Plaintiffs reasonable costs and attorney's fees under 42 U.S.C. § 1988; and

      f.     Grant Plaintiffs such other relief as this Court deems just.

Dated: March 21, 2012                     Respectfully submitted,

                                      /s/ Miriam Haskell
                                      Miriam Haskell
                                      Fla. Bar. No. 69033
                                      Southern Poverty Law Center
                                      P.O. Box 370037
                                      Miami, FL  33137
                                      Tel: (786) 347-2056
                                      Fax: (786) 237-2949
                                      miriam.haskell@splcenter.org

                                      Tania Galloni
                                      Fla. Bar. No. 619221
                                      Southern Poverty Law Center
                                      P.O. Box 370037
                                      Miami, FL  33137
                                      Tel: (786) 347-2056
                                      Fax: (786) 237-2949
                                      tania.galloni@splcenter.org

## CERTIFICATE OF SERVICE

      I hereby certify that, on this 21st day of March, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being personally served on all Defendants identified in the attached service and via email to Anne Gibson, attorney.

                                      /s/ Miriam Haskell
                                      Miriam Haskell

**SERVICE LIST**

**Attorneys for Plaintiffs**
Tania Galloni (Fla. Bar. No. 619221)
Miriam Haskell (Fla. Bar. No. 69033)
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037
Miami, FL 33137
T: (786) 347-2056
F: (786) 238-2949
*tania.galloni@splcenter.org*
*miriam.haskell@splcenter.org*

**Defendants**
Sheriff Grady Judd
POLK COUNTY SHERIFF'S OFFICE
1891 Jim Keene Blvd.
Winter Haven FL 33880
T: 863-298-6200

Major Michael Allen
POLK COUNTY SHERIFF'S OFFICE
1891 Jim Keene Blvd.
Winter Haven FL 33880
T: 863-298-6200

Captain Kim Marcum
Facility Commander
Central County Jail
2390 Bob Phillips Rd.
Bartow FL 33830
T: 863-534-6123