# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| CHANDA HUGHES, as guardian and on behalf of J.B., a minor, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 8:12-cv-00568-SDM-MAP |
| GRADY JUDD, Polk County Sheriff, in his official capacity; and CORIZON HEALTH, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## PLAINTIFFS' PRE-HEARING BRIEF

Plaintiffs K.J., B.G., D.M., J.B., K.G., J.P., Jeremiah Davis[1] and Franky Jean-Pierre, by and through their parents and guardians, and on behalf of themselves and all others similarly situated, bring this action to remedy unconstitutional conditions of confinement for children detained at the Polk County Jail. Plaintiffs have moved the Court preliminarily to enjoin Defendant Sheriff Grady Judd from failing to protect children from harm at the jail, as alleged in Count 2 in the Second Amended Complaint. They submit this pre-hearing in brief in accordance with the parties' agreed-upon Case Management Report, as adopted by the Court on June 5, 2012. (DE 61.)   Plaintiffs will show they are likely to succeed on the claim that dangerous conditions of confinement at the Polk County Jail pose a substantial risk of irreparable harm to the children detained there. Plaintiffs ask the Court to craft an appropriate interim remedy to ensure children's safety pending resolution of this action.

---

[1] Since the filing of this action, Plaintiff J.D. has reached the age of majority (18) and consents to the use of his name in court filings.

# I. STATEMENT OF FACTS

Traditionally, the Central County Jail in Bartow ("Polk County Jail") housed only adults, with a capacity of about 800 individuals. In late September 2011, Defendant transferred the children in Sheriff's custody who were charged as adults from the jail in Frostproof, Florida, to the Polk County Jail in Bartow. In October 2011, Defendant transferred children charged as juveniles from the custody of the Department of Juvenile Justice ("DJJ") to the Polk County Jail. Defendant placed children in the adult jail without modifying the physical plant or hiring staff trained and experienced in working with children.

Today, at any one time there are 70-80 boys and girls detained at the Polk County Jail, including both children charged as juveniles and children charged as adults.[2]  The remainder of the inmates are adult men and women. The vast majority of juveniles detained at the jail are held pre-trial. Those detained at the jail include children as young as nine years old. (Captain Kimberly Marcum Dep. 93:6, July 24, 2012.)[3]  Polk County Sheriff Grady Judd has lauded the housing of children at the adult jail as a great cost-saving measure to deal with "incorrigible kids,"[4] who he has opined "are not children in the traditional sense."[5]

Defendant fosters a punitive adult correctional environment at the Polk County Jail, failing to recognize the unique characteristics, needs and vulnerabilities of a juvenile

---

[2] There is fluidity between these populations at the Polk County Jail. Plaintiff K.J., for example, was originally charged as a juvenile, was subsequently direct filed to be tried as an adult, and was ultimately sentenced to juvenile sanctions. He is currently at a DJJ rehabilitative program.

[3] In an effort to avoid duplicate filings, Plaintiffs will file the relevant deposition transcripts or play the relevant portions of the videotaped depositions for the Court at the hearing on Plaintiffs' motion.

[4] Press Release, Polk County Sheriff's Office, Polk County Juvenile Detention Facility Safe, Secure, & Cost Effective (October 13, 2011), available at http://www.polksheriff.org/NewsRoom/News%20Releases/Pages/10-13-2011PolkCountyJuvenileDetentionFacilitySafe,Secure,CostEffective.aspx.

[5] Jeff Roslow, Lawsuit: Jail abuses juveniles, Polk County Democrat (Apr. 11, 2012).

population. Guards curse at children (J.P. Dep. 85:15, June 20, 2012; Franky Jean-Pierre Dep. 31:3, June 27, 2012; B.G. Dep. 79:3, June 20, 2012; K.J. Dep. 18:10-18:11, June 26, 2012), and call them names meant to demean them, like "bitch" (J.P. Dep. 85:15; B.G. Dep. 79:4), "snitch" (J.P. Dep. 85:15; B.G. Dep. 79:4), "scumbag" (K.J. Dep. 22:23), "cracker" (K.J. Dep. 22:23) or "dumb niggers" (Exh. 3, Decl. of B.M. (July 31, 2012)). Guards also make comments to the children, the vast majority of whom are pre-adjudicated, about them "belonging" in jail (J.P. Dep. 85:18 (describing an example of a guard stating to a child, "That's why you're in jail. F--- you."), or referring to them by their charges, for example by calling certain children "rapists." (K.J. Dep. 18:9.) Plaintiff J.P. testified that guards called the protective custody dorm (also known as the "PC" dorm) as "pussy control" (J.P. Dep. 68:22), and mocked those who sought protection as being "soft" (id. at 68:17).

Additionally, despite the fact that children have unique needs in a custodial setting, children at the Polk County Jail are not provided with structured programming to occupy their time. Instead, they spend most of their time in "forced idleness," either locked in a small cell or locked in a dorm. Although children are permitted to go to school, they spend only between 1-4 hours in the "classroom" on any given day (when school is in session), and are either told to work independently (i.e., teach themselves) or are given work to do that does not correspond in any way to their grade level. (Jean-Pierre, Dep. 27:11-27:14.)

According to Plaintiff J.P., even recreation is at times limited to once a week for children who are charged as adults. (J.P. Dep. 62:15-63:20.) Whether children go to recreation often depends on which guard is working, rather than adhering to a consistent schedule. (D.M. Dep. 22:24-23:5, June 21, 2012.) Deputies do not provide organized

3

activities at recreation. As Plaintiffs J.P. and Franky Jean-Pierre (who was charged as a juvenile) testified, children have had to stuff toilet paper or socks into a sock to create a "football" in order to have something to play with at recreation. (J.P. Dep. 90:9; Jean-Pierre Dep. 28:4-28:5.) "Television" at the jail is limited to instructional programming (i.e., how to perform CPR) that often plays on a continuous loop from a television set up high in each dorm. (J.P. Dep. 12:18-12:24.)

### A. Defendant Has Created Dangerously Violent Conditions of Confinement for Children at the Polk County Jail.

Children detained at the Polk County Jail are subjected to dangerous conditions of confinement as a result of Defendant's policies and practices. Typically, only three to four detention deputies are scheduled to supervise 65-70 boys (Marcum Dep. 69:18, 49:7-21), making the staffing ratio for boys typically between 1:15 and 1:20—nearly twice to three times the federal standard of 1:8 during waking hours.[6] No detention deputy is stationed inside any of the locked dorms where boys are housed, resulting in predictable fights and other avoidable violence.

Rather than take reasonable steps to protect children from these harms, Defendant continues to station its deputies at desks outside the dorms, where lines of sight and sound are limited. Detention Deputy Russell, for example, admitted that there are rooms where the line of sight from outside the dorms, looking into the cells, makes it particularly difficult to see. (Keith Russell, Dep. 53:4-53:25, August 1, 2012.) While Deputy Russell testified that, because of the poor line of sight, guards keep these "blind spot" cells empty, he later

---

[6] National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37,106, 37,108 (June 29, 2012) (to be codified at 28 C.F.R. pt. 115).

acknowledged that there were presently four children being housed in one of those remote rooms, including a child new to the jail. (Id. at 56:8-56:14.)  Deputy Russell further conceded that these four boys were being housed in that one room even though only 15 children were assigned to the dorm all together, which has 8 rooms. (Id. at 56:15-56:19.)

Given that deputies are not stationed inside the dorms, and that there are poor lines of sight and sound, children report that many fights take place in cells without deputies' knowledge. Children also report that when deputies do become aware of these fights after the fact, they typically take no action. Plaintiff K.J., for example, testified that there were two particular rooms in his dorm where children would go to fight because it would be hard to see into them from the deputies' desks. (K.J. Dep. 65:25-67:3.)  K.J. testified that "[a]ll the kids would come out of that room like out of breath and sometimes they get all swollen eye or they're bleeding or something," but that deputies did nothing in response. (Id.)  Plaintiff J.P. also testified that one of the remote rooms in his dorm (which was the protective custody dorm) was used for fights so that guards would not be able to see:

> [K]ids go in room four to the back and they fight, and they fight without the guards knowing. They have people watching, watching out for the guards to make sure when they come in, the kids go out of there from fighting. So they have fights in there, and guards don't even know about it because, you know, it's way off in the corner.

(J.P. Dep. 91:11-91:25.) Plaintiff K.J. similarly testified that while he was involved in seven to eight fights at the jail, but that he was only "caught with" two. He testified that he saw an additional eight to ten fights while he was at the jail. (K.J. Dep. 64-65.)

When the guards are stationed outside the dorms, it is also difficult or impossible for them to hear what is happening in the dorms. Plaintiff J.P., for

example, testified that on one occasion child in the protective custody dorm was "screaming and yelling in pain" while being beaten by other children, but that the guard on duty was outside the dorm on his cell phone and could not hear what was happening. (J.P. Dep. 29:1-32:21 ("[y]ou can't hear anybody once that door is closed.")). In February 2012, youth T.W. was reportedly beaten and tortured by his cellmates over several hours without any guard noticing or intervening. During this time, T.W. reported that he was "hog-tied, beaten with wet towels and choked with a sheet and a pillowcase,"[7] and that he was stripped of his pants and whipped with a wet towel on his buttocks and back."[8]

Though Defendant claims that its detention deputies continuously monitor all the boys at the jail visually, and regularly conduct 15 minute checks of every dorm (of which there are six, each with two stories), these claims are belied by children's testimony that guards spend a large amount of time at their desks as well as by the high incidence of preventable violence among boys at the jail. As Plaintiff J.P. testified:

> When you're eating, they're at the desk. When you're out and about, they're at the desk… [S]o they really can't hear what's going on. They don't know what's going on. They don't know if somebody's getting ready to fight. They don't know until it happens.

(J.P. Dep. 16:19-16:25.)

Defendant's records document at least 20 fights over a six-month period, the vast majority of which Defendant considered serious enough to respond with pepper spray. (See Exh. 1, Incident Reports Produced by Defendants). When predictable and avoidable violence

---

[7] Matthew Pleasant, Questions Surround Teen's Jail Beating, Lakeland Ledger, March 1, 2012.

[8] Jason Geary, Three Teens Accused in Polk Jail Assault Charged as Adults, Lakeland Ledger, March 20, 2012.

occurs, Defendant's records show that deputies respond with the use of dangerous chemical agents, often harming even children not involved in the fight, the victim of the assault, a child trying to wash off the painful spray, or a kid who just talks back.

**B. Defendant's Failure to Provide Minimum Safeguards to Prevent Fights Results in Reliance on Dangerous Chemical Agents, Which Also Harms Children.**

Over the course of about six months, fights among juvenile boys have regularly and predictably occurred at the Polk County Jail. Rather than take reasonable steps to prevent violence inside dorms where children are detained, it is Defendant's policy and practice simply to respond belatedly by spraying dangerous chemical agents in children's faces. Moreover, rather than apply the minimal force necessary to control a situation, it is Defendant's policy to spray children with chemical agent directly in the face, so as to achieve the chemical's "maximum" effect. (Major Michael Allen Dep. 156:18, July 20, 2012.) Indeed, a deputy's deploying pepper spray in a manner other than directly in a child's face is the basis for a reprimand at the Polk County Jail.  (See id. 104:16-105:8, July 23, 2012.) When asked if he would do any differently, the deputy involved testified only that he would spray the children in the face. (Glenn Harrison, Dep. Draft Vol. II 38:8-10, August 3, 2012.)

Defendant's policy and practice of relying on dangerous chemical agents is based at least in part on the erroneous belief that pepper spray is not harmful. In her deposition, Captain Marcum admitted that she had previously stated that pepper spray does not "break bones or cause bruises," and testified that she believed it does not cause injury. (Marcum Dep. 131:20-132:5.)  The Eleventh Circuit, however, has recognized that the chemical agent known as pepper spray causes "intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis

of the larynx . . . and sometimes also causes disorientation, anxiety, and panic in the person sprayed." <u>Danley v. Allen</u>, 540 F.3d 1298, 1309 (11th Cir. 2008) (citations omitted). Medical expert Dr. Daphne Glindmeyer states that especially for children, being sprayed with dangerous chemical agents constitutes a severe traumatic experience that can impact psychological, emotional, and behavioral functioning. Dr. Glindmeyer states that this trauma is not limited to those children who are directly sprayed, but also affects other children who witness the pepper spraying of a child. (Exh. 4, Glindmeyer Expert Report, at 8.)  The painful effects of pepper spray are made all the worse when there is a delay in decontamination or children are offered only hot water with which to shower, as is often the case at the Polk County Jail. (D.M. Dep. 63:10-63:22.)

When responding with dangerous chemical agents to fights that could have been avoided, deputies regularly harm even children not involved in the fight, the victim of the assault, a child trying to wash off the painful spray, or a kid who just talks back. In September 2011, for example, deputies pepper sprayed six youths, including some children not involved in the fight. According to Deputy Choquette's account, even after the fight was over three of the youths were sprayed again "to gain compliance" with the officers' order to lay [sic] still on the ground. (Exh. 1, Bates Nos. 3630-31.)  It was only after that time that the detention deputies "determined those inmates who were fighting and those that had been spectating [sic]."  Among those sprayed was a 4'11" juvenile weighing 100 pounds, and one that weighed 105 pounds. (<u>Id.</u>, at Bates No. 3655, 3670.)  While Deputy Choquette reported that some of the children returned to their cells before being sprayed, (<u>Id.</u>, at Bates No. 3630) Plaintiff D.M. testified that all children were sprayed. (D.M. Dep. 29:6.)  Among those not

fighting was youth S.W., who reports that he was nevertheless pepper sprayed, and that when he tried to crawl to the shower to wash the pepper spray off, he was pepper sprayed again. (Exh. 2, Decl. of S.W. (Feb. 17, 2012).)  S.W. further reports that when his friend said to one of the guards, "Hey, Frank,[9] this don't burn that bad how you all be talking," his friend was also pepper sprayed again.

In October 2011, guards again responded to fights with pepper spray. In one incident, the guard pepper sprayed a juvenile, who reportedly had attempted to hit another child, in the face, because the juvenile did not comply with an order to "get on the ground."  (Exh. 1, Bates No. 3734.)   On another occasion, detention deputies pepper sprayed four boys for fighting, including a 5'4" youth weighing 115 pounds. (Exh. 1, Bates No. 3689.)  On a third occasion, three detention deputies responded to two children fighting (including Plaintiff K.J.), who were described as on the floor "wrestling and striking on another with their hands" (id., Bates Nos. 3700-01), and pepper sprayed both boys in the face  (id., Bates Nos. 3698-99). The boys involved each weighed 150-155 pounds. (Id., Bates Nos. 3697, 3706.)

In November 2011, the pattern continued.  On one occasion, a guard pepper sprayed two youths who were fighting. But when the fight was over, and one of the two youths tried to get to the shower, the guard pepper sprayed him again, reportedly for failing to comply with an order to lie down on the floor. (Id., Bates No. 3736.)  At his deposition, this deputy testified incredulously that he did not know why a child who is pepper sprayed would want to get to water. (Samuel Gay Dep. 64:7-64:24, July 25, 2012.)   The boys involved in this incident each weighed 140-145 pounds. (Exh. 1, Bates Nos. 3735, 3740.)

---

[9] Some youths call deputy Franklin "Frank."  (Jacques Franklin Dep. 10:22-23, July 27, 2012.)

On another occasion in November, guards responded to a fight among three juveniles, two of whom complied with the order to stop fighting and lie down on the ground. When the third youth, Plaintiff D.M., did not comply with the order to lie down on the ground, and instead "took a few steps away from the other inmates," the guard pepper sprayed him in the face until he went down to the floor, even though by that point the fight was over as the other two children were already on the ground. (Id., Bates Nos. 3746-49.)  On a third occasion in November, three guards responded to a fight among three youths; when the youths did not comply with the order to stop fighting and return to their cells, a guard pepper sprayed each of them in the face. (Id., Bates No. 3760.)  The boys involved weighed 140-145 pounds. (Id., Bates Nos. 3767, 3775.)  On a fourth occasion, a guard pushed another 140-pound youth against the wall for striking another youth, and, when the youth tried to strike again, pepper sprayed him and took him down the ground. (Id., Bates Nos. 3797-99.)  On the last day of November, another guard pepper sprayed two boys, weighing 149 and 155 pounds, respectively, for fighting. (Id., Bates Nos. 3787-89.)

In December 2011, three guards responded to a fight involving six children; the guards reported that they entered the dorm, ordered the youths to stop fighting and lie on the ground, and then "sprayed several juveniles."  (Id., Bates No. 3864.)  One guard described this as "mov[ing] from fight to fight" using the chemical agent on those who continued to fight. (Id., Bates No. 3873.)  Another guard reported that they sprayed the juveniles "until they complied with our verbal orders."  (Id., Bates No. 3874.)  The six children who were pepper sprayed weighed no more than 150 pounds each, and two of them weighed 119 and 106 pounds respectively. (Id., Bates Nos. 3828, 3839, 3850, 3862, 3872, 3883.)

In January 2012, two juveniles were pepper sprayed for fighting in one of the cages. When the children attempted to wipe their eyes, the guard who pepper sprayed them handcuffed them with their hands behind their backs. (Id., Bates No. 3899.)  Two days later, the same guard pepper sprayed two other boys for fighting on the second tier of their dorm. After the boys separated, another guard pepper sprayed one of the boys a second time, "to make him comply and lie prone on the floor."  (Id., Bates Nos. 3918-19.)  The other boy then "dropped prone to the floor without being sprayed a second time."  (Id., Bates No. 3918.)

Later than month, several children "jumped" Plaintiff J.P. while in the dayroom and began to fight him. According to J.P., when the guards came, four of the boys ran into a cell, leaving only J.P. and one other boy wrestling on the ground. The guards pepper sprayed the two boys on the ground (id., Bates No. 3941), including J.P., who was the victim of the attack and who suffers from asthma. (J.P. Dep. 55:15-17.)  Although they now deny it, the guards then proceeded to pepper spray the boys who were already back in a cell. (Exh. 2, Decl. of S.R. (Feb. 14, 2012).)  The guards acknowledge that they followed the children who ran into the cell, but claim that this was "to identify" them. (Exh. 1, Bates No. 3951.)  Plaintiff J.P. testified that the guards sprayed the boys in their cell after the fight was over. (J.P. Dep. 88:16-88:25.)   Three days after the incident, S.R. asked one of the guards involved, "Why did you come in my room and spray me?"  (Exh. 1, Bates No. 4898.)  Four of the six boys who were pepper sprayed in this incident weighed 130 pounds or less. (Id., Bates Nos. 3939, 3950, 3960, 3970, 3981, 3991.)

In February 2012, a guard observed Plaintiffs K.J. and B.G. fighting while in the protective custody dorm. When they did not comply with the order to stop fighting, the guard

attempted to pepper spray both children, but only sprayed K.J. (Id., Bates No. 4017.)  The children stated they had been fighting over food. (Id., Bates Nos. 4018-19.)  The next day, two guards responded to two boys fighting in a dayroom. When the boys did not stop fighting, the guard sprayed one of the boys, aiming for his face but getting the back of his head. (Id., Bates Nos. 4032-33.)  Later than month, a youth reportedly ran out of a dorm and started hitting Plaintiff D.M., who was assisting a guard with the laundry exchange. When the youth did not comply with the guard's order to stop, the guard pepper sprayed him, causing Plaintiff D.M. to "receive[] some residual spray."   (Id., Bates Nos. 4072-73.) Another guard then came over and pepper sprayed both children, including D.M., the victim of the assault. (Id., Bates Nos. 4073.)

In March 2012, a guard observed a large child (weighing more than 250 pounds) strike another child (weighing 140 pounds) "in the head with a closed fist."  According to the guard, the larger child got on top of the smaller child and was punching him. (Id., Bates Nos. 4088-89, 4096.)  The two boys fell onto a portable metal bunk that was next to the dorm glass, and the bunk collapsed as the two boys continued to struggle. The guard entered the dorm, and then sprayed both children with chemical agent, in the face.

The predictable (and by now evident) pattern of violence among boys at the Polk County Jail arises from unacceptable staffing ratios and Defendant's refusal to simply station deputies inside the areas where boys are housed. Defendant's own records show that when deputies are close to the juveniles they are supposed to be monitoring, they are able to intervene quickly and effectively to resolve conflict without resorting to dangerous chemical weapons. For example, in December 2011, a guard was able to quickly separate two children

who began to fight in the recreation area when the deputy was also there. Having been in the same area as the youths, the guard was able to hear an argument beginning to develop, anticipate the fight, and promptly intervene to resolve the matter without pepper spray. (Exh. 1, Bates No. 3895; Joseph Choquette Dep. 33:19-33:24, July 26, 2012.)  Similarly, in January 2012, a guard was able to quickly intervene and separate two fighting youngsters, and remove the aggressor, without resorting to pepper spray, as he was only "a couple of feet away" when the incident occurred. (Exh. 1, Bates No. 3910.)

Notably, the record shows that far fewer fights occur in the girls' unit at the Polk County Jail, where two detention deputies are assigned to supervise 5-10 girls, creating a staffing ratio of at least 1:5. This not only reduces the likelihood of fights occurring, but also permits officers to respond to fights without having to resort to the use of pepper spray. In January 2012, for example, deputies in the girls' dorm inadvertently left two dorm doors open at the same time. Two girls stepped out of the dorms, and one of the girls chased the other and began punching her. The deputies were able to separate the two girls and end the fight without resorting to dangerous chemical agents. (Id., Bates Nos. 4002-03.)

### C. Defendant Fails to Protect Children From Harm by Using Dangerous Chemical Agents to Force Compliance with Rules and Orders.

Detention deputies at the Polk County Jail also regularly threaten to use pepper spray against children who fail to comply with orders. When children do not accede, deputies force compliance though the use of pepper spray.  On one occasion, for example, Plaintiff D.M. was sprayed following an order to go to bed. D.M. and three other children asked if they could finish their last game of cards prior to going to bed, and the guard said no. As the children continued to play cards, the guard threatened to pepper spray them. D.M. and the

others then began walking to their cells slowly, and the guard sprayed all four of them while walking. (D.M. Dep. 62:6-63:5.)   On another occasion, a guard pepper sprayed Plaintiffs B.G. and K.J. for failing to comply with his order to stop singing or "quiet down" while both boys were confined to the cage for suicide watch. (Russell Dep. 88:1; K.J. Dep. 43:1-43:12; B.G. Dep. 34:11-34:13.)  As a result of the spraying, the boys suffered trouble breathing and burning sensations on their skin. (B.G. Dep. 42:9.)  The guards laughed. (Id. at 42:15.)

On Christmas night, three girls were beating on the window in one of the cells. According to Deputy Cranor, the girls stated they could see the boys from their window. (Jessica Cranor Dep. 179:22, July 27, 2012.)   A guard ordered the girls to stop, and threatened that otherwise they would be moved to separate cells and locked down for the rest of the night. (Exh. 1, Bates Nos. 3815-16.)  When one of the girls was told to leave but refused, the guard told her "that she was going to be [pepper] sprayed if she did not exit the cell."    (Cranor Dep. 181:3-182:11.)  The girl still would not leave, so the guard pepper sprayed her in the face. When the girl then tried to go to the sink to rinse her face, another guard ordered her out of the cell, and when she did not comply, forcibly removed her.

Deputies deploy pepper spray without regard to the physical or mental health condition of the children sprayed. On two separate occasions in January 2012, guards pepper sprayed a girl who is mentally ill for failing to comply with orders. On the first occasion, the girl was being house alone in a dorm because she was on suicide watch, and asked to be moved to a bunk that was not under the lights so that she could sleep. When that request was denied, the girl told a guard that she would just sleep on the floor under her bunk; the guard responded that if the girl did not sleep on the top of the bunk "she would be shackled" to it."

14

(Exh. 1, Bates Nos. 3929-33.)  The girl moved away from her bunk, but ran back to it when the deputy displayed the shackles. Once the guards exited the dorm again, the girl walked to a table in the dayroom and sat on it. Guards then entered the dorm to shackle the girl. A guard placed her hand on the girl's back, and because she failed to move, the Sergeant ordered a guard to pepper spray her. (Id., Bates Nos. 3934-35.)  The girl tried to avoid the spray; so the guard "took a hold of [her] suicide smock" and sprayed her in the face. (Id.) Later that month, the girl was pepper sprayed again for resisting being shackled to a bed.[10]

In February 2012, three boys reported "that they wanted to kill themselves," and were therefore moved to a holding cage. (Id., Bates Nos. 4046-49.)  Initially, all three boys refused to put on "suicide smocks," but two of them eventually agreed. While the two stripped and changed into those smocks while inside the cage, guards repeatedly ordered the third boy, M.H., to strip and put on a suicide smock. He would not. When guards then ordered M.H. to face the wall, he refused, and the lieutenant gave the order to pepper spray him. A guard pepper sprayed "the face and upper torso" of M.H., causing him to fall to the ground. The lieutenant then "secured" M.H. while guards forcibly removed his clothes. The guards then left the holding cage and handed M.H. a suicide smock to don. (Id., Bates Nos. 4046-47.)

In March 2012, Sergeant Mitchell ordered Plaintiff Jeremiah Davis to put his yellow uniform shirt (which goes over the white t-shirt). Davis refused and was ordered to return to his cell, which he did. Sergeant Mitchell and Detention Deputy T. Brown, each of whom

---

[10] On this occasion, the girl reportedly "began to act erratic," pacing around the dorm and hitting "her fists on the dorm windows" and "punch[ing] the cell doors in anger."  (Id., Bates Nos. 4025-28.)  When ordered to sit on her bunk, the girl screamed, stormed off, and started to walk up the stairs in her dorm. When the guard obtained authorization to shackle the girl to her bunk, the girl ran up the stairs. The guard then informed the girl that "her resistance would not be tolerated and that if she further refused, she would be sprayed."  When the girl did not comply and tried to get to another dorm, the guard took her down to the ground. When the guard then attempted to shackle the girl again to the bunk, she resisted. So the guard pepper sprayed her in the face.

weighs about 300 pounds, then followed Davis into his room to "counsel him" about his behavior. Sergeant Mitchell testified in deposition that he believed Davis was delusional; despite that, he did not call a nurse. (Sergeant Alvin Mitchell Dep. 211:20-211:23, July 20, 2012 ("I thought he was definitely losing it there for a minute.")) When Davis reportedly "began to pace around the room with his fist balled up," was cursing at the officers, and then "stepped toward" Sergeant Mitchell, Detention Deputy Brown sprayed him with chemical agent in the face. (Exh. 1, Bates Nos. 4068-69.) After spraying Davis, the guards cursed at him while they had him on the ground with his arm twisted behind his back. (Davis Dep. 24:1-24:16, June 22, 2012.)

In April 2012, a deputy observed that one of the children held in an isolation cell "had flooded his cell and threw his food on the floor in his cell and refused to relinquish his tray and cup." (Exh. 1, Bates Nos. 4080-81.) When this child complied with another deputy's order to go to the back of the cell, but did not comply with the order to face the wall, that deputy pepper sprayed him in the face, claiming that the child had raised his arms "as if to take a fighting stance." Although one of the deputies stated that the child "raised his arms quickly like he was preparing to fight" (id., Bates Nos. 4079), neither deputy claimed that this child—who weighed 155 pounds—even approached either one of them. In response to questioning about why he did not simply close the isolation cell door and leave the child alone to calm down, the guard could only justify his use of spray by the claim that the child had refused a verbal order: "He was asked several times by myself and the other deputy to put the tray out." (Andrew Hertel Dep. 112:8-112:14, August 1, 2012.)

Although Defendant's discovery production does not go beyond April 1, 2012, there is ample evidence that Defendant's policy and practice continues unabated.[11] Since that time, for example, a guard pepper sprayed a girl named A.S., after a guard and nurse antagonized her for refusing to take her medication. (Exh. 2, Decl. of K.G.) Plaintiff B.G. was pepper sprayed after arguing with a youth who then began hitting him. (B.G. Dep. 69:7-69:9.) When guards arrived and ordered the boys to separate, B.G. could not lift himself up off the ground because his arms were still in his shirt, and the other boy was on top of him. Guards pepper sprayed them both. (Id. at 70:1-72:21.) A guard sprayed P.P. for refusing to be locked down in his cell when other children were in the day room, and testified that P.P. was "playing around." When the guard pulled out his canister of pepper spray, the child ran, and the guard sprayed him in the back of his head. (Russell Dep. 106:1-107:8.)

Defendant's abusive use of chemical agents extends to all sorts of ordinary juvenile behavior. Defendant's records, and the testimony of detention deputies, establish that it is Defendant's policy and practice to spray dangerous chemical agents on children for disobeying institutional regulations, to force compliance with an order, and when a child is "causing a disturbance," which includes things such as singing. Defendant applies this policy even against children who suffer from serious mental illness, and/or who are expressing suicidal ideation, and/or who are locked into an isolation room.

---

[11] Since June 7, 2012, Defendant has declined to produce any discovery to Plaintiffs other than information related to Defendant's expert. Of the discovery produced, the last incident report involving pepper spray is dated April 1, 2012, even though chemical agents continue to be regularly used against juveniles at the jail. As of this filing Defendant has not produced any of the additional discovery that on July 25, 2012, in opposition to Plaintiffs' Motion to Compel, Mr. Campbell represented to the Court was available. Defendant also declined to serve any response to Plaintiffs' June 19, 2012 Second Request to Produce, which by agreement of the parties was due on July 26, 2012. On August 9, 2012, Defendant asked Plaintiffs for an additional 7 days to respond to that request, but to date has not provided any assurance that additional information will be produced.

During incidents where guards respond to an alleged fight or failure to comply and do not use pepper spray, it is significant that guards note in incident reports the reason why they did not spray. On October 8, 2011, Detention Deputy Cannon ordered a juvenile to return to this cell, which he refused. Deputy Cannon "grabbed" him by the uniform and "escorted him back to his cell." When the youth tried to hold on to the doorframe to keep from having to go into the cell, Deputy Cannon pushed him in and locked the door. Deputy Cannon's report suggests that he intended to use pepper spray but did not have the chance to before the situation resolved. (Exh. 1, Bates No. 3600.) On September 16, 2011, Detention Deputy Petit-Frere observed two children fighting in the dayroom. Deputy Petit-Frere, who was not inside the dayroom at the time, called for assistance entered the room with Deputy LeBlanc. Deputy Petit-Frere attempted to spray the children, but could not remove his pepper spray. Instead, he physically removed one of the children from the other, and the fight ended. Deputy Petit-Frere's incident report does not note any injuries to himself or Deputy LeBlanc as a result of the physical intervention. (Id., Bates No. 3624.)

## II. ARGUMENT

While federal courts have a policy of minimal intrusion into the affairs of prison administration, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." Williams v. Edwards, 547 F.2d 1206 (5th Cir. 1977) (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)); Campbell v. Beto, 460 F.2d 765, 767-68 (5th Cir. 1972). Where plaintiffs show that they are likely to succeed on their claim that a jail has failed to protect prisoners from a substantial risk of harm, entry of a preliminary injunction is appropriate.

Maynor v. Morgan County, Alabama, 147 F. Supp. 2d 1185, 1188 (N.D. Ala. 2001) (granting preliminary injunction to remedy unconstitutional conditions of confinement).

In this case, Plaintiffs seek a preliminary injunction to enjoin Defendant Grady Judd, sued in his official capacity as Sheriff of Polk County, from failing to protect children detained at the Polk County Jail from dangerously violent conditions of confinement as alleged in Count 2 of the Second Amended Complaint. To prevail on their motion for preliminary injunction, Plaintiffs must demonstrate (1) a likelihood of success on the merits; (2) that the plaintiff class are at risk of irreparable injury absent the injunction; (3) that the threatened harm to the plaintiff class outweighs the potential harm to the defendant; and (4) that the injunction would not be adverse to the public interest. Haitian Refugee Ctr., Inc. v. Nelson, 872 F.2d 1555, 1561-62 (11th Cir. 1989) (aff'd, 498 U.S. 479 (1991)); Shatel Corp. v. Maota Lumber and Yacht Corp., 697 F.2d 1352, 1354-55 (11th Cir. 1983); Canal Auth. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). In a case such as this, where the equities weigh heavily in favor of granting an injunction, Plaintiffs need only show a "substantial case on the merits" to meet the "likelihood of success" prong. Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir.1986).

## A.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The Supreme Court of the United States has recognized that "children are constitutionally different from adults." Miller v. Alabama, 132 S. Ct. 2455, 2464-66 (2012). See generally Graham v. Florida, 130 S. Ct. 2011 (2010), as modified (July 6, 2010); Roper v. Simmons, 125 S. Ct. 1183 (2005). Among these differences are children's "diminished culpability and greater prospects for reform[.]" Miller, 132 S. Ct. at 2474. This recognition

rests not only on common sense, but also on science and social science research. Id. (See also Expert Report of Dr. Daphne Glindmeyer, at 2-5.)

As the Court observed in Graham, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds . . . [including in] parts of the brain involved in behavior control." 560 U.S., at ——, 130 S.Ct., at 2026. Among these is a youngster's "inability to assess consequences." Miller, 132 S. Ct. at 2465. In Graham, for example, the Supreme Court specifically held that juvenile offenders may not be sentenced as though they are "incorrigible," as "'incorrigibility is inconsistent with youth.' " 560 U.S., at ——, 130 S.Ct., at 2029. Moreover, youth is a "condition of life when a person may be most susceptible to influence and to psychological damage." Miller, 132 S. Ct. at 2467 (quoting Eddings v. Oklahoma, 455 U.S. 104, 115 (1982)).

Plaintiffs are likely to succeed on the merits of their claim that Defendant fails to protect children in its custody from harm. As children, Plaintiffs and the class they seek to represent, are fundamentally different from adults. To pass constitutional muster, the conditions of their confinement must take into account children's developmental differences, inability to assess consequences, and particular vulnerability to harm.

**1. Defendant Fails to Protect Children in his Custody from Harm, Creating Dangerous Conditions of Confinement.**

Both the Eighth and Fourteenth Amendments require that jailers not expose prisoners to a substantial risk of harm, including harm from other prisoners. Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir.1986) (inmates have "a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates"). When jails fail to provide adequate staff to supervise,

monitor, and manage children in their custody, they create an unacceptable risk of harm. See, e.g., LaMarca v. Turner, 995 F.2d 1526, 1537 (11th Cir. 1993); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (inadequate staff may rise to deliberate indifference as to prisoner safety). The Constitution prohibits such unsafe conditions of confinement "even if no assault or similar physical injury has yet occurred." Marsh v. Butler County, Ala., 268 F.3d 1014, 1034 (11th Cir. 2001) (citing Farmer, 114 S. Ct. at 1983). Officers may be liable for violations of the Constitution where they are "aware of a substantial risk of serious harm to the inmates and [do] not take reasonable measures to alleviate that risk.").

In order to succeed on a "failure to protect" claim, a child "must show that he is incarcerated under conditions posing a substantial risk of serious harm." Laube v. Haley, 234 F. Supp. 2d 1227, 1244-45 (M.D. Ala. 2002). Furthermore, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." Wilson v. Seiter, 501 U.S. 294, 304 (1991).

In this case, the record shows that Defendant maintains conditions at the Polk County Jail that fail to protect children from harm. Although the juvenile population at the Polk County Jail is relatively small, over the course of just six months there were at least 20 documented fights at the jail involving more than 50 children. Plaintiffs' testimony establishes that there are in fact many more fights than those documented, but that detention deputies are often unaware of, or indifferent to, fights among children that take place inside cells. Plaintiffs testified that children often use remote cells (those in the corners of a

particular dorm) to engage in fights as those have the poorest line of sight for officers, who are stationed outside.

The dangerous conditions of confinement that permit this level of violence include, but are not limited to: (1) failing to station detention deputies inside any of the dorms where children are housed, leaving them unsupervised for various periods of time; (2) failing to provide a staffing ratio of at least 1:8 during waking hours; (3) relying on obstructed lines of sight and sound, and cameras with limited views, to supervise children; and (4) failing to provide children with adequate structured programming to occupy their time. (See Expert Report of Paul DeMuro, at 6, 10, 11, 14-15.)

That male youths are likely to fight when confined together for long periods of time without adequate supervision or distraction is not surprising. But even if it were, the frequency and regularity with which fights among youths detained at the Polk County Jail occur has put officials on ample notice that current staffing and supervision practices are not adequate to keep children safe. Defendant's failure to remedy these conditions constitutes deliberate indifference to a substantial risk of harm. Cf. D.S. ex rel. Stinson v. County of Montgomery, Ala., 286 F. App'x 629, 634 (11th Cir. 2008) (there was insufficient evidence to establish deliberate indifference to the substantial risk of harm resulting from sexual assault of minor where "detainee-on-detainee violence was 'very rare' … and no detainee had complained of being sexually assaulted" while at the facility).

There is also evidence of serious issues with the classification and housing assignment of children. On February 24, 2012, for example, T.W. was allegedly attacked by his three roommates, while the four youths were locked down in one cell in response to a

food fight. The alleged attack was so severe that it led to charges of attempted murder charges against the three alleged assailants. As Deputy Harrison, who was working that shift, testified, these four youths were locked down together into one cell (its full capacity), even though the dorm was nowhere near capacity. The youths further were housed in the most remote cell in that dorm, a corner cell on the upper tier. Though deputies are supposed to perform regular 15-minute rounds, Deputy Harrison conceded that this was not done. The police report recounts how T.W. was allegedly beaten and tortured by his roommates over the course of several hours, without any deputy noticing much less intervening.[12]

### 2. Defendant Exhibits Deliberate Indifference to the Substantial Risk of Harm to Children Caused by his Use of Dangerous Chemical Agents.

Rather than properly supervise and engage children, Defendant permits fights to occur, and then harms children who fight (or who are found near a fight or who are the victim of a fight or who attempt to get to water after being pepper sprayed relative to a fight) by using dangerous chemical agents against them. Of the fights for which the jail has provided incident reports, 85 percent resulted in the use of pepper spray. And in those instances resulted in at least 46 children being pepper sprayed following fights over the course of just a few months.

It is Defendant's policy and practice to allow detention deputies to carry dangerous chemical agents at all times when interacting with children, and to authorize them to deploy those chemicals spontaneously and without supervisory authorization, creating the substantial risk of serious injury to children. Deputies used these dangerous chemical agents without

---

[12] Plaintiffs' expert has to date been unable to fully evaluate those systems as Defendant has refused to provide the necessary information.

regard to the vulnerabilities of the children in their custody, and thus have pepper sprayed children who suffer from asthma (J.P.), heart conditions (M.A.), and mental illness (D.M., M.H., and mentally ill girl on suicide watch).[13]   In addition, it is Defendant's policy and practice to use pepper spray against children in order to force compliance with a rule or order, even when that rule or order does not affect the safety of the child or any other person (failing to stop singing, failing to wear a uniform shirt, failing to exit a cell, failing to strip and put on a suicide smock). This use of dangerous chemical agents is contrary to recognized standards for juvenile secure facilities. (DeMuro, at 5.)

## B.  ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS FACE A SUBSTANTIAL RISK OF HARM.

Plaintiffs must next show that they are at risk of irreparable harm. <u>Newman v. Alabama</u>, 683 F.2d 1312 (11th Cir.1982). Whether an injury is irreparable may depend on whether it can "be undone through monetary remedies." <u>N.E. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville</u>, 896 F.2d 1283, 1285 (11th Cir. 1990); <u>see</u> <u>also</u> <u>United States v. Alabama</u>, 813 F. Supp. 2d 1282, 1317 (N.D. Ala. 2011).   It is well-established that "injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1318-19 (11th Cir. 2010) (<u>quoting</u> <u>Farmer</u>, 511 U.S. at 845) (affirming injunction against prison's chemical agent policy). "In such circumstances, the irreparable-injury requirement may be satisfied by

---

[13] When asked whether there are certain types of individuals against whom pepper spray should not be used, Deputy Cranor testified that she had not been trained on any. (Cranor Dep. 131:1-10, July 27, 2012.)  On re-direct by Defendant's counsel, the deputy was able only to recall that she had been told that if someone "[has] a breathing machine, something that is actually providing them oxygen, it would be best to avoid spraying them with pepper spray." (<u>Id.</u> at 200:8-21.)

demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." Id. at 1318.

In this case, Plaintiff children have suffered and continue to suffer substantial risk of serious harm from Defendants' failure to protect them and from Defendants' excessive and punitive use of dangerous chemical agents against them. Plaintiffs have suffered physically, psychologically and emotionally, and continue to be at risk of such harms. See, e.g., Thomas v. Bryant, 614 F.3d 1288, 1322 (11th Cir. 2010) (holding that monetary relief would not provide inmate with protection from future irreparable injury from unconstitutional use of chemical agents). No amount of money or eventual success on the merits could possibly compensate them for the ongoing harm and risk of harm being inflicted upon them presently. See Ray v. Sch. Dist. of DeSoto County, 666 F. Supp. 1524, 1535 (M.D. Fla. 1987) (granting preliminary injunction where neither a monetary award nor prevailing on the merits could compensate Plaintiffs). Because of their age, children are particularly vulnerable to irreparable harm, such as mental anguish. See e.g., H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1088 (11th Cir. 1986).

## C.  THE HARM TO PLAINTIFFS OUTWEIGHS POTENTIAL HARM TO DEFENDANTS

The irreparable harms faced by Plaintiffs in this case, including the substantial risk of serious physical, psychological, and emotional harm, outweigh any harm Defendants might experience from a preliminary injunction of their unconstitutional policies and practices. (See, e.g., Dr. Glindmeyer, at 9-10.)  The named Plaintiffs, and the class they seek to represent, are incarcerated children with no recourse for self-help, medical attention, or even parental assistance when endangered by Defendants' policies and practices. These harms

outweigh any inconvenience that may be caused to Defendants by requiring them to provide a safe environment for children and restricting Defendants' unlawful use of dangerous chemical restraints. In fact, Defendants would likely benefit from the relief requested, as providing a safe, legal and non-punitive environment for children in their custody is ultimately in the Defendants' financial and security interest as well.

### D.  THE PUBLIC INTEREST & POSTING A BOND

Lastly, for the reasons stated in their Motion for Preliminary Injunction, Plaintiffs submit that the preliminary relief requested is not adverse to the public interest for the reasons and that they should not be required to post a bond.  (DE 4.)

### III. CONCLUSION

Based on the foregoing, as well as evidence to be presented at the September 10, 2012 hearing on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs respectfully request that requested injunction issue.

Respectfully submitted,

SOUTHERN POVERTY LAW CENTER

By: /s/ Tania Galloni
Tania Galloni (Fla. Bar. No. 619221)
Miriam Haskell (Fla. Bar No. 69033)
P.O. Box 370037
Miami, FL 33137
T:  (786) 347-2056
F:  (786) 238-2949
tania.galloni@splcenter.org
miriam.haskell@splcenter.org

BAKER & McKENZIE LLP
Donald J. Hayden (Fla. Bar. No. 097136)
donald.hayden@bakermckenzie.com
Joseph J. Mamounas (Fla. Bar. No. 041517)

joseph.mamounas@bakermckenzie.com
Sabadell Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

Steven Chasin (admitted *pro hac vice*)
815 Connecticut Ave., N.W.
Washington, DC 20006
Telephone: +1 202 835 6132
Facsimile: +1 202 416 7132
steven.chasin@bakermckenzie.com

Joseph P. Rindone (admitted *pro hac vice*)
1114 Avenue of the Americas
New York, NY 10036
Telephone: +1 212 626 4941
Facsimile: +1 212 310 1723
joseph.rindone@bakermckenzie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 13, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.

/s/ Tania Galloni
Tania Galloni