# EXHIBIT 3
# (1 of 4)

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CHANDA HUGHES, as guardian and on behalf of J.B., a minor; BRENDA SHEFFIELD, as guardian and on behalf of J.D., a minor; FRANKY JEAN-PIERRE; MICHELLE MINOR, as guardian and on behalf of J.P., a minor; LISA JOBE, as guardian and on behalf of K.J., a minor; AMY GAGE, as guardian and on behalf of B.G., a minor; CRYSTAL CUYLER, as guardian and on behalf of D.M., a minor; NIKEYTA MATTHEWS, as guardian and on behalf of K.G., a minor; and ANITA NAVA, as guardian and on behalf of A.H., a minor; on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 8:12-cv-00568-SDM-MAP |
| v. | ) ) | |
| GRADY JUDD, Polk County Sheriff, in his official capacity; and CORIZON HEALTH, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

# INITIAL ASSESSMENT OF CONDITIONS OF CONFINEMENT
# FOR YOUTH HELD AT THE POLK COUNTY JAIL

Baker & McKenzie, LLP, 1111 Brickell Avenue, Suite 1700, Miami, FL  33131.

**INITIAL ASSESSMENT OF CONDITIONS OF CONFINEMENT
FOR YOUTH HELD AT THE POLK COUNTY JAIL**

## I.  INTRODUCTION

My name is Paul DeMuro.  My address is 1201 Futch Creek Rd., Wilmington, NC, 28411.  I have been retained by the Southern Poverty Law Center to review a variety of materials regarding the Polk County Jail (also known as the Central County Jail, referred to here as "PCJ") and to conduct an on-site assessment of the facility, focusing my review on allegations relating to the excessive use of force, including the use of pepper spray, and the failure of PCJ to protect youth from harm.

### A.  Expertise

I have forty-two years of experience in juvenile justice institutional and community programs as well as child welfare services.  I have been superintendent of a large urban, secure juvenile detention center and a superintendent of a large training school for juvenile delinquents.  I have served as Assistant Commissioner of the Massachusetts Department of Youth Services, overseeing all parole supervision for adjudicated juveniles in Massachusetts.  In Pennsylvania from 1975-78, I was responsible for educational services in Pennsylvania's adult prisons.  In the late 1970's, I was appointed by the Governor in Pennsylvania to serve as the Commissioner of Children and Youth in Pennsylvania.  As the Commissioner, I supervised the superintendents of Pennsylvania's juvenile justice institutions, including all of the State's secure institutions for the most violent juvenile offenders.  As Commissioner, I also developed state regulations that governed the operation of county secure juvenile detention centers.

I have developed public and contract residential and non-residential programs for delinquent youth, including model secure units for violent offenders.  I am knowledgeable about contemporary juvenile justice and child welfare program standards, policies and practices.  For over six years I served as the Federal Court monitor in a class action case in Florida, overseeing on a regular basis conditions in juvenile correctional institutions.  I held a similar appointment for the Federal District Court in Oklahoma.  As Federal Court monitor, I monitored Florida's and Oklahoma's secure institutional and community programs for youths and reported my findings to the Federal Court.  I have been appointed as a mediator and an expert to help resolve class action juvenile justice and child welfare cases.

As a consultant, I have assessed secure juvenile justice institutions in a number of states.  My clients have included state juvenile justice agencies, county juvenile justice agencies, the National Juvenile Detention Association, private foundations and the Civil Rights Division of the United States Department of Justice.  Currently I serve as the Federal Court Monitor for a class action case regarding the conditions of confinement for the City of New Orleans' secure juvenile detention center.

1

I have co-edited an anthology regarding violent offenders (Violent Juvenile Offenders, 1984) and have co-authored a book regarding the problems of overcrowding in the California Youth Authority's secure institutions (Reforming the CYA, 1988). I have written a number of reports and articles concerning young offenders.

Exhibit 1 contains my CV and consulting prospectus which more fully set out my educational, employment and consulting experience. Exhibit 1 also contains a list of my publications. Exhibit 2 identifies the recent court cases in which I have served as an expert witness or court-appointed expert/monitor.

The opinions expressed in this report are based on: (a) My experience in the field and my knowledge of juvenile justice standards, policies and good practices; (b) A review of relevant incident reports and other written documentation regarding the operation of the PCJ[1]; and (c) a brief on-site facility assessment that took place on May 22, 2012.

## B. Overview of the Assessment

In addition to adults, PCJ holds two types of youth: (1) juvenile justice children (meaning youth who by order of the local juvenile court are held in secure confinement on a pre-adjudication status); and (2) youth who have been direct filed to the adult court by local prosecutors, and whose cases are therefore pending in adult court.

On May 21, 2012 approximately seventy-four youth were locked up in the PCJ. Thirty-three of these youth (twenty-nine boys and four girls) were being held in a pre-adjudicative status on orders from the local juvenile court. Approximately forty-one of the youth (thirty-seven boys and four girls) were in a pre-adjudicative status in adult court, having been direct filed by local prosecutors or waived by the juvenile court.[2]

On May 22, 2012, I conducted an on-site assessment over the course of approximately six hours. A photographer accompanied me to take pictures of the jail, but was not permitted to take photographs showing youth or PCJ staff. A number of these photographs are attached to this report.[3]

On May 21-May 23, 2012, I interviewed twelve youth who were or recently had been held at the jail. Of the twelve, five are named plaintiffs in the litigation. Most of the interviews took place in the attorneys' interview rooms at the jail. Of those

---

[1]   See Exhibit 3 for a list of documents and materials that were reviewed.

[2]   Although I made the request, I was unable to obtain specific descriptive data regarding the direct filed youth incarcerated in the jail during the time of my on-site work other than the raw number of youth on a direct file status on or about May 21, 2012.

[3]   See Exhibit 4 for a complete list and copy of photographs referenced in this report.

interviews that were not, two were conducted at state-run or contracted treatment centers for juvenile justice youth, and one was conducted at a restaurant. In all, I interviewed seven direct filed youth and five juvenile justice youth. Ten boys and two girls were interviewed.

The physical assessment of the jail was conducted under somewhat limiting conditions. At PCJ I could only talk with youth in the small formal interview rooms, not in the specific space in the jail where youth live (their day rooms and jail cells), and my time to talk with youth was limited. I had hoped also to interview staff at the facility; however, they were advised by their attorney not to speak with me.

Also my access to the physical facility was somewhat limited. While on site, I was denied access to the transportation area of the facility where youth are prepared for trips to court and other outside destinations. I was advised that the mechanical restraints that are used on youth in the facility are stored in the transportation area. I requested but was not permitted to inspect these mechanical restraints (e.g., handcuffs and shackles) that youth must wear when they are being transported. Also I was told by PCJ staff that the individual cells at the youth intake/booking area of the jail were not used by youth. In the interviews, however, youth claimed that these cells were used.

Please note that this report should be considered preliminary. Opinions and findings stated in this report may be modified or supplemented as more documentation becomes available and future on-site reviews and interviews are conducted. Based upon my qualifications and experience and based on the materials reviewed, interviews conducted, and on-site assessment I have sufficient information to reach the conclusions regarding the issues raised in Plaintiffs' motion for a preliminary injunction with a reasonable degree of certainty.

## C. Physical Description

Polk County jail is a relatively large adult jail facility (with the capacity of approximately 800 beds). Both pre-adjudicative juvenile court cases and direct filed and other boys waived to the adult court are housed in Building #3. The few girls are held in Building #2.

In the boys' unit in Building #3, there are six two-tiered, secure housing units. There are eight cells in each living unit; four on the first level and four on the second level. At times as many as four youth may be locked into one cell. Three of these living units (marked A, B, and C) are reserved for juvenile court cases. The other three (marked D, E and F) are for direct filed youth.

There is an enclosed control room in the center area of the building where the boys' units are located. Outside of the control room in front of the secure glass walls of the living units there are two desks, one facing units A, B, and C (juvenile court youth) and one on the opposite side facing units D, E, F (direct file youth). One or two officers may be stationed at each desk. (See below for a discussion of line of sight supervision.)

3

In addition, in two corners of the large central area there are two secure cages in which suicidal boys are held. Juveniles and direct filed youth can see each other across the secure glass walls and can talk with each other in the recreation yard. From the living units they can also see youth who are placed in the cages. On the first level of the boys' unit, off a secure corridor, are four isolation cells.

Building #2 contains three similar units for girls (G, H, and I). One of these is reserved for juvenile court cases; one for direct filed cases; and one for girls on close observation/suicide precaution status. There is one desk stationed in front of these three living units in the girls' housing area. The control room for Building #2 is not in the same area as the living units, but rather in a separate secure area.

## II.   FAILURE TO PROTECT CHILDREN AND YOUTH FROM HARM

### A. General Conclusion: Brutal & Inhumane Conditions of Confinement for Children and Youth Detained at the Polk County Jail

Based on my review of incident reports provided by the jail, interviews with a dozen youth, my review of sworn statements by eleven additional youth, my on-site assessment of the facility, and my knowledge of juvenile detention facilities I find that the Polk County Jail fails to protect children and youth from harm. Youth are regularly subjected to chemical and physical and mechanical restraints; pain compliant holds/techniques and harsh disciplinary practices, including the prolonged use of isolation. Youth on suicide watch suffer a particular set of indignities. The jail also fails to provide adequate supervision. The conditions at the jail are cruel and punitive. The practices at the jail fail to comply with widely accepted juvenile justice institutional standards. Instead of being helped, youth are being damaged in this jail.

### B. Widespread and Inappropriate Use of Pepper Spray.

OC spray (also known as "pepper spray") is an aerosol spray made with the pepper derivative oleoresin capsicum. It causes temporary blindness when it comes into contact with a person's face. It irritates the skin with an extreme burning sensation, and it also irritates mucous membranes. The burning effects of OC spray last for several hours, particularly when a youth is kept in a confined space (i.e., a cell) and is not allowed promptly to decontaminate himself or herself and to receive a clean change of clothes in a timely fashion. OC spray can be very debilitating for youth with asthma and other medical conditions and in some cases can cause serious health problems.

From interviews with youth and from the facility's own incident reports, it is clear that the PCJ staff routinely use OC spray to punish youth and to force compliant behavior. Youth are sprayed even when they present no physical threat to staff or any risk of escape.

4

Contrary to recognized standards for secure juvenile facilities, line staff carry and can discharge OC spray at their own discretion, without any supervisory approval.[4] The jail appears to have no system to monitor the amount of spray used in each spraying incident or the amount of spray used by an individual officer. In addition to the OC devices that officers carry, they also have access to a larger canister of OC spray that is kept in the control room (see Exh. 4, Photo #1) in the boys' living area. The larger canisters can discharge a larger amount of OC spray than the devices carried by the officers.

There is a pattern and practice of OC spray being used punitively at the Polk County Jail. It is often used in non-life threatening situations to address a youth's non-compliant behavior, and in some cases to punish youth. Verbal de-escalation efforts -- or simply ignoring non-complaint behavior that does not endanger the safety of another youth or staff -- are rarely employed.

Here are two examples of the punitive use of OC spray taken from the jail's incident reports. On February 25, 2012, a youth was sprayed in the cage used to observe suicidal youth for refusing to get undressed and put on the suicide smock (also known as a "turtle suit"). He was then forcibly undressed after being sprayed with a three-second burst of OC spray (PCJ Incident Report, Bates # 04046-51). The youth presented no threat to the facility or staff; he was already locked in the cage. He was sprayed with the chemical agent for refusing to get undressed.

On March 5, 2012, a juvenile justice youth refused to put on his shirt while he was in the day room. He was then forcibly taken to his cell. He and two officers got into a verbal argument in his cell while the youth was being counseled by the two officers in his cell. The youth paced around the cell with his fist "balled" up; he then was sprayed and taken to the floor (PCJ Incident Report, Bates # 04068-69). Once again the youth presented no threat to the staff or to the security of the facility; he was already in his cell.

Staff often escalate a youth's non-compliant behavior into violent confrontations that result in OC spray and the use of mechanical restraints. One girl was sprayed twice within eight days.

On January 16, 2012, a girl refused to stay on her bunk for "direct observation." She was on suicide watch in the girls' unit. According to the author of the incident report:

---

[4]     An overwhelming number of states do not permit the use of OC spray in juvenile facilities. Those that do permit its use allow it only in very specific and narrow circumstances (for example when a youth is armed). Only six states authorize staff to carry OC spray. COUNCIL JUV. CORRECTIONAL ADMINISTRATORS, PEPPER SPRAY IN JUVENILE                    FACILITIES                    (2011), http://www.ok.gov/oja/dOCuments/CJCA_Behavior_Management_-_May_2011.pdf.

[The girl] refused to comply and remained sitting at the table [in the day room]. Lt. Palmer told [the girl] to return to her bunk and again, she refused. I handed the shackles to Sgt. McGraw and placed my hand on [the girl's] back and she pushed back against me. Sgt. McGraw gave me the order to spray [the girl]. I pulled out [the OC spray] and reached around to spray [the girl] in the face. She held up her arm <u>in an effort to prevent me from spraying her in the face, so I took a hold of her suicide smock, pulled her back, and continued to spray her in the facial area.</u> [The girl] then went and sat on her bunk and [staff] placed shackles on [her] ankles. (emphasis added).

(PCJ Incident Report, Bates # 03930-31.) After seeing the nurse and being permitted to shower, the girl was then shackled to her bunk. (Id.) On January 24, 2012, the same girl was sprayed again while on suicide watch because she refused to be shackled to her bunk (PCJ Incident Report, Bates # 04025-29).

Often OC spray is used to break up fights or other conflicts between youth that should have been resolved without resorting to the use of a chemical agent. (See below for a discussion of officers' line of sight and staff supervision issues.) Since staff are not normally posted inside the living units, and since there is little organized programming on the living units, officers typically enter the living units <u>after</u> they observe a fight in progress. According to the institutional reports, staff order the youth to stop fighting and if there is a delay in stopping the fight, officers then spray the youths in their faces to bring an end to the fighting.

Of thirty-seven "Reported Incidents" between September 5, 2011 and April 1, 2012, OC spray was deployed in both the juvenile and direct filed units to break up fights twenty-one times.[5] In addition, I reviewed eleven sworn statements by youth at the jail which further substantiate the harsh and abusive use of OC spray, often following fights.[6] Pepper spray is also used to enforce other institutional rules (e.g., destruction of state property, disobeying institutional regulations).

Youth reported that after being sprayed, medical staff do not always see them in a timely fashion and that they are often not given the opportunity to properly decontaminate. Youth reported that after some OC incidents they were not allowed to shower for some time; were offered hot water showers (warm or hot water re-ignites the effects of the OC spray) and were not offered a change of clothes in a timely manner.

---

[5]  Presently there is no way to determine if these thirty-seven incidents represent the total number of institutional incident reports for this period. See Exhibit 5, Analysis of Incident Reports, prepared by SPLC staff.

[6]  The sworn statements I reviewed are attached as Exhibit 6. While there may be overlap with the incidents reported by the jail, the statements suggest there may have been additional uses of OC spray during the same period for which there is no incident report.

## C. Cruel Treatment of Suicidal Youth

Boys who claim to be suicidal or who are thought by staff to be suicidal are taken, at times by force, to one of the two cages in the boys unit (see Exh. 4, Photo #2). In the case of the girls' unit, girls on suicide watch are taken to a bunk directly in front of the supervisor's desk on the other side of the plexiglass wall (see Photo #3).

As has been noted, on January 16, 2012 and January 24, 2012, a suicidal girl was sprayed in the face with OC spray and forcibly shackled to her bunk in the girls' unit for not following a direct order of the staff. She could not run away; she had no weapon. Rather, she was emotionally upset and judged to be suicidal.

Suicidal boys taken to the cage must take off their clothes and put on a green, heavy suicide smock (referred to by both youth and staff at as a "turtle suit" (see Exh. 4, Photo #4)). If they fail to comply, they are sprayed with OC. In these cages there are no beds or cots, and, except for a bench, no furniture. Youth must sleep on the floor (Photos #5-7 (Left cage) and Photos #8-11 (Right cage)). Youth can spend several days in the cage on "suicide watch." Suicidal youth in these cages can readily be seen by both direct filed and juvenile justice youth as well by staff who walk through the boys' housing unit (Photo #6, taken from inside one of the cages). One youth reported that he was sprayed while in the cage on suicide watch for making noise.

The suicidal youth are presented with a cruel paradox when they are placed in the cage: they are isolated, with little human contact and with no activity offered to them, but in full public view. There is no regular human interaction with staff or other youth. No counseling services are offered. There is no life-affirming activity. Visits from family members are not allowed. At times youth in these cages must spend days before being assessed by a mental health specialist.

It is also apparent that at times PCJ uses the locked isolation cells (discussed below) for suicidal youth. Officers cannot routinely see or hear youth placed in these isolation cells. This practice makes no sense. Such cruel conditions serve only to increase a youth's depression and anxiety. Youth are much more likely to commit suicide when they are locked into an isolation cell.

## D. Punitive Use of Isolation

From the interviews with youth, it is clear that youth spend an inordinate amount of time locked in their cells. The use of isolation, particularly for youth, is harmful and counterproductive. Isolated youth often feel depressed and desperate. Locking a youth in his or her room or in an isolation room does not reduce a youth's acting out; its use only makes matters worse.[7]   Consider what a non-academic expert, John McCain, says about isolation:

---

[7]   See Linda Finke, *The Use of Seclusion Is Not Evidence-Based Practice*, J. CHILD & ADOLESCENT PSYCHIATRIC NURSING, Oct.–Dec. 2001. (concluding that "the scientific

"It's an awful thing, solitary," John McCain wrote of his five and a half years as a prisoner of war in Vietnam—more than two years of it spent in isolation in a fifteen-by-fifteen-foot cell... "It crushes your spirit and weakens your resistance more effectively than any other form of mistreatment." And this comes from a man who was beaten regularly; denied adequate medical treatment for two broken arms, a broken leg, and chronic dysentery; and tortured to the point of having an arm broken again. A U.S. military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than McCain, reported that they found social isolation to be as torturous and agonizing as any physical abuse they suffered.[8]

A recent law school journal article by two academics and a noted children and youth psychologist with extensive experience in juvenile justice concluded that:

Because isolation is so detrimental to the mental health of juveniles, mental health and correction professionals generally agree that the use of such measures should be limited to those rare occasions when a young person poses an imminent threat to others' safety.

Isolation, even for brief periods, is harmful for adolescents for two reasons: (1) Youth in isolation cannot participate in programs [or relate to other peers]; and (2) Isolation has negative psychological consequences, including increasing risk of suicide, re-traumatizing, depression and agitation. Interactive treatment programs have more success in reducing problem behavior and mental health problems in youth than does isolation, which in fact provokes and worsens these problems. (Emphasis added.)[9]

At the Polk County Jail youth can experience isolation in their cells on the living units or in four harsh and barren isolation rooms off a small, secure hallway in the boys' unit (Exh. 4, Photo #12.) Youth spend up to 22-23 hours in isolation. They do not get showers regularly; they do not go outside. Youth in isolation are at greater risk of suicide than youth in the general population.

---

evidence available illustrates that the use of seclusion with children is not therapeutic and is, in fact, harmful...")(emphasis added).

[8]     Atul Gawande, *Annals of Human Rights: Hellhole*, THE NEW YORKER, March 30, 2009 (*available at* http://www.newyorker.com/reporting/2009/03/30/090330fa_fact_gawande).

[9]     Sandra Simkins et al., *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 WASH. U. J.L. & POL'Y 241, 257 (2012) (see Exhibit 7 for an extensive extract from this article).

[I]solation causes an increased risk of suicide. In 1999, the Office of Juvenile Justice and Delinquency Prevention released a national study of suicides in public and private juvenile facilities. The study found that 50 percent of youth who committed suicide were in isolation at the time of their suicide and 62 percent had previously been in isolation. Even youth who had not previously expressed thoughts of harming themselves can become desperate, hopeless and suicidal in isolation. For youth who are already talking about or who have previously attempted suicide, isolation is a dangerous practice that should be prohibited. While regularly checking on a suicidal teen in isolation may prevent death, the young person's mental health deteriorates. Suicidal youth must spend most of each day in activities and interacting with peers and staff. Further, isolation is not the only means of staff observation of troubled teens; they can just as easily be observed outside of isolation without the negative psychological consequences of isolation.[10]

Youth on a protective custody status are also locked in their cells an average of 22-23 hours a day, every day. Youth placed in their cells in the living units for disciplinary reasons can also spend 22-23 hours locked in their cells.

Officers can lock down youth for cursing or for being verbally disrespectful. Youth can be locked down for minor misbehavior. There seems to be no effective supervisory review of these practices.

Youth can also be locked in one of the four isolation cells for extended periods of time, in some cases for months. The conditions for youth who get locked down into these four isolation cells are most troubling. Staff cannot regularly observe or hear youth placed into these cells (there is no camera observation into the isolation cells and there is no mechanism for youth to communicate with staff).

The four isolation cells are off a secure corridor. The door of each isolation cell is a solid metal door with a slot for a youth's hands when he is to be handcuffed (Exh. 4, Photo #13). Youth can only attempt to communicate with staff by yelling through the secure slot in the solid jail cell door (see Photos #14-16, taken from inside isolation cell); an officer could only readily hear a youth if he were in the secure isolation area.

Youth can and do spend extended periods of time in these cells, getting out occasionally to shower in the isolation unit's showers. The cells have no natural light, no bed or bunk, just a hard slab on the floor close to the toilet (see Exh. 4, Photos #17-19). Youth reported that while in the isolation cells they are not routinely visited by medical or counseling staff. Locking youth in these cells for any extended period of time is a cruel and punitive practice.

---

[10]      Id. at 259.

### E. Failure to Supervise Youth in a Safe Manner

There are major deficiencies regarding the number of staff assigned to direct supervision and the line of sight of officers who are responsible for direct supervision (i.e., officers' ability to see and hear youth in their cells). This inadequate supervision often leads to fights and violence in the cells and living units. Youth report that no more than two officers are stationed outside of the three juvenile justice living units and no more than two are stationed outside the three direct filed units; it is not clear from the jail's records how many may be stationed outside the three girls' units.[11]

Two officers, posted outside the plexiglass walls of the living units, however, cannot adequately supervise three separate living units of youth (see Exh. 4, Photo #20, taken from officers' desk, looking into units E & D). Widely accepted standards for secure juvenile detention centers call for a minimum of one direct supervisory staff per eight youth during waking hours. The Polk County Jail, however, generally assigns two officers to the juvenile and direct file sides of Building #3, each of which regularly houses thirty to forty youths at a time. This means that there is usually no more than one direct supervisory staff assigned per fifteen youth.

Moreover, supervisory staff should be positioned (posted) within the living unit itself, not behind a plexliglass wall. From where they are typically stationed, officers who are charged with supervising youth at the PCJ cannot see or hear youth locked in their cells. They also have poor or non-existent line of sight/supervision to youth locked into their cells, particularly youth locked in cells on the second tier of the living units. There is therefore little or no chance to anticipate and de-escalate problems. While staff in the control rooms have camera access to the day room and stairs in the living units, there is no camera access into the cells and no audio access into the living units or cells. Often, as discussed above, staff interventions are instead punitive violent reactions to the youths' behavior (e.g., OC spray, restraints, lock-down).

### 1. Line of Sight Problems on the Girls' Unit

Photos taken from where officers are normally stationed show that when the door to a cell is closed and the subject walks to the back of the cell, it is extremely difficult for the officers to see the subject in the cell (Exh. 4, Photos #21-22, taken as to G dorm; see also Photos #23-25, taken as to H dorm, cell 5, and Photos #26-27, taken as to H dorm, cell 9). From where they are typically stationed for supervisions, officers cannot observe or hear girls when the girls are locked into their cells (see Photo #28, view of H dorm from officer's desk).

---

[11]     The jail's staffing logs routinely list four or five officers (which may include staff in the control room) as assigned to Building #3, where only juvenile and direct filed boys are housed. The logs similarly list officers assigned to Building #2, where both adult women and girls are held, but without specifying which or how many of those officers are assigned to the girls' units as opposed to the adult women's units.

## 2. Line of Sight Problems on the Boys' Unit

The same critical line of sight problems exist in the boys' building for the three juvenile justice units and three direct filed units (see Exh. 4, Photos #29-31, C dorm, view of cell 1). This series of photos shows that a subject in cell 1 on the first tier of C dorm (the juvenile side) cannot be seen as he moves to the rear of the cell. It is also difficult for a subject inside cells on the second tier to see out to where officers are typically positioned, even when the cell door is open (see Photo #32, view from inside cell 5 on second tier of C dorm).

The same problems exist on the direct file side (see Exh. 4, Photos #33-35). This series of photos shows the difficulty of seeing an individual who is in cell 1 on the first tier of E dorm. Photos #36-38 show the difficulty of viewing cells on the second tier of D and E dorms from the control room.

## 3. Dangers Arising from Supervision Failures

Without sight and sound direct supervision in the living units and without officers being stationed *inside the living units*, fighting becomes typical. According to youth, many of the fights in the cells go ignored or undetected by staff. As noted above, when staff do see a fight or a disturbance from the other side of the plexiglass wall, they often react with the use of OC spray.

In these fights, youth can and do get seriously hurt. According to a police report, on February 24, 2012, over a lengthy period of time three youth detained at the Polk County Jail attacked their fourth roommate in a locked cell on the second tier of F unit.

The police report concerning this incident states that between 4:30 PM and 10:30 PM on this date, the victim was "beaten and tortured" in a cell # 8 in unit F in the boys' building. The incident allegedly started after a food fight and while the boys in F-8 were on lock down. The victim was reportedly beaten for several hours and was urinated on by his cellmates. His pants were forcibly removed; his back and buttocks were repeatedly beaten with wet towels. A sheet was wrapped tightly around his neck and pulled through a bar on the window.

It was reported that the alleged victim lost consciousness three times. After an extended period of time an officer finally observed the victim's plight. The police report notes that the victim had "ligature [marks] around his neck...and multiple welts and bruising on his [face], chest, arms and back. [The victim] had a bruised left eye and bruising all across his [illegible]." (Incident # 2012-018749, Detective Todd Magyarosi, Polk County Sheriff's Office, signed and sworn on February 28, 2012.)[12]

---

[12]      This incident raised a number of related questions: Why were four youth placed into one cell the afternoon and evening of February 24, 2012? Why were they on lock-down status from 4:30 PM to 10:30 PM? What was the total number of youth in F unit at the time? The jail's records suggest that other cells were available in F or another unit on

**F.  Failure to Provide Adequate Due Process Protections and Failure to Provide Objective Youth Grievance System**

Although there is a written PCJ policy regarding the existence of a due process hearing that should take place before the imposition of disciplinary lock-down, all the youth reported that no such process existed in practice.  Standards call for an objective due process hearing to be held *before* the imposition of a sanction (such as lock-down) for a major rule violation.  At such a hearing a youth charged with a major disciplinary infraction is given a chance to tell his side of the story (and even to ask that observers of the incident testify) in front of impartial and uninvolved staff who will weigh the facts and decide on the appropriate sanction, if any.

Similarly, youth reported that they had no access to a viable and objective grievance system.  Youth also stated that they were verbally belittled for talking to SPLC attorneys (PCJ staff call the youth "snitches" when the youth do talk with an attorney from SPLC).[13]  In a very basic sense, all the youth interviewed stated that they had little confidence in the grievance system.

Without a viable due process system and an effective and objective grievance process youth cannot be adequately protected from harm in a secure detention facility.

**G.  Use of Pain Compliant Physical Restraints**

A number of youth who were interviewed claimed that when they were being restrained, officers deliberately inflicted pain on the youth after the youth were being compliant.  Youth reported that officers bent their arms or hands in a painful manner, forcefully took them to the floor or pushed them against the wall of the cells.

There are a number of physical behavior management programs approved for juvenile facilities that provide staff with the appropriate training to safely and effectively handle youth without resorting to the infliction of pain.  These approaches emphasize counseling and de-escalation skills and rely on physical techniques and holds only as a last resort.  These holds are designed not to inflict pain.[14]

---

this date and time.  Why were these specific four youth locked in one cell together?  Why were they locked into a room in one corner of the second tier, where arguably the worst line of sight exists?  The Investigator's report also makes it clear that the beating had racial overtones.

[13]     Further investigation should be done regarding the grievance process at PCJ and the process by which allegations of child abuse are investigated.

[14]     One such approach is "safe crisis management."   JKM Training, Inc., http://www.jkmtraining.com/.

The jail's own incident reports document that officers at times rely on inflicting pain on youth to respond to a youth's non-compliant behavior. On March 4, 2012, for example, a youth had been banging on his cell door in one of the jail's isolation rooms. He was dressed in a suicide smock that he had pulled around his neck. According to the officer's incident report:

> [The youth] was standing at the cell door and stated he was going to kill himself, "right now." ... In an attempt to intervene, I opened cell 4. As I was unlocking the cell, [the youth] took a few steps away from the door. I opened the cell door and [the youth] took an aggressive step toward me. Fearing for my safety, I executed a palm heel strike to [the youth's] upper chest on his left side.[15]  Because [the youth] wasn't wearing [a] shirt, when I struck him in the chest, it slid up off his left shoulder and made contact with the left side of his head. [The youth] stumbled back into the cell and I shut the cell door.

(PCJ Incident Report, Bates # 04055.)

Also on March 4, 2012, a youth was escorted from an isolation room (isolation room 3) and escorted to the nurse's office while he was in handcuffs and "placed" on the floor in the nurse's office "in a controlled manner." According to the incident report, no less than six officers were present. While the youth was on the floor and handcuffed in the nurse's office, the officer reported that:

> [The youth] continued to struggle by attempting to roll his body, so I took a hold of his upper right arm and applied pressure to the brachial nerve on the inside of his right arm until [the youth] became compliant.

This youth then refused medical attention and claimed that in addition to the pain compliant hold, he had been slapped and punched by another officer.  (PCJ Incident Report, Bates # 04062-63.)

Another incident report states that on March 22, 2012, a juvenile justice youth in C dorm was unwilling to go into his cell. Two officers physically escorted the youth to his cell; as he was approaching his cell the youth grabbed the doorframe of his cell with both hands "and would not let go". According to the incident report:

> I pulled [the youth] from behind and [another officer] struck the left forearm of [the youth] to cause his hand to release the doorframe. We then moved [the youth] to the rear of the cell and placed him on the floor. He tried to get up and I placed my leg against his body to keep him in place.

---

[15]   The palm heel strike is a martial arts blow. For a short video description of a palm heel strike, see http://www.youtube.com/watch?v=CRNxB6PFeak.

(PCJ Incident Report, Bates # 04084.)

Not only do pain compliant techniques physically hurt youth, they increase a youth's alienation and distrust of staff.

## III.    OTHER CRITICAL ISSUES

Several other critical issues were identified that jeopardize the safety of children and youth at the Polk County Jail and merit additional consideration.

- **Younger children and youth held at the jail.**  Of the thirty-three youth held in a pre-adjudication status by the juvenile court at the jail on Monday, May 21, 2012, fourteen youth were fifteen years old or younger.  This included five fifteen year-olds; three fourteen year-olds; four thirteen year-olds; one twelve year-old and one eleven year-old).[16]

- **Staff often curse at youth and/or verbally belittle them.**  In every youth interview, youth stated that they experience verbal abuse regularly in the PCJ.  The youth interviewed reported that some staff ridicule and intimidate youth who meet with SPLC attorneys by calling them "snitches."

- **Lack of privacy.**  When more than one youth is locked in a cell, there is no privacy for using the bathroom (Exh. 4, Photos #39-40).  In both the boys' and girls' units there is no privacy when youth shower.  Staff and other youth can readily and fully observe youth when they shower (boys' juvenile and direct file dorms, Photos #41-45; girls' juvenile and direct file dorms, Photos #46-47).  A simple shower curtain or partial shower stalls could offer a degree of privacy and still assure adequate supervision while youth are showering.

- **Lack of a positive behavior management system.**  There are no incentives for positive behavior.   Well-run secure juvenile facilities have a system whereby youth can be rewarded for positive behavior.  In a sense, the PCJ is an example of a bizarre one-sided Skinner's box with only negative and punitive consequences for behavior.  Youth can suffer harsh punishments for perceived negative behavior.  But they can earn no incentives for positive behavior.

- **Lack of a structured program.**  In addition, with the exception of a weekday educational program for pre-adjudication youth and approximately a one hour weekday educational program for some direct file youth, there is little or no youth-centered programming offered in the jail (at times there are church volunteers who come into the jail in the evening).  There is no organized recreation program, and no counseling program.  Youth may or may not be

---

[16]    Florida Department of Juvenile Justice, Daily Statistical Information Report for youth held at the Polk County Jail on May 21, 2012, Bates # 04806-14.

14

allowed to use the rather barren recreational yards (Exh. 4, Photos #48-49), depending on which staff are on duty. Youth spend an inordinate amount of time locked into their cells. Protective custody youth are locked down approximately 22-23 hours a day.

- **No evidence of appropriate and effective training for line staff regarding essential children & youth issues.** There is little evidence that staff have even a basic understanding of how to talk with and relate to teenagers or an understanding of adolescent development or of verbal methods to de-escalate a situation. Force or the threat of force is used to control and punish youth. The use of OC spray, of physical and/or mechanical restraints and locked isolation are the methods used to compel compliant behavior and to punish youth. Minor and non-threatening adolescent behavior (e.g., humming while in mechanical restraints, refusing to dress or undress) is met with the use of force or OC spray.

- **There are no contact visits with families.** Visits are conducted through secure, thick plexiglass partitions (Exh. 4, Photos #50-53). Youth must communicate with their families by telephones available at these partitions. Visits are withheld or youth on suicide or punishment status.

- **Adult Jail-like culture.** In the interviews with youth, youth spoke openly of the practice known as "ToH" (Test of Heart). "ToH" simply means that newly admitted youth often have to fight with other youth to show that they are strong enough to withstand the rigors of jail life. As has been discussed, because officers are not routinely stationed in the living units and because of the difficult sight lines, these fights take place in rooms on the living units that cannot be readily visually supervised by an officer. When these fights create enough of a disturbance that officers become aware of them, then officers will typically use OC spray to break up the fights. Another adult jail-like custom was referred by many youth as being "on someone's payroll." This is a custom whereby weaker youth have to give up their food to a stronger youth on the unit. This custom also can lead to fights among youth. Many youth justifiably fear for their safety in the PCJ. While conducting the on-site assessment on May 22, 2012, two sharp objects were found in two cells that readily could have been used as weapons. One of these was found in a juvenile justice dorm (Exh. 4, Photo #54, C dorm, cell 1), the other in a direct file dorm (Photo #55, E dorm, cell 1).

## IV.    FINAL OBSERVATIONS

In the early twentieth century the juvenile court was established to assure that children and youth were kept separate from adults in our criminal court system and in our correctional institutions. Historically, juvenile detention facilities were brought about by the institution of the juvenile court to assure that juvenile offenders on a pre-trial status were kept separate from adults.

15

Jails like PCJ are dangerous places for children and youth. In jails children and youth are much more likely to be sexually assaulted and to commit suicide than children and youth held in juvenile facilities. Indeed to comply with Federal law and Florida law, in the PCJ, children and youth under eighteen must be kept in sight and sound separation from adult prisoners. In this instance, PCJ seems to recognize that children and youth are different from adults. Nonetheless, although PCJ keeps children and youth separate from adults in the jail, children and youth in PCJ routinely experience the negative effects of an extremely punitive adult correctional facility.

Recently, the U.S. Department of Justice released its Prison Rape Elimination Act (PREA) standards. In addition to mandating that youth under eighteen who were waived or direct filed in the adult court system be separated from adults in jails and prisons, these standards require adult jails to make best efforts to avoid placing youth in isolation and to provide them with activities and programming. The standards also mandate a minimum of one direct supervisor to eight youth during waking hours.[17]

Children and youth are not simply small adults. As anyone knows who has raised a teenager, critical reasoning functions and impulse controls are not fully formed by the age of seventeen.[18] And when one considers that the children and youth locked up in the PCJ range in age from eleven to seventeen and are in a pre- adjudication status— not yet having had their day in court—the conditions in PCJ become even more egregious.

The children and youth in the PCJ are routinely exposed to cruel and overly harsh practices, practices that are arguably, quite arguably, questionable practices even for adults held in adult jails and prisons (e.g., extensive isolation, lack of adequate supervision and programming, pain compliant holds, use of OC spray, etc.) let alone for children and youth. The children and youth in the PCJ need to be protected from the harsh and cruel practices at the PCJ.

Paul DeMuro _Paul DeMuro_     Date: _July 10, 2012_

---

[17]   National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37,106 (June 29, 2012) (to be codified at 28 C.F.R. pt. 115).

[18]   See Laurence Steinberg, *What the Brain Says About Maturity*, N.Y. TIMES, May 29, 2012 ("Neuroscientists now know that brain maturation continues far later into development than had been believed previously. Significant changes in brain anatomy and activity are still taking place in young adulthood, especially in prefrontal regions that are important for planning ahead, anticipating the future consequences of one's decisions, controlling impulses, and comparing risk and reward. Indeed, some brain regions do not reach full maturity until the early or mid-20s.") (emphasis added).

16

# Exhibit 1

## Paul DeMuro CV and Consulting Prospectus, Including Publications

Paul DeMuro: 1201 Futch Creek Rd., Wilmington NC 28411, 910-681-3781.
e-mail: PDeMuro@aol.com

## Paul DeMuro

## PROFESSIONAL STRENGTHS

* Providing a wide variety of consulting services to youth serving agencies

* Planning and conducting fact-finding and dispute resolution efforts

* Planning and directing program and policy oriented research and evaluation efforts

* Communicating effectively to staff, the public and media

* Planning and implementing successful programs

* Providing imaginative and cost effective leadership for innovative youth policy initiatives

* Managing complex contract, budget, personnel and program interventions

* Planning & providing a variety of staff training initiatives

* Supervising, developing and motivating staff

* Producing successfully under intense financial, political and time pressures

## BACKGROUND

Forty one years experience managing staff, programs, budgets and processes designed to improve a wide variety of youth serving agencies. Experienced at conducting fact-finding evaluations of community-based and institutional programs; expert on conditions of confinement. Retained by the US Justice Department and public interest attorneys in a variety of federal and state court cases. Experienced expert witness. Developed mediated settlements in child welfare class action litigation in Oklahoma, Tennessee and Hamilton County, Ohio. Appointed by Federal Courts in Florida and Oklahoma to monitor statewide consent decrees designed to improve services for children, youth and families. Designed case management systems for Hawaii's and Missouri's state youth services organizations; conducted risk assessment and policy studies for state and county agencies; designed and conducted training seminars for child welfare and juvenile justice staff. Presently serves as a senior consultant for the Annie E. Casey Foundation and the National Juvenile Detention Association. Consulting prospectus, list of publications and references available upon request. Married with four children. Interests include reading, tennis and music.

Paul DeMuro: 1201 Futch Creek Rd., Wilmington NC 28411. 910-681-3781.
e-mail: PDeMuro@aol.com

## EDUCATION

BA, Villanova University, 1963.

MA, Villanova, 1965.

## EMPLOYMENT HISTORY

1983 - to present. *Founder and principal staff* of a small, flexible consulting firm that provides a variety of policy, program, management and conflict resolution services to private and public youth serving agencies. Clients include the US Justice Department, federal Courts, state and county agencies, private foundations, public interest attorneys and the private Bar.

1979 - 1983. *Vice-President for Program Services, National Council on Crime and Delinquency.* Responsible for field related activities of nationally prominent criminal justice agency. Managed national projects, maintained liaison with other national and state organizations; conducted policy and evaluation studies; supervised and delivered technical assistance to state and local juvenile justice agencies. Prepared and delivered testimony to US Congress and state legislative bodies. Prepared publications; developed and offered training to professional staff. While with NCCD, directed two national juvenile justice projects: (1) Citizen Advocacy Network project, a $1.5 million dollar, four state effort to involve local citizens in efforts aimed at improving their juvenile justice systems; (2) Violent Juvenile Offender Research and Development Project, a $3.5 million dollar project aimed at testing innovative interventions for violent offenders: developed program models and request for proposals; supervised competitive bidding process; and oversaw all fiscal and program reporting to the US Justice Department.

1978 - 1979. *Commissioner of Children and Youth, Pennsylvania Department of Public Welfare.* Responsible for $300 million dollars of state funding to provide management and program supports for services to over 35,000 children and youth. Policy and program responsibilities included the state's day care, child welfare and juvenile justice programs.
Prepared budgets, developed regulations, drafted legislation and represented the Governor's office in local, state and national negotiations. Supervised the state training school system.

2

Paul DeMuro: 1201 Futch Creek Rd., Wilmington NC 28411, 910-681-3781.
e-mail: PDeMuro@aol.com

1975 - 1978. *Director, Office of Corrections Education.* Created and directed this office which had fiscal, planning and evaluation responsibility for educational programs in the state's run adult and juvenile correctional institutions which held over 9,000 offenders.

1973 - 1975. *Director, Unified Delinquency Intervention Services, Illinois Department of Children and Family Services.* Planned and implemented this nationally recognized model that serves adjudicated youth. UDIS diverts youth from institutional placement by using a network of community-based placements and strong case management.

1970 - 1973. *Massachusetts Department of Youth Services (DYS).* With DYS held three positions of increasing responsibilities: *Assistant Commissioner for Aftercare (1972 - 73),* supervised all non-institutional programs for adjudicated youth (e.g., parole, group homes, non-residential interventions, etc.). Supervised seven regional offices with 220 staff and a purchase of service budget of $5 million; *Director of Non-Residential Programs ( 1971 - 72),* developed and administered a statewide network of non-residential interventions providing educational, vocational, counseling and mentoring supports to more than 1000 youth living at home or in foster care. Sponsors of programs included churches, community groups and traditional youth serving agencies. *Superintendent, Shirley Industrial School (1970- 71),* responsible for 125 bed reform school for "hard core" delinquents aged 14 - 18.

1963 - 1970. *University English Instructor, Ohio State University (1965 - 70); Villanova (1963 -1965).*

## DeMuro: CONSULTING PROSPECTUS

## PROFESSIONAL EXPERIENCE

Forty two years experience managing people, programs, budgets and processes for youth serving programs; extensive experience providing a wide range of consulting services to support progressive efforts to improve programs for troubled youth and families. Examples: Functions as a senior consultant to the Annie E. Casey Foundation's child welfare and juvenile justice initiatives; helps plan and evaluate innovative child welfare and juvenile justice projects. Experienced at conducting fact-finding evaluations of community-based and institutional programs; retained by the U.S. Justice Department and public interest attorneys in a variety of federal and state court cases. Experienced expert witness.

Developed mediated settlements in child welfare and juvenile justice class action litigation in Oklahoma, Tennessee and Hamilton County, Ohio. Appointed by Federal Courts in Florida and Oklahoma and New Orleans to monitor consent decrees designed to improve services for children, youth and families. Designed case management systems for Hawaii's and Missouri's state youth services organization; conducts risk assessment studies and other policy studies for a variety of states; designs and conducts training seminars for child welfare and juvenile justice staff. Editor, Violent Juvenile Offenders: An Anthology, 1984; co-author, Reforming the California Youth Authority, 1988; author of Annie E. Casey training monographs and several articles; former Vice-president, National Council on Crime and Delinquency. Held a variety of leadership positions within state governments: e.g., Pennsylvania Commissioner of Children and Youth. Curriculum vitae available.

## CONSULTING SERVICES

### Developing and Monitoring Court Ordered Settlements

Designs, implements and monitors step-by-step plans to comply with court ordered mandates, usually as a result of class action litigation. Examples: Developed settlement agreements/court ordered implementation plans for class action law suits in Florida, Indiana, New Mexico, New Orleans, Oklahoma, Tennessee and Hamilton County, Ohio. Appointed by Federal District Courts to serve on Court appointed Panels to develop and negotiate settlement agreements, and in Oklahoma and Florida to monitor class action settlements. Able to develop agreements among parties regarding settling class action litigation.

### Fact Finding, Negotiating and Expert Witness Services

Organizes and implements fact-finding investigations to help resolve litigation involving public and private youth serving agencies. Expert in assessing conditions of confinement.

1

Identifies and leads highly qualified teams of professionals to evaluate community based and institutional programs. Able to enter adversarial situations, discover the facts, and assist in either resolving/mediating the case or preparing for trial. Experienced at interviewing children, youth and staff involved in law suits. Has helped develop settlement agreements and has testified at numerous trials in Federal and state courts. Examples: Retained by the Civil Rights Division of U.S. Justice Department and public interest law firms to investigate and document alleged unconstitutional conditions in a number of private and public institutions throughout the country.

### Policy Oriented Research

Over forty years experience writing and directing policy studies, articles, reports, evaluations and other materials designed to analyze public policy questions and present alternative courses of action. Examples: Directed risk assessment studies of institutional populations in five states; these studies often help bring about major organizational change. Retained by state legislative committee in Tennessee to conduct studies on juvenile justice issues, child welfare and managed health care issues. Co-authored book analyzing California's juvenile justice system. Co-edited a book on violent juvenile offenders and published a number of reports and articles concerning troubled youth and public policy.

### Evaluation and Technical Assistance

Conducts management and program evaluations of public & contracted youth serving programs and agencies. Analyzes problems and develops specific recommendations. Examples: Foundation supported evaluation of Hawaii's juvenile justice system ("Opportunity for Reform", 1987) and program evaluation of Toledo, Ohio's substance abuse programs; developed mediated settlement in a New Mexico conditions of confinement case (2009). Conducts comprehensive evaluations of detention centers and training schools. Examples: evaluation of Maryland training school (Hickey) which led to the reform and privatization of that institution; evaluation of Cleveland's detention center and Toledo's detention system. Conducts program and systemic reviews of public youth serving programs for state legislative committees. Example: Review of Iowa's residential programs for delinquent youth. Provides technical assistance/planning to Directors of state agencies. Examples: Senior consultant to the Annie E. Casey's highly successful initiative aimed at reforming juvenile detention (JDAI) in several public jurisdictions. Helped develop case management and day treatment services in Missouri. Assisted public interest law firm in Mississippi to close a reform school for girls (Columbia).

### Plan and Conduct Staff Training

Plans, directs and offers a variety of training workshops, seminars and other training efforts designed to improve the skill level and knowledge of direct service staff. Examples: designed and conducted team-building and case management training for

2

executive staff of the Missouri and Alabama Departments of Youth Services.  Plans
and conducts skill-building workshops for public defenders sponsored by the
American Bar Association; plans and conducts training workshops for child welfare staff
sponsored by the Annie E. Casey Foundation: Conducts child welfare
training: e. g. ,"Team Decision Making" in a number of jurisdictions.


## Direct Services -- Program Development

Plans, organizes and implements innovative and cost effective, youth services within
government and non-profit organizations at the local, state and national levels.
Examples: Developed statewide system of non-residential interventions
in Massachusetts for adjudicated delinquents.  Planned and directed nationally recognized
community-based program model for adjudicated delinquents in Cook County.
Planned crisis intervention program for Toledo, Ohio. Implemented model
correctional program for the U.S. Department of Justice, developing
multi-site, state-of-the-art, intensive, secure programs for violent juvenile offenders.

3

## PARTIAL CLIENT LIST

**Government Agencies:**

U. S. Justice Department, Civil Rights Division, Washington, DC.

State Human Service Departments, Child Welfare & Juvenile Justice Agencies:
(e.g.,  Hawaii, Indiana, Missouri, New Jersey, Oklahoma, Pennsylvania, Tennessee & Texas)

State Legislative Committees: Iowa & Tennessee

County Human Service, Child Welfare & Juvenile Justice Agencies:  (e.g. Cook, Ill.; Cuyahoga, Hamilton, Lucas Counties, Ohio;  Jefferson County, Ala.; Multnomah, Oregon.)

County Juvenile Probation: (e.g.. Lucas Co. Ohio; Tarrant County, Fort Worth, Texas)

**Federal Courts:**

Federal District Courts:  Tallahassee, Fl.; Oklahoma City, OK. & Washington, DC

**Private Foundations:**

The Annie E Casey Foundation, Baltimore, Maryland.
The MacArthur Foundation, Chicago, Ill.

**Public Interest Law:**

The American Bar Association's Juvenile Justice Center
Juvenile Law Center, Philadelphia, PA
National Center for Youth Law, San Francisco
Public Defenders Office, Dade Co., Fl
Youth Law Center, San Francisco.
The Southern Poverty Law Center, AL

**Private Attorneys:**

Goldstein & McGroder, Phoenix, Arizona
Robert Link, Jacksonville, Fla.
Covington & Burling, Washington, DC

**Research, Policy & Technical Assistance Centers:**

The National Juvenile Detention Association
The John Howard Association
The Urban Institute.

4

## List of Publications and Reports

### Books

Violent Juvenile Offenders: An Anthology, National Council on Crime and Delinquency, 1984. Co-editor.

Reforming The California Youth Authority, Common Knowledge Press, 1988. Co-author.

### Articles and Reports [some co-authored]

"Preliminary Plan: Reducing the Population in Florida's Training Schools", March 1986. Report to the Federal District Court, Tallahassee, Fl.

"Report of the Jerry M. Panel", March, 1987. Submitted to Washington, D.C. Superior Court.

"Adjudicated Youth in Delaware Who Need Secure Care", National Council on Crime And Delinquency, 1987.

"Hawaii's Juvenile Justice System: Opportunity for Reform", August 1987. Funded by the Clark Foundation, New York, NY.

"Resisting the Adultification of Juvenile Corrections: Rational Programs for Violent Juvenile Offenders", American Psychological Association Newsletter, Winter, 1988.

"At the Crossroads: A Population Profile of Youth Committed to the Alabama Department of Youth Services", 1989. Funded by the Clark Foundation, New York, NY.

"Population Profile and Risk Assessment Study: Mississippi Department of Youth Services", February 1989, Center for Study of Youth Policy, University of Michigan.

"Risk Assessment of Adjudicated Delinquents, Division for Children and Youth Services, State of New Hampshire," December 1989, Center for Study of Youth Policy, University of Michigan.

"Framework for Dispositional Decisions", Alabama Division of Youth Services, 1990.

"In Search of Excellence: Reflections Regarding the Improvement of the Missouri Division of Youth Services", April 1990.

"Comprehensive Services for Oklahoma's Delinquent, Deprived, INT & INS Children: The Terry D. Panel Report", December 1990. Submitted to the Federal District Court, Oklahoma City, Okl.

Final Report of the Alabama Detention Project", July 1991. Prepared for the State of Alabama, Juvenile Detention Advisory Committee.

5

"Final Report: Iowa's Service Delivery System For China & Delinquent Youth", June 30, 1993. Study conducted for the Iowa State Legislature.

"OverCrowding in Juvenile Detention: Some Concrete Suggestions", June 1996.

"Conditions of Confinement Review: Cuyahoga County Juvenile Detention Center", NJDA, September 1997.

"Developing Partnerships with Neighborhoods and Local Communities", the Family to Family Initiative, the Casey Foundation, 1997.

"Team Decision-making: Involving the Family and Community in Child Welfare Decisions", the Family to Family Initiative, the Casey Foundation, 1997.

A Reasonable Alternative to Locking More Kids Up:  The Development of Jurisdictional Core Groups, [with Earl Dunlap], Special Edition:  Journal for Juvenile Justice Issues and Detention Services, NJDA, Spring, 1998.

Crowding in Juvenile Detention Centers: A Problem Solving Manual, [with Sue Burrell, Earl Dunlap, Carl Sanniti and Loren Warboys], OJJDP, December 1998.

Consider the Alternatives:  Planning & Implementing Non-Secure Detention Alternatives", the Casey Foundation, November, 1999.

"Be All You Can Be – Reflection on Leadership Development & Staff Training", Spring 2003, Journal for Juvenile Justice and Detention Services, Spring 2003.

"Good News From Toledo: Real Improvements in Detention", Journal for Juvenile Justice and Detention Services, Fall 2003.

"Boot Camps Revisited", Journal of Juvenile Justice Services, National Partnership for Juvenile Services, Vol. 22, # 1, 2008.

"Why Child Welfare Agencies Should Limit the Role of Residential Care", Journal of Juvenile Justice Services, National Partnership for Juvenile Services, Vol. 22, # 1, 2008.

6

# Exhibit 2
## Recent Court Cases in which Paul DeMuro Served as Expert Witness or Court-Appointed Expert or Monitor