# EXHIBIT 3
# (4 of 4)

Declaration of [redacted]

My name is [redacted] and I am 15 years old. I have been detained in the juvenile unit in the Polk County Jail since around June 13, 2012. I was also detained at the Polk County Jail one other occasion for almost one month, beginning in mid-December 2011. Both times I have been on the juvenile unit.

Around December 20, 2011, I was on the Bravo Dorm on the juvenile unit, and I saw Officer Franklin and Officer Gay run onto the Charlie Dorm on the juvenile unit when two youth were "play fighting." Those two boys stopped "play fighting" when the guards came in. One of the youth tried to run and Officer Franklin pulled him to the ground and pepper sprayed him. I do not know the youth's name, but one day I used sign language to communicate to him and he told me he didn't know why he got pepper sprayed because he was just playing around. I felt bad for the boy.

Around December 25, 2011, I was on the Bravo Dorm sitting in the day room with [redacted] and [redacted]. At that time, two youth walked up and one shoved [redacted], this led to a fight breaking out. I was trying to break it up and looked over and saw the doors to the dorm open and a hand stick out with a can of pepper spray in it. The officer immediately started pepper spraying. Soon there were three officers on the dorm. One was a white male and the others were Officer Gay and Officer Franklin. As soon as those three officers came on the dorm we all got on the ground and stopped fighting, but they still pepper sprayed all of us. Although I was on the ground I looked over and saw Officer Franklin spray [redacted] in the face and mouth. I was lying beside [redacted] and Officer Gay just got over top of us and began pepper spraying more. [redacted] asked why he wouldn't stop, and Officer Gay said "Ya'll wanna fight in my dorm." There was so much pepper spray on the floor it looked like it had just been mopped.

The pepper spraying probably went on for around two minutes but we all lay on the ground for what felt like a half hour. During that time, my face was directly in the pepper spray and I wanted to lift it up but I couldn't. The reason I couldn't lift up my face was because the white officer said that if we moved he would pepper spray us more. It made me feel very angry that I was treated this way. After that we were all handcuffed and me, [redacted] and [redacted] were taken to a cage and the other two youth to a separate cage. Everybody was complaining about their eyes and I could barely open mine. We were in the cage for about five minutes then we got to go the nurse and wash our faces.

After seeing the nurse, we were taken back to the Bravo dorm and put on lockdown in cells by ourselves. We were on lockdown like this for three days. I couldn't use the phone or take a shower. A day after the incident, I told Officer Gay I wanted to write a complaint, and he gave me a blank sheet of notebook paper. I used that to write a grievance about the use of pepper

spray and mentioned Officer Gay in the grievance because he used too much pepper spray. I turned this in to Officer Gay. No one ever talked to me about the grievance.

After being pepper sprayed I did not feel safe and I feel it was wrong to pepper spray me and the other youth. It caused a lot of pain and burned really bad. The guards pull their cans out regularly to threaten us with mace, and that is scary.

Besides the use of pepper spray, on two separate occasions I saw a youth get grabbed by a guard and pushed against a wall for not walking fast enough. Two other times I saw youth grabbed by a guard and pushed against the floor. I do not understand why they have to do this.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signature [redacted]

Date 6/26/12

STATEMENT BY [redacted]

My name is [redacted] and I am 15 years old. I am detained in the Polk County Central Jail as a juvenile. I arrived on or about May 1, 2012. This is my third time here. My first time was in Nov. 2011. At that time I was in Alpha dorm and another kid punched me in my face and we fought. When we saw Officer Hillard coming we stopped fighting. Even though we stopped fighting, I was sprayed with pepper spray for about 10 seconds. I was not taken to see a nurse after.

About 3 weeks ago I was in Bravo dorm and two kids started fighting. About a minute later Officer Saunders sprayed both youth, even though one boy stopped fighting and put his hands up. The boys stayed face down on the floor for a couple of minutes after being sprayed.

About 2-3 days ago an officer threatened to spray me with pepper spray. Other boys were acting out and running around on the mod, and I was on the phone with my mom. The officer told everyone to go to their room and I hung up the phone and started walking to my cell. The officer told me to go to my room, I guess because he thought I was not going fast enough. He took his pepper spray out of its holster and said "go to your room." When I got to my room I kicked the closed door 2-3 times, and officers opened the door. The Sgt. had a big can of pepper spray—like 6-8 inches long—and told me to stop beating on the door or he would put me in the cage. They threatened to mace me too. TH

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: June 14, 2012

[redacted signature]

Declaration of ████████████

My name is ████████████ and I am fourteen years old. I have been detained █████████ at the Central County Jail in Bartow Florida on juvenile charges. Around January 2012, I was in the India Dorm when I heard Officer Cranor yelling. I looked across to the Hotel Dorm and could see she was yelling at another girl in the juvenile dorm named ████████████ She was telling her to get on her bed and then threatened to mace her if she did not get off the table she was on. When ████████████ did not do as she was told, Officer Cranor pulled her hair back and maced her in the face two to three times. The officer then left the area and ████████ was crying. After this, she went off the dorm and I am not sure what happened next. I was sad for the girl because she takes lots of medications for mental health problems and was already on suicide watch. I have also seen Ms. Cranor threaten ████████████ with mace and cuss her out. Hearing guards use cuss words was a regular occurrence at the jail and there were many times when I was cussed at. I was threatened with permanent lock-down for making faces. Around the end of January, I along with other females on my unit filed a grievance about the cussing, macing and the threats of mace. My grievance directly referenced Ms. Cranor. No one who worked at the jail ever talked to me about the grievance I filed.

I am prescribed psychotropic medication and I was never given my medicine properly at the jail. Sometimes I went without medication and another time the jail prescribed me a new prescription. I was put on suicide watch twice while at the jail. Once it lasted about a week and the other time it was 3-4 days even though I was not suicidal. Both times I had to take off all my clothes, including my panties and bra and wrap myself in a thing called a "turtle suit". It was embarrassing being naked underneath the suit and uncomfortable. While on suicide watch, I could not go to school or go outside for recreation. When my meals were brought to me I was not given any silver wear and had to eat with my hands. I also was not given any pencil or paper to write letters.

One time when I was at the jail, the juvenile female dorm was put on lock down for the whole weekend. We all were put in a cell by ourselves and only got out of our cells once a day to shower. We weren't able to go outside for recreation or to even use the phones. I even had to eat alone in my cell and wasn't even able to talk to other juveniles. I felt very lonely, depressed and like an animal in a cage. Another time I was very lonely, was when I was forced to stay on the Hotel dorm all by myself and didn't get to go to school. This was because my co-defendants mother asked that I and her daughter be kept apart. I don't think this was fair and it lasted about four to five days until I was released.

I got hurt at the jail when a girl from the Direct File unit came onto my dorm and started beating me up. I had even reported to staff that the girl was threatening me but I was not protected. It even took a while for staff to respond and for them to pull her off of me. She hit my head a lot and I had a busted lip. Luckily I was being released that day and got to go home.

I got lice two different times during my stays at the jail. It itched so bad that I couldn't even sleep. I got home and my grandma had to spend a lot of money to get it out both times. She even made me cut my hair because of it.

I saw female and male adult inmates at the Polk County Jail. On a few occasions the males made sexual gestures towards me. Once a female adult raised her shirt and showed me her breasts on my way to the attorney booth.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signature [redacted]

Date 4-19-12

Declaration of [redacted]

My name is [redacted] [redacted] I am 17 years old. Around the middle of January, 2012, I was placed in the Polk County Central County Jail on the juvenile unit.

Around the end of January, everybody was fighting in the day room. It was right after dinner, probably around 4:45 or 5 p.m., in C-dorm.

There were 5 or 6 of us fighting. There were no guards around. Then I heard the doors opening, so I knew the guards were coming. We stopped fighting before the guards got through the day room door. I know that because the door makes a loud noise while it opens. I ran back to my room with three

of my roommates. We each got into our beds. Two of the other boys stayed in the dayroom. I was in my bed for 10 or 20 seconds before Officer gay came in. No one was fighting. Officer gay sprayed one of my roommates, [redacted] in the face. I had my shirt over my face. Officer gay moved my hand and pulled my shirt down. He maced me directly in the face. Then he maced my other roommate, [redacted] [redacted], directly in the face. We were all laying in our beds when we were maced.

[redacted]

[redacted] [redacted]

DOB: [redacted]

2/14/12
Date

Declaration of [redacted]

My name is [redacted] and I am 16 years old. I have been detained in the Polk County Jail Since April 12th, 2012.

Around April 13th I was in the Charlie Dorm and saw two kids fighting. One was named [redacted] and the other [redacted]. When the guards came onto the unit the youth stopped fighting. [redacted] started to walk away and a guard sprayed him across his face with mace. The guards threaten us with mace all the time for the simplest things. I don't think mace should be used because it is dangerous and could even permanently hurt someone. I also do not think it is needed because there are other ways to handle kids.

On another occasion around April 14th, I was on the Charlie dorm and Officer Franklin wanted all the youth in their cells and another guard threatened to mace the youth if they did not go to their cells. They also said if we didn't they were going to charge us all with trying to start a riot. One youth named [redacted] was sitting on the floor and said he hadn't done anything wrong. An Officer then picked him up and slammed him against a wall.

We shouldn't be treated like this.

Signature [redacted]

Date 4-24-12

# Exhibit 7
## *The Harmful Use of Isolation in Juvenile Facilities* (excerpt)

Excerpt from Article:  Sandra Simkins, Marty Beyer, & Lisa Geis, *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, WASH. U. J.L. & POL'Y 241, 251-61 (2012).

# The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation

Sandra Simkins*
Marty Beyer**
Lisa M. Geis***

* Sandra Simkins, Clinical Professor, is the Director of Clinical Programs and Co-Director of the Children's Justice Clinic at Rutgers-Camden School of Law. Professor Simkins is the author of sixteen professional articles related to juvenile justice issues; and has a book under contract, *When Kids Get Arrested, What Every Adult Should Know*, which was released in 2009. In 2008, she was selected by the MacArthur Foundation to participate in the *Models for Change* Juvenile Indigent Defense Action Network. Prior to joining the Rutgers faculty in 2006, she spent fifteen years working at the Defender Association of Philadelphia where she was the Assistant Chief of the Juvenile Unit. Sandra is also the co-director of the Northeast Region Juvenile Defender Center, a subsidiary of the National Juvenile Defender Center, where she provides consultation and training to child advocates in Delaware, New Jersey, New York and Pennsylvania.

** Marty Beyer is a juvenile justice and child welfare consultant with a Ph.D. in clinical psychology from Yale University. In addition to assisting states in designing delinquency services, her work with juveniles focuses on how a young person's cognitive, moral and identity development, trauma and disabilities affected the offense and must be considered in designing rehabilitation. She has also assisted with the implementation of strengths/needs-based child welfare practice in several states. Some of her publications can be found on her website MartyBeyer.com.

*** Lisa M. Geis is a graduate fellow at Rutgers-Camden School of Law working with the John D. and Catherine T. MacArthur Foundation's *Models for Change* Juvenile Indigent Defense Action Network. Although she represents juveniles at all levels of the adjudication process, she primarily provides post-disposition representation for youth detained. Lisa participated in the MacArthur Foundation *Models for Change* initiative in conjunction with New Jersey Office of the Public Defender, working to improve access to legal representation for juveniles at initial detention hearings. Through her work with the Rutgers Children's Justice Clinic, Lisa continues her research on conditions of confinement and the use of isolation in juvenile detention facilities.

### *A. What is Isolation?*

1. Defining Isolation

Juvenile facilities use a variety of terms and acronyms when referring to instances of isolation. Youth placed in secure facilities refer to it as being "put in the box,"[42] "lockdown," "seg," or "the hole."[43] In juvenile facility manuals, removal of a juvenile from his cell and separating him from other residents may be referred to as segregation, pre-hearing confinement, protective custody, seclusion, behavior modification unit, close watch, or room restriction, among other things.[44] Regardless of what a facility's policy and procedure

---

42. This knowledge is based on more than seventy-five client interviews conducted by Lisa Geis as part of the NJ post-disposition representation program.

43. Interview by Marty Beyer with juvenile clients.

44. STATE OF NEW JERSEY DEP'T OF LAW & PUB. SAFETY, JUVENILE JUSTICE COMM'N, NEW JERSEY TRAINING SCHOOL, HANDBOOK ON RULES, REGULATIONS, AND DISCIPLINE Rev.

guidebook calls such placement, it is, definitively, isolation or solitary confinement.

Isolation is usually described as placing a youth alone in an unfurnished cell for as much as twenty-three hours a day, usually for disciplinary, safety or administrative purposes. Isolation typically includes extensive surveillance and security controls, the absence of ordinary social interaction, and abnormal environmental stimuli (e.g., many isolation units are noisy and cold). Isolated individuals are often allowed only five hours a week of solitary recreation and little, if any, educational, vocational, or other purposeful activities. They may be handcuffed and/or shackled when they leave their cells.[45]

Courts use isolation and solitary confinement synonymously and they have been clear in their definition. The District Court in North Carolina in *Berch v. Stahl* aptly defined solitary confinement as "confinement alone and removed from sustained contact with other human beings."[46] The court held that solitary confinement's "severity as punishment is drastically increased when the isolation is accompanied by the 'sensory deprivation' which is . . . attached to the isolation."[47] The court then explained that sensory deprivation occurs if "visual contact and effective voice communication with others" is barred and if an inmate is prevented from "read[ing], writ[ing], [or] work[ing] on projects," concluding that the person's "[m]ental and emotional stability are both threatened, and mental health may be impaired."[48]

In a report concerning "torture, and other cruel, inhuman or degrading treatment or punishment," the United Nations General Assembly defined solitary confinement as "the physical isolation of individuals who are confined to their cells for twenty-two to

---

Feb. 2010); N.J.A.C. 13:92 (2011); N.J.A.C. 13:95-11; N.J.A.C. 13:101-5.3; Interviews with Post-disposition program clients.

45.   Marty Beyer addition.

46.   Berch v. Stahl, 373 F. Supp. 412, 420 (W.D.N.C. 1974).

47.   *Id.*

48.   *Id.* Because the court in *Morales v. Turman* was aware of the various names applied to isolation in juvenile facilities, it defined solitary confinement as the placement of an "inmate alone in a [room] other than a room in the inmate's own locked or otherwise secured room or cell dormitory." Morales v. Turman, 364 F. Supp. 166, 177 (E.D. Tex. 1973). The court also defined "dormitory confinement" and "security" in a similar fashion. *Id.*

twenty-four hours a day."[49] The same report specifically recommends that the use of isolation should be strictly prohibited for use on children under the age of eighteen and for prisoners with mental illness.[50]

Several years earlier, the General Assembly adopted the United Nations Rules for the Protection of Juveniles Deprived of Their Liberty. Rule 67 prohibits the use of "closed or solitary confinement" of juveniles.[51] The Rule qualifies such punishment as "cruel, inhuman or degrading treatment."[52] In 1980, Amnesty International defined solitary confinement in a report on prison conditions as all "forms of incarceration that totally remove a prisoner from inmate society."[53] The organization explained that such confinement removes the prisoner "visually and acoustically" from other inmates resulting in "no personal contact with them."[54] International treaty bodies and human rights experts, including the Human Rights Committee, the Committee against Torture, and the U.N. Special Rapporteur on Torture, conclude that long term isolation may amount to cruel, inhuman, or degrading treatment in violation of the International Covenant on Civil and Political Rights and the Convention against Torture and other Cruel, Inhuman, and Degrading Treatment or Punishment.[55]

### 2. *Psychological Effects of Isolation in Secure Facilities*

There is limited isolation research pertaining to its use in juvenile detention facilities but extensive research has been done on the use of

---

49. *Interim Report*, *supra* note 39, at 18.

50. *Id.* at 25.

51. United Nations Rules for the Protection of Juveniles Deprived of Their Liberty, G.A. Res. 45/113, R. 67, U.N. Doc. A/RES/45/113 (Dec. 14, 1990).

52. *Id.*

53. AMNESTY INT'L, AMNESTY INTERNATIONAL'S WORK ON PRISON CONDITIONS OF PERSONS SUSPECTED OR CONVICTED OF POLITICALLY MOTIVATED CRIMES IN THE FEDERAL REPUBLIC OF GERMANY: ISOLATION AND SOLITARY CONFINEMENT 9 (1980), *available at* http://www.amnesty.org/en/library/asset/EUR23/001/1980/en/a49b3516-773f-4a2d-b753-50eb1c34c493/eur230011980en.pdf.

54. *Id.*

55. Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & LAW 104–08(2010).

isolation with adult prisoners. Findings show that "[i]solation can be psychologically harmful to any prisoner, with the nature and severity of the impact depending on the individual, the duration, and particular conditions (e.g., access to natural light, books, or radio). Psychological effects can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[56]

Craig Haney, in the *From Prison to Home: The Effect of Incarceration and Reentry on Children, Families and Communities* project,[57] reported that the use of isolation on adults has the following negative results:

- Impaired sense of identity, hypersensitivity to stimuli, confusion, memory loss, irritability, and anger.

- Aggression & rage: attacks on staff, destruction of property, and collective violence.

- Lethargy, helplessness, hopelessness, and depression.

- Self-mutilation, suicidal ideation, and emotional breakdowns.

- Psychosis, hallucinations, and paranoia.

- Overall deterioration of mental and physical health.

- Produces indices of psychological trauma & psychopathic behaviors.[58]

In 1997, Dr. Haney and Mona Lynch published an article that extensively explored the use of isolation in adult prisons.[59] In compiling their data, they studied the use of isolation in a variety of situations: German wartime prison camps, soldiers stationed in Antarctica, male and female adult prisoners in various facilities

56. *Id.*
57. CRAIG HANEY, THE PSYCHOLOGICAL IMPACT OF INCARCERATION: IMPLICATIONS FOR POST-PRISON ADJUSTMENT 14 (2001), *available at* http://aspe.hhs.gov/hsp/prison2home02/haney.pdf.
58. *Id.*
59. *See* Haney & Lynch, *supra* note 38.

throughout the world, and, in some cases, in voluntary research projects.[60] In these varied settings, the effects of isolation were the same: the prisoners experienced a range of "stress-related, dysfunctional, and destructive behavior."[61] In interviews with hundreds of prisoners many reported that they experienced "rage, panic, loss of control, breakdowns . . . and a build-up of physiological and psychic tension that led to incidents of self-mutilation."[62]

Psychiatrist and noted isolation expert Dr. Stuart Grassian has published research concerning the psychiatric effects of solitary confinement in prisons for the state and federal courts in New York, California, Massachusetts, and Kentucky. Dr. Grassian found that solitary confinement often causes "severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness."[63] After being isolated, many of the prisoners Dr. Grassian studied developed psychiatric syndromes including hypersensitivity to external stimuli; perceptual distortions, illusions, and hallucinations; panic attacks; difficulties with thinking, concentration, and memory; intrusive obsessional thoughts and emergence of primitive aggressive ruminations; overt paranoia; and impulse control problems.[64]

In an earlier article, Dr. Grassian reported that isolation can cause "severe psychiatric harm" to prisoners.[65]

> This harm includes a psychiatric syndrome which has been reported by many clinicians in a variety of settings. . . . In more severe cases, this syndrome is associated with agitation, self-destructive behavior, and overt psychotic disorganization. More than half the prisoners [in isolation] reported a progressive inability to tolerate ordinary stimuli . . . Almost a third described hearing voices, often in whispers, often saying frightening things to them. Well over half the inmates

60. *Id.* at 511–25.
61. *Id.* at 525.
62. *Id.* at 518.
63. Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325, 333 (2006).
64. *Id.* at 335–36.
65. Grassian, *supra* note 63.

> interviewed described severe panic attacks while in SHU [isolation] . . . Many reported difficulties in concentration and memory . . . Almost half the prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. . . . Almost half the prisoners interviewed reported paranoid and persecutory fears.[66]

Although the level of psychological harm varies and some symptoms may subside upon release from solitary confinement, the damage suffered by prisoners subjected to isolation continues to present itself once the prisoner is released back into the prison population or into society at large. Dr. Grassian concluded:

> This harm is most commonly manifested by a continued intolerance of social interaction, a handicap which often prevents the inmate from successfully readjusting to the broader social environment of general population in prison and, perhaps more significantly, often severely impairs the inmate's capacity to reintegrate into the broader community upon release from imprisonment.[67]

Many of these behaviors were demonstrated by sixteen-year-old William, a New Jersey's post-disposition project client:

> *Case example:* William, a fifteen year-old boy at a New Jersey secure juvenile facility, spent approximately 178 of his 225 day commitment in isolation. The cell measured approximately seven feet by seven feet. He had no access to books or other reading materials, auditory stimulation, or substantial conversation. Prior to his commitment, William was diagnosed with mental health issues as well as displaying a history of aggressive behaviors and a need for psychiatric treatment. Within a few days of being placed in the "seg unit", William began to report auditory and visual hallucinations and demonstrated outrageous behaviors such as throwing bodily fluids. Within a week he began to self-mutilate by "cutting."

66. *Id.* at 1–4.
67. Grassian, *supra* note 63.

> Soon thereafter, he attempted suicide by hanging himself on five different occasions.[68]

Based on a variety of studies and expert opinions, it is undisputed that the psychological effects of isolation are detrimental to both the mind and the spirit. Although little research has been done on the effects of solitary confinement on juveniles, based on what is known about adolescent development and teen brain studies, isolation is likely to be more damaging to a juvenile than to an adult.

### *B. The Harmful Effects of Isolation on Juveniles*

Because isolation is so detrimental to the mental health of juveniles, mental health and correction professionals generally agree that the use of such measures should be limited to those rare occasions when a young person poses an imminent threat to others' safety.

Isolation, even for brief periods, is harmful for adolescents for two reasons: (1) Youth in isolation cannot participate in programs, including education, designed to rehabilitate them; and (2) Isolation has negative psychological consequences, including increasing risk of suicide, re-traumatizing, depression and agitation. Interactive treatment programs have more success in reducing problem behavior and mental health problems in youth than does isolation, which in fact provokes and worsens these problems.

As is evidenced in adult prisoners, isolation can exacerbate a young person's emotional crisis.[69] Isolation practices can have the following negative consequences on juveniles. First, isolation causes depression. Often, youth in isolation are denied reading materials, programming (including school and therapy), and exercise. Being alone and having nothing to do gives youth too much time to ruminate, which can lead to the onset of depression. "Depression is common but often not diagnosed in delinquent youth. Their behavioral problems become the focus rather than their underlying sadness, isolation and loss. Irritability is a frequent symptom of

---

68. *See supra* text accompanying notes 2, 3.

69. NAT'L ADVISORY COMM. FOR JUVENILE JUSTICE & DELINQUENCY PREVENTION, U.S. DEP'T OF JUSTICE, STANDARDS FOR THE ADMIN. OF JUVENILE JUSTICE § 4.52 (1980).

adolescent depression, and annoys staff and peers and makes it more difficult to involve the adolescent in positive activities."[70] Adolescents may not be able to see the temporariness of isolation and, as a result, cannot pull themselves out of their depression. Youth in isolation are deprived of whatever socialization is available to youth in the general population. They usually eat their meals alone in the cells. Recreation and exercise activities are solitary. They may have no one to talk with other than by yelling through the cell door. Isolation prevents youth from meeting their social needs, which further contributes to depression. Depression in adolescents can cause a variety of behavioral problems, which usually result in more punishment. Whether or not a youth is depressed before being isolated, usually he/she will feel disturbed from being alone and having nothing to do.

Second, isolating juveniles causes agitation. During adolescence, young people gradually define their moral values—and tend to be moralistic—and insistent upon what should be and are intolerant of anything that seems unfair. Juveniles view isolation as unfair. Adolescents do not have the adult cognitive abilities to say, "This is not unfairness directed at me personally, isolation is the consequence for certain behaviors for all residents." Especially for youth of color, isolation may be perceived as degrading and racist; girls may also object to isolation as discriminatory. It is normal for youth to protest unfairness, and when their protest does not get attention, they are likely to become more agitated. Their trust in adults, on whom they remain dependent and who they expect to be fair and kind, is violated when they are isolated and their protests of the perceived unfairness of their confinement are unheard. Youth may believe that "confinement is an overt attempt by authorities to 'break them down' psychologically . . . [and] the product of an arbitrary exercise of power, rather than the fair result of an inherently reasonable process."[71]

Third, isolation causes juveniles to feel victimized, which can be re-traumatizing. Many youth in juvenile facilities experience abuse,

70. Michael D. Cohen et al., *Health Services for Youth in Juvenile Justice Programs*, *in* CLINICAL PRACTICE IN CORRECTIONAL MEDICINE, 120, 124 (Michael Puisis ed., 2d ed. 2006).

71. Grassian, *supra* note 63, at 333.

neglect, significant loss, exposure to violence, and other trauma. Some youth in delinquency facilities are previously known to child protective services agencies and may have had multiple placements in foster care. Trauma slows down development and can cause disturbances of emotional regulation, relationships, and communication.[72] The depression, difficulties trusting others, fearfulness, aggression, substance abuse, and concentration problems common in delinquent youth are often caused by untreated trauma. Abuse of power by an adult can provoke in traumatized youth a combination of self-blame and a sense of betrayal, which can lead to self-destructiveness or aggression. For those who have been abused and/or neglected, isolation is likely to activate painful memories and may be experienced as re-victimization. Isolation could make a traumatized youth feel once again that they cannot control hurtful things that happen to them. Such powerlessness is damaging and can undermine the progress the youth has made in recovering from earlier trauma.[73]

Fourth, isolation causes an increased risk of suicide. In 1999, the Office of Juvenile Justice and Delinquency Prevention released a national study of suicides in public and private juvenile facilities. The study found that 50 percent of youth who committed suicide were in isolation at the time of their suicide and 62 percent had previously been in isolation. Even youth who had not previously expressed thoughts of harming themselves can become desperate, hopeless and suicidal in isolation. For youth who are already talking about or who have previously attempted suicide, isolation is a dangerous practice that should be prohibited. While regularly checking on a suicidal teen in isolation may prevent death, the young person's mental health deteriorates. Suicidal youth must spend most of each day in activities and interacting with peers and staff. Further, isolation is not the only means of staff observation of troubled teens; they can just as easily be observed outside of isolation without the negative psychological consequences of isolation.

---

72. Marty Beyer, *A Developmental View of Youth in Juvenile Justice System*, *in* JUVENILE JUSTICE: ADVANCING RESEARCH, POLICY, AND PRACTICE (Francine Sherman & Francine Jacobs eds., 2011).

73. *See id.*

Finally, youth in isolation are frequently denied the education to which they are entitled. In juvenile detention and commitment facilities, youth are required to attend school, and educational benefits should not be denied because they are being punished. As many as half of the youth in detention and commitment facilities have disabilities that substantially affect their learning abilities and either have or should have been identified for special education. The Individuals with Disabilities Education Act services should be designed to prevent the behaviors that might lead to punishment, such as isolation.[74] When youth are deprived of educational services, not only do they lose that aspect of rehabilitation, but they also lose an important source of self-esteem building.

Facilities use isolation to manage behavior, but the reality is that isolation makes things worse. Isolation is "a reaction to day-to-day crises and evolve[s] into an institutional practice with its foundation never being questioned."[75] Juveniles isolated for behavior problems

---

74. As Joe Tulman described in the ABA publication *Representing Juvenile Status Offenders*, youth who have or should have been identified for special education have the right not to be excluded from school, even if facility staff are disciplining the youth for rule violations. Joseph B. Tulman, *Using Special Education Advocacy to Avoid or Resolve Status Offense Charges*, *in* AM. BAR ASS'N, REPRESENTING JUVENILE STATUS OFFENDERS 89–120 (Sally Small Inada & Claire S. Chiamulera eds., 2010).

75. Jeff Mitchell & Christopher Varley, *Isolation and Restraint in Juvenile Correctional Facilities*, 29 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 251–55 (1990). The authors describe their work with a juvenile detention center that closed its isolation unit despite the objections of staff and instituted a behavior modification program. Jeff Mitchell & Christopher Varley, *Isolation and Restraint in Juvenile Correctional Facilities*, 29 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 251, 253 (1990). The incidence of behavior problems decreased dramatically. *Id.*

> It is essential for juvenile correctional programs to provide their residents with stimulating recreational programs, educational programs, well-administered behavior management programs . . . and team-generated, individualized service plans. . . .
>
> . . . [T]hese recommendations . . . improve behavioral management. Administrators who eliminate abusive isolation . . . practices find that they are in more control of their programs. It is presumed that their residents recognize this and behave accordingly.

*Id.* at 254–55. "[P]rograms relying on excessive isolation experience high rates of aversive behaviors among residents." *Id.* at 253.

> While as many as 65%–75% of youthful offenders have one or more diagnosable psychiatric disorders, most juvenile detention facilities do not have the capacity to serve them. This situation is aggravated by multiple problems, including overcrowding, dilapidated institutions, inadequate funding for services and programs,

tend to be youth who act out as a result of perceived harassment and threats due to past trauma. Behind problematic youth behavior is a combination of immature thinking and identity, learning disabilities, and trauma.[76] And, as a result of isolation, the very behaviors that are the cause for placement in isolation are exacerbated. This is particularly alarming among juveniles because often the residents are subjected to isolation because they have "acted out" in some way or are not able to conform to the rules of the facilities.

> and inadequately trained custodial and mental health staff. These factors are associated with an increased risk of suicide, physical assaults, and accidental injuries.

Kim J. Masters & Joseph V. Penn, *Practice Information, Juvenile Justice + Interventions = Fragmentation*, J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY (July/Aug. 2005), *available at* http://www.aacap.org/cs/root/member_information/practice_information/jul/aug_2005_aacap_news_seclusion_restraint_juvenile_justice_interventions_fragmentation.

76. "Aggressive youth overreact to perceived threat, typically because it is reminiscent of past victimization. These youth do not see these responses as excessive. They may have little experience expressing their thoughts and resolving their feelings verbally rather than through aggression. These youth may feel helpless about regulating their behavior." Cohen, *supra* note 70, at 124. Some teenagers who have been victimized in the past react to limit-setting as if it is personalized, or a form of harassment against them. Any "No" from an adult can be seen as victimization. Some of these youth misinterpret and are offended by relatively benign things that others say and do. They perceive hostility coming from others, and their reactions cause adults to view them as difficult and oppositional.

Reacting to perceived threats is characteristic of traumatized teenagers. When there is a history of repeated physical and sexual abuse, a young person is likely to feel more threatened and is more likely than other teens to be on the alert.

Afterwards, it may appear that a frightened teenager over-reacted, but threat can only be evaluated from the perspective of each young person at the time that he/she felt in danger (no matter how well-intentioned the adult was). It is not unusual for traumatized youth to be surprised by their angry outbursts when memories of their victimization are triggered. A traumatized teenager may have no way of responding to harassment or a perceived threat, feeling out of control and experience a primitive, unthinking reflex. It is these youth who are often punished with isolation.