EXHIBIT 4

DAPHNE GLINDMEYER, M.D.
DONNA M. MANCUSO, M.D.
JANET SELIGSON-DOWIE, M.D.
KRISTEN A. LUSCHER, PH.D

229 BELLEMEADE BLVD., STE. 420
GRETNA, LA 70056

OFFICE: (504) 392-8348
FAX: (504) 398-4334

July 31, 2012

Southern Poverty Law Center
Attention: Tania Galloni, Esq.
4770 Biscayne Blvd, Suite 760
Miami, Florida 33137

Dear Ms. Galloni,

Per your request for consultative interviews of youth who were detained at the Polk County Jail in Bartow, Florida, I conducted interviews with seven youth on May 21, 2012 and May 22, 2012. This consultation was requested in response to a suit filed on behalf of the youth detained at the Polk County Jail in Bartow, Florida to protect them from abusive and unconstitutional conditions of confinement. The concerns outlined in the following report include: traumatic experiences and trauma sequelae related to the use of pepper spray; traumatic experiences and trauma sequelae related to the use of isolation; lack of appropriate suicide prevention/intervention policy and practices; lack of appropriate training for officers with regard to adolescents; and delays in receipt of psychotropic medications and psychiatric treatment.

For a list of documents reviewed in order to complete this report, please see attachment A. Youth interviews will be documented in attachment B.

**Literature Review:**
In an effort to provide a context within which to consider the youth interviews of youth previously detained in Polk County Jail (attached in attachment B), the following review of the scientific literature is included. Specific areas of focus include issues related to the housing of juvenile detainees in adult facilities; trauma and traumatic stress with regard to the use of chemical agents (i.e. pepper spray) and isolation; and addressing self-injurious or suicidal behavior.

**Issues Related to the Housing of Juveniles in Adult Jails:**
Historically, the juvenile justice system was created in order to better address risk factors for delinquency; provide rehabilitative care and treatment; and provide for specific needs of adolescents that differ from those of adults (Woolard, et al., 2005). While it is understood that the youth interviewed were not housed with

adults, they were detained in a facility that has historically housed adult inmates with facility staff experienced with adult inmates rather than adolescents.

Developmental Characteristics of Adolescents:
It is well established that brain development and maturation continues well into the third decade of life (i.e. the early 20's). The pre-frontal cortex, located in the frontal lobe of the brain (right behind your forehead) is the center that controls executive functioning. This area can be considered the "brain boss" and is responsible for planning, sequencing, organizing, strategizing, impulse control, modulation of emotion, and considering consequences of behaviors. It is also known that adolescents experience difficulties in all of the above areas, which is directly related to the latency of development in this area. This is further evidence of the need for specific programming and behavioral supports for adolescents that is individualized to their specific developmental needs.

Research from the John D. and Catherine T. MacArthur Foundation reviewed how differences in executive functioning affected youth decision-making. Specifically, they concluded that adults have greater future orientation and that adolescents have a lack of foresight that "along with their tendency to pay more attention to immediate gratification than to long-term consequences are among the factors that may lead them to make bad decisions." They also noted poor impulse control wherein adolescents, "are both less sensitive to risk and more sensitive to rewards- an attitude that can lead to greater risk-taking." Other differences specific to adolescents included their vulnerability to peer pressure, where they "are coerced to take risks they might otherwise avoid...[due to] desire for peer approval...fear of rejection...capitulating in the face of a challenge can be a sign of weakness, inviting attack and continued persecution."

Diversity in the presentation and needs of adolescents is another important factor when considering management of youth in a correctional setting. In other words, although adolescents share a common factor of age, the emotional, behavioral, cognitive, social, and developmental functioning can vary widely within this population. Variability can be related to multiple domains including but not limited to physical growth, nutrition, education, peer influences, and parenting (Woolard et al., 2005).

Woolard et al. (2005) highlighted the developmental differences between adolescents and adults noting the implications of these differences with regard to the placement of youth in the adult correctional setting. Because adolescence is a period of extensive change, "individual growth challenges adult corrections systems to sort and manage a young population that can appear simultaneously adult-like and immature. Individuals may differ from each other, but the same adolescent may be more or less advanced in various

specific capacities (p. 8)." For example, youth may appear to be older, more mature, and capable based on physical appearance alone. But in fact, they are still young, immature, and vulnerable with difficulty navigating social situations. They experience significant challenges with comporting their behavior with the confines of an institutional setting where there are rules and regulations that are seemingly arbitrary to them as they have not been properly oriented. They may seem brave and bold, but are actually fearful and this fear can present as aggression.

There is an overwhelming body of scientific literature regarding differences between adolescent and adult functioning across the aforementioned domains. When considering the specific needs associated with incarceration or detention coupled with differing developmental profiles for adolescents, simply adjusting adult correctional programs and practices inadequately accounts for the needs of adolescents. In other words, a "one size fits all" program based on adult populations is inadequate in addressing the specific programmatic and developmental needs of adolescents. The approach fails to account for unique aspects of adolescent development discussed above and requires a more qualitative approach toward program development for adolescents.

<u>Safety and Management of Adolescents</u>:
Woolard et al. (2005) highlighted two primary issues that arise when considering appropriate programming for adolescents in the adult correctional setting. One area focuses on concerns related to the safety and management of youth offenders in this setting. A second area centers on how to meet treatment and programming needs for the diversity inherent within the adolescent population.

With regard to the safety and management of youth, there are a number of variables or conditions within the correctional setting that differ for adolescents when compared to adult inmates. The environmental needs of adolescents must take into account physical development, the need for activity, and safety concerns, which are different from adults. Considering the physical demands of growth and development in the adolescent populations, programs must provide opportunities for gross and fine motor development. Given the vulnerability of youth, ensuring the physical safety and prevention of victimization is of central concern considering the vast amount of scientific literature documenting the adverse effects victimization has on adolescent brain development, as well as psychiatric and mental health functioning.

Behavior management plans or programs used in adult populations are also not equivalent to those that should be implemented with adolescents. Reinforcement and consequences typically used with adult populations do not have the same effectiveness with adolescents. Behavior modification programs utilized for adults will require adjustment in the types of reinforcers and schedules

of reinforcement when used with adolescents given that responsiveness to adult behavioral modification programming may be ineffective or inadvertently punitive when considering developmental characteristics of youth. Some means of behavior modification (i.e., chemical agents, isolation) can be related to the development of trauma sequelae in adolescent populations. For example, an adolescent's concept of time is different from that of an adult. A period of time in seclusion in response to a disciplinary infraction following appropriate due process that may be used for an adult would be excessive for an adolescent and could lead to the development of psychological sequelae. The development of trauma sequelae will be discussed in detail below.

Without consideration of the developmental needs of adolescents in the context of management and environment, correctional facilities and staff increase the risk of detrimental emotional, behavioral, and psychological outcomes. Interviews with the youth previously detained at Polk County Jail included in attachment B indicated concern with regard to the lack of appropriate behavioral intervention and de-escalation techniques, over-reliance on seclusion/isolation, physical management of behavioral challenges, and aversive/punitive behavioral management methods (i.e. pepper spray). For specific youth commentary regarding this issue, please see the interviews regarding youth 111, youth 222, youth 333, youth 555, and youth 999.

Given the minimal information provided from Polk County Jail, it was not possible to determine if classification specifically included an assessment of the developmental needs of the children and adolescents. Woolard et al. (2005) specifically stated, "the inaccuracy of adult classification tools has been cited as a contributing factor to the high rates of victimization and self harm...the inability of adult classification instruments to correctly...account for the victimization and self harm potential of juveniles, has been cited as contributing to increased security risks (Reddington and Anderson, 1996)." There are tools designed for use with adolescents, and "are more likely...to include age appropriate items and definitions...such as previous level of psychological and physical maturity, and family, school and peer difficulties...also more likely to include 'dynamic' risk factors." As youth grow and mature, their ratings on these risk items may change. These differences highlight the need for assessment and classification tools geared toward the adolescent population.

Research has supported that the "one size fits all" approach has not historically been successful in managing violent behavior outbursts, behavior problems, or staff injuries in the context of incarceration. Rather, Liberman (2011) reviewed behavior interventions that have been shown to be more effective in reducing and controlling behavioral difficulties exhibited by adolescents. Specifically, the author identified positive programming and activity scheduling, which involves scheduling activities that allow social interaction; satisfaction of completing

constructive pursuits; and opportunities for positive staff interactions as successful means of reducing challenging behavior and increasing adaptive behaviors. Additionally, social learning therapy involving token economy systems, incentive programs, and contingency management plans has also been beneficial in managing behavior problems in adolescents. Underwood et al. (2006) cited similar findings for incarcerated adolescents diagnosed with a mental health condition(s) wherein therapeutic interventions focusing on emotion regulation, de-escalation, and distress tolerance (i.e., dialectic behavior therapy) were effective in reducing problematic behavior.

Inherent in the aforementioned behavior interventions is the use of both preventative strategies and de-escalation responses in the face of aggressive or problematic behavior. De-escalation interventions have been long supported as appropriate for use in conjunction with behavior modification and are recommended for use before administration of punitive measures occurs. De-escalation is often very effective in managing behavior and, if applied in concert with an appropriate behavioral management program, significantly reduces the need for reliance on punitive interventions.

Punitive interventions rarely lead to any real measurable changes in behavior. Punitive interventions do not teach skills or allow for issues to be addressed, they simply result in immediate cessation of the problem behavior. Additionally, the potential for abuse with punitive interventions is concerning. Studies involving the attitudes of correctional officers toward adolescents indicate that adolescents are often perceived as more volatile and difficult to manage than adult inmates (Austin, Johnson, and Gregoriou; 2000). Such attitudes, coupled with the availability of punitive interventions lead to the possibility for inappropriate use or, in some cases, abuse of the intervention.

**Restraint Use and Seclusion with Adolescents:**
The use of restraint and seclusion varies depending on state laws and regulations. Restraint is generally defined as any physical or mechanical intervention that restricts behavior or controls movement of a person whereas seclusion generally refers to confinement to a location where a person is voluntarily unable to leave (Busch & Shore, 2000). Metzner, et al. (2007) noted that the use of restraint or seclusion in correctional settings is often influenced by classification and disciplinary issues of the incarcerated youth. The use of restraint and seclusion in correctional facilities should be implemented in a manner consistent with current community practices (Metzner, et al., 2007). Restraint and seclusion have been contraindicated with individuals who have medical vulnerabilities, dementias, paranoia, posttraumatic syndromes, or psychological symptoms that make restraint or seclusion difficult to tolerate.

Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

Scientific literature pertaining to the effects of restraint use or seclusion with children and adolescents is sparse; however, in the context of incarceration it is a rarity. One article authored by Simkins, Beyer and Geis (2012) was located. They indicated that "it is undisputed that the psychological effects of isolation are detrimental to both the mind and the spirit...based on what is known about adolescent development and teen brain studies, isolation is likely to be more damaging to a juvenile than to an adult...the use of such measures should be limited to those rare occasions when a young person poses an imminent threat to others safety." Simkins et al. (2012) elaborated on the harmful effects of isolation on juveniles. Specifically, while in isolation, youth cannot participate in programming inclusive of education, and isolation exposes youth to increased risk of suicide, re-traumatization, depression and agitation.

The American Academy of Child and Adolescent Psychiatry issued a policy statement regarding Solitary Confinement of Juvenile Offenders in April 2012. They reiterated the negative effects of solitary confinement outlined by Grassian (2006) and Simkins et al. (2012). They further delineate the difference between solitary confinement and "brief intervention such as 'time out' which may be used as a component of a behavioral treatment program...or seclusion, a short term emergency procedure...should only be used for the least amount of time possible for the immediate physical protection of an individual where less restrictive interventions have proven ineffective." Interviews with youth detained at Polk County Jail included in attachment B described youth spending extended periods of time in isolation; short-term seclusion or time out was not described. For specific youth commentary regarding this issue please see the interview regarding youth 333.

Research pertaining the adverse effects of restraint and seclusion has been investigated with more frequency in behavioral health settings. In research investigating the negative effects associated with restraint use and seclusion, the most negative outcome cited has been physical injury. Injuries, such as abrasions to more serious events such as asphyxiation and pulmonary embolisms, have been associated with restraint use (Brown et al., 2000). With regard to seclusion, suicide completions and engagement in self-injurious behaviors have resulted in the absence of adequate supervision and monitoring (Brown et al., 2000). Use of restraint and seclusion in psychiatric populations has

been associated with reintroduction of traumatic experiences exacerbating posttraumatic stress symptomatology or mental health conditions (in Frueh et al., 2005). Frueh et al. (2005) found that individuals subjected to restraint and/or seclusion reported it as harmful and traumatic, consistent with the diagnostic criteria for posttraumatic stress disorder, as well as frightening. They also experienced concern for their physical safety and feelings of helplessness. These experiences were "both traumatic and harmful...associated with psychological distress. (p. 1130)." Pre-existing conditions were worsened by exposure to restraint and seclusion, which further highlights the needs to assess the unique history of each individual prior to administration of restraint or seclusion.

The deleterious effects of confinement and seclusion have been well documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems. Individuals without a pre-existing history of mental health problems experienced a greater amount of irritability, anxiety, and dysphoric symptoms.

The most analogous conditions associated with seclusion in the Polk County Jail resembles restraint and seclusion used with psychiatric populations. It has been established that restraint and seclusion are considered to be traumatic events. The effects of traumatic events on adolescents will be discussed in greater detail below.

**Trauma and Traumatic Stress:**
Extensive research pertaining to the effects of exposure to trauma in adolescents exists. As cited by van der Kolk, McFarlane, & Weisaeth (1996), Green (1990) proposed several generic categories defining what constitutes a traumatic stressor. These categories include "(1) threat to one's life and body integrity, (2) severe physical harm or injury, (3) receipt of intentional injury/harm, (4) exposure to the grotesque, (5) witnessing or learning of violence to loved ones, (6) learning of exposure to a noxious agent, and (7) causing death or severe harm to another." Traumatic events include, but are not limited to, physical abuse, sexual abuse, neglect, excessive physical punishment, and maltreatment. Turner and Finkelhor (1996) identified physical or corporal punishment as a traumatic stressor for children and adolescents.
Researchers have now begun to expand the definition of events to include significant traumatic stressors, directly or indirectly experienced, which impact the psychological, emotional, or behavioral functioning of adolescents.

Recently, research has begun to also focus on the effects of secondary violence exposure, such as witnessing an event. Originally, a traumatic event, by definition, was relegated to only those events in which a child or adolescent directly experienced some form of abuse or violence that led to the development of symptoms included in a specific set of diagnostic criteria. However, this nomenclature has changed and researchers have now begun to expand the definition of events to include significant traumatic stressors, directly or indirectly experienced, that impact the psychological, emotional, or behavioral functioning of children and adolescents.

In this case, the use of oleoresin capsicum (OC), which is commonly known as pepper spray, would be considered a traumatic stressor, as it involved the use of a noxious agent. A noxious agent is a substance that is harmful, poisonous, or very unpleasant. Adolescents interviewed in preparation for this report described being sprayed with OC (which they commonly referred to as "mace"), and witnessing other youth being sprayed with OC. Additionally, the use of this agent would also be equivalent to a threat to physical integrity regardless of the identified reason for its use. A threat to physical integrity is an event that is deemed by the individual to compromise his or her well-being or personal safety. In this case, OC use caused a reaction or consequence that threatened the well-being or safety of the person receiving OC.

Youth interviewed reported experiencing OC spray in an indiscriminate manner. They recalled observing other youth receiving OC spray in what was described as punitive situations. For example, youth recalled receiving OC spray while they were locked in the "cage" for suicide watch due to singing out loud. They also recalled receiving OC spray for fighting where the spray was administered after the fight was over and the youth had returned to their rooms. These examples are not indicative of the use of OC spray to control violence or behavioral exacerbations, but rather to punish the youth.

Youth reported that they experienced or witnessed others having difficulties following the administration of OC spray. They recalled experiencing burning in their eyes and on their skin as well as difficulty breathing. Youth indicated that they were not always given the opportunity to shower or change clothes following the administration of OC spray. Review of available medical records revealed documentation that youth were examined by a nurse after being sprayed with OC. Most of the youth interviewed had no recollection of this occurring. This is not surprising, as receipt of OC spray is in, and of itself, a traumatic experience. As discussed further below, one of the sequelae of a traumatic stressor is a lack of memory for specific details of the traumatic incident. Therefore, there is a strong likelihood that the youth would have memory of only parts of the experience. For specific youth commentary

regarding this issue please see the interviews regarding youth 111, youth 222, youth 333, youth 555, and youth 999 included in attachment B.

In 2007, the Texas Criminal Justice Coalition published research review findings and policy recommendations for pepper spray use. As part of an executive summary, the Coalition cited that "long-term risks associated with pepper spray points to the following harmful effects: a degeneration of nerve terminals, which results in desensitization to pain and thermal regulation; lasting nerve damage in corneal tissue; acute pulmonary inflammation and respiratory cell injury; a mutagenic effect on organs; changes in the body leading to various types of cancer, including gastric, esophageal, and skin cancers; and tumors." Moreover, they also stated "youth at increased risk from pepper spray exposure include those with impaired eye conditions, skins conditions (such as allergic dermatitis), asthma or respiratory complications, underlying cardiac or pulmonary diseases, and those taking prescribed antipsychotic drugs." The Coalition was unable to cite one research article supporting the safe use of pepper spray on children and cited a federal court that determined "the harm resulting from pepper spray use is so severe that it 'satisfies the definition of a dangerous weapon'".

<u>Effects of Trauma and Traumatic Stress on Children and Adolescents</u>:
Literature has documented that traumatic victimization or exposure to traumatic stress has significant ramifications for children and adolescents across a number of areas including emotional, behavioral, cognitive, psychological and physical functioning (Armsworth & Holaday, 1993). Many children and adolescents who have experienced trauma exhibit good outcomes; however, victimization doubles the risk of developing psychopathology, which places these children and adolescents at greater risk for future psychiatric and mental health problems (Pine, 2003). Although many children and adolescents who have experienced trauma may meet the necessary criteria for a psychiatric diagnosis, they may also have a number of symptoms that do not meet diagnostic criteria, but significantly interfere with immediate and long-term functioning (Broman-Fulks et al., 2009). Therefore, the effects of traumatic stress do not require an actual diagnosis of a psychiatric condition to have deleterious effects on children and adolescents.

Research, in general, has identified that exposure to a traumatic event or multiple traumatic events will negatively impact the well-being and psychological functioning of adolescents. Immediately following exposure to a traumatic event or stressor, almost all adolescents experience adverse symptoms. These symptoms may or may not reach the level of diagnostic criteria. In these cases, symptom presentations are referred to as peritraumatic responses. Such responses include, but are not limited to a subjective sense of numbing, reduced awareness of surrounding (i.e., being in a daze),

derealization (i.e., feeling as if things are unreal), depersonalization (e.g., feeling as if you are removed from your body), and dissociative amnesia (i.e., inability to recall important aspects of the traumatic event). Adolescents will exhibit peritraumatic responses and maladjustment in the days and weeks following a traumatic event.

Research has shown that a proportion of adolescents will continue to exhibit trauma symptoms that meet criteria for a diagnosis of Posttraumatic Stress Disorder (PTSD) (Boney-McCoy & Finkelhor, 1996; Kilpatrick, Saunders, & Smith, 2003) following exposure to a traumatic event. Moreover, adolescents exposed to trauma are more likely to exhibit a greater rate of major depressive disorders (Kilpatrick, et al., 2003), alcohol and substance dependence (Kilpatrick et al. (2003), increased aggression toward others and animals; regressive behaviors; greater engagement in self-destructive or self-abusive behaviors; greater non-compliant, defiant, and disruptive behaviors at school; fewer social interactions and greater trust issues; increased risk taking behavior; thinking style of threat expectation; greater learning problems; long-lasting increased responsiveness and sensitization of the central nervous system and neurotransmitter system causing over-responsiveness in the endocrine, autonomic, and behavioral stress system; regression of previously learned skills; and sleep problems (Kilpatrick et al., 2003; Armsworth & Holaday, 1993; Pynoos, Steinberg, & Goenjian; Heim & Nemeroff, 2001).

Health Effects of OC Spray:
Per the research review and policy recommendations authored by the Texas Criminal Justice Coalition regarding the use of pepper spray, there are some individuals who are at greater risk of negative health effects from exposure to pepper spray. These include individuals with eye conditions (increased risk for corneal abrasions), and skin conditions (allergic dermatitis is exacerbated).

Other issues were cited with regard to individuals with respiratory conditions, specifically asthma, as these individuals are at risk due to the decrease in respiratory airflow caused by the spray. The Coalition reported, "at least one well documented death has occurred...as a direct result of severe bronchial construction precipitated by pepper spray exposure." Heart disease also predisposes individuals to the negative effects of pepper spray, as "the pain and anxiety resulting from...exposure may elicit cardiovascular changes."

Individuals prescribed psychotropic medications are at increased risk from exposure to pepper spray. It is well known that psychiatric medications affect the autonomic system, "which includes blood flow, heart rate, and airflow. Pepper spray may have the effect of altering or disrupting the autonomic functions of the body...there may be increased risk of death when pepper spray is used against individuals under the influence of psychotropic drugs."

**Prevalence of Suicide in Juvenile Correctional Facilities:**
The scientific literature has extensively documented the fact that suicide is a serious problem within the correctional system. An evaluation of suicide prevalence rates in correctional settings between 1995 and 1999 found suicide to be the third leading cause of death, and was 1.5 times higher than the prevalence rates in the general population (Metzner, 2002). In some studies, the suicide rate in incarcerated individuals has been show to be between five to nine times higher than that of the general population (see Daniel, 2006; Hayes, 2004). Overall, the literature leaves little doubt that the prevalence of suicide among youth, regardless of placement in juvenile or adult correctional facilities, is substantial. It has been established that the rate of suicide attempts and completed suicides are significantly higher in incarcerated youth when compared to youth in the general population.

Certain factors have been associated with increased risk of suicide among incarcerated youth. Risk factors for incarcerated individuals are fairly similar to that of the general population; however, the scientific literature has identified unique factors related to incarceration, which have been related to increased risk of suicide. These risk factors include age, indicating that individuals below the age of 21 years are at greatest risk for suicide while incarcerated (Daniel, 2006). Other risk factors include the presence of a diagnosable psychiatric disorder; presence of a depressive disorder; history of emotional, physical, and/or sexual abuse; previous suicidal thoughts, attempts, gestures, or self-harm behavior; recent loss of a loved one; history of substance use (Wasserman, Ko, & McReynolds, 2004; Hayes, 2004).

Self-Injurious Behavior in Adolescents:
Self-injurious behavior is not an uncommon phenomenon in incarcerated adolescents. Incarcerated adolescents engaged in self-injurious behavior and suicide attempts at greater rates than the general population (Penn et al., 2003). Nock and Prinstein (2005) found that adolescents with a history of posttraumatic symptoms, depressive symptoms, feelings of hopelessness, perfectionism, and loneliness were more likely to engage in self-injurious behaviors. Considering research related to increased trauma exposure among incarcerated adolescents, self-injurious behavior poses a significant concern for this population.

Interviews with youth detained at Polk County Jail included in attachment B revealed concerns regarding ineffective suicide precautions with an over-reliance on seclusion and a lack of mental health services available during the critical period during and after a period of suicidal behavior. Records available for review did not include policy and procedure regarding suicide response or suicide precautions. The records available for review included rare

documentation of suicide precautions and mental health assessments subsequent to a youth requiring suicide watch. These assessments were brief and not inclusive of detail, as such it was not possible to determine if risk assessments or ongoing follow up occurred. For specific youth commentary regarding this issue please see the interviews regarding youth 222, youth 333, youth 444, and youth 555 included in attachment B.

The increased risk for suicide and self-harming behaviors in juveniles illustrates the need for classification, intake, and assessment practices geared toward adolescents. As this information was not provided from Polk County Jail, it was not possible to determine if the current tools utilized would adequately address youth needs. In fact, the training provided regarding the Juvenile Classification System dated June 21, 2011 revealed a classification system based on the severity of the current charge, criminal history; escape history; disciplinary history; and special management concerns. The special management concerns were not identified. It noted that consideration would be given with regard to gender, age, physical characteristics, special needs (mental/physical disabilities) and sexually aggressive behavior. The document did not note how special needs would be assessed or addressed. There was documentation of training provided to staff regarding suicide prevention, however, corresponding facility policy and procedure and/or examples of documentation generated during the employment of suicide prevention strategies with a particular youth were not available for review.

<u>Effective Responses to Suicide Risk and Suicidal Behavior:</u>
In 2005, the American Academy of Child and Adolescent Psychiatry published an official action outlining parameters for the assessment and treatment of mental health disorders in juvenile detention and correctional facilities. The purpose of their position was to provide clinical guidelines for clinicians (i.e., a child and adolescent psychiatrist or any other licensed mental health professional in these centers) to improve provision of services to incarcerated juveniles with mental health problems.

In total, the American Academy of Child and Adolescent Psychiatry put forth fourteen recommendations related to the provision of mental health care for incarcerated juveniles. Each recommendation made in their position was defined in the following terms: a) minimal standards (i.e., recommendations based on substantial empirical evidence or overwhelming clinical consensus), b) clinical guidelines (i.e., recommendations based on empirical evidence and/or strong clinical consensus), c) options (i.e., acceptable practices, but not required), and d) not endorsed (i.e., practices known to be ineffective or contraindicated). For purposes of this report, only certain recommendations will be discussed. As such, please refer to the article in its entirety for all outlined recommendations.

One of the proposed recommendations supported by minimal standards requires that all youth entering a detention or correctional center be screened for mental or substance abuse disorders, suicide risk factors and behavior, and other emotional or behavior problems. As outlined, "the intake process should include comprehensive screening for suicide risk, alcohol and other drug abuse, and adjustment to the juvenile setting...an evidence-based mental health screening should be undertaken as part of the general screen (Wasserman et al., 2003). Records received from Polk County Jail did not include assessment documentation for each individual. Only one youth interviewed recalled undergoing an admission screening.

Also recommended, as a clinical standard, was the provision of adequate time and resources needed to perform a mental health assessment of incarcerated youth using a biopsychosocial approach with special attention to cultural, family, gender, and other relevant youth issues. Moreover, it is recommended, as a clinical guideline, that clinicians be alert to symptoms, behaviors, and other clinical presentations of malingering, secondary gain, and manipulative behavior by incarcerated youth. Specifically, "Clinicians should be aware that some psychiatric symptoms...may be attempts to avoid incarceration or to be placed into a perceived less restrictive and more therapeutic environment...Although structured interviews and additional psychological testing may be helpful, the mainstay of diagnosis remains a high index of suspicion combined with careful data collection and ongoing assessment for discrepancies in histories...It is important to collect collateral information when suspicions of malingering arise; staff observations are particularly invaluable...will help identify inconsistencies and discrepancies commonly found in adolescent malingerers (p. 1093)." Finally, set forth as a clinical guideline, it is recommended that all clinically referred youth should be evaluated for current and future risk of violent behavior.

Management of Suicidal Behavior
Unfortunately, policy and procedure regarding the management of suicidal ideation within the Polk County Jail was not available for review. Interviews with youth revealed that if youth reported suicidal ideations, they were placed in a "turtle suit" which was described as a suicide safe garment and housed in the "cage" which was a small enclosure visible to security staff and other youth. Youth interviewed indicated that they could remain in this environment for several days prior to an assessment by a mental health professional. They described these assessments as brief, and documentation reviewed in some available records revealed notes of encounters that were brief and devoid of detail. The records did not reveal evidence of ongoing mental health intervention for those youth who required suicide watch. Generally accepted practices in juvenile justice require that youth placed on suicide watch receive

an assessment by a mental health professional daily and that they are seen by a psychiatrist at the next available opportunity. The American Academy of Child and Adolescent Psychiatry Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities 2005 outlines appropriate evaluation and interventions for youth with suicidal ideation or suicide attempts occurring prior to or during incarceration. For specific youth commentary regarding this issue please see the interviews regarding youth 222, youth 333, youth 444, and youth 555 included in attachment B.

The National Commission on Correctional Health Care issued a position statement in 2007 recommending varying levels of suicide watch based on the mental health risk assessment, including "Constant Observation: This 1:1 monitoring is used when suicide risk is high. It occurs on a continuous, uninterrupted basis for a juvenile judged to be at imminent risk for suicide. These juveniles may also be assessed as in need of psychiatric hospitalization. In such cases, the one-on-one, constant observation is maintained until the transfer occurs. Intermediate Observation: This monitoring is used for juveniles assessed as being at moderate risk for suicide. It occurs at staggered intervals not to exceed 5 minutes. Close Observation: This monitoring is used for juveniles assessed to be at low risk for suicide. It occurs at staggered intervals not to exceed 15 minutes." Again, as policy was not available, it was not possible to determine if these watch levels were defined at Polk County Jail. Medical records received did not include detail with regard to monitoring of youth who required suicide watch.

**Medical Services:**
The adult corrections system provides limited medical and mental health treatment to the general adult inmate population, usually providing no additional services that are specifically targeted for youth under the age of 18 years. As such, many adult jails and prisons are ill equipped to identify and respond to the mental health needs of inmates. This is especially concerning when considering the mental health profile of adolescents within the juvenile justice system. As complete medical records were not available for review from Polk County Jail, it was not possible to determine the adequacy of mental health services at this facility. Interviews with the youth outlined below indicated cause for concern with regard to timeliness of medication prescription, access to health care, and timeliness of psychiatric evaluation.

**Assessment:**
As evidenced by self-report, youth both witnessed and experienced spray with mace or pepper spray during their detention at Polk County Jail. Youth reported they were not allowed to shower nor were they given clean clothing for an indeterminate amount of time after the incident. Medical records received revealed that one youth, Youth 333, was seen by medical staff

following the incidents.   Medical records were not available for review regarding other youth, however, youth self report indicated that not all youth were examined by medical personnel following the receipt of spray.   Youth indicated that facility staff did not attempt to de-escalate situations prior to resorting to the use of the chemical agent.

In regard to requesting medical or sick-call access, few of the youth acknowledged receiving any instructions on how to access medical care and if they did, their requests were often ignored or they did not receive attention in a timely manner.   Intake assessments were minimal and of the three individual medical records received, only one contained any psychiatric history or notations by any psychiatric personnel even though the youth were prescribed psychotropic medications prior to their admission.   There was general concern among the youth regarding the delay in receiving appropriate medications, and when medications were received they were not administered  in pill form, but had been crushed.   Many medications are not therapeutic as intended when crushed, but of greater concern to the youth was the belief they were not receiving the correct medications and they could not alleviate this concern by pill identification.

Determination of placing youth on suicide watch was described more as a punitive measure rather than as a psychiatric concern.   Suicidal ideation was not a pre-requisite for placement on watch nor did the placing of youth on watch require any screening assessment by psychiatric or mental health personnel prior to placing youth in the "cage."   The cage was a four foot by eight foot wire enclosure open to the entire unit.   Whether a youth was placed in watch was mainly at the discretion of the jail personnel.   Youth placed on watch were not given psychiatric treatment or counseling appropriate to suicidal ideation or self-injurious behavior; rather, they were required to wear a "turtle suit" without undergarments, sit on a bench or a bed without any mattress throughout the day, allowed no privacy for personal hygiene, were required to ask the permission of the officers to use any bathroom facilities and were required to eat with their hands. At night they slept on the floor on a suicide blanket.   One youth reported being sprayed with mace while in the "cage" for the act of singing.   None of the youth interviewed reported appropriate psychiatric treatment or counseling services during their detainments.

Consistently throughout the interviews, youth testified to the fact they were hungry, that youth would fight each other for food, that they received clean clothes as infrequently as twice each week and were not always given hygiene items.  One hour of outdoor recreation each day was at the discretion of the officers and was often denied as a group punitive measure.  When the youth were given outside recreation, they were not provided any equipment to

engage in activities, despite the facility policy that states that youth are to be provided with one hour of outside activity to exercise the large muscles and will be provided the equipment to engage in activities.

Youth reported the school classes were childish and "beneath them." They were not given any individualized instructions, but were told to get a book and read. When discussing the classroom experience, the youth interviewed considered that they were falling behind in their studies and that what they were offered was information they had mastered at an earlier age.

The most central theme of the interviews was an understanding that how well these youth were able to adjust and cope within the Polk County Jail did not originate from how they were oriented or what they understood about the rules and regulations of the facility, but was at the discretion of whatever officer they were accountable to. These youth did not experience any sense of safety, and felt threatened by physical harm from both the officers and other youth that could be experienced at any moment. The adolescent does not experience their environment as an adult does. They often do not have the psychological coping skills to successfully adjust and adapt as adults think they should.

Many of these youth held at the jail have been accused of non-violent offenses. As a consequence of experiencing incarceration within what was originally intended to be an adult facility, many of these youth will make poor adjustments once released. They will experience a higher recidivism rate, increased substance abuse, Post Traumatic Stress, higher rates of depression and suicide. Trauma has been shown to have negative effects on adolescent development. Given the number of physical and emotional changes that are occurring at this period of time, a disruption in the process can have long lasting negative effects.

The incidence of traumatic events that occur in this facility must be the focus of a change of the cultural climate in the facility to a zero tolerance for youth maltreatment and violence. It is opined that the reason for youth safety issues and the overall violent culture of the facility is multifactorial, but ultimately the end result is due to incarcerating youth based upon a model for incarcerated adults. There was no overarching behavioral support system, mental health services were limited and it was apparent that many youth in need of mental health services had not been identified as such, and the facility relied on punitive, isolating and abusive methods for addressing behavioral or mental health challenges.

In addition, given the content of the interviews outlined above, it is apparent that not even the most basic of human needs were met for youth at the Polk County Jail including safety, adequate nutrition, cleanliness, privacy,

recreational opportunities, and education services.  The majority of these youth require treatment calculated to assist youth to make positive life choices and it is opined that they should not be detained in an environment that threatens their physical and mental well-being.

**Conclusion:**
Based on my professional experience, my review of the scientific literature, my review of the provided documents, and my interviews with youth previously detained at the Polk County Jail, it is my opinion to a reasonable degree of medical certainty, that conditions at the Polk County Jail threaten the physical and mental well-being of youth detained there.

As outlined in the literature review above, the Polk County Jail must provide services consistent with the specific developmental needs of adolescents. They must reduce the reliance on isolation and seclusion, which has been determined to have negative mental health effects.  The facility must employ appropriate de-escalation practices and cease the utilization of chemical agents for behavior control and punishment, as chemical agents are associated with the development of trauma sequelae.  The facility must utilize generally accepted practices for the classification of youth, assessment of suicide risk, suicide precautions, and mental health treatment of youth who engage in or threaten self-injurious behavior. And finally, the facility must provide medical and psychiatric services that meet the needs of youth and that comport with generally accepted practices.

There were limitations to this evaluation due to the limited records received and an inability to visit the facility.  As such, there are likely other areas worthy of comment, however, given the limited scope of this report, further assessment, interview and document review is necessary. Should additional information become available that would alter the opinions provided in this report, an addendum will be authored.

There were additional issues elucidated in the interviews with the youth, and these, while important, will require additional information (e.g. additional interviews, review of facility records, facility inspection, interview of facility staff) in order for them to be addressed.  These would include subjects including, but not limited to mental health care and treatment; access to medical and nursing care; access to special educational services.

Daphne Glindmeyer, M.D.
Adult, Child and Adolescent, Forensic Psychiatrist

**Attachment A**

**Pertinent Document Review:**

Medical Records:

> Medical Records for Youth 333, Polk County Jail, Correctional Medical Services, Various Authors, dated; October 19, 2011 through March 22, 2012.

> Medical Records for Youth 222, Polk County Jail, Correctional Medical Services, various authors, dated March 30, 2012, January 9, 2012 to January 14, 2012, September 30, 2011 to October 4, 2011.

> Laboratory Results for Youth 222, Department of Health, Bureau of Laboratories – Tampa, No author noted, dated September 15, 2011

> Psychiatric Records for Youth 222, Hallmark Youthcare, various authors, dated July 2, 2010 to November 6, 2010.

> Medical Records for Youth 555, Polk County Jail, Correctional Medical Services, various authors, dated February and April 2012.

> Medical Records for Youth 888, Polk County Jail, Correctional Medical Services, various authors dated February 25, 2012 through March 7, 2012.

> Medical Records for Youth 999, Polk County Jail, Correctional Medical Services, various authors dated May 27, 2011 through July 18, 2012.

Florida Model Jail Standards, Florida Association of Counties, Effective date, August 30, 2011.

Staff Training Courses, Polk County Sheriff's Office, including:  Juvenile Detention Training; Communicating Effectively with Juvenile Offenders; Authority to Treat; Behavior Modification; Juvenile Classification System; Hospital Watch; JJIS Training; Medical Admission; Structured Environment; Suicide Prevention; Understanding Juvenile Behavior

Policy and Procedures, Polk County Sheriff's Office, including:  Protective Custody; Pre-Adjudicated Youth Housing; Medical; Programs; Visitation; Recreation; Use of Chemical Agents; Electro-Muscular Devices; Use of Inmate Restraint Chair; Security Codes

Mental Health Transport Agreement, entered into by Grady Judd, Sheriff of Polk County, Peace River Center, Winter Haven Hospital, and Lakeland Regional Medical Center, effective July 1, 2009.

Independent Contractor Agreement, entered into by Grady Judd, Sheriff of Polk County and Peace River Center for the purpose to consult in certain circumstances involving a prospective Baker Act Candidate, effective March 29, 2007.

Interagency Agreement, Children's Home Society of Florida, Children's Advocacy Center, for the purpose to ensure a coordinated multidisciplinary response to child abuse and neglect allegations, effective, April 6, 2010.

Seventh Amendment to Health Services Agreement entered into by Grady Judd, Sheriff of Polk County and Corizon, Inc. for the purpose of provision and coordination of health care services for the pre-adjudicated juveniles under the custody and control of the Division of Juvenile Justice who are housed at the jail, effective February 15, 2012.

Local Transportation Reimbursement Agreement entered into by Grady Judd, Sheriff of Polk County and Winter Haven Hospital Behavioral Health Division, effective November 6, 2008.

Out of County Transport Reimbursement Agreement entered into by Grady Judd, Sheriff of Polk County and Heart of Florida Regional Medical Center, effective October 30, 2008.

Confidentiality Agreement between the Florida Criminal Justice Mental Health and Substance Abuse Technical Assistance Center and Grady Judd, as Sheriff of Polk County, and Correctional Medical Services, effective August 4, 2009.

Photographs of Polk County Jail

United States District Court Middle District of Florida Tampa Division Case No. 8:12-cv-00568-SDM-MAP Verified Amended Complaint submitted by Miriam Haskell and Tania Galloni.

**Attachment B**

**Youth Interviews:**
The following are brief case reports based upon oral interviews performed by
Daphne Glindmeyer, M.D. with seven youth who were previously detained at
the Polk County Jail. At the beginning of each interview, all individuals being
interviewed and all parents/guardians participating were informed that the
interviews were being performed at the request of Southern Poverty Law Center
in a suit against the Polk County Jail. They were informed that a report would be
prepared for Southern Poverty Law Center and that in the future, testimony
before the Court may be required; therefore, the information provided would
not be confidential. They all verbalized understanding of the lack of
confidentiality associated with this interview process.

Unless noted in the summary below, the youth's mental status examination
performed during the interview was within normal limits. Additionally, there were
issues reported by all youth that will be discussed here rather than individually.
Specifically, all youth reported that breakfast was served at 4:30 am. They
reported that they were frequently hungry either due to a lack of food provided
or in the case of male youth, being strong-armed to give away their food in
order to avoid being beaten. Youth also reported a brief school day
(approximately three hours) and a lack of regular structured activity. Youth all
reported issues with showers, in that there was no privacy and other youth could
observe them while they bathed. Male youth all reported showering in their
underwear for modesty.

Youth all reported a lack of behavioral management with frequent fighting
amongst youth. Youth also reported a lack of interaction with security staff
other than when behavioral challenges occurred. Youth with a history of
mental illness reported that they did not receive ongoing mental health services,
and that they had difficulty with regard to access to medical and mental health
care.

**1. Youth 333**: Youth 333, a fifteen-year-old male, was interviewed May 21, 2012
for approximately one hour and fifteen minutes. At the time of the interview, this
youth was in a court ordered halfway house placement. He reported no history
of prior mental health treatment other than meeting with a guidance counselor
during elementary school.   He denied any history of inpatient psychiatric
hospitalization or treatment with psychotropic medications.

Youth 333 indicated that he was detained at the Polk County Jail on one
occasion for a period of seven months, but he was not able to recall the date of
his confinement.  He did recall that he was initially admitted to the "juvenile
side" for twenty days, and then transferred to "direct file" for the remainder of

his stay.  He indicated that, "the juvenile side was not much different from the direct file; except they treat you better on direct file because staff would get to know you and talk to you more...but there was more fighting on direct file." He stated that on his admission to the facility, he was not given any explanation of the rules and he was not instructed how to file a grievance or make any complaints.  He also did not recall undergoing any initial assessment upon admission.

He described the environment as "uncomfortable, nasty, dirty...afraid sometimes because of the fighting...staff would disrespect the youth and would curse and call the youth 'nigger and crackers.'" He recalled that one officer was "straight up...by the rules," and would sometimes talk to him. He reported there were no organized programming, treatment teams, or treatment goals on the either unit.

He reported that the staff worked 12-hour shifts, and the treatment youth received was dependent on who was scheduled, as staff would sometimes threaten the youth with "lock down." He stated that he was placed in lock down one to two times each week.  There were no cameras in the cells, and during lock down, he could be housed with another youth and "do whatever." He denied any real interaction with the prison staff stating,  "Some staff would preach to us about their experience."

He denied being physically restrained other than during transportation. If he misbehaved or had any behavioral challenges, he was placed in isolation.  He denied that any staff ever touched him, but he reported he did see them grab other youth by the shirt and throw them into cells. He witnessed other youth "put down" and have a knee put in their back and have their arms twisted.

He reported that staff ratios were high, with two officers responsible for monitoring 30 or more youth.  During periods of lax supervision, youth would engage in "test of heart," which he described as "going into a room to see how you could fight...Any new kid had to do it...your room mates are going to jump you if you don't go into the room." He recalled some youth experiencing injuries as a result of the "test of heart...if you got hurt, you had to ask the nurse for a form and put in for sick call." He recalled youth "wrapping kids in sheets...staff did not know because they can't see it...could be tied up for 10 to 15 minutes...if you didn't pay or give them food they might hit you or rat tail you."

Punitive measures employed by the officers included getting sprayed with mace. He recalled that on three occasions he was sprayed with mace.  The first incident was secondary to fighting.  "Getting sprayed with mace depended on how much the guards like you." He asserted that staff did not attempt to de-escalate situations before using mace.  After his first episode of being sprayed

with mace, he reported he was not allowed to shower and could not change his clothes until the next day. This report was in contradiction to an incident report reviewed regarding this event. Per the report, the youth was given the opportunity to shower and change clothes, but he declined to do so. The youth indicated this was not the case.

He recalled a second incident where he was sprayed with mace due to a physical altercation with a peer. He indicated that staff did not attempt any de-escalation prior to spraying him and the peer. He reported no decontamination efforts following the exposure.

The third time, he was placed on suicide watch on one occasion as a result of "playing around." Suicide watch consisted of being placed in a 4x8 "cage", dressed in a "turtle suit" where all the other youth could see him. He remained in the "cage" for one and one-half days prior to seeing a nurse. During this time, he was required to ask permission to go to the bathroom, as there were no toilet facilities in the "cage." He indicated that he observed up to four youth in the "cage" at one time. When he was placed in the "cage" he recalled that he and another youth were singing and talking. He stated that staff "came and sprayed [pepper spray] around the bottom of the case...he told us he was putting it there so that he didn't have to write an incident report about it." He recalled that ultimately, he was interviewed by a nurse who authorized his release from suicide watch. He recalled seeing a psychiatrist approximately two weeks following his release from suicide watch. He reported no decontamination procedures following this exposure to mace.

Medical records regarding this youth revealed an "Incident Report" dated 2.13.12. This document indicated that the nature of the incident was "release from suicide watch." Narrative indicated, "suicide assessment completed...denies any suicidal/homicidal thoughts...to be released from suicide watch and placed in stepdown." Subsequent follow up notes dated 2.12.12, 2.13.12 and 2.20.12 revealed brief documentation and a mental status checklist. In all three documents the section entitled "Treatment Goals and Objectives" was blank, with the exception of two follow up appointment dates. Documentation was located for one follow up date, but not the second. Documentation of an evaluation by a psychiatrist was not included in the records.

**2. Youth 222**: Youth 222, a 16 year old female, was interviewed May 21, 2012 for approximately one hour and fifteen minutes at her current court ordered placement. She reported a history of mental health services including both inpatient and outpatient treatment. She has a history of treatment with multiple psychotropic medications, and at the time of the interview, reported she was prescribed Depakote ER, Trazadone, Geodon, and Tenex. Her reported history

of mental health treatment was corroborated by collateral document review indicating a history of diagnoses including Posttraumatic Stress Disorder; Mood Disorder, not otherwise specified; and Attention Deficit Hyperactivity Disorder.

Youth 222 recalled experiencing detention at the Polk County Jail on three separate occasions for periods of two weeks, five days, and twenty-six days. She was unable to recall the exact dates of her detentions. On each admission, she was admitted to the juvenile area and where she was one of four to sixteen female youth housed on a unit. She recalled undergoing an assessment that occurred ten to fifteen minutes after her admission. She was weighed, her blood pressure was checked, and blood samples were obtained on her first and second admission. She stated there was no explanation of why blood samples were obtained and she was not given any results of any laboratory testing. She did not recall undergoing an electrocardiogram, or abnormal involuntary movement testing for side effects of psychotropic medications.

In regard to psychotropic medications, she did not recall signing an informed consent document, but recalled the facility nurse contacting her mother. She did recall a one to two day delay in receiving her medications. She indicated that the delay in receiving her medications resulted in her feeling agitated. During her first admission, her mother brought the prescribed medications, which included among others Depakote ER, to the facility. The youth was informed that medications would be dosed in crushed form. She was aware that this would "mess up the extended release...and I wanted to see the pills they were giving me."

She recalled seeing a psychiatrist on one occasion over the course of the three admissions. "I talked to him for about fifteen minutes. If the psychiatrist thought your medications were ok he just kept you on them." She reported the psychiatrist did not ask her about the symptoms she was experiencing, nor did anyone review potential side effects of the prescribed medications with her. There was reportedly no therapy or counseling available at the jail.

She reported that staffing consisted of two staff members for two dorms with up to twelve girls in each dorm and that the staff was required to go through a door in order to reach the youth. She recalled that there were two staff members that she trusted and spoke to on a regular basis. She indicated that other staff generally talked to her with respect, but if pushed, the staff would curse at the youth.

Disciplinary actions included "lock down" if the girls were heard talking about fighting. She stated there were no positive rewards for good behavior, only negative responses to unwanted behavior. She did not describe the use of de-

escalation techniques by staff, and reported that staff often threaten to spray mace for control.

While she was never sprayed, she recalled witnessing a girl who refused her medication and the officer antagonized her. The girl became upset and attempted to swing at the officer, which resulted in the officer macing the girl. The girl was allowed to see the nurse and then was allowed to take a shower. Other than this event, she did not recall seeing restraints or shackles used. She stated; "I didn't think it was fair that the guard maced the girl...think they do it for control...you can see how macing could be avoided." She denied any knowledge of "test of heart."

If a girl verbalized suicidal ideation, Youth 222 reported the individual is put into a "turtle suit" (made from a green blanket) and made to sleep on the floor. She was once placed on suicide watch but did not have to "dress out." She did witness other girls having to wear the "turtle suit."

This youth has a past history of psychiatric in-patient hospitalization for diagnoses including: Attention Deficit Hyperactivity Disorder, Bipolar Disorder, Oppositional Defiant Disorder, and Post Traumatic Stress Disorder. A review of medical records from her admissions to the Polk County Jail did not document any psychiatric assessment or medication orders for her third admission in March 2012. Her second admission in January 2012 noted orders for psychotropic medications, but contained no records of any psychiatric history or notations from a psychiatric health provider. Her first admission on September, 2011 contained medication orders. There was a notation that she reported having "an emotional seizure" at home, but the records again contained no psychiatric history or notations from a psychiatric health provider. The Polk County Jail records did not include any medication administration documentation so it is not possible to know when medications were received or what was given to the youth on a daily basis.

**3. Youth 111:** Youth 111, a 17-year-old male, was interviewed May 21, 2012 for approximately one hour and fifteen minutes at his current court ordered placement. This youth denied any past history of mental health or psychiatric treatment. He reported he has never been prescribed psychotropic medications. This youth did report a history of experiencing pneumonia as a child and an ongoing history of asthma. He reported that he informed staff at Polk County Jail that he had a history of asthma. Unfortunately, this youth's medical records from Polk County Jail were not available for review at the time this report was authored.

Youth 111 reported experiencing incarceration at the Polk County Jail on three separate occasions for periods of two weeks, twenty-four days, and one month.

On each occasion, he was admitted to the juvenile section and was never placed in direct file. He did not recall participating in any screening assessments on admissions. He related one episode when his grandmother called the facility and reported she was worried about him and the officers told him they were going to put him on direct observation. He stated he was put on "suicide watch" but was not required to wear a "turtle suit." He recalled observing other youth placed on watch and they were required to sleep in the "cage" and wear a "turtle suit" when they were not attending school. They were allowed to wear clothes to school. There were some youth who did not get up for school and they remained in the "cage" all day.

He recalled waking at 4:00 am to eat breakfast and then going back to sleep until 7:00 am. At 7:00 am he was awakened for hygiene; "If you go back to sleep you get slammed by an officer who pulls you off the bed and snatches your mat from under you if you move too slow and throws you to the ground." He attended school from 9:00 am until 2:30 pm. "In school, they weren't teaching me nothing...go to class and tell us to sit there or write about something...lots of sitting quietly...then on Friday we watch a movie...either Radio or Remember the Titans...they were the teachers favorites so we watched them every Friday." Youth 111 recalled that he would sometimes see adult prisoners on his way to school and the adults "watched us walk to school." They would ask him why he was incarcerated. One time "a woman looked at me funny...and all crazy."

Youth reportedly did not get sick call except when the nurse came around; "If you saw the nurse you could get a call form because they [indicating security staff] would buck us...you fill out the form and give it to a kid who takes meds because you know they would see the nurse." He indicated that to his knowledge, there was not a formal mechanism for him to request medical or mental health treatment.

Youth 111 described a "payroll system" in which people had to pay other youth with their food so as not to get hit or beat-up. "People wouldn't have to do that if they would feed us right...food is bad...wanted crackers, dessert, fruit...officers didn't do anything about them taking kids food." He felt sorry for one hungry youth and gave him some of his food. He denied any knowledge of "test of heart."

Youth 111 reported he had very little interaction with the officers, other than an individual named Mr. Sanders. Officers were posted outside the unit and only came on unit once each hour; however, Mr. Sanders would come on the unit. Youth 111 stated he felt unsafe because "you could be chilling and then they take stuff out on you...try to put you in a cell with people you don't like." He

recalled officers using racial slurs and attempting to wake youth while they were sleeping by flicking lights on and off and opening and closing cell doors.

Youth 111 reported he was sprayed with mace four or five times even though he tried to avoid it "because it burns" and even though he reported to the facility medical department that he had a history of asthma. He recounted the following incident; "Six people were fighting...as the fight finished, we heard a door open and everybody started back to their rooms...I was laying on my bed when Officer Gay sprayed a youth on the floor...he (Officer Gay) runs into my room...I know what he was going to do and I grabbed the covers and put them over my face...he pulled them down and sprayed me right in the face...it messed with my asthma." He recalled that the youth were allowed to take a shower following being sprayed, however, this took time, and he recalled, "we didn't get to shower until later that night...we didn't get to see a nurse...we didn't get clean clothes...if they offered them, we would take them."

Youth 111 stated that he would frequently witness a youth being sprayed with mace and the officers made little attempt to de-escalate situations; "they go directly to slam, lock down or mace." After spraying the youth with mace, the officers put the youth in the cage. He elaborated stating "officers don't have DJJ stuff on their minds...they are used to dealing with real adult inmates."

**4. Youth 444:** Youth 444, a 15-year-old male, was interviewed in the community in the company of his mother. This interview, lasting approximately one hour and forty minutes occurred May 22, 2012. Youth 444 reported a history of psychiatric treatment beginning at age eleven years. He recalled a history of four psychiatric commitments due to among other issues engaging in self-injurious behavior and verbalizing suicidal ideation. Since that time, he reported being engaged in psychiatric treatment and being prescribed antidepressant medication.

Youth 444 recalled that he was detained at Polk County Jail on one occasion. He stated that due to his history of mental health issues, he was on "watch" for the majority of his stay. While on watch, Youth 444 was confined to a "little bed" in the day area for five to six days. He was reportedly inadvertently sent to another unit for one-half day until the staff realized he was to be kept on watch and returned him to his original unit where youth who were on watch were housed.

Youth 444 recalled that during his approximately eleven day incarceration, he saw a mental health counselor twice, "she talked to me for ten minutes and the second time she let me off watch." He recalled seeing a psychiatrist for "six minutes." He denied receiving any other counseling or mental health therapies.

He reported that on admission he went to the nurse's offices where she asked him about his medications. He did not recall her asking him about his history of self-injury or if he experienced suicidal ideation. His mother indicated that she provided Youth 444's medication to the facility including the antidepressant medication Zoloft and the gastrointestinal medications Pepcid and Prilosec.

Youth 444 and his mother reported a medical history for severe GERD (gastrointestinal reflux disease) with severe gastrointestinal pain that will prevent him from eating. Youth 444 stated he did not receive his prescribed medication regularly despite his mother bringing them to the jail. He was admitted on a Monday and received his Monday morning dose of Zoloft, but he reportedly did not receive his medications on Tuesday. When he was given his medication on Monday, his Zoloft was crushed and not in pill form. As a result of not receiving his gastrointestinal medication, his stomach hurt and he saw the nurse.

Youth 444's mother reported she made multiple calls to the facility and despite her calls; her son did not receive his medications. She was worried because her son complained of gastrointestinal pain and did not receive any medications for this condition for the first four days and then received his medication crushed. Youth 444 wanted to see what medications he was receiving and he was worried that mixing the medications by crushing them would cause problems. As this youth's medical records from Polk County Jail were not available, it was not possible to review the medical records or the medication administration record to determine what medications were administered to Youth 444 during his stay.

Youth 444 recalled observing other youth on suicide precautions. He indicated that these youth were "in turtle suits in cages...and they slept on the floor if they didn't have a mat; I saw a kid stay in there for eight or nine days...didn't go to school or rec." There were no toilet facilities available to him during his period on watch (when he slept in the day room) the "officers are supposed to leave cell #3 open for use as a bathroom, but they didn't always leave it open...there were times when I couldn't go to the bathroom...had to hold it for up to two to three hours...then they wouldn't open it if it was shift change...it is on lock down for that."

Youth 444 denied any knowledge of "test of heart." He did recall issues with other youth regarding food. He stated that youth try to intimidate other youth to get their food because "the food is rationed...the food is gold...it is rationed, no seconds...other kids serve you your food." He reported he was hungry for the first few days and his stomach hurt when he started eating until his stomach adjusted to the low protein diet served at the facility; "the acid didn't help [referring to the increased acid in his stomach in the absence of his medication]."

With regard to education, Youth 444 believed the schoolwork was "kindergarten work," and beneath him. Every Friday they watched the same movie. He stated that in the beginning there was no recreation and he "did not know they had it." When he finally went to recreation, Youth 444 stated there was no organized activity and "some of the kids made a football out of socks."

Youth 444 denied real interaction with the officers; "Most of them were not so nice." If youth asked for something (e.g. toilet paper) they would reply; "What do I look like, Wal-Mart?" He reported he did not always have toiletries and some youth would save their shampoo to wash their hands. On one occasion, he stated he went without a shower for four days because there were no clean clothes to fit him.

Youth 444 recalled that he "did not feel safe...heard all about the jail...gay staff...at any moment knew that something could happen...knew that officers would come in...knew they would mace everybody...always threatening kids with mace." While he did not experience mace, he did witness other youth getting sprayed. On one occasion, youth were fighting over food and were brought to the cage after being sprayed with mace. "They were sitting there with mace on them...I could smell it and feel it through the glass...and an officer took a picture of them with an I-phone." He indicated that he did not see the youth get a shower or clean clothes. One youth was shirtless and "I saw him in the cage for a long time...I didn't want to get maced or be anywhere near it."

**5. Youth 555**: Youth 555, a 14-year-old female, was interviewed May 22, 2012 for approximately one hour and fifteen minutes. The interview was conducted at her current court ordered placement.

Youth 555 has a history of psychiatric treatment and prescription of psychotropic medication. She reported a history of inpatient psychiatric treatment due to suicidal ideation. She recalled that initially, upon admission to Polk County Jail, she did not receive her prescribed medication. She also indicated that her medications were changed during her stay. She recalled that she did not regularly receive her medication while at Polk County Jail, and that when she did, the medications were crushed. She recalled one visit with a psychiatrist at Polk County Jail "for about fifteen minutes." She reported that she did not receive any counseling or other mental health services during her incarceration.

Some medical records were received from Polk County Jail regarding two admissions (April 2012 and February 2012). The April 2012 admission noted a history of inpatient hospitalization at Peace River Hospital, but there was no documentation of psychiatric symptoms, no psychiatric diagnosis, no notation of any prescribed psychotropic medications and no documentation by

psychiatric personnel included.  Of the two medical admission records received, one contained a nursing admission assessment dated February 21, 2012, but no medications were ordered until February 24, 2012 and the record did not contain any notation of a diagnosis or symptoms that would justify the medication prescribed.

Youth 555 reported that she has been incarcerated at Polk County Jail on five separate occasions.  She reported that she had an intake on admission at the Polk County Jail in which she was asked about her health, substance use, and suicidal ideation.  It would usually take one week to see a doctor (at the jail). Youth 555 stated she saw a nurse on her first admission who performed a Tuberculosis test, and she would sometimes see the nurse when she gave medications to the youth; "It would take days to see the nurse for sick call...knew it was no point."  The procedure to see a nurse for sick call involved asking the officers for a form, fill out the form, give the form back to the officer and then "hope they would give it to the nurse."  There was no sick call "box" or receptacle to leave a sick call form.

Youth 555 indicated she did not feel safe at the facility "The guards would threaten us with mace and curse at us."  She recalled one incident involving another youth where she overheard an officer say, "I am not going to mace her, I am going to beat the shit out of her."  She reported that another officer played loud music and told the youth that she saw dead people and that people had died at the jail.  "I think she wanted to scare us."  She reported that during orientation she was told about a grievance form and she did fill out one regarding officers cursing and playing loud music, but nothing happened; "The guards are not helpful...with juveniles we still have hope to change and they are not trying to help us at all."

Youth 555 denied she was ever sprayed with mace but did report an incident in which she observed another youth who was sprayed, "she had problems...mentally challenged...she would make up lies that she had kids ...she used the bathroom in the shower and smeared it...put her hand in ant piles when she went outside...she would say she heard voices...I think she wanted attention...she said the voices said to kill us all...she was on suicide watch, in turtle suit...was supposed to be on bed but was sitting at a table...she refused to go back to bed...so they shackled her to the bed...she still sat at the table and they told her to stop and pulled her head back by her hair and sprayed her in the eyes...she sat on the bed screaming and crying...they put her in the shower...gave her a new turtle suit and then took her to see the nurse."

Youth 555 was placed on suicide watch on four separate occasions; "they put me in a turtle suit for three to five days...no panties or bra...have to eat food

with your hands...don't get any utensils...you go in your cell and take off your clothes while the female staff watch you...get in a turtle suit...stay in the day room on a metal bed with no mattress...have a thick blanket...the suit is itchy...and the guards watch you...a lady comes every two or three days and talks to you for a few minutes [may be a counselor]...no school when on watch, but some officers let you go to school and then you put on your regular clothes and a guard goes with you."   Youth 555 stated;  "No matter how much they want us to be, we are not grown...they should have counselors or someone to talk to...that is a scary place ...especially the first time...don't let you make a call ever...phones are all collect...need someone to help kids adjust."

**6. Youth 777**:  Youth 777, a 15-year-old male, was interviewed at his home in the company of this mother.   This interview, lasting approximately one hour occurred May 22, 2012.

Youth 777 reported a history of psychiatric treatment.  He is currently under the care of a psychiatrist and is prescribed medication including Risperidone 2 mg at bedtime, Ritalin 10 mg every morning and Clonidine 0.1 mg at bedtime for the treatment of Attention Deficit Hyperactivity Disorder. It should be noted that this youth appeared sad, and experienced some difficulty and apparent stress with discussion of his stay at Polk County Jail.

Youth 777 reported a history of one admission to Polk County Jail in April 2012. He recalled that his first night there, he met with a nurse who asked him why he had hit his head prior to admission, "I hadn't had medication for three days...I got scared and I hit my head in the police car."  Youth 777 stated he did not receive any treatment for his cuts and a small scar remains.  Youth 777 stated he told the nurse he needed his medications and asked her to call his mother about his medications and the dosage.  His mother reported she dropped off the medication on the first day of admission, but was told the youth had to see the facility psychiatric doctor to order medications.   Youth 777 reported he continued to ask for his medication and was told they [indicating facility staff] would get the medications to him when they could.

After two days, Youth 777 was seen by the psychiatrist for "ten minutes" and reported this was the only time he saw a psychiatrist during his incarceration. Two days following his admission, he was provided Ritalin and Risperidone, but not Clonidine.  When he asked for his Clonidine he was told, "[he] had been without it for a time and the doctor decided I did not need it."   Youth 777 reported his medications were always crushed and this worried him because he was not able to determine if he was given the correct medications.   After receiving his medications for six days he stated he felt better.

During his twenty-one day confinement, he had his blood pressure taken two times each day.   His weight was taken two times.   He did not receive an electrocardiogram or an examination to determine the presence of abnormal involuntary movements due to treatment with antipsychotic medication.  He did not recall laboratory testing.  He asserted he saw the nurse most days; however, he did not know how to fill out the sick call form and as the nurse came everyday with the medications and "I just took them." He denied he was ever seen by a mental health counselor.   Unfortunately, medical records from Polk County Jail were not available for review.

On admission, Youth 777 recalled that he was put on "head watch" for two days.  During this time, he slept in the facility day room.  During this time, he did not receive psychotropic medications and as such, he experienced difficulty with sleep and concentration.  When he attempted to move around the room, he was threatened with a turtle suit.  While at school he continued to be unable to maintain focus and as a result an officer shackled his arm to a desk and then called someone.   Youth 777 stated the officer pulled his arm back and put the ball of his hand against Youth 777's back with another officer holding his arm.  He denied any injury as a result of this incident.  This incident was the only time he was shackled.  He denied he was ever sprayed with mace; however, he witnessed fights where youth were sprayed with mace and then got in the shower, but did not get clean clothes.

Youth 777 denied any knowledge of the "test of heart."  He did witness officers cursing and threatening other youth.  He stated that he did not feel safe at the facility, as youth would fight each other over food.  He recalled seeing other youth "go hungry because of pay roll and the guards did nothing...kids say if you say something we will beat you."   He believes he lost approximately five pounds in the twenty-one days he remained at the jail.  He is a youth who normally has a "lean" build.

His mother reported that on one occasion, Youth 777 feigned suicidal ideation as a means of avoiding "pay roll" and as result, was placed in the "cage" for five days; Youth 777 reported he was provided with toiletries, but was required to use cell #3 as a restroom and if he asked to use the restroom, the officers would curse or tell him "no" and he had to "pee in the shower drain."  If he needed to defecate, he reported he had to wait or use the shower drain and one time, had to hold off defecating for three days.

**7. Youth 999:** This youth was not interviewed, and the following constitutes a medical record review only.  Medical records from Polk County Jail revealed that this youth requested treatment on 1.12.12 due to "I am hearing and seeing things and I'm asking can I get put back on my meds." The youth was assessed by the nurse on 1.14.12 who documented, "placed on sick call last

month...resubmitted referral for mental health evaluation." The youth was seen by psychiatry 1.28.12. The youth was diagnosed with psychosis, not otherwise specified and cannabis dependence. Medications that the youth had reported as beneficial were restarted (Risperdal and Depakene). The youth signed consent forms and there was no documentation of parental contact. This was concerning as the youth's birth date is 6.17.95 indicating that at the time he consented for treatment with psychotropic medications on 1.28.12 he was 16 years old. It was concerning that despite treatment with psychotropic medications; this youth received pepper spray on four occasions, 9.26.11, 11.8.11, 2.17.12, and 6.27.12.

Physican's orders revealed that during the youth's detention, laboratory examinations including a Depakene level, metabolic panel and complete blood count were requested (1.28.12). Laboratory examinations commonly requested for youth treated with Risperdal would include a lipid panel. It was concerning that the medical record received did not include laboratory results nor did it include the physician's review of the laboratory results. The documentation did include an abnormal involuntary movement assessment due to treatment with Risperdal.