# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CHANDA HUGHES, as guardian and on behalf of J.B., a minor; BRENDA SHEFFIELD, as guardian and on behalf of J.D., a minor; VIOLENE JEAN-PIERRE, as guardian and on behalf of F.J.P., a minor; MICHELLE MINOR, as guardian and on behalf of J.P., a minor; LISA JOBE, as guardian and on behalf of K.J., a minor; AMY GAGE, as guardian and on behalf of B.G., a minor; CRYSTAL CUYLER, as guardian and on behalf of D.M., a minor; NIKEYTA MATTHEWS, as guardian and on behalf of K.G., a minor; and ANITA NAVA, as guardian and on behalf of A.H., a minor; on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.                       Case No. 8:12-cv-00568-SDM-MAP

GRADY JUDD, Polk County Sheriff, in his official capacity, and CORIZON HEALTH, INC.,

      Defendants.

_____/

## DEFENDANT JUDD'S BRIEF IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant, Grady Judd, in his official capacity as Polk County Sheriff ("Defendant Judd"), hereby files his Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction.[1]

_____

[1] Per this Court's direction at the August 21, 2012 Case Management Conference, Defendant Judd's Exhibit List will be submitted September 6, 2012.

00166396-1

# I. PLAINTIFFS' GENERAL ALLEGATIONS

Plaintiffs-Minors K.J., K.G., B.G., D.M., J.P., J.D., by and through their parents and guardians, and Franky Jean-Pierre, have filed suit against Defendant Judd alleging claims pursuant to Title 42, United States Code, Section 1983 for violations of their constitutional rights under the Fourteenth Amendment to the United States Constitution to be free from cruel and unusual punishment.  Plaintiffs seek a preliminary injunction against Defendant Judd to remedy "dangerous conditions of confinement" of their detention.  Specifically, Plaintiffs seek to enjoin Defendant Judd from failing to protect the juveniles from harm through a failure to have a staffing, supervision and classification plan for adequate supervision and to enjoin Defendant Judd from using chemical restraints such as pepper spray or mace to punish or discipline.  (Doc. No. 22-1 p. 2.)  Plaintiffs cannot now seek relief beyond what they requested in their second amended complaint and proposed order.  *Campbell v. Johnson*, No. 3:05cv113/EMT, 2007 WL 1531321, at *1 (N.D. Fla. May 25, 2007).

# II. PLAINTIFFS' BACKGROUND

All Plaintiffs have either been ordered into secure detention by the Juvenile Court pending their adjudication on juvenile charges (pre-adjudicated juveniles), or are juveniles charged criminally as adults (direct files) who have been ordered by the criminal court to be detained pending their criminal trials.  In either capacity, Plaintiffs are being detained by Court order in the juvenile detention section of the Polk County Central County Detention Facility ("Detention Facility")[2].

---

[2] K.J. was initially ordered into secure detention on the underlying charges of armed burglary, grand theft, resisting an officer with violence and battery.  K.G. was initially detained for hitting a pregnant woman, a neighbor, and her own mother.  B.G. was

These juveniles have a lengthy history of violence and anti-social behavior, as do virtually all of the juvenile detainees at the Detention Facility.  Many of them have been through multiple stays with the Department of Juvenile Justice ("DJJ"), have seen counselors, have gone to alternative schools, have been treated at mental health facilities, or have been on probation, among other interventions.  They frequently have been presented a wide range of medication with generally no improvement in their behavior.  Their schools have often expelled them, and their parents often cannot manage them.  Their crimes get progressively worse until a judge places them in the Detention Facility, where they stay as pre-adjudicated juveniles for an average of ten days before being placed in yet another program.

The Detention Facility cannot possibly reverse the accumulated impact of years of negative influences, neglect, and ineffective interventions in a span of ten days.  One of the juveniles is a convicted rapist; he raped a 14 year old girl at knife point.  Another is a 220 pound "child" who is charged with aggravated battery and armed robbery; accused of hitting his victim over the head with an object in an attempt to rob him.  One young inmate is a 240 pound "child" charged with brutally beating and raping a woman while she was taking a break from her job at the Lakeland Civic Center.  Most recently, a juvenile inmate was brought in for murder.  Although Plaintiffs' attorneys typically refer to them as "children," their history is anything but innocent.  This lawsuit is an outrage to

---

charged as an adult with sexual assault battery with a weapon on a 14 year old girl.  On August 10, 2012, B.G. was convicted by jury trial of the offense and awaits sentencing. D.M. was charged as an adult with attempted armed robbery with a deadly weapon. J.P. was initially ordered into secure detention on the underlying charges of burglary, grand theft, possession of drug paraphernalia and armed burglary.  J.D. was initially ordered into secure detention for robbery.  Franky Jean-Pierre was initially ordered into secure detention for possession of marijuana, battery and burglary.

the victims who unfortunately will never be heard in this trial, although it would be illuminating to hear their view of the Plaintiffs' complaints.  It is an insult to the Detention Deputies who must find ways to manage these juveniles in ways that did not work at home, in school, on probation, with DJJ, in a mental facility, or on a therapist's couch. This lawsuit is also a subterfuge brought by a victim's advocacy group after its picketing and planned demonstrations failed to stop the enactment and implementation of state legislation.  The suit was planned well in advance of any of the alleged constitutional violations, and the Court's authority is being involved as a policy maker.  As the Court previously noted, if the Plaintiffs' case is actually a claim to change state and local policies, or push for what Plaintiffs argue are "best practices," the courts are not the place to pursue such goals.  *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government."); *see also Baze v. Rees*,  553 U.S. 35, 51 (2008).

### III. THE DETENTION FACILITY

Section 985.688, Florida Statutes, sets forth requirements for the administration of Juvenile Detention Facilities that house both pre-adjudicated juveniles and direct filed juveniles.  Plaintiffs are housed in the Detention Facility in compliance with the statute. This section provides in pertinent part:

> The child shall be housed separately from adult inmates to prohibit a child from having regular contact with incarcerated adults, including trustees. Regular contact means sight and sound contact.  Separation of children from adults shall permit no more than haphazard or accidental contact. The receiving jail or other facility shall contain a separate section for children and shall have an adequate staff to supervise and monitor the child's activities at all times.  Supervision and monitoring of children includes physical observation and documented checks by jail or receiving

> facility supervisory personnel at intervals not to exceed 15 minutes.  This subsection does not prohibit placing two or more children in the same cell.  Under no circumstances shall a child be placed in the same cell with an adult.

Fla. Stat. § 985.688.  The record evidence establishes that Defendant Judd houses both pre-adjudicated juveniles and direct filed juveniles in a separate section of the Detention Facility in compliance with both the sight and sound restrictions of Section 985.265.  Defendant Judd also has policies and procedures in place to ensure against contact with adult detainees.

Pre-adjudicated juveniles are also housed separately from direct filed juveniles.  A central control room separates the pre-adjudicated dorms from the direct filed dorms.  Two Detention Deputies are typically stationed in front of both the pre-adjudicated and direct filed pods.  The position of the Detention Deputies enables them to see through a glass partition into the common area of the pods, with direct line of sight into most of the individual cells.  In compliance with Section 985.265, Defendant Judd's policies and procedures require a Detention Deputy to walk through the common areas and look into the individual cells every 15 minutes.  In addition, and contrary to Plaintiffs' assertions, Detention Deputies interact with the juveniles during the course of the day, including their respective walk-through inspections of the common areas and cells.

The statute also requires that the DJJ periodically evaluate county administered detention facilities to ensure compliance with "rules for certification of secure juvenile detention facilities operated by the [DJJ]."  Fla. Stat. 985.265.  At all times material, the Detention Facility has been found by the DJJ to be in compliance with Florida law for the administration of a juvenile detention facility.

Section 985.688 further requires that any detention facility operated by a county sheriff to be "accredited by the Florida Corrections Accreditation Commission or the American Correctional Association with annual inspections for compliance with the Florida Model Jail Standards."   At all times material, Defendant Judd has been fully accredited as required by the statute, and the administration of the Detention Facility has been found to be in compliance with the Florida Model Jail Standards.

The Florida Model Jail Standards require Defendant Judd to develop policies and procedures on the use of force "consistent with the Florida Department of Law Enforcement (FDLE) Use of Force Continuum and/or the Florida Department of Juvenile Justice (FDJJ) Use of Force Continuum and to provide FDLE and FDJJ approved training in connection therewith."   In this regard the Florida Model Jail Standards permit the use of pepper spray by certified correctional officers trained in its use in juvenile detention facilities when the use of force is necessary and the level of force is least likely to cause injuries to staff or youth.   The Florida Model Jail Standards require that when pepper spray is used on a juvenile, that the youth be examined by medical personnel as soon as practical.

Defendant Judd has in place appropriate policies and procedures for the use of force, including the use of pepper spray.   These policies and procedures include Defendant Judd's General Order for the use of Protective Action, and a Department of Detention Directive on the use of pepper spray.   (*See* DD 11.13.)   Detention Deputies are well-trained substantially beyond the training of other juvenile justice officers, and Detention Deputies utilize various approved methods and programs for dealing with the juvenile detainees in their care, including verbal intervention in circumstances that have

not reached the need for physical confrontation, as well as the continued use of verbal direction during and subsequent to the interaction.  All Detention Deputies are trained and certified in the use of pepper spray before they are able to use it.  This training includes being sprayed in the face themselves so as to afford the deputy the knowledge of the pepper spray's physical and psychological impact.  The training further includes prompt medical attention and decontamination procedure for persons sprayed. Plaintiffs in this case **cannot and do not argue** that Defendant Judd's use of force policies and procedures or its training in connection therewith are in violation of law.[3]

In compliance with Florida law, each Detention Deputy is required to undergo training specific to juvenile detention.  The training exceeds the training required by Florida Department of Juvenile Justice employees involved in juvenile detention. Detention Deputies receive training on juvenile issues, including but not limited to:

1. Understanding Juvenile Behavior

2. Communicating Effectively with Juvenile Offenders

3. Understanding Behavior Modification

4. Understanding the Benefits of a Structured Environment

5. Understanding the Importance and Means of Suicide Prevention.

(Juvenile Detention Training Lesson Plans.)  More specifically, the training addresses the following topics, among others: characteristics and attitude perspectives of the juvenile offender; factors that influence the juvenile offender behavior in an institutional context; influences of self-concept, values, goals, and the inmate code of juvenile

---

[3] In fact, Plaintiffs' expert, Paul DeMuro, testified that he has not reviewed Defendant Judd's policies and procedures on the use of force, including pepper spray.

offender behavior; the concepts related to the authority to treat juvenile offenders; the classification system as it relates to juvenile offenders; one-way and two-way communication; the concepts of body language; the methods of communication that motivate juvenile offenders; understanding that a successful behavior modification system requires clear communication and implementation of facility rules; the prohibited methods of behavior modification; the suicide prevention plan; identification of youths at risk of suicide; the procedure for placing and removing youths on suicide watch; and the procedures for serious attempts.   (*Id.*)   Defendant Judd's policies, procedures, and training exceed constitutional requirements.   Plaintiffs, through their advocacy group, simply voice their perceived "better practice."   However, "[s]imply demonstrating that training could have been better is insufficient to establish liability."   *Samarco v. Neumann*, 44 F. Supp. 2d 1276, 1287 (S.D. Fla. 1999).   Also, the fact that a particular officer may be "unsatisfactorily trained" does not automatically result in liability for the sheriff's office, "for the officer's shortcomings may have resulted from factors other than a faulty training program."   *Id.* (citations and quotation marks omitted).

## IV. LAW

**A.   Preliminary Injunction Standard**

In order to obtain a preliminary injunction the Plaintiffs are required to prove:

1.   A substantial likelihood of success on the merits of their claims of blanket excessive use of force and unconstitutional conditions of confinement;

2.   That an injunction is necessary to prevent irreparable injury;

3.   That the threatened irreparable injury outweighs the harm the preliminary injunction would cause the non-movant; and

4.   That the preliminary injunction is not adverse to the public interest.

*See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).  The irreparable injury cannot be either remote or speculative, but must be both actual and eminent.  *Seigal v. Lapore*, 234 F. 3rd 1163 (11th Cir. 2000).  A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly establishes its burden on all four prerequisites.  *Id.*

The purpose of a preliminary injunction "is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits."  *Schiavo*, 403 F.3d at 1231.  "This necessitates that the relief sought in the motion be closely related to the conduct complained of in the actual complaint."  *Campbell*, 2007 WL 1531321, at *1.

**B.    Constitutional Standards**

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Pre-trial detainees, who are not protected directly by the Eighth Amendment, can bring Eighth Amendment claims through the Fourteenth Amendment.  *Bozeman v. Orum,* 422 F.3d 1265, 1271 (11th Cir. 2005).  There are differing types of claims under the Eighth Amendment's cruel and unusual punishment clause, including claims for excessive use of force and conditions of confinement.  *Danley v. Allen,* 540 F.3d 1298, 1306 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

As a general prerequisite, detention facilities are given broad administrative and discretionary authority in connection with the day-to-day operation of their institution.  A detainee has no constitutional right to be housed at one prison over another and courts are generally reluctant to interfere with the day-to-day decision

making by detention officials in the administration of their facility. *Barfield v. Bruton*, 883 F. 2d 923 (11th Cir. 1999). The "Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Prison conditions that are "restrictive and even harsh" are not per se in violation of the Constitution. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). In addition, "[p]rison officials have full discretion to control conditions of confinement, including prisoner classification." *Sanchez v. McCray*, 349 F. App'x 479, 481 (11th Cir. 2009) (citing *Moody v. Daggett,* 429 U.S. 78, 88 n.9 (1976)). "There is no constitutionally protected liberty interest in being housed in a certain prison or a certain section within a prison." *Id.* at 481-82 (citing *Meachum v. Fano,* 427 U.S. 215, 224 (1976); *Parker v. Cook,* 642 F.2d 865, 876 (5th Cir. 1981)).

## 1.    Excessive Use of Force

Plaintiffs allege that Defendant Judd's policies and procedures for the use of pepper spray to maintain and restore order in the Detention Facility constitutes *per se* excessive force in violation of the Constitution. Excessive force in violation of the Fourteenth Amendment is force that "shocks the conscience." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). The use of force "shocks the conscience" when it is "applied maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). In order to establish a constitutional excessive use of force violation, Plaintiffs are required to prove that the policies and procedures in place for security at the Detention Facility "shock the conscience" and that such policies are applied "maliciously and sadistically for the very purpose of causing harm." *Daley*, 540 F. 3d at 1307 (citing *Whitley*, 475 U.S. at 320-21). In evaluating whether a particular policy and procedure – either written or in practice – shocks the conscience,

courts generally consider the following factors: (1) a need for the force, (2) the relationship between that need and the amount of force used, and (3) the extent of the resulting injury. *Id.* (citing *Whitley*, 475 U.S. at 321). In addition to these three factors, courts also consider the "extent of the threat to the safety of the staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to them, and any efforts made to temper the severity of their forceful response." *Id.* (citing *Whitley*, 475 U.S. at 321).

The use of force to restore order in a detention facility is constitutional. *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990). A Detention Deputy need not wait until disturbances reach dangerous proportions before responding with force. *Id.* The Eleventh Circuit has held that the use of pepper spray is an acceptable non-lethal means of controlling unruly inmates. *Danley*, 540 F.3d at 1307; *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002). It has determined that a short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a Detention Deputy's order. *Danley*, 540 F.3d at 1307. A short burst of pepper spray is not excessive when used to break up a fight among inmates after they have repeatedly ignored verbal commands to stop. *Id.* at 1308.[4]

2.      **Conditions of Confinement**

"The Supreme Court has developed a two part analysis to govern Fourteenth Amendment challenges to conditions of confinement." *Chandler*, 379 F.3d at 1289. A prisoner must first prove that from an objective point of view his condition of

---

[4]  The Eleventh Circuit has held that pepper spray is designed to disable a suspect without causing permanent physical injury. Pepper spray is a very reasonable alternative to escalating a physical struggle. *Vineyard*, F.3d 311 at 1348.

confinement is sufficiently serious to violate the Eighth Amendment. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). "The challenged condition must be extreme." *Id.* "While an inmate need not await a tragic event before seeing relief, he must at the very least show that a condition of his confinement poses an unreasonable risk of serious damage to his future health or safety." *Id.* (internal citations and quotation marks omitted). "[T]he Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement]." *Id.* (quoting *Helling v. McKinney,* 509 U.S. 25, 33 (1993)). "It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* (quoting *Helling,* 509 U.S. at 33). The second test for an Eighth Amendment conditions of confinement claim is that the prisoner show that the prison officials acted with a sufficiently culpable state of mind with regard to the issue. *Id.* The proper standard is deliberate indifference. *Id.* Negligence does not suffice to satisfy the standard. *Id.* A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards unaccepted risks. *Id.* To establish deliberate indifference, the Plaintiffs are required to prove (1) Defendant Judd's subjective knowledge of a risk of serious harm because of the condition of confinement; (2) disregard for that risk; and (3) that the conduct at question is more than gross negligence. *Bozeman*, 422 F.3d at 1272.

Plaintiffs do not attack Defendant Judd's written policies and procedures for the administration, detention and day-to-day operation of the Detention Facility; indeed,

Plaintiffs' experts did not even review those policies. However, Plaintiffs allege in support of the preliminary injunction that Defendant Judd operates the Detention Facility pursuant to a pattern of unconstitutional conduct – specifically, lack of staffing, supervision, and classification – which promotes fighting among the juveniles. Plaintiffs must prove that Defendant Judd had a "policy or custom" of deliberate indifference that led to the violation of their constitutional rights. *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Because Plaintiffs do not attack the written policies, they must show that Defendant Judd had a custom or practice of permitting constitutional violations and that the custom or practice was the "moving force" behind the constitutional violation. *Id.* "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality." *Id.* A pattern of constitutional violations is ordinarily necessary. *Id.* Liability for a pattern of unconstitutional conduct will only attach where the unconstitutional conduct is so obvious as to put the official on notice that the imposition of the policy results in constitutional violations. *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

## V. ANALYSIS OF PLAINTIFFS' CLAIMS

Here, although the relief sought in the motion for preliminary injunction must "be closely related to the conduct complained of in the actual complaint," *Campbell*, 2007 WL 1531321, at *1, Plaintiffs' brief and expert testimony go far beyond the allegations in the second amended complaint, particularly beyond the motion for preliminary injunction, and the proposed order with regard to same. Despite the narrow relief Plaintiffs seek in their second amended complaint and proposed order, Plaintiffs now

expand their contentions to focus on fights that occur among juveniles at the Detention

Facility, asserting that the fights are caused by Defendant Judd's:

> 1. Failing to station Detention Deputies inside the dorms where children
> are housed;
>
> 2. Failing to provide staffing ratio of at least 1:8 during waking hours;
>
> 3. Relying on obstructed lines of sight and sound and cameras with limited
> views;
>
> 4. Failing to provide children with adequate structured programming to
> occupy their time.

Plaintiffs seek the consent to engage in policy making about best practices in running a

Detention Facility, rather than rule on specific alleged constitutional departures.

## A.    Lack of Structured Programming

Plaintiffs allege that Judd fails to provide the juveniles with enough structured

programming to occupy their time, which results in violent conditions of confinement.

Plaintiffs maintain that Defendant Judd "fosters a punitive adult correctional environment

at the Polk County Jail."  (Doc. No. 117 p. 2.)  Plaintiffs assert that the juveniles "have

unique needs in a custodial setting" requiring that they be provided with more

"structured programming to occupy their time." (*Id.* at 3.)  Specifically, Plaintiffs contend

that Defendant Judd has failed to institute or provide preventive policies and/or

protocols to help stop detained juveniles from fighting, such as the implementation of

daily programming involving recreational activities, prayer groups, and book reading

groups.  (DeMuro Dep. p. 267:11-25.)  Plaintiffs maintain that if these types of daily

activities were provided and if the Detention Deputies interacted more frequently with

them as guidance counselors, the Detention Facility would be less violent.

In a case such as this one, the Court's role is not to attempt to construct a "model program." *Alexander S. ex rel. Bowers v. Boyd*, 876 F. Supp. 773, 779 (D.S.C. 1995). Instead, the Court's role "is limited to establishing minimally acceptable constitutional standards." *Id.* Courts hesitate to interfere with the running of juvenile programs on the basis of scanty records and in the absence of a clear showing of deprivation of a constitutional right. *See Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1374 (D.R.I. 1972).

Plaintiffs contend that fights occur because of a lack of programming to distract or engage them. They argue that they face an increased risk of getting into fights, which then increases their risk of being pepper-sprayed when they refuse to comply with orders to disengage from fighting. Importantly, however, the failure to provide Plaintiffs with the recreational and programming activities they request is not a constitutional violation. Further, the causative nature of their argument is without support. To suggest that it is Defendant Judd's policies and procedures that cause Plaintiffs to get into fights and to ignore reasonable and legitimate directions deflects from Plaintiffs' own violations and inappropriate behavior. It is not Defendant Judd's lack of additional programming that is responsible for Plaintiffs engaging in fights, it is the Plaintiffs who are responsible for their actions; this Court should look no further in addressing the allegations made herein.[5]

---

[5] Notwithstanding Plaintiffs' allegations, Defendant Judd does have appropriate and available programming. Education is provided to all juvenile detainees through the Polk County School Board in accordance with its education protocols. Juveniles are provided classroom time as well as outdoor recreation. Both the educational and daily activities have been approved as appropriate by the previous accreditation agencies, including, but not limited to, the Florida Department of Juvenile Justice.

Plaintiffs' complaint does not state a cognizable injury necessitating an injunction necessary to prevent irreparable injury.  Instead, Plaintiffs' requested injunctive relief requires this Court to change Defendant Judd's day-to-day management and operation of the facility.  As stated above, however, the law provides an official such as Defendant Judd with wide discretion in the management and operation of the Detention Facility. Court intervention is not warranted in light of the lack of a constitutional violation, a lack of proof that "insufficient programming" is the cause of the fighting at the facility, and/or that Defendant Judd is deliberately indifferent to preventing fighting in its facility.  There is no proof that increased programming would prevent irreparable injury – what if organized recreation causes Plaintiffs to fight more?  What if juveniles start fighting about what they see on television or what television channel should be watched that afternoon?  Implementation of Plaintiffs' requested relief would require the Court to continually monitor the situation within the facility to determine whether the injunction was "working".  This is in contrast to permissible injunctions needed to prevent irreparable injury, such as, perhaps, an injunction against a prison policy of beating inmates with a baton every time they use an obscenity.

Plaintiffs argue that they "spend only 1-4 hours in the classroom on any given day" and that in the classroom they are told to "work independently" or "are given work that does not correspond to their grade level." (Doc. No. 117 p. 3.)  Notably, Plaintiffs are not contending that they are academically harmed by the alleged lack of education programming; instead, the harm is that they have been denied the right to have their time occupied.  (*See id.*)  This obviously does not rise to the level of a constitutional

deprivation. Further, a review of Plaintiffs' records establishes that before their detention, many habitually skipped school.

As an example, one juvenile last attended the ninth grade, where he skipped every single day. He has taken medication for a variety of mental disorders since he was very young but they were never any help to him. He has had counseling for impulse control and anger management, but that was of no use to him either. From the time he was eleven years old until he turned fifteen, he was Baker-Acted at least eight times. He was first charged with a battery at the age of nine and has had several violations of the law, culminating in his rape conviction. Before being placed in the Detention Facility, he spent several months at DJJ, at a youth camp in the Appalachian Forest, at a halfway house, and at a juvenile facility in Arcadia. He was the "singer" who was pepper sprayed, as discussed below.

The education program at the Detention Facility complies with standards set by the Polk County School Board. Section 985.265(4)(b), Florida Statutes, requires only that a juvenile detainee receive education "commensurate with his or grade level and educational ability." Plaintiffs quote Jean-Pierre's deposition for the proposition that the schoolwork did not correspond "in any way" to their grade level. What he actually said in agreement with the question posed to him was that he felt like the classes were not challenging enough.[6] (Jean-Pierre Dep. 27:11-27:14.) This is a complaint that could be

---

[6] According to Jean-Pierre's mother, Violene Jean-Pierre, whom he slapped hard enough to make her bleed (Violene Jean-Pierre Dep. p. 29:16) causing her to call law enforcement, Jean-Pierre missed "a lot of days" of school when he was at home. (*Id.* at 19:9.) As recently as July 27, his mother stated that he doesn't "listen" to her about completing his remaining work to graduate from school (*id.* at 47:13) and while in school, did not "listen" to her attempts to correct behavior that caused him to be suspended from school. (*Id.* at 48:4.)

made by numerous students in any given public school. Plaintiffs never allege that they informed anyone at the Detention Facility that they needed more challenging material. Considering that most of the detainees spend no more than twenty-one days at a time at the facility, even if Plaintiffs are sometimes told to work independently, this is a reasonable way to accommodate all of the different grade levels and abilities present in the Detention Facility in the short time they are detained there. Again, Plaintiffs seem to be alleging that the biggest issue is that they do not have anything to pass the time. As alleged by Plaintiffs, the education system Judd provides at the Detention Facility does not rise to the level of deliberate indifference.

Although Plaintiffs are critical of the education provided to juveniles on the one hand, they complain on the other hand that the television only provides instructional programming. (Doc. No. 117 p. 4.) It is safe to say that Plaintiffs do not have a substantial likelihood of success of proving that the lack of television entertainment rises to the level of a constitutional deprivation.

As mentioned above, pre-adjudicated juveniles are detained for usually less than twenty-one days for their various offenses. Notwithstanding, these juveniles complain that their constitutional rights are being violated because whether they get recreation depends on which deputies are on duty and because deputies "do not provide organized activities at recreation." (*Id.* at 3-4.) Plaintiffs do not allege that they are denied recreation except that it is sometimes limited to once a week for juveniles held as adults. The causative component for lack of recreation is Plaintiffs' misconduct and non-compliance with detention detectives.

Plaintiffs have not shown that an injunction for more exercise time or for structured physical activities is necessary to prevent irreparable injury. Even as alleged, pre-adjudicated juveniles are usually provided time to exercise every day. There is absolutely no constitutional requirement that structured activities must be provided during the exercise time.

Plaintiffs assert that the lack of structure to occupy the juveniles' time leads to fights, as does failing to station deputies inside juvenile dorms, failing to provide a staffing ratio of 1:8 during waking hours, and relying on obstructed lines of sight and sound. (*Id.* at 22.) What Plaintiffs fail to leave any room for is the juveniles' own accountability. The juveniles are responsible for their own actions. They are being detained for a reason, and although they are not detained for punishment, detention is not constitutionally required to be summer camp. *Vega v. Parsley*, 700 F. Supp. 879, 883 (W.D. Tex. 1988) ("The Constitution does not mandate comfortable prisons, and such prisons cannot be free of discomfort."). Plaintiffs have failed to show that the education system currently available to the juveniles or the availability of recreation and entertainment shows deliberate indifference to any substantial risk of harm to the juveniles including, but not limited to, increased fights.

## B.    Staffing and Positioning

Plaintiffs allege that there are not enough Detention Deputies on staff and that the Detention Deputies are not stationed within the locked boys' pods, but instead have limited lines of sight and sound. Plaintiffs allege that these staffing decisions predictably cause fights. Notwithstanding their allegations, Plaintiffs offer no evidence that Defendant Judd's policies and procedures regarding the operation or maintenance of

the Detention Facility violate the United States Constitution.   Plaintiffs offer no comparison evidence that fights would decrease if there were more Detention Deputies or if they were stationed differently.  In fact, Plaintiffs' own expert confirms that even the proposed better practices would not stop all fighting within the facility.

Further, Defendant Judd has accepted policies and procedures in place to address the supervision of the court ordered juveniles in the detention facility.  These accepted policies and procedures include the training of Detention Deputies in juvenile detention, staffing of at least two Detention Deputies immediately outside the common areas with direct line of sight to the same and to most of the individual cells, and walk-throughs throughout the entire area by a Detention Deputy every fifteen (15) minutes. The sightlines into the common area and the individual cells are typical of detention facilities.  The placement of the officer desk outside the central control room and in front of the glass partition into the common area allows for increased visibility and ready access to both the common area and individual cells.  In fact, other than one occasion, Plaintiffs' own filing reflects that Detention Deputies respond to fights within seconds of the same occurring.   The standards utilized by Defendant Judd meet approved practices for juvenile detention as evidenced by the accreditations the facility has received and the Florida Department of Juvenile Justice assertion that the facility is in compliance with their standards.

Plaintiffs' allegations that Defendant Judd fails to follow a 1:8 federally mandated staffing requirement is simply wrong.  No such standard exists.  Plaintiffs cite the Prison Rape Elimination Act (PREA) for the 1:8 staffing ratio.   The PREA was enacted in response to the issue of prison rape in federal prisons.  The standards set forth therein

do not apply to jails.[7]   Notwithstanding, Defendant Judd utilizes a staffing and supervision plan that exceeds historical or contemporary minimums for detention facilities.

Defendant Judd's staffing decisions regarding the number of Detention Deputies to have on duty and the positioning of the same does not establish deliberate indifference.   Further, there is no evidence that Defendant Judd's failure to have a higher staffing ratio is evidence of constitutional deprivation.   As set forth above, this Court in reviewing the matter is required to give deference to Defendant Judd's day-to-day management and operation of the facility.   Plaintiffs simply proposing management/operation alternatives under the guise that the proposals are "best practices" or "better practices" is not enough to establish a constitutional violation.

Lastly, the procedures in place are reasonable for juvenile detention and supervision.  In addition to the strategic placement of the Detention Deputies outside the glass partition with full view of the common area and direct line of sight to most of the individual cells, Defendant Judd requires the Detention Deputies to perform a walk-through every fifteen minutes of both of the common area and the individual cells. These walk-throughs are not *pro forma* as they involve the Detention Deputy interacting with the juveniles and looking through each individual cell.  Despite Plaintiffs' selective photographs of the views from the Detention Deputy desk, most of the individual cells are in line of sight of the deputies.  While it is true that Detention Deputies cannot see into each cell when the doors are closed, this issue is addressed through the implementation of the fifteen minutes walk-throughs.

---

[7] There have been no allegations by Plaintiffs of rape within the juvenile detention facility.

Plaintiffs' allegation that on one occasion Defendant Judd's procedures failed to prevent a "hate crime" that resulted in one juvenile being repeatedly attacked does not constitute deliberate indifference.   The isolated event where T.W. was allegedly attacked by three of his roommates does not establish deliberate indifference because it does not show a pattern or practice of constitutional violations.   The staffing was admittedly decreased on the evening that the attack took place; however, this was because one deputy was transporting a juvenile and a second was engaged in one-to-one observation of a juvenile on suicide watch.   Further, there was a Detention Deputy performing a walk-through, and when he asked T.W. if everything was okay, T.W. answered in the affirmative.   Plaintiffs cannot show deliberate indifference by this single incident because the incident was investigated and the Detention Deputies were disciplined for their inactions.

Plaintiffs have not demonstrated evidence of a persistent or widespread policy of understaffing or lack or supervision that caused this sort of violence.   *See Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir. 1989).   In *Edwards*, a juvenile convicted as an adult was being held in jail awaiting sentencing.   *Id.* at 1272.   He committed suicide in his cell but had not previously attempted or threatened suicide, although the nurse could not remember if he had seen the psychologist as he had requested.   *Id.*   On the night of his suicide, the guard checked the cells every fifteen minutes until 3:45 a.m. when he went to help in the jail kitchen.   *Id.* at 1272-73.   When the guard returned around 4:30 a.m., the juvenile was dead.   *Id.* at 1273.   The court concluded that the evidence to support the plaintiff's position that the jail had fewer officers than were needed, that defendant knew it was understaffed and decided not to increase the staff, and that defendant knew

or should have known that the consequence of inadequate staffing would be an inmate's suicide was "colorable at best". *Id.* at 1277.  The *Edwards* court found it "[f]ar more important" that "the law was by no means settled that the undisputed level of staffing at this jail, or in substantially similar circumstances, was understaffing or that this understaffing would amount to deliberate indifference." *Id.*  Plaintiffs have likewise failed to show that the staffing levels in the Detention Facility amount to deliberate indifference.

This event could also be compared to the rape of an eleven-year-old juvenile detainee by another detainee in *Stinson v. Montgomery County*, 286 F. App'x 629 (11th Cir. 2008).   In that case, the attack occurred in a juvenile detention center where juveniles' daily activities were similar to Plaintiffs' activities in the instant case.  They included "attending classes, going to court, having visitation, going to the doctor, or eating in the cafeteria" and each wing had two dayrooms where detainees would "watch television, play cards or board games, or read." *Id.* at 631.  Officers observed the detainees through glass windows in the control room and audio amplification devices, as well as periodically entering the dayrooms. *Id.*  Even though the juvenile called out for help several times during the rape and the officers could neither see nor hear him, the court found that he could not establish that the officers acted with deliberate indifference because there was "insufficient evidence to create a factual issue as to whether the officers were subjectively aware of, and were deliberately indifferent to, a substantial risk of serious harm" to the juvenile. *Id.* at 634.  The court stated that although the officers may have acted with negligence or even gross negligence, that

was not enough to satisfy the subjective-awareness standard required to establish deliberate indifference. *Id.*

Defendant Judd has accepted policies and procedures in place for the supervision of the juveniles under his control. Plaintiffs' proposal of perceived "better practices" is insufficient to establish a constitutional violation.

## C.    Use of Pepper Spray

Plaintiffs complain that Defendant Judd's use of pepper spray to maintain and restore order within the Detention Facility during and following fights among both the pre-adjudicated and direct filed juveniles constitutes a violation of their Fourteenth Amendment Rights under the United States Constitution in terms of both excessive use of force and deliberate indifference to their conditions of confinement.[8]

Pepper spray has been approved for use by the Eleventh Circuit and is also approved for use against juveniles by the Florida Model Jail Standards. *Danley*, 540 F.3d at 1307 ("Pepper spray is an accepted non-lethal means of controlling unruly inmates."). Pepper spray is beneficial because "as a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury." *Vinyard*, 311 F.3d at 1348 (citations and quotation marks omitted). "[P]epper spray is a very reasonable alternative to escalating a physical struggle . . . ." *Id.*

Contrary to Plaintiffs' implication, the Detention Deputies do not spray juveniles at the slightest provocation; it is used on average less than once a week. The Detention

---

[8] Plaintiffs did not have their expert review Defendant Judd's written policies and procedures regarding the use of force and offer no evidence that as written the use of force policies and procedures are in violation of constitutional law.

Deputies have been thoroughly trained in its use and, according to Defendant Judd's policies and procedures, may not use it until they have been so trained.  This training is mandated by detention directives and policies and procedures that are in place, as cited above.

Although Plaintiffs dedicate a significant portion of their brief discussing various incidents using pepper spray and informing the Court on how much each juvenile weighs, what these incidents rather show is that pepper spray is almost always used to control fights between the juveniles.  Plaintiffs' implication that these "children" only weigh about 150 pounds and should be able to be controlled by the Detention Deputies by other means overlooks the fact that, as set forth above, the juveniles are not always easy to deal with, and the Detention Deputies have a better sense of what must be done to control the behavior.  Would Plaintiffs rather have the Detention Deputies use physical techniques?  The use of "physical" techniques to attempt control of someone holds the inherent risk of injury to both the officer and juvenile.  It is accepted that pepper spray is a lesser means of use of force than hands on physical force; the latter increases the risks of injury to both the juveniles and the Detention Deputies.  What Plaintiffs ignore is that the use of pepper spray results in fewer injuries to Detention Deputies who must deal with non-compliant, disruptive and/or combative detainees.  The use of pepper spray allows the Detention Deputies to gain or maintain control of situations.  Plaintiffs seem to want the Detention Deputies just to put the juveniles in "time out" until they have cooled down whenever the juveniles display resistance.  However, the Detention Deputies "do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out."  *Danley*, 540 F.3d at

1307. "Certainly they are not required to do so where an inmate repeatedly fails to follow those orders." *Id.* The Constitution does not require the Detention Deputies to allow the juveniles a cool-down period before taking any action when the juvenile detainees refuse to obey reasonable directives.

As stated above, whether force is excessive is evaluated by whether it shocks the conscience. "To evaluate whether actions shock the conscience, we consider the following factors: (1) the need for force; (2) the relationship between that need and the amount of force used; and (3) the extent of the resulting injury." *Danley*, 540 F.3d 1298, 1307 (11th Cir. 2008). The incidents Plaintiffs list involving the use of pepper spray overwhelmingly were in response to fights. Some of the Plaintiffs actually voiced appreciation for the Detention Deputies' quick response with pepper spray to de-escalate fights. The other incidents Plaintiffs cite involved juveniles refusing to obey orders, sometimes with physical resistance both in connection with a fight or in response to a lawful and reasonable order. These are not constitutional violations. "A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Danley*, 540 F.3d at 1307. Although these are juveniles, the Detention Deputies still must have some means to control them. It seems again that Plaintiffs would leave the Detention Deputies only with the option to say "please" after a juvenile refuses an order.

When considering whether a use of force was necessary, courts look at "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Cockrell*, 510 F.3d at 1311 (citations and

quotations marks omitted).   Courts additionally "must also give a wide range of deference to prison officials acting to preserve discipline and security, including when considering [d]ecisions made at the scene of a disturbance." *Id.* (citations and quotation marks omitted).   "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."   *Vinyard*, 311 F.3d at 1349 (quoting *Saucier v. Katz*, 533 U.S. 194, 209 (2001)) (internal quotation marks omitted).

Defendant Judd acknowledges that the incident involving B.G. in the suicide cage was against detention policy.   However, the Detention Deputies were disciplined, and again, a single incident does not rise to a custom or policy and is not sufficient to show a constitutional violation.   Moreover, these were not just children singing quietly while being held in the cage, as set forth above.   For two hours, B.G., after lights out and against orders to stop, had been loudly singing "Afro-Man," a song filled with the most salacious lyrics one can imagine.[9]   He had been told several times to stop singing, and it started to create a disturbance in the dorm.   The other inmates were trying to sleep and B.G. wouldn't stop no matter how many warnings he was given by the Detention Deputy.   As the other inmates began yelling back that they would "take care of him" if he didn't stop, the deputy decided to attempt to stop the disturbance B.G. was

---

[9]   An example of the lyrics recited by B.G. in his deposition include:   "We effed on the bed, effed on the floor, we effed so long I grew an effing afro.   And then we effed to the left, we effed to the right, she sucked my – till the – turned white.   I thought to myself, sheebra, sheebra, got my ass looking like a zebra.   Put on my clothes and I was on my way, until her daddy pulled up in a Chevrolet.   So I ran, I jumped out the back window, but her daddy, he was waiting with a two-by-four.   Oh, he beat me to the left, he beat me to the right, the mother- -- whooped my ass all night, but I ain't mad at her prejudiced dad.   That's the best damn pussy I ever had.   I'ma get a bag of weed and a bottle of wine and go eff that B one more time."

causing.  To this end, Defendant Judd would have been within policy directives to spray B.G. directly.

According to their brief, Plaintiffs would have the Court get involved in such decisions as whether to spray a juvenile who flooded his cell, threw his food on the floor, would not give his tray and cup to the deputies, refused to follow instructions to face the wall when deputies entered his cell, and raised his arms as if to fight.  (*See* Doc. No. 117 p. 16.)  Plaintiffs presumably would have the Court enter an injunction that the Detention Deputies should ignore such refusals to follow their instructions and leave the juveniles alone to calm down.  (*See id.*)  However, as stated above, these are just the sorts of decisions courts defer to prison officials.

## VI.    CONCLUSION

In conclusion, although Plaintiffs would have the Court intervene as a policy maker and decide the "best practices" for the Detention Facility, the Court only has the authority to determine whether the conditions of confinement and Defendant Judd's use of force are constitutional.  Plaintiffs have not demonstrated that Defendant Judd has violated the Constitution.  That the Detention Facility is not the ideal place to spend a portion of one's youth does not equate with a constitutional violation.  Plaintiffs' assertions that their constitutional rights are being violated should be tempered by the testimony of a mother of one of the juveniles that she never considered posting bond for her son and felt that it was better for him to be in the Detention Facility rather than out. (Lisa Jobe Dep. 107:22-25 & 108:12-18.)

Plaintiffs are also prohibited from seeking relief beyond what they alleged in the second amended complaint and requested in their proposed order – to enjoin

Defendant Judd from failing to protect the juveniles from harm through a failure to have a staffing, supervision and classification plan for adequate supervision, and from using chemical restraints such as pepper spray or mace to punish or discipline.  Plaintiffs' motion for preliminary injunction should be denied because they have not satisfied the standard for granting a preliminary injunction because they have not shown a substantial likelihood of success on the merits or that an injunction is necessary to prevent irreparable injury.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of August, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to **TANIA GALLONI, ESQ.** and **MIRIAM HASKELL, ESQ.**, Southern Poverty Law Center, P.O. Box 370037, Miami, FL  33137; **SHEILA A. BEDI, ESQ.**, Southern Poverty Law Center, 4431 Canal St., New Orleans, LA   70119; **DONALD J. HAYDEN, ESQ.**, **ANGELA VIGIL, ESQ.**, **JOSE A. AVILA, ESQ.** and **JOSEPH A. MAMOUNAS, ESQ.**, Baker & McKenzie, P.A., Sabadell Financial Center, 1111 Brickell Ave., Ste. 1700, Miami, FL  33131; **JOSEPH P. RINDONE, ESQ.**, Baker & McKenzie, LLP, 1111 Avenue of the Americas, New York, NY  10036 and **STEVEN M. CHASIN, ESQ.**, Baker & McKenzie, LLP, 815 Connecticut Ave., N.W., Washington, DC 20006 (Attorneys for Plaintiffs) and **PATRICK H. TELAN, ESQ.**; **JEANELLE G. BRONSON, ESQ.; RAMON VAZQUEZ, ESQ.** and **PHILIP J. WALLACE, ESQ.**,

Grower, Ketcham, Rutherford, Bronson, Edie & Telan, P.A., P.O. Box 538065, Orlando,

FL 32853-8065 (Attorneys for Defendant, CORIZON).

s/ Hank B. Campbell
HANK B. CAMPBELL
Florida Bar No. 434515
h.campbell@vcttalawyers.com
JONATHAN B. TROHN
Florida Bar No. 880558
j.trohn@vcttalawyers.com
ROBERT J. ARANDA
Florida Bar No. 988324
r.aranda@vcttalawyers.com
WILLIAM T. McKINLEY
Florida Bar No. 51115
b.mckinley@vcttalawyers.com
VALENTI CAMPBELL TROHN
 TAMAYO & ARANDA, P.A.
Post Office Box 2369
Lakeland, Florida 33806-2369
(863) 686-0043
(863) 616-1445 Fax
Attorneys for Defendants