Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, as guardian and
on behalf of J.B., a minor;
BRENDA SHEFFIELD, as guardian
and on behalf of J.D., a minor;
FRANKY JEAN-PIERRE; MICHELLE          Case No.:
MINOR, as guardian and on behalf      8:12-cv-00568-SDM-
of J.P., a minor; LISA JOBE, as       MAP
guardian and on behalf of K.J.,
a minor; AMY GAGE, as guardian
and on behalf of B.G., a minor;
CRYSTAL CUYLER, as guardian and
on behalf of D.M., a minor;
NIKETYA MATTHEWS, as guardian
and on behalf of K.G., a minor;
and ANITA NAVA, as guardian and
on behalf of A.H., a minor; on
behalf of themselves and all
others similarly situated,

       Plaintiffs,

vs.

GRADY JUDD, Polk County Sheriff,
in his official capacity, and
CORIZON HEALTH, INC.,

       Defendants.
_____/


VIDEOTAPED DEPOSITION OF SAMUEL GAY

Taken on Behalf of the Plaintiffs

Stenographically Reported by:
Donna L. Peterson, RDR, CRR
July 25, 2012

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 2 of 98 PageID 4231

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 14

1    Q.   Which are boys and which are girls?

2    A.   I have one boy, five girls.

3    Q.   Okay.  Which one is the boy?

4    A.   He's 26.

5    Q.   And all the others are girls?

6    A.   All the others are girls.

7    Q.   What's your highest level of education?

8    A.   I have a 12th grade education, ma'am.

9    Q.   Where did you go to school?

10   A.   Plant City High.

11   Q.   And you have a high school diploma?

12   A.   Yes, ma'am.

13   Q.   Do you have any other degrees or certificates,

14   licenses?

15   A.   Law enforcement and correctional.

16   Q.   What sorts of degrees are those?

17   A.   Criminal -- ma'am, I can't tell you unless I

18   was looking at the documents.

19   Q.   Okay.  Do you know if it's a certificate?

20   A.   Certificate, yes, that's what they are.

21   Q.   And you said a certificate in law enforcement?

22   A.   Yes, ma'am, I have.

23   Q.   And a certificate in corrections?

24   A.   Yes, ma'am.

25   Q.   What schools are those from?

1    A.    The law enforcement certificate was from PCC.

2    Q.    Is that Polk Community College?

3    A.    Yes, ma'am.

4          And the correctional certificate was from

5    Hillsborough Community College.

6    Q.    How long have you worked at the Polk County

7    Sheriff's Office?

8    A.    Since -- how long?  Almost 12 years, ma'am.

9    Q.    What's your current position there?

10   A.    Detention deputy, ma'am.

11   Q.    How long have you been a detention deputy?

12   A.    Come October the 2nd, this year will be

13   12 years.

14   Q.    So you have not had another position with the

15   Polk County Sheriff's Office?

16   A.    No, ma'am.

17   Q.    What are your duties as a detention deputy?

18   A.    Care, custody, and control.

19   Q.    Okay.  I've heard that phrase before.  Can you

20   tell me a little bit more about what it means?

21   A.    What it mean is -- gosh, I never really thought

22   about it.  I just go in and do a job.

23         My job is to maintain safety, to make sure that

24   everything is -- runs smooth and properly, that the area

25   is clean, the -- I -- I do a lot.

Page 16

1    Q.   Okay.  We'll -- we'll get into that a little

2    bit more.

3    A.   Okay.

4    Q.   A little bit later.

5         So you say come October that will be 12 years?

6    A.   Yes, ma'am.

7    Q.   What were you doing before the sheriff's

8    office?

9    A.   I worked for the Department of Correction.

10   Q.   How many years did you do that?

11   A.   I started with them in, what, '88, 1988.  You

12   got my mind.  I can tell you this:  I start with them in

13   '88, and I left there.  It was in 2000 of October.

14   Q.   Department of corrections, is that then working

15   in the state prison system?

16   A.   Yes, ma'am.

17   Q.   What was your job with corrections?

18   A.   My job with corrections, I had a lot of

19   different jobs with corrections.  My job was with care,

20   custody, and control, I made, what, dorm rounds, set

21   parameter posts, medical escort.  I was on the CMT team,

22   conference management team, cell extraction team,

23   shotgun squad.  And in '95, 1995, I worked with

24   juveniles from 1995 until 1997 of July.

25   Q.   Does that mean that prior to 1995 you were

Page 17

1    working with adults?

2        A.    Yes, ma'am.

3        Q.    And these were adults in the correction system

4    who had been convicted of crimes and sentenced --

5        A.    Yes, ma'am.

6        Q.    -- to a prison term; is that right?

7        A.    Yes, ma'am.

8        Q.    Tell me about the work with juveniles from 1995

9    to 1997.  Where was that?

10       A.    That was Hillsborough Correctional in

11   Hillsborough County.  1995, Hillsborough Correctionals

12   was converted over to a juvenile correctional facility.

13       Q.    Was this for juveniles who were tried as

14   adults?

15       A.    Yes, ma'am.

16       Q.    And had these juveniles been convicted?

17       A.    Yes, ma'am.

18       Q.    You said you worked there, I think, from '95 to

19   '97?

20       A.    Yes, ma'am.

21       Q.    What -- what was the size of the population

22   there?

23       A.    The population was approximately, I want to

24   say, about 315.

25       Q.    How large was the staff?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 6 of 98 PageID 4235

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 20

1      Q.   Okay.  And has it been day shift, say, for the

2  past year or so?

3      A.   Yes, ma'am.

4      Q.   Does Bravo platoon currently work only with

5  juveniles or with juveniles and adults?

6      A.   Bravo platoon is split up.  It's -- we have

7  certain deputies that's assigned to juveniles only, and

8  you have deputies that work with adults only.

9      Q.   Which are the deputies that are assigned to

10 work with juveniles only?

11     A.   It would be myself, Deputy Franklin,

12 Deputy Hertel, Deputy Choquette, Deputy Sanders; female

13 side, it would be Deputy Hawkins, Deputy Rawles.

14     Q.   I'm sorry.  What was that last name?

15     A.   Rawles.

16     Q.   How do you spell that?

17     A.   I have no idea.

18     Q.   Okay.

19     A.   I cannot recall.

20          And just recently a Deputy McCoy.

21     Q.   Is that everyone?

22     A.   I think so.  I'm not sure.

23     Q.   How long have these deputies been assigned to

24 work with juveniles only?

25     A.   We -- almost a -- well, September would be a

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 7 of 98 PageID 4236

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 21

1    year.  I want to say September of last year when we

2    got -- received them.

3        Q.   So since September 2011, the deputies you just

4    mentioned have only worked with juveniles; is that

5    right?

6        A.   I need to go back, ma'am.

7             Deputy McCoy just came on, so she -- she had to

8    go through the training before she was.

9        Q.   As to the other deputies?

10       A.   September of last year, ma'am.

11       Q.   So since September of last year, those

12   deputies, except for maybe McCoy, have worked

13   exclusively with juveniles; is that right?

14       A.   Yes, ma'am.

15       Q.   So then is it -- is it fair to say that since

16   September 2011 you have not worked with adults at the

17   Central County Jail?

18       A.   No, ma'am.  I have worked with adults, on

19   different shifts, on callouts, when they didn't need a

20   juvenile deputy.

21       Q.   What is a callout?

22       A.   A callout is when they need somebody to come in

23   to work so they call you to come out.  The other shift

24   would call you.

25       Q.   So you have worked with adults under those

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 8 of 98 PageID 4237

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 22

1   circumstances when there's a callout, another shift

2   needs you to come in to cover?

3        A.   Yes, ma'am.

4        Q.   How often does that happen?

5        A.   Not very often, ma'am.

6        Q.   How many times would you say it's happened

7   since September of 2011?

8        A.   I cannot recall, ma'am, not without looking at

9   the schedules.

10       Q.   Is it more than 10 times?  More than 20?

11       A.   I can't recall, ma'am.

12       Q.   Is that -- is that also true of these other

13  deputies, if there's a callout they may be called to

14  work another shift?

15       A.   Ma'am, I can't speak for them.  I don't know

16  how they do things.

17       Q.   So you don't know if any of these other

18  deputies have ever been called to cover a shift?

19       A.   No, ma'am.

20       Q.   How long have you been working specifically at

21  the Central County Jail?

22       A.   Since October of 2000.  Almost 12 years.

23       Q.   Oh, so the whole time you've been with the

24  sheriff's office, you've worked at Central County Jail?

25       A.   Yes, ma'am.

Page 23

1    Q.   You've not worked at South County Jail?

2    A.   Only for training for two weeks, and back down

3    there.

4    Q.   So you were at the Central County Jail around

5    September 2011 when you received the juveniles; is that

6    right?

7    A.   Yes, ma'am.

8    Q.   Okay.  Tell me about that transition.  Where

9    did the juveniles come in to, and how -- what

10   preparations were made to bring them in?

11   A.   I don't know what you mean by "preparations to

12   bring them in."

13   Q.   Well, were there other inmates in the areas

14   where the juveniles were brought to be housed?

15   A.   No, ma'am.

16   Q.   So the spaces where the juveniles were brought

17   were vacant?

18   A.   Yes, ma'am.  All the adults was moved down to

19   South County.

20   Q.   Okay.  When were the adults moved to South

21   County to make room for the juveniles?

22   A.   Ma'am, I can't recall.

23   Q.   So the adults were moved to South County, room

24   was made for the juveniles where, what part of the jail?

25   A.   Building 3, ma'am.

Page 27

1    Q.   Was anyone from DJJ involved in the training,

2    or anyone else?

3    A.   Yes, ma'am, it was.

4    Q.   Who was that?

5    A.   Ma'am, I can't recall the name.

6    Q.   Now, you said this was 40 hours?

7    A.   Yes, ma'am.

8    Q.   Over what period of time did that training take

9    place?

10   A.   Are you asking --

11   Q.   Was it full week, 40 hours?

12   A.   It was a full week, 40 hours, ma'am.

13   Q.   So that's all you did that week, 40 hours of

14   juvenile training?

15   A.   40 hours of juvenile training.

16   Q.   Have you received any training related to

17   juveniles since that time?

18   A.   Not to my knowledge, ma'am.  I don't -- no,

19   ma'am.

20   Q.   Have you ever been suspended or terminated from

21   a job?

22   A.   No, ma'am.

23   Q.   Have you ever been disciplined, specifically at

24   the sheriff's office?

25   A.   Yes, ma'am.

Page 28

1    Q.   Tell me about that, what happened, when it

2    happened.

3    A.   The first time, I received a letter of

4    guidance, and it was for putting an inmate in the

5    wrong -- in a cell with another inmate.  The inmate went

6    off -- what took place, the inmate went off to prison.

7    So there was no keep-separate in the computer, so when I

8    checked -- so I -- there was nothing -- nothing

9    indicating that I could not put him in that cell at the

10   time.

11   Q.   But it was two inmates that somebody later

12   determined should not have been together; is that right?

13   A.   Yes, ma'am.

14   Q.   And you put them together and you got a letter

15   of guidance because of that?

16   A.   Yes, ma'am.

17   Q.   What is a letter of guidance?  How would you

18   describe that?

19   A.   Oh, without looking at it, ma'am, I cannot tell

20   you.

21   Q.   Is it -- it's some form of discipline from the

22   sheriff's office?

23   A.   I take it as a discipline, as a -- as a

24   correcting counsel to -- to make sure -- I'm going to

25   say, to make sure I -- that don't happen again.

Page 29

1    Q.   What year, roughly, did that happen?   How long

2    ago was that?

3    A.   I can't recall, ma'am.

4    Q.   Was it in the last year?

5    A.   No, ma'am.

6    Q.   Two years?

7    A.   No, ma'am.

8    Q.   Three years?

9    A.   No, ma'am.

10   Q.   So it's been over three years?

11   A.   Yes, ma'am.

12   Q.   And then I assume, then, did that involve

13   inmates who were adults?

14   A.   Yes, ma'am.

15   Q.   Any other discipline or letter?

16   A.   Yes, ma'am, I did receive a letter, another

17   one.

18   Q.   What was that one about?

19   A.   That one was on -- because -- that one was on a

20   protective action that I didn't notify the lieutenant

21   first.

22   Q.   So if I'm understanding, it was a protective

23   action, you were supposed to notify the lieutenant ahead

24   of time, but you didn't, and that's what the letter of

25   guidance was about; is that right?

Page 30

1    A.   That's what he wanted me to do, yes, ma'am.

2    Q.   What sort of protection -- I'm sorry,

3  protective action was it?

4    A.   It was a situation where a inmate was putting

5  items into a door, preventing it from closing.  We were

6  trying to secure a cell.  And he was given orders to

7  stop, and he refused to comply at the time.  And that's

8  the only way I knew how to prevent it from happening.  I

9  was protecting county property.

10   Q.   What -- what did you do to protect county

11  property?

12   A.   I used Freeze.

13   Q.   Is that some sort of chemical agent?

14   A.   Yes, ma'am.

15   Q.   And that was because this inmate was refusing

16  to comply with your orders?

17   A.   Yes, ma'am.  Like I say, I preventing him from

18  damaging.  As a matter of fact, he ended up -- the door

19  was damaged, and we end up had to call maintenance to

20  repair it.

21   Q.   And how long ago was that?

22   A.   I cannot tell you.  I cannot recall.

23   Q.   Do you remember if it was more recent or older

24  than the first one you told me about?

25   A.   It was more recent than the first one I told

Page 31

1    you about.

2         Q.    Was it over a year ago?

3         A.    Yes, ma'am.  Over two, over three.

4         Q.    And was that, then, also involving an adult

5    inmate?

6         A.    Yes, ma'am.

7         Q.    And for that you received a letter of guidance.

8    Any other discipline because of that incident?

9         A.    Just a letter of guidance, ma'am.

10        Q.    Any other letters of guidance?

11        A.    Yes, ma'am, there is another one.

12        Q.    Okay.  Tell me about that one.

13        A.    That one was on where I was conducting chow and

14   I was standing in the Echo dorm.  I had the -- directing

15   the inmates in which direction I needed them to go in.

16   I had one that come across in front of me, so I -- one

17   came in front of me.  I grabbed him by his shirt, pulled

18   him back round; and he called his mom and said I beat

19   him up, which I did not beat him up.

20        Q.    So I take that to mean that this was a

21   juvenile?

22        A.    No, ma'am.

23        Q.    Oh, it was not.  It was an adult?

24        A.    It was an adult.

25        Q.    Okay.  And how recently was that?

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 32

1      A.    Oh, lord, I don't know.  It could have been --

2    oh, I don't know, ma'am.  I can't recall.

3      Q.    Was it over a year ago?

4      A.    Yes, ma'am.

5      Q.    Was this at the Central County Jail?

6      A.    Yes, ma'am.

7      Q.    Were all of these incidents at the Central

8    County Jail?

9      A.    Yes, ma'am.

10     Q.    And why did you receive a letter of guidance

11   for that?

12     A.    I was told, by grabbing his shirt, that was a

13   protective action.

14     Q.    So then was the issue that you had not done a

15   report for that protective action, or what was the

16   concern in the letter of guidance?

17     A.·   It's because I didn't do a -- they said I

18   didn't do a report.

19     Q.    Any other letters of guidance?

20     A.    Not to my memory, ma'am.

21     Q.    Any other types of discipline from the Polk

22   County Sheriff's Office?

23     A.    No, ma'am.

24     Q.    Any other reprimands or concerns from your

25   supervisors?

Page 33

1    A.    No, ma'am.

2    Q.    Have you ever been arrested?

3    A.    No, ma'am.

4    Q.    Have you ever been convicted of a crime?

5    A.    No, ma'am.

6         MS. GALLONI:  I am sorry.  I keep knocking part

7    of this microphone off.

8         THE VIDEOGRAPHER:  It's okay.  You can leave it

9    off.

10        MS. GALLONI:  Okay.

11   Q.    What's the most recent shift you worked at

12   Central County Jail?  Did you work yesterday?  The day

13   before?

14   A.    No, ma'am.  I worked -- my shift -- I just

15   started back today.

16   Q.    Did you work at all last week?

17   A.    Yes, ma'am.

18   Q.    Okay.  So tell me about your most recent shift.

19   Can you walk me through it just hour by hour, what you

20   do?

21   A.    Hour by hour.  We first get there.  We inspect

22   the place for cleanliness.  Then we conduct a head

23   count.  And every 15 minutes we attempt to try to get --

24   we do dorm rounds.

25   Q.    How many -- how many detention deputies are

Page 34

1    there in Building 3 on a particular shift?

2         A.    Four.

3         Q.    Does that include the person in the control

4    room or no?

5         A.    No, ma'am.

6         Q.    Is there also a person in the control room?

7         A.    Yes, ma'am.

8         Q.    What is the officer in charge?  I've seen that

9    term listed.  What does that person do?

10        A.    That's the OIC.  He main -- he runs -- work the

11   doors, monitor the video, the cameras -- well, the

12   monitors, keep logs, phone calls, inputting stuff in the

13   computer.

14        Q.    On a shift, is there one OIC for the entire

15   jail, or is there an OIC per building?  How does that

16   work?

17        A.    It's an OIC per building.

18        Q.    Where is the OIC located during the shift?

19        A.    Inside a office, an officer station in the

20   middle of the floor.

21        Q.    Inside -- I'm sorry.  Did you say inside the

22   building?

23        A.    Yes, ma'am.

24        Q.    So for Building 3, there would be an officer in

25   charge in an office inside that building?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 18 of 98 PageID 4247

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 35

1      A.    Yes, ma'am.

2      Q.    And that person in that office has access to

3   the cameras or to see what the cameras are seeing?

4      A.    Yes, ma'am.

5      Q.    Does the officer in charge also go onto the

6   floor, into the dorms?

7      A.    No, ma'am.

8      Q.    When you come in to work, are you -- are you

9   carrying pepper spray or any kind of chemical agent?

10      A.    Yes, ma'am.

11      Q.    Do you take -- do you take that home with you

12   and then bring it the next shift?

13      A.    Yes, ma'am.

14      Q.    What -- how big is the -- the -- is it pepper

15   spray?  Do you know what it actually is?

16      A.    It's Freeze plus P2K3, if I'm not mistaken.

17      Q.    And how big is that can?

18      A.    It's a 2-ounce can, ma'am.

19      Q.    Do you have to sign that out?

20      A.    No, ma'am.

21      Q.    What other types of restraints do you carry on

22   your person?

23      A.    Handcuffs.

24      Q.    Anything else?

25      A.    That's it.

Page 38

1    Q.   The four officers that are in Building 3, where

2    are they stationed?

3    A.    Two is on the -- it's in a common area in area

4    at a desk, monitoring A through C.  And then two would

5    be on the other side of the building monitoring D, E,

6    and F.

7    Q.   Okay.  Are the officers stationed inside the

8    dorm?  Are there any officers stationed inside the dorm?

9    A.   No, ma'am.

10    Q.   What is involved in moving kids from one

11    section of the jail to another?  What is that process

12    like?

13    A.   What do you mean, moving kids?

14    Q.   Well, do you ever have to move kids from one

15    part of the jail to another part of the jail?

16    A.   As in?

17    Q.   For school, for medical, for recreation.

18    A.    For school?  Oh, what's involved in that?

19    What's involved in that is we have to make contact with

20    master control.  And what we -- they do then, they clear

21    the compound, lock down, move -- make sure no adults on

22    the compound.  And they also have an alarm, a light that

23    flashes that -- to let the, what I guess you can say,

24    food service and laundry know that that juvenile is

25    getting ready to compound.  Compound is clear of all

Page 39

1    adults, and then once we get the okay, we move them to

2    education.

3        Q.   Now, is that process you just described the

4    same if you're going to move the juveniles to

5    recreation?

6        A.   Recreation is -- is attached to the building.

7    They go -- they do not see any adults.

8        Q.   Is there any other time that this light

9    flashes?

10       A.   Only when juvenile movement only, ma'am.

11       Q.   But is it only when the juveniles are going to

12   the classroom, or is it some other time?

13       A.   Only when juvenile is going -- well, going out

14   to court.  They use that light during -- to -- it will

15   flash during that time.

16       Q.   What about when a juvenile is being moved

17   because he or she is going to be released from the

18   facility?

19       A.   It's the same process, ma'am.

20       Q.   How long has that process been in place?

21       A.   What?  Clearing the compound, ma'am?  Ever

22   since -- ever since I've been -- the juveniles have been

23   there.

24       Q.   And with the light flashing, has that been in

25   place the whole time as well?

Page 42

1   sheriff's office?

2        A.   Yes, ma'am.

3        Q.   What is that e-mail address?

4        A.   I don't know, ma'am, because I don't use it.

5        Q.   Tell me about your training in using -- I want

6   to get the name right -- the Freeze P2K3.  What sort of

7   training have you received on how to use that?

8        A.   We was trained how to deploy it.

9        Q.   When did you receive that training?

10       A.   I received that training when I -- when I first

11  got there, back in 2000.  But we received training every

12  year, part of our DART training.

13       Q.   What is that?  What is DART?

14       A.   I cannot tell you, ma'am.  Only thing I can

15  tell you, this:  It's training that we receive on

16  computers.  We have to go back and read through --

17  through the -- oh, lord.  What it's called?  I can't

18  tell you.

19       Q.   Is it some sort of online --

20       A.   Yes, ma'am.

21       Q.   -- course?

22       A.   Yes, ma'am.

23       Q.   So there's no live instructor?

24       A.   No, ma'am.

25       Q.   And how much time each year do you spend on

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 43

1    topics related to chemical agents?

2        A.    That, I don't know, ma'am.

3        Q.    Is it more than an hour?

4        A.    It depend on the individual, ma'am.

5        Q.    You work at your own pace; is that right?

6        A.    Yes, ma'am.

7        Q.    What is covered in that annual training, as far

8    as chemical agents go?

9        A.    Ma'am, I -- without having the policies in

10   front of me or the actual training format, I could not

11   tell you.

12       Q.    But you're trained on that, whatever it is,

13   every year?

14       A.    Yes, ma'am.

15       Q.    When is it appropriate to use a chemical agent

16   at the jail?

17       A.    When a -- someone is being attacked, a riot,

18   prevent a person from being -- you know, being attacked,

19   self-defense.

20       Q.    Any other circumstances?

21       A.    Disobeying a lawful command.

22       Q.    What else?

23       A.    Ma'am, I can't tell you without having the

24   policies in front of me.

25       Q.    What is the process that allows you to use a

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 44

1   chemical agent?  Are there steps that you have to

2   follow?

3          A.   Yes, ma'am.

4          Q.   What are those steps?

5          A.   At first we have to try to de-escalate the

6   situation first.

7          Q.   What does that entail?

8          A.   Entail of communicating with the subject.

9          Q.   And what kind of communication would that be?

10         A.   It depend on the situation, ma'am.

11         Q.   What's the objective in the communication?

12         A.   The objective is that you're trying to talk the

13  person to comply without using a chemical agent.

14         Q.   And then it's when the person doesn't comply,

15  then, that you can move on to using the chemical agent?

16         A.   Yes, ma'am.

17         Q.   Do you need authorization from anyone before

18  you deploy the chemical agent?

19         A.   No, ma'am.

20         Q.   Does the chemical agent bottle that you use

21  ever get weighed, or is anything else done to track how

22  much is used in any particular incident?

23         A.   No, ma'am.

24         Q.   Other than the can or bottle that you carry on

25  your person, is there other -- are there other bottles

Page 45

1    or cans of chemical agent available to you?

2        A.    Yes, ma'am.

3        Q.    And what are those?

4        A.    That's Deep Freeze.

5        Q.    What's the difference between Deep Freeze and

6    the Freeze that you carry?

7        A.    There is no difference in -- in it, ma'am.

8    It's just a bigger can and it's designed for breaking up

9    riots or more than one person.

10       Q.    And I'm sorry.  You said designed to break up a

11   riot with more than one person.  It's an incident --

12       A.    For instance, if you got five or six fighting,

13   it's designed to -- to use in -- in that situation.

14       Q.    Where is that larger can kept?

15       A.    It's kept in a cabinet in the control room.

16       Q.    In Building 3?

17       A.    Yes, ma'am.

18       Q.    Does every deputy have access to that?

19       A.    Yes, ma'am.

20       Q.    Do you need someone's authorization before you

21   use that can?

22       A.    No, ma'am, not -- well, not to my knowledge.

23       Q.    Is that the can that some people refer to as

24   Black Jesus?

25       A.    No, ma'am.

Page 46

1      Q.    Do you know what Black Jesus is?

2      A.    Black Jesus is a prison term that these -- some

3   of these -- how -- what -- not pre-adjudicated, the

4   direct-files that been to prison and come back.  And

5   that's what they're talking about, Black Jesus.  It's a

6   different-type chemical agent.

7      Q.    Do any staff at the jail refer to the chemical

8   agent at Central County Jail as Black Jesus?

9      A.    Not to my knowledge, ma'am, no.

10     Q.    Now, you believe there are direct-file kids who

11  have been to prison and come back as pretrial

12  direct-file children at Central County Jail?

13     A.    Repeat that question, please.

14     Q.    Sure.  I heard you say that it's direct-file

15  juveniles who have been to prison, which means they were

16  convicted of a crime, and then come back to the jail.

17. So do you believe that there are children in that

18  situation, who have been to prison and come back as

19  pretrial direct-file juveniles?

20     A.    No, ma'am.  Not as pretrial, no, ma'am.

21     Q.    Do you have any convicted direct-file children

22  at the jail?

23     A.    That has been convicted?  Yes, ma'am.

24     Q.    And they've been to prison and come back to the

25  Central County Jail?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 26 of 98 PageID 4255

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 47

1      A.    Yes, ma'am.

2      Q.    As juveniles?

3      A.    Yes -- as a direct-file, juveniles, yes.

4            MR. TROHN:  When you got a minute, why don't we

5      take a break.

6            MS. GALLONI:  Yeah, I was about to say, why

7      don't we go ahead and take a quick break.

8            THE VIDEOGRAPHER:  We're off the video record.

9            (Recess from 10:19 a.m. until 10:32 a.m.)

10           THE VIDEOGRAPHER:  We are back on the video

11     record.

12   BY MS. GALLONI:

13     Q.    Now, before the break we were talking about a

14   couple of different things, the layout of Building 3 and

15   the staffing and the use of pepper spray.

16           You stated that there are four deputies

17   assigned to Building 3 on a particular shift; is that

18   right?

19     A.    On my shift, yes, ma'am.

20     Q.    Are there breaks taken by the deputies?

21     A.    We usually work straight through.

22     Q.    And that's a 12-hour shift?

23     A.    Yes, ma'am.

24     Q.    So there's no break taken for a meal?

25     A.    We eat right down on the floor, ma'am.

Page 48

1    Q.    And there are no designated break times?

2    A.    It -- it is, but I feel it's better -- my

3    belief, it's better to be there because I don't want

4    anything to happen.

5    Q.    What do you mean by that?

6    A.    By being visible, you prevent things from

7    happening.

8    Q.    What kinds of things?

9    A.    Fights.

10    Q.    Now, on the chemical agent, you testified that

11    you have about a 2-ounce can that you carry.  What do

12    you do when that can runs out of agent and you need

13    more?

14    A.    I contact my sergeant.

15    Q.    What happens from there?  Are there additional

16    bottles on site that you can go get a replacement?

17    A.    I contact my sergeant, and then they usually

18    replace that empty can.

19    Q.    How often do you replace the can?

20    A.    I replace my can only when it's malfunctioned,

21    or expiration date, if it's bad.

22    Q.    So how many times would you say that you've

23    replaced your can?

24    A.    I replaced it this year.  This year I replaced

25    a can that malfunctioned.  It wouldn't spray.

Page 49

1     Q.    How did you know it malfunctioned?

2     A.    Went to use it on a -- on a fight, ma'am,

3  protective action.

4     Q.    Involving juveniles?

5     A.    Direct-file juveniles, yes, ma'am.

6     Q.    And what happened when you went to use it?

7     A.    It just fizzled.

8     Q.    And that's the only time you've replaced a can

9  in this year?

10     A.    Yes, ma'am.

11     Q.    By "this year," do you mean 2012?

12     A.    Yes, ma'am.

13     Q.    And what about 2011?

14     A.    No, ma'am, no -- yes, ma'am.  I had to replace

15  one in '12, that I had a can that malfunctioned.  Same

16  thing, the agent, the -- wouldn't come out the can.

17  It --

18     Q.    And when was that?

19     A.    Had to be -- ma'am, I don't remember.  I can't

20  tell you the exact date or month.  But I know it was one

21  done in '11.

22     Q.    So in 2011, 2012, twice, you've replaced the

23  can; is that right?

24     A.    Yes, ma'am.

25     Q.    How many protective action reports have you

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 29 of 98 PageID 4258

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 50

1    prepared relating to juveniles?

2         A.   Ma'am, I don't know.

3         Q.   Do you remember preparing any protective action

4    reports relating to juveniles?

5         A.   Yes, ma'am.

6         Q.   Okay.  Tell me about the ones that you

7    remember.

8         A.   What you mean?  Explain what you mean, "tell

9    you about them."

10        Q.   Okay.  Tell me what the protective action

11   report was for.

12        A.   Fights.

13        Q.   How many reports have you written related to

14   fights?

15        A.   Ma'am, that, I can't tell you.

16        Q.   What about in the last year?  Do you remember?

17        A.   No, ma'am, I don't.

18        Q.   Do you remember the most recent one?

19        A.   Most recent one was last week.

20        Q.   Okay.  Tell me about that one.  What was the

21   date?

22        A.   I cannot recall the date, ma'am.

23        Q.   But it was last week, so that would have been

24   the week of July 16th?

25        A.   I don't remember the date, ma'am.

Page 51

1    Q.    But it was last week?

2    A.    Yes, ma'am.

3    Q.    Okay.  Where was the fight?

4    A.    This one wasn't on a fight, ma'am.  It was a

5    protective accident, disobeying a verbal order.

6    Q.    Where did that happen?

7    A.    That happened on the direct-file side in Echo

8    dorm.

9    Q.    Who was the juvenile involved?

10   A.    D'      M      .

11   Q.    So tell me what happened.

12   A.    He was given several orders to return to his

13   sleeping cell for lockdown for chow, and he refused to

14   comply, and he attempted to step outside the dorm.

15   Q.    Was this in the dayroom?

16   A.    This incident took place -- ma'am, I can't tell

17   you without looking at my report.

18   Q.    Well, it was in Echo dorm.

19   A.    It was in Echo dorm.  I cannot -- I don't

20   remember the specifics unless I get a chance to look at

21   my report, ma'am.

22   Q.    Do you remember what room D       M      was

23   supposed to go into?

24   A.    Not without looking at my report, ma'am.  I

25   can't tell you.

Page 52

1     Q.    Do you remember if it was the first floor or

2     the second floor?

3     A.    It was the first floor, ma'am.

4     Q.    And you told him to go to his cell to be locked

5     down for chow.  Is that mealtime?

6     A.    Yes, ma'am.

7     Q.    And you said that he refused to do that?

8     A.    He didn't comply with the orders, yes, ma'am.

9     Q.    So then what happened?

10    A.    Ma'am, without looking at my report, ma'am, I

11    can't tell you.

12    Q.    Do you remember what you did?

13    A.    Without looking at my report, ma'am, I can't

14    tell you.

15    Q.    Do you remember anything else that happened,

16    other than what you've told me?

17    A.    As in?

18    Q.    Anything else that happened regarding that

19    incident, other than what you've told me?

20    A.    Not without looking at my report, ma'am.

21    Q.    Okay.  And this happened a week ago?

22    A.    I think so, ma'am.

23    Q.    Did this incident involve the use of your

24    chemical agent?

25    A.    Yes, ma'am.

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 53

1    Q.    So what do you remember about using the

2    chemical agent?

3    A.    What I remember about using the chemical agent?

4    Q.    Uh-huh.

5    A.    Ma'am, not without looking at my report.   I

6    cannot tell you.   I don't remember.   I try not to

7    remember the thing from one day to the next.

8    Q.    So all you know is that D___ )M    did not

9    comply with an order and you deployed a chemical agent

10   on him, and that's the extent of your recollection?

11   A.    He didn't comply with orders.

12   Q.    He didn't comply with orders to go into his

13   cell, and you deployed a chemical agent on him?

14   A.    After he attempted to step outside, push past

15   me and step outside the dorm.

16   Q.    Okay.   So then you were at the dorm door?

17   A.    Yes, ma'am.

18   Q.    And D_____ tried to push past you to get

19   outside; is that right?

20   A.    Ma'am, I can't remember without looking at that

21   report.   I want to be accurate.

22   Q.    Do you have a copy of that report with you?

23   A.    No, ma'am, I don't.

24   Q.    Is that one of the reports you reviewed before

25   coming here today?

Page 54

1     A.    No, ma'am, I didn't.

2     Q.    Why not?

3     A.    I didn't think it was important, ma'am.

4     Q.    Is there anything else that you can tell me

5   about that incident, that you remember sitting here

6   today?

7     A.    Not without looking at my report, ma'am.

8     Q.    So that was last week.  What about before that?

9   What's the next most recent protective action report you

10  wrote?

11    A.    Ma'am, I -- I don't know, ma'am.  I -- I don't

12  remember, don't recollect.

13    Q.    Do you know if you wrote any other protective

14  action reports during the month of July?

15    A.    I can't tell you, ma'am.  I don't recollect --

16  I don't remember.

17    Q.    What about for the month of June?

18    A.    I don't know, ma'am, not without going back and

19  find it in some records.

20    Q.    What about May or April?

21    A.    Ma'am, I don't know.

22    Q.    So you don't remember in the last -- April,

23  May, June, July -- say, four months whether you wrote

24  any other protective action reports other than this one

25  we just talked about?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 34 of 98 PageID 4263

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 55

1      A.   I don't remember, ma'am.  I can't recall.  Been

2   writing quite a few DRs here lately.

3      Q.   What is a DR?

4      A.   Disciplinary report, ma'am.

5      Q.   So tell me about those.  You've written a few

6   of those lately.  What do you remember about those?

7      A.   Sagging pants, underwear being seen, won't pull

8   up their pants.  Pulled up for direct-files.

9      Q.   And how many direct-file juveniles have you

10   written up for saggy pants?

11      A.   That, I cannot tell you.

12      Q.   But it's more than one?

13      A.   I cannot tell you, ma'am.

14      Q.   Well, you said you wrote several of them

15   lately?

16      A.   Yes, ma'am.  I wrote -- I don't know how many I

17   wrote -- written, so I really couldn't tell you how

18   many.

19      Q.   And these DRs did not involve a protective

20   action report?

21      A.   No, no, ma'am.

22      Q.   Where do those disciplinary reports go after

23   you write them?

24      A.   They go into a South County mailbox.  Who

25   received them, I have no idea.

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 56

1      Q.    But you don't put it back into the individual's

2   file at the jail, the individual juvenile?

3      A.    That, I don't know, ma'am.  I just write the

4   reports.  They handle it from there.

5      Q.    Who?  Who is "they"?

6      A.    Whoever handled the -- I don't know who

7   handling the DR, who receive it after that.  I don't --

8   all I know, go to my sergeant, my sergeant sign off on

9   it, I place it into a South County box.

10      Q.    So 12 years at the sheriff's office, you -- you

11   don't know where a disciplinary report goes after you

12   put it in that box?

13      A.    Ma'am, I don't know where it goes.  Things

14   change.

15      Q.    Okay.  Excuse me.  Let me ask you about an

16   incident that took place on November 3rd, 2011.  I have

17   a protective action report here and an incident report,

18   written by you, involving a fight between two juveniles

19   in Charlie dorm.  Do you remember anything about an

20   incident like that?

21      A.    Not without names, ma'am, I don't.

22      Q.    And the incident report states that you used a

23   chemical agent.  Does that help jog your recollection at

24   all about this incident?

25      A.    Ma'am, I don't.  Broke up many fights using

Page 57

1    chemical agent.

2        Q.    How many fights have you broken up using

3    chemical agent?

4        A.    That, I could not tell you, ma'am.

5        Q.    What about in the last year?

6        A.    That, I cannot tell you, ma'am.

7        Q.    Okay.  Let me show you this protective action

8    report and incident report, and then I'm going to ask

9    you a couple of questions about it.

10       A.    Yes, ma'am.

11            MS. GALLONI:  Would you like to look at it?

12            MR. VAZQUEZ:  John, let me take a look at that.

13            Thank you.

14            MR. TROHN:  Does that go with it?

15       Q.    Now that Mr. Trohn and Mr. Vazquez have had a

16   chance to review those papers --

17            MR. TROHN:  Let me swap you.

18       Q.    -- we'll hand them to you.

19            Now, that appears to be a copy of a

20   protection -- protective action report and incident

21   report prepared by you for an incident occurring

22   November 3rd, 2011; is that correct?

23       A.    Yes, ma'am.

24       Q.    When is the last time you saw these documents

25   before today?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 37 of 98 PageID 4266

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 58

1      A.    Was -- what today is?  I want to say Monday or

2    Tuesday.

3      Q.    So last Monday or Tuesday you reviewed these

4    documents?

5      A.    Yes, ma'am.

6      Q.    After you've had a chance to look at them, if

7    you could hand them back to me, I'll ask you a few

8    questions.

9            MR. VAZQUEZ:  Excuse me.

10           MR. TROHN:  Do you want me to give him -- give

11      him a copy of the report while you ask him

12      questions?

13           MS. GALLONI:  That's fine.

14           I'll be marking this as Exhibit 1.  And for the

15      record, let me list the Bates stamp numbers.  It

16      starts at 3740, to 3743.  Then there's a page with

17      photographs where the Bates stamp number has been

18      blacked out.  And then it goes on to pages 3735

19      through 3738, and it ends with another picture --

20      photographs where the Bates stamp number has been

21      blacked out.

22           (Deposition Exhibit No. 1 was marked for

23    identification.)

24      Q.    Now, the -- this report states that there was

25    an incident at about 9:10 in the morning on

Page 59

1    November 3rd, 2011; is that correct?

2         A.   Yes, ma'am.

3         Q.   What can you tell me about this incident?

4         A.   According to my report, what I've written,

5    ma'am, it -- they was -- they were -- the

6    pre-adjudicated was returning from -- they was returning

7    from the rec yard and going back into Charlie dorm, and

8    where I observed two inmates fighting and two

9    pre-adjudicated juveniles fighting in there.

10        Q.   Now, this incident report says it took place at

11   9:00 a.m. and the juveniles were returning from the

12   recreation yard.

13        A.   Uh-huh.

14        Q.   Does that mean, then, that these

15   pre-adjudicated juveniles were not in school at the

16   time?

17        A.   That's correct, ma'am.

18        Q.   Now, the incident report states that you heard

19   a commotion in C3C.  That's Charlie dorm, correct?

20        A.   Yes, ma'am.

21        Q.   Where were you when this was happening?

22        A.   I was in the day -- I guess you can say the

23   common area.

24        Q.   The common area of Charlie?

25        A.   The common area of -- of all the dorms, of

Page 60

1    sitting in that -- I was between Delta and Echo, and I

2    can see what was going on.  When I heard a commotion,

3    looked over; I can see what was going on.  When I

4    heard -- when I heard the commotion.

5         Q.   So you were on the Delta Echo side.  Does that

6    mean that you were supervising the direct-file --

7         A.   Yes, ma'am.

8         Q.   -- children?

9              And you heard a commotion in Charlie?

10        A.   Yes, ma'am.

11        Q.   Who else was working that shift?

12        A.   Ma'am, I can't recall.  Wait a minute.

13             I can't recall who was on that day, ma'am.

14        Q.   But you were working the direct-filed side?

15        A.   Yes, ma'am.

16        Q.   You responded to the commotion that you heard?

17        A.   Yes, ma'am.

18        Q.   Where were the guards that were supposed to be

19   watching A, B, and C dorms?

20        A.   They was coming.  They was come -- I don't -- I

21   cannot recall.  I can tell you one was out on the rec

22   yard.  Who was on the rec yard, I don't remember.  They

23   was coming in.  So, you know, you escort.  You always

24   keep your inmate -- your inmates on juveniles in front

25   of you.  So I cannot tell you where.

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 61

1      Q.   But there was no one else there at the time to
2   respond to this but you; is that right?
3      A.   I don't recall, ma'am.
4      Q.   Did anybody else respond to this incident,
5   other than you?
6      A.   I had it under control.
7      Q.   So no one else responded other than you?
8      A.   I cannot recall, ma'am.
9      Q.   Well, if someone else had responded with you,
10  would their name appear on your incident report?
11     A.   I believe so.
12     Q.   So you heard the commotion, you were outside
13  the dorm at the time, in what you are describing as the
14  common area; is that right?
15     A.   Yes, ma'am.
16     Q.   What did you do next?
17     A.   I entered the dorm, ma'am, and I ordered them
18  to stop fighting.
19     Q.   Was the dorm door open at the time, or did you
20  have to --
21     A.   Yes, ma'am.  The direct -- the pre-adjudicated
22  was still coming in from rec.
23     Q.   So the pre-adjudicated were coming in from rec,
24  and the door was already open?
25     A.   It was open for them to enter into, yes, ma'am.

Page 62

1    Q.   Okay.  So you heard the commotion.  You could

2    hear it because the door was open?

3    A.   Yes, ma'am.

4    Q.   And then you went inside?

5    A.   Yes, ma'am.

6    Q.   Okay.  And who were the juveniles that you

7    observed fighting?

8    A.   Without having the original report, ma'am, I

9    cannot tell you.

10   Q.   You don't remember either of their names?

11   A.   No, ma'am.

12   Q.   Do you remember what they looked like?

13   A.   No, ma'am.

14   Q.   And the copy your counsel has given you there

15   also has the names redacted?

16   A.   Yes, ma'am.  They blacked -- everything blacked

17   out.

18   Q.   So you observed the two juveniles fighting.

19   What did you do next?

20   A.   I gave them several orders to stop fighting,

21   ma'am.

22   Q.   Where were they fighting?

23   A.   In the dayroom area, ma'am.

24   Q.   What part of the dayroom?

25   A.   Near the stairs.

Page 63

1    Q.    Near the stairs?

2    A.    Yes, ma'am.

3    Q.    In front of the stairs if you're facing the

4    dorm or to the side of the stairs, behind the stairs?

5    A.    I don't recall, ma'am.

6    Q.    How did the fight start?

7    A.    I don't know, ma'am.

8    Q.    What was the fight about?

9    A.    I don't know that either, ma'am.

10   Q.    Was there any officer in the dorm when the

11   fight started?

12   A.    No, ma'am.

13   Q.    So you gave them orders, I think you said, to

14   stop fighting?

15   A.    Yes, ma'am.

16   Q.    Okay.  And what happened then?

17   A.    They didn't comply.

18   Q.    What did you do?

19   A.    I deployed chemical agent Freeze plus P.

20   Q.    How did you do that?

21   A.    What you mean, how did I do that?

22   Q.    Well, what -- what exactly did you -- did you

23   do when you say you deployed it?  What exactly did you

24   do?

25   A.    That's when I pull my can out and I sprayed

Page 64

1    them.

2         Q.    Now, what were these two kids doing at the time

3    you deployed the chemical agent?

4         A.    Physically fighting.

5         Q.    Okay.  And how did you get to them with the

6    chemical agent?  Did you pull them apart?

7         A.    Ma'am, that's dangerous to go in on a fight and

8    try to pull people apart.  You make yourself known that

9    you just stop fighting, stop fighting.  If they don't

10   comply, you use the chemical agent.

11        Q.    Okay.  So how did you spray them?

12        A.    How do I --

13        Q.    Were they standing when they were fighting?

14   Were they on the ground?

15        A.    They were swinging, ma'am.  They was punch --

16   it was punches being throwed.

17       ·Q.    Were they standing?  Were they on the ground?

18        A.    Standing.

19        Q.    Okay.  They were standing.  And then how did

20   you deploy the chemical agent?

21        A.    Explain it.  How did I deploy?  I don't know

22   what you mean.

23        Q.    You said you pulled out the can.  Who did you

24   spray first?

25        A.    I don't recall, ma'am.  I don't even know the

Page 65

1    names -- remember the names of the inmates, so I cannot

2    tell you this.

3        Q.    Did you spray them at the same time or did you

4    spray one and then the other?

5        A.    It was a sweeping motion, ma'am.

6        Q.    And where did you spray them?  Where did the

7    spray land?

8        A.    Facial area, ma'am.

9        Q.    Were they facing you when they were sprayed?

10       A.    That, I cannot recall, ma'am.

11       Q.    But you do believe that you got the spray on

12   their facial area; is that right?

13       A.    Yes, ma'am.

14       Q.    Okay.  How did the juveniles react when you

15   sprayed them?

16       A.    I sprayed one.  One laid down on the floor.

17   He -- I told him to lay down on the floor prone.  The

18   other one started walking toward the restroom area or

19   the shower area.

20       Q.    Did they say anything, either one of them?

21       A.    I don't recall, ma'am.

22       Q.    Did they respond at all to the chemical spray?

23       A.    One did, ma'am, and the other one walked off

24   toward the shower area.  And I gave him an order to lay

25   prone on the floor.

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 45 of 98 PageID 4274

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 66

1      Q.    Well, you say the one --

2      A.    And I had -- go ahead.

3      Q.    You say the one laid down prone.  But did he

4    respond in any other way?  Did he react to the chemical

5    agent at all?

6      A.    Ma'am, I don't recall.

7      Q.    Okay.  And you told that person to get on the

8    floor, and he did; is that right?

9      A.    Yes, ma'am.

10     Q.    And then the other one -- I'm sorry.  What did

11   the other one do?

12     A.    Other one didn't comply to the order.  He --

13     Q.    What did he do?

14     A.    Let's see.  He walked -- continued toward the

15   shower area.

16     Q.    And so what did you do in response to that?

17     A.    I deployed chemical agent Freeze plus PK23

18   again to the facial area.

19     Q.    Again?

20     A.    And ordered him on the floor.

21     Q.    Okay.  So because he didn't comply with the

22   order to lay down, you sprayed him a second time; is

23   that correct?

24     A.    Yes, ma'am.

25     Q.    Okay.  And then he -- and then what did he do?

Page 67

 1      A.    He complied.

 2      Q.    After he complied, what did you do?

 3      A.    I felony cuffed.

 4      Q.    Were they both on the floor at that point?

 5      A.    Yes, ma'am.

 6      Q.    And were they facedown?  Face up?

 7      A.    They laying facedown, ma'am.

 8      Q.    And did you cuff both of them?

 9      A.    Without names I --

10            I felony cuffed one, ma'am.  Which one, I have

11    no idea.

12      Q.    Okay.  Were they on the floor in the dayroom

13    area?

14      A.    The one that refused the order the first time,

15    he ended up being on the -- laying down on the floor in

16    the shower area.

17      Q.    In the shower area.  Okay.

18            And the other one was in the dayroom area?

19      A.    Yes, ma'am.

20      Q.    And what happened after that?

21      A.    I cuffed the aggressive one, that I felt was

22    more aggressive.  I believe that's the one I cuffed.

23    And usually you can have one that's nonaggressive,

24    that's complying.  You can have them and walk out.  So I

25    really don't remember because, like I say, because of

Page 68

1    the names blacked out here I...

2         Q.   Is the aggressive one the one that kept going

3    to the shower after you told him to lie down?

4         A.   Yes, ma'am, I call that the aggressive one,

5    yes.

6         Q.   Okay.  Where did you take these two after that?

7         A.   They was taken to be examined by LPN Jennings.

8         Q.   Now, your testimony today, for the record,

9    you're reading from the incident report.  Is that the

10   best of your recollection?

11        A.   That's the best of my recollection, ma'am.

12        Q.   You don't have an independent recollection of

13   what transpired?

14        A.   No, ma'am, I don't.

15        Q.   So you're basing everything on what you're

16   reading in the incident report?

17        A.   Yes, ma'am.

18        Q.   And do you believe that the incident report

19   accurately reflects what occurred?

20        A.   Yes, ma'am.

21        Q.   Why do you think the one youngster was trying

22   to get to the shower?

23             MR. TROHN:  Object to the form of the question.

24        Q.   You can still answer.

25             MR. TROHN:  That doesn't mean you should stop

Page 69

1     answering.  It just means that I'm lodging an

2     objection to the question, but.

3        A.   Ma'am, I don't know why.  I don't know what he

4   was thinking.

5        Q.   Do you have any idea what he might have been

6   thinking?

7        A.   No, ma'am.  I'm not a psychologist.

8             MR. TROHN:  Well, I would still object, even if

9     you were a psychologist.  But different story.

10       Q.   Is it normal for somebody who has been

11  pepper-sprayed to try to get to water?

12       A.   I don't know, ma'am.

13       Q.   You don't know.  You ever been pepper-sprayed?

14       A.   Yes, ma'am.

15       Q.   Do you have any desire to get to water?

16       A.   No, ma'am.

17       Q.   No?  Okay.

18            So I think we already said we're going to mark

19  this as Exhibit 1.

20            There are some photographs attached to this.

21  Now they're really blacked out, so I assume from your

22  copy you can't make out any better --

23       A.   No, ma'am.

24       Q.   -- than the rest of us can what these pictures

25  are?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 49 of 98 PageID 4278

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 71

1      Q.   Now, I'm sorry.  Before I ask you about this

2   December 23rd.  I have just one more question going back

3   to the November 3rd incident we were talking about.

4            On the incident report, it says, "Was DR

5   authorized?  No."

6            What does that mean?

7      A.   That means that he did not receive a DR because

8   they were pre-adjudicated.  Pre-adjudicated do not

9   receive DRs from us.

10     Q.   And what is a DR?

11     A.   DR is a disciplinary report.

12     Q.   So pre-adjudicated juveniles, is that a policy

13  that pre-adjudicated juveniles do not receive

14  disciplinary reports at the jail?

15     A.   They're not there long enough, ma'am.

16     Q.   How long does somebody having to be there to

17  get a disciplinary report?

18     A.   When they become direct-file and moved over,

19  then that's -- then they can receive that.

20     Q.   Does the incident have to have occurred when

21  the juvenile was direct-filed in order to get a DR?

22     A.   We don't write pre-adjudicated DRs, ma'am.

23  They're not there long enough.

24     Q.   Okay.  Let me ask you about December 23rd.

25            Now, from reading the incident report, this

Page 78

1     Q.    Then you took him to Building 3 isolation; is

2  that correct?

3     A.    Yes, ma'am.

4     Q.    Why did you take him to an isolation room?

5     A.    He was placed there, ma'am, until he was seen

6  by the nurse.

7     Q.    But why did you put him there?

8     A.    I can't recall, ma'am.  It could have been

9  somebody else inside the holding cage at that time.

10    Q.    But your intention was to take him to the

11 holding cage?

12    A.    Yes, ma'am.

13    Q.    So if there was already somebody else in there,

14 would your intentions still have been to take him to the

15 holding cage?

16    A.    If somebody else was in there and he hadn't --

17 have never snatched away, yes, he would have, probably.

18 I don't know.

19    Q.    But you took him to an isolation room?

20    A.    Yes, ma'am.

21    Q.    And was that in response to his failing to

22 follow the order to be escorted to the cage?

23    A.    Ma'am, I don't remember.

24    Q.    So you don't know why you put him in the

25 isolation room?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 51 of 98 PageID 4280

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 79

 1      A.    Like I say, ma'am, it could have been somebody

 2   else inside the -- inside the holding area at that time.

 3      Q.    Okay.

 4      A.    And when they become -- stuff like that happen,

 5   you don't want to place another pre-adjudicated inside

 6   when -- in that -- they could have pull -- been pulling

 7   for school.  I don't know.  I don't remember.  I don't

 8   recall.

 9      Q.    And it doesn't say in your report, one way or

10   the other, why you chose to take him to the isolation

11   room, does it?

12      A.    No, ma'am, it doesn't.

13      Q.    But you put him in the isolation room?

14      A.    Yes, ma'am.  And I notified Building 3 nurse.

15      Q.    And how long did you put him in the isolation

16   room for?

17      A.    He could have been in there probably between 5,

18   10 minutes.

19      Q.    Why would you have him in there for 5 to 10

20   minutes?

21      A.    Why?  Being examined.

22      Q.    To be examined by the nurse?

23      A.    Yes, because if she has somebody in there -- in

24   there, she don't just stop unless it's an emergency.

25   She could have had somebody in the office, treating

Case 8:12-cv-00568-SDM-MAP  Document 195-1  Filed 11/08/12  Page 52 of 98 PageID 4281

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 80

1   someone.  I don't know.

2       Q.    But there would be a log, an isolation log,

3   that would show exactly how long he was in there,

4   wouldn't it?

5       A.    He wasn't placed in there for punishment or for

6   disciplinary if it's just holding there until he can see

7   the nurse, ma'am.

8       Q.    So does that mean it would not show up on the

9   isolation log that he was in there?

10      A.    Not to my knowledge, ma'am.

11      Q.    You did not record that he went to the

12  isolation room?

13      A.    He wasn't in there long enough to be recorded

14  in there, ma'am.

15      Q.    How long does somebody have to be in an

16  isolation room in order for it to make the log?

17      A:    That is if they are being housed in there of

18  a -- for a discipline area and being approved to put in

19  there; yes, there would be a log for that.  But just for

20  temporarily just to see the nurse, I can't tell you.

21      Q.    Why did you take him there to be seen by the

22  nurse?

23      A.    Anytime you have a PA, ma'am, you must get them

24  examined, have them examined.

25      Q.    And after he was examined, what did you do?

Page 83

1       A.    Yes, ma'am.

2       Q.    Okay.  Let me ask you now about

3   December 28th, 2011.  I have a protective action report

4   and an incident report.

5           MR. TROHN:  This is going to be a long one.

6       Should we take a break before you get started with

7       this one?

8           MS. GALLONI:  Sure, we can take a few minutes.

9           THE VIDEOGRAPHER:  We're off the video record.

10          (Recess from 11:21 a.m. until 11:37 a.m.)

11          THE VIDEOGRAPHER:  We are back on the video

12      record.

13  BY MS. GALLONI:

14      Q.    The next incident I have for you is

15  December 28th, 2011.  It looks like Mr. Trohn has given

16  you a stack of papers that relate to that incident.  Is

17  that right?

18      A.    Yes, ma'am.

19          MS. GALLONI:  Great.  And I have shown these to

20      Mr. Vazquez for Corizon during the break.

21          Let me state for the record, page numbers are

22      3828 through 3832, and then 3839 to 3843, 3850 to

23      3853, 3860 to 3865, 3872 to 3876, 3883 to 3887, and

24      3833 to 3838.

25          And I will mark that as Exhibit 3.

Page 84

1      (Deposition Exhibit No. 3 was marked for

2  identification.)

3      Q.   Now, aside from reading these reports, do you

4  have any independent recollection of what occurred

5  during that incident?

6      A.   No, ma'am.

7      Q.   So everything you recall is based on what's

8  contained in the report; is that right?

9      A.   Yes, ma'am.

10     Q.   And you have in front of you a copy of the

11  protective action report and the incident report; is

12  that right?

13     A.   Yes, ma'am.

14     Q.   According to this incident report, states that

15  there was a fight in the dayroom of Bravo dorm on

16  December 28th at 11:35 in the morning; is that right?

17     A.   Yes, ma'am.

18     Q.   So, then, am I right to say that those

19  juveniles were not in school at that time of the

20  morning?

21     A.   Yes, ma'am.

22     Q.   Who were the juveniles involved in that

23  incident?

24     A.   I don't recall, ma'am.

25     Q.   Now, it looks as though there were several,

Page 85

1    maybe six.  Is that right?

2        A.   I don't recall.  I can't tell you without

3    seeing the --

4        Q.   Okay.

5        A.   -- actual report because it's blacked out.

6        Q.   I don't know if yours are marked with the same

7    Bate stamps numbers.  There's a page 3830 at the bottom

8    left corner that is your incident report stating, "I saw

9    six pre-adjudicated juveniles fighting each other in

10   63B."

11           Is that right?  Do you see where I am?

12       A.   Oh, hold on.  I'm looking at the wrong report.

13       Q.   I can show -- I can show it to you to make it

14   easier.

15       A.   All right.  I have it.

16       Q.   Okay.

17       A.   Okay.  Yes, ma'am.  Now I'm on my report now,

18   yes.

19       Q.   Okay.  So there's six pre-adjudicated juveniles

20   in the Bravo dorm.  You don't recall who any of them is?

21       A.   No, ma'am.  They're not there -- a lot of them

22   is not there long enough.  Some of them be there maybe a

23   couple of days, 10 days, 21 days.  It's hard to say,

24   ma'am.

25       Q.   But you don't know, of these six, if they

Page 86

1    were there 21 days, 10 days?

2        A.    Not without seeing the original report, ma'am.

3        Q.    Okay.  Do you have a copy of the original

4    report anywhere?

5        A.    No, ma'am.  That's the one I told you I lost on

6    my thumb drive and went -- the thumb drive died.

7        Q.    And you don't have a paper copy anywhere?

8        A.    No, ma'am.

9        Q.    Before today, when is the last time you looked

10   at this incident report?

11       A.    Last week, ma'am, when I received a packet.

12       Q.    And the packet you received?

13       A.    Blacked out just like this, ma'am.

14       Q.    Was blacked out just like this.  Okay.

15             Now I'm looking at your incident report.  Where

16   were you when this incident began?

17       A.    I don't recall, ma'am.

18       Q.    It says in your report that "Detention

19   Deputy Hertel, Franklin, and I entered C3B."

20             So I take it to mean, from that, that you were

21   not inside the dorm when this incident began?

22       A.    No, ma'am.

23       Q.    No, you were not inside the dorm?

24       A.    I was not inside the dorm when this incident

25   began.

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 57 of 98 PageID 4286

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 87

1    Q.   Neither was Hertel and Franklin, according to

2    this report; is that right?

3    A.   No, ma'am.

4    Q.   Sorry.  Just to be clear for the record, is

5    that right that neither one of them was in there?

6    A.   I can't recall, ma'am.

7    Q.   Okay.  But if it says that "Detention

8    Deputy Hertel, Franklin, and I entered C3B," does that,

9    to you, suggest that you were not already in C3B when

10   this incident began?

11   A.   Was not inside, I guess, yes, ma'am.

12   Q.   Okay.  According to this report, all three of

13   you gave verbal orders for the juveniles to stop

14   fighting and to lay on the floor.  "Juveniles that were

15   not involved in the fight returned to their sleeping

16   cells and were locked down.  Then Detention

17   Deputy Franklin and I began spraying the juveniles that

18   were still fighting."

19   How many juveniles were still fighting?

20   A.   I can't recall, ma'am, not without seeing the

21   actual report, ma'am, with the names.

22   Q.   Do you remember how many children you used the

23   chemical agent on?

24   A.   No, ma'am, I can't recall, not without seeing

25   the original report, ma'am.

Page 88

1    Q.    Now, when you and Officer Franklin and

2    Officer Hertel responded to this incident, the three of

3    you were in Bravo dorm; is that right?

4    A.    Repeat the question, please.

5          MS. GALLONI:  I'm sorry.  Could you read it

6    back?  I already forgot it.

7          (The question was read by the reporter.)

8    Q.    Let me rephrase it.  I see a quizzical look on

9    your face.

10         Were the three of you in Bravo dorm when you

11   were responding to this incident?

12   A.    We went in -- according to my report, ma'am, we

13   went into Bravo dorm.

14   Q.    So there were three detention deputies inside

15   Bravo dorm?

16   A.    Deputy Franklin, Hertel, and myself went

17   inside.

18   Q.    All three of you were inside Bravo dorm; is

19   that correct?

20   A.    Yes, ma'am.

21   Q.    Okay.  Now, if there are ordinarily four

22   detention deputies, who was watching the rest of the

23   dorms when the three of you went into Bravo dorm?

24   A.    Ma'am, I can't recall who was working that day.

25   Q.    But there would have been the fourth detention

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 59 of 98 PageID 4288

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 91

1    covers the entire jail, or movement, which covers the

2    entire jail except for juveniles?

3        A.   Yes.

4        Q.   So there's not a fifth person who is stationed

5    inside Building 3 to work with the juveniles, right?

6        A.   You're confusing me.

7        Q.   I'm confused, too.

8             Is there a fifth person assigned to work with

9    the juveniles in Building 3?

10       A.   There are a total of five males.  Only four at

11   a time is assigned to work down into the buildings.

12   This is how they give us a break out of there, by

13   rotating us out.

14       Q.   All right.  So it's five people, four

15   positions; is that fair to say?

16       A.   Yes.

17       Q.   So at any one time there will be four males

18   working in Building 3?

19       A.   That is correct.

20       Q.   But they may rotate in and out with this other

21   person who may be in master control; then that person

22   may come in?

23       A.   No.  What I'm -- what I'm saying is -- let me

24   explain this.

25            On any given -- any given day, they can assign

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 60 of 98 PageID 4289

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 92

1    five of us -- four of us down in -- down inside

2    Building 3.  But once we are assigned to work master

3    control or movement, we don't go down in that building

4    and work with juveniles because once we are assigned to

5    work around -- around juveniles -- I mean around adults,

6    we don't go back in that building for that day.

7         Q.    So if there are four of you assigned to work in

8    Building 3 on a shift, and one of you is called to work

9    master control, does that mean that then there would be

10   three of you?

11        A.    You're missing it again.

12        Q.    Okay.

13        A.    From the beginning, there would be four people

14   assigned down in the building.  The fifth person be

15   assigned either movement or master control.

16        Q.    All right.  I -- I think I have it.

17             The bottom line is that there are four officers

18   stationed inside Building 3?

19        A.    Yes, ma'am.

20        Q.    So now back to December 28th.  Where this all

21   started was that three of you entered Bravo, Detention

22   Deputy Hertel, Franklin, and -- and yourself.  So that

23   means of the four detention deputies, three of you were

24   in the Bravo dorm to respond to this incident on

25   December 28th; is that right?

Page 93

1    A.    That is correct.

2    Q.    Now, it says that "Detention Deputy and I began

3    spraying the juveniles that were still fighting."

4          You stated you do not recall how many juveniles

5    you sprayed; is that right?

6    A.    That is correct, ma'am.

7    Q.    And you don't remember who they are?

8    A.    No, ma'am, I don't.

9    Q.    What were they doing when you sprayed them?

10   A.    They was fighting, ma'am.

11   Q.    How did you spray them?

12   A.    Explain "how," please.

13   Q.    Well, I'm hoping you'll be able to explain how.

14   A.    What do you mean by how did I spray them?

15   Q.    What did you do?  Were all six of them fighting

16   when you sprayed them?

17   A.    Ma'am, I don't remember who I sprayed, where I

18   sprayed them at in the building.  All I know, I sprayed

19   in there.  Okay?  They was fighting, the ones I sprayed.

20   You don't spray people that's not participating in a

21   fight.

22   Q.    Okay.  Unless they're going to a shower?

23   A.    Oh.

24         MR. TROHN:   Object.  Was that a question or a

25         little bit of argument there?

Case 8:12-cv-00568-SDM-MAP  Document 195-1  Filed 11/08/12  Page 62 of 98 PageID 4291

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 94

1          MS. GALLONI:  I'll withdraw it.

2          MR. TROHN:  Okay.

3     Q.   So you don't know who you sprayed, you don't

4  know how many you sprayed.  Earlier you testified that

5  you sprayed in a sweeping motion in a different fight.

6  Would you say that it was about the same, that you would

7  have sprayed in a sweeping motion towards these

8  juveniles who were still fighting?

9     A.   Yes, ma'am, I would say that.

10    Q.   Okay.  Then they were ordered to lie prone to

11 the floor, according to the incident report?

12    A.   Yes, ma'am.

13    Q.   It says that Detention Deputy Franklin and

14 Hertel handcuffed the juveniles.

15         Do you remember anything else related to this

16 incident?

17    A.   No, ma'am.

18    Q.   Now, it says here that all juveniles signed a

19 waiver of prosecution.

20         What is a waiver of prosecution?

21    A.   A waiver of prosecution is a form where you ask

22 them, do you want to prosecute or -- I can't really

23 explain it, not without seeing it, ma'am.

24    Q.   Okay.  Let me --

25    A.   Because I don't know how it's written.  I

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 63 of 98 PageID 4292

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 99

1    January 22nd, 2012.  I gave Mr. Vazquez an

2    opportunity to review these during the break.

3          MR. TROHN:  What was the date of it?

4          MS. GALLONI:  January 22nd, 2012.  Would you

5    like to look at these?

6          MR. TROHN:  Is this oh -- 3939?

7          MS. GALLONI:  Yes.

8          MR. TROHN:  I've got a copy somewhere.

9          MS. GALLONI:  I'm sorry?

10          MR. TROHN:  I have a copy somewhere, so you can

11    go ahead.

12    Q.    Okay.  So I know Mr. Trohn has just handed you

13    a copy of this report to review.

14          MR. VAZQUEZ:  Can you identify the Bate stamps

15    numbers?

16          MS. GALLONI:  Yes.  The Bate stamp numbers are

17    3939 to 3941.  There is also 3942, 3949 to 3952,

18    3959 to 3963, 3970 to 3972, 3980 to 3982 -- I'm

19    sorry, to 3983, 3990 to 3993, 4000, and then 3943 to

20    3948.

21          That will be marked as Exhibit No. 4.

22          (Deposition Exhibit No. 4 was marked for

23    identification.)

24    BY MS. GALLONI:

25    Q.    Now, this incident relates to a protective

Page 100

1   action and a fight dated January 22nd, 2012, according

2   to the incident report, that took place in Charlie dorm.

3          Do you have any recollection of this incident

4   aside from what's in the report?

5          A.   Yes, ma'am.

6          Q.   All right.  Tell me what you remember about

7   this incident.

8          A.   I remember seeing a group of inmates,

9   juveniles, fighting.  And we entered, Deputy Hertel and

10  I, entered and gave orders for them to stop fighting

11  and -- and, you know, to lay on the floor.

12         Q.   Okay.  Well, we can go through the incident

13  report in a second.

14         Aside from what's in the incident report, is

15  there anything that you remember independently; or is it

16  only by going through the incident report that you

17  remember?

18         A.   Because of it's so long ago, I have to look at

19  the --

20         Q.   You have to --

21         A.   -- report.

22         Q.   -- look at the report?

23         A.   Yes.

24         Q.   Okay.  Well, we can go through the report.

25         First let me ask you:  Do you remember any of

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 65 of 98 PageID 4294

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 101

1    the juveniles involved in this incident?

2        A.   D_____ J____ the only one I remember, and --

3    and also P_____.   I don't remember -- recall

4    Patterson first name.

5        Q.   Is that J____ P_____

6        A.   Yes, ma'am.

7        Q.   Now, there's another name on here,

8    A_____ M____.   Was that one of the juveniles involved?

9        A.   I could not tell you right offhand, ma'am.

10       Q.   Do you recall the names of any other juveniles

11   involved?

12       A.   Just P_____ and D____ J____, because I had

13   to go testify here as a witness.   Was -- was it -- I

14   want to say either the May or June.

15       Q.   All right.   Now, looking at the page marked

16   3940, that's the incident report.

17            Actually let's look at 3941.   I think that's

18   the one that has your signature on it.

19       A.   All right.

20       Q.   Is that an accurate copy of your report?

21       A.   Yes, ma'am.

22       Q.   Okay.   According to this report, this took

23   place in the Charlie dayroom at about 1650, which would

24   have been about 4:00 o'clock, 4:50.   Is that correct?

25       A.   Yes, ma'am.

Page 102

1    Q.   Okay.  Walk me through what happened in this

2    incident.

3    A.   Well, we entered the dorm and ordered them to

4    stop fighting and to lay down on the floor.  Nobody --

5    they didn't comply.  Well, what P█████ and J██ ,

6    D████ J█ █, they laid down, they complied.  And I'm

7    trying to think without going through this report here.

8    Q.   It's all right if you need to look at the

9    report.

10   A.   Okay.  They was ordered to lay down.

11   D, █ J████ collapsed, just put his hands up under him

12   as if he was concealing something.

13   Q.   Let me ask you this:  At that point had you

14   sprayed anybody with pepper spray?

15   A.   No, ma'am.

16   Q.   It says here that Detention Deputy Hertel

17   attempted to spray the six fighting juveniles.  Is that

18   correct?

19   A.   Hertel, yes, ma'am.

20   Q.   Hertel.

21        And did he manage to spray any of the

22   juveniles?

23   A.   I -- I can't remember without -- not without

24   looking at that video, ma'am.

25   Q.   So you don't recall whether P█████ and J█████

Page 103

1   were sprayed?

2       A.   I -- I don't remember, not without looking at

3   that video, ma'am.

4       Q.   Okay.  And then you said that, "J      and

5   P           were on the floor.  J     had his hands" --

6   now I'm reading from the report -- "clasped his -- his

7   hands under -- together underneath his body."

8       A.   Uh-huh.  Yes, ma'am.

9       Q.   Okay.  And then it says you stood by Juvenile

10  J,       and asked him to show you his hands; he didn't

11  respond?

12      A.   That's correct, ma'am.

13      Q.   What happened at that point?

14      A.   That's when I walked around the right side of

15  the juvenile and I knelt down beside him.

16      Q.   He was facedown at the time?

17      A.   He was, like, facedown like -- he was like

18  this, ma'am.

19      Q.   Facedown with his hands underneath him?

20      A.   Yes, ma'am.

21      Q.   And then you ordered him to remove his hands

22  and arms from underneath his body?

23      A.   Yes, ma'am.

24      Q.   And what happened then?

25      A.   He didn't comply.  That's when I walked around

Page 104

1    the -- let me see.  Wish I could see the video.

2          That's when I walked on the right side of --

3    right side of the juvenile, ma'am.

4    Q.   Okay.  But then I think it says that you knelt

5    down beside him, "Placed my left hand on his back to

6    gain a tactical advantage.  I ordered him to remove his

7    hands and arms from underneath his body."

8    A.   Yes, ma'am.

9    Q.   And then what happened?

10   A.   That's when Juvenile J___, -- Juvenile J_____'

11   right elbow came out of -- see.  What did I --

12         It came out under -- underneath in a quick and

13   aggressive manner, and that's when I felt threatened.

14   Q.   Okay.

15   A.   It happened so fast, and I sprayed him right

16   about the same time when that came out, when he did

17   that.

18   Q.   So he was lying facedown with his arms

19   underneath his body, and you were kneeling down beside

20   him --

21   A.   Yes, ma'am.

22   Q.   -- with your hand on his back?

23   A.   Yes, ma'am.

24   Q.   And you ordered him to remove his hands and

25   arms from his body?

Page 105

1      A.    Yes, ma'am.

2      Q.    And he moved his right elbow out from

3   underneath him; is that right?

4      A.    Yes, ma'am.

5      Q.    And then it states here that you felt

6   threatened by his response and you sprayed him.  Is that

7   right?

8      A.    Yes, ma'am, that is correct.

9      Q.    Tell me how you felt threatened by his

10  response.

11     A.    Without seeing the video, ma'am, I can't --

12  it's -- it's --

13     Q.    Without seeing the video, you don't remember?

14     A.    I don't remember.

15     Q.    You do agree, though, that he was facedown at

16  the time when this happened, right?

17     A.    I can't say exactly was he facedown.  I

18  don't -- yeah, I guess -- if he on his stomach I guess

19  you assume he -- assume he is facedown, I guess.

20     Q.    At that point it says you sprayed the juvenile

21  and then you disengaged and move away -- moved away.

22     A.    Yes, ma'am.

23     Q.    Did you leave J(   )then on the floor, or what

24  did you do with him?

25     A.    He was on the floor, ma'am.

Page 106

1    Q.   And after he was sprayed, you left him there

2   while you and Detention Deputy Hertel went to cell

3   No. 4?

4    A.   Yes, ma'am.

5    Q.   Was he handcuffed at that point, Jones?

6    A.   No, ma'am.

7    Q.   So he was just on the floor?

8    A.   Yes, ma'am.

9    Q.   You and detention Deputy Hertel went to Cell

10  No. 4.  Why did you go to Cell No. 4?

11   A.   To attempt to identify the other four juveniles

12  that was involved.

13   Q.   Well, how -- the fight took place in the

14  dayroom; is that right?

15   A.   Yes, ma'am.

16   Q.   At what point did the other juveniles go into

17  Cell No. 4?

18   A.   Ma'am, I cannot tell you that until I --

19  unless -- unless I can review the video.

20   Q.   But you agree that four juveniles, according to

21  your report, were involved in the fight, went into Cell

22  No. 4, and you and Detention Deputy Hertel went to Cell

23  No. 4 to them, to where they were; is that right?

24   A.   Yes, ma'am.

25   Q.   Then it states that Detention Deputy -- well,

Page 107

1    let me back up.

2            We know that these four did not include

3    D_____ J_____ because he was still in the dayroom; is

4    that right?

5        A.   That's correct, ma'am.

6        Q.   Was there any of the other children involved in

7    this fight who were still in the dayroom?

8        A.   P_____.

9        Q.   P_____.  So it didn't involve P_____, or

10   J____; it was four others who were in Cell No. 4.  Is

11   that right?

12       A.   I'm sorry.  What was that now?

13       Q.   So P_____ and J____ were still in the

14   dayroom; therefore, the four who went back to Cell No. 4

15   did not include P_____, or J____?

16       A.   That's correct.

17       Q.   What happened after that?

18       A.   After what, ma'am?

19       Q.   After you went to Room No. 4.  Well, it says

20   you went to Cell No. 4, identified the four juveniles

21   and secured them in a cell.  Does that mean that they

22   were locked in the cell?

23       A.   Yes, ma'am.

24       Q.   Had those four been pepper-sprayed?

25       A.   That, I don't know, ma'am.  I can't answer

Page 108

1    that.

2        Q.    So you don't know whether Detention

3    Deputy Hertel or you used the chemical agent on any of

4    those four?

5        A.    I did not use chemical agents on them four.

6        Q.    You did not?

7        A.    No, ma'am.

8        Q.    So the only person that you had used the

9    chemical agent on was Juvenile J____ ?

10       A.    Yes, ma'am.

11       Q.    Okay.  Then it states that Detention Deputy

12   Hertel felony handcuffed Juvenile P____ ___ and that you

13   felony handcuffed Juvenile J____-

14       A.    That's correct, ma'am.

15       Q.    Where were they taken from there, P____   and

16   J____ ?

17       A.    I don't know which one went first, but one was

18   taken straight in to -- to see the nurse, and the other

19   one was placed in the holding -- holding area.

20       Q.    So who -- who took the person to the nurse and

21   who took the other person to the holding cage?

22       A.    I cannot recall, ma'am.

23       Q.    The person who was taken to the cage, how long

24   was he there?

25       A.    I cannot recall that either, ma'am.

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 73 of 98 PageID 4302

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 109

1      Q.    Did the juvenile who was in the cage say

2   anything to you?

3      A.    I cannot recall that, ma'am.

4      Q.    Do you recall who it was of P_____ and

5   J_____, which one of them was in the cage?

6      A.    No, ma'am, I cannot recall that.

7      Q.    And then the remaining four juveniles were left

8   in Room No. 4; is that correct?

9      A.    During that time while they was -- the other

10  two was being examined, yes, ma'am, they was left in

11  that cell.

12     Q.    Okay.  Were the juveniles in that cell taken to

13  see the nurse?

14     A.    Yes, ma'am.

15     Q.    Why were they taken to see the nurse?

16     A.    We had chemical agents everywhere, ma'am.  When

17  you spray chemical agent, it just don't go in one place,

18  one area.  It's spreads all over.

19     Q.    So those juveniles in Room No. 4 had been

20  exposed to the chemical agent?

21     A.    If they was involved, it's a possibility,

22  ma'am.

23     Q.    Well, you said they were taken to the nurse

24  because of the chemical agent; is that right?

25     A.    I'm pretty sure, ma'am, that's why they was

Page 110

1    taken.

2        Q.    Okay.    Does it say in your report that they

3    were taken to the nurse to see?   And actually -- and

4    that's not a trick question.   I mean, I saw -- I see it

5    in your report, "All juveniles involved were allowed to

6    wash their affected areas and taken to the --

7            The REPORTER:   Excuse me.   Could you read it a

8        little slower, please.

9            MS. GALLONI:   I'm sorry.

10       A.    Yeah, "All juveniles signed prosecution of

11   waiver.   Photographs was taken of juvenile -- all

12   juveniles" -- (reading to himself).

13       Q.    But it's your recollection that the four who

14   were in room four were also taken to the medical area;

15   is that right?

16       A.    Yes, ma'am.   If I'm not mistaken, it was

17   Detention Deputy Hertel escorted them there.

18       Q.    And he would have escorted them there because

19   of their exposure to the chemical agent; is that right?

20           MR. TROHN:   Object to the form of the question.

21       A.    If they was involved in that fight, ma'am, yes,

22   ma'am.

23       Q.    What I'm trying to ask is:   Were they taken to

24   the medical area because of exposure to the chemical

25   agent?

Page 111

1      A.    If they was involved in the fight, ma'am, yes,

2    ma'am.

3      Q.    Okay.  So if they were involved in the fight,

4    they would have been exposed to the chemical agent --

5      A.    If they was sprayed --

6      Q.    -- and then taken to the nurse?

7      A.    -- yes, ma'am, they would have been taken, yes,

8    ma'am.

9      Q.    And is it your understanding that they were

10   taken because they were sprayed?

11         MR. TROHN:  Object to the form of the question.

12     A.    D. Hertel used Deep Freeze.  So that was

13   designed to -- it put out a lot of agent -- chemical

14   agent.  So if they was -- if they was affected by it,

15   I'm pretty sure, yes, ma'am.  They was involved in that

16   fight, yes, ma'am.

17     Q.    And when you say yes, is it yes, then they were

18   exposed to the chemical agent?

19     A.    If they was involved in that fight, ma'am, yes,

20   ma'am.

21     Q.    And this is the Deep Freeze you were telling us

22   about earlier, which is the larger cannister of chemical

23   agent; is that right?

24     A.    Yes, ma'am.

25     Q.    Is that larger cannister something that

Page 112

1   Detention Deputy Hertel would have carried on his

2   person?

3       A.   No, ma'am.

4       Q.   Where would he have gotten that from?

5       A.   Out of the control room, ma'am, in the cabinet.

6       Q.   And the agent that you used, was that the agent

7   that you carry on your person?

8       A.   Yes, ma'am.

9       Q.   You testified that one of the juveniles of the

10  six was taken to the cage and one of them was taken to

11  the nurses' station, of the two that were handcuffed; is

12  that right?

13      A.   Yes, ma'am.

14      Q.   At what point were the four that were secured

15  in the cell taken to the medical area?

16      A.   Probably right after the other two had a chance

17  to shower.

18      Q.   So the first two would have gone to the medical

19  area, showered --

20      A.   Then to --

21      Q.   -- come back, and then the four --

22      A.   They wouldn't have came -- I -- I don't

23  remember in what -- we actually did that.  I know they

24  was allowed to shower.  They gave -- was given a change

25  of clothes.

Page 113

1    Q.   Well, tell me about the juvenile that you were

2    with.  Do you remember if you went to the medical area

3    or to the cage?  Which juvenile were you accompanying?

4    A.   Ma'am, I don't -- I don't remember exactly what

5    took place, ma'am.

6    Q.   Okay.  So when you say you know that they

7    showered, I mean, what do you remember about a shower,

8    or are you just remembering what the procedure normally

9    is?

10   A.   I just remember the procedure was something

11   that we do automatically.

12   Q.   Okay.  But you don't have a specific

13   recollection about these specific juveniles?

14   A.   Ma'am, that was so long ago.

15   Q.   So is that a no?

16   A.   I don't, ma'am.

17   Q.   Okay.  After seeing medical, would -- what

18   shower would you have taken a juvenile to?

19   A.   These two, one of -- one was in the cage while

20   one -- the other one was showering inside the iso cell

21   showers.  They have an open room.  They go -- will

22   shower in there to keep them separated because they was

23   involved in an incident.  Nobody was placed inside a

24   cell.

25   Q.   But they would have been taken to the isolation

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 78 of 98 PageID 4307

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 114

1   room shower?

2       A.   To separate them, yes, ma'am, one at a time,

3   with the officer standing there, whoever.  I don't

4   know -- remember who -- who it was.

5       Q.   Okay.  This is -- but now we're talking about

6   your general recollection about what would happen, not

7   specifically what happened on this day; is that right?

8       A.   Yes, ma'am.

9       Q.   Do you know anything about the temperature of

10  the water in the isolation room shower?

11      A.   No, ma'am.

12      Q.   Were waivers of prosecution signed for this

13  incident?

14      A.   Yes, ma'am.

15      Q.   Did all the juveniles sign waivers?  I can show

16  you the pages if that will help.  It's 3943 through --

17      A.   Oh, I have them right here, ma'am.  Look --

18      Q.   -- 3948.

19      A.   Just looking through them.

20           I assume, ma'am.

21      Q.   I'm sorry?

22      A.   I think so.

23      Q.   Okay.  You testified earlier that you went and

24  testified recently regarding D        J     .  Did that

25  have to do with this incident?

Page 115

```
1        A.    Yes, ma'am.

2        Q.    What was that case about?  Was that a

3   prosecution regarding this fight?

4        A.    Yes, ma'am.

5        Q.    If all the children signed waivers of

6   prosecution, how was it that there was a prosecution?

7        A.    That, I don't know, ma'am.  But I do know

8   J           -- whatever is his name.  P           .

9   J        P            pressed charges.

10       Q.    How do you know that?

11       A.    He was the defendant of -- he was the victim of

12  that -- of the case.

13       Q.    He was the victim of the fight?

14       A.    Yes, ma'am.  And he testified against these

15  guys.

16       Q.    He testified.  Do you know whether he was

17  subpoenaed to testify or whether he voluntarily

18  testified?

19       A.    Ma'am, I don't know that.

20       Q.    So do you know in fact whether he pressed

21  charges?

22       A.    We was there in court.

23       Q.    So you believe, because he was there in court,

24  he must have pressed charges?

25       A.    Yes, ma'am.
```

Page 116

1    Q.   Do you have any other basis for your belief

2    that he pressed charge?

3    A.   No, ma'am.

4    Q.   When this incident started in Charlie, this

5    fight, again it says that Detention Deputy Hertel and

6    you entered Charlie dorm.  So I take that to mean that

7    you were not inside Charlie dorm when the fight began.

8    Is that right?

9    A.   That is correct, ma'am.

10   Q.   How did you become aware that the fight was

11   happening?

12   A.   Ma'am, I don't recall where I was.  I know I

13   was outside the area.  I can't recall, ma'am.

14   Q.   Were you the first person to observe the fight,

15   of the detention deputies?

16   A.   I don't recall, ma'am.

17   Q.   Did Detention Deputy Hertel go to the control

18   room to get the large cannister of chemical agent before

19   the two of you entered the dorm?

20   A.   He had to, because it's -- it's secured in a --

21   in a box.

22   Q.   So he had to have gone to get that, taken it

23   from its secure location, and then gone with you when

24   the two of you entered together into the dorm?

25   A.   Yes, ma'am.

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 117

1    Q.   And would you have had to radio somebody to

2  open the dorm door, or can you open the dorm door

3  yourself?

4    A.   That's why our DSS, our officer in charge

5  there, saw it; and because it's glass everywhere, you

6  can see, so he opened the door for us.

7    Q.   He opened the door for you?

8    A.   Yes, ma'am.

9    Q.   And that is from inside the control room?

10   A.   That is correct.

11   Q.   And that's done electronically, I take it?

12   A.   Yes, ma'am.

13   Q.   You said earlier that J_____ P_____ was a

14 victim of the fight; is that right?

15   A.   Come to find out, yes, ma'am.  Later we found

16 out.

17   Q.   How did you find out he was the victim of the

18 fight?

19   A.   I viewed the video, ma'am.

20   Q.   When did you view the video?

21   A.   It was 6/2/12 -- I'm sorry.  It was -- what was

22 it?

23        It was 2/6/12.  I'm sorry.

24   Q.   That's all right.

25        2/6/12.  So that would have been February 6?

Page 118

1      A.     Right.

2      Q.     What caused you to view the video that long

3  after the incident?

4      A.     Well, Captain Markham had called me to the

5  office to review the video of that protective action

6  that occur at 1/22/12.

7      Q.     Did she tell you why she wanted you to view the

8  video?

9      A.     Well, when I viewed the video, that's when it

10  revealed that D[____] J[____] was concealing something

11  underneath his body.

12      Q.     Did she tell you, when she asked you to come in

13  to view the video, why she was having you view the

14  video?

15      A.     No, ma'am.

16      Q.     Is that unusual that she would have you come

17  and see a video weeks after an incident?

18      A.     Well, I didn't know we could do that, and I --

19  if I'm not mistaken -- no.  You know what?  I don't know

20  whether I asked her to see it.  I can't remember, don't

21  recall.

22      Q.     Whose idea was it to see the video, yours or

23  hers?

24      A.     I don't recall, ma'am.

25      Q.     What were you looking for when you went to see

Page 119

1    the video?

2         A.    When I viewed the video, ma'am, that's when I

3    observed that D⬛⬛⬛ J⬛⬛⬛ was concealing something

4    underneath his body.

5         Q.    What was he concealing?

6         A.    I cannot tell you exactly what it was.  I

7    believe it, to my knowledge, it could have been a spoon.

8         Q.    Did you write an incident report about that?

9         A.    I wrote an incident report on -- yeah,

10   regarding that protective action and reviewing that

11   video, when I reviewed it, that something came out from

12   under his body and went down by his right leg and he

13   attempted to conceal it.

14        Q.    Does the report say what it was that you

15   believed he was concealing?

16        A.    I couldn't tell what it was, ma'am, from the

17   video.

18        Q.    Okay.  Now we're looking at page number 3942,

19   which is part of Exhibit -- what we'll mark Exhibit 4.

20             It says that Captain Markham called you to her

21   office to view the video.  She didn't tell you why she

22   wanted you to see the video?

23        A.    No, ma'am.

24        Q.    You didn't ask her?

25        A.    No, ma'am.

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 84 of 98 PageID 4313

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 120

1    Q.   What did the video show?

2    A.   It showed D_____J_____ was concealing something

3    under his body.

4    Q.   But you don't know what that is?

5    A.   No, ma'am.

6    Q.   Were any charges brought against Diagus for

7    having an object that he was trying to conceal?

8    A.   I don't know, ma'am.

9    Q.   Well, did you file anything that would have

10   initiated a charge against him?

11   A.   No, ma'am.  He's a pre-adjudicated.

12   Q.   Well, having something -- some sort of an

13   unauthorized object would be contraband, wouldn't it?

14   A.   Depending on what it is, ma'am.  If it wasn't a

15   weapon, I don't know -- I can't really say, but I can

16   tell you he did have something underneath his body and

17   it came out from underneath his body in the video.

18   Q.   But you don't know if it was authorized or

19   unauthorized?

20   A.   I don't know what it was, ma'am.

21   Q.   Are you aware of juveniles stating that you

22   deployed chemical agent against them while they were

23   secure in their cell the day of this incident?

24   A.   Later on, yes, ma'am.  I sure was.

25   Q.   How did you come to know about that?

Page 121

1    A.   A report on -- what -- what his name was.  I

2    cannot recall the young man's name.

3    Q.   Was it S_____ R_____)?

4    A.   S_____) R_____), yes, ma'am.

5    Q.   I can see past the redaction.

6    All right.  And what happened with S_____)?

7    A.   I was pulling -- I was pulling juveniles for

8    school.  And he came up and asked me why did I spray

9    him, and then he stated that he was going to get paid

10   and they were going to close this place down.

11   Q.   What did you say to him?

12   A.   I didn't respond.  I went and wrote the

13   incident report.

14   Q.   What do you think prompted him to say that to

15   you?

16   MR. TROHN:  Object to the form of the question.

17   A.   That Southern Poverty, you all was coming to

18   shut it down and he was going to get paid.

19   Q.   And you think that's why he asked you, "Why did

20   you come into my room and spray me?"

21   A.   If he never said he was going to get -- they

22   was going to shut this place down, he was going to get

23   paid.

24   Q.   Is that why you think he said, "Why did you

25   come into my room and spray me?"

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 122

1    A.    That's the only reason, ma'am.

2    Q.    Did you spray any of the juveniles inside the

3    room?

4    A.    No, ma'am.

5         MS. GALLONI:   The document we've been referring

6    to, the incident report you wrote up, is at 4894.

7    We'll mark that as Exhibit 5.

8         (Deposition Exhibit No. 5 was marked for

9    identification.)

10   Q.    Other than Officer Hertel, were there any other

11   detention deputies involved in that January 22nd

12   incident?

13   A.    No, ma'am.

14   Q.    Were other deputies present?

15   A.    I don't recall their location, ma'am.

16   Q.    But you don't recall any other officers who

17   would have been witnesses to what happened?

18   A.    No, ma'am.

19   Q.    Did any other officer work with you and

20   Officer Hertel, or were you two the only ones involved

21   with those juveniles after that fight?

22   A.    I don't recall, ma'am.

23   Q.    When it came to taking the juveniles either to

24   the medical area or to the cage or to the showers, was

25   that done by you and Officer Hertel?

Page 123

1      A.    Repeat that question again.

2      Q.    When it came to taking those juveniles either

3    to the medical area or to the holding cage, was that

4    done by you and Officer Hertel?

5      A.    I escorted D____ J____ out.  I cuffed him.

6      Q.    So you escorted him to where?

7      A.    I don't know if I took him straight into the

8    medical or placed him in a cage.  I don't recall.

9      Q.    And then Officer Hertel would have escorted the

10   other youngster, J___ P_____, who was cuffed?

11     A.    I don't recall, ma'am.

12     Q.    Did anyone either than you and Officer Hertel

13   take those -- any of the six juveniles to the holding

14   cage or to medical?

15     A.    I don't recall, ma'am.

16     Q.    You don't recall whether someone else did or

17   you don't recall --

18     A.    I don't recall whether anyone else did, ma'am.

19     Q.    Other than that statement by S_____ R_____

20   on January 25th, did you ever hear that juveniles had

21   alleged that you had sprayed them in their room?

22     A.    No, ma'am.

23     Q.    Did Captain Markham ever ask you anything about

24   that incident?

25     A.    Yes, ma'am.

Page 124

1    Q.   What did she ask you?

2    A.   I don't recall the question or my answer to

3    that.  I knew -- I know where it didn't happen.

4    Q.   So she asked you specifically about whether you

5    had sprayed children in the room.  Is that -- is that

6    what you're -- what you said?

7    A.   She asked about that, yes.  I think she did

8    ask.

9    Q.   Did she ask you to write anything more about

10   what happened that day than what is in that incident

11   report?

12   A.   I don't think so.  I don't recall.

13   Q.   Did she make notes while you talked to her

14   about what happened that day?

15   A.   I don't recall, ma'am.

16   Q.   How long after this incident did she ask you

17   the questions?

18   A.   I don't recall, ma'am.

19   Q.   Was it the same day?

20   A.   I don't recall, ma'am.

21   Q.   Was it before or after you saw the video?

22   A.   I don't recall, ma'am.

23   Q.   Does the video show what happened in Cell 4?

24   A.   No, ma'am.

25   Q.   What area does the video cover?

Page 125

1    A.   I don't recall, ma'am, unless I see the video
2    itself.
3         Q.   But you do know that it didn't see into Room 4?
4         A.   Yes, ma'am.
5         Q.   Other than Captain Markham, did anybody else
6    ask you about what happened that day?
7         A.   I don't recall.
8         Q.   Do you know whether there's been any sort of
9    investigation into what happened that day?
10        A.   I -- I don't recall.  I don't know.
11        Q.   If there were an investigation into an incident
12   like this, is that something you would know?  Would you
13   be notified?
14        A.   I would hope so.  After -- they probably
15   wouldn't let me know until afterwards.
16        Q.   But no one else has questioned you about this
17   other than Captain Markham; is that right?
18        A.   Ma'am, I don't recall.
19        Q.   Let me ask you about a March 22nd incident.
20             MR. TROHN:  Let's take a break before you go
21        with that.
22             THE VIDEOGRAPHER:  We're off the video record.
23             (Recess from 12:39 p.m. until 12:56 p.m.)
24             THE VIDEOGRAPHER:  We are back on the video
25        record.

Page 140

1      Q.    You don't have to get anybody's permission to

2   do that?

3      A.    No, ma'am.  They're juveniles.

4      Q.    What does that mean?  I didn't catch that.

5      A.    I don't need to get anybody permission to work

6   juveniles.  I was trained for juveniles.  They're

7   juveniles.

8      Q.    Well, what if everybody wanted to work in the

9   direct-file side, how do you decide who works the

10  pre-adjudicated side and who works the direct-file side?

11     A.    We never had a problem with it, ma'am.

12     Q.    So you tend to work -- you choose to work the

13  direct-file side?

14     A.    Yes, ma'am.

15     Q.    What sorts of rule infractions would cause you

16  to put a child on lockdown on the direct-file side?

17     A.    Direct-file side?  It would probably be

18  horseplaying, put them timeout for probably 30 minutes,

19  then you let them back out.

20     Q.    Have you ever put somebody on lockdown for

21  longer than 30 minutes?

22     A.    No, ma'am.

23     Q.    If you put a child on lockdown, do you write an

24  incident report for that?

25     A.    They direct-files, ma'am.  No, ma'am, because

Page 141

1    they inside the dorm.  I'm making 15-minute rounds.

2        Q.    Let's back up a second.

3            So if you put a child on the direct-file side

4    on lockdown, you do not write an incident report for

5    that?

6        A.    They're not going to the iso cell, ma'am.

7        Q.    I'm just asking the question.

8        A.    Ma'am, they inside their sleeping cell.  They

9    in timeout in their sleeping cell.

10       Q.    Okay.  Just to be clear for the record, if you

11   put a child on the direct-file side on lockdown, you do

12   not write an incident report for that; is that right?

13       A.    It's not required, ma'am.

14       Q.    And therefore --

15       A.    Not to my knowledge.

16       Q.    -- you don't do it?

17       A.    Not to my knowledge.

18       Q.    And therefore you don't do it; is that right?

19       A.    That's right, ma'am.  They in timeout.

20       Q.    Is there ever a time when you put a child from

21   the direct-file side on lockdown that an incident report

22   would be required?

23       A.    Not to my knowledge, ma'am.

24       Q.    Have you ever put a child on lockdown for over

25   an hour?

Case 8:12-cv-00568-SDM-MAP   Document 195-1   Filed 11/08/12   Page 92 of 98 PageID 4321

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 142

1     A.   No, ma'am.

2     Q.   But any of these times you've put a child on

3   lockdown, it would not be recorded in an incident report

4   because you're not required to do that, right?

5     A.   Ma'am, again, please --

6          MR. TROHN:   Object; asked and answered.

7     Q.   Is that right?

8     A.   They are placed out in timeout, ma'am, for

9   30 minutes.  I'm making 15-minute rounds in this dorm,

10  ma'am.  Where I sit, you can just -- you can see if

11  they -- wherever they at.  You make your 15-minute

12  rounds, you see they're okay.

13    Q.   So you don't write an incident report for that?

14         MR. TROHN:   Objection.

15    A.   No, ma'am.

16    Q.   Is there a log where you keep track of who you

17  have put on lockdown and for how long?

18    A.   No, ma'am.  They inside their dorm, in their

19  sleeping cell.  I'm making a 15-minute round.  I'm

20  checking on these kids.

21    Q.   I understand.  You just need to answer the

22  question.

23         So there's no log for who you put on lockdown,

24  correct?

25    A.   No, ma'am.

Page 143

1   Q.   Is there any process when you put a child on

2   lockdown?  Can they complain to anybody about the fact

3   that they're on lockdown?

4   A.   They grieve it if they want to grieve it.  They

5   have that right.

6   Q.   Is there any process before you put them on

7   lockdown?

8   A.   What you mean?  Could you explain that

9   question, please?

10   Q.   Sure.  Is there any process that you have to go

11   through or that they have a right to go through before

12   you put them on lockdown?

13   A.   Always communicate with them first and give

14   them warnings.  It's not just going straight in, you

15   place and say, "Okay, you're horseplaying.  Now you come

16   in.  Look, you can't horseplay."

17        You show them the rules and the regulation.

18   You show them that they can receive a DR for

19   horseplaying, which would take away some of their --

20   their -- their privileges.  You just don't put them on

21   lockdown.  You explain things to them.  You communicate

22   with them first.

23   Q.   And if they disagree with the reason that

24   you're putting them on lockdown for, can they go to an

25   impartial person?

Page 144

1    A.    Sure.

2    Q.    Who is that?

3    A.    They can request to see a sergeant, write a

4  grievance.  That is the -- that is the procedure, for

5  them to write a grievance.

6    Q.    Okay.  But there's no process ahead of time

7  that gives them the opportunity, unless they request it,

8  to be heard on the reason you're putting them on

9  lockdown; is that right?

10    A.    They are direct-file, ma'am.

11    Q.    I understand that.  It doesn't change the

12  question.

13          Is there a process before they're put on

14  lockdown --

15    A.    For direct-files, no, ma'am.

16    Q.    Now, you said you explained to them that their

17  privileges could be taken away.  Which privileges are

18  those?

19    A.    Privileges can be canteen.  They get to order

20  canteen.

21    Q.    Now, that's if they have money in an account,

22  right?

23    A.    That's if they have money in the account, yes.

24    Q.    Okay.  What other privileges do they have?

25    A.    Recreation privileges.

Page 154

1    tell them who the lieutenant is, or who's the sergeant.

2    Or some of them, if -- if it's a grievance, they can

3    check "administration."  Administration will make sure

4    it gets to the proper person.

5        Q.   Have you ever -- have you ever gotten back a

6    resolved grievance, a piece of paper answering the

7    grievance, that you've had to deliver to a juvenile?

8        A.   Adults only, when I worked adults.

9        Q.   So since you've worked with juveniles, you've

10   never had a response to a grievance that you've had to

11   deliver to a juvenile?

12       A.   No, ma'am, I never had one.

13       Q.   Do you know what "test of heart" means?

14       A.   No, ma'am.

15       Q.   You've never heard that term?

16       A.   No, ma'am.

17       Q.   What about "TOH"?

18       A.   I don't even know what that is, ma'am.

19       Q.   What about "payroll," have you ever heard that

20   term?

21       A.   Yes, ma'am.

22       Q.   What does that mean?

23       A.   Payroll is usually when -- as a matter of fact,

24   there was an incident not too long where a juvenile will

25   make a weak -- a weaker juvenile give him his lunch or

Page 155

1  his dinner or whatever.

2      Q.    Does that happen at Central County Jail?

3      A.    Only when they -- only incidents I know of when

4  they was direct-filed.  And what we'll do, we'll put

5  them in a -- try to place them in a cell where -- where

6  we know this won't happen.  So we try to prevent it.

7      Q.    All right.  And just to be clear, the

8  direct-filed are juveniles, right?  I want to make sure

9  we're not getting tripped up here on language.

10     A.    The are --

11     Q.    They're still minors?

12     A.    The are judicated as adults.

13     Q.    Well, the direct-file kids who are at the

14  Central County Jail are, for the most part, pretrial,

15  are they not?

16     A.    Some are and some not.

17     Q.    Do you know how many?

18     A.    I cannot tell you that.  I can't answer that

19  question.  I don't know.

20     Q.    Are they minors?

21     A.    Minors, yes, ma'am.

22     Q.    So when I say "juveniles," I mean anybody under

23  the age of 18, just to be clear.  I want to make sure

24  that there's no confusion there.  Okay?

25     A.    Yes, ma'am.  But there's still a difference.

Page 156

1    You got pre-adjudicated and you got direct-file

2    juveniles.

3        Q.   Uh-huh.

4        A.   So there is a difference.

5        Q.   They're housed in the same building at the

6    jail?

7        A.   But in different dorms.

8        Q.   I understand that.  But they're housed in the

9    same building and supervised by the same staff; isn't

10   that right?

11       A.   That is correct, ma'am.

12       Q.   Are there different rules that apply to the

13   pre-adjudicated juveniles versus the direct-file other

14   than what you mentioned before about disciplinary

15   reports?

16       A.   I don't know unless I get to look at the

17   policies.

18       Q.   Have you ever heard a detention deputy curse,

19   use profanity, while at work?

20       A.   Not to my knowledge.

21       Q.   Have you ever cursed at work?

22       A.   No, ma'am.  I don't do that.  I don't believe

23   in it.

24       Q.   What is a snitch?

25       A.   A snitch is a person that tells everything, and

Samuel Gay, 7/25/2012
Hughes vs. Judd

Page 157

1   they try to do it secretly without other people knowing

2   about it.

3       Q.   Have you ever called any of the direct-file or

4   other juveniles at the jail a snitch?

5       A.   I don't recall, ma'am.

6       Q.   Isn't that the sort of thing you might recall,

7   whether you had called a child a snitch?

8       A.   I don't recall, ma'am.

9       Q.   What does PC stand for?

10      A.   Protective custody.

11      Q.   Have you ever referred to that as pussy

12  control?

13      A.   No, ma'am.

14      Q.   Have you ever heard any detention deputy --

15      A.   No, ma'am.

16      Q.   -- do that?

17           When we started earlier today, I had asked you

18  about any discipline from the Polk County Sheriff's

19  Office.  Do you remember that?

20      A.   Yes, ma'am.

21      Q.   And you talked to me about a couple letters of

22  guidance that you had received?

23      A.   Yes, ma'am.

24      Q.   Do you recall a letter of guidance from 2009

25  regarding inmates that had been put in suicide watch?