Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, as guardian and
on behalf of J.B., a minor;
BRENDA SHEFFIELD, as guardian
and on behalf of J.D., a minor;
FRANKY JEAN-PIERRE; MICHELLE      Case No.:
MINOR, as guardian and on behalf  8:12-cv-00568-SDM-
of J.P., a minor; LISA JOBE, as   MAP
guardian and on behalf of K.J.,
a minor; AMY GAGE, as guardian
and on behalf of B.G., a minor;
CRYSTAL CUYLER, as guardian and
on behalf of D.M., a minor;
NIKETYA MATTHEWS, as guardian
and on behalf of K.G., a minor;
and ANITA NAVA, as guardian and
on behalf of A.H., a minor; on
behalf of themselves and all
others similarly situated,

     Plaintiffs,

vs.

GRADY JUDD, Polk County Sheriff,
in his official capacity, and
CORIZON HEALTH, INC.,

     Defendants.

_____/


VIDEOTAPED DEPOSITION OF GLENN HARRISON

Taken on Behalf of the Plaintiffs


Stenographically Reported by:
Donna L. Peterson, RDR, CRR
July 25, 2012

Page 11

1     Q.   Okay.  And what was the highest level of school

2  you attended?

3     A.   12th grade, Bartow High School.

4     Q.   Okay.  And did you get -- did you get a high

5  school diploma?

6     A.   Yes, I did.

7     Q.   Okay.  Any other certificates that you've

8  received, either from, you know -- I don't know.  Any

9  type of vocational training or anything like that?

10     A.   Just training since I've been with the

11  sheriff's office.

12     Q.   Okay.  And what -- what did you -- what did you

13  receive certificates for?

14     A.   TASER.  CIT, crisis intervention training.

15  Weapons.  Chemical spray.  A lot of training.  I'd have

16  to sit and think about all the rest of it.

17     Q.   Okay.  What -- what does the -- what -- what

18  training did you receive for the TASER?

19     A.   TASER, we had to successfully do a written test

20  and hands-on use of the weapon.

21     Q.   Okay.  And what does the -- what does -- tell

22  me about the written test.  What does that involve?

23     A.   Written test, you have to pass the written test

24  after your classroom studies on a TASER.

25     Q.   Okay.  What -- what is the classroom studies?

Page 12

1      A.    How to use it, how to load it, the effects of

2    it, the aftereffects to the person that you have used it

3    on, medical treatment, so forth and so on.

4      Q.    Is that in a live classroom?

5      A.    Live classroom, yes, sir.

6      Q.    Live instructor?

7      A.    Uh-huh.

8      Q.    And how long -- how long of training is that?

9      A.    I don't recall how many days it was.

10     Q.    Okay.  It was more than one day?

11     A.    I believe it was.

12     Q.    More than a week?

13     A.    No.

14     Q.    How much time in the classroom were you there

15   each day?

16     A.    Eight hours, break for lunch.

17     Q.    Okay.  And where was that training at?

18     A.    The Polk County Sheriff's Office firing range.

19     Q.    And why was it you were trained on the TASER?

20     A.    I'm sorry?

21     Q.    Why was it you were trained on the TASER?  Do

22   you carry a TASER?

23     A.    Because I'm dual certified.  I can go to the

24   road or work in corrections.  And we have to be trained

25   on a TASER and all handguns.

Page 13

1    Q.    I'm sorry.  What does work on the road mean?

2    A.    I am certified, dual certified to be a road

3    deputy.  And to get that certification and pass the

4    state board, you have to be trained on all weapons.

5    Q.    Okay.  And -- and I'm --

6    A.    And a TASER is a weapon.

7    Q.    What is a road deputy?

8    A.    A road deputy is a patrol deputy on the street,

9    not in a jail.

10    Q.    Okay.

11    A.    Corrections is in a jail.

12    Q.    Okay.  So a road deputy patrols.  It's

13    basically -- it's basically like a police officer in the

14    town?

15    A.    That's what it is, yes, sir.

16    Q.    Okay.  And have you ever -- have you ever acted

17    as a road deputy?

18    A.    No, sir.

19    Q.    Okay.  Do you have a TASER?

20    A.    No, sir.

21    Q.    They would issue you a TASER if you were, for

22    example, a road deputy?

23    A.    Exactly.

24    Q.    Okay.  And crisis intervention training.

25    A.    Okay.

Page 14

1    Q.    What did that involve?

2    A.    40-hour-a-week study with the head executive

3 man that runs Peace River, crisis center in Bartow.  He

4 actually teaches it.

5    Q.    I'm sorry, I didn't get the name.  What -- what

6 does he run?

7    A.    He -- he runs Peace River Center, crisis

8 intervention center in Bartow.

9    Q.    What is -- what is Peace River Crisis

10 Intervention Center?

11    A.    It's a crisis intervention center for people

12 that need that kind of service.

13    Q.    Do -- do they -- what type of people who need

14 that service do they cater to?  Is there a particular

15 type of crisis?

16    A.    People that have issues.

17    Q.    Is there a particular type of issue that

18 they're -- they're geared toward?

19    A.    I don't know what it totally entails.  That's

20 not my forte.

21    Q.    Okay.

22    A.    That's not my business.

23    Q.    And -- and -- okay.  So how many weeks did you

24 do the crisis intervention training?

25    A.    I think I told you 40 hours.  That was one

Page 15

week.

Q.   40 hours, and you did it all in one week?

A.   Uh-huh.

Q.   Okay.  And what -- what did they train you to be able to do?

A.   How to talk to people.

Q.   Okay.  And what did they train you to -- to say when you spoke to people?

A.   Depending on the situation.

Q.   Okay.  Just -- just in general -- generalities, what did they instruct you to do when you're speaking to someone?

A.   Well, if you had a -- had a person standing out in the middle of the road wanting a car to run over him, you talk to him different than you talk to a guy that's laying in the gutter that's all drugged out and needs some help coming down.  That's a total different situation.

Q.   Okay.  Let's take -- let's take both of those, then.

A.   Okay.

Q.   So if I understand you correct, the person standing in the street wants to commit suicide.  Was that your example?

A.   Yes, sir.

Page 17

1    A.    Okay.

2    Q.    That -- that -- what you said, that -- that --

3 that's what I was looking for.

4    A.    Yeah.

5    Q.    That's helpful.  And we'll come back to -- to

6 that a bit as well.

7          Now, you also said you had weapons training.

8 What -- what weapons were you trained on?

9    A.    Shotgun, .40 caliber Glock pistol, handgun.

10   Q.    And why were you trained on those?

11   A.    So that you could be efficient.  If you were

12 called on to go to the road, you would know how to

13 shoot.

14   Q.    Okay.  So that -- that again is for the road

15 deputy position?

16   A.    Exactly.

17   Q.    Okay.

18   A.    We do not have handguns in the jail.

19   Q.    Okay.  Now, the chemical spray training, what

20 did that entail?

21   A.    That entailed learning about the chemical spray

22 and then getting sprayed with it.

23   Q.    Okay.  And how long did that take?

24   A.    How long did what take?

25   Q.    How long did the training take?

Page 18

1      A.    It's about a week.

2      Q.    And again is that 40 hours?

3      A.    It's in a combination on -- on weapons was

4   about a week's training.  It wasn't just on TASER.  It

5   wasn't just on chemical spray.  It was combined week

6   of -- of training.

7      Q.    Okay.  So was the combined week of training

8   you're talking about, the TASER crisis intervention

9   training, the weapon, and the chemical spray, that was

10  one week for 40 hours?

11     A.    Just the weapon.

12     Q.    Okay.  Let's let me break --

13     A.    Crisis intervention was a total different

14  training process.

15     Q.    Okay.  But the other three were one.  So TASER,

16  weapon, and chemical spray were on 40-hour week

17  training?

18     A.    Uh-huh.

19     Q.    Okay.  Do you recall how much of that 40-hour

20  week training you spent training on the TASER?

21     A.    TASER, a day.

22     Q.    One day.

23           And how about for the weapons, meaning the

24  shotgun and the Glock?

25     A.    That was another added week, added on to

Page 38

1    A.   Okay.

2    Q.   And we'll get into that.

3         Now, when you were -- when you were working in

4    Building 3 with the juveniles, what was your work

5    schedule?

6    A.   12-hour shifts, 6:00 to 6:00 on Delta shift,

7    night shift.

8    Q.   And I know I've heard this before, but can you

9    just take me through how many days each week you work?

10   A.   One week we work three days, and one week we

11   work two.

12   Q.   One week three days, one week two days?

13   A.   The next week is exact opposite.  We're off

14   15 days a month.

15   Q.   Okay.  And while you were working the night

16   shift in Building 3, you were -- were you also doing

17   overtime at the South County Jail?

18   A.   No set process on overtime.

19   Q.   Were there times when you were working Delta in

20   Building 3 and you worked overtime at the South County

21   Jail?

22   A.   On my days off.

23   Q.   Uh-huh.

24   A.   Yeah, I might work one day a week.

25   Q.   Okay.  Okay.  Is there any procedure as to when

Page 41

1   were brought to century -- Central County Jail, were any

2   other preparation -- were any preparations made to the

3   jail before their arrival?

4        A.   I don't know.  I wasn't at the jail until the

5   juveniles came.  I came with them October 1st.

6        Q.   Okay.  And where were you before

7   October 1, 2011?

8        A.   South County.

9        Q.   Okay.  I think you told me that.

10            Have you ever been suspended or terminated from

11  a job?

12       A.   No, sir.

13       Q.   Have you ever been arrested?

14       A.   No, sir.

15       Q.   Ever been convicted of a crime?

16       A.   No, sir.

17       Q.   Okay.  I know it's been a while since -- since

18  you've worked in -- in Building 3 in the -- in the --

19  with the juveniles.  But can you -- can you take me

20  through a typical day of what -- what your day would

21  entail working with the juveniles in Building 3.  Just

22  starting at the beginning of the day, what time you

23  arrive, and take me through it as detailed as possible.

24       A.   Come on at 1800 hours and get briefed by the

25  previous shift of what went on during the day, what to

Page 44

1    they tell you to look forward to?

2        A.    What briefing is that?

3        Q.    The briefing at 1800 hours, which is 6:00 p.m.,

4    when you come in.

5        A.    Just whether they have anybody that has -- has

6    been a problem that day, how good things went that day,

7    if they have anybody on lockdown, who got showers, who

8    didn't, whether they got rec or not, if it was raining.

9    I mean, they -- they try to get us heads-up.

10           You know, they're -- they're -- they're

11   juveniles.  If they don't get rec, they're full of

12   energy.  They -- they want us to know why they're full

13   of energy, they didn't get rec.  You know, not every day

14   does it not rain.

15           You know, there's reasons.  They want us to

16   know those reasons before we take over shift from them.

17       Q.    Now, if at this briefing you were informed that

18   a juvenile is -- is on lockdown, what information would

19   you be provided?

20       A.    Why and how long and by whom.

21       Q.    And how would you be informed of that?

22       A.    In the control room by the deputies before we

23   relieve them.

24       Q.    And -- and just -- just so I understand, a

25   deputy would verbally inform you of that?

Page 45

1    A.   The deputies that work the floor would inform

2    the deputy that's coming on the floor, because we're

3    taking over their job, "Room 105 is on lockdown for two

4    hours" or whatever, for food fight.  I'm just giving you

5    an example.  Could be anything.  So that we know.

6    Q.   Is there any paperwork for lockdowns?

7    A.   They usually have to do a lockdown report, yes,

8    sir, incident report on why they're locked down.

9    Q.   Is -- is that anytime someone is locked down?

10   A.   I think anytime they're locked down for more

11   than an hour.  I may be corrected on the time, but I

12   think it's an hour, they supposed to write a report.

13   Q.   Okay.  And just so I'm clear, lockdown is

14   they're locked in their individual room?

15   A.   Cell, right.

16   Q.   Okay.  And if someone was in lockdown, would

17   you be instructed when to -- to take them out of

18   lockdown?

19   A.   Yes, sir.

20   Q.   Did you have any discretion in whether to take

21   a person out of lockdown before the time you were

22   instructed to, whether --

23   A.   Not if I didn't put him on it, no.

24   Q.   -- whether earlier or later?

25   A.   Not if I didn't put him on it, no.  A

Page 46

1    supervisor can, but I can't because I'm not the deputy

2    that put him on lockdown.  I can't override another

3    deputy.

4        Q.   Okay.  So just so we're clear, the person who

5    puts the juvenile in lockdown decides when that

6    juvenile --

7        A.   And when they go home, it automatically goes to

8    the supervisor because they're not there anymore.

9        Q.   Okay.  What is the longest you're aware of a

10   juvenile being in lockdown?

11       A.   Two or three hours.  Depending on the

12   situation.  I mean, there's different times for

13   different -- you know, again, that's discretion of the

14   deputy also.

15       Q.   Is there a maximum amount of time a juvenile

16   could be in lockdown?

17       A.   That would be up to something a supervisor is

18   called on.

19       Q.   Does a supervisor review when a juvenile is in

20   lockdown while they're presently in lockdown?

21       A.   He looks -- he reads the report, yes, sir.

22       Q.   When does he do that?

23       A.   At the end of the shift.  Before the end of the

24   shift, all reports have to be turned in to the

25   supervisor, any report written on that 12-hour shift.

Page 49

1    differences regarding disciplinary events --

2        A.    No, sir.

3        Q.    -- between pre-adjudicated juveniles and

4    direct-file juveniles?

5        A.    No, sir.

6        Q.    And no other difference between how you treat a

7    pre-adjudicated juvenile versus a direct-file juvenile?

8        A.    They're all juvenile.

9        Q.    How many -- how many times have you placed a

10   juvenile on lockdown?

11       A.    Zero.

12       Q.    One of the things you mentioned was that you

13   would be advised whether or not certain children had a

14   shower during the day?

15       A.    Right.  Pre-adjudicated, after they have their

16   rec, recreation, outside, hot, sweaty.  When they come

17   in, they automatically get new uniforms, able to take a

18   shower.  Sometimes the inclement weather changes that;

19   and if that's the case, we are advised when we come on

20   and we have to do it.

21       Q.    Okay.  Meaning you would have --

22       A.    We would have to give them a shower and

23   uniform, so forth.

24       Q.    Okay.  Gotcha.  Okay.  Getting back to -- to

25   your typical day in the -- in the juvenile facility, how

1   Q.   Did you ever see other deputies using their
2   cell phone in Building 3?
3   A.   No, sir.
4   Q.   And I think you said this earlier, but just to
5   be clear, you didn't have a -- you're not using a TASER
6   when you're in the juvenile facility?
7   A.   No, sir.
8   Q.   Okay.  And how -- how big of a can is the
9   pepper spray?
10   A.   It's two different sizes.  One is 4-ounce and
11   one is 10- to 12-ounce.  One is a bigger bottle and one
12   is a small bottle.
13   Q.   Okay.  And which do you have on your belt?
14   A.   Small.
15   Q.   And where is the 10- to 12-ounce can?
16   A.   It's in the control room, in the key box,
17   locked.
18   Q.   Have you ever run out of the 4-ounce bottle of
19   pepper spray that you carry on your person?
20   A.   Never ran out.  We've had it replenished
21   because the date was outdated.
22   Q.   Okay.
23   A.   And they'd issue you a new one.
24   Q.   So there's an expiration date on the can?
25   A.   Yes, sir.

Page 82

1    I said, we walked in the control room and grabbed our

2    sandwich.  We went back out to the desk and we ate it.

3        Q.   Well, that's -- that's the dinner, right?

4        A.   That's breaks or the dinner.

5        Q.   Okay.

6        A.   We -- we never left the building to take these

7    allowed time.  We just didn't do it.

8        Q.   But, now, did you -- did you spend some time in

9    the control room as a break?

10       A.   No.  Well, we brought it out to the desk.

11       Q.   Okay.  So -- so basically you're saying you

12   didn't take a break at all, ever?

13       A.   Basically we hardly ever took a break.  If

14   our -- our break consisted of what I just told you.  If

15   we had something to heat up in the microwave, yeah, we

16   stayed in there for 30 seconds or whatever, heated it

17   up, took it back out to the desk and ate it at the desk.

18       Q.   Okay.  Did you ever use profanity while you

19   were in Building 3 supervising the juveniles?

20       A.   Not directed to the juvenile, no, sir.

21       Q.   And what does that mean?

22       A.   I never used profanities directed at the

23   juveniles.

24       Q.   But you used "profanity" generally?

25       A.   Maybe around the adult workers, but not around

Page 83

1   the juvenile.  Again, not around the juvenile.

2      Q.   Meaning you believe the juveniles never heard

3   you use profanity?

4      A.   I've never cussed at them, never cussed around

5   them.  I've got on them for doing it.

6      Q.   How about either of the other deputies you

7   worked with, did they --

8      A.   I can't answer for them.  I can only answer for

9   myself.

10     Q.   Is that because you're not aware of any of the

11  other deputies using profanity?

12     A.   That means I can't answer for anybody but

13  myself.

14     Q.   I understand that.  But are you saying you

15  can't answer because you don't know?

16     A.   I'm saying I can't answer for anybody but me.

17  That's what I mean by that.

18     Q.   Okay.  My question is if -- if you ever heard

19  any of the other deputies use profanity in Building 3.

20     A.   I cannot answer that question because I can

21  answer for myself only.  I don't understand your

22  question, number one.  I'm not going to stand here and

23  tell you that I've heard people cussing, I heard people

24  not cussing.  Ask them that question, not me.

25     Q.   Well, I'm sorry, I --

Page 84

1    A.   I don't know.  Okay?  That's my answer.  I
2  don't know.  That's my answer to your question.  I don't
3  know.  Have I ever heard them cussing?  I don't know.
4    Q.   And -- and you are aware that you are under
5  oath, right?
6    A.   I am under oath, yes.
7    Q.   Okay.  Are you familiar with the term "test of
8  heart"?
9    A.   No.  I was reading that.  I -- I really don't
10 know what that is.
11   Q.   How about "TOH"?
12   A.   What's it stand for?  Maybe I know what it is.
13 I don't -- I don't know what it stands for.
14   Q.   Okay.  How about "payroll"?
15   A.   Now, I've heard of payroll.
16   Q.   And what is that?
17   A.   It's where kids steal other kids' trays and
18 the -- I don't know how you put this.  The -- the guys
19 that are not as tough as other guys and other -- other
20 inmates, juveniles, take advantage of them and they
21 steal their food and so forth and so on.  That happens.
22   Q.   How do you know that happens?
23   A.   The inmate tell me.  If we find out about it
24 and we can stop it, we stop it.  If we don't know about
25 it, we can't stop it.  A lot of them don't talk.

Page 85

1    Q.   And what happens after a juvenile informs you

2    of that?

3    A.   I stop it.  I make sure he gets his meal and I

4    make sure he eats it.

5    Q.   How often did you encounter that?

6    A.   About maybe two times since October 1st where

7    an inmate actually came to me and said, "Hey, you know,

8    I want to eat.  They're taking my meal."  And I put a

9    stop to it.

10   Q.   And what happened to the person or persons that

11   took the meal?

12   A.   I didn't see him take the meal, so I can't do

13   anything to that kid, you know.  All I can make sure is

14   that the kid gets the next meal.

15   Q.   And how did you ensure that the -- that the

16   juvenile ate the next meal?

17   A.   When we hand delivered it, I set him over at

18   the table and watched him eat it.

19   Q.   What does "PC" stand for?

20   A.   Protective custody.

21   Q.   Have you ever referred -- have you ever -- have

22   you ever referred to that as pussy control?

23   A.   No, sir.

24   Q.   Have you ever heard anyone else refer to it as

25   that?

Page 86

1      A.   No, sir.

2      Q.   How does a juvenile put in a sick call?

3      A.   They ask for an inmate request form.

4           Oh, you said sick call.  I'm sorry.

5           They ask for a sick call.  They can only get

6  that from the nurse.  They can only get that from the

7  nurse on day shift, and they turn it in on night shift.

8      Q.   So what does a child -- what does a juvenile

9  who is sick do on the night shift?

10     A.   They see the nurse.

11     Q.   How does a juvenile on night shift let you know

12 that they're sick?

13     A.   Most of the time you can tell, but they -- they

14 tell you, I mean, "Can I see the nurse?"

15          "What's wrong?"

16          And we take them to see the nurse.

17     Q.   You, the deputies --

18     A.   They still have to fill out a sick call sheet

19 that the nurse will give them if they're sick.  She will

20 make that exception and let them fill it out right then

21 so that they get seen and get the proper care.

22     Q.   Okay.  I want to talk about the subject we

23 touched on a little earlier, which is the isolation

24 rooms.

25          How many times have you put a juvenile into

Page 87

1    isolation?

2        A.    I don't recall ever putting an inmate in

3    isolation.  I might have helped escort inmates to

4    isolation, but as far as me as a deputy placing an

5    inmate in isolation, I don't think I ever have.

6        Q.    Okay.  What are the isolation rooms used for?

7        A.    Isolation.

8        Q.    What causes a juvenile to be placed into

9    isolation?

10       A.    Fighting, repetitive discipline problems, which

11   then becomes administrative discipline from a supervisor

12   to be put in isolation.  If that happens, it's up to

13   them when they come off of isolation.  Deputy has

14   nothing to do with it.  Basically it's for their

15   protection and the protection of other inmates if it's a

16   fighting/discipline problem.  For their protection.

17       Q.    So I'm sorry.  Can -- can it --

18       A.    It's not a punishment.  I mean, it's for

19   protection of them and other inmates.  Isolation is not

20   a punishment.

21       Q.    Now, can a deputy put someone in isolation?

22       A.    Absolutely.

23       Q.    Okay.  How many times would you say you

24   assisted escorting a juvenile to isolation?

25       A.    Maybe a couple since I went in a juvenile dorm.

Page 88

1    Q.    Do you recall the reasons on those occasions

2    why the juvenile was placed into isolation?

3    A.    No, sir.

4    Q.    And how long is a -- is a juvenile kept in

5    isolation?

6    A.    Up to the reason he's in there.

7    Q.    Okay.  How long would a juvenile placed in

8    isolation for fighting be kept in isolation?

9    A.    Usually it's a minimum of 24 hour, a report

10   written.  And if he's in isolation, the supervisor is

11   the only one that can take him out of isolation.  Then

12   it becomes an administrative discipline.

13   Q.    And when is this report filled out?

14   A.    Before your shift is over.

15   Q.    But not contemporaneous to the juvenile being

16   placed into the isolation room?

17   A.    What is the question again?

18   Q.    How long after a juvenile is placed in

19   isolation is the report created of the fact that the

20   juvenile is in isolation?

21   A.    As soon as the deputy can work that into his

22   schedule with his other work he had.

23   Q.    And where does that report go?

24   A.    That -- where does it go?

25   Q.    Uh-huh.

Page 89

1      A.    To the supervisor.

2      Q.    Is that the e-mail again?

3      A.    That's the e-mail.

4      Q.    Okay.  So this report, like the other report,

5   is e-mailed to the sergeant or lieutenant who's in

6   charge --

7      A.    Right.

8      Q.    -- at that particular shift?

9      A.    Right.

10     Q.    What is the longest a juvenile has been in

11  isolation?

12     A.    Longest a juvenile has been in isolation?  We

13  had three in isolation probably for a couple months.

14     Q.    Why were each of those juveniles in isolation

15  for a couple months?

16     A.    Because they got -- they were in a incident

17  where it was pretty serious and they wanted to isolate

18  them from the other inmate.  Administrative discipline.

19     Q.    And what was the -- the incident?

20     A.    Fighting.

21     Q.    And what made this fighting incident so serious

22  that it caused three juveniles to be kept in isolation

23  for a couple months?

24     A.    I think you know the case.

25     Q.    Please let me know.

Page 100

1        Just to remind you of a couple of things, if at

2   any time you want to take a break, just let us know.

3        If you think of something later, after a

4   question, just let us know.  We can go back and explore

5   that more.

6        Are you on any medication or drug today that

7   would inhibit you from testifying truthfully and

8   honestly today?

9        A.   No, sir.

10       Q.   Anything that you could be aware of that would

11  inhibit you from testifying truthfully and honestly

12  today?

13       A.   No, sir.

14       Q.   Wonderful.

15       So I'd like to start cleaning up some things

16  from the last time.

17       The -- the head count that you perform, you --

18  you had testified that you perform a head count

19  immediately when you start your shift?

20       A.   Yes, sir.

21       Q.   And how do you determine -- how do you get the

22  information for the head count, meaning how many

23  juveniles there are in -- in that particular dorm?

24       A.   Basically lay eyes on every juvenile.

25       Q.   But -- but how do you -- for example, if you

Page 101

1    count 14 juveniles, how do you know there's supposed to

2    be 14 juveniles in that dorm?

3        A.    We have a board in the control room.  We have a

4    card for each juvenile when they were incarcerated.

5        Q.    Tell me about the board in the control room.

6    What information does that have?

7        A.    The board in the control room with a name to

8    each inmate with their book-in number.

9        Q.    Any other information?

10       A.    That's about it.

11       Q.    Does it identify which cell the juveniles are

12   in?

13       A.    No, sir.

14       Q.    So it's simply a name and a booking number is

15   the only information on that board?

16       A.    It designates the dorm they are in.

17       Q.    Okay.

18       A.    Not the cell.

19       Q.    Okay.  So --

20       A.    Echo, Fox, Charlie.

21       Q.    Got it.  So Echo, Fox, Charlie, a booking

22   number, and the name.  And that's the extent of the

23   board?

24       A.    Uh-huh.

25       Q.    And tell me about these cards on each juvenile

Page 102

1    that you referred to.

2         A.    There's a card that has their book-in number on

3    it, their name, prevalent information as far as -- you

4    know, I don't really know what's all on the card, but

5    every inmate has a card with their information on it,

6    and it's in a file box.

7         Q.    Is this like an index card?

8         A.    It's a little bigger than an index card.

9               And then we have a board with magnetic holders

10   that has their name, book-in number, and what dorm

11   they're in.

12        Q.    And what is some of the prevalent information

13   you've seen on these cards?

14        A.    Just who they are.

15        Q.    Any other information?  I know you can't

16   remember everything, but can you remember some of the

17   things, some of the --

18        A.    A couple things.

19        Q.    -- some of the prevalent information you've

20   seen on there?

21        A.    When they come in and they are issued uniforms,

22   commodities, it is on that card, and it's checked that

23   they did receive, and they have to sign it.

24        Q.    What does uniform issues refer to?

25        A.    Excuse me?

Page 103

 1     Q.    What does uniform issues refer to?

 2     A.    A uniform that they received to wear.

 3     Q.    Okay.  So that identifies that they received

 4  the uniform?

 5     A.    Right.

 6     Q.    And what's the commodities refer to?

 7     A.    They had -- they get a care package when they

 8  come in of soap, toothpaste, toilet paper, that type of

 9  thing.

10     Q.    So this card just identifies that they've

11  received a uniform and these commodities?

12     A.    And who they are and their book-in number.

13     Q.    Gotcha.

14           I also believe you testified that the

15  Deep Freeze, the large can that's kept in the control

16  room, is used for fights of two or more people?

17     A.    Yes, sir.

18     Q.    Is that correct?

19     A.    Uh-huh.

20     Q.    Is that the only time that large can is used?

21     A.    Supposed to.

22     Q.    Okay.  And what are the procedures to use the

23  small can of mace that you keep on your person?

24     A.    When they refuse to obey three verbal

25  demands -- commands to stop fighting, or disrespect,

Page 111

1    directed to use pepper spray in that situation?

2        A.    It's not in our directives to use pepper spray

3    for them damaging county property.

4        Q.    Okay.  You had also talked about last time,

5    about using the pepper spray in order to achieve the

6    goal of de-escalation?

7        A.    Yes, sir.

8        Q.    Okay.  Can you -- can you define for me what

9    you mean by "de-escalation"?

10       A.    I don't understand what you're saying as far as

11   de-escalation.

12       Q.    When is the situation de-escalated?

13       A.    When your verbal command of stop fighting

14   stops.

15       Q.    So then is -- is de-escalation the same as

16   achieving compliance from the juveniles?

17       A.    You could say it that way.

18       Q.    You also mentioned last time that you work --

19   previously worked at South County with the direct-file

20   juveniles.  Is that correct?

21       A.    I was.

22       Q.    And what differences did you observe how the

23   direct-files were housed there versus how they are

24   housed in the Central County Jail?

25       A.    Down there they were in one dorm, and you have

Page 112

1    your PC and your max.  They didn't get out as much

2    because of the housing.

3          And down at Central County Jail they have their

4    own dorm, so they're out a lot more and the fighting has

5    decreased a lot more.

6    Q.   Fighting has decreased in --

7    A.   Decreased.

8    Q.   -- Central County Jail?

9    A.   A lot more.

10   Q.   So you just mentioned that in the South County

11   Jail there was one dorm.  How many juveniles were housed

12   in one dorm?

13   A.   I think it averaged about maybe 30, 32.

14        MR. VAZQUEZ:  Bless you.

15        MR. RINDONE:  Bless you.

16        MR. TROHN:  Thank you.

17   Q.   How many deputies would be on duty for a shift

18   at South County Jail for the direct-file juveniles?

19   A.   One person stayed in the dorm the whole

20   12 hours, never left the dorm.

21   Q.   Actually I want to -- I want to clarify

22   something for -- for today anyway.

23        So when I refer to the common area within the

24   dorms where the children are allowed their out-time --

25   A.   Uh-huh.

Page 113

1      Q.    -- I'm going to call that the dayroom today.

2      A.    Okay.

3      Q.    And then the common area where only the guards

4    can be, I'm going to refer to as the common area, if

5    that's okay with you.

6      A.    It's one and the same.

7      Q.    Okay.  So when you just said there's one deputy

8    in the dorm at -- or there was one deputy in the dorm at

9    South County Jail, do you mean in the dayroom area?

10     A.    In the dayroom.

11     Q.    At all times?

12     A.    At all time.

13     Q.    And why was it that the protective custody and

14   max direct-files did not get out much because of the

15   housing?  What -- what -- what because of the housing?

16     A.    They didn't come out at the same time, so they

17   didn't get as much out-time because there was one dorm

18   instead of three.

19     Q.    Oh, meaning in the dayroom area?

20     A.    Yes, sir.

21     Q.    Gotcha.

22     A.    One big dorm.

23     Q.    I see.

24           And what would you attribute the fact that the

25   fighting has decreased in Central County Jail versus the

Page 114

1    South County Jail?

2          A.    Because the maxes are in one dorm together, the

3    PCs are in one dorm together, and so forth and so on.

4          Q.    Could you tell me what the "so forth and so on"

5    part is?  Is there -- is there more to your answer?

6          A.    PCs are housed with -- the protective custody

7    inmates are housed in the same dorm.  They're in PC for

8    protective custody, and they are together in the same

9    dorm.  So when they go out in the dayroom, all you have

10   in that dorm is protective custody inmates.

11          Max custody inmates are in the dorm together

12   all at the same time.  They're not in with PCs.  They

13   are not with -- with other inmates.  So there's not as

14   much fighting.

15          And that's my belief why there's not enough

16   fighting -- as much fighting.

17          Q.    Understood.  Thank you.

18          Now, I meant to come back to this last time

19   and -- and -- and I didn't get back to it.  But when did

20   you stop working with juveniles at the Central County

21   Jail?

22          A.    I don't -- I don't know exactly the date.  I

23   think I worked from October 1st, for about six months

24   maybe.

25          Q.    Did you have that paperwork that you had

Page 115

1  mentioned before that -- that identified the date you

2  stopped working with juveniles with you today?

3       A.   I don't have any paperwork on me today.

4       Q.   And -- and why was it that you stopped working

5  with juveniles?

6       A.   Because I had an incident with a juvenile was

7  on suicide watch.  They were in the cage, and they were

8  disrupting the dorm.  I had a disturbance.  They were

9  waking the other kids up that were trying to go to

10 sleep.  And I warned them for an hour and a half that

11 they needed to calm down.  I didn't really care if they

12 went to sleep, but they didn't -- needed to quit making

13 noise.  They were singing.  Singing -- they call it

14 singing -- a rap song, a vulgar rap song about killing

15 cops.

16          And I did everything in my power to keep from

17 spraying the inmates, so I sprayed a little line on the

18 floor outside the cage, the holding cell, whatever you

19 want to call it, and they got louder.  So I sprayed a

20 little line on the floor, about a three-foot line.  I

21 immediately mopped it up, moved them to another holding

22 cell which is about 35 feet away.  Spray did not come in

23 contact with the juvenile.

24          And I got in trouble for it, and I have been

25 removed from the dorm indefinitely, working with

Page 116

1    juveniles, for that incident.   I also got 34 hours of

2    time, what they call on the porch without pay, for that

3    incident.

4        Q.   How long after this incident were you taken off

5    supervising juveniles?

6        A.   The next day.

7        Q.   The next day after this incident?

8        A.   That I was removed from the dorm?   Next day.

9        Q.   So this was the last day you worked at Central

10   County Jail supervising juveniles?

11       A.   Uh-huh.

12       Q.   What happened the next day after this incident?

13       A.   What do you mean, what happened the next day?

14       Q.   Did you speak with someone?

15       A.   I had a meeting with my captain.

16       Q.   Who was that?

17       A.   Captain Marcum.

18       Q.   How was she made aware of the incident?

19       A.   Excuse me?

20       Q.   How was Captain Marcum made aware of the

21   incident?

22            MR. TROHN:   Object to the form of the question.

23       A.   I have no idea.

24       Q.   Did you initiate the meeting with

25   Captain Marcum the next day after this incident?

Page 118

1  wasn't a protective action in this incident.

2      A.   Because I didn't spray them.

3      Q.   Thank you.

4      Now, who were the -- who were the two juveniles

5  involved in this incident?

6      A.   B    G  . and -- I don't know J  s first

7  name.

8      Q.   Okay.  Had you supervised B   G   prior to

9  this incident?

10      A.   Absolutely.

11      Q.   Had you supervised K  'J  prior to this

12  incident?

13      A.   Absolutely.

14      Q.   Had either of them ever filed a grievance

15  against you prior to this incident?

16      A.   I have no idea.

17      Q.   Did either of them file a grievance against you

18  after this incident?

19      A.   I have no idea.

20      Q.   What were your interactions like with Mr. G

21  prior to this incident?

22      A.   Same as with any other inmate.  You go in,

23  check on him, talk to him.  Never had any problem with

24  either one of them, to speak of.

25      Q.   And why was Mr. G  in the cage?

Page 119

1    A.    He was on suicide watch.

2    Q.    So is that the typical procedure, to place

3    someone in the cage that is on suicide watch?

4    A.    Not actually a cage.  It's a holding cell.  But

5    it depends on where there's room.

6    Q.    Well, let's start with:  What is the -- the

7    holding cage used for?  What is that supposed to be used

8    for?

9    A.    The only thing we use it for in the juvenile

10   dorm, when we have to, is what -- what we were using it

11   for.

12   Q.    Is to do what?  For suicide watch, that's the

13   only time you use the holding cage?

14   A.    Basically.  We have two cages that sometimes

15   when a new juvenile comes in, we will put them in there

16   and shut the door until they see the nurse.  That's

17   about the only other thing -- the only other thing we

18   use it for, because we can't let them go in the dorm

19   until they see medical.

20   Q.    Is it used for disciplinary purposes?

21   A.    Occasionally.

22   Q.    What types of disciplinary reasons would have a

23   juvenile placed in the cage?

24   A.    Not wanting to wear a uniform.  Again, being

25   vulgar with their language, disrespecting, disrespect.

Page 120

1    Put them in there for sometimes 30 minutes, sometimes an

2    hour.  And most of the time they would speak up,

3    apologize, "Can I go back to my dorm now?"  It's like a

4    timeout.

5        Q.    And why is the cage used for those reasons?

6        A.    So we can see them.

7        Q.    The reasons you just described to me, the, you

8    know, examples of occasional discipline for the cage,

9    the no uniform, using vulgarities, disrespect, things

10   like that, are -- are those reasons to ever place a

11   juvenile on lockdown?

12       A.    No, sir.

13       Q.    And those reasons that you just described for

14   me, are those reasons ever to place a juvenile in those

15   isolation cells?

16       A.    No, sir.

17       Q.    Is the use of the cage to discipline the

18   juvenile documented any -- documented anywhere in a log

19   or anything?

20       A.    No, sir, because we can visually see them.

21       Q.    Is there any record kept of, you know, things

22   such as a juvenile not using their uniform or using

23   vulgarities, et cetera, the things that you mentioned?

24       A.    No, sir.

25       Q.    So what time did the incident with Mr. Gage and

Page 123

1    A.    He did not tell me, no, not other than the fact

2    that they were on suicide watch.

3    Q.    Should that have been something that you were

4    informed of?

5    A.    Not if he informed the other deputy.  There was

6    more than one of us that worked that side.

7    Q.    Who was the other deputy?

8    A.    Jay Brown.

9    Q.    Did he tell you why either J̶    or G̶ ̶j were on

10   suicide watch?

11   A.    No, they did not.

12   Q.    And do you know why J̶    was on suicide watch?

13   A.    No, I do not.  The only reason they would be on

14   suicide watch is they had to tell a deputy they wanted

15   to hurt their self.

16   Q.    Okay.  But you were informed that the reason

17   they were in the cage was for suicide watch?

18   A.    No, I was not informed.

19   Q.    Just as the suicide watch?

20   A.    Just as a suicide watch.

21   Q.    That's my question.

22         You were informed that they were on suicide

23   watch, and that's why they were in the cage?

24   A.    (Witness nodding head.)

25   Q.    Yes?

Page 124

1    A.    Yeah, I was informed.

2    Q.    Okay.

3    A.    But, I mean, they were wearing suicide smock,

4  so pretty evident they were on suicide watch.

5    Q.    Gotcha.

6          And how long were Mr. G   , and Mr. J   , singing

7  a song?

8    A.    I don't know exactly, but quite awhile.  Long

9  enough to wake kids up in the other -- in the dorm

10  that's about 75 feet away.

11   Q.    Were the doors to the dorms open?

12   A.    Closed.  They were locked down for -- to go to

13  bed.

14   Q.    Well, not the cell rooms.  The dorm room doors

15  that let you into the dayroom area, were they open or

16  closed?

17   A.    They were closed.

18   Q.    Is that typical?  Are they always closed during

19  lockdown?

20   A.    Most of the time, yes.

21   Q.    And how many verbal commands did you provide

22  them to stop singing?

23   A.    About an hour and a half.

24   Q.    Is there anything else about this situation

25  that -- that occurred, besides them singing a song?

Page 125

1          MR. TROHN:  Object to form of the question.

2      Q.   I'll rephrase.

3          Did -- did -- did J{     and -- and G· ¡do

4  anything else other than singing the song?

5      A.   Just causing a disturbance.

6      Q.   And how were they causing a disturbance?

7      A.   Being loud enough to wake other inmates up.

8      Q.   Which is still related to singing the song,

9  right?

10      A.   Well, they call it singing.  I don't call it

11  singing.

12      Q.   Okay.  But other -- other than whatever --

13      A.   No, they didn't -- they didn't do anything

14  other than rapping or singing or whatever they want to

15  call it, and beating on the cage while they were doing,

16  using the cage for drums, in between their verses.  And

17  it has plexiglas on it, so it's a -- it's a -- it's

18  quite a noise.

19      Q.   There's plexiglas where?

20      A.   On the inside of the cage, there's plexiglas.

21  This dorm was -- used to -- used to be for men, and the

22  plexiglas kept inmates from spitting on the deputies.

23      Q.   And what caused you to, as you testified, spray

24  a line along the bottom of the cell?

25      A.   Again I reiterate, I had no intentions on

Page 126

1    spraying the inmates in the face.  I did this as a

2    warning after an hour and a half of trying to get

3    them -- I told them I didn't even -- I didn't care if

4    they went to sleep, just be quiet, because they were

5    causing a disturbance.

6           By my directives for the Polk County Sheriff's

7    Office, I could have opened the door, sprayed them,

8    wrote a report, and I wouldn't even have got in trouble.

9    But I went out of my way not to spray these kids.  So I

10   sprayed a line on the floor as a warning that I was

11   serious about them calming down, and my objective

12   worked.

13          When I moved them, in less than two or three or

14   four minutes I mopped it up, moved them to the other

15   holding cell, and in five minutes both of them were

16   asleep.  So I obtained my -- what I wanted to obtain.

17          So therefore I didn't deem it necessary to

18   write a report, and that got me in trouble.

19       Q.   And why -- why was it that you would have been

20   justified to spray the two juveniles in the face?

21       A.   Our directives say that we can quell a

22   disturbance by using chemical spray.

23       Q.   And why was this a disturbance that you could

24   use a -- that you could quell -- quell with pepper

25   spray?

Page 127

1          MR. TROHN:  Objection; asked and answered.

2      Q.   You can answer.

3          MR. TROHN:  You can tell him again.

4      A.   Yeah.  Our directives say that to quell --

5          MR. TROHN:  No, no.  He wants to know what the

6      disturbance was that --

7      A.   The disturbance was disrupting the whole dorm

8   and waking the other kids up.  And it was time to sleep.

9          And if you want to know what exactly the

10   directives say --

11         MR. TROHN:  No.  Just wait for a question.

12         THE WITNESS:  Okay.  Well, it -- it -- it's a

13     continuation of the disturbance.

14         MR. TROHN:  Okay.  Go ahead, then.

15         MR. RINDONE:  Well, please, go ahead.

16         MR. TROHN:  Yeah, go ahead.  I'm -- just

17     generally speaking, I want you to wait for a

18     question.

19         THE WITNESS:  Okay.

20         MR. TROHN:  Don't -- you know.  But if it

21     completes your last answer, then you can finish.

22     A.   Creating a disturbance of that magnitude is the

23   starting of an affray, which is the beginning stages of

24   a riot, because they were upsetting the dorm that bad.

25   I had inmates threatening them that if they didn't shut

Page 128

1   up, that they were going to take things in their own

2   hand when they got in general pop.  I did not want that

3   to happen.

4       Q.   Which -- which juveniles were making those

5   threats?

6       A.   Fox dorm.

7       Q.   Which specific juveniles?

8       A.   I don't know which juvenile or what name of a

9   juvenile.  It was just several of them that was woke,

10  waken up, and they came to their door.

11      Q.   And how did you know that -- that the children

12  had woken up?

13      A.   Because they were standing at the door, yelling

14  at Gage and Jobe.

15      Q.   How many children had woken up?

16      A.   Several.

17      Q.   More than five?

18      A.   I don't know how many there was.  There was

19  enough to get our attention and put more emphasis on me

20  trying to get them to be quiet.

21           THE WITNESS:  I need a break.

22           MR. TROHN:  Okay.

23           MR. RINDONE:  Sure.  Any time.

24           THE VIDEOGRAPHER:  We're off the video record

25      at 9:42 a.m.

Page 129

1        (Recess from 9:42 a.m. until 9:50 a.m.)

2        THE VIDEOGRAPHER:  We're on the video record at

3    9:50 a.m.

4    BY MR. RINDONE:

5    Q.    So you were -- you were able to hear other

6    juveniles making threats against Mr. G    and Mr. J

7    through the closed dorm doors as well as the closed cell

8    doors?

9    A.    Absolutely.

10   Q.    Now, what effect did you anticipate the pepper

11   spray being sprayed on the bottom of the cage having on

12   the juveniles?

13   A.    Did it so they could smell it a little bit.

14   They know what it smells like.  But I used it as a

15   warning device instead of acting by spraying them.

16   Q.    Used it as a warning device.  Does that mean

17   you've -- you've used it before as a warning device?

18   A.    No, I never have.

19   Q.    Besides juveniles, have you ever used it, you

20   know, even with adults, as a warning device?

21   A.    No, sir.

22   Q.    What effect did you expect the juveniles to

23   have after they smelled the pepper spray a bit?

24   A.    To be quiet, go to sleep.

25   Q.    How about physically?  Did you expect any

Page 136

1    A.    No, I did not.

2    Q.    Did any of the deputies that witnessed this

3  incident ever write down their account of this incident?

4    A.    Not that I know of.

5    Q.    Would you characterize Mr. J   and Mr. G  's

6  actions as kids being kids?

7        MR. TROHN:   Object to the form of the question.

8    A.    I don't understand that question.

9    Q.    Have you ever heard the phrase "kids being

10  kids"?

11    A.    Of course.

12    Q.    What does that mean to you?

13    A.    Kids being kids.

14    Q.    Walked into that one, didn't I?

15        On this evening, did you detect a nefarious

16  motive by Mr. J   and Mr. G   in their singing?

17    A.    Did I detect what?

18    Q.    Did you detect meanness coming from Mr. J

19  and -- and Mr. G  ?

20    A.    Did you say meanness?

21    Q.    Meanness.

22    A.    No.   They were just having fun.

23    Q.    They were just having fun?

24    A.    They were.   They were having a good time.

25    Q.    And kids often like to have fun, right?

Page 137

1    A.   Absolutely.

2    Q.   As you sit here today, would you do anything

3  differently with regard to this incident?

4    A.   Yes, sir.

5    Q.   What would you do different?

6    A.   I would have opened the door of that cage and I

7  would have sprayed them in the face.

8    Q.   And why is that?

9    A.   Because my directive says I can, and I got in

10 trouble for spraying the floor instead of spraying them

11 because I didn't write a report because I didn't deem it

12 necessary, and for that reason I got in trouble.

13   Q.   But you wouldn't have -- you wouldn't have

14 tried to ignore them?

15   A.   Not as loud as they were being, no.  Again,

16 they were creating a disturbance.

17   Q.   Is there any other way you could have handled

18 that situation?

19   A.   Not really, other than spray them, you know.

20 That's not -- that's not a situation where you want to

21 go in and go hands on and have a PA with them.  I -- I

22 don't believe in that.  So I did what I thought was the

23 best way, and just didn't turn out good.

24   Q.   Could you have talked to them more?

25   A.   I talked to them for an hour and a half, and

1       A.   Sitting at the desk in between dorm rounds.

2       Q.   But I mean just how long -- how long were you

3  sitting at the desk before you heard them start singing?

4       A.   About two seconds after they started singing.

5       Q.   So once you sat down is when Mr. J'    and

6  Mr. C   began singing?

7       A.   I don't remember whether they were singing when

8  I was standing up or sitting down.

9       Q.   Which can of pepper spray did -- did you use in

10 this incident?

11      A.   The big black can.

12      Q.   And where was that -- and -- and --

13           Let's go back.

14           The big black can, is that the Deep Freeze?

15      A.   Deep Freeze.

16      Q.   Deep Freeze.

17           Is that also called Black Jesus?

18      A.   It is.

19      Q.   And why is that?

20      A.   It's just a nickname that inmates nicknamed it.

21      Q.   You don't know why it's called that?

22      A.   I have no idea.

23      Q.   Do you ever use that term?

24      A.   Use the "big black can," is what I call it.

25      Q.   Any other deputies use that term?

Page 140

1   A.   I've heard the other deputies say that, yeah.

2   Q.   And where was this can of Deep Freeze pepper

3   spray located?

4   A.   Locked in the key box in the control room.

5   Q.   What made you go into the control room to get

6   the Deep Freeze pepper spray?

7   A.   Because they wouldn't obey my verbal command to

8   quiet down.

9   Q.   But why -- why the -- why the Deep Freeze large

10  can of pepper spray versus the small can of pepper spray

11  you carry on your belt?

12  A.   I thought I could put a little bit of fear in

13  them with the big can.  You know, I didn't have any

14  intention on spraying them, but it was a bluff on my

15  part at that point.

16  Q.   How did you bluff using the Deep Freeze can?

17  A.   I actually told them I was going to spray them

18  if they didn't calm down.

19  Q.   And how long between when you threatened to use

20  the big can of pepper spray on them and when you

21  actually used it to spray the bottom of the floor?

22  A.   Sometime within that hour and a half.

23  Q.   Why did you ultimately decide to use the

24  Deep Freeze large can of pepper spray to spray as

25  opposed to using your small can of pepper spray?

Page 141

1    A.    Can't tell you.   Fear factor maybe, because

2    they don't like it.   It's a more of a deterrent than the

3    small can.

4        Q.    And why is that?

5        A.    Because it's more powerful.

6        Q.    I believe you had testified earlier that --

7    that Deep Freeze was only supposed to be used with a

8    fight with two to three or more people.   Is that right?

9        A.    I did.

10       Q.    So what made you use the Deep Freeze in an

11   incident that didn't involve a fight with two to three

12   or more juveniles?

13          MR. TROHN:   Object to the form.

14       A.    I just explained, to use the fear factor as a

15   bluff on my part, trying to get them to hush.

16       Q.    But it wasn't actually a bluff, since you used

17   it, correct?

18       A.    I did not spray them.

19       Q.    Right.   But you -- you deployed the Deep Freeze

20   can?

21       A.    I put a line on the floor, yes, I did.

22       Q.    What happened after you sprayed the bottom of

23   the -- the cage and you moved the -- Mr. Jobe and

24   Mr. Gage to the other cage?

25       A.    They were asleep within five minutes.

Page 149

1      A.    I don't know.

2      Q.    So -- so --

3      A.    Depending on what day it was.

4      Q.    To be --

5      A.    I work night, so I -- I don't -- I don't know

6    how their shifts work.  I work night.

7      Q.    So you wouldn't be able to advise the oncoming

8    shift, if it -- if it was different deputies, when to

9    release them from lockdown?

10     A.    No.

11     Q.    Do you recall an incident that occurred where

12   juveniles were -- were in the cage for suicide watch and

13   they would not change into the turtle suits?

14     A.    I do.

15     Q.    Can you tell me about that incident, please?

16     A.    Three juveniles told us their wish of they were

17   going to hurt their self, they wanted to go on suicide

18   watch.

19           So protocol is they have to change into a

20   suicide gown, smock.  People call it different things.

21   So we have to go get them out of the room and bring them

22   out, and we have to dress them out.  They can't have

23   anything other than that smock, the blanket, and it's

24   like a little sleeping-bag-type thing that they can get

25   in, while they are on suicide watch.

1      Q.    Which juveniles?

2      A.    That particular day, I believe it was H

3    H           and Watlington, I think is how you pronounce

4    his name.

5      Q.    And were you present when any of these three

6    juveniles expressed that they were going to hurt

7    themselves?

8      A.    I didn't put them on suicide watch.  I don't --

9    I don't know who did.  I don't know who they expressed

10   this to.  I was just on that shift.

11     Q.    Were they on suicide watch prior to your shift?

12     A.    No.  They came on suicide watch after we came

13   on shift.

14     Q.    Did you assist in placing them in the cage?

15     A.    I did.

16     Q.    And what happened after you -- well,

17   actually strike that.

18           Did you assist in getting them out of their

19   cell?

20     A.    No, I did not.

21     Q.    So was your -- your first appearance in this

22   incident after they were already in the cage?

23     A.    Right.

24     Q.    And so what happened after you arrived at the

25   cage and the two juveniles -- the three -- the three

Page 151

1    juveniles were in the cage?

2        A.   I believe I was the one that went and got the

3    suicide smocks and brought them to the cage, and they

4    refused to dress out.

5        Q.   Why did they refuse?

6             MR. TROHN:   Object to the form.

7        A.   They didn't want to.

8        Q.   What did they say after the command was given

9    to change into the turtle suit?

10       A.   They said, "No."

11       Q.   Did they say anything else besides "no"?

12       A.   They just refused to dress out.

13       Q.   But did they say anything?

14       A.   I don't remember.

15       Q.   At that time did they express that they were

16   going to hurt themselves?

17       A.   They did that before they were put on suicide

18   watch.

19       Q.   Right.   But did they say anything again after

20   that, in your presence?

21       A.   Not to me.

22       Q.   Did they say that -- did they deny that they

23   were going to hurt themselves?

24       A.   No, not at all.

25       Q.   And so how many times was the command given to

Page 152

1  change into the suicide smocks?

2      A.   Three.

3      Q.   And was that you giving the command?

4      A.   Yes, it was.

5      Q.   And what happened after that?

6      A.   After they refused, I called my supervisor, who

7  is Lieutenant Galloway.

8           And he says, "I will be down in a minute."

9           He came down.

10     Q.   And then what happened?

11     A.   He talked to all three of them.

12     Q.   What did he say to them?

13     A.   Same thing I told them, that they had to dress

14  in the suicide smock.

15     Q.   And what did the juveniles say in response to

16  Lieutenant Galloway?

17     A.   They didn't have much response with him, and he

18  told them the captain was on call and she would be

19  coming down to talk to them also.  And she did.

20     Q.   And that's Captain Marcum?

21     A.   Yes, it is.

22     Q.   So did anything happen between the time

23  Lieutenant Galloway talked to the three juveniles and

24  Captain Marcum arriving?

25     A.   No, sir.

Page 153

1    Q.    So what happened after Captain Marcum arrived?

2    A.    She spoke to all three.  Two of them complied

3  and one refused.

4    Q.    What did Captain Marcum say to the juveniles?

5    A.    Same thing lieutenant told them, that they have

6  to dress out in a suicide smock.

7    Q.    Which two complied?

8    A.    Watlington and H

9    Q.    And when you say comply, you mean they changed

10  into the suicide smock?

11    A.    They changed their clothes and put the suicide

12  smock on.

13    Q.    And where did they do that?

14    A.    They did it in the holding cell.

15    Q.    In the cage that they were already located?

16    A.    We call it a holding cell.

17    Q.    Okay.  Were -- were all three juveniles in --

18  in the same -- in the same cage?

19    A.    No, sir.

20    Q.    Who -- who was in which cage?

21    A.    I'm sorry?

22    Q.    Who -- who was in which cage?

23    A.    You want a east and west or -- I -- I --

24    Q.    Well, you can just tell me --

25    A.    There's no numbers on the cages.

Page 154

1      Q.   You can just tell me who -- who was grouped.   I

2  assume two were in one --

3      A.   Watlington and H      were in one, and H

4  was in another one by his self.

5      Q.   Did that occur after the two decided to comply,

6  that they were separated into two cages?

7      A.   Did what occur afterwards?

8      Q.   Prior to the two juveniles complying with or at

9  least saying that they were going to comply with

10  Captain Marcum's verbal command, were all three

11  juveniles located in the same cage?

12      A.   No, they weren't.

13      Q.   So this is originally how they were separated

14  when they were first placed in the cage?

15      A.   Uh-huh.

16           THE WITNESS:  I got to break.

17           MR. TROHN:   Okay.

18           MR. RINDONE:  Sure.

19           THE VIDEOGRAPHER:  We're off the video record

20      at 10:22 a.m.

21           (Recess from 10:22 a.m. until 10:31 a.m.)

22           THE VIDEOGRAPHER:  We're on the video record at

23      10:31 a.m.

24  BY MR. RINDONE:

25      Q.   Mr. Harrison, where was Captain Marcum located

1    when Watlington and H·       'changed into the suicide

2    smocks?

3         A.    She actually turned her back.  She's in the

4    vestibule area, and she turned her back while they

5    dressed.

6         Q.    Did the juveniles say anything about

7    Captain Marcum being present?

8         A.    Not to me.

9         Q.    When -- when you first spoke to the three

10   juveniles about changing into their suicide smocks, did

11   you let them know what would happen if they didn't

12   change into the -- the smocks?

13        A.    I did.

14        Q.    What -- what did you tell them?

15        A.    If they did not change out, we would change

16   them out.

17        Q.    What does that mean?

18        A.    That means we were going to change them out.

19        Q.    What does -- what does it mean, you would

20   change them out?  Can you describe what would happen?

21        A.    We would undress them and dress them.

22        Q.    And how many people would -- would -- would

23   partake in that?

24        A.    However many it took.

25        Q.    Do you have an idea how many deputies it would

Page 157

1    what would happen if they didn't change into their

2    suicide smocks?

3         A.    I was with -- not within hearing distance when

4    she spoke to the three, but I know she spoke to all

5    three.

6         Q.    At any point in time during this incident, was

7    the use of pepper spray discussed with the juveniles?

8         A.    No, sir.

9         Q.    Was pepper spray used at all in this incident?

10        A.    It was.

11        Q.    And when did that happen?

12        A.    When the third and final juvenile refused to

13   dress, after about five verbal commands by a lieutenant.

14        Q.    By Lieutenant Galloway?

15        A.    He issued the verbal commands to the juvenile

16   to change out, and he refused.

17        Q.    How many commands?

18        A.    At least five.

19        Q.    Where was Captain Marcum at this time?

20        A.    She was in the vestibule with her back turned.

21        Q.    And this was -- I'm sorry.  Was this H

22        A.    It was H

23        Q.    So what happened after Lieutenant Galloway

24   issued the five verbal commands?

25        A.    He looked at the young man and said, "It's

Page 158

1    evident that you're not going to obey our verbal

2    commands, so we are going to undress you," and he told

3    me to spray him.

4         Q.   Lieutenant Galloway told you to spray him?

5         A.   He did.

6         Q.   Which pepper spray did you deploy?

7         A.   I had the big can in my pocket, and that's what

8    I used.

9         Q.   When did you obtain the Deep Freeze from the

10   control room?

11        A.   I obtained it from the Deep Freeze when -- when

12   they were escorting the three to the holding cell.

13        Q.   And why did you obtain the Deep Freeze at that

14   time?

15        A.   Because these three particular inmates are very

16   unpredictable.

17        Q.   Why is that?

18        A.   They're very unpredictable of what they will

19   do.

20        Q.   What about these juveniles led you to

21   characterize them as unpredictable?

22        A.   Fighting, quite often.

23        Q.   What else?

24        A.   That's all I need.

25        Q.   What was their history of fighting?

Page 160

1  happen when the juveniles were being transported to

2  the -- to the holding cell that would cause you to get

3  the Deep Freeze?

4      A.   Anything could have happened.

5      Q.   What are some examples of -- of anything that

6  could happen?

7      A.   My favorite word, fighting.

8      Q.   Fighting with who?

9      A.   Anybody, at any time.

10     Q.   Right.  But in this instance where the three

11 juveniles are being escorted to the holding cage,

12 what -- what possibility for fighting is there at that

13 time?

14     A.   Well, they're not handcuffed.  They're not

15 shackled.  They can fight anytime they get ready to

16 fight.

17     Q.   So were you concerned that the three juveniles

18 were going to fight with one another?

19     A.   Sometime, or deputies.  They're unpredictable.

20 I think I've already used that word, too.

21     Q.   Yeah.  I'm just trying to find out what the

22 "unpredictable" means in your mind.

23          What happened after you deployed the pepper

24 spray on H        P

25     A.   H;    ?   We undressed him, and dressed him in

Page 161

1   the suicide smock.

2        Q.    What was the juvenile's reaction to being

3   sprayed?

4        A.    He didn't like it.

5        Q.    What did the juvenile do upon being

6   pepper-sprayed?

7        A.    Laid there and immediately put his hands to his

8   face.  And as soon as we -- we didn't even put a smock

9   on him.  We took him to the shower and let him take a

10  shower.  Then we dressed him out and let him see the

11  nurse.

12       Q.    What do you mean, he laid there?  He -- he was

13  on the ground?

14       A.    He went to the ground, yes.

15       Q.    So in response to the pepper spray being

16  deployed --

17       A.    He went to the ground.

18       Q.    -- Hector went to the ground?

19       A.    Uh-huh.

20       Q.    And when he was on the ground, he put his hands

21  to his face?  Is that what you said?

22       A.    Put his hands to his face immediately.

23       Q.    Immediately.

24             And when you say "dressed him," does that mean

25  you -- you took his clothes off and then put the suicide

Page 169

1              MS. GALLONI:  Court.

2              MR. TROHN:  Maybe you'd better block it out

3      anyway, if you're making a deposition out of it.

4              MR. RINDONE:  What -- what page are we talking

5      about?

6              MR. TROHN:  It's -- one of these reports

7      doesn't have his name blocked out.

8              MR. RINDONE:  I can't see what page you're on.

9              MR. TROHN:  46?

10             MS. GALLONI:  Where it has "inmate name," it

11     has "Michael Hector."

12             MR. RINDONE:  Oh.

13             MS. GALLONI:  Yeah, we can block, except for

14     the initials.  But the name is also in the

15     transcript.

16             MR. TROHN:  Yeah.  I mean, I don't know how --

17     it doesn't matter to me.  I don't -- I don't know

18     what the rights are, you know.

19             MR. RINDONE:  So are you -- are we good?

20             MR. TROHN:  Yeah.

21     BY MR. RINDONE:

22        Q.   Okay.  Mr. Harrison, did you have a chance

23     to -- to take a look at these documents?

24        A.   I'm still reading.

25        Q.   Okay.

Page 170

1          Are you good, Mr. Harrison?

2     A.    Yes.

3     Q.    Okay.  And these documents that I've handed to

4   you, do you recognize these documents?

5     A.    Uh-huh.

6     Q.    Are -- are these incident reports related to

7   the incident that we've just been discussing?

8     A.    Yes, sir.

9     Q.    And 4048 through 4049, is that the report

10   that -- that you wrote with regard to this incident?

11     A.    I need to see another page.  48, right?

12     Q.    And 49.

13     A.    Oh.  Yeah.

14     Q.    Is that your --

15     A.    Yes.

16     Q.    Is that your report that you authored?

17     A.    My report, yes.

18          (Brief interruption.)

19          MR. TROHN:  Hey.  Not there yet.

20          MR. RINDONE:  We're in good shape.  Just a

21     little bit more yet.

22   BY MR. RINDONE:

23     Q.    And if you look at your report, what -- what

24   time did this incident occur?

25     A.    This incident, 1940.

Page 171

1    Q.    And is that 7:40 p.m.?

2    A.    That is 7:40 p.m.

3    Q.    If you look on that first page of your report,

4    about two -- five lines up from the bottom, the line

5    will start "LPN Brandenburg."  Do you see that?

6    A.    Okay.

7    Q.    There's a portion that's -- that's whited out

8    just prior to "is a common reaction from chemical

9    agent."

10   A.    Okay.

11   Q.    Do you know what that is that was whited out?

12   A.    Not right off.  I don't even know why it's

13   whited out.

14   Q.    What -- what are some of the common reactions

15   to pepper spray?

16   A.    Burning.

17   Q.    What else?

18   A.    That's about the only reaction I had when I was

19   sprayed, was burning.

20   Q.    We had -- we had discussed earlier that two

21   juveniles were in one cell, and one juvenile was by them

22   self in a cell?

23   A.    Right.

24   Q.    And the one in the cell by them self was

25   H      _?

Page 172

1      A.    H      .

2      Q.    I'm sorry, H      .

3           Now, in your report it mentions -- and let me

4      just see if it's -- one, two, three, four -- 12 lines

5      down.  I'm sorry, ten lines down from the top.  The line

6      starts, "Because he was very aggressive."

7      A.    He seemed to be the very aggressive one out of

8      that three.  That's why he was put in the cell -- a

9      holding cage by his self.

10     Q.    Well, just to take a step back, my question was

11     going to be:  Is that -- because it's blacked out -- is

12     that -- is that Hector that's being referred to as very

13     aggressive?

14     A.    Yes.

15     Q.    And can you tell me what he was doing to be

16     very aggressive?

17     A.    Being aggressive.  Very loud, non-compliable,

18     aggressive of the three.  The other ones submitted

19     pretty fast at changing out, and he refused.  He's just

20     a very aggressive inmate.

21     Q.    And when you say the others submitted, they --

22     they were --

23     A.    They submitted to change clothes pretty quick

24     after the captain talked to them.

25     Q.    And they weren't being loud in any way or

Page 173

1   anything like that?

2       A.   Not at all.

3       Q.   Okay.  And -- and I did notice in this report

4   that you included that you deployed the pepper spray for

5   three seconds?  It's one, two --

6       A.   Yeah.

7       Q.   It's eight lines from the bottom -- or nine

8   lines from the bottom, I'm sorry, if you count that half

9   a line.

10      A.   Okay.

11      Q.   Is that something that typically you would

12  include in -- in an incident report, how long the pepper

13  spray was deployed?

14      A.   Uh-huh.

15      Q.   Now, is that something that was directed for

16  all deputies to do or just your practice?

17      A.   That's the first time I've ever sprayed

18  anybody.

19      Q.   Had you ever been instructed in your incident

20  report to document how long you deployed the spray for?

21      A.   No, sir.

22      Q.   So one more question on the very aggressive.

23           In addition to the loudness and non-compliable,

24  was there anything else that Hector exhibited to be

25  characterized as very aggressive?

Glenn Harrison, 8/3/2012
Hughes v. Judd

Page 174

1    A.   Very tensed up.  Again, the offensive stances,
2    like he could fight at a second.  And he is a very
3    aggressive inmate, so we had to take precautions.
4         Q.   What does "tensed up" mean?
5         A.   Tensed up with your fists balled up like you're
6    going to fight.  That's aggressive to me.
7         Q.   Yeah, I just want to understand the terms,
8    that's all.
9              So tensed up is balling up the fists?
10        A.   Not necessarily balling up your fists.  Tensed
11   up in an -- in an offensive stance also.
12        Q.   Okay.  So what did H⁻      exhibit to be
13   characterized as tensed up?
14        A.   All the above.
15        Q.   Both.  So he had balled up his fists and --
16        A.   He did at --
17        Q.   -- took an offensive stance?
18        A.   -- one point, yeah.
19        Q.   And took an offensive stance?
20        A.   Yeah.
21        Q.   Now, H     s -- H'    's taking the offensive
22   stance and balling up his fists, that's not expressed in
23   your report; is that correct?
24        A.   I didn't see it in here, no.
25        Q.   Is there a reason why that wouldn't have been

Page 175

1    documented in your incident report?

2         A.    That's what I mean by being aggressive.

3         Q.    What instructions are you given about

4    documenting incidents in an incident report?

5         A.    Write the facts, what happened.

6         Q.    Anything else other than write the facts?

7         A.    Write about exactly what happened and what you

8    did.  That's it.

9         Q.    Any instructions with regard to details?

10        A.    Details such as?

11        Q.    Such as, for example, documenting that a

12   juvenile tensed up and took an offensive stance.

13        A.    That would be at my discretion what I write in

14   my report.  Just get the point across, and they either

15   approve the report or they don't.

16        Q.    I'm sorry.  The report is approved?

17        A.    Yes, it is.

18        Q.    And whose -- who approves it?

19        A.    The supervisor.

20        Q.    Do you -- do you receive notification that your

21   report has been approved?

22        A.    We do.

23        Q.    And how -- what form does that take?

24        A.    What form?

25        Q.    Are you --

Page 177

1    Q.   But do you receive something that says it's --

2    that says it's approved?

3    A.   They send them back to us.

4    Q.   And is there something written on the report

5    that says it's approved?

6    A.   Most of the time it's grammar.

7    Q.   No, no, no.  But actually when your report is

8    approved and you said you receive -- well, strike that.

9         What happens after your report is -- is

10   approved?  Are you notified in any way that your report

11   has been approved?

12   A.   When we don't get it back, we know it was

13   approved.

14   Q.   Thank you.

15        Oh, yeah, if you could just give that to the

16   court reporter.

17   A.   You want this back, too?

18        THE REPORTER:   I'll take that.  Thank you.

19   Q.   Now, I wanted to go back to something we had --

20   we had just touched on at the last deposition, and

21   that's the -- and if I'm saying this name incorrectly,

22   let me know -- the T      W        incident.

23   A.   Okay.

24   Q.   So can you tell me what took place at that

25   incident?

Page 178

1    A.    Allegedly some other inmates beat him up.

2    Q.    Which dorm did that -- did that occur?

3    A.    I believe they were in Fox dorm.

4    Q.    Were you on duty that night?

5    A.    I was.

6    Q.    And were you responsible for Fox dorm that --

7    that evening?

8    A.    I'm trying to -- I'm trying to get your

9    question right.

10        All deputies that's there is responsible for

11   all the dorms in that building.

12   Q.    Okay.  On -- on that evening was Fox dorm --

13   actually strike that.  Let's back up.

14        I -- I believe you testified last time that --

15   that it was you and one other deputy working that

16   evening?

17   A.    Brown.

18   Q.    And Jay -- is that Jay Brown?

19   A.    Uh-huh.

20   Q.    Okay.  And were you responsible for the dorm

21   rounds for Fox dorm on that evening?

22   A.    Both of us were.

23   Q.    When you came on shift, did -- did you and

24   Mr. Brown, Mr. Jay Brown, split up the assignments at

25   all?

Page 179

1      A.   We actually had three people when we came on

2   shift, and we did -- we split it up somewhat, yes.

3      Q.   And how -- how is it -- how is the dorms area

4   split up?

5      A.   I don't recall.

6      Q.   I think you testified that it -- that it's

7   typical when the deputies come on shift, they each take

8   certain dorms.  Is that correct?

9      A.   Sometimes we do.  That particular night there

10   was, for three hours, there was only two of us, and I

11   was actually visually observing Delta, Echo, and Fox.

12      Q.   Okay.  And then Jay Brown was responsible to

13   observe Alpha, Bravo, and Charlie?

14      A.   While our third person was gone, yes.

15      Q.   And so what alerted you to the fact that an

16   incident took place on this evening?

17      A.   I didn't know anything about an incident had

18   taken place until Mr. Brown took Mr. W.        . out of

19   his cell about 10:30, I believe it was, somewhere around

20   that time.

21      Q.   Why did Brown take W         out of his cell?

22      A.   On a particular dorm round, that he came to the

23   door and -- he either came to the door or Brown looked

24   in and saw something that didn't look right, so he

25   open -- had the door opened and -- and pulled him out of

Page 180

1    the cell.

2        Q.    Has Mr. Jay Brown ever informed you what didn't

3    look right when he was doing his dorm room round?

4        A.    I don't recall.  I'm sure he wrote a report.

5        Q.    Now, prior to Brown's dorm round around

6    approximately 10:30, did you conduct dorm rounds of Fox

7    dorm?

8        A.    I went in the dorm, yes.

9        Q.    Is that -- is going in the dorm different from

10   doing your dorm rounds?

11       A.    That is a dorm round when you go in the dorm.

12       Q.    Was the 10:30 p.m. dorm round the first dorm

13   round that Brown conducted in Fox dorm on that evening?

14       A.    I don't recall.

15       Q.    How many dorm rounds did you do on that evening

16   prior to 10:30 p.m. in Fox dorm?

17       A.    I don't recall.  I'd have to pull the logs and

18   see.

19       Q.    Oh, that's right, because there's -- there's a

20   log that you have to, what is it, write down or initial

21   each time you do a dorm round, and it identifies which

22   dorms you went into; is that correct?

23       A.    That's correct.

24       Q.    And just to refresh -- what does the dorm round

25   consist of again at this time, you know, in the --

Page 181

1   after --

2       A.    Going in the dorm.

3       Q.    After lockdown, what -- what does the dorm

4   round consist of?

5       A.    After lockdown it's -- it is considered inmates

6   observed.

7       Q.    Is -- is this the -- the time that I think you

8   testified that you eyeball each -- each juvenile in each

9   room?

10      A.    It is.

11      Q.    Now, lockdown begins at 9:00 p.m., right?

12      A.    It does.

13      Q.    Were these -- were these four juveniles on

14  lockdown prior to 9:00 p.m.?

15      A.    I believe they were briefed by the former shift

16  that they were on lockdown because of food fight.

17      Q.    Who informed you of that?

18      A.    Alpha shift.

19      Q.    Do you recall who specifically?

20      A.    They didn't actually inform me.  I was outside

21  getting the mop buckets done, and they informed the

22  other deputies of --

23      Q.    Do you --

24      A.    -- them being on lockdown.  I don't know who

25  they told.

Page 182

1    Q.    Was this a 24-hour or longer lockdown that the

2  three juveniles were on?

3    A.    I don't recall.  I didn't put them on lockdown.

4  I didn't have anything to do with the incident.

5    Q.    Were these four the only juveniles on lockdown

6  for a food fight that day?

7    A.    I believe so.

8    Q.    So were these four juveniles having a food

9  fight amongst each other?

10   A.    Sir, I wasn't there.  I don't know.  It

11 happened on day shift.

12   Q.    And so what happened after Brown removed

13 Mr. W          ?

14   A.    He went and took him to be examined by a nurse.

15   Q.    What did Mr. W____ look like after

16 Mr. Brown removed him from the cell?

17   A.    I didn't look at him.

18   Q.    Did you look at him at all that evening after

19 10:30 p.m.?

20   A.    I had nothing to do with the incident except

21 being on there that night and going in the dorm while

22 they were out.  And then I think I went in one time when

23 they were actually locked down.  I think I was hollered

24 at or something.  And I did not go up and look in that

25 thing, the cell, on that particular dorm round, inmates

Page 183

1   observe round.  Other than that, I wasn't involved in

2   this.  I never looked at the inmate.  So I can't tell

3   you.

4        Q.   Okay.  So Brown took W        to the nurse,

5   right?

6        A.   That's correct.

7        Q.   What happened -- what happened after W

8   saw the nurse?

9        A.   I just told you, I didn't have anything to do

10  with this incident or the inmate.  Brown took care of

11  this inmate.  Okay?

12       Q.   Well, was W         brought back to the -- to

13  the dorm area after seeing the nurse?

14       A.   I don't recall.  I don't know where he took

15  him.  I really don't remember.

16       Q.   And, now, can you tell me what you're referring

17  to when you testified that you -- you were going in the

18  dorm one time when lockdown, and you were hollered at

19  because you didn't look at that cell?  What -- what does

20  that refer to?

21       A.   On camera it shows me going in the dorm and not

22  going upstairs.  And I don't know why I didn't go

23  upstairs.  I don't know if I was interrupted.  I can't

24  tell you.

25       Q.   You watched the video of this?

Page 184

1    A.    I did.

2    Q.    And with -- with whom did you watch this video

3    with?

4    A.    The internal affairs investigator.

5    Q.    Who was that?

6    A.    Polk County Sheriff's Office.  I don't remember

7    his name.

8    Q.    How long after this incident did you view the

9    video with the internal affairs investigator?

10   A.    I don't recall.

11   Q.    What did the camera show you doing?

12   A.    Walking in the cell -- I mean walking in the

13   dorm, and stopping and turning around and -- and looked

14   at the bottom and didn't look at the top.

15   Q.    Okay.  So the video shows you walking into the

16   dayroom of Fox dorm?

17   A.    It does, it does.

18   Q.    Now, does the video show you eyeballing the

19   juveniles in each individual cell?

20   A.    I just said, on the bottom floor.  I did not go

21   upstairs.

22   Q.    Right.  But on -- on the bottom floor, are you

23   saying that the video shows you walking up to each

24   individual cell door on the bottom floor and --

25   A.    No, it does not.  It shows me going into the

Page 185

1    dayroom.

2         Q.    Hold on.   Let me finish the -- the question.

3         A.    Okay.

4         Q.    Does -- does the video show you walking up to

5    each cell door on the first floor and eyeballing each

6    juvenile?

7         A.    No, it does not.

8         Q.    Were there juveniles housed on the first floor

9    on that evening?

10        A.    Yes, there was.

11        Q.    So other than walking into the dayroom area,

12   does the video show you doing anything else?

13        A.    Not that I recall.

14        Q.    How long were you in the dayroom area?

15        A.    I don't recall.

16        Q.    How long did you spend in the dayroom area?

17        A.    I don't recall.

18        Q.    Did you do anything once you were in the

19   dayroom area?

20        A.    I observed the dorm and turned around and

21   walked back out.

22        Q.    What does the video show you did after you

23   turned and -- and left that dorm area, Fox dorm?

24        A.    It didn't show anything because it doesn't

25   record except in the dorm.

Page 186

1    Q.    Okay.  So after you turned out of Fox dorm, for

2    example, the video doesn't show you going to one of the

3    other dorms?

4    A.    No.

5    Q.    Does the logbook show that you conducted your

6    15-minute round for this instance?

7    A.    It does.

8    Q.    So the logbook reflects that you did the round

9    and -- bless you.

10    A.    The logbook refers to me observing inmates from

11    my desk, is what my logbook shows.

12    Q.    So the logbook doesn't show that you did

13    your -- your -- your round in the dorm area at that

14    time?

15    A.    Not every 15 minutes, no.

16    Q.    And which cell were the four juveniles that

17    we've been discussing housed?

18    A.    Best of my memory is Fox 8.

19    Q.    And where is that cell located?

20    A.    Upstairs.

21    Q.    Upstairs where?

22    A.    On the right side.

23    Q.    On the right side where?

24    A.    On the right side upstairs.  You can only go

25    left or right.  It's -- it's on that end.