Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, as guardian and
on behalf of J.B., a minor;
BRENDA SHEFFIELD, as guardian
and on behalf of J.D., a minor;
FRANKY JEAN-PIERRE; MICHELLE
MINOR, as guardian and on behalf
of J.P., a minor; LISA JOBE, as
guardian and on behalf of K.J.,
a minor; AMY GAGE, as guardian
and on behalf of B.G., a minor;
CRYSTAL CUYLER, as guardian and
on behalf of D.M., a minor;
NIKETYA MATTHEWS, as guardian
and on behalf of K.G., a minor;
and ANITA NAVA, as guardian and
on behalf of A.H., a minor; on
behalf of themselves and all
others similarly situated,

Case No.:
8:12-cv-00568-SDM-MAP

**CERTIFIED COPY**

       Plaintiffs,

vs.

GRADY JUDD, Polk County Sheriff,
in his official capacity, and
CORIZON HEALTH, INC.,

       Defendants.
_____/

VIDEOTAPED DEPOSITION OF ANDREW HERTEL

Taken on Behalf of the Plaintiffs

Stenographically Reported by:
Donna L. Peterson, RDR, CRR
August 1, 2012

Page 6

1    Q.   She also can't take down both of us speaking at

2    the same time.  So I'd ask that you let me finish my

3    question before you answer it so we're not talking over

4    each other.  All right?

5    A.   Yes.

6    Q.   Okay.  During the course of the deposition,

7    counsel for Sheriff Judd or counsel for Corizon may

8    raise objections.  That's for the Court to resolve at a

9    later date.  Let them make their objection and then,

10   unless you're instructed otherwise, answer the question

11   that I've asked as best you can.  Okay?

12   A.   Yes.

13   Q.   If for any reason you don't understand any of

14   my questions or you -- you're not sure if you heard it

15   right, I'm happy to rephrase it or repeat it.  So,

16   please, I'm going to assume you understand my questions.

17   All right?

18   A.   Yes.

19   Q.   Have you ever testified in court before?

20   A.   Yes.

21   Q.   On how many occasions?

22   A.   Once.

23   Q.   When was that?

24   A.   That was last month, I believe.

25   Q.   And what was the occasion of that?

Page 7

 1    A.    That was the J‾‾‾   It had to do with the
 2  P(‾‾‾‾‾  fight.  It was D‾‾  J‾‾‾
 3    Q.    The J‾‾‾ -- the fight involving
 4  J‾‾  P(‾‾‾‾  ]?
 5    A.    Right.
 6    Q.    And that was in January of this year?
 7    A.    Right.
 8    Q.    That was the -- and that was in the juvenile
 9  dorms; is that right?
10    A.    Right.
11    Q.    Okay.  We'll talk a little bit more about that.
12          That -- was that the fight in which charges
13  were brought about a month after the fight?
14    A.    Right.
15    Q.    Okay.  And you testified on behalf of the
16  prosecution?
17    A.    Right.
18    Q.    For -- for which defendant?
19    A.    It was battery charges on Jones against
20  Patterson.
21    Q.    Okay.  Other than that, have you ever testified
22  before in court?
23    A.    No, sir.
24    Q.    Have you ever been a plaintiff or a defendant
25  in a lawsuit?

1          And Christian is the 19-year-old.   Okay.

2          What's the highest level of education that

3     you've obtained?

4     A.    I have an associate's degree.

5     Q.    And you received that at Kaiser; is that right?

6     A.    Right.

7     Q.    And you received that while you were employed

8     at the jail?

9     A.    Right.

10    Q.    Was the associate's degree in a particular

11    area?

12    A.    Business administration.

13    Q.    And when did you receive that?

14    A.    2008, I believe.

15    Q.    Have you attended any additional education

16    after the associate's degree?

17    A.    Other than job related?

18    Q.    First let's talk about any formal education

19    besides the associate's degree.

20    A.    No.

21    Q.    Okay.   Second, do you have -- do you have any

22    certificates or licenses?

23    A.    What do you mean?

24    Q.    Well --

25    A.    I mean, I have my certificate for standards.

Page 21

1      Q.   What is your certificate for standards?

2      A.   For correction standards.

3      Q.   So it's called a "Certificate for Correctional

4  Standards"?

5      A.   I can't recall the exact name of it.  We get it

6  from the State after we pass the state exam.

7      Q.   Okay.  And when did you pass the state exam for

8  correctional standards?

9      A.   It would be January 1994.

10     Q.   Have you ever been convicted of a crime?

11     A.   No.

12     Q.   Have you ever -- have you ever been arrested?

13     A.   No.

14     Q.   When did you start working at Polk County

15  Sheriff's Office?

16     A.   In September 1993.

17     Q.   What was the position you started at?

18     A.   The corrections officer trainee.

19     Q.   And where were you located at that time?

20     A.   Central County Jail.

21     Q.   And when did you become a correctional officer?

22     A.   Be January of '94.

23     Q.   So there's -- there's a one-year trainee or

24  probation period; is that correct?

25     A.   Right.

Page 22

1    Q.    And your title was corrections officer; is that

2    right?

3    A.    Correctional law servants, when I started, what

4    we were called.

5    Q.    Okay.  And what unit were you assigned to?

6    A.    The Central County Jail.

7    Q.    Yeah.  Where at the Central County Jail?

8    A.    The housing.

9    Q.    Okay.  Were you assigned to a particular

10   platoon?

11   A.    It was the Bravo platoon at the time.

12   Q.    And the Bravo platoon is a -- is a day shift;

13   is that right?

14   A.    Well, back then we rotated night and day every

15   28 days.

16   Q.    That's right.

17         And are you still in the Bravo platoon?

18   A.    The platoon I'm on is called Bravo platoon, but

19   it's the -- everything has changed since then.

20   Q.    Okay.  Why don't I -- why don't we just go

21   through the -- the change or transformation.

22         In 1994 you were -- you were made a

23   correctional officer after a year of probation, correct,

24   or training?

25   A.    Right.

Page 23

1      Q.    Okay.  And at that time you were with the Bravo

2    platoon, correct?

3      A.    Correct.

4      Q.    Okay.  And how long did you stay as a

5    correctional officer with the Bravo platoon?

6      A.    I can't recall.  I'd have to look at my -- my

7    personnel file.

8      Q.    And you indicated that you were assigned to

9    housing.  Were you assigned to a particular building?

10     A.    No.

11     Q.    What were your responsibilities in 1994 as a

12    correctional officer?

13     A.    Same as they are now, care, custody, and

14    control.

15     Q.    At any point in time did your responsibilities

16    change or your position change?

17     A.    No.  I've always been in housing.

18     Q.    Okay.  So from -- who was your immediate

19    supervisor in 1994?

20     A.    It would have been Lieutenant Decomeau at the

21    time.

22     Q.    Okay.  And there's a -- the lieutenant.  And

23    then if you were a detention deputy, you would have --

24    your immediate supervisor would be a sergeant, correct?

25     A.    Right.  I can't recall who the sergeants were

Page 26

1     1993, January 1993 until January 1994, correct?

2          A.   I'm not sure the exact dates, but that sounds

3     about right.

4          Q.   Okay.  And then from 1994 you were at Polk

5     Central County Jail, correct?

6          A.   Probably.

7          Q.   All right.

8          A.   Because there was some time that I transferred

9     to the old jail, and I can't remember that date.

10         Q.   Okay.  How many -- can you tell me

11    approximately how many -- how much time you were at

12    Central County Jail before being transferred to the old

13    jail?

14         A.   It was approximately a year.

15         Q.   Okay.  And then you were at the old jail.  When

16    you say the "old jail," what jail do you mean?  Do you

17    mean the jail in Bartow?

18         A.   Right.

19         Q.   In downtown Bartow?

20         A.   Right.

21         Q.   And how long were you at the old jail?

22         A.   I'd have to look.  I was -- I've been there a

23    few times.

24         Q.   Okay.  Approximately how long that first stint

25    were you at the old jail?

Page 27

1       A.    About a year.

2       Q.    And what were your job responsibilities at the

3    old jail?

4       A.    The same as at the Central County Jail, care

5    custody, control, and housing.

6       Q.    Did you have any contact with direct-files at

7    the old jail?

8       A.    Yes.

9       Q.    Okay.  Is that because the -- the direct-file

10   youth were located at the old jail?

11      A.    Right.

12      Q.    Okay.  So during that period, you had more

13   opportunities to interact with the direct-file youths

14   because that's actually where they were housed --

15      A.    Correct.

16      Q.    -- right?

17            And how long were you there for that first

18   period at the old jail?

19      A.    About a year.

20      Q.    During that year, were you assigned to dorms

21   for direct-files?

22      A.    The old jail is set up different, so.

23      Q.    How was it set up?

24      A.    There is hallways, pretty much.

25      Q.    Were the direct-file youth housed in the same

Page 28

1   areas as the adults?

2       A.   No.   They were kept separate by sight and

3   sound.

4       Q.   Okay.   So -- and would the -- did the

5   correctional officers that were assigned the

6   direct-files, would they also work with the adults?

7       A.   I can't recall, it's been so long.   I can't

8   recall.

9       Q.   I mean, when you were assigned to direct-files,

10  would you also, on the next shift, be working with

11  adults?   Is that how it worked?

12      A.   Right.

13      Q.   Okay.   So you -- each day you -- you worked on

14  a different unit?

15      A.   We could.   I mean, it was possible, yeah.   I

16  mean, we could work the same unit a couple days in a row

17  or it might be different unit.

18      Q.   Okay.   There was no attempt at that point in

19  time to segregate the deputies that were working with

20  direct-file youth from deputies that were working with

21  adults?

22      A.   No, not that I recall.

23      Q.   So on occasion you'd be assigned to the unit

24  that held -- that housed the direct-file youth?

25      A.   Right.

Page 31

1     Q.    How does -- how does it work?

2     A.    You go for interview, and they decide from the

3   interview.

4     Q.    So you were at -- you were at South County Jail

5   from 2000 to 2008.  And then did you get transferred

6   again in 2008?

7     A.    I bid for Central.

8     Q.    And you got it, correct?

9     A.    Correct.

10     Q.    Okay.  And have you been at Central since 2008?

11     A.    Correct.

12     Q.    And you indicated that your responsibilities

13   are care, custody, and control.  What -- what do you

14   mean by care, custody, and control?

15     A.    We make sure that they have what they need each

16   day.  We keep custody, have the -- maintain them in the

17   jail, make sure they don't escape.  And we have the --

18   the controlled behavior we need to.

19     Q.    So you make sure they have what they need, you

20   prevent escape, and you control behavior if you have

21   to --

22     A.    Correct.

23     Q.    -- is that right?

24         Is there anything else that you do?

25         MR. TROHN:  Object to the form of the question.

Page 33

1          Is there anything else that falls within care,

2     custody, and control?

3          MR. TROHN:  Object to form of the question.

4     A.    And there's, I mean, medical treatment, and

5     that falls under the care.

6     Q.    Okay.  Do you provide medical treatment?

7     A.    No, I don't provide medical treatment.

8     Q.    Do you have any involvement whatsoever in --

9     with regard to the medical care of the inmates?

10    A.    Only making sure that if they need to get the

11    medical that they get the medical.

12    Q.    Okay.  And how do you do that?  How do you make

13    sure they get the medical?

14    A.    If I see that there's some -- that -- if I see

15    that somebody needs medical attention, I will get them

16    to the nurse.  If they need a sick call slip for a

17    general medical complaint, then I make sure they get a

18    sick call slip.

19    Q.    Okay.  Have you been given any training with

20    regard to adolescent mental health?

21    A.    We've had a 40-hour block of training, and I

22    know that that was included.

23         THE VIDEOGRAPHER:  Mr. Hayden, you knocked your

24         microphone off.

25         MR. HAYDEN:  Thank you.

Page 34

1    Q.   Okay.  Besides medical treatment, is there

2  anything else that falls within care, custody, and

3  control as -- as you've described it?

4    A.   There's making sure they get their meals.

5    Q.   Okay.  Anything else?

6    A.   There's patrols.

7    Q.   Okay.  And patrols would be to preserve -- or

8  to prevent escapes and to protect the inmates, right?

9    A.   Correct.

10    Q.   Anything else that would fall within the term

11  you used, care, custody, and control?

12        MR. TROHN:   Object to form of the question.

13    A.   Well, it all depends on the day, what might

14  come up.

15    Q.   Okay.

16    A.   I mean, I can't think of anything specific but,

17  I mean, that's the basics.

18    Q.   Those are the basics.  I mean, you're -- it's a

19  term you used about ten times, so that's why I want to

20  understand what it is.

21    A.   Yes.

22    Q.   Okay.  So those are the basics of what you

23  understand to be care, custody, and control; is that

24  right?

25    A.   Correct.

Page 40

1      A.    It was on -- I'd have to check, but I believe

2    it was on our days off, we had to come in a few days a

3    week.

4      Q.    And how long were the class days?

5      A.    Eight hours.

6      Q.    So it was five eight-hour days of training?

7      A.    Correct.

8      Q.    Other than Sergeant Neally, were there any

9    other trainers involved?

10     A.    I remember Derek Zimmerman came in to talk

11   about mental health.  And other than that, I -- I can't

12   recall.

13          Oh, I know a lady from DJJ came to show us the

14   computer system, Keira.  And I know there was a couple

15   other people in there, but I can't recall their names.

16     Q.    Okay.  First I'm going to ask you:  What other

17   deputies were in your training session?

18     A.    There -- I mean, I can't recall names, but I

19   know there was the people that I'm working with

20   currently.

21     Q.    Who is that?

22     A.    That would be Deputy Choquette, Gay, Franklin,

23   and Sanders.  I know for a fact they were there.  And

24   then there was others.  I can't recall names.

25     Q.    Okay.  So Choquette, Gay, Franklin, Sanders.

Page 41

1   Did I miss anyone?

2       A.   No.   That's everybody that's on my shift that I

3   can recall.

4       Q.   Okay.   And besides Sergeant Neally, you recall

5   Derek Zimmerman talking on mental health?

6       A.   Right.

7       Q.   And you recall a woman named Keira from DJJ

8   talking about the computer system?

9       A.   Right.

10      Q.   Okay.   And what did Derek Zimmerman --

11  Derek Zimmerman is a physician that's affiliated with

12  the jail?

13      A.   I'm --

14           MR. VAZQUEZ:   Objection; form.

15      A.   -- not sure his credentials, but he's over

16  mental health.

17      Q.   Okay.   Who -- who -- who is -- who is he?

18      A.   Derek Zimmerman?

19      Q.   Yeah.

20      A.   He is the -- over mental health.

21      Q.   For -- for what facility?

22      A.   I believe he does the whole jail facility.

23      Q.   Okay.   So it would be not only for the Central

24  County Jail but for the South County Jail?

25      A.   I believe so.   I couldn't tell you for certain.

Page 42

1    Q.   Do you know if he's a medical doctor?

2    A.   I don't know his credentials.

3    Q.   Do you know if he's employed by the county or

4 the sheriff's office?

5    A.   He's employed by Corizon.

6    Q.   All right.  How long did he speak to you on

7 mental health?

8    A.   I can't recall the time frame.  It was a few

9 hours.

10    Q.   Were you -- were you trained in any different

11 methods for de-escalation of conflicts with juveniles?

12    A.   We were trained to try to talk to them.

13    Q.   How were you trained to try to talk to them?

14    A.   We just talk, try to talk them down,

15 de-escalate.

16    Q.   What techniques were you trained -- what types

17 of talking were you told about?

18    A.   Just -- just verbalizing.  Just be more

19 understanding, take more time than we would with an

20 adult.

21    Q.   Did they indicate why you should take more time

22 with children than adults?

23    A.   Because they're more -- how would you say?

24 Don't think things through, more spontaneous.

25    Q.   Would you agree that there is differences

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 45

1   family members hurt or -- or killed would affect a

2   child?

3       A.    I've never experienced that, so.

4       Q.    How about physical or sexual abuse, how that

5   would affect a child?

6       A.    I'm sure it would affect a child.

7       Q.    And -- and how do -- are you aware of the fact

8   that some of the children that are detained at Polk

9   Central have mental health issues?

10      A.    Yes.

11      Q.    Okay.  How -- how would their mental health

12  issues affect their ability to react to orders?

13          MR. VAZQUEZ:  Objection to form.

14          MR. TROHN:  Object.

15          MR. VAZQUEZ:  And I'll state a standing

16      objection regarding mental health issues, or any

17      medical issues, for that matter.

18          MR. TROHN:  Object to the form of the question.

19      A.    I wouldn't be sure.

20      Q.    Are you aware of the fact that some of the

21  children are on psychiatric or psychotropic medicines?

22      A.    I can't say specifically, but I would imagine

23  some of them are.

24      Q.    Well, would they be -- or you're not aware that

25  they are actually on some medications?

Page 46

1    A.    I don't know anything about medications.  I

2    know people take medications there, but I don't know

3    what the medication is.

4    Q.    You're not involved in any way, shape, or form

5    in the administration of the medications?

6    A.    Not the administration.  I'm just there to

7    provide security for the nurse while she hands out

8    medication.

9    Q.    Okay.  So you walk around with the nurse when

10   she hands out the medications?

11   A.    Right.

12   Q.    Are the children that are housed in the dorms

13   that you work in, are they any different than the

14   children in Polk County?

15       MR. TROHN:  Object to the form of the question.

16   A.    I don't know what you mean by that.

17   Q.    Do you -- do you -- okay.  You've -- you

18   work --

19       You have two children in Polk County, correct?

20   A.    Right.

21   Q.    And they probably go to high school, or I think

22   one of them is probably in junior college?

23   A.    They graduated.

24   Q.    They both graduated from high school, but they

25   were -- they were both through the local high schools?

Page 47

1      A.   Right.

2      Q.   Okay.  So you've worked -- you've seen or

3  interacted with teenagers in Polk County?

4      A.   Right.

5      Q.   Outside of -- and you've interacted with them

6  outside of the jail, correct?

7      A.   Correct.

8      Q.   Okay.  Now, you've also interacted with

9  teenagers in the jail, correct?

10     A.   Correct.

11     Q.   Okay.  Are -- do you see any differences

12 between the children that are -- that you've interacted

13 with outside the jail from the children that you've

14 interacted with in the jail?

15     MR. TROHN:  Object to form of the question.

16     A.   There is -- I mean, it's hard to say because

17 my -- it's not hard to get in jail, and they could be --

18 I mean, people go in for mistakes.  So, I mean, any one

19 of my sons' friends could end up in jail for

20 something -- for a mistake.  I mean, it's -- it's hard

21 to say.  I mean, kids are kids.

22     Q.   Right.  So the -- but I guess what I'm asking

23 you is:  Are the -- the children that you work -- work

24 with on a daily basis at your job, are they -- do you

25 see them any differently than the children that you

Page 48

1    interact with outside of work?

2         MR. TROHN:  Object to the form of the question.

3         A.   I treat everybody -- are you talking about the

4    way I treat them?  I don't treat them any differently.

5    I don't see them any differently than -- I mean, I try

6    to -- I'm objective.

7         Q.   Okay.  And actually these -- with the -- the

8    pre-adjudicated youth, those are youths that have not

9    yet been convicted of a crime?

10        A.   Well, they've been convicted of juvenile crimes

11   but not adult crimes.

12        Q.   Is that your understanding --

13        A.   Some of them.

14        Q.   -- that they have been convicted of juvenile

15   crimes?

16        A.   Well, some of them have.  Not all of them.

17        Q.   Okay.  So where did you -- where -- so your

18   understanding is that they are in -- they're being

19   housed in the Polk jail -- county jail, Central County

20   Jail, because they have been convicted of juvenile

21   crimes?

22        MR. TROHN:  Object to the form of the question.

23        A.   They're not being housed -- they're being --

24   it's a hold -- holding facility.  They're waiting to go

25   to a program or they're waiting to go to court to be

Page 49

1  sentenced to a program.

2     Q.   Or they've been charged and they're waiting for

3  a hearing?

4     A.   Right.

5     Q.   Okay.  And in that case where there has --

6  there hasn't been a hearing yet, they haven't yet been

7  convicted of a crime, have they?

8     A.   If it's their first time, right.

9     Q.   Okay.  If it's their second time, should they

10 be treated differently?

11    A.   No, they're not.

12    Q.   Okay.  So everyone is treated the same?

13    A.   Correct.

14    Q.   And if it was one of your children's friends

15 that was in jail, you'd treat them the same as you would

16 a -- or a child who you had seen multiple times in the

17 jail for -- for juvenile offenses, correct?

18    A.   Correct.

19    Q.   Okay.

20         MR. TROHN:  Whenever you want to take a break,

21    Don.  Let me know when you're at a stopping point.

22         MR. HAYDEN:  Okay.

23    Q.   And so just so I'm -- just so I understand,

24 would you -- would you treat the children that you're

25 working with in the dorms at the Polk Central County

Page 50

1    Jail the same as you treat your sons' friends when they
2    were teenagers in high school?
3         MR. TROHN:  Object to the form of the question
4    as asked and answered.  It's terribly overbroad.
5         But if you have --
6    A.   I don't treat anybody any differently.
7    Q.   Do you notice similar behaviors among the
8    teenagers in the jail from -- and with the behaviors
9    that you saw with your teenage sons' friends when they
10   were teenagers?
11   A.   Not necessarily.  They weren't apt to fight.
12   Q.   Okay.  When you say "they weren't apt to
13   fight," you're saying that your sons' friends weren't
14   apt to fight?
15   A.   I've never known them to be in a fight.
16   Q.   Okay.
17   A.   Whereas not all the kids in the jail are apt to
18   fight either.  But it's -- I mean.
19   Q.   So I want to understand.  When you said, "They
20   weren't apt to fight," do you mean that the kids that
21   are housed at Polk Central are apt to fight?
22   A.   Some of them, not all of them.
23   Q.   And -- and are there particular individuals
24   that are apt to fight?
25   A.   What do you mean?

Page 51

1      Q.   Well, you said some are, not all of them.

2   Are -- can you give me names of particular individuals

3   that are apt to fight that you've --

4      A.   Not off the top of my head I can't.

5      Q.   How about the kids that fought with

6   J[___    P[_____] that you went to -- to court about last

7   month, were those individuals that were apt to fight?

8      A.   I couldn't tell you.  I'm sure a couple of them

9   were, and you got your leaders and your followers.

10     Q.   Okay.  You're been -- you've been assigned to

11  the juvenile dorms since -- you said since October of

12  last year; is that right?

13     A.   Correct.

14     Q.   Okay.  So in the ten-month period that you've

15  been working there, are there particular leaders that

16  you've seen who were apt to fight?

17     A.   There's been some.  I can't recall names.

18     Q.   You can't recall names as you sit here today,

19  none of them.  Okay.

20          MR. HAYDEN:  Why don't we take a break.

21          THE VIDEOGRAPHER:  We're off the video record.

22          (Recess from 10:13 a.m. until 10:30 a.m.)

23          THE VIDEOGRAPHER:  We are back on the video

24      record.

25  BY MR. HAYDEN:

Page 52

1      Q.    Okay.   Mr. Hertel, you indicated you're on the

2    Bravo -- you're in the Bravo platoon and you're on the

3    day shift, correct?

4      A.    Correct.

5      Q.    Okay.   When does your day start?

6      A.    With briefing starts at 5:45.

7      Q.    Okay.

8      A.    a.m.

9      Q.    And what does that involve?

10     A.    It's -- would be some briefing training, talk

11   about what happened on the night shift or other shift

12   business that needs to be taken care of.

13     Q.    Oh, do you meet with the detention deputies for

14   the juvenile dorms that were assigned to the prior night

15   shift?

16     A.    When we go to the building we do.

17     Q.    And that's -- is that during this 5:45 --

18     A.    No.   That's after that.

19     Q.    Okay.   At this 5:45 briefing, who -- who runs

20   the briefing?

21     A.    The supervisors, the lieutenant and the

22   sergeant.

23     Q.    And who are the lieutenant and sergeant for

24   your -- lieutenants and sergeants for your platoon?

25     A.    Lieutenant Borders, Sergeant Kemp, and

Page 53

1    Sergeant Robinson.

2         Q.   And of the -- those lieutenants and sergeants,

3    which of them are trained to work with juveniles?

4         A.   All three of them.

5         Q.   Okay.  So after the briefing -- and the

6    briefing occurs in the main building?

7         A.   Correct.

8         Q.   Okay.  And then you go to Building 3 after

9    that?

10        A.   Correct.

11        Q.   And what do you do when you get to Building 3?

12   What's the first thing you do?

13        A.   Well, they let us know of any -- anything that

14   happened the night before, and then --

15        Q.   And what --

16        A.   -- then we go do our head count and check

17   everybody.

18        Q.   And when you say they, "they" let you know what

19   happened the night before, you're talking about the

20   detention deputies from the prior shift?

21        A.   Correct.

22        Q.   Okay.  Are all -- how many -- how many

23   detention deputies are on the night shift?

24        A.   I can't recall.  I know at times there's three

25   or four when we get down there.

Page 54

1     Q.    Do all -- all of the detention deputies that

2  were on the prior shift stay until you arrive at the

3  unit, or do only some of them?

4     A.    I haven't -- I don't know.

5     Q.    Okay.  How many are there when -- usually, when

6  you arrive?

7     A.    Between three and four.

8     Q.    And do you discuss what happened the prior

9  shift?

10     A.    Correct.

11     Q.    Do you -- are you aware of something called a

12  pass-down log?

13     A.    Yes.

14     Q.    Did I use the right terminology?  Is it that?

15     A.    Pass-down log.

16     Q.    What is that?

17     A.    That's where anything significant is written

18  for the night before or shift before.

19     Q.    And where is that kept?

20     A.    In the control room.

21     Q.    Do you go through the pass-down log with the --

22  the officers from the prior shift?

23     A.    No.

24     Q.    Okay.  If there was a protective action that

25  occurred the night before, would you be advised of that

Page 55

1    at the time?

2        A.    Yes, usually.

3        Q.    If someone was placed on suicide watch, would

4    you be advised of that?

5        A.    Yes, you would.

6        Q.    And what instances -- you say usually.  Are

7    there occasions where you might not be advised of that?

8        A.    Everybody is human.  They might forget to

9    mention something, and so everything is in the pass-down

10   log.

11       Q.    Okay.  If it -- yeah, if it wasn't -- if you

12   weren't advised of it, you would assume that it would be

13   in the pass-down log, correct?

14       A.    Correct, correct.

15       Q.    Okay.  And -- and would it be fair to say that

16   it is standard protocol to advise the -- the deputies

17   that are coming on shift of any situations like a

18   protective action or a suicide watch?

19       A.    Yes.

20       Q.    And how many detention deputies are assigned to

21   Building 3 during the day shift?

22       A.    It was four of us.

23       Q.    And where are you -- where are you situated?

24       A.    What do you mean?

25       Q.    Where are you stationed?

Page 56

1    A.   It's usually two of us on the pre-adjudicated

2    side and two on the direct-file side.

3    Q.   Are you assigned to a -- are -- are you -- have

4    you -- are you assigned to a particular side,

5    pre-adjudicated or direct-file?

6    A.   No.  I usually work either/or.

7    Q.   Okay.  And it changes from day to day?

8    A.   It can..  Usually you got people like to work a

9    certain side and they'll usually go to that side.  I

10   have no preference, so I'll go to wherever I need to go.

11   Q.   Okay.  Now, are you assigned to a particular

12   side for an entire shift, or do you move around?

13   A.   We move around.  I mean, we're not just

14   solely -- I mean, if something happens on the other

15   side, we're not barred from going and -- I mean, it's --

16   we're there for each other.  We're there for the whole

17   building.  But we primarily take care of the one side

18   that we're on.

19   Q.   Okay.  And just -- just so I understand, it's

20   my understanding that dorms A, B, C are the

21   pre-adjudicated youth and D, E, and F are for the

22   direct-file youth?

23   A.   Correct.

24   Q.   Okay.  Now, where you say you rotate around, I

25   do understand if there was a need to go -- if you were

Page 57

1    with the pre-adjudicated youth to -- and there was a

2    need for you to go over and assist with the direct-file

3    youths.  But are you formally assigned to a particular

4    side for your shift?

5        A.   No.

6        Q.   Okay.  So how is it that you decide who is

7    going to be on the -- with the direct-file and who is

8    going to be with the pre-adjudicated youth?

9        A.   Usually I know Mr. Gay always likes to go on

10   the direct-file side.  So he goes there, and

11   Mr. Choquette will usually go to the pre-adjudicated

12   side.  I go where I'm needed, because there's got to be

13   two on the pre-adjudicated side at all times.

14       Q.   Okay.  And on the pre-adjudicated side,

15   where -- if there's two of you, where do you station

16   yourselves?

17       A.   Well, there's a desk that's our primary, and

18   then we walk -- are constantly walking around the three

19   dorms.

20       Q.   Okay.  When you start -- or when you start your

21   shift, have the -- are the children already awake?

22       A.   No.  They're asleep.

23       Q.   When do you wake the -- the children?

24       A.   They usually start their school at 7:15, so we

25   usually start trying to get them up around 6:00, 6:50,

Page 59

1    programming on the television.

2         Q.   Now, I understand there's no TVs in the -- in

3    the dayrooms; is that right?

4         A.   Right.

5         Q.   Okay.  Is it -- so there's six new TVs?

6         A.   There's two in each dorm, so that would be 12.

7         Q.   Okay.  Two in each dorm, so there's 12?

8         A.   Right.

9         Q.   And they're big 20-inch screens?

10        A.   I'm not sure of the size.  They put them in --

11   the day they put them in, I went on vacation the next

12   day.  I haven't been back since, so.

13        Q.   Okay.  Oh, you haven't been back since the day

14   they put them in?

15        A.   Right.

16        Q.   Okay.  So you don't know if things have changed

17   at all in the dorms?

18        A.   I don't know.

19        Q.   So the -- the children in the -- let's talk

20   about the pre-adjudicated youth.

21             The pre-adjudicated youth, they are at school

22   for how long?

23        A.   Well, they've got a summer schedule, and

24   they're up -- there -- most of the day.  I can't

25   remember the hours.  And then there's a regular school

Page 60

1    schedule where it's broken up throughout the day.

2        Q.    So how long is the summer schedule?

3        A.    It goes until about 2:30.  They go -- now, I

4    can't remember the exact time, but they go during the

5    morning, they come back for lunch, then they go back

6    after lunch until around 2:30, and then they come back

7    to the dorm.

8        Q.    Okay.  And then during the fall schedule

9    what -- does the school schedule change?

10       A.    For the regular school schedule?

11       Q.    Yeah.

12       A.    Yes.

13       Q.    What's the regular school schedule?

14       A.    There's a group that goes up in the morning.  I

15   think it -- I can't remember exactly if it's the older

16   kids or the younger kids.  But a group goes up in the

17   morning, and while they're at school, the other group

18   goes to recreation.  And then they switch, and the group

19   that's at class comes back and goes out to recreation,

20   and that group goes up.  And then the group that's down

21   at recreation, they go up to the classroom, and then

22   they're all up there until lunch.  And then they come

23   back to the dorm for lunch, and then after lunch they go

24   back up to the classroom until about 2:15, I believe.

25       Q.    Till 2:15?

Page 61

1      A.   Right around there.

2      Q.   And then after 2:15, what do they do?

3      A.   They come back to the dorm.   And then if we

4   have their laundry back, everybody takes showers.

5      Q.   So they take showers in the afternoon?

6      A.   If we have their laundry back, we'll try to get

7   their showers done.   If not, the night shift does them.

8      Q.   Okay.   And other than the taking showers, are

9   they sitting in the dayrooms?

10     A.   Usually, yeah.

11     Q.   Okay.   And you -- going back to you said

12  certain -- if the kids refuse to go to their class, to

13  the classroom, you said that they sit in the dayroom; is

14  that right?

15     A.   Right.

16     Q.   Okay.   If they refuse -- has there ever been

17  any instances where if they refuse to go to school

18  they're put into the transfer cage?

19     A.   No, not that I can recall.

20     Q.   Okay.   Have the children ever been disciplined

21  for not going to school?

22     A.   No.

23     Q.   Okay.   Now, you -- you've -- we've talked about

24  waking them up between 6:50 and 7:00 and then getting

25  them to school about 7:15, correct?

Page 63

1    shift to do, right?

2        A.    Right.

3        Q.    So you just serve them lunch?

4        A.    Right.

5        Q.    Right?

6        A.    And supper.

7        Q.    And -- and you'd serve them supper.  What time

8    is supper at?

9        A.    4:30.

10       Q.    And at by 4:30 do you usually have their

11   showers done?

12       A.    We try to.  If we have -- like I said, if the

13   laundry has their uniforms and laundry back on time, you

14   know, around 2:00 o'clock, we try to get all that stuff

15   done.

16       Q.    Okay.  It's somewhat dependent if the laundry

17   is back or not?

18       A.    Right.

19       Q.    Okay.  Now, we talked about recreation.

20             With regard to recreation, what -- where do the

21   kids go for recreation?

22       A.    To the rec yard.

23       Q.    And how much time -- and the rec area is -- my

24   understanding is it's a -- it's a walled-in field with

25   an asphalt pad?

Page 64

1    A.    No.

2    Q.    Okay.   What's your understanding of where the

3    rec area is?

4    A.    It's fenced, with a screen around the fence.

5    There's a concrete pad, and around the concrete pad

6    there's grass.

7    Q.    Is there anywhere to sit?

8    A.    There's benches.

9    Q.    Other than sitting, what else is there -- is

10   there -- do you provide them with any athletic

11   equipment?

12   A.    They -- there's footballs and, like, I guess

13   you could call them kick balls, bouncy balls.

14   Q.    Okay.   Kick balls.   Are there was basketballs?

15   A.    No.

16   Q.    Because there's no basketball hoops, right?

17   A.    Right.

18   Q.    Those were taken down?

19   A.    Right.

20   Q.    And with regard to footballs, are those Nerf

21   footballs?

22   A.    Yes.

23   Q.    Okay.   And how long are the children out there?

24   A.    Approximately an hour.

25   Q.    And that's every day?

Page 74

1   Q.   Okay.  And are -- of the detention deputies

2   that are on your shift, is any particular deputy

3   assigned to -- to patrol the isolation cells?

4   A.   That would depend if there's anybody in there

5   and who they are.

6   Q.   How often are people in isolation cells?

7   A.   It varies.  I know before I left, there wasn't

8   anybody in there for weeks, before I left on vacation.

9   Q.   Okay.  Are you aware of the fact that there are

10  some that -- there -- that some of the youth have been

11  kept in isolation cells for more than two months?

12       MR. TROHN:  Object to the form of the question.

13  A.   I'm not aware of that.

14  Q.   Okay.  Are you aware of -- of youths -- what's

15  the longest you're aware of youth being detained in

16  isolation cells?

17  A.   I couldn't speculate on that.

18  Q.   More than a --

19  A.   I'd have to --

20  Q.   More than a week?

21  A.   I have no idea.  I'd have to look at detention

22  records.

23  Q.   Now, do you carry a cell phone when you're on

24  your shift?

25  A.   Sometimes.

Page 79

1   supposed to have more than one detention deputy in the

2   control room at any one time?

3        A.   No.

4        Q.   Okay.  So it -- it's just not common because

5   it's not often that there's two of you doing your

6   reports at the same time?

7        A.   Right.  We like to try and be out and keep an

8   eye on the kids.

9        Q.   Okay.  Now, if -- if in fact there is one of

10  the kids on a suicide watch, is then one of the

11  detention deputies on your shift assigned to watch that

12  child?

13       A.   What do you mean by "suicide watch"?  Because

14  the only term we use for suicide watch is for the

15  direct-files.

16       Q.   Okay.  Let's -- let's talk about that, then.

17            Suicide watch is only for the direct-files?

18       A.   Right.

19       Q.   Okay.  And when a -- somebody, a direct-file,

20  is on suicide watch, what do you do with them?

21       A.   If there is one of them, we take everything out

22  of their cell and we set in front of the cell with them.

23       Q.   Okay.  So if they have roommates, you move the

24  roommates out?

25       A.   Right.

Page 80

1     Q.    And you remove all of their personal items?

2     A.    Anything that they might be able to hurt

3  themselves with, yes.

4     Q.    Okay.  Do you make them put on a suicide smock?

5     A.    Yes.

6     Q.    What else do you do?

7     A.    What do you mean?

8     Q.    Do you give -- are they allowed to -- do you

9  ever put them in the transfer cages?

10     A.    No.

11     Q.    You've never put anyone in a transfer cage?

12     A.    Only if they're waiting to see medical.

13     Q.    Okay.  So it's not common practice to put

14  someone in the transfer cage for suicide watch?

15     A.    No.  It's not a housing area.

16     Q.    So they'd only be sitting in the transfer cage

17  if they're waiting for medical?

18     A.    Right.

19     Q.    Okay.  Have you ever -- has there ever been an

20  instance where someone has sat in the transfer cage in a

21  suicide smock for more than an hour or two?

22     A.    Not that I'm aware of.  I mean, I'm not

23  saying -- like I said, I can't talk for any other

24  shifts, but my shift, no.

25     Q.    And -- and just so I understand, these transfer

Page 81

1   cages are right out in the open, correct?

2        A.   Correct.

3        Q.   So everyone can see?

4        A.   Right.

5        Q.   And there's not -- when you're in the transfer

6   cage, there's nothing else allowed in the transfer cage;

7   the kids aren't allowed to bring their personal property

8   in there?

9        A.   You talking about on suicide watch or in

10  general?

11       Q.   Or while -- you indicated that they're never in

12  there except when waiting for medical care.

13       A.   In regards to suicide watch.

14       Q.   Yeah.  And -- and they would be sitting in

15  there with the suicide smock on, correct --

16       A.   Correct.

17       Q.   -- waiting for medical?

18            Now, that's only for direct-files.  Are there

19  instances -- and -- and just so I understand, one of you

20  then would be assigned to that individual on suicide

21  watch for the entire shift?

22       A.   Right, an individual.

23       Q.   Okay.  And do you -- does that individual take

24  the suicide watch the entire shift, or do you rotate

25  among yourselves?

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 82

1      A.   We can rotate.

2      Q.   Well, what's your common practice on your

3    shift?

4      A.   It depends.  Sometimes if the person wants to

5    rotate, we'll rotate.  Sometimes somebody will just want

6    to sit there.

7      Q.   Okay.  Do you generally -- when -- have you

8    been assigned to an individual suicide watch?

9      A.   I have.

10     Q.   Have you sat there for the full shift?

11     A.   No.

12     Q.   You like to rotate?

13     A.   Right.

14     Q.   Is that the common practice in your shift to

15   rotate among the group?

16     A.   If the person wants to rotate, the -- that's on

17   there initially.

18     Q.   What if there's more than -- what if there's

19   more than one individual on suicide watch, what do you

20   do then?

21     A.   If there's more than one, they're put in the

22   cell together and they don't need to be a one-on-one.

23   They're put in a cell that can be seen without any

24   obstructions.

25     Q.   And are they kept in a particular dorm?

Page 83

1    A.   Usually the dorm that they're in, we try to

2    keep them in.  If not, we'll put them in a -- depending

3    on the population of the -- another dorm, if it's a lot

4    lower, we'll put them in an empty cell in there.

5    Q.   Okay.  Now, if you had somebody on suicide

6    watch in dorm Delta, and you had somebody in suicide

7    watch in dorm Echo, what would you -- would you have to

8    have a detention deputy at each of those, watching each

9    of those individuals?  How would you handle that?

10    A.   No.  If they're both on suicide watch, they can

11    be together, unless we know of some kind of problem that

12    they can't be together.  A suicide watch classification

13    overrules all other classifications, so they can be

14    together, like I said, unless we know of some reason

15    that they can't be together, that they have problems

16    with each other.

17    Q.   So have you had any -- have you -- has there

18    ever -- since October of 2011, has there ever been

19    instances where you've had problems with -- where you've

20    had an instance where you had two individuals who went

21    on suicide watch, where you knew that they had problems

22    with each other?

23    A.   No, not that I can recall.

24    Q.   Okay.  And as far as you recall, you've never

25    kept anyone in a -- the transfer cage on suicide watch?

Page 84

```
 1       A.    Correct.
 2       Q.    Okay.  Do you know B_____ G__?
 3       A.    Yes.
 4       Q.    Okay.  Do you recall him being kept in the
 5   transfer cage for approximately three days in February
 6   of this year?
 7       A.    I don't recall that.
 8       Q.    Do you recall him being in the transfer cage on
 9   suicide watch at any time?
10       A.    I can't recall that.
11       Q.    Do you recall him ever being on suicide watch?
12       A.    I can't -- no.  I don't recall that.
13       Q.    Do you ever recall a protective action
14   involving B_____ G__ and K___ J___'
15       A.    Not that I can recall.
16       Q.    Just so I understand, there is also activity
17   logs, right?
18       A.    Correct.
19       Q.    Okay.  And that's kept in the control room?
20       A.    No.  That's kept out on the desk.
21       Q.    Okay.  So there would be -- there -- would
22   there be an activity log for each dorm?
23       A.    Correct.
24       Q.    Okay.  So there should be six activity logs?
25       A.    Correct.
```

Page 87

1    A.    Correct.

2    Q.    Would it also -- what -- how are the -- how are

3    the youth -- are the -- are the youth assigned to

4    particular cells?

5    A.    They're assigned to dorms.

6    Q.    Okay.  Okay.  So they're assigned to dorms.

7    And then how do -- how do you determine where each child

8    sleeps?

9    A.    Usually if they get along with people, they

10   sleep in the same room with that person.

11   Q.    So there's no assignment to a particular cell?

12   A.    No.

13   Q.    Is that the same for the pre-adjudicated youths

14   and the direct-file youths?

15   A.    After the most part, yes.

16   Q.    Okay.  When -- when you say "for the most

17   part," are there instances where they are -- they are

18   assigned to particular rooms?

19   A.    If the pre-adjudicated comes in and has a --

20   some kind of sexual charge, they have to be in a room by

21   themselves.  They can't sleep with another juvenile.

22   But it's just for sleeping time.

23   Q.    Okay.  Any other instance where they are

24   assigned to a particular room?

25   A.    Not that I can recall.  No particular room, no.

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 88

1    Q.    Now, if you -- if -- if a child has -- is
2    classified as dangerous, would that child be treated --
3    assigned to a particular cell?
4    A.    If they are a code D, then they would be in
5    isolation, but I'm not aware of any children are
6    classified as code D.
7    Q.    If there -- are there any instances where --
8    other than being classified as code D, is there any
9    other instance where a child would be put in isolation?
10   A.    If the captain deems necessary that they be in
11   isolation, then we would put them in isolation.
12   Q.    And that captain, that would be Captain Marcum?
13   A.    Right.
14   Q.    Now, you can place a child in isolation for a
15   24-hour period, can't you, on your own discretion?
16   A.    No.  We have to get supervisor approval for
17   that long.
18   Q.    Okay.  And that would be either approval from
19   either the sergeant or lieutenant on -- on duty? .
20   A.    Right.
21   Q.    Okay.  And that's for the first 24-hour period,
22   correct?
23   A.    Right.
24   Q.    And anytime after that 24-hour period would be
25   decided by Captain Marcum?

Page 94

1    and the direct-file youth?

2        A.   It varies, especially with the pre-adjudicated

3    because they don't stay very long.

4        Q.   All right.  And in the summer months, actually

5    the -- the population drops because the kids aren't in

6    school?

7        A.   That's the way it's looking, yes.

8        Q.   All right.  Did you notice a drop when school

9    ended in -- in May?

10       A.   Yes, I did.

11       Q.   Okay.  A significant drop, correct?

12       A.   Yes.

13       Q.   Do you know what the kids currently being

14   detained at -- at Polk Central are being detained for?

15       A.   I know what some of them are being detained

16   for.

17       Q.   Okay.  Tell me what some of them are being

18   detained for.

19       A.   Rape.

20       Q.   And that's a direct-file youth, correct?

21       A.   Right.

22       Q.   Do you know any particular individual that's

23   being detained for rape?

24       A.   Yes.

25       Q.   Who is that?

Page 95

1   A.   It would be Q___ S____.

2   Q.   Do you know what any of the other children are

3   being detained for?

4   A.   Not particularly.  I try not to look at their

5   charges.  I just know him because of the TV coverage.

6   Q.   Other than C ___| S(   ' are you aware of --

7   what -- of the offenses of the children that you are

8   responsible for?

9   A.   I know there's rapists, attempted murderers,

10  murderers.

11  Q.   Okay.  There's also kids that just violated

12  probation?

13  A.   Violated probation.

14  Q.   Would you say a large number of the children

15  violated probation?

16  A.   I have no idea.  I couldn't say that.

17  Q.   What other rapists are you aware of that are in

18  the population?

19  A.   I can't think of any names.  Like I said, I

20  just know that's the type of charges that we have.  I

21  don't know.

22  Q.   What other -- what other attempted --

23  individuals that have been charged with murder?

24  A.   There's R____ but that was another news

25  coverage that I remember him for.

Page 96

1    Q.   Okay.

2    A.   I can't remember his first name.

3    Q.   Okay.  Other than Mr. S____, and Mr. R____, what

4    other -- of the kids that you've been involved in, what

5    other rapists or alleged rapists or murderers are you

6    aware of --

7    A.   I don't know --

8    Q.   -- in the population?

9    A.   I'm not aware.  Like I said, I don't look at --

10   I don't look up charges.

11   Q.   Okay.  So you don't know what -- what the

12   offenses are, do you?

13   A.   In general, no.

14   Q.   Okay.  And would that matter to you, what the

15   offenses were?

16   A.   No.

17   Q.   Do you -- have you ever witnessed fights among

18   kids in the jail?

19   A.   Yes.

20   Q.   Okay.  On how many occasions?

21   A.   I can't recall.  Multiple.

22   Q.   Do you know of specific fights that you recall?

23   A.   I recall a P_____ fight.

24   Q.   Besides the P_____ fight, do you have any

25   specific recollection of a fight --

Page 97

1    A.    Not --

2    Q.    -- that you were involved in?

3    A.    Not -- nothing that I can specifically say.

4    Q.    How often do fights occur in the juvenile

5    dorms?

6    A.    It's hard to say.  You might have a couple in a

7    week and then not have any for a month.  It's sporadic.

8    Q.    How often do you use OC spray to de-escalate

9    the fights?

10    A.    Only if they refuse to stop fighting when I

11    order them to stop.

12    Q.    Have you ever used OC spray after a child has

13    stopped fighting?

14    A.    No.

15    Q.    Never?

16    A.    Never.

17    Q.    How about when -- have you ever used OC spray

18    when a child has refused an order?

19    A.    No.

20    Q.    Have you ever used OC spray when a child has

21    refused to pick up food?

22    A.    No.

23    Q.    Have you ever used OC spray on a child who is

24    locked in an isolation room at the time?

25    A.    No.

Page 98

1      Q.    How many times have you put a child in one of

2    the isolation rooms?

3      A.    I haven't put anybody in there to be housed.

4      Q.    Okay.  There's never been an instance where

5    you've put a child in isolation?

6      A.    No, not personally, not unless they were

7    already there and I've taken them out for some reason

8    and had to take them back.

9      Q.    That's fair enough.  But have you -- I'm just

10   trying to understand.

11          Have you individually made a decision that this

12   child has to go into an isolation room?

13     A.    No.

14     Q.    Okay.  Have there ever been instances during

15   your shift where there has been a decision made to put a

16   child into an isolation room?

17     A.    Not that I can recall specifically.

18     Q.    How about generally, do you recall there ever

19   being instances where there was a decision made during

20   your shift to put a child in isolation?

21     A.    Not that I can recall, no.

22     Q.    What -- what types of things are children put

23   in isolation for?

24     A.    That would be up to the supervisor to

25   determine.  I mean, like I said, I've never made a

Page 99

1    decision to put anybody in iso so, I mean, it would...

2        Q.    Have you ever presented to your supervisor a

3    child who should be considered for isolation?

4        A.    No.

5        Q.    Has anyone on your shift ever put a child up to

6    a supervisor for consideration to be put in isolation?

7        A.    Not that I'm aware of on that.

8        Q.    What's the longest that you're aware of a child

9    being in an isolation room?

10        A.    I have no idea.

11        Q.    Do you know how to -- you track how -- how a

12    child is kept in isolation?

13        A.    I -- we can go back to their -- to the computer

14    and see how long that certain individual is housed

15    somewhere.

16        Q.    Okay.  Because on the computer, you indicate

17    where a child is held?

18        A.    Right.

19        Q.    How is that recorded on the computer?

20        A.    There's a spot for their dorm location.

21        Q.    And how often is that information put into the

22    computer?

23        A.    Whenever somebody is moved.

24        Q.    On your shift, how do you record where people

25    are located in the various dorms?

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 104

1   ever placed a pre-adjudicated youth in isolation?

2        A.   No.

3        Q.   On no occasion?

4        A.   I haven't, no.

5        Q.   Okay.  Are you aware of anyone on your shift

6   placing a pre -- pre-adjudicated youth in direct

7   observation or -- or in isolation?

8        A.   Not that I can recall.

9        Q.   Okay.  Have you ever used OC spray with a youth

10  named T        , H       ?

11       A.   Yes.

12       Q.   Do you recall that incident, or was it more

13  than one occasion?

14       A.   I -- I don't recall.  I'd have to see a report.

15  I remember one incident.

16       Q.   Okay.  You recall one incident.  What do you

17  recall about that incident?

18       A.   He was in isolation.

19       Q.   Okay.  So was he a direct-file youth or was he

20  a pre-adjudicated youth?

21       A.   Direct-file.

22       Q.   Do you know what he was in for?

23       A.   No, I don't.

24       Q.   Okay.  And do you know when this incident

25  occurred?

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 105

1      A.    No, not offhand I don't.

2      Q.    Was it sometime within the -- sometime in the

3   spring of this year?

4      A.    I couldn't tell you.  I don't recall.

5      Q.    What do you recall happening?

6      A.    I remember it was after feeding one of the --

7   it was either supper or lunch.  I can't remember.  One

8   of the deputies went back there to retrieve his tray,

9   and he wouldn't give it up.  He wouldn't put it back

10  through the food slot.  So we went back there to get it,

11  and he tried to attack us.

12     Q.    Okay.  When you say he wouldn't give up the

13  tray, he was in a locked isolation cell, correct?

14     A.    Correct.

15     Q.    Okay.  So at that time he would not put the

16  tray through the tray grate --

17     A.    Correct.

18     Q.    -- if you will?

19           Okay.  And actually he threw the food, is

20  that -- is that -- did he throw the food tray?

21     A.    Yes.

22     Q.    Okay.  So food was laying on the -- in the

23  isolation cell?

24     A.    Right.

25     Q.    And he was in the isolation cell alone,

Page 106

1  correct?

2      A.   Correct.

3      Q.   Okay.  And so you -- you maced him because he

4  threw the -- the food?

5      A.   No.

6      Q.   Okay.  Why -- what happened?

7      A.   We went -- myself and the other deputy went in

8  to get -- retrieve the tray, and we told him to stand

9  against the back wall so we can get the tray, and he ran

10 off and tried to attack us.

11     Q.   Okay.  Do you know, T▮   ▮ H▮        at that time

12 had been in isolation for approximately five weeks,

13 correct?

14     A.   I have no idea.  I couldn't tell you that.

15     Q.   It had been for an extended period, hadn't it?

16          MR. TROHN:  Object to the form of the question.

17     A.   I'm not sure.

18     Q.   You don't know?

19     A.   I can't recall, no.

20     Q.   Okay.  So we -- but we'd be able to tell from

21 the isolation logs, wouldn't we?

22     A.   Right.

23     Q.   So would it be unusual for you, for someone to

24 be in isolation for more than four weeks?

25     A.   Not generally, no.  I mean --

Page 107

1    Q.    Not generally, it --

2    A.    I mean it -- I mean, we're talking about adults

3    or kids?

4    Q.    We're talking about kids.

5    A.    No.  I don't know how long they'd be in there

6    for.

7    Q.    Okay.  Because you've only worked -- correct me

8    if I'm wrong.

9          You've only worked with kids since October of

10   last year, correct?

11   A.    Mostly, yes.

12   Q.    Oh, so you have worked some with adults?

13   A.    Some, yes.

14   Q.    Oh, good.  Tell me when you've worked with

15   adults.

16   A.    I couldn't tell you.  It's various.

17   Q.    On what instance -- on what occasions have you

18   been working in adult dorms at Polk Central Jail since

19   October of last year?

20   A.    Oh, I haven't worked in the dorms as a -- I've

21   worked overtime on transportation.

22   Q.    Okay.  When did you work on transportation with

23   adults?

24   A.    Numerous times.  I couldn't tell you exactly.

25   Q.    And was that during the same shift that you

Page 108

1   were working with the children?

2        A.    No.   We can't do that.

3        Q.    Okay.   So there have been occasions where you

4   have had your -- on your shift you've worked

5   transportation rather than the youth dorms?

6        A.    Correct.

7        Q.    How often does that happen?

8        A.    Not often.

9        Q.    Okay.   Now, going back to this instance with

10  T        H        , did you fill out an incident report?

11       A.    Yes.

12       Q.    Did you fill out a protective action report?

13       A.    Right.

14       Q.    Okay.   If we didn't receive that type of a

15  document -- or strike that.

16            Now, you -- you're saying that he -- what --

17  that he was -- he came after you --

18       A.    Correct.

19       Q.    -- when you went into the cell?

20       A.    Correct.

21       Q.    How big is T       ?

22       A.    I couldn't tell you.

23       Q.    Is he about 5'5"?

24       A.    I don't know.

25       Q.    Do you know how much he weighs?

Page 109

1    A.   Not offhand, no.

2    Q.   How much do you weigh?

3    A.   About 300 pounds.

4    Q.   And how tall are you?

5    A.   About 6 foot.

6    Q.   And who was the deputy that went in there with

7    you?

8    A.   Deputy Sanders.

9    Q.   And how big is Deputy Sanders?

10   A.   He's smaller than I am.

11   Q.   Okay.  Height-wise he's smaller than you?

12   A.   He's probably a little bit shorter.

13   Q.   Okay.  And a little less weight?

14   A.   A lot less weight.

15   Q.   Okay.  Okay.  What did you do after you sprayed

16   him in his isolation cell?

17   A.   I --

18       MR. TROHN:  Wait a minute.  Wait.  Do you want

19   him to refresh his recollection, or are you still

20   trying to learn what he knows without referring to

21   it?

22       MR. HAYDEN:  I don't have that report.  Okay.

23   Okay.  This one.

24       MS. HASKELL:  Hold on.  Do you want him to it

25   look at it?

Page 114

1        MR. HAYDEN:  Yeah.  I'm working with him.

2   We're -- you're -- I'm look --

3        Q.   We both have the same Bate numbers, right?

4        A.   Right.

5        MR. TROHN:  Who is the author on that one?

6   Sanders?  340?

7        MS. HASKELL:  Just make copies.

8        MR. TROHN:  Hertel?

9        MR. HAYDEN:  Why don't we take a quick a break.

10        MR. TROHN:  Yeah.

11        MR. HAYDEN:  Go off the record.

12        THE VIDEOGRAPHER:  We're off the video record.

13        (Recess from 11:44 a.m. until 11:58 a.m.)

14        THE VIDEOGRAPHER:  We are back on the video

15   record.

16   BY MR. HAYDEN:

17        Q.   Sir, I'm showing you what's been marked as

18   Exhibits 1 and 2.  These are incident reports from the

19   incident on or -- on April 1st, 2012, that you were

20   involved in, correct?

21        A.   Correct.

22        Q.   Okay.  And Exhibit 1, that's your report,

23   correct?

24        A.   Correct.

25        Q.   And Exhibit 2, that's the report that was

Page 115

1   created by Officer Sanders?

2       A.   Correct.

3       Q.   Okay.  And you were the two detention deputies

4   involved in this incident, correct?

5       A.   Correct.

6       Q.   Okay.  And just so I understand the process,

7   then, when you get these incident reports, because there

8   was a protective action involved, there would be a

9   protective action report that would be placed on top of

10  this; is that right?

11      A.   Correct, correct.

12      Q.   And that would be given to the supervisor to

13  review?

14      A.   The protective action report, the supervisor

15  generates that.

16      Q.   Okay.  And then that goes up the chain of

17  command for review, correct?

18      A.   Correct.

19      Q.   Is that your understanding of how it works?

20      A.   Yes.

21      Q.   And that's for all instances where there are

22  restraints used, chemical or physical restraints?

23      A.   Yes.

24      Q.   Okay.  And incident reports could be made for

25  anything, correct?

Page 116

1      A.    Correct.

2      Q.    And a protective action report would be only

3  when you're using either physical -- physical or

4  mechanical or chemical restraint?

5      A.    Yes.

6      Q.    Okay.  And how often do -- in your shifts, in

7  your usual shifts, do you do a protective action report?

8      A.    There, we could go weeks without doing any, or

9  it could be a couple in a week.  I mean --

10     Q.    Okay.

11     A.    -- it depends.

12     Q.    Have you ever had multiple protective actions

13  in the same shift?

14     A.    I recall there being a couple.

15     Q.    Okay.  When were those?

16     A.    I don't recall when.  I just remember them

17  happening, but --

18     Q.    Do you recall the instances?

19     A.    No.

20     Q.    Let's look at Exhibit 1 and Exhibit 2.  We

21  talked a little bit about your recollection before you

22  reviewed these.

23          Now, have you had an opportunity to look at

24  these exhibits?

25     A.    Yes, I looked at them.

Page 117

1    Q.    Do they refresh your recollection?

2    A.    Yes, some.

3    Q.    Now, T[  H[  ] was in an isolation room at

4    the time, correct?

5    A.    Right.

6    Q.    Which was locked, right?

7    A.    Right.

8    Q.    And there was food on the floor, and he refused

9    to give up his tray, correct?

10   A.    Correct.

11   Q.    Okay.  Why did you feel it necessary to enter

12   the locked cell at that time?

13   A.    To get the dirty dishes.

14   Q.    Okay.  We talked about with -- with kids, that

15   sometimes you need a little bit more patience, right?

16         Wouldn't it have been more prudent -- do you

17   recall that, when we talked about --

18   A.    Right.

19   Q.    -- being more patient with kids?

20   A.    Right.

21   Q.    Wouldn't it have been more prudent to just let

22   him sit in the locked cell than go in the cell after the

23   tray?

24   A.    He was asked several times by myself and the

25   other deputy to put the tray out.

Page 118

1    Q.   Okay.  And he refused?

2    A.   Correct.

3    Q.   Okay.  He was not in a fight, right?

4    A.   Right.

5    Q.   He was by himself?

6    A.   Right.

7    Q.   Okay.  So this would -- earlier you said that

8  you used OC spray only to stop fights; is that right?

9    A.   Not only to stop fights.

10   Q.   What else do you use it for?

11   A.   It can be used to prevent damage to county

12  property, to protect yourself.

13   Q.   Okay.  And -- and in this instance, there was

14  no damage to county property, correct?

15   A.   Correct.

16   Q.   And the individual was in a cell by himself?

17   A.   Correct.

18   Q.   And he weighed about 150 pounds, at most?

19   A.   I -- probably.

20   Q.   Okay.  And there were two of -- two adult

21  detention deputies going into the cell, correct?

22   A.   Correct.

23   Q.   Okay.  And it says that you asked him to go to

24  the back wall and he refused, correct?

25   A.   I asked him several times to go to the back

Page 119

1   wall.

2       Q.   And to face the wall?

3       A.   Which he did eventually.

4       Q.   But only after he -- he did face the wall

5   eventually?

6       A.   Eventually, yes.

7       Q.   Okay.  Was that before or after you maced him?

8       A.   That was before.

9       Q.   Okay.  So then -- so he had gone to the back

10  and faced the back wall, and then your report indicates

11  he took a fighting stance?

12      A.   He turned around and took a fighting stance.

13      Q.   Okay.  And for that reason, you felt it

14  necessary to mace him?

15      A.   Correct.

16      Q.   Did he -- did he touch you in any manner?

17      A.   No.  I maced him.

18      Q.   Okay.  Why didn't you just leave the room and

19  lock the door behind you?

20      A.   Because there was two of us in there and...

21      Q.   Okay.  What did you do after you maced him?

22      A.   I -- we handcuffed him and took him to the

23  nurse and let him shower and change his uniform.

24      Q.   Okay.  Do you recall any other incidents where

25  you used OC spray?

Page 120

1        A.    There has been a couple, yes, a few.

2        Q.    Okay.  What other incidents?

3        A.    All I remember, the P(        ) fight.

4              MS. HASKELL:  It's January.  Yep.

5              Mark this.

6              (Plaintiffs' Exhibit No. 3 was marked for

7        identification.)

8              MR. TROHN:  Oh, good, you got them copies.

9        Q.    Sir, I'm showing you what's been marked as

10       Exhibit 3, and we'll call it composite Exhibit 3.

11             Do you recall -- you mentioned the P(

12       incident.  That was -- tell me what you recall about

13       that incident.

14       A.    I recall seeing a large group of juveniles

15       fighting.

16       Q.    Where were they fighting?

17       A.    In the dayroom of Charlie dorm.

18       Q.    Where were you located when you saw them

19       fighting?

20       A.    I was in the control room.

21       Q.    Who was the first deputy on the scene?

22       A.    I believe it was Gay.

23       Q.    Okay.

24       A.    Or we both got there about the same time,

25       really.

Page 121

1    Q.   Okay.  And what do you recall happened?

2    A.   Well, as we were entering the dorm, we were

3    yelling at them to stop fighting, which they didn't.

4    Q.   Okay.  How long between the time you saw the

5    fight start and the time that you told -- that you

6    entered the dorm and told them that -- to stop fighting?

7    A.   I don't know.  15 seconds, 20 seconds maybe.

8    Q.   Okay.  And so how long did -- what efforts did

9    you do to try to de-escalate the -- the -- the

10   situation?

11   A.   They were fully involved.  We were yelling at

12   them to stop fighting, but whether they heard us, they

13   were -- it was a total melee.

14   Q.   What -- what individuals were involved?

15   A.   Well, I -- there was a few of them.  The only

16   ones that I can say for sure is P(_____) because he's

17   the one I dealt with, and D⌐   J⌐   ⌐ because he's the

18   one that Deputy Gay directly dealt with.

19   Q.   Okay.  Did you use pepper spray on any of the

20   individuals?

21   A.   Yes.

22   Q.   Who?

23   A.   I know for a fact that it was P⌐      , and I

24   know there was a residual to the other ones.  Their

25   names have been blacked out.  I can't remember who they

Page 122

1    were.

2        Q.    Okay.  What -- did any of the kids stop

3    fighting when you told them to stop fighting?

4        A.    No.

5        Q.    They all continued to fight?

6        A.    Yes.

7        Q.    Okay.  If the children had stopped fighting,

8    would you have still sprayed them?

9        A.    No.  There would be no need to.

10       Q.    Okay.  What -- did you use the pepper spray

11   that was on your belt, or did you go into the -- the

12   pepper spray from the control room?

13       A.    I was already in the control room, so I took

14   the pepper spray from the control room.

15       Q.    Now, did you see the fight when it started?

16       A.    No.

17       Q.    Okay.  So you don't know who was the victim

18   and -- or if there was a victim?

19       A.    Right.

20       Q.    Okay.  Did you later determine that there was a

21   victim?

22       A.    Well, later it was determined that there was.

23       Q.    And how was that determined?

24       A.    The detective.

25       Q.    That was -- did they look at the video cameras?

Page 123

1      A.    I -- I believe so, yes.

2      Q.    Okay.  Where -- and who -- who -- how was it

3   determined -- was it -- who was determined to be the

4   victim?

5      A.    J┌     ⌐  P┌         ┐.

6      Q.    And I see that there were waivers of

7   prosecution that are attached.  Do you see that?  I'd

8   like -- I'd ask that you look at Exhibit 3 now.

9      A.    Right.

10     Q.    First, why don't we go through Exhibit 3.

11           The first page of Exhibit 3, that's your

12   report, correct?

13     A.    Correct.

14     Q.    Okay.  And then -- now, two of the juveniles

15   did lay on the floor in the dayroom, correct, and then

16   four others ran into Cell No. 4?

17     A.    Correct.

18     Q.    Did you follow them into Cell No. 4?

19     A.    No.

20     Q.    Okay.  Who followed them into Cell No. 4?

21     A.    Nobody followed them.  I was dealing with

22   P        ), and Mr. Gay was dealing with J

23     Q.    Okay.

24     A.    We just saw that they ran into No. 4.

25     Q.    Did you use OC spray on any of the individuals

Page 124

1    that ran into 4, Cell 4?

2         A.    No.  Only if they got the residual from the

3    initial.  There was no second -- or no secondary spray.

4         Q.    Okay.  So not only P[____] and J__  , but

5    also the others were evaluated by the nurse; is that

6    right?

7         A.    Correct.  Yes.

8         Q.    Okay.  Now, in this -- in this instance, if you

9    go -- the second page is -- of Exhibit 3 is the report

10   of deputy Gay, right?

11        A.    Right.

12        Q.    Okay.  And that goes on to page 3 of this

13   exhibit, correct?

14        A.    Right.

15        Q.    Okay.  Actually Exhibit -- page 3 of Exhibit 3

16   is actually an addendum, correct?

17        A.    I wouldn't know.  That's written by Mr. Gay.

18        Q.    And it -- Well, it's dated -- you see it's

19   dated February 26, 2012?

20        A.    Okay.

21        Q.    And the other reports were dated

22   January 22nd, 2012.

23        A.    Okay.

24        Q.    Were you aware of this addendum?

25        A.    No.

Page 125

1    Q.   Did you have any involvement in the

2   investigation after -- strike that.

3        Did you have any involvement with regard to any

4   actions taken on the protective action described here

5   after you did your incident report?

6    A.   What do you mean?

7    Q.   Okay.  Well, you did the incident report?

8    A.   Right.

9    Q.   On or about January 22nd, right?

10   A.   Right.

11   Q.   Were you involved in any investigation or any

12  activities after that time?

13   A.   I was asked if I could identify any of the

14  individuals that were in the video.

15   Q.   Okay.  So you reviewed the video?

16   A.   Right.

17   Q.   Okay.  When did you do that?

18   A.   I don't recall.  It was sometime after.

19   Q.   Okay.  Did you ever -- before sitting here

20  today, had you ever seen this page 3 of Exhibit 3?

21   A.   No.

22   Q.   Okay.  Do you recall being called by

23  Captain Marcum to her office to view the video?

24   A.   I remember going up to review the video.  Who

25  called me to go up there, I couldn't tell you.

Page 126

1      Q.    Do you recall seeing that one of the juveniles

2  was trying to conceal an -- an object in the video?

3      A.    Yes, I saw that in the video.

4      Q.    Okay.  Who -- what -- what individual?

5      A.    That would be J\'

6      Q.    Okay.  And what was he trying to conceal?

7      A.    I have no idea.

8      Q.    Okay.  Is that what you testified to in the

9  trial of J\    the other day?

10     A.    It was last -- it's been about two months,

11 but --

12     Q.    Okay.  About two months ago, is that what you

13 testified to?

14     A.    I can't recall that I was asked about that.

15     Q.    What were you asked about?

16     A.    Just general questions in specific to the dorm

17 and what I saw.

18     Q.    At the time that it occurred, had you made a

19 determination whether there was a -- a detainee who was

20 responsible for the fight?

21     A.    At the time of the incident?  No.

22     Q.    All right.  Later on did you come to a

23 conclusion that a certain individual was responsible for

24 the fight?

25     A.    I didn't, no.

Page 127

1    Q.   Okay.  After reviewing the video, did you --

2    did that change your impression of who was responsible

3    for the fight?

4    A.   No, because to me it just looked like a melee.

5    The only thing that I did see was that P(_____ was

6    attacked.

7    Q.   Okay.  So Patterson was not -- P    was

8    attacked; he was -- he was jumped, more or less,

9    correct?

10   A.   Correct.

11   Q.   Okay.  But you still sprayed P    _    when you

12   went into the dayroom?

13   A.   Well, he was fighting, yeah.  I mean, I had no

14   idea what had happened prior to that.

15   Q.   Now, the next -- the next couple pages appear

16   to be waivers.  Do you know what these documents are, if

17   you go to the fourth, the remainder of Exhibit 3?

18   A.   I've seen them before.

19   Q.   What are they?

20   A.   They're waivers of prosecution.

21   Q.   Okay.  And these were obtained from each of the

22   youth?

23   A.   It would appear so, yes.

24   Q.   Yeah.  Did you obtain them?

25   A.   I can't recall if I had any involvement with

Andrew Hertel, 8/1/2012
Hughes v. Judd

Page 129

1       Q.    Are you aware of any other incidents besides

2   the one we just talked about where you used OC spray in

3   an isolation cell?

4       A.    I don't recall any, no.

5       Q.    Okay.  Do you recall -- what -- what is the

6   procedure for determining when to use OC spray?

7       A.    If somebody's trying to hurt themselves and

8   they refuse to stop or if there's a fight and they

9   refuse to stop fighting, then we can use the pepper

10  spray to stop them from fighting, which it works.  As

11  soon as we spray, they immediately stop.

12      Q.    Okay.  So when the -- there's a concern that

13  someone might hurt themselves?

14      A.    Right.

15      Q.    Or to stop them from fighting?

16      A.    Right.  Or significant damage to property.

17      Q.    Any other instance where you would use OC

18  spray?

19      A.    To protect -- if somebody is attacking

20  somebody, spray the attacker.

21      Q.    Okay.  The instance that we -- we talked about,

22  Exhibit -- that's described in Exhibits 1 and 2, is that

23  the only instance where you have used OC spray because

24  you've -- you felt that this youth was attacking you?

25      A.    As far -- all I can -- from what I can remember

Page 138

1   fight context, to use OC spray?

2       A.    If they don't stop fighting.  If they stop

3   fighting, then there's no need for it.

4       Q.    Okay.  How much time do you give them to stop

5   fighting before you use OC spray?

6       A.    I tell them to stop fighting.  I say, "Stop

7   fighting, stop fighting."  They don't stop fighting,

8   that's when I spray.  I don't want -- the longer they

9   fight, the more potential they have of hurting

10  themselves or hurting the other person.

11      Q.    And you don't use any attempt to use physical

12  restraints to hold them apart from each other?

13      A.    That could cause injury, too.  Spray is the --

14  is the best.

15      Q.    Because --

16      A.    Best means.

17      Q.    -- it's cleaner or easier for you?

18      A.    Most of the time when you spray, they

19  immediately stop fighting, and that's what you want,

20  stop fighting.

21      Q.    Okay.  And what's the protocol for -- for

22  cleaning them up after you've sprayed them?

23      A.    They take a shower, like I said, and then we

24  give them fresh uniforms.

25      Q.    Okay.  Do they see a nurse?

Page 139

1    A.    They always see a nurse.

2    Q.    How long is it before they see a nurse?

3    A.    Usually immediately or within the very -- it's

4  usually immediately, if she's right there.  If we have

5  to wait for, like, if she's pulling medication, then

6  we -- as soon as she gets to the building, they see a

7  nurse.

8    Q.    What's the longest that a child has ever had to

9  wait?

10    A.    I couldn't tell you.  I don't know.

11    Q.    More than an hour?

12    A.    Never longer than an hour.

13    Q.    Okay.  What's the longest a child has had to

14  wait for a shower after being OC sprayed?

15    A.    I have no idea.  Not long.

16    Q.    Is it more than an hour?

17    A.    Never more than an hour, no.

18    Q.    More than a half hour?

19    A.    It's -- I have no idea.  I mean, it's possible.

20    Q.    Okay.  Are you aware of the fact that other

21  juvenile facilities don't use OC spray?

22    A.    I have heard.

23    Q.    Who have you heard from?

24    A.    From the people that used to work at DJJ that

25  now work for us.