1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF FLORIDA
 2                   TAMPA DIVISION

 3            Case No. 8:12-cv-00568-SDM-MAP

 4   CHANDA HUGHES, as guardian and on behalf
     of J.B., a minor; BRENDA SHEFFIELD, as
 5   guardian and on behalf of J.D., a minor;
     VIOLENE JEAN-PIERRE, as guardian and on
 6   behalf of F.J.P. a minor; MICHELLE MINOR,
     as guardian and on behalf of J.P., a
 7   minor; LISA JOBE, as guardian and on
     behalf of K.J., a minor; AMY GAGE, as
 8   guardian and on behalf of B.G., a minor;
     CRYSTAL CUYLER, as guardian and on behalf
 9   of D.M., a minor; NIKEYTA MATTHEWS, as
     guardian and on behalf of K.G., a minor;
10   and ANITA NAVA, as guardian and on behalf
     of A.H., a minor; on behalf of themselves
11   and all others similarly situated,

12        Plaintiffs,

13   vs.

14   GRADY JUDD, Polk County Sheriff, in his
     official capacity, and CORIZON HEALTH,
15   INC.,

16        Defendants.

17           VIDEOTAPED DEPOSITION OF FJP

18      Taken on Behalf of the Defendant Grady Judd

19   DATE TAKEN:    JUNE 27, 2012
     TIME:          1:07 P.M. - 2:34 P.M.
20   PLACE:         WASILEWSKI COURT REPORTING
                    1525 SOUTH FLORIDA AVENUE, SUITE 4
21                  LAKELAND, FLORIDA 33803

22

23      Examination of the witness taken before:

24                  Joan L. Pitt
                Registered Merit Reporter
25               Certified Realtime Reporter
                Florida Professional Reporter
```

1        Lakeland, Florida.  The court reporter is Joan Pitt

2    with Wasilewski Court Reporting.  Today's date is

3    June 26th, 2012, and we're now beginning at 1:06

4    p.m.

5        Counsel, would you please introduce yourselves.

6        MS. HASKELL:  Miriam Haskell, attorney for

7    plaintiffs.

8        MR. RINDONE:  Joseph Rindone on behalf of the

9    plaintiffs.

10       MS. BRONSON:  Jeanelle Bronson, counsel for

11   Corizon Health, Inc.

12       MR. TROHN:  Jon Trohn on behalf of Polk County

13   Sheriff's Office.

14       THE COURT REPORTER:  Raise your right hand,

15   please.  Do you swear or affirm the testimony you

16   give will be the truth, the whole truth, and nothing

17   but the truth?

18       THE WITNESS:  Yes.

19       THE COURT REPORTER:  Thank you.

20       FRANKIE JEAN-PIERRE, called as a witness by the

21   Defendant Grady Judd, having been first duly sworn,

22   testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. TROHN:

25       Q.   Frankie, would you begin by stating your full

7

1     Q.   You didn't know you were going to be doing all

2  this spelling today, did you?

3     A.   I'm good at spelling, so I'm good.

4     Q.   Good practice.  Anybody else?

5     A.   No.

6     Q.   How old are you, Frankie?

7     A.   I'm 18.

8     Q.   What's your date of birth?

9     A.   March 21st, 1994.

10     Q.   Where are you going to school?

11     A.   I graduated, but I'm making up a class online

12  in the summer.

13     Q.   Okay.  You graduated from which high school?

14     A.   Ridge Community High School.

15     Q.   That's in Davenport?

16     A.   Uh-huh.

17     Q.   And you say you graduated, but you're still

18  making up a class?

19     A.   Uh-huh.

20     Q.   Can you explain that for me?

21     A.   Like, I have to, like, make a credit for one

22  class, and then after I finish that I'll get my diploma.

23     Q.   Did you walk with the rest of your class at the

24  graduation?

25     A.   The graduation?  No, I couldn't.

1      A.    Loughman Oaks Elementary.

2      Q.    Loughman?

3      A.    Oaks.

4      Q.    Loughman Oaks.  How were your grades in high

5 school?

6      A.    They were, like, average.

7      Q.    Did you ever have any disciplinary problems,

8 any suspensions, expulsions?

9      A.    Uh-huh.  Yeah.

10     Q.    You did?

11     A.    Not expulsion, but --

12     Q.    Suspensions?

13     A.    Uh-huh.

14     Q.    From which schools?

15     A.    All three, I think.

16     Q.    Really?

17     A.    Yeah.

18     Q.    What were the nature of the problems there?

19     A.    When I was in middle school, one suspension was

20 a fight, and when I was in elementary it was like

21 in-school suspension, ISS.

22     Q.    I'm sorry?

23     A.    In-school suspension, but it's called ISS.

24     Q.    Okay.  What was that for?

25     A.    That was -- I really can't remember.  It was a

1     while back, but --

2          Q.    How about at Dundee or Ridge High School?

3          A.    Ridge was mostly I had tardies and -- oh, yeah,

4     I forgot to mention that I did go to an alternative

5     school too.

6          Q.    Any suspensions from Dundee?

7          A.    Dundee?  Yeah.

8          Q.    What were those for?

9          A.    Basically getting in trouble too much.  Like

10    insubordination.

11         Q.    Do you have any mental health or physical

12    health problems?

13         A.    Problems?  No.

14         Q.    Have you undergone counseling of any sort in

15    your lifetime?

16         A.    Uh-huh.  Anger management.

17         Q.    You have?

18         A.    Uh-huh.

19         Q.    Can you tell me where you got that and what

20    prompted that?

21         A.    It was actually in my school.  Like, they had

22    it -- like, I would go to -- I would be out of class and

23    then I would go to, like, a counselor and she would talk

24    to me.

25         Q.    Which school offered that?

1       A.    Loughman.

2       Q.    This was elementary school?

3       A.    Uh-huh.

4       Q.    Was it useful for you, do you think?

5       A.    Yeah, because I was -- I had an anger problem.

6    I used to.

7       Q.    Do you still, or --

8       A.    No, I'm --

9       Q.    Was that just a specific issue that was

10   bothering you in --

11      A.    No.  I just, I don't know, had a temper.

12      Q.    Had a temper.  How about outside of the

13   counseling you got at Loughman, did you have any other

14   counseling at any point in time?

15      A.    No.

16      Q.    No?

17      A.    I'm about to start family counseling, but

18   that's for my probation.

19      Q.    Okay.  You're not going to be a father, are

20   you?

21      A.    No.

22      Q.    I didn't mean that in any derogatory way, but

23   that's when I hear that you're having family counseling,

24   people may be doing that.

25      A.    Oh, no.  It's mandatory.  I have to do it.

1      Q.   Do you have a regular doctor or pediatrician

2   you've seen?

3      A.   Don't know his name.

4      Q.   Do you know, is he with a clinic, or is he with

5   Heart of Florida, or --

6      A.   I don't know.  It's been a while since I've

7   seen him.

8      Q.   Okay.  Do you just see the doctor when

9   something comes up, or do you have -- do you have

10  regularly scheduled visits for any reason?

11     A.   My mom just says I got to see the doctor and I

12  go.

13     Q.   Okay.  Is that for colds and flu?

14     A.   No, it's, like, she just wants to do, like, a

15  checkup just in case anything's wrong with me.

16     Q.   Do you know who does that?  Like a physical,

17  you mean?

18     A.   No, not a physical, but, like, if I got -- if

19  I'm sick or anything or --

20     Q.   Okay.

21     A.   Open your mouth, say ah.

22     Q.   And you don't -- you don't know who these

23  doctors or doctor might be?

24     A.   No.

25     Q.   Let me ask you about your history getting in

1   trouble with the law.  How old were you when you

2   first --

3        A.   First got arrested?

4        Q.   Yeah.

5        A.   I'd say about 15.

6        Q.   And what happened there?

7        A.   It was a burglary charge.

8        Q.   Did you have to go to DJJ --

9        A.   Uh-huh.

10        Q.   -- or something like that?  You did?

11        A.   (Nodding head.)

12        Q.   Well, tell me about your arrest.  Where were

13   you arrested?

14        A.   In my neighborhood.

15        Q.   Were you handcuffed?

16        A.   Uh-huh.

17        Q.   Yes?

18        A.   Yes, sir.

19        Q.   And transported via squad car to probably

20   Juvenile Assessment Center?

21        A.   (Nodding head.)

22        Q.   Yes?

23        A.   Yes.

24        Q.   And from there to DJJ?

25             MS. HASKELL:  Objection.  Vague.

1     Q.    From the Juvenile Assessment Center to DJJ?

2     A.    Yeah.

3           MS. HASKELL:  Vague as to DJJ.

4     A.    Like, explain.  What do you mean by DJJ?

5     Q.    There's a -- DJJ was where a lot of

6  juveniles --

7     A.    Oh, the detention center.

8     Q.    Yeah.

9     A.    Oh, no, no.  No, I didn't go there.  I'm sorry.

10    Q.    You didn't go there, you just went to the

11 assessment center?

12    A.    Uh-huh.

13    Q.    All right.  The big green building in Bartow?

14    A.    Yes.  I didn't go to DJJ.

15    Q.    Have you -- do you know what DJJ is, the

16 detention facility?

17    A.    Uh-huh, but it got shut down.

18    Q.    Right, but before it got shut down, have you

19 ever been there?

20    A.    No, I've never been there.

21    Q.    All right.  So you went to the assessment

22 center, and then presumably you went home?

23    A.    Uh-huh.  And then I was put on probation.

24    Q.    What was the next -- next problem you had with

25 the law?

1     A.   It was -- it was weird, because it was, like, a

2  battery charge.  My mom called the cops and she said I

3  hit her, but it didn't really go down like that.  That

4  was my next incident.

5     Q.   How old were you?

6     A.   Sixteen, probably.

7     Q.   Were you arrested?

8     A.   Yeah.  Well, I wasn't arrested, but it was a

9  violation.

10     Q.   Violation?

11     A.   Probation.

12     Q.   Probation?

13     A.   Yeah.

14     Q.   When your mother called the police, did they

15  come to the house?

16     A.   Uh-huh.

17     Q.   You weren't handcuffed and taken to the

18  assessment center or anything?

19     A.   Ung-ugh.

20     Q.   You were allowed to stay there?

21     A.   Uh-huh, but it was still a violation.

22     Q.   Yes?

23     A.   Yes.

24     Q.   Okay.

25     A.   I'm sorry.  I need to say something.

1      Q.   So were you charged then with a violation of

2   probation?

3      A.   Uh-huh.

4      Q.   And I keep correcting you because when you go

5   "uh-huh," as I do, it's not correct for the record.

6      A.   Yeah, I know.

7      Q.   She's trying to --

8      A.   I'm sorry.

9      Q.   -- distinguish between yeses and nos.

10      A.   Yes.

11      Q.   So I'm going to keep asking you, "Is that yes?"

12      A.   My bad.

13      Q.   So the charge was violating probation.  And did

14   you have to --

15      A.   Go to court?

16      Q.   -- go to court?  What was the sentence?  What

17   did you have to do?

18      A.   I don't think I went to court for that.  I

19   don't recall going to court for that.

20      Q.   Did they do anything more with your probation,

21   or what was the penalty there?

22      A.   It got added on.  Like, it was longer.

23      Q.   Additional probation?

24      A.   Uh-huh.

25      Q.   All right.  How about after that, what was the

1    next problem you had?

2         A.   Then I was off probation, and then I got put

3    back on probation for -- it wasn't really a burglary

4    charge, because the house was vacant, but I went in a

5    vacant house and then I had resisting arrest and

6    possession of marijuana.

7         Q.   Was this the one that resulted in you going to

8    Polk County Jail?

9         A.   Uh-huh.

10        Q.   Yes?

11        A.   Yes, sir.  I need to stop saying that.

12        Q.   That's all right.

13             MR. RINDONE:  That's okay.  Everybody does it.

14        Q.   Everybody does it.

15             So that charge was possession?

16        A.   Resisting arrest.

17        Q.   Resisting, burglary?

18        A.   But the burglary got dropped down to trespass.

19        Q.   Were you arrested?

20        A.   For that?

21        Q.   For that.

22        A.   Oh, yeah.

23        Q.   You were?

24        A.   Yeah.

25        Q.   Where?  Where were you arrested?

19

1      A.    After I ran away from the cops, like, I went

2   home, and then they got me from the house.

3      Q.    Handcuffed and taken to the assessment center?

4      A.    Yes, sir.

5      Q.    Have you been in any trouble since this one?

6           MS. HASKELL:  Objection.  Vague.

7           MR. RINDONE:  You can answer.

8      A.    Oh.  After that, I had an affray charge.  It

9   was a battery charge, but it got dropped down to an

10  affray charge.

11     Q.    To a what charge?

12     A.    Affray.

13          MS. HASKELL:  Affray, a-f-f-r-a-y.

14     Q.    Oh.

15     A.    Never heard of it?

16     Q.    Ung-ugh.  I don't practice criminal law,

17  though, so I was trying to act like I've heard it.

18  Right.  Certainly.  Obviously.

19          So it was battery.  That's some reduced charge

20  from, originally, the battery, got reduced to affray?

21     A.    Uh-huh.

22     Q.    When did that happen?

23     A.    July 16th, 2011.

24     Q.    Did you have to go back to the county jail?

25     A.    I had to go to court.

1     Q.   Had to go to court?

2     A.   Uh-huh.

3     Q.   What happened?

4     A.   That's when they dropped it down to an affray,

5  and it was additional probation, and I had to do more

6  community service hours.

7     Q.   Have you just been to the county jail that one

8  time?

9     A.   Uh-huh.

10    Q.   Yes?

11    A.   Yes, sir.

12    Q.   And we kind of went past it.  That was your

13  third arrest.  How old were you when -- when that

14  happened?

15    A.   Seventeen.

16    Q.   And what period of time were you at the Polk

17  County Jail?

18    A.   Like, how long I was there?

19    Q.   Yeah.  What months?  From what month to what

20  month?

21    A.   Oh.  It was in March.  Like -- yeah.

22    Q.   Of this --

23    A.   It was February 29th to March 18th.

24    Q.   Of 2011?

25    A.   No, this year.

1       Q.   Of 2012?

2       A.   Yes.

3       Q.   Okay.   So February to March 2012.

4       A.   Uh-huh.

5       Q.   The other one you mentioned that you said it

6  was a battery that went down to affray, when did that

7  happen?

8       A.   That was July 16th of last year.

9       Q.   So that was before the time you went to the

10 jail?

11      A.   Yeah.

12      Q.   Okay.   I was -- got the order mixed up then.

13      A.   You're good.

14      Q.   How old were you when -- when that happened?

15      A.   The battery?

16      Q.   Yeah.

17      A.   Seventeen.

18      Q.   And what happened there?

19      A.   Basically I was approached by this drunk guy

20 and he got in my face, and, like, I pushed him away from

21 me, and then he tried to attack me, and that's when I

22 attacked him.

23      Q.   Okay.   And that was -- you said you didn't have

24 to go to jail or anything, or DJJ, you just got

25 additional probation for that?

22

1     A.   Uh-huh.

2     Q.   All right.  And then I guess the most recent

3  one is the one where you went to the jail?

4     A.   Most recent?

5     Q.   Like the most recent arrest.

6     A.   Yeah.

7     Q.   Was when -- is when you ended up in the jail?

8     A.   Yeah.  That was a violation for curfew.  I have

9  a lot of those, just to let you know.

10       MS. HASKELL:  Could we go off the record for a

11    second?

12       MR. TROHN:  Yeah.

13       (Discussion off the record.)

14  BY MR. TROHN:

15     Q.   Okay.  I think I have a handle on the order of

16  things.  Your first scrape with the law was when you

17  were 15.  You were charged with burglary.  You were sent

18  to the assessment center and got probation.

19     A.   Yes, sir.

20     Q.   Then when you were 16 you had the battery where

21  your mom called and you got additional probation?

22     A.   Yes, sir.

23     Q.   Then when you were 17 you had a burglary that

24  you were charged -- charged with burglary of an

25  unoccupied dwelling, which was ultimately dropped to

23

1    trespass, and you got probation for that?

2        A.    Yes, sir.

3        Q.    Then after that, also while you were 17, you

4    were charged with battery, which was reduced to affray?

5        A.    Yes, sir.

6        Q.    And you got probation for that?

7        A.    Additional.

8        Q.    Additional probation.  And then after that you

9    had a curfew violation, and as a result of that you went

10   to the Polk County Jail from February to March of 2012?

11       A.    Yes, sir.

12       Q.    Okay.  And is there any -- has the curfew

13   violation -- is there anything left of that, or is that

14   all resolved at this point?

15            MS. HASKELL:  Objection.  Vague.

16       A.    Like, I don't have to go to jail no more, if

17   that's what you're asking.

18       Q.    Is there anything more to your sentence?  Do

19   you still have probation?

20       A.    Yes, I still have probation.

21       Q.    And community service, stuff like that?

22       A.    And community service.

23       Q.    Okay.  How much more of that do you have?

24       A.    I still need to do community service hours, and

25   right now I'm about to start Tri-County, which is

1    something that I need to do to finish probation, and I

2    need to do family counseling.

3         Q.   What's Tri-County?

4         A.   It's like this program.  You go every week, you

5    get drug tested.

6         Q.   Okay.

7         A.   Since I had the marijuana charge, that's why.

8         Q.   How much longer will you be on probation?

9         A.   It depends.  I'm trying to end it as soon as

10   possible.

11        Q.   Did they -- they didn't say like 12 months?

12        A.   Oh.  Until I'm 19, I think.

13        Q.   Okay.  And have you had any other problems with

14   the law since getting out of the Polk County Jail in

15   March?

16        A.   No.

17             MS. HASKELL:  Objection.  Vague.

18        A.   No.

19        Q.   No.  Okay.  When you went to the Polk County

20   Jail, let me ask, were you charged as an adult?

21        A.   I don't think so, because I was in the juvenile

22   part of the jail, so --

23        Q.   Were you a yellow shirt?

24        A.   Yeah, I was yellow, so I don't think I was

25   charged as an adult.

25

1      Q.    While you were at the Polk County Jail, did the

2   detention deputies ever have to use force on you for any

3   reason?

4         MS. HASKELL:  Objection.

5      A.    Not really.  Like, they didn't put force on me.

6   Not physical force.

7      Q.    You've never been pepper-sprayed when you were

8   at the Polk County Jail?

9      A.    No.

10      Q.    Are there any -- were you injured while at Polk

11   County Jail for any reason at all?

12         MS. HASKELL:  Objection.  Ambiguous.

13      A.    No.

14      Q.    Did you get in fights with any of the other

15   inmates while you were at the Polk County Jail?

16      A.    No.

17      Q.    Was there any type of counseling that you

18   believe you should have had while at the Polk County

19   Jail that you didn't get?

20      A.    Yeah, I would like -- I would like to have

21   some, but there wasn't.

22      Q.    Can you be more specific, what kind of

23   counseling you would have liked to have had?

24      A.    Like, not really, I should say, counseling,

25   but, like, if we had a complaint, like, we had someone

1   to talk to about our complaints what's going on about

2   the jail.  That's what I mean by that.

3       Q.   That's what you would have liked, someone to

4   talk to about problems that you saw there?

5       A.   Yeah, so, like, they could at least fix it or

6   try to do something about it.

7       Q.   What sorts of problems did you observe there?

8       A.   Where should I start?  I didn't like the food.

9   I'm not trying to be picky or anything, but -- and the

10  guards, like, they didn't treat us with the utmost

11  respect.  Like, most of them were very rude.  And

12  educational, like, the equipment they had, like, it

13  wasn't really good.

14      Q.   Educational equipment?

15      A.   Like, they didn't give us a lot of educational

16  stuff.

17      Q.   Can you explain that a little bit more for me?

18      A.   We didn't have enough resources.

19      Q.   Computers and such?

20      A.   They had computers, but we didn't use them.

21  And, like, the books, we had -- we worked out of, like,

22  one textbook all the time.

23      Q.   So you don't feel like you had enough, I don't

24  know if equipment is the right word, but --

25      A.   Yeah.  I don't know why I said equipment.

1      Q.    Well, you don't feel like you had enough that

2   your education --

3      A.    Was being used, yeah.

4      Q.    Okay.   Other than only having that one

5   textbook, is there any other specific issue with the

6   school that you can think of that you disliked or had a

7   problem with?

8      A.    Yeah.   We basically did the same thing.   Like,

9   it was repetitive.   We did the same work almost every

10  day.   Except Fridays.   We watched movies.

11     Q.    So you feel like the classes weren't

12  challenging enough?

13     A.    That's what I meant to say.   They definitely

14  weren't.

15     Q.    How many people were in your class?

16     A.    It would depend, because kids would come and

17  go, so I can't really give you an exact number.

18     Q.    All right.   Is there anything else about the

19  Polk County Jail that you had a problem with?

20     A.    Like, when we went out to rec, there was really

21  nothing to do, if you know what rec is.

22     Q.    Yeah.   Recreation.

23     A.    Yeah.   Like, playtime, basically.

24     Q.    What sorts of things did you all do there?

25     A.    Like, nothing.   We would have to, like, get all

1    our socks together and make a ball so we could play some

2    football.

3         Q.   How would that work?

4         A.   Like, grab a whole bunch of socks, put them in

5    one sock and make a big sock ball.

6         Q.   Make a big sock ball?

7         A.   Yeah.

8         Q.   Did you ever ask for --

9         A.   Yeah.

10        Q.   -- balls?

11        A.   (Nodding head.)

12        Q.   What were you told?

13        A.   "We don't have any."

14        Q.   So you played, what, football with the -- with

15   the ball you made?

16        A.   Uh-huh.

17        Q.   Yes?

18        A.   Yes, sir.

19        Q.   All right.  Anything else?  Any other problems

20   that you had there?

21        A.   It was awkward how we had to use the restroom

22   in front of our, like, I shouldn't say peers, but, like,

23   our roommate.

24        Q.   You mean having the toilet there in the cell?

25        A.   Yeah, while -- yeah.

```
 1        Q.    Anything else?

 2        A.    I think I'm done complaining.

 3        Q.    Okay.  Well, the reason I'm trying to get a

 4   complete list is I'm going to go back and ask you about

 5   each of these and see if you can expand a bit about it.

 6   And what you've told me is one -- the first thing was

 7   the food; the second thing, the guards were rude; the

 8   third thing was the education wasn't challenging; the

 9   fourth thing was recreation, there was nothing to do?

10        A.    Yeah.

11        Q.    And the fifth thing you mentioned was using the

12   bathroom in front of your cellmates was awkward.

13        A.    Yeah.

14        Q.    All right.  So does that complete all the

15   problems you had there?

16        A.    (Nodding head.)

17        Q.    Yes?

18        A.    Yes, sir.

19        Q.    Okay.

20             MS. HASKELL:   Jon, would this be a good time

21        for a break?

22             MR. TROHN:   Well, let me -- let me finish with

23        these, and then we'll break right quick.

24             MS. HASKELL:   You doing okay, Frankie?

25             THE WITNESS:   Uh-huh.
```

1   used on you, no pepper spray on you, never injured,

2   never got in any fights while you were there, correct?

3        A.   (Shaking head.)

4             No, sir.  I'm sorry.

5        Q.   So I'm -- I'm correct on all that?

6        A.   Yeah, correct.

7        Q.   Okay.  Were there any deputies that you

8   particularly liked or disliked?

9        A.   I liked some deputies, but I cannot remember

10  their names, but there were some good deputies there.

11       Q.   How about disliked?

12       A.   Yeah.

13       Q.   Do you remember any of their names?

14       A.   There was one I was trying to think of.

15  Frazier.  Officer Frazier.  There we go.  I got it.  But

16  that's the only one that I can remember.

17       Q.   What didn't you like about Officer Frazier?

18       A.   How he was rude towards everybody.  Like, let's

19  say if we would always try to ask for a phone call, he

20  would not even acknowledge us.

21       Q.   Anything else about him you didn't like?

22       A.   How he used pepper spray on juveniles that

23  didn't really -- he didn't really need to use pepper

24  spray on them.  Like, the situation wasn't called for to

25  use pepper spray.

1      Q.    Okay.  Anything else?

2      A.    That's about it.

3      Q.    Let me ask you about that a little bit.  Did

4  you see some times when you felt like pepper spray was

5  not necessary?

6      A.    Yes.

7      Q.    What did you see?

8      A.    It was actually Officer Frazier who did it

9  himself, who used it on a juvenile who refused to go to

10  school.

11      Q.    Do you know who the juvenile was?

12      A.    I can't remember his name.

13      Q.    Was that Jeremiah Davis?

14      A.    He had a nickname in jail.  Do you know his

15  nickname?

16      Q.    No.

17      A.    Oh.

18      Q.    But is this -- tell me what you remember about

19  that incident.

20      A.    Like, the kid, he was refusing not to go to

21  school, and then Officer Frazier was, like, "Get the F

22  out the bed and get your butt to school."

23           And the kid didn't want to go, so Officer

24  Frazier, like, he maced him, and then, like, he made him

25  drag himself to the cage.

1    Q.   Was this juvenile a blue or a yellow?

2    A.   Yellow.

3    Q.   So Officer Frazier told him to get out of bed

4  and get ready for school, and he refused?

5    A.   Yeah.  He didn't want to go to school.

6    Q.   Did he give a reason why he didn't want to go

7  to school?

8    A.   I mean, there was nothing to do in school.

9  That's, like, the main reason.

10    Q.   No.  I mean, did the kid tell -- did you

11  overhear --

12    A.   The officer?

13    Q.   -- why he didn't want to get ready for school?

14    A.   No, no, no, he didn't really say a reason.  He

15  just said, "I don't want to go."

16    Q.   Do you remember the name of the juvenile?

17    A.   No.

18    Q.   I may have asked you that.  I'm sorry.

19         Okay.  So he said he didn't want to go, and

20  then what did you see happen?

21    A.   I seen Officer Frazier, like, push him down to

22  the bed and then mace him.

23    Q.   Where did this happen?  Was this in your dorm?

24    A.   Yeah, it was in my dorm.

25    Q.   Which dorm was that?

1       A.    Charlie.  C.

2       Q.    Do you remember what date this happened?

3       A.    No.

4       Q.    Was this when you were towards the beginning of

5   your stay there?

6       A.    It was midway.

7       Q.    The middle?

8       A.    In the middle of my sentence.

9       Q.    And you told me earlier.  When was it in

10   February that you got there?

11       A.    February 29th.  It was on a leap year, a leap

12   year day, which was --

13       Q.    And you got out March what?

14       A.    18th.

15       Q.    So you were there a total of 19 days?

16       A.    Yeah.  Because that's another thing that they

17   do.  Like, it takes them a while for them to get

18   students, not students, but juveniles' papers to, like,

19   get them ready to get out.  I don't know what those

20   papers are called.  Yeah, but it takes them a while.

21       Q.    Okay.  Anyway, let's get back to this incident

22   with Officer Frazier.  You told me that a juvenile

23   didn't want to go to school and he pushed him down on

24   the ground and pepper-sprayed him?

25       A.    Uh-huh.

1      MS. HASKELL:  Objection.  Misstatement of the

2    testimony.

3    Q.   Anything -- anything more that you can recall?

4    A.   He pushed him down on the bed, not the ground.

5    Q.   Onto the bed?

6    A.   Yeah.

7    Q.   What else do you remember about that incident?

8    A.   Then after he maced him, he, like, grabbed him

9  by the collar, took him out the room.  And they were in

10  the main room.  They were out the dorm in the main room,

11  and he said, "Now, get your ungrateful a-s-s to the

12  cage."  And then it's like a box, cage thing.  And he

13  was going to go, but then Frazier was like, "No, I want

14  you to, like, drag your way there."  So he was scooting

15  on his butt to the cage.

16    Q.   He was on the ground scooting himself?

17    A.   Uh-huh.

18    Q.   He couldn't stand up?

19    A.   That's what I'm saying.  Frazier was like, "No,

20  I want you to drag yourself there," so --

21    Q.   You mean -- did he try to stand up?

22    A.   He was going to, but then Officer Frazier told

23  him no.  He said no, he wanted him to --

24    Q.   Where were you when this happened?

25    A.   I poked my head through the door, because I was

1    nosey, so I seen, like -- that's how I seen the macing.

2    And then everyone was at the dorm entrance.  Like,

3    there's a door to the dorm, and that's where I was, in

4    front of the door.  And, plus, the windows are all

5    see-through.  It was, like, glass, so I seen everything.

6         Q.    Where he got pepper-sprayed was inside of his

7    cell?

8         A.    Uh-huh.

9         Q.    It was on the first floor or the second?

10        A.    The second.

11        Q.    Second floor?

12        A.    Uh-huh.

13        Q.    And you were standing on the first floor?

14        A.    My room is on the bottom floor, but I went

15   upstairs because I heard the argument.

16        Q.    Because of what?

17        A.    I heard the arguing.

18        Q.    Okay.  So you went up the stairs to the second

19   floor to watch?

20        A.    (Nodding head.)

21        Q.    Yes?

22        A.    Yes, sir.  I'm sorry.

23        Q.    And were you actually at the cell where it

24   happened?

25        A.    I was in front of the doorway.

1      Q.   Right outside the doorway?

2      A.   Uh-huh.

3      Q.   And did this person who was sprayed have any

4 cellmates in there?

5      A.   I don't think so.

6      Q.   He was in there by himself?

7      A.   Yeah, I think so.

8      Q.   Can you describe this person?

9      A.   He was, like, real black, and he wasn't as tall

10 as me, but he was, like, more chunkier.

11      Q.   Okay.  And where were you when he was taken

12 outside and put in the cage?

13      A.   I was at the door.  The dorm door, not my --

14 not the cell door.  The dorm door.

15      Q.   Okay.

16      A.   Okay.

17      Q.   Was that door open?

18      A.   Uh-huh.

19      Q.   Were there any other incidents of pepper spray

20 which you thought --

21      A.   Was wrong?

22      Q.   -- was wrong?

23      A.   I heard of an incident, but I never seen it.

24 It was before I came in there.

25      Q.   Okay.  How many -- I want to know what you've

1   seen.

2        A.   No, after that I haven't seen any.

3        Q.   Okay.  Was that the only -- was that the only

4   use of pepper spray that you saw while you were there?

5        A.   That I seen, yes.  That I witnessed, yes.

6        Q.   In those 19 days you were there, just that one

7   use of pepper spray?

8        A.   Yes.

9        Q.   Yes?

10       A.   Yes, sir.

11       Q.   How many juveniles were in your dorm?

12       A.   In my dorm?

13            MS. HASKELL:  Objection.

14       A.   Yeah, I can't --

15            MS. HASKELL:  Calls for speculation.

16       Q.   It varied?

17       A.   Like, an estimate, you want?

18       Q.   Well, yeah, I guess it would vary from day to

19   day, wouldn't it?

20       A.   Yeah, it would, too.  Like, kids would come and

21   go, so --

22       Q.   Yeah.  What would be an estimate then?

23       A.   The least we probably have is 18.  That's all I

24   can tell you.

25       Q.   Were there any issues that you had with medical

42

1    care while you were there?

2        A.    Ung-ugh.

3        Q.    Did you have to -- did you require any medical

4    care while you were there?

5        A.    No.

6        Q.    Never had to see the nurse or anything?

7        A.    No.  I had to see her.  It was, like -- but it

8    was mandatory.  It was, like, when I came in there,

9    like, they had to get my information and --

10       Q.    Yeah, when you were initially assessed, I

11   guess.

12       A.    Uh-huh.

13       Q.    But I meant in terms of, did you ever have a

14   medical issue --

15       A.    A test?

16       Q.    -- pop up where you needed to see the nurse?

17       A.    No.

18       Q.    And you were never -- never required any type

19   of medication while you were there?

20       A.    No.

21          MS. HASKELL:  Objection.  Basis of knowledge.

22       Q.    Are there any other issues or problems that you

23   experienced at the Polk County Jail other than what

24   we've already discussed?

25       A.    Problems?  No, sir.

1    Q.   None come to mind?

2    A.   I'm trying to think, but --

3    Q.   Okay.

4         MS. HASKELL:  How about a break?

5         MR. TROHN:  Do you want to -- yeah, do you want

6    to have a break?

7         THE WITNESS:  All right.

8         MR. TROHN:  She's going to -- I'm done with my

9    questions anyway, but probably a good time for a

10   break if she's going to ask some.

11        THE VIDEOGRAPHER:  Going off the record at

12   1:50 p.m.

13        (Recess from 1:50 until 2 p.m.)

14        THE VIDEOGRAPHER:  We are back on the record at

15   2 p.m.

16        THE WITNESS:  All right.

17   BY MR. TROHN:

18   Q.   Let me ask the question first.  Now that we've

19   been on a break, there are some things that you would

20   like to say?

21   A.   Uh-huh.  I would like to clarify the fact that

22   I did get in trouble with the law after that incident

23   that I told you about.

24   Q.   Which one?

25   A.   The second one that led me on probation.  After

1        Q.    All right.  Is there anything else about that

2    incident that you think was wrong?

3        A.    No, but a thing that I do think was wrong is

4    how, like, sometimes kids would refuse not to go to

5    school, and one time I did that, and they would put us

6    in this thing called the cage.  And, like, we would sit

7    there until the whole school is over and then we would

8    go back to our dorms.

9        Q.    All right.  Why wouldn't you go to school?

10       A.    Because, like, we would do the same thing over

11   and over again and I was -- I didn't want to do it.

12       Q.    Well, you understand, I guess, when you're in

13   the jail you're supposed to follow the rules?

14            MS. HASKELL:  Objection.

15       A.    Yeah, I know that.

16       Q.    And you know if -- if cards aren't allowed and

17   you're playing cards you may get punished for that,

18   correct?

19            MS. HASKELL:  Objection.  Speculation.

20       A.    But cards are allowed, because the guards offer

21   the cards.

22       Q.    Well, apparently they weren't allowed, because

23   the guard came to get them, right?

24            MS. HASKELL:  Objection.  Basis of knowledge.

25       A.    If they weren't allowed, then the cards

1    would -- the guards would never give us the cards.

2        Q.    Okay.  And you understand people have to go to

3    school --

4            MS. HASKELL:  Objection.  Speculation.

5        Q.    -- right?

6        A.    I understand, but I didn't go school is

7    because, number one, we did the same thing over; and

8    number two, they would not, like, transfer our grades to

9    our schools.  So we was basically doing it for nothing.

10   Like, they would lack on that.

11       Q.    And you feel like the inmates there should be

12   able to decide on their own if the school is something

13   they like and want to go to, or not?

14           MS. HASKELL:  Objection.

15           MR. RINDONE:  Objection.

16       A.    No, I don't feel that, but I feel that if we're

17   going to do the work they could at least have the

18   decency to make sure our work would go to our original

19   schools.

20       Q.    Okay.  But that being the case, you still have

21   to go, right?

22       A.    I know.

23       Q.    I mean, in the jail, you understand it's a

24   structured environment, you have to eat when you're

25   supposed to?

1          MS. HASKELL:  Objection.

2     Q.   Sleep when you're supposed to?

3          MS. HASKELL:  Argumentative.

4     Q.   Go to school when you're supposed to?

5          MS. HASKELL:  Objection.  Vague.

6     A.   Yes.

7     Q.   And you understand if you don't do that and

8  tell the guards that you want to eat when you want or

9  sleep when you want or go to school when you want that

10  you may get punished for that?

11          MS. HASKELL:  Objection.

12     A.   Yeah, but the cage is not used -- it's not used

13  for, like, a holding cell for students -- not

14  students -- but juveniles who didn't want to go to

15  school.  The cage is used for, like, newcomers who go

16  in.  That's where we wait, in the cage, so we could get

17  processed, and then they choose which dorm we go in.

18  That's what the cage was for.

19          But they would put us in there, and usually,

20  like, when I didn't want to go to school, there were

21  other juveniles that didn't want to go to school and we

22  were packed in there.  That's why I'm complaining about

23  it, because, like, there was no room in that little

24  cage.

25     Q.   You would have rather just been left to stay in

1    your cell or go where you want?

2         A.    There's nowhere to go, but, yeah.

3         Q.    Within the dorm.

4         A.    Yeah, I would rather just be left in the room.

5         Q.    Okay.  And did you ask the --

6         A.    Guards that?

7         Q.    -- deputy, say, "I don't feel like going to

8    school.  Can I just hang out in the dorm today?"

9         A.    I just said, "I don't feel like going to

10   school."

11              And then they said, "Well, you know the rules

12   to that.  You're going in the cage."

13        Q.    Okay.  And you didn't like that punishment?

14        A.    No.

15        Q.    Any other problems that come to mind we haven't

16   discussed?

17        A.    No, sir.

18              MR. TROHN:  Okay.  Here, let me give you --

19              MS. BRONSON:  Thank you.

20                        CROSS-EXAMINATION

21   BY MS. BRONSON:

22        Q.    Is it okay if I call you Frankie?

23        A.    Frankie J.

24        Q.    I'm sorry?

25        A.    Frankie J.

1      Q.   Okay.   Did you ever request medical care while

2  you were at the Polk County Jail?

3      A.   No, ma'am.

4      Q.   Okay.   Earlier you testified that you had

5  attended an alternative school?

6      A.   Yes, ma'am.

7      Q.   Can you tell me what year that would have been?

8      A.   Tenth grade.

9      Q.   Tenth grade?

10     A.   Yes.

11     Q.   What was the name of the alternative school?

12     A.   Dawn E. Woods.

13     Q.   Spell that for me, please.

14     A.   I think it's D-a-w-n E. W-o-o-d-s.

15     Q.   Dawn E. Woods?

16     A.   Yeah.   It's, like, someone's name.

17     Q.   And why was it that you wound up at an

18  alternative school?

19          MS. HASKELL:   Objection.   Basis of knowledge.

20     A.   Basically I had too many referrals.

21     Q.   What did you have referrals for?

22     A.   Most were insubordination.   Had some tardies

23  too.   And -- but mostly for insubordination.

24     Q.   How many insubordinations did you have?

25     A.   To be exact, I really don't know, but it was

1    enough to get me kicked out.

2        Q.   More than three?

3        A.   Oh, yeah.

4        Q.   More than five?

5        A.   Oh, yeah.

6        Q.   More than 10?

7        A.   Probably, yeah.

8        Q.   More than 15?

9        A.   I do not know.

10        Q.   Okay.  So you know it was more than 10.

11        A.   A double digit.  Yeah, it was a double digit.

12        Q.   And can you describe what an insubordination

13    is?

14        A.   Like, either disrupting the class or something

15    like that.  Or sometimes they'll write you up for not

16    coming to school prepared.

17        Q.   Were there occasions when you were disruptive

18    in class?

19        A.   Oh, yeah.

20        Q.   Okay.  Can you describe some of those occasions

21    for me?

22        A.   Talkative.

23        Q.   Talkative?

24        A.   Uh-huh.

25        Q.   Were you being disrespectful to your teachers?

58

```
 1              MS. HASKELL:  Objection.  Vague.
 2      A.   Yeah, sometimes.
 3      Q.   Okay.  Were you swearing at your teachers?
 4      A.   The last incident, yes, I swore at my teacher.
 5  That's what probably kicked me out.
 6      Q.   And when I say swearing at, I mean, were you
 7  using profanity towards your teachers?
 8      A.   I don't think I used profanity, but I was
 9  using, like, vulgar words.
10      Q.   Like what?
11      A.   I'm not going to say the curse word.  Well, it
12  wasn't a curse word, but, like --
13      Q.   If you would, I'd appreciate you saying
14  whatever it was, whatever words you used.
15      A.   I did tell my teacher that she has a fake booty
16  and she needs to get laid, and I said something else,
17  but I forgot.
18      Q.   What did you mean by she needs to get laid?
19      A.   Because, like, she was so uptight.  There was
20  something wrong with her.
21      Q.   How long were you at the alternative school?
22      A.   Half a semester.  No, a semester.  One
23  semester.
24      Q.   Is that the only time that you've had to go to
25  an alternative school?
```

59

1      A.   Uh-huh.

2      Q.   Yes?

3      A.   Yes, ma'am.

4      Q.   Okay.  And you said that on the last day that

5  you were at the Polk County Jail you were placed in

6  isolation?

7      A.   Yes, ma'am.

8      Q.   Can you describe for me what you mean by

9  isolation?

10     A.   It's, like, it was in a separate place from the

11 dorm, and it's, like, when you go in there you have your

12 own room, a smaller room, but it was, like, disgusting.

13     Q.   What was disgusting about it?

14     A.   Like, when I went in my cell, the toilets was

15 clogged up with -- and it had the smell of pee and,

16 like, it would not flush at all.  That's why I was,

17 like, flipping, because I thought I was going to stay in

18 there the whole day, and I did not -- and it stunk.

19     Q.   Okay.

20     A.   And it had no mats in it.

21     Q.   It had no?

22     A.   Mats.

23     Q.   Mats.  And you were there for about 30 minutes?

24     A.   Yeah.

25     Q.   Okay.  And when you say you were going crazy,

1    what was it?  Can you describe that behavior for me?

2        A.    I was just, like, punching the door, basically.

3        Q.    You were doing what?

4        A.    Punching the door.

5        Q.    Punching the door?

6        A.    Yeah.

7        Q.    What kind of door was it?

8        A.    Metal door.

9        Q.    It was a metal door?

10       A.    Yeah.

11       Q.    You were punching it with what?  Your hands?

12       A.    My fist.

13       Q.    Punching it with your fist?

14       A.    (Nodding head.)

15       Q.    How long did you do that?

16       A.    For, like, a minute, and then I realized I'm

17   hurting myself, so I stopped.

18       Q.    Did you kick the door?

19       A.    No.

20       Q.    Okay.  Did you do anything else that you would

21   describe as, quote, crazy?

22       A.    Talking to myself.

23       Q.    What were you saying?

24       A.    Like, I got to get out of here.

25       Q.    Were you yelling that?

61

1    A.   No.  I wasn't that crazy.

2    Q.   Okay.  Is there anything else about your

3 behavior while you were in that isolation cell that you

4 would describe as crazy?

5    A.   No.

6    Q.   No?

7         MS. HASKELL:   Objection.  Misstatement of

8 testimony.

9    A.   No, ma'am.

10   Q.   Now, I believe you mentioned that you had on

11 another occasion while you were at the jail been -- that

12 you were placed in the cage, did you say?

13   A.   Yeah, uh-huh.

14   Q.   Okay.  When would you have been placed in the

15 cage?

16   A.   Like, what day?

17   Q.   Yes.

18   A.   I do not know.

19   Q.   Okay.  Was it at the beginning of your

20 sentence?  I believe you testified earlier that you were

21 there for about 19 days?

22   A.   Uh-huh.

23   Q.   Yes?

24   A.   It was probably third -- three-fourths of the

25 of the way of my sentence.

62

1     Q.   All right.  And did any corrections officer or

2  corrections deputy tell you why you were being placed in

3  the cage?

4     A.   Oh, I knew.  I knew why.

5     Q.   Why were you placed in the cage?

6     A.   Because I didn't want to go to school.

7     Q.   Okay.  Because you refused to go to school?

8     A.   Uh-huh.

9     Q.   Yes?

10    A.   Yes, ma'am.

11    Q.   Okay.  And how long were you in the cage?

12    A.   The whole school hours.  Eight hours.

13    Q.   And when you refused to go to school, do you

14  just say, "I'm not going today," or what?

15    A.   Yeah, that's what I said.

16    Q.   Okay.  Did you -- did the corrections deputy or

17  officer have to force you into the cage?

18    A.   No.

19    Q.   You just voluntarily went into the cage?

20         MR. RINDONE:  Objection to the form.

21    A.   Well, I wouldn't say voluntarily, but I knew I

22  had to go in there, so I went in.

23    Q.   So you went into the cage unassisted?

24    A.   There we go.  I like that.

25    Q.   Okay.  All right.

63

1      A.   Oh, and I remember one time where after the

2   spray incident, after that kid got maced, like, these

3   kids had a protest so they were, like, "We're not going

4   to school," because of that, and they didn't go, and

5   they were all in the cage.  Like, there was a lot of

6   them, but I went to school, because, I don't know, I

7   just went.

8      Q.   And the cage was large enough for how many

9   students?

10          MR. RINDONE:  Object to form.

11      A.   There are two cages.

12      Q.   I'm sorry?

13      A.   There are two cages.

14      Q.   Two cages?

15      A.   One on the right and one on the left.  So they

16   just filled them up.  And --

17      Q.   Can you give me an estimate as to how many --

18      A.   Kids were in there?

19      Q.   -- juveniles would have been in, say, one of

20   the cages?

21      A.   I'll say -- because, like, it was a lot, so,

22   like, each cage had kids standing up because there

23   wasn't enough room, but I would say about nine each,

24   probably.  I don't know.

25      Q.   Okay.

64

1       A.    That's just an estimate, though.  I'm not sure.

2       Q.    Sure.  That's all I'm asking for is an

3   estimate.  You were only placed in the cage once?

4       A.    Uh-huh.

5       Q.    Yes?

6       A.    Yes, ma'am.  Sorry.

7       Q.    You testified that you were going to have to

8   undergo family counseling?

9       A.    Yeah.

10      Q.    Is that -- was that per court order?

11      A.    Yeah, court order.  It was kind of weird,

12  though.  I don't know why.

13      Q.    Do you have an appointment to start the family

14  counseling?

15      A.    Yeah, I think so, but I don't know the date, if

16  you're going to ask.

17      Q.    Have you lived anywhere else other than -- is

18  it --

19      A.    Davenport.

20      Q.    Davenport?

21      A.    Yes.

22      Q.    And I believe you testified that you lived in

23  another state?

24      A.    New Jersey.

25      Q.    New Jersey?