Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 1 of 113 PageID 4733

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              1

1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF FLORIDA

3                  TAMPA DIVISION

4                    * * * * * *

5    CHANDA HUGHES, as guardian and
     on behalf of J.B., a minor;
6    BRENDA SHEFFIELD, as guardian
     and on behalf of J.D., a minor;
7    VIOLENE JEAN-PIERRE, as
     guardian and on behalf of
8    F.J.P., a minor, et al.,

9            Plaintiffs,
                           Case 8:12-CV-00568-SDM-MAP
10           vs.

11   GRADY JUDD, Polk County
     Sheriff, in his official
12   capacity; and CORIZON HEALTH,
     INC.,

13           Defendants.

14   _____

15

16

17          VIDEOTAPED DEPOSITION OF

18             GARY W. DELAND

19

20           August 29, 2012
                8:22 a.m.

21

22      2300 West Sahara, Suite 770
           Las Vegas, Nevada

23

24      Heidi K. Konsten, RPR, CCR # 845

25



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 2 of 113 PageID 4734

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              5

1          MS. BRONSON:  Jeanelle Bronson

2    representing Corizon Health.

3

4    Whereupon,

5                GARY DeLAND,

6    was called as a witness, and having been first duly

7    sworn to testify to the truth, was examined and

8    testified as follows:

9

10                  EXAMINATION

11   BY MS. HASKELL:

12        Q    Good morning.

13        A    Good morning.

14        Q    My name is Miriam Haskell, and I

15   represent the plaintiffs in this matter.

16             Can you state your name for the record.

17        A    Gary Walter DeLand.

18        Q    And, Mr. DeLand, you've been offered as

19   an expert for the defendants in the -- in this

20   matter, correct?

21        A    Yes, I have.

22        Q    Okay.  So I presume today you'll be

23   testifying -- you'll be offering expert testimony

24   with respect to this case?

25        A    I will.



```
 1              Is that okay?
 2       A     Yes.
 3       Q     If you need a break at any time, please
 4   let me know.
 5       A     Okay.
 6       Q     And is there any reason today why you
 7   cannot give a truthful and complete deposition?
 8       A     No.
 9       Q     What is your current work address?
10       A     Post Office Box 579, Santa Clara, Utah
11   84765.
12       Q     And what's your business name?
13       A     DeLand & Associates Criminal Justice
14   Consultants.
15       Q     Who are your associates?
16       A     The associates are actually a network of
17   people that I work with, and it would be everyone
18   from Kerry Hill in Minnesota to -- oh, heavens, I
19   would have to go through their names.  Jim Chip
20   from Utah; Tate McCauther from Utah; Louisiana,
21   Mike Haley.
22              There's a number of them.  I choose to
23   contract and subcontract with people to work with
24   me, as opposed to actually employing them.
25       Q     Okay.  All right.  Mr. DeLand, I'm
```



1    day that I'm talking about, when I was still a

2    young lad, I know there was a personnel case I

3    dealt with in one of the county jails down there.

4    There was a fire case in Seminole County, which

5    settled while I was flying there to testify.

6           There was a suicide case in the Tampa

7    area, in Ellis County, I believe.  So I think

8    there were about five cases I worked, and it's not

9    out of the realm of possibility that Polk County

10   was one of those.  I just don't recall.

11        Q    Okay.  I want to talk more about your

12   prior experience.

13        A    Certainly.

14        Q    Where did you earn your undergraduate

15   degree?

16        A    University of Utah.

17        Q    All right.  And what was your major?

18        A    It was physical education at the time.

19   I was working towards becoming a physical

20   therapist.

21        Q    Did you ever work as a physical

22   therapist?

23        A    Well, actually I did in a limited

24   capacity.  My father was the athletic trainer at

25   the University of Utah, and they hired me and gave



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 5 of 113 PageID 4737

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              39

1   me a partial scholarship to assist treating, you

2   know, athletes there.  And then, of course, you

3   did internships, in this case at the VA hospital.

4          By the time I got through with it, I

5   already become a deputy sheriff, and I found I

6   liked doing that a lot more than I figured I would

7   like being a therapist.

8      Q    Why did you become a deputy sheriff?

9      A    To get through school.  A friend --

10  well, it wasn't a friend at the time, but an

11  individual who we were giving some treatment to

12  that came up to the University of Utah to get me

13  physical treatment, asked me where I was working.

14  And I said, "Well, I just got this little gig

15  here, and it's not very much money."

16         And he said, "I could get you on with

17  the sheriff's office, work -- dispatch office.

18  You could work nights, study at night," and so

19  that's what I did.  But before long I had gotten

20  transferred to the juvenile division, which I

21  quite liked, and before long after that, I decided

22  to change my career.

23     Q    The juvenile division at the sheriff's

24  office?

25     A    Yes.



1        Q    What were your responsibilities there?

2        A    We investigated all crimes committed by

3   or against juveniles.

4        Q    Allegedly committed by, right, at that

5   point?  Or would you -- would you -- I mean, you

6   would investigate any crimes that a juvenile had

7   been alleged to have committed?

8        A    Well, if it was past alleged and it had

9   already been decided, obviously we wouldn't be

10  involved with it.  But, yeah, when somebody

11  claimed that -- or we observed, or whatever it

12  might be, a juvenile acting -- well, not just

13  crimes even, you know, because ungovernable

14  children, neglected children also fell under our

15  bailiwick.

16       Q    And how long did you work in the

17  juvenile division?

18       A    I'm guessing probably about three years,

19  but I don't recall exactly.  I moved around in

20  different divisions.  That's fairly typical.

21       Q    Within those three years, would you have

22  moved around also?

23       A    No, within those -- my time in juvenile

24  I know was one solid time.  And then, you know,

25  I'd work vice, I'd work detectives, I'd work

1  patrol, I'd work the jail.  In fact, I ended my

2  career running the jail.

3       Q    Do you have any academic training

4  related to juveniles?

5       A    Well, I took coursework.  My second

6  degree was a bachelor's of arts, and it was in

7  sociology with a criminal justice emphasis.  And

8  the criminal justice emphasis included classes on

9  juvenile delinquency and so on.

10      Q    How many classes on juveniles?

11      A    There would have been one or two.  I

12 don't recall exactly.

13      Q    Do you recall the subject of those

14 classes?

15      A    One of them was juvenile delinquency,

16 and then it seems like there was a -- one of the

17 social work classes, a psychology class would have

18 had something to do with juveniles, as I recall.

19      Q    Okay.  And you received that degree in

20 1960 -- oh, I'm sorry, 1985; is that correct?

21      A    No.  No, the first degree was in 1964.

22 The second was in '69, and the third degree, the

23 one that I got -- my master's degree was in 1985.

24      Q    You're right.

25           So the BA in sociology you're referring



1    to was in 1969?

2        A    That's when I completed that, yes.

3        Q    Do you know if -- if the field of

4    sociology or psychology of juveniles or

5    adolescents has changed since 1969?

6        A    I would guess.  Most things do.

7        Q    Do you know how it's changed?

8        A    Probably a whole bunch of new theories

9    that we will later decide were incorrect have come

10   on the scene.  I found that area to be somewhat

11   fad-driven, with programs that were touted highly

12   and then turned out not to be very good when we

13   got to them.

14       Q    When you were studying it, you found it

15   to be fad-driven?

16       A    Well, both.  But particularly I was

17   talking about we tried a lot of different things

18   that other people had tried and thought really

19   worked when we were in the juvenile division.

20       Q    In those three years?

21       A    Right, much like in the adult system.

22   When I ran the adult system, there were all kinds

23   of things that were being touted as cure-alls for

24   crime, which rarely worked unless you had a very

25   narrow, specific type of people that were very



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 9 of 113 PageID 4741

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              44

1    juvenile division in the late 1960s?

2        A    Yes, and probably early -- very early in

3    the '70s maybe.

4        Q    Other than your work in the juvenile

5    division those three years, what work do you have

6    that relates to juveniles?  What work experience?

7        A    Raising kids, which may have been the

8    toughest part of the whole thing.

9        Q    How many children do you have?

10       A    I have two from my initial marriage, and

11   I have two more children from marrying the wife

12   that we celebrated our 29th wedding anniversary

13   this week -- this week.  And then my sister died

14   when she was 27 of an embolism, and so we took her

15   son on after we won a lengthy court fight to get

16   him away from his abusive father.

17       Q    Other than raising your own children, do

18   you have any other experience with juveniles?

19       A    That would pretty much do it.

20       Q    And you were a deputy sheriff for 17

21   years; is that right?

22       A    Yes, that would be about right.  It may

23   be off a month or two somewhere, I suppose.

24       Q    Other than those three years as deputy

25   sheriff, how -- as a deputy sheriff in the



1    juvenile division, did you ever work with children

2    or juveniles?

3        A    Not as a direct assignment.  Obviously

4    as a law enforcement officer working in patrol or

5    detectives or other parts, you come into contact

6    with kids one way or another.  There's overlapping

7    constantly.  But in terms of a primary assignment,

8    no; that would be the only time.

9        Q    If on patrol you came in contact with a

10   juvenile, would someone who was in the juvenile

11   division then step in at some point?

12       A    We would call for them.  If they weren't

13   available, we just went ahead and processed them,

14   just like they would call for us when I was there,

15   but we -- if we were busy and couldn't get there,

16   they would go ahead and handle it.

17       Q    As a deputy sheriff in that period of

18   time from 1963 to 1980 -- is that right?

19       A    (Nodding head.)

20       Q    -- you ever worked with juveniles who

21   were detained?

22       A    Yes.

23       Q    Did you work with juveniles who were

24   detained longer than immediately following an

25   arrest?



1          A    Now, let me make sure I clarify your

2     question correctly.

3               If by that you mean did I work as

4     somebody in a detention unit, the answer would be

5     no.

6          Q    Okay.

7          A    If what you're saying is going to, say,

8     the Salt Lake County detention home and

9     interviewing kids or doing various kinds of work

10    inside of there that -- that were intended to

11    connect us with the people who worked there, yes.

12              But did I actually -- was I employed in

13    a -- in a detention facility?  Oh, no, absolutely

14    not.

15         Q    And during that period of time, were you

16    ever employed in a detention facility for adults?

17         A    Yes.

18         Q    And when was that?

19         A    That would have been -- that would have

20    ended in 1979.  There -- 1980 -- let me explain --

21    was the day I left the sheriff's office, but I had

22    taken a year's leave of absence up to that day.

23    So I came back for one day and then resigned,

24    because by then I had built up a consulting

25    business over that year.



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 12 of 113 PageID 4744

GARY W. DELAND                                      August 29, 2012
HUGHES vs. JUDD                                                  47

1           But from '79 back to I think around
2   1970, '71, with one small period of time where the
3   sheriff took me out of the jail to write an
4   operations manual for the department, I worked in
5   the jail, in the jail administration.
6           Q     And that was an adult jail?
7           A     That was an adult jail, although we did
8   handle some juveniles.
9           Q     What do you mean by "handling some
10  juveniles"?
11          A     Well, we have in Utah what are called
12  certified juveniles.  That means because of their
13  extensive records, their dangerousness, very often
14  the inability of the juvenile system to handle
15  them, a petition would be filed with the juvenile
16  court to have them certified as adults.
17          And that -- that involved both the
18  juvenile court and I think the -- at that time,
19  the -- the district court itself, although the
20  juvenile court was a district court, too.  But
21  they then had to be certified to stand trial as an
22  adult and to be housed as an adult.  So we had
23  those in our jail.  We had those in my prison.
24          Q     Do you know what percentage of people in
25  the jail they made up?



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 13 of 113 PageID 4745

GARY W. DELAND                                           August 29, 2012
HUGHES vs. JUDD                                                        48

1        A     Very small percentage.  Very small

2    percentage.

3        Q     Were there times -- were there periods

4    at the jail when there were no certified juveniles

5    there?

6        A     There may have been.  It wouldn't be

7    very many of those periods.  It seemed like we

8    always had one or two.  And then we also had, if

9    somebody could not be handled at the juvenile

10   facility but they had not been certified, either,

11   the juvenile court judge could ask us to house

12   them in the jail where we had more capability of

13   high security operations.

14            But we had to handle those completely

15   different than the certified.  The certified could

16   be housed with adults, you could do anything with

17   them that your classification dictated was

18   appropriate.  The others had to be separated in

19   individual cells away from any adults.

20       Q     Do you know if that's still the case,

21   that juveniles in that situation can be held at

22   the adult jail?

23       A     Yes.  Yes.  They still can at the

24   prison, as well.

25       Q     So children in the juvenile system in



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 14 of 113 PageID 4746

GARY W. DELAND                                        August 29, 2012
HUGHES vs. JUDD                                                    49

1  Utah can be kept at the prison -- the state

2  prison?

3              MR. CAMPBELL:  Object to the form.

4              THE WITNESS:  Well, they're not in

5  the juvenile system anymore.

6  BY MS. HASKELL:

7      Q    That's what I'm asking you about.

8           I believe that you mentioned that you

9  would have in the adult jail children who had been

10 certified --

11     A    Right.

12     Q    -- but also children who were not

13 certified but could be kept there?

14     A    Okay.  Okay.  I didn't mean to confuse

15 you.

16     Q    Okay.

17     A    Those that are not certified are only

18 there as a temporary measure, and it's only

19 because they created too much of a danger,

20 perhaps, in the jail they were in.  Also in Utah,

21 there is an allowance in the rural areas where

22 there's no detention facility immediately

23 available, to have short-term holds, as well,

24 until proper transfer can be arranged.

25           But in those instances, we have to keep



1  them separate as much as possible from adults.

2  They wouldn't be housed in the same housing area,

3  for example.

4      Q     Okay.  So in 1979 you worked on building

5  your consulting business?

6      A     Yes.

7      Q     And why did you make that shift or

8  decide to make that shift?

9      A     Well, I had been asked about three years

10 before by the National Institute of Corrections to

11 leave Salt Lake County and go to work for them in

12 Boulder, Colorado at the jail center.  And I

13 turned that down, but did agree to do consulting

14 work for them and training work for them.

15      I got to where I was traveling a great

16 deal.  My sheriff found ways to accommodate that

17 by having me write promotional exams, write policy

18 manuals and everything, which I could do as well

19 on the road, as long as I kept track of my time

20 properly.

21      And then we had a new sheriff, who

22 didn't like that whole idea.  So I had to make a

23 decision, "Do I want to stay here as a captain

24 making this much money, or do I want to take the

25 consulting business that I built for myself, where



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 16 of 113 PageID 4748

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              53

1    whether it would be exclusive or whether it would

2    not.

3        Q    And then when did you become -- when did

4    you move to the Utah State Department of

5    Corrections?

6        A    1985.

7        Q    And why did you make that change?

8        A    I've asked myself that before.  I was

9    called by the Director of Public Safety, who said

10   that they were having big troubles at the prison,

11   would I be willing to take the job, and I said no.

12   I had two or three other officials that I knew

13   that asked me the same thing, and then finally the

14   governor called me.

15           And initially I said no, and then a

16   month or two later decided -- because I never

17   picked up my retirement.  I was a couple of three

18   years short of my retirement, maybe I would do it.

19   But I promised him a very short -- you know, I

20   thought maybe two years, and I can buy the last

21   year, or three years.  I ended up realizing I'm

22   not a good counter, I guess.  I was there seven

23   years, so I recruited somebody to replacement me

24   and bailed out.

25       Q    How many prisons were there in the



1   department of corrections?

2        A      There was -- there were two in the Salt

3   Lake County area, what they called Northpoint and

4   Southpoint.   There was one that I built while I

5   was there called the Central Utah Facility in

6   Gunnison, Utah.   And there was a facility -- a

7   joint city -- or excuse me, a joint county/state

8   facility called the Iron County Utah State

9   Correctional Facility in Cedar City, Utah.

10           And then I had started a program where,

11  to keep the building costs down and to help the --

12  the smaller counties be able to run bigger

13  facilities.   It's easy to run a big facility than

14  a small one, if you can keep it filled up with

15  prisoners.   If you only have prisoners now and

16  then, you don't have enough staff to really meet

17  some of the requirements you need.

18           So what we started doing was taking

19  small counties, we would contract with them.   They

20  would build maybe a 100-bed facility where they

21  only needed -- or 180-bed, whatever, where they

22  only needed 10 or 12 beds themselves, and then we

23  would contract with them to house our prisoners

24  under conditions that they agreed to go through

25  our training programs, they agreed to meet our

Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 18 of 113 PageID 4750

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              55

1    operational standards.

2            And it really turned out to help.  In

3    fact, because of all of that, that's probably part

4    of the reasons that I was hired as the head of the

5    Sheriffs Association, they wanted to continue that

6    process now that I was gone.

7        Q    What was the prison population in Utah

8    at the time?

9        A    That I left?

10       Q    Uh-huh.

11       A    I'm guessing about 5,000.

12       Q    And do you know how many of those 5,000

13   inmates would have been certified juveniles?

14       A    Again, it would be a real wild guess,

15   but I would say probably less than two dozen.

16   It's started to pick up now, I'm told.  And I

17   don't know what they've got, but because of the

18   gang activities, you know, there's a lot of these

19   kids that they just can't deal with anymore in the

20   system, and so they're -- that number may have

21   changed significantly.  I don't know.

22       Q    Because juvenile work is not your focus?

23       A    No.  No, I -- I get called periodically

24   to take juvenile cases, and I just tell them to

25   get somebody who's more specialized in that area.



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 19 of 113 PageID 4751

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                            59

1    jail.

2         Q    But are jails then able to do some of

3    those evaluations?

4         A    They are, but they don't have the same

5    information to work with.  So, for example, in --

6    in a prison system, once we've classified

7    somebody, unless an event came up, we just looked

8    at the classification again a year later.

9              In jails, most of the jails that I

10   worked with will have their classification

11   officers look at classification at least every

12   month.  And during the first month or so they're

13   in there, you know, be more aware of -- of their

14   behavior and conduct so that they can make those

15   adjustments as they need to.  It's different.

16        Q    Are you aware that within the Department

17   of Juvenile Justice in Florida, children receive

18   an assessment upon arrest?

19        A    I'm aware that they do, yes.

20             MR. CAMPBELL:  Object.

21             THE WITNESS:  I was told that.

22             MR. CAMPBELL:  Object to the form.

23   BY MS. HASKELL:

24        Q    Who told you that?

25        A    I got that when I was -- I toured the



1    jails, as I believe you're aware.  And Captain

2    Marcum I know talked about that they were assessed

3    and all of that before they ever got them.

4         Q    Do you know the contents of that

5    assessment?

6         A    No, I haven't gotten to that.  But I

7    only know they did it because I got that from

8    Captain Marcum.

9         Q    Well, based on your experience and

10   expertise, what should be the contents of such an

11   assessment?

12        A    Well, you certainly would want to know

13   the history of violence that an individual has,

14   the nature of that violence, whether you've got a

15   predator on your hands, and predators come in all

16   ages.  You would also want to know in that

17   assessment whether you've got somebody who's

18   vulnerable, either because of size or personality.

19             You would want to know at least

20   something about their mental health status, if

21   that information is available, something about

22   their medical status, if that information is

23   available, because these are all things you have

24   to deal with when you get there.  So there's a

25   variety of things that you take into account.



1          You know, drug use, prior escape or

2    escape efforts, running from police, all of that.

3    You know, if you're going to have a juvenile or an

4    adult, either one, who is going to -- may be

5    eligible for work gang, but he got on his past

6    history an escape from a detention home or fleeing

7    from peace officers, that may not be the person

8    you want to classify as eligible for these kinds

9    of programs.

10         Q    So these are things that you would need

11   to determine whether you were working with adults

12   or children?

13         A    Both.  I mean, our job is to do what we

14   can to protect.  And the fact that you turned 18

15   or didn't turn 18 has very little effect on the

16   danger to yourself or others that you may present

17   given your present circumstances.

18         Q    Is there anything that you would

19   recommend an evaluation include for a juvenile in

20   particular that would be different?

21         A    I would look basically at the same set

22   of circumstances.  And if the juvenile files were

23   available -- a lot of times in a lot of states,

24   the juvenile files are so protected, they don't

25   get pulled into any kind of assessment process.



1    So anything that's available you want to look at,

2    but particularly their violence records, their

3    escape records, their drug use, you know, mental

4    health, medical, any potential for suicide, you

5    know, that kind of thing.

6         Q    And are you basing this opinion on your

7    experience evaluating adults?

8         A    Evaluating adults.  But like I said, we

9    had to evaluate the juveniles that came into our

10   facility.  We had to make a decision, do we create

11   a whole separate unit just for those that haven't

12   turned 18 because of that day on a calendar, and

13   they'll suddenly be a whole different person the

14   day after their birthday, or do we try to classify

15   them the same way we do everybody else to keep

16   everybody protected, and that was the approach

17   that we took.  And it worked very well for us, I

18   might add.

19        Q    Okay.  So -- so you treated those

20   children as you treated adults in the system?

21        A    Yes, because they had been determined to

22   be adults, and because I was not pursued by

23   exactly when their birth date was going to be that

24   the violence that they could commit or the

25   likelihood that they could be the subject of



```
 1    attacks was governed by their birthday.  It was
 2    more a matter of their own issues of
 3    vulnerability, their own issues of violence, their
 4    own issues or predatory behavior, those kinds of
 5    things.
 6         Q    And how young was the youngest child
 7    that you detained?
 8         A    The youngest while I was there was 16.
 9         Q    Are you aware that there have been
10    children as young as nine in the Polk County Jail?
11         A    No, I wasn't aware of that.
12         Q    If there were children as young as nine
13    that needed to be evaluated, would you do anything
14    differently?
15         A    Sure.
16         Q    What would you do?
17         A    Well, the first thing I would do is --
18    you know, looking at it from their point of view,
19    or when I was in Utah?
20         Q    You can start with Utah, if that --
21         A    Okay.  First of all, of course I
22    wouldn't have got a nine-year-old.  But assuming,
23    just for the sake of the hypothetical, I had, you
24    know, that person would not be sufficiently mature
25    to put them in any circumstance other than total
```

1    isolation.

2            Well, when I say total isolation, I mean

3    isolated from other prisoners.  They wouldn't be

4    isolated from staff or social workers or other

5    people that might be working with them.

6        Q    And why is that?  Why is it that they

7    would need to be isolated from other prisoners?

8        A    Well, nine is so far down that level

9    that, you know, and the size issues and their

10   potential for violence against other prisoners

11   is -- I mean, all of the things that they could do

12   or are likely to do are much, much, much, much

13   less there.

14           Plus, you know, even though I'm saying

15   that that birthday on 18 doesn't -- you know,

16   between 16 and 18, a lot of things can be done.

17   There's wide varieties of maturity there.  But

18   when we're getting down to nine, that's a whole

19   other category unto itself.

20       Q    All right.  And in your experience and

21   expertise, is there a way that the Polk County

22   Jail should be treating a nine-year-old

23   differently?

24       A    Yeah.  They should be kept separately,

25   not only from the adults, but probably from the



1    other juveniles.

2        Q    And why is that necessary?

3        A    Just protection.  Avoid them from being

4    taken advantage of.

5        Q    And what about an 11-year-old?

6        A    Well, you know, we can move up the scale

7    one at a time.

8        Q    Right.

9        A    I don't know exactly what the cut-off is

10   going to be.  But obviously when you look at

11   somebody, if you see -- a 17-year-old even, if

12   they've got the vulnerability of a

13   nine-year-old -- what we're doing is getting into

14   issues where we have to look more at what the risk

15   is.

16        The nine-year-old could have gone

17   through the same risk assessment, and he still

18   would have been separated out the way a

19   nine-year-old would be, because his potential for

20   violence, his potential for any of the kinds of

21   things we would be concerned about causing

22   problems for the inmates would be low, but his

23   vulnerability level would be high.

24        So any -- you can have a 25-year-old

25   whose mental capacity, say an IQ of 75 or 80, same



1  thing, we would treat him the same way.  His

2  potential for violence might be very, very low,

3  but his vulnerability assessments would be very,

4  very high.  So it's less a matter of the age and

5  more a matter of the vulnerability.  And a

6  nine-year-old simply fits very -- very much into

7  very vulnerable and not dangerous.

8      Q    And are you basing that on your personal

9  experience with children or your corrections

10  experience?

11      A    I'm basing that on both.  I mean, you

12  live life and you're around children.  As a cop on

13  the street, you had to deal with kids of all ages.

14  And some of the kids in that 15, 16, 17,

15  18-year-old age can be very extremely dangerous,

16  but I've never feared a nine-year-old.

17          So what we're looking at is simply what

18  are the vulnerabilities, how do we protect the

19  prisoner from others, how do we protect other

20  prisoners from that individual.

21      Q    You used the term "hard core" earlier.

22          What do you mean by that?

23      A    Well, hard core -- there are any number

24  of juveniles that we run into -- I have run into

25  on the street.  I did a lot of work with LA



1       A     I don't know.

2       Q     Okay.  Going back to your CV --

3       A     Yes.

4       Q     -- I see that you assisted with the

5   rebuilding of Abu Ghraib?

6       A     Yes.

7       Q     How did you get involved with that work?

8       A     Well, I was in Hawaii testifying at a

9   trial, and I was watching tanks roll in front of

10  the Republican Palace, which would later be my

11  office.  And the phone rang, and it was a

12  representative either from the state department or

13  the department of justice -- I have forgotten

14  which now, because they were both involved --

15  asking if I would be willing to join a team to go

16  over.  I agreed.  My wife was sitting there, and I

17  told her what it was and I wanted to go, and she

18  said fine.

19      Q     Did you work with juveniles in that

20  position?

21      A     Unfortunately, yes.

22      Q     Tell me about that.

23      A     When I got to -- no juveniles were ever

24  at Abu Ghraib.  In fact, there were no inmates in

25  the Abu Ghraib Prison we built when I left.  We

Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 28 of 113 PageID 4760

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                                76

 1    still didn't have locks on the doors yet.  We had

 2    cut the ribbon, because we were leaving.  Our team

 3    that built it was leaving.

 4            But when I got there, there was a

 5    facility called Tasferat, and at Tasferat when I

 6    got there, I found there was everything from

 7    75-year-old men to seven- and eight- and

 8    nine-year-old children, and they were all housed,

 9    lumped in together.

10        Q    And what was your opinion on that?

11        A    Horrification.  I mean, you know,

12    because a lot of these people were hardened, very

13    bad people that were locked up.  Some were locked

14    up just being in the wrong time -- the wrong place

15    at the wrong time.

16            But the point was, yes, we did run into

17    that, and -- and we had -- we did everything we

18    could to get the kids out of there.  I even -- one

19    was an arranged escape, which I almost got in

20    trouble for.  But after that, what we did is we

21    just built a separate room and put the kids in

22    there and doubled up the staff to keep track of

23    them.

24            I used MPs to keep track of them at that

25    point instead of the Iraqis, who had a whole



1   different view of -- and they had to run most of

2   our facilities.  We didn't have enough MPs over

3   there to run the facilities.  So, you know, I had

4   the unfortunate experience of having kids young

5   that were mixed in with the other prisoners that

6   got picked up in sweeps.

7        Q    In the -- in the writing that you have

8   done over the years of articles --

9        A    Yes.

10       Q    -- have you ever written about issues

11  affecting juveniles?

12       A    Not that I recall.  There may have been

13  an article somewhere in there, but I don't recall

14  it.  All of the articles that I have written are

15  right in there, so you know, if you see one,

16  please call my attention to it.

17       Q    Have you ever advised -- in your

18  consulting history, have you ever advised

19  operators of a juvenile detention facility?

20       A    Only to the extent that the Idaho State

21  Industrial Training School was finding they

22  couldn't house their prisoners in their existing

23  facilities because they were getting a harder

24  group of inmates to deal with, and so I was part

25  of a team that they brought in to build a maximum



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 30 of 113 PageID 4762

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              78

1  security holding facility -- or maximum security

2  facility in St. Anthony, Idaho.

3          So I helped design that, and we talked

4  about different practices of operating, you know,

5  that sort of thing, but mostly it was around the

6  design.

7      Q    So that would be the limits of your

8  experience with the juvenile detention facilities

9  specifically?

10     A    Yeah, pretty much.  Yeah.

11             MS. HASKELL:  We just got the

12  warning --

13             THE WITNESS:  Well, one more.

14  BY MS. HASKELL:

15     Q    Please.

16     A    And that would be -- let's see, New

17  Mexico.  Sante Fe, New Mexico, we built a jail and

18  a juvenile facility at the same time.

19     Q    Who is "we"?

20     A    Well, the architectural firm that hired

21  me, which at that time was Jones -- no.  Who was

22  it?  Edwards & Daniels Architects.  We were

23  building a jail, and they wanted to also have a

24  juvenile facility that was physically connected,

25  but where the inmates of the two different age



1    groups would be entirely separate.

2        Q    On that -- in that work, did anyone who

3    had more experience with juveniles also consult?

4        A    No.

5             MS. HASKELL:  I just got the warning

6    that they need to change the tape, so --

7             THE WITNESS:  That's fine.

8             MS. HASKELL:  -- we'll stop for a few

9    moments.  Go off the record.

10            THE VIDEOGRAPHER:  This is the end of

11   Tape No. 1 to the videotaped deposition of Gary

12   DeLand.  The time is 9:38 a.m.  We're off the

13   record.

14            (Whereupon, a recess was taken.)

15            THE VIDEOGRAPHER:  This is Tape No. 2

16   to the videotaped deposition of Gary DeLand.  The

17   time is 9:47 a.m.  We're on the record.

18   BY MS. HASKELL:

19       Q    Mr. DeLand, when we broke, I believe you

20   had mentioned that you were involved in the

21   building of a juvenile facility in Sante Fe.

22       A    Yes.

23       Q    When was that?

24       A    It would have been about 1982, '83, I

25   guess.



1     Q    Do you know if that facility is still in

2   operation?

3     A    I'm sure it is.

4     Q    As a juvenile facility?

5     A    Well, it's both.  There were two sort

6   of -- two separate buildings kind of joined at the

7   hip.

8     Q    And when you were first hired for that

9   project, did they have the intention to build a

10  juvenile facility at that point?

11    A    Yeah, I believe they did.  Yeah.

12    Q    And is that --

13    A    The main thing was to build a jail, but

14  I think they decided that they might as well run a

15  bond election for both and get them done at one

16  time.

17    Q    And by -- by 1982, did you have

18  experience at that point in jail construction?

19    A    Yes.

20    Q    Can you describe -- describe what went

21  into the construction of the -- that -- or the

22  design of that juvenile facility.

23         Were there any differences, for example,

24  than -- in the ways in which of the adult facility

25  was constructed?

1       A     No.   Security is security.   You need

2   rooms to sleep in.   You need to have some

3   reasonable lines of sight.   You know, you need to

4   have hard structures that prevent people from

5   breaking out from them.   So there was really

6   nothing with regard to building that facility,

7   other than the program areas.

8            They had very specific desires with

9   respect to program areas, and so we designed to

10  meet those requirements.   But in terms of safety,

11  security, the basic building requirements of the

12  facility, those were pretty much the same.

13      Q     Same for juvenile as for an adult

14  facility?

15      A     Yes.

16      Q     What do you mean by reasonable lines of

17  sight?

18      A     Well, there's no way that I've ever

19  seen, sort of having everything in dormitories,

20  that you can see every square inch of every living

21  area that you're in.   But if you've got the

22  ability to see the entire day room area, for

23  example, that -- or as much of that as is possible

24  from one location, and then you have the ability

25  at least on walking patrol to see into the

1   not right inside of the prisoners, as opposed to

2   remote linear where you walk along the corridors

3   to see people, and you see them only that minute

4   that you're looking at that, that few seconds

5   you're looking at them.

6        Q    Is there any difference in the necessary

7   lines of sight for adults or juveniles?

8        A    Not really.  I mean, the bottom line is

9   the people who are responsible for the safety and

10  security have to be able to see, and a line of

11  sight is a line of sight.

12       Q    And I think you said one of the

13  differences in this construction was the program

14  areas?

15       A    Yeah.

16       Q    And did you say that was the only

17  difference or the main difference?

18       A    It would be the primary difference.

19  They're -- you know, in every jail or prison or

20  anything you build, there are differences just

21  based on the desires and the preferences for the

22  people you're working for.

23            But the only thing of any significant

24  difference that I can recall in that was that they

25  wanted a very heavy programming area, and so that

1    affected how hallways were built, it affected how

2    those areas would be supervised and so on.

3        Q    What do you mean by programming?

4        A    Well, everything from school to areas

5    where they would maybe have -- deal with anger

6    management courses or drug courses, or anything

7    where people were trying to deal with them in a

8    non -- not just a security setting, but rather

9    dealing with counseling, dealing with education,

10   those kinds of things.

11       Q    And did you incorporate that into the

12   construction or design at their request, or was it

13   something that you also recommend?

14       A    Well, what we do is sit down and ask

15   them -- long before we start designing, I would do

16   a prearchitectural report so the architects would

17   know what to design to.  And what we did was spend

18   a significant period of time with -- I believe his

19   name was Kurt Freedinour, as a matter fact.  It's

20   odd I remember that.

21           But he would -- we would sit down and

22   say, okay, now, what are the kinds of things

23   you're going to do?  What kind of adjacencies

24   would you like?  What things would you like

25   located in what fashion?  How many people are you



1    going to want to be dealing with at a given time

2    in this particular type of programming?  Do you

3    want your room to be multipurpose or do you want

4    them single purpose?  So there's all kinds of

5    things that you would ask them.

6              Then we would advise them, you know,

7    also we would like you to think 20 years in the

8    future, this building will be here 20 years from

9    now.  Will that meet your needs then?  How are

10   things going to change?  You won't know exactly,

11   but do you want us to add anything in or do you

12   want us to make any adjustments to accommodate

13   what could happen in the future.

14             Once all of that was done, I reduced it

15   to writing, and the architects, with my aid, began

16   designing it.

17        Q    In your experience and expertise, other

18   than programming, are there any other ways in

19   which a juvenile facility should differ from an

20   adult facility in construction?

21        A    None that I can think of.

22        Q    Do you believe, then, that it would be

23   appropriate to move juveniles into any adult

24   facility?

25        A    No.  I've seen some adult facilities I



1   after I came back.

2         But I just don't think it works out so

3   well.  Since I turn down a lot of cases that --

4   that defendants call me on, it's not very hard to

5   turn down plaintiff's cases.

6         Q     So people end up having to choose a

7   side, essentially?

8         A     Yeah, they do.  And that's not -- I have

9   no problem with that.  But given all the work that

10  I do separate from being an expert witness, it

11  just doesn't work out well.  You know, and I don't

12  want to have any plaintiff's lawyer feel like I'm

13  not giving them full value for having brought me

14  in or that I have any reason to hold back because

15  I know the people involved or they've been in my

16  classes.

17        Q     They might think you're biased against

18  them?

19        A     Well, yeah, I suspect that would be

20  believed against -- of any expert witness by

21  anybody looking at it.  But I just think that it

22  makes more sense to let them get somebody besides

23  me in those circumstances.

24        Q     Okay.  I would like to discuss a couple

25  of the articles that you listed in your CV.



1       A    Sure.

2       Q    In 2001 I believe you published an

3   article on OC spray entitled, "Effective and

4   Non-Lethal."

5       A    Yes.

6       Q    Do you recall what your opinions were in

7   that article?

8       A    Do I recall what?

9       Q    What your opinions were in that article?

10      A    Yes, basically.  I mean, I don't recall

11  everything that I put in that particular article,

12  but basically the opinions were that it was a low

13  level of force, that it was a type of force which

14  resulted in a significantly lower level of injury

15  to both those who are sprayed and those who are

16  trying to regain control of the situation, and

17  that there was a relatively short recovery time

18  from it.  Those would be the basics, but you can

19  ask further questions if you would like.

20      Q    And over the course of your career, when

21  did OC spray begin being used more widely in jails

22  or prisons?

23      A    I couldn't tell you exactly, but

24  certainly because there was a -- when it really

25  became much more used -- in use was probably in



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 39 of 113 PageID 4771

GARY W. DELAND                                                    August 29, 2012
HUGHES vs. JUDD                                                            105

1   the mid '80s.  Before that they used CN and CS,

2   and what those stood for, their name is this long,

3   so I don't want to try to butcher them for you.

4   But both of those -- but especially the CN, the CN

5   had potentially some harsher effects, more

6   long-term.

7        But pepper spray is basically an

8   inflammatory rather than the chemical irritant

9   that especially CN was.  Recovery time was better,

10  and a lot of research had been done on both the --

11  on what it did to the mucus membranes, what it --

12  you know, what it did to the gastrointestinal

13  system, if anything, the eyes, and so on.

14       So there's been a lot of research on

15  that, and they found it to be in all instances

16  better than the CN, which had been marketed as

17  mace for the most part.  A lot of things get

18  called mace now, but originally that was mace.  It

19  was a very harsh chemical irritant.

20       Q    And so what is the impact of OC spray on

21  those areas that you mentioned, the mucus membrane

22  and --

23       A    Okay.  With respect to the eye, it

24  causes -- and, by the way, I've -- I've had myself

25  sprayed in the face in training classes before.



1    Q    And do you consider yourself able to

2    testify as an expert as to the impact of OC spray

3    physically?

4    A    Yes.

5    Q    Okay.  Please continue.

6    A    OC, when sprayed in the eyes, first of

7    all, causes the eyes to -- to dilate, which makes

8    it more difficult to see.  But more importantly,

9    it burns, and so there's tearing.  And so you have

10   a combination of -- of less ability to see, and

11   also, you know, pain, which makes it less likely

12   you're going to be able to resist appropriately.

13        It also serves as a distraction.

14   There's a lot of reasons for using it, because a

15   lot of times inmates will fight through OC.  I've

16   seen that happen.  In fact, my SWAT team -- and I

17   trained with them for that very reason -- would be

18   sprayed, and then they were required, and I did

19   that with them, to carry out a series of tasks

20   before they could leave the room, which we pretty

21   heavily fogged with OC.

22        But even for people who can withstand

23   it, it's a distraction long enough for officers to

24   move in, gain control, get handcuffs or other

25   kinds of manacles on.  So that's -- that's one



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 41 of 113 PageID 4773

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                               107

1    thing it does.

2              Other thing is that it irritates the

3    mucus membranes for, you know, usually a good 20

4    minutes or so, and it also makes it a little more

5    difficult to breathe.  You're gasping more for

6    air.

7              With respect to the skin, unless it --

8    if it's atomized in the air, you don't get too

9    much problem there.  But if it's sprayed directly,

10   then there would be a burning sensation on the

11   skin for -- again, you know, my experience with it

12   has been -- and it's up and down, different --

13   with people's different makeup, I guess.

14             But 20 minutes before, it's pretty much

15   resolved.  It may be an hour or two before you get

16   completely beyond, you know, the feelings of

17   irritation and so on.  But the nice thing that it

18   does in terms of controlling people is it creates

19   pain as opposed to injury.

20             And one of the things that in every

21   police academy you'll go to or corrections

22   academy, they teach pain compliance, you know,

23   using different restrictions on joints and -- and

24   so on, even to the point, you know, some academies

25   teach using a knee strike to a -- a leg muscle



1    where it's particularly painful, not for injury,

2    but because pain distracts and gives you a chance

3    to control people as opposed to just wading in and

4    having a bar fight.

5         Q     Does pepper spray cause any injuries?

6         A     I'm not aware of it, with the

7    exception -- there's one study that was done by

8    a -- an individual by the name of Winders, if I

9    remember his name correctly.  In fact, I think

10   I've even got him in my report.  He's got a -- he

11   had an excellent study where he looked at -- he

12   found two instances in all -- in the materials

13   that ACLU and others had submitted talking about

14   deaths and whatnot, where two people who died who

15   had serious asthma conditions.

16        But in terms of injury, anything lasting

17   longer than burning sensations, irritation,

18   that's -- I'm not aware, and certainly none of the

19   uses we ever did -- and I was there seven years.

20   None of the uses any of my staff who -- anybody

21   who used pepper spray had to go through the

22   training and they got sprayed.  Same with those

23   that used tasers had to go through taser training.

24        We never had any -- any long-term

25   results there.  And then the other thing, is I've



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 43 of 113 PageID 4775

GARY W. DELAND                                   August 29, 2012
HUGHES vs. JUDD                                             109

1    read a lot of -- it's been a little bit of time

2    since I've read them, but I read a lot of the

3    National Institute of Justice studies where they

4    looked for injury or long-term effects, and that

5    just doesn't seem to be there.

6              But let's assume there is a certain

7    amount of injury.  Let's just, for arguendo --

8         Q    Well, before you move on, can I just

9    ask --

10        A    Yeah.

11        Q    -- those NIJ studies, those involved

12   adults who were sprayed?

13        A    Let's see.  Well, it's hard to say,

14   because, for example, the Baltimore study was on

15   the street, so it could have been a combination.

16   The Alaska Highway Patrol study was on the street,

17   so there could have been --

18        Q    There might have been children involved?

19        A    Sure.

20        Q    Are you aware of any studies that

21   specifically document the effects of OC spray on

22   children or juveniles?

23        A    None that I have ever read.

24        Q    Okay.  Please go on.

25        A    Okay.  One of the reasons -- you know,



1    if you look at the way I've approached in this in

2    the past -- and that seems to be what you're

3    looking for at the moment -- is even if, for the

4    sake of argument, injuries may occur on occasion,

5    even serious injury on occasion, when you look at

6    it statistically -- and the Arizona State study is

7    one of the best I've ever seen.  But when you look

8    at it statistically, less people get hurt, less

9    people get injured on both sides of the event.

10            So what you need to do when you're

11   running a jail or prison in looking at how you're

12   going to deploy OC or any other type of force, is

13   what provides us the best opportunity to resolve

14   the situation without injury.  You know, I've --

15   I'm aware of situations where somebody got shot

16   with a taser and fell down and hit their head on a

17   toilet.  Okay.  It was -- you know, it's

18   collateral to what you were doing it for.  The

19   taser didn't hurt them, but the fall did.

20            And that's one of the reasons I like OC

21   better than tasers, because once your muscles

22   relax and you go down, you know, there's a good

23   possibility you get hurt.  Not a good -- a lot of

24   people get hurt, nonetheless.

25        Q    When you use the word "injury," are you

1    referring to physical injuries?

2         A    Yes.

3         Q    Okay.  Are you aware of any nonphysical

4    injuries that could be caused by pepper spray?

5    For example --

6         A    Like?

7         Q    -- injuries to one's mental health,

8    posttraumatic stress disorder?

9         A    No, I would be -- I'm not a

10   psychologist, I'm not a psychiatrist.  I don't --

11   but I can't think of any reason why OC would make

12   somebody mentally ill.

13        Q    But you are an expert in the impact of

14   OC spray?

15        A    Yes.

16        Q    Okay.  In your expertise, is there any

17   potential for nonphysical injury or injuries to

18   someone's mental health related to OC spray?

19              MR. CAMPBELL:  Object to form of --

20              THE WITNESS:  Well, let's say --

21         (Interruption by court reporter.)

22              THE WITNESS:  Oh, I'm sorry.

23              MR. CAMPBELL:  Object to form.  Thank

24   you.

25              THE WITNESS:  I'm not aware of any,



1   nor have I seen any, nor have we experienced any

2   in my career.

3   BY MS. HASKELL:

4       Q    Have you ever seen a study that dealt

5   with the impact on someone's mental health of OC

6   spray?

7       A    I have not.

8       Q    And I believe you said -- strike that,

9   actually.

10          Okay.  I want to go back to a couple of

11  other articles, Mr. DeLand.

12      A    Sure.

13      Q    You wrote -- you wrote I believe at

14  least two -- in 1997 and 1982, two articles on the

15  values of accreditation?

16      A    Yes.

17      Q    And what were your opinions in those

18  articles?

19      A    Well, what I was talking about

20  specifically was the American Correctional

21  Association's accreditation programs --

22      Q    Okay.

23      A    -- later developed -- debated their

24  president on that subject at a conference.  They

25  even had me write in their magazine about it.



1        A     I don't think so, that -- for a moment

2    the name sounded familiar, but no, I can't

3    think --

4        Q     Have you referred -- have you reviewed

5    any of the plaintiff expert reports in this case?

6        A     No.  Oh, I -- I had one that arrived,

7    but I'll review it when I get home.

8        Q     Okay.

9        A     That's where I've heard that name,

10   that's right.  That was on the outside of the

11   disk.

12       Q     Okay.  Just give me one second,

13   Mr. DeLand.

14             Did you -- did you visit the Polk County

15   Jail in preparing your report?

16       A     Yes, I did.

17       Q     Okay.  When was that?

18       A     I didn't bring my calendar with me, but

19   I'm guessing it was probably maybe three months

20   ago or so.  I could be off a bit.

21       Q     Did you only visit the one time in

22   preparation of this report?

23       A     Yes.  Although to be honest, I visited

24   it for at least the Rogers case.  I can't recall

25   whether I did for Slone or not.



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 48 of 113 PageID 4780

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              122

1    also -- I don't recall -- I can't even recall his
2    title.   Grant?   Is there somebody by the name of
3    Grant?
4         Q    Brian Grant?
5         A    Yes.   He was there for a time.   And then
6    we went across the street to the juvenile
7    facility, and the individual who I guess has been
8    the commander or the supervisor, whatever you call
9    the head of that unit, was there to show us
10   through there.
11              Other than that, there would be others,
12   you know, coming and going as we went into
13   different parts of the facility that would come
14   up, approach us.
15              MS. BRONSON:   Excuse me, Miriam.   Can
16   we take a real quick break?
17              MS. HASKELL:   Sure.   Is that okay
18   with you, Mr. DeLand?
19              THE WITNESS:   Sure.
20              THE VIDEOGRAPHER:   Off the record at
21   10:34 a.m.
22              (Whereupon, a recess was taken.)
23              THE VIDEOGRAPHER:   On the record at
24   10:38 a.m.
25



1    you do your programming, you know, what areas are

2    available for you, where is your rec yard.  You

3    know, there were -- there were a number of

4    questions that I would have asked going through

5    just to get a sense of how they operated the

6    place.

7         Q    Was there furniture in the building?

8         A    There were bits and pieces of it here

9    and there, but it was certainly not furnished, if

10   that's the question.

11        Q    Were you able to assess where -- where

12   staff were, for example, when they were

13   supervising children?

14        A    For the most part, yeah.

15        Q    How did you do that?

16        A    One was looking at the surroundings and

17   seeing where staff would generally be, and the

18   other was by asking.

19        Q    All right.  Mr. DeLand, I would like to

20   move on to your -- the specifics in your report.

21        A    Sure.

22        Q    Do you have it in front of you?

23        A    I do.

24        Q    Can you please tell me generally your

25   opinions in this report, and then we'll discuss



1    them point by point.

2        A    Well, since we're dealing with -- in my

3    report with use of force and particularly OC,

4    nothing that I have seen to this point would cause

5    me to be uncomfortable with either the written

6    policies of the use of force or of OC.  As you'll

7    note from my report, much of it is dealing with OC

8    as a product in general.

9            Once I've had an opportunity to read

10   depositions, incident reports, look at any CD --

11   disks, you know, of information where it's been

12   used, then I'll actually be able to opine with

13   respect to how it was used in specific

14   circumstances.  Right now, I have not had the

15   opportunity to see those.

16           And so my opinions are that OC is a

17   safer product than grappling.  My opinions are

18   that it's a safer product than going in and trying

19   to grab and hold on, to use pain compliance holds,

20   many of the things that you're taught to do.  If

21   I'm writing policy, I'm going to put OC at a lower

22   standard than I will so-called soft hands, which

23   means everything short of punching.

24       Q    And I believe on one of your earlier

25   points, you made a statement about a policy -- a



1   policy being important, but also being as

2   important as how it's put into place or how it's

3   carried out; is that correct?

4        A    You confused me a little here.

5        Q    If a facility -- you mentioned that

6   you -- you reviewed the policies and procedures

7   for OC and use of force.

8        A    Yes, I did.

9        Q    Okay.  Why is that significant or

10  important?

11       A    Because I wanted to see, in general,

12  what guidance they give staff with respect to

13  using force and what guidance they give staff with

14  respect to using OC.

15       Q    So those policies -- those policies

16  demonstrate what is told to staff or how a staffer

17  might be trained?

18       A    Well, it's a little different than

19  training, but when you're trained, you're trained

20  also to carry out the policy.  So, yes, there

21  would be an overlap there definitely.

22       Q    Okay.  But does reviewing the policies

23  tell you anything about the way in which they are

24  actually implemented?

25       A    It tells you how they're supposed to be



1   implemented if -- you know, in order to be

2   compliant with policy.

3        Q    Okay.  All right.  Well, let's -- so I'm

4   on page 18 of your report.

5        A    Good.  So am I.

6        Q    Okay.  Opinion A-1.1, what is your

7   opinion?

8        A    You want me to read it into the record?

9        Q    Yes, that would be wonderful.  Thank

10   you.

11       A    Oh, okay.  Sure.

12           "In an environment where the subjects

13   being housed have been incarcerated against their

14   will and the incarceration was deemed unnecessary

15   as a result of a criminal conviction or charging

16   of violation of criminal law, experience has

17   demonstrated that force is an option that must

18   sometimes be used to restore or maintain order,

19   control, and discipline."

20       Q    Okay.  And what is the basis for that

21   opinion?

22       A    Well, the basis for that opinion is a

23   variety of things.  One is the years that I've

24   worked in the system, you come to work every day,

25   you see the kinds of prisoners that I was talking



1   about there, and you see their behavior.  And

2   after years of observing that, that's hard --

3   that's a very easy opinion to have.

4          The other part of that is that the force

5   option must be available in order to maintain

6   order, control, and discipline.  Well, as anybody

7   who has worked in this system knows, you don't

8   just walk up to a prisoner and say, "Okay, stop

9   doing that now," and they stop.  Once in a while

10  that may happen, which surprises you.

11         More often than not, if prisoners don't

12  cease and desist immediately, then you end up

13  having to take some -- exercise some level of

14  force in order to prevent that from happening,

15  control them -- isolate them, control them, and

16  manacle them, whatever it is that that set of

17  circumstances demands.

18         So years and years and years and years

19  of experience -- not only mine, but the experience

20  of people I talked to in training classes I do,

21  technical assistance stuff I've done -- inmates

22  who come to facilities didn't get there because

23  they were following the rules better than anybody

24  else.  They tend to be the people who are less

25  likely to follow the rules.

1    They also very often -- a significant

2    portion of them may have some violent tenancies or

3    may have had a lot of violence in their history.

4    So you kind of put those people together in a very

5    close environment where -- where it's difficult to

6    walk away from people who annoy you or who have --

7    be intimidating you or whatever else, you lock

8    somebody in that environment, and there's going to

9    potentially be a need to restore order.

10    And restore order, very often in a

11    number of cases, certainly -- I would say very

12    often requires some level of force or threatened

13    force.

14    Q    Okay.  And just to be clear, the vast

15    majority of your experience that you're talking

16    about is dealing with adult prisoners, correct?

17    A    Well, let's see, seven years working in

18    Salt Lake -- or in -- roughly in Salt Lake County

19    Jail, and about seven years running the department

20    of corrections where we had juveniles most of the

21    time that I was there -- small numbers, granted,

22    but you have -- you have plenty of opportunity to

23    see how they react, you have -- especially in the

24    prison setting, where those juveniles had been

25    certified to stand trials as adults, so you really

1  study -- it was a two-year long study -- they

2  found that the display of the can, which they

3  considered a use of force, the canister, was

4  adequate to change the attitude of the individuals

5  and restore order quickly without having to

6  actually spray.  So I -- I include as use of force

7  both.

8       Q    Are there other methods, other than use

9  of force, for maintaining order in a facility?

10      A    Sure.  You can ask people to stop doing

11 what they're doing to restore order, and it works

12 sometimes.  You know, the first thing would be

13 officer presence.  You know, the officer comes on

14 the scene, those prisoners who do not want to be

15 observed in misconduct will stop.

16           On the other hand, I'm familiar with any

17 number of cases where stabbings, beatings,

18 full-scale riots take place right in front of

19 staff.

20      Q    So after office presence --

21      A    So officer presence is -- works with a

22 few people.

23           Then, you know, there's -- well, I guess

24 what you could call verbal negotiation, verbal

25 instructions, verbal orders.  When you walked up,



1    they didn't stop what they were doing, but you

2    yell at them to stop, some people will.  But from

3    that time on, it gets to be more of a process that

4    is now no longer verbal.  It involves hands on.

5    It involves sprays, pepper sprays.  It involves

6    tasers.  It involves some kinds of efforts beyond

7    just being there and talking.

8         Q    And earlier you -- you used as an

9    example, I think your quote was, "Okay, stop doing

10   that now" doesn't work.

11             Is that actually how that order would be

12   delivered in a facility?

13        A    Well, it might be delivered in a louder

14   tone, you know, to knock it off or, "Get in your

15   cells.  Lock down," you know, there are any number

16   of orders that may be issued depending on what

17   they're trying to accomplish.  Usually when you've

18   got that problem, you immediately give a loud

19   verbal command for everybody to get into their

20   cells for lockdown.

21             And if you've got 20 inmates out there,

22   for example, in my experience, a significant

23   number of them will go straight to their cells,

24   and a bunch more will choose to push it further.

25   And that's when you might send in a special



GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              150

1   reaction team or, you know, do whatever you have

2   to do in order to bring order to the situation.

3   If it's only one or two inmates, then you may do

4   it, but with -- with staff available.

5        Q    Are you familiar with the PAR method of

6   de-escalation?

7        A    No, but I'm -- not specifically, no.

8   I've taught classes on de-escalation, but I don't

9   recall using any called PAR.

10       Q    Okay.  And what is de-escalation?

11       A    De-escalation is trying to defuse a

12  situation prior to employing force.  And if the

13  force is not active, that is there's not a fight

14  going on or if somebody is not being punched,

15  there's some kind of disorder or you've got one or

16  two prisoners who are being recalcitrant, then you

17  can verbally step people down away from that.

18            But de-escalation or defusing, any of

19  those terms that you might want to apply, when

20  you've got an active fight going on and they don't

21  respond to an immediate command, de-escalation

22  there is to get troops in, boots on the ground,

23  and stop people from being hurt.

24            Because when we go in, our intention is

25  maybe pain but no injury.  There's no prescription



1      Q     Right.

2            And what do you mean by "maintain

3   order"?

4      A     Maintain order sometimes will be a

5   situation in which things are beginning to occur,

6   you begin to see aggression or in subordination,

7   things beginning to happen where officers need to

8   prevent it from happening.  It's more of a

9   prophylactic as opposed to a -- it's already a

10  full-blown event, let's get in and resolve it.

11           So maintain basically is that, you --

12  you want to keep things from going beyond.  And so

13  when you see threats to the proper maintenance of

14  disorder, then it may be necessary to act at some

15  level, whether that's cautioning, whether that's

16  threatening, or whether that's moving force into

17  the area so that prisoners have to rethink it.

18     Q     Are those the only three options?

19     A     No.  You know, the options would vary

20  according to a -- you know, whatever circumstances

21  are in place.  But the -- I gave those as examples

22  more than, you know, anything that was -- all that

23  were available.

24     Q     Could an option be -- if an officer

25  anticipated conflict between two people, could an



1    option be to separate them?

2        A    Sure.

3        Q    Could an option be -- if an officer

4    anticipated a disruption in a unit, could an

5    option be to occupy the people in the unit with

6    some sort of activity?

7        A    I guess it would depend on what the

8    level of the threat was.  You know, if -- if it

9    was a high level of threat, that might be a

10   useless endeavor.  In fact, it could I suppose

11   even complicate the situation under some

12   circumstances.

13           The main thing is you evaluate what the

14   risk is, and then decide what actions you're going

15   to apply to that, and then you have a wide range

16   of approaches that you might use.

17       Q    And who makes that decision?

18       A    Well, sometimes that decision is made in

19   split seconds by the individual officer who's

20   responsible or is responding to the -- the issue.

21   In other cases where let's say it's a forced cell

22   entry, somebody refuses to -- that you can sit

23   down and talk about, you know.  Because you have

24   spontaneous things and you have things where

25   you've got some time.



GARY W. DELAND                                          August 29, 2012
HUGHES vs. JUDD                                                     171

1   it.  And if going in means we're now going to have

2   to apply some physical force, we always prefer to

3   use pepper spray over hands on.

4        Q    Okay.  Would disobedience of any order

5   justify the use of pepper spray?

6        A    Any order?

7        Q    Yes.

8        A    Oh, no, not any order.  But there may be

9   circumstances where you're pressing somebody to do

10  what has to be done and it has some -- some

11  necessity in order to get the day's work done or

12  for safety or security reasons, and somebody is

13  confronting you.  Or they're confronting you in

14  front of other prisoners where everybody else is

15  watching to see if they can get away with the same

16  conduct.

17       Q    So are those the distinctions, necessity

18  for what has to get done that day, safety and

19  security, and sort of making an example not

20  encourage -- to discourage that kind of conduct?

21       A    It's not so much in that instance making

22  an example, it's putting an end to what's going on

23  more quickly, and so that the event is over.  But

24  there -- you know, those are three of many reasons

25  why you might choose to do that.



1          Grab somebody and drag them into their

2     cell, if I can do it, or am I going to use pepper

3     spray, which has two benefits?  One, it makes it

4     easier for me to handle them at low risk to either

5     of us, although there's a lot of blow-back from

6     that.  A lot of officers don't like pepper spray

7     for the very reason that they get into it, too.

8          But the other reason, then, is somebody

9     who hasn't been sprayed often would prefer not to

10    have that happen again, so next time you talk to

11    them, at least, they may be less likely to

12    confront you.

13         Q    Are you aware that the Florida

14    Department of Juvenile Justice line staff do not

15    carry pepper spray?

16         A    No.

17         Q    Do you believe that would have an impact

18    on their operations?

19         A    Well, obviously it has an impact, but if

20    they put other -- you know, maybe they put other

21    things in place they feel more comfortable with.

22    I would -- you know, I'm not going to judge what

23    their management practices are.  There's a wide

24    range of practices.

25         I can only tell you what I, in my own



1   situation, have done and what I've found effective

2   in other circumstances, and that is if you're

3   going to use force, use something that has a lower

4   potential for injury on staff and on the people

5   you're using it on.

6        Q    All right.  And so going back to your

7   point about how you -- you would not recommend a

8   less safe method for juveniles than for adults --

9        A    Right.

10        Q    -- what about that child we discussed

11   earlier that's maybe as young as nine years old in

12   the Polk County Jail?

13        A    Well, somebody who's as young as nine

14   years old -- and I didn't see any of those, but

15   the risk level to somebody -- any nine-year-old

16   that I have ever seen is so low that I don't think

17   any officer going in is in fear of getting knocked

18   down by a nine-year-old or receiving injury from a

19   nine-year-old.

20            So, you know, they are going to have to

21   look at each situation.  I wouldn't spray a

22   nine-year-old, just because I know that I can

23   handle him otherwise.  On the other hand, and I

24   make this a point -- this point in my report,

25   correction officers go to work every day, and



1  they're supposed to come home and see their wife

2  and kids or their husband and kids.

3         And I want -- I'm -- they don't

4  initiate, you know, those situations I mentioned.

5  The prisoners have that opportunity.  Well, I want

6  the line staff who have to deal with those

7  situations to be as much protected as possible.

8  And if that's what the -- my experience tells me,

9  and if that's what the studies show, that there's

10  less staff injury, then I'm all for that.  And

11  it's nice that it also includes less injury to

12  prisoners.

13     Q    I know -- and I know we can go through

14  these years one by one, and I won't make you do

15  that.  But you wouldn't spray a nine-year-old.

16         I mean, would you spray an

17  eleven-year-old?

18     A    See, and I won't go there.  Because what

19  we're talking about is not -- when we decide who

20  to spray and not is not based on age, it's based

21  on threat.  It's based on need.  The fact that you

22  happen to pick a nine-year-old, I respond to that

23  because I can't imagine a nine-year-old I could

24  not have somebody handling.

25         But I'm not going to walk up that line,



1   because walking up that line, all of a sudden it

2   get us back to it's the age as opposed to the

3   threat.  I suppose if I had a 12-year-old that

4   could bench press 450 pounds and had knocked down

5   three of my people I might view him in a different

6   way.

7              So it's -- what we have to do is get to

8   what is the threat assessment to the particular

9   prisoner or to the people around him, to staff.

10  The classification, the use-of-force decisions

11  have to be made on that basis.  And I can't see

12  with your nine-year-old example where anybody

13  approaching that would perceive a threat to their

14  personal injury or a threat to, you know, anything

15  around them, other than just controlling that

16  young nine-year-old and putting him somewhere

17  else.

18       Q    Have you ever reviewed a situation, in

19  your experience, working in facilities or as a

20  consultant where someone was threatened by a

21  12-year-old?

22       A    Not in my immediate experience, no.

23       Q    And I believe you said earlier that it's

24  not the officers who initiate these situations,

25  correct?



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 65 of 113 PageID 4797

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                               178

1      A      Right.

2      Q      Okay.  Have you ever seen a situation

3  where an officer goaded an inmate?

4      A      Uh-huh, yes.

5      Q      Okay.  What happened then?

6      A      It was in the Salt Lake County Jail.

7  One of my officers -- I had found out from others,

8  because I wasn't there at night when he was

9  generally working -- would bait drunks into taking

10 a swing at him.  So in his case, we simply fired

11 him.

12            I talked to the county attorney later

13 about it, and he said that's -- we wouldn't have

14 charged -- you know, give you charges on it,

15 because it would be too hard to get a conviction.

16 But, no, that's absolutely intolerable.  You bait

17 people into things, that's intolerable.

18     Q      So it's possible that officers could

19 initiate disorder?

20     A      There may in some cases.  You know, that

21 happens in cases around the country, yeah, sure.

22     Q      I want to go back to your explanation of

23 the sorts of disorder that could warrant pepper

24 spray.  I believe you said screaming or raising

25 cain.



1    heck in a hand basket.

2    BY MS. HASKELL:

3        Q     What if someone disobeyed an order to

4    stop singing?

5        A     Singing?

6        Q     Yes.

7                    MR. CAMPBELL:   Object to the form.

8                    THE WITNESS:   What are they singing?

9    No, it --

10   BY MS. HASKELL:

11       Q     Does that matter?

12       A     It doesn't matter what -- what they're

13   singing.  The matter is what the effect is having

14   on -- on the environment around them, you know.

15   I'm not opposed to singing, but I would be opposed

16   to if it was done with an intent to encourage

17   discord, to encourage disturbance, you know, to

18   upset, you know, what was going on, you know, the

19   very things we've been talking about.

20              So whether somebody yelling,

21   threatening, whatever is going on that could

22   possibly set up a -- others to become involved, if

23   the singing had that same effect, you know, again,

24   I'm -- there's all kinds of things that can have

25   an effect on the people around them.  If that's



1    one of them, then I would be opposed to that and I

2    would say you can take some kind of process to

3    stop it.  And that might include, depending on the

4    circumstances, pepper spray.

5        Q    What if the impact was simply annoyance

6    to an officer who was present?

7        A    Annoyance in and of itself, probably not

8    enough.  But if the officer sees that it's also

9    annoying other prisoners or it's going to have --

10   or he believes, in fact, he perceives that there's

11   going to be a wider effect, then that's a

12   different matter.

13             Officers are annoyed I think pretty

14   constantly when they come to work.  Not everybody

15   treats them with the respect they would like to

16   have.  That's just part of the business.

17       Q    Do they have to have a thick skin as a

18   result?

19       A    Yeah, it helps.  It certainly helps.

20       Q    Do you think that would be the same case

21   with juveniles or adults?

22       A    Sure.

23       Q    You mentioned that you can think of one

24   case where you disagreed with the amount of pepper

25   spray --



1        A      Yes.

2        Q      -- that had been used.  Tell me about --

3        A      Well, it was because somebody, you know

4   the person had already been controlled by that

5   time and put into an isolation cell, and the

6   person kept going after the office verbally and he

7   sprayed them.  But that -- like I say, I couldn't

8   see any purpose for the spray at that point.

9            He wasn't creating a discord that was

10  affecting any of the other prisoners at that

11  point.  He was mostly just angry at the officer

12  and being unpleasant.  He had been involved in

13  upsetting discord prior to that, but they now had

14  him under control.

15       Q      Okay.  Do you know if he was pepper

16  sprayed prior to being put in the isolation room?

17       A      He might have been, I just don't recall.

18  I remember -- but the part -- that wouldn't -- if

19  it was, it wasn't something that I found

20  disconcerting.

21            What I found disconcerting was once he

22  was fully controlled and his actions were fairly

23  isolated in terms of their impact, that he got

24  sprayed.

25       Q      Okay.  So in the -- in the situation,



1    the person was taken into an isolation cell?

2        A    Yes, basically that.  It had the same

3    effect as being in an isolation cell, because it

4    had a steel door.

5        Q    And they continued to verbally assault

6    an officer; is that correct?

7        A    Yeah, basically that.

8        Q    Okay.  And then what happened?

9        A    He got sprayed.

10       Q    Okay.  And why did you find that

11   problematic?

12       A    Because if you're going to use a spray,

13   you have to have a certain reason for it.  And

14   everything I've been talking about up to now is

15   avoiding the spreading of discord, you know, doing

16   things that might upset the safety, security,

17   order, discipline, control in the environment.

18            As I had looked at that particular

19   situation, none of those things seemed to come

20   into play, other than the fact that the officer

21   was unhappy with him at that point.  Earlier,

22   maybe that was the case but, you know, I looked at

23   it in the context of how is it right now.

24       Q    So once the person was in a point that

25   they were isolated in that cell, and only making

1  verbal assaults, pepper spray was not appropriate?

2      A    As I recall, those were the

3  circumstances, as a matter of fact.

4      Q    Do you recall the name of that case?

5      A    Let me see if I was -- I may have

6  been -- I don't, but let me tell you right now

7  there's one case missing from my depositions,

8  then, so I'll have to --

9      Q    That was a case you gave a deposition

10 in?

11     A    Yeah, I did give a deposition in it.

12     Q    Okay.

13     A    And I can't recall now what the name of

14 the case was, but I can get that information.

15     Q    Will you provide it to Mr. Campbell, who

16 will provide it to me?

17     A    I will.  I will.  I just don't recall

18 the name of the case.  But I noticed in looking at

19 that, it's not there, so I apologize for that.

20          MR. CAMPBELL:  Was that in the last

21 four years?

22          THE WITNESS:  Yes.  It was in the

23 last year.

24 BY MS. HASKELL:

25     Q    And correct me if I'm wrong, did you say



1   in California?

2        A    Where it happened?

3        Q    Yes.

4        A    No, it was actually Florida.

5        Q    Oh, I'm sorry.

6             Do you remember the city or county?

7        A    No, but Lee County.

8        Q    Lee County.  Okay.

9        A    I'm pretty sure that was Lee County.  If

10  I'm wrong, I'll correct it later.

11       Q    And did that involve an adult?

12       A    Yes.

13       Q    All right.  We discussed singing and the

14  different factors that go into play there.

15            What if a person were ordered to return

16  to their cell, and they were walking to their cell

17  but too slowly from the perspective of the guard?

18       A    Well, again, there's any number of

19  things that could lead to that, but the -- the

20  bigger question is the conduct, what is the

21  conduct the officer fears -- or, excuse me, the

22  outcomes that the officer fears from that conduct.

23            So there's probably a thousand scenarios

24  where somebody can be walking slowly.  If it's

25  merely somebody is walking too slowly and he



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 72 of 113 PageID 4804

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              186

1   suddenly gets sprayed, if it's somebody who is

2   walking slowly and they have asked for these

3   reasons to pick up the pace, and to be -- to be

4   nothing more than recalcitrant, you know, in front

5   of other inmates and so on, intentionally disobeys

6   the officer, then it suddenly raises the stakes.

7         At exactly what point it may justify use

8   of force/OC, I couldn't tell you in this setting.

9   The hypothetical is too general.  But the point is

10  what is the impact of the conduct as opposed to

11  just the conduct itself.  The potential impact,

12  even.

13        Q   So that situation, to justify spray,

14  there would have to be some sort of perceived

15  negative impact of that person's walking slowly?

16        A   Right.  If I've got a group of

17  officers -- excuse me.  I don't think we would be

18  escorting officers.

19        If I've got a group of prisoners that

20  I'm escorting, and one of them is intentionally

21  violating the rule when being advised to pick it

22  up or whatever it is they want them to do, they

23  continue to be insubordinate, then it's moved to

24  something different than just walking slowly.

25  It's moved to insubordination, which in the



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 73 of 113 PageID 4805

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              193

1    "What, are you back in here again, Harold?"  You

2    know, that kind of stuff.  "How is your mom

3    doing?"

4        Q    Or, yeah, family who knows each other?

5        A    Sure.  But you get into urban areas,

6    that disappears.  You know, it's just not there.

7    So it's hard to generalize, is what I'm trying to

8    say, I guess.

9        Q    Okay.  Well, is there anything else on

10   that opinion?

11       A    Not unless you've got another question.

12       Q    All right.  Well, moving on to your next

13   opinion, A-21 -- 2.1, what is your opinion there?

14       A    2.1.  Okay.

15            "When use of force is required, there's

16   always a potential that staff members and/or

17   involved prisoners will sustain some level of pain

18   and/or injury that" -- "or" I guess should be an

19   "of."

20       Q    What is the basis for your opinion?

21       A    Well, the opinion is any time you have

22   people conflicting with one another, there's

23   pulling, there's tugging, there's potentially

24   striking.  Every time an officer goes into a

25   use-of-force situation with a prisoner, starting



1    there, they know that there's a potential they're

2    going to get hit.  They know there's a potential

3    that even if somebody is not swinging at them, if

4    this is taking place in a cell, for example,

5    you've got bunks protruding out, you've got

6    toilets protruding out.  Even if you're in the --

7    in a dayroom, you've got furniture bolted to the

8    floors.

9            So if you're wrestling, grappling,

10   there's a potential just when you fall somebody is

11   going to be hurt.  Maybe you don't hit any of

12   those things, you simply fall on the cement floor.

13   I think there was even some kind of shoddy carpet

14   over across the street.

15           But that fall may simply result in

16   somebody breaking a bone, experiencing other --

17   other kinds of injuries.  I fell off my bike and

18   broke my hip.  I only fell that far.

19           So if the -- the point is any time you

20   have people grappling, any time you have something

21   where balance is going to become an issue, as is

22   in the case in a controlling situation, somebody

23   is going to -- in a Montana case that I worked on,

24   where there had been a riot there, and they were

25   taking prisoners out.  All the officer was doing



1   was holding onto the prisoner as he was running

2   out the door.

3           The prisoner kind of jerked away for a

4   second, the officer stepped in the -- there was

5   water there, as well, stepped in it, fell, and

6   wrenched his knee and never came back to work

7   because he tore both of the medial and lateral --

8   whatever those other ligaments are in your knee,

9   he tore himself up.  He was old enough, he just

10  never returned back.

11          But the point is, anytime you've got

12  that going on, you have a risk.

13      Q    Well, would the use of force in this

14  opinion include the display of pepper spray, as

15  you testified earlier?

16      A    I'm not aware of anybody who was so

17  frightened by pepper spray, they fell down and

18  hurt themselves.  Okay.  But if it actually

19  becomes physical, that's where, of course -- in

20  fact, the display and the -- and then the

21  compliance would be a perfect type of force,

22  because that's not going to happen then.

23      Q    What is the distinction between pain and

24  injury?

25      A    Good question.



1          MS. BRONSON:  I need a restroom

2    break.

3          MS. HASKELL:  Let's go off the

4    record, please.

5          THE VIDEOGRAPHER:  This is the end --

6              (Discussion off the record.)

7          THE VIDEOGRAPHER:  This is the end of

8    Tape No. 3 to the videotaped deposition of

9    Gary DeLand.  The time is 12:13 p.m.  We're off

10   the record.

11             (Whereupon, a recess was taken.)

12         THE VIDEOGRAPHER:  This is Tape No. 4

13   to the videotaped deposition of Gary DeLand.  The

14   time is 12:51 p.m.  We're on the record.

15   BY MS. HASKELL:

16      Q    All right.  Mr. DeLand, I think we had

17   just moved on to opinion A-2.2.

18             And what is that opinion?

19      A    "Incidents regarding use of force

20   involve different unique fact situations.  Jail

21   officials must thus be free to apply their

22   training, knowledge, expertise, and judgment in

23   deciding the amount and type of force to be used

24   in a -- given the specific circumstances present

25   in individual cases."



1    Q    Okay.  And what is the basis for that

2    opinion?

3    A    Well, a lot of it is stuff we've already

4    talked about, is it's hard to set very specific

5    requirements for exactly how you're going to

6    handle every use-of-force situation, because

7    they're all quite different.  The levels of

8    resistance will be different.  The size and number

9    of the people you have to deal with are different.

10        So basically you can provide a set of

11   factors that should be considered in the use of

12   force and what should be considered in the use of

13   force, but then you have to apply all of those

14   factors against the facts in any given case.

15   Q    And you write there are many studies

16   that support the safety and effectiveness of OC

17   spray?

18   A    Yes.

19   Q    Do any of these studies address OC spray

20   specifically among juveniles?

21   A    Not that I've read, no.  They just

22   basically looked at the effectiveness generally.

23   Q    For adults?

24   A    Yes.

25   Q    And when -- when in your report you



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 78 of 113 PageID 4810

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              223

1   or there's a fairly significant risk of escalation

2   to actual physical force.

3        Q    What do you define as a disturbance?

4        A    A disturbance is any set of

5   circumstances where prisoners are in violation of

6   the general rules that are required to maintain

7   order and discipline in a facility.  They're being

8   insubordinate, recalcitrant, maybe making a lot of

9   noise that will upset other parts of the jail.

10  There can be any number of circumstances that

11  qualify under that, but those are some of them

12  that would.

13       Q    And not every disturbance would warrant

14  the use of pepper spray?

15       A    No.  In fact, none of the circumstances

16  involving disturbances would warrant pepper spray

17  if officer presence and verbal commands were

18  sufficient to get everybody to go back in their

19  cells or whatever it is we were trying to get them

20  to do.

21       Q    So that's why people should start with

22  an officer presence and verbal command?

23       A    Yes, sure.

24       Q    Anything else on that opinion before we

25  move on to your next?



1      Q      In an incident where a person has been
2  sprayed multiple times and continues to be sprayed
3  or to allegedly warrant -- warrant spraying, what
4  is it that's making -- why isn't the OC spray
5  effective in preventing that?
6      A      I don't know.  I guess there could be
7  several reasons:  High tolerance to pain, stubborn
8  with a capital S.  Different people have different
9  levels.  For example, I put -- the very thing
10  that's in OC spray is oleoresin capsicum, of
11  course, which is the same thing that's in the --
12  Tabasco and so on.  I can drink shot glasses with
13  it, but there's other people around me that can't
14  take a drop of it on their food.
15          So I'm sure that tolerances have
16  something to do with it, but beyond, you probably
17  need to talk to clinical people.
18      Q      It's the same thing that's in Tabasco,
19  but I believe it's to the millionth in --
20      A      No, actually it's going to be way
21  stronger in Tabasco.  If you spray this in the air
22  and have it atomized and you're sticking your
23  tongue out, it's like 1 percent -- in what they
24  spray, most of the sprays with which I'm
25  familiar -- and they may vary slightly -- are



1  1 percent OC.  Everything else the propellant and

2  the inherit gases.

3          So at 1 percent, that's not a great

4  deal.  On the other hand, the Tabasco sauces and

5  those kinds of things are intended to light you

6  up.  That's what you bought them for.

7      Q    So spraying Tabasco would be more

8  powerful than spraying OC?

9      A    If you -- it would probably have a very

10  similar effect.  I can't tell you exactly what the

11  percentages are.  It would be a little messier, as

12  well, of course.  But the point is OC, once it

13  hits the eyes -- I know because as much of it as I

14  eat, and it's constant, every now and then when

15  you inadvertently wipe your face and my eyes burn

16  for 15 minutes or so.  If I have really strong

17  peppers, it may last in my mouth for, you know,

18  ten minutes or so.

19          It's the same ingredient, it's just

20  provided in a different format or a different -- a

21  different, you know, inert gas spray in the air.

22  And it will have a different effect if it's

23  sprayed directly on the skin as if will if it's

24  atomized.  Atomized it has -- tends to have more

25  of an effect on the breathing, in my experience



1        Q     Okay.  So your -- nothing in your

2    opinion, as it relates to OC spray, is based

3    specifically on knowledge of the Polk County Jail?

4        A     No.  It's based on my own experience

5    working with that with a wide variety of prisoners

6    other places around the country.

7        Q     Anything else on that opinion?

8        A     No.

9        Q     All right.  What is your next opinion,

10   Mr. DeLand?

11       A     Let's see.  "Studies and surveys support

12   the Polk County Facility officials' belief that

13   OC -- OC is an effective tool for restoring and

14   maintaining order, discipline, and control."  Very

15   similar to the first opinion.

16       Q     Yep.

17             And in the version I'm looking at, it

18   says effective product for restoring.

19       A     Uh-huh.

20       Q     Does your also say effective product?

21       A     It does.

22       Q     Okay.  I just want to make sure we're

23   looking --

24       A     Oh, did I misread that?

25       Q     I believe you said tool.



1     A    Oh, okay.

2     Q    I just want to make sure we're looking

3  at the same document.

4     A    Okay.   Thank you.

5     Q    Thank you.

6          All right.   What is the basis for your

7  opinion?

8     A    Well, it's really the same thing.  We've

9  talked about those studies and surveys before, and

10 I'm not saying that they read them and therefore

11 that's why they use them.   What I'm saying is it

12 would support their belief that OC is an effective

13 product for restoring and maintaining order.

14    Q    Okay.

15    A    And the fact that they continue to use

16 it is an indication that they find it effective.

17 If they found it ineffective, presumably they

18 would want to not do that anymore.

19    Q    All right.   And you wrote that before --

20 that after being sprayed once, a person who is

21 threatened with OC spray is more inclined to be

22 compliant.

23    A    Yes.   With, as I've talked about, some

24 exceptions to the rule.

25    Q    Of course.



1  same brand, you're going to still have 1 percent

2  OC or one and a half percent, whatever that

3  particular brand may have.  The fact that the can

4  is bigger doesn't change the -- you know, now,

5  different companies will put out different levels

6  of effectiveness, of course.  You know, and I

7  think some of the ones they use for bears and

8  other things have a much higher level of OC in

9  them.

10      Q    And in our discussion earlier of people

11 who potentially should not be sprayed, like with

12 severe asthma, you mentioned that it might be a

13 good idea to consult with medical, for example,

14 before doing that?

15      A    Yes, if you know you've got an

16 asthmatic.

17      Q    Should a facility have in place a policy

18 or protocol that -- that requires a person --

19 requires everyone to be assessed for whether

20 they're asthmatic and then to consult medical?

21      A    It certainly would be very useful,

22 whether they do it according to policy or whether

23 they just do it on their own.  The main thing

24 would be you don't want to run into that situation

25 where you do have a severe asthmatic and -- and



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 84 of 113 PageID 4816

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              251

1  incidents, 20 were animals.

2      Q    All right.  And moving on to the -- the

3  multi-agency review that you cite --

4      A    Those are separate reviews.  I just

5  compressed them.

6      Q    Oh, this was your multi-agency review?

7      A    Yeah.

8      Q    Okay.  In -- in -- in these different

9  reviews, is the effectiveness of hands-on

10  techniques also cited?

11      A    Only to the extent that they were using

12  hands-on techniques before, and now they were

13  looking at how things changed when they went to

14  using OC in some of these cases.  For example,

15  let's see -- well, without getting -- pulling them

16  out and reading them now, there are some

17  comparatives that they do in these studies.

18          And so some of it had to do with how

19  effective they were before compared to how

20  effective they are now, and especially with

21  respect to injuries, that was the case, but also

22  in terms effectiveness.

23      Q    Okay.  Well, for example, in this

24  Sarasota County case you write that there was a

25  finding that there were no official use-of-force



1    complaints after six months' use of OC.

2         A    Right.

3         Q    Do you know how many official

4    use-of-force complaints there were prior to the

5    six months?

6         A    No, I don't know why I even continue to

7    include that, because it doesn't give us a whole

8    lot of information.  But maybe I'll pull it out in

9    the future.  I just -- it's just there for

10   reference mostly.

11        Q    Well, why do you think that wouldn't

12   give -- give information?  I mean, if there

13   were -- if there were zero use-of-force complaints

14   prior to those --

15        A    It may simply have been how the survey

16   or the study was done.  You know, I mean, you've

17   got different researchers.  You may have a certain

18   amount of self-reported information, which is the

19   case in the Sarasota case.  So, you know, there

20   may be a number of variables that come into play

21   there.

22        Q    I think what I'm asking is in terms of

23   your report --

24        A    Yes.

25        Q    -- when you say that in the Alaska State



1    Trooper case, for example, OC spray was effective

2    90 percent of the time with intoxicated subjects.

3        A    That was the finding of the NIJ research

4    and survey.

5        Q    Is it -- do you know how effective

6    hands-on techniques were with intoxicated

7    subjects?

8        A    No.

9        Q    So they could have been effective

10   95 percent of the time?

11       A    In theory.

12       Q    Anything else on that opinion,

13   Mr. DeLand?

14       A    Again, unless you've got a question --

15   any more questions.

16       Q    All right.  So moving on to your next

17   opinion, what is your opinion?

18       A    "Safety of OC as a control agency with

19   respect to the prisoners' safety, studies and

20   surveys support the Pacific" -- Pacific -- "the

21   Polk County facility officials' belief that OC

22   offers greater safety to prisoners than do

23   traditional methods of using force to restore and

24   maintain order, discipline, and control."

25       Q    And what is the basis for your opinion



GARY W. DELAND                                          August 29, 2012
HUGHES vs. JUDD                                                    254

1    that the Polk County Jail officials believe OC

2    spray is safer?

3         A    They keep using it, in part.  Also some

4    limited discussion with Captain Marcum, but mostly

5    this particular opinion is based on research that

6    supports such a belief.

7         Q    And in that research and in the studies

8    that you cite, do you know if the line officers in

9    these agencies cited in the study all carry pepper

10   spray?

11        A    Let's see.  In the Arizona State study,

12   I don't know if at the time -- I can't remember if

13   at the time everybody did.  But I know in other

14   involvement in Maricopa County Jail, there were

15   periods certainly when they did.  So that could

16   also have been the case during the -- the time

17   that the study was being done.  I will have to

18   review the study again.

19        Q    Okay.  In facilities like in Texas where

20   the line officers don't actually carry the pepper

21   spray, does that have an impact on their response

22   to conflict or problems in the facilities?

23        A    Well, it does in one respect.  They are

24   told that -- for example, if they're doing a

25   forced cell entry or they've told somebody to cuff



1   up so they can take them out and they refuse, then

2   much not unlike my situation in Utah, they didn't

3   have the line officers jump in immediately.

4          Now, in our case, we would have special

5   operations come down.  In their case, they would

6   have a staff member that was certified to use go

7   get it, retrieve it.

8          Their process was to show it, explain

9   what they were going to do, "We're going to shoot

10  a four second burst if you don't comply.  If you

11  have not complied with that, we'll shoot a second

12  four second burst.  If not -- if you don't comply

13  then, we will have a team come in and physically

14  remove you or physically do what we have to have

15  done."

16         And then they would -- they're the only

17  people that -- well, I'm sure other people do it,

18  but they're the only ones that I've run into so

19  far that actually weighed the can so they can

20  decide before and after exactly how much spray was

21  there, and it was kind of a control method for

22  the -- for the supervisors to anticipate, you

23  know, whether this was being used properly and so

24  on, I guess.

25         Q   Can you say, based on your knowledge and



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 89 of 113 PageID 4821

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              256

1    experience, whether in a facility that uses pepper

2    spray it's more or less common for line staff to

3    carry it?

4        A    No.  I'll just -- I haven't even began

5    to do any kind of research on that.

6        Q    And forgive me if we've already covered

7    this, but when you were the director of the Utah

8    Department of Corrections, did line staff carry

9    pepper spray?

10       A    No.  There was some line staff that

11   could use it, but we started with the special

12   operations people.  And then they usually used it

13   in conjunction with them, if they used it at all.

14       Q    Do you know if the way "injury" is used

15   in the Arizona State University study is as you

16   have defined it?

17       A    They actually do explain that.  It was

18   usually things that required medical to do --

19   well, everybody had to be examined immediately

20   after, so everybody went to medical.  But if there

21   was a requirement to do treatment to contusions or

22   cuts or abrasions or whatnot, then they considered

23   it an injury.  I don't -- I couldn't give you an

24   exhaustive list, however, at this point.

25       Q    Is that the proper protocol, in your



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 90 of 113 PageID 4822

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              257

1    opinion, to send people to medical after being

2    sprayed?

3        A    Yes.

4        Q    And why is that necessary?

5        A    Well, with any use of force, it

6    provides -- you know, from a selfish point of

7    view, it provides you some protection against

8    false claims that certain kinds of injuries

9    occurred that, in fact, did not.  It's also useful

10   for the inmate side, that if anything happened in

11   a way of an injury, that immediate attention is

12   there.

13       Q    Do you know if any of the studies that

14   you cite take into account psychological harm as

15   an injury?

16       A    None of the ones that I have read dealt

17   with that as a specific issue.  There have been

18   some discussions about people with mental health

19   issues being more or less susceptible -- actually,

20   less susceptible.  And I think, you know, in --

21   there has been also some limited discussion about

22   people on certain kinds of drugs were less

23   susceptible.

24           But none of the studies that I read were

25   done specifically to look at that particular



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 91 of 113 PageID 4823

GARY W. DELAND                                    August 29, 2012
HUGHES vs. JUDD                                              258

1    issue.

2        Q    And none of these studies specifically

3    addressed harm caused on juvenile?

4        A    No.  No.

5        Q    Do you know if any OC spray products

6    have been tested on juveniles?

7        A    I would be surprised if they have, only

8    because they are juveniles.

9        Q    And what do you mean by that?

10       A    Well, by that, adults are in a -- in a

11   position to be willing to be tested, for example,

12   like me going into the same training.  But

13   juveniles aren't hired to work in facilities.  You

14   wouldn't use them as test subjects and, you know,

15   it just flies in the face of common sense that you

16   would do that.

17       Q    All right.

18       A    If there's a study out there, I sure

19   would like you to tell me about it, because I want

20   to read it.

21       Q    In the North Carolina study that you

22   cite where injuries to subjects declined after OC

23   was introduced, do you know how much that decline

24   was by?

25       A    I don't recall in that, exactly how much



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 92 of 113 PageID 4824

GARY W. DELAND                                          August 29, 2012
HUGHES vs. JUDD                                                     259

1    it was.

2         Q    And in the Arizona study, you cite the

3    difference of 9 percent versus 15 percent injury?

4         A    Yes.

5         Q    Do you know if that's statistically

6    significant?

7         A    It certainly would be for me, both for

8    staff and inmates, because each one of those

9    variances is somebody who got hurt.  So to the

10   extent that you can reduce that, that's exactly

11   what you want to do.  It's part of what we're

12   trying to accomplish with keeping our people safe

13   and the prisoners themselves.

14        Q    And with regards to this NIJ study by

15   Charles Petty that you cite --

16        A    Yes.

17        Q    -- I'm hoping you can explain it to me a

18   little bit.

19        A    Okay.

20        Q    Of the 61 incidents --

21        A    63.

22        Q    Yes, I know.

23             Of the -- of the 61 other incidents --

24        A    Oh, okay.  I'm sorry.

25        Q    -- where -- where pepper spray was not



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 93 of 113 PageID 4825

GARY W. DELAND                                      August 29, 2012
HUGHES vs. JUDD                                                260

1  found to be a cause of death --

2      A    Yes.

3      Q    -- pepper spray was somehow involved

4  with those people; is that correct?

5      A    Yeah.  The way that was set up was

6  anybody who had been exposed to pepper spray and

7  then subsequently, at some period within -- I

8  forget what period of time, but some reasonable

9  period of time had suffered death.

10         73 was the original number, but as he

11  did his study, he found out ten of them had never

12  even been exposed to pepper spray.  That was

13  anecdotal information which turned out not to be

14  true.  Then -- this is a pathologist who did all

15  of this, and I incorrectly identified him as

16  Winters.  He's somebody on a different study, but

17  Petty is the name.  Thank you.

18      Q    Okay.

19      A    What he found was a lot of people had

20  died from heart failure or from the drugs they had

21  been taking, but there were a significant number

22  that had medical problem entirely unrelated to,

23  and there was another group of people who had --

24  because of the drugs they were taking, had died

25  as -- as a direct result of that.



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 94 of 113 PageID 4826

GARY W. DELAND                                              August 29, 2012
HUGHES vs. JUDD                                                        261

1      He had some other little factors built

2  in, and then he had some that were -- a very, very

3  small number that said -- I can't even remember

4  what he called them, but he referred to them as

5  fuzzy issues or something, where there just wasn't

6  enough information even within the -- the

7  autopsies, I guess, or whatever else had been done

8  that he was studying, to make any kind of judgment

9  of any -- you know, of what had happened.

10      So he really got down to two incidents

11  where he said it could have -- it could have

12  resulted from the pepper spray, and those were the

13  two asthmatics.

14      Q   So is correct to say, then, that with

15  the 61 other incidents, it might have been

16  affected by the pepper spray, he just couldn't

17  determine that?

18      A   No, his conclusion was that it was not.

19  His conclusion is it was not.  It's a good study

20  worth reading.  I'm sure you will, as a matter of

21  fact, because I've talked about it.

22      Q   All right.  And with this New Britain

23  Connecticut Police Department study you cite that

24  they reported no injuries to arrestees during two

25  and half years' use of OC -- OC spray?



1        A    Right.  Yes.

2        Q    Do you know what the rate of injuries to

3    arrestees was prior to that?

4        A    No, and I don't know how they were

5    defining "injuries" at that point, you know,

6    whether -- I'm sure somebody must have suffered

7    some abrasions or whatnot.  But the question then

8    would be what they considered injuries, but -- so

9    what I've done is simply provide what they

10   reported in that, but I'm, you know, lacking a

11   definition for you.

12       Q    All right.  Mr. DeLand, with regards to

13   that opinion, anything additional?

14       A    No.  Nope.

15       Q    All right.  What is your next opinion?

16       A    A-5.1, "Safety of OC as a control

17   agent," referring to staff.  "Studies and surveys

18   support the Polk County facility officials' belief

19   that OC offers greater safety to staff than do

20   traditional methods of using force to restore and

21   maintain order, discipline, and control."

22       Q    That's very similar to your -- so your

23   prior statement was greater safety to prisoners --

24       A    Right, exactly.

25       Q    -- and this is greater to staff.  Okay.



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 96 of 113 PageID 4828

GARY W. DELAND                                          August 29, 2012
HUGHES vs. JUDD                                                     263

1        A     And the -- the significance of the

2    safety to staff is even greater, because it's

3    almost three times greater, the hands-on force,

4    you know, 5 versus 13 percent.

5        Q     And why is that?

6        A     Well, as I mentioned before, when you

7    use OC, you're in a position where you're putting

8    the prisoners off balance.  You're making them

9    less capable of hurting you, making them less

10   capable of aggressive -- sustained aggressive

11   conduct.  So it's not surprising that staff do

12   much better under those circumstances, you know,

13   the -- the circumstances are tilted very much in

14   their favor.

15            Now like I say, some people can work

16   through it, and when those are -- when that's the

17   case, somebody tough enough to work through it is

18   also somebody tough enough likely to cause you

19   some injury.

20       Q     And I -- and I believe you said it was

21   three times more -- three times safer?

22       A     I said almost.  I said it was almost

23   three times more, talking about injury from use of

24   force.

25       Q     Okay.



 1   report that information.

 2       Q    Do you not believe that that's

 3   significant?

 4       A    Sure, it would be significant, you know,

 5   and perhaps in the future I'll have to put that

 6   there.

 7       Q    Okay.  Why didn't you include it here?

 8       A    I'm basically providing some of the

 9   studies that I've relied on in the past.  And it's

10   all information that simply continues to support

11   a -- a proposition that is well-supported in a

12   variety of other ways.  If there is -- you know,

13   so it's possible that you could -- with any of

14   these studies, give you a lot more information.  I

15   rely very much more on the Arizona State study,

16   because it's the one I like the best in terms of

17   how in-depth they went with what the -- the work

18   they were doing.  Some of these tend to be more

19   survey-like than what the Arizona State people

20   did.

21       Q    Anything else on that opinion?

22       A    No.

23       Q    All right.  Moving on, what is your next

24   opinion?

25       A    "Research and surveys regarding OC use



1   show it to be safer and more effective than

2   traditional methods of using force," so I think

3   it's a repeat of an opinion I gave before.  Well,

4   in fact, it is, yes.  It mentioned the opinions

5   below that where I've already said that.

6        Q    That's correct.  You simply refer back?

7        A    It was foundational, yeah.  It's really

8   foundational for the rest of the discussion.

9        Q    And this is -- this is in a section of

10  your report that's specifically dealing with

11  juveniles?

12       A    Yes.

13       Q    So, again, the opinions that you have

14  for adults and the use of OC spray are the same as

15  for juveniles; is that correct?

16       A    Based -- yes.  And the reason for that,

17  as I mentioned, is I don't see anything magic

18  about birthdays.  If at 15 years old or 16 years

19  old or 17 years and 11 months, this was effective

20  and safe, at 18 years and one month, it's highly

21  unlikely that physiologically that's changed in

22  any respect.

23       Q    Okay.  So all of your previous opinions

24  discussed in your report apply equally to adults

25  and to juveniles?



1        A     They do, based on my experience and

2   based on the fact that I just don't believe a

3   birthday changes anything, you know.

4        Q     In your experience, do juvenile and

5   adult offenders within a facility require anything

6   different?

7        A     In our circumstances, probably the

8   juveniles were the ones we required more attention

9   to.  They were the ones that took a little longer

10  to convince to follow the rules.  You know, if --

11  if people come and go from prison, they get to

12  learn it's a lot better to do your time following

13  the rules than it is being a constant source of

14  attention to the people who run the facility.

15        But youngsters coming into the system,

16  for some reason -- that may be one of them -- tend

17  to be harder to manage.  And very often I suppose,

18  you know, much as they do driving automobiles and

19  taking drugs and other things, feel they're

20  bulletproof or don't -- less vulnerable than the

21  rest of us do.

22        Q     In your opinion, do juvenile offenders

23  require different types of housing within a

24  facility?

25        A     No.



1      Q      Different -- different punitive measures

2   or techniques?

3                 MR. CAMPBELL:  Object to the form.

4                 THE WITNESS:  You may modify it some,

5   but basically it's the same.  The techniques we

6   use in jails and prisons, denying certain

7   benefits, you know, denying access to commissary,

8   denying television, lock -- locking in your room

9   for a period of time, all of these are things that

10  translate across the board.

11  BY MS. HASKELL:

12     Q      Taking away a privilege?

13     A      Sure.  It may work, it may not.  You

14  just keep upping the ante at certain point until

15  you hit the spot where they are more willing to

16  comply.

17     Q      Would you use a different de-escalation

18  method for juvenile versus adult offenders?

19     A      I would -- I might very well, just based

20  on what is effective.  But I would also use a

21  different de-escalation method on these adults

22  versus these adults.  Again, it's becoming more of

23  a classification issue than an age issue.

24     Q      Mr. DeLand, in your opinion, why do you

25  believe there's a separate juvenile system?



Case 8:12-cv-00568-SDM-MAP   Document 195-9   Filed 11/08/12   Page 101 of 113 PageID
4833

GARY W. DELAND                                          August 29, 2012
HUGHES vs. JUDD                                                     271

BY MS. HASKELL:

    Q    All right.  Mr. DeLand, when we broke, I
think we were on opinion A-6.1.

         Is there anything else in regards to
that opinion that we should discuss?

    A    No.

    Q    Okay.  Moving on, what is your next
opinion?

    A    "If, as the research has shown, OC is a
safer and more effective means of applying force
than traditional hands-on methods, I can see no
justification for using less safe and effective
means of controlling disruptive juveniles."

    Q    And that goes back to what we've already
discussed, that the utility on adults is
transferred to juveniles, correct?

    A    Yes.  I would not want to use something
more dangerous on juveniles, certainly, such as
hands on.

    Q    And you've alluded to some ways in which
juveniles are different than adults, correct?

    A    Yes.

    Q    Okay.  Are they -- in your experience,
are they different in terms of decision-making?

    A    Very often, yes.



GARY W. DELAND                                      August 29, 2012
HUGHES vs. JUDD                                                272

1        Q     And how so?

2        A     Less life experience.  Perhaps a greater

3   belief in vulnerability.  Not many adults would

4   stand up on a car 60 miles an hour going down a

5   freeway to surf the car, you know, but lots of

6   time juveniles get hurt doing those things.  So,

7   yes, juveniles have less experience and very often

8   less controls that they employ on themselves.

9        Q     What about in terms of understanding

10  consequences?

11       A     I'm sure, as life goes on, you begin to

12  understand consequences more.  You know, it --

13       Q     Does that difference impact the

14  effectiveness of OC spray?

15       A     Not the effectiveness of OC spray, no.

16  It's still effective whether you -- that's a very

17  quick learning curve.  A few minutes ago, I felt

18  fine.  All of a sudden now my eyes burn and I'm

19  not nearly as comfortable as I was before.  I now

20  understand that that is awfully effective.

21       Q     Sure.  But if a juvenile understands

22  consequences differently than an adult, is it

23  possible that they might not understand as

24  clearly, "If I do X, I will be "pepper sprayed"?

25       A     It's possible.  One of the ways to



1   resolve that is to let them know it's going to

2   happen.   You know, you tell them it's going to

3   happen, you show them the can, you approach them.

4           So whether they fully understand how

5   uncomfortable it's going to be, how painful that

6   can be, like they say, it's a fast learning curve

7   at that point.

8       Q    Would that difference then potentially

9   make it more important in a juvenile setting to

10  show them the can, make sure they understand that?

11      A    Sure, I would think so.   But I feel the

12  same way with adults, you know, you -- if you can

13  avoid using it by merely showing it, that's always

14  good.

15      Q    Well, what is the basis for your

16  opinions in regards to adolescence development?

17      A    I don't think I gave any opinions

18  regarding adolescence development, other than I

19  didn't think the 18th birthday was critical.

20      Q    Right.   Right.   But you did say that

21  the -- the maturity levels differ.

22      A    Yes.   Oh, in our discussion during the

23  deposition, sure.

24      Q    Yes.

25          What do you mean by that?



1  you may have some 12-years-olds that are more

2  mature than your 17-year-olds.

3      Q    So is age a factor in the effectiveness

4  of OC spray?

5      A    I don't think in terms of its

6  effectiveness or its safe safety -- it may be a

7  factor in the sense that maybe prisoners --

8  juvenile prisoners would be more inclined to risk

9  being sprayed, not having the experience once

10 before.

11         I don't know, because I haven't done a

12 study on that.  But I -- I can tell you that the

13 effectiveness is not going to change based on a

14 birthday, and the risks factors will not change

15 based on a birthday.

16     Q    All right.  So based on your experience

17 and your knowledge today, do you believe a

18 17-year-old would react the same way as a

19 30-year-old to OC spray, all other factors being

20 equal?

21     A    All other factors being equal, sure.

22     Q    Okay.  And how about an 11-year-old and

23 a 30-year-old, all other factors being equal?

24     A    I wouldn't spray an 11-year-old.  He's

25 not the risk or she's not the risk that would



1   justify that.  You're sneaking up from 9 to 11.

2        Q    What if the person being sprayed were,

3   you know, 4 foot 11 and weighed 100 pounds, does

4   that factor in?

5        A    Everything factors in.  Obviously the

6   size, you know, the capabilities.  I will say

7   this, my grandson fought in tournaments for years

8   in karate, and we always fought him at least three

9   years over his age group because we didn't think

10  it was fair to fight him with anybody else.  And

11  it wasn't that he was that much bigger than them,

12  he was just that much more skilled.

13           So I bring that up for one purpose, and

14  that is you have to look at a variety of factors

15  before you make those decisions.

16       Q    And is the fact that you have to look at

17  all of those factors precisely why line staff

18  shouldn't be carrying OC spray?

19       A    No.

20           MR. CAMPBELL:  Object to the form.

21           THE WITNESS:  No, I wouldn't draw

22  that comparison at all.  All that says is certain

23  people are more mature than others, certain people

24  are more capable than others.  But it doesn't say

25  that line staff shouldn't be carrying pepper spray



1       Q    Give me one second, please.

2       A    No problem.

3       Q    All right.  I want to draw your

4  attention back to your report.

5       A    Sure.

6       Q    On the top of page 30, you present a

7  number of questions that we have discussed, and,

8  you know, I read them, to be honest, as

9  hypotheticals.  I mean, why would it be different

10  for juveniles?  If OC spray reduces injury to both

11  staff and adult prisoners compared to other

12  methods, why would it be different for juveniles?

13          Do you --

14       A    Yeah, they're intended to be rhetorical

15  questions, of course.

16       Q    Okay.  Do you -- can you say

17  conclusively that it is not different for

18  juveniles?

19       A    Again, if all we're talking about is the

20  birth date, yeah, I'll say that.  Just based on my

21  experience, I've never seen a situation where a

22  birth date changed physiologically or in level of

23  maturity someone -- someone to some degree that

24  these things would not be the same the day before

25  and the day after their birthday.  You know, you



1   keep plugging the 9 and 11 years old in, and

2   obviously there's some differences there.

3        Q    Well, and let's not even just talk only

4   about 9 and 11, but let's talk about that magic

5   date that you say is not magical.

6             Are you aware that the Supreme Court has

7   come to the conclusion that children are different

8   than adults in a variety of cases?

9        A    I'm aware that they have.

10       Q    Okay.  Are you familiar with the recent

11  Miller v. Alabama case?

12       A    No.

13       Q    Are you familiar with Roper v. Simmons?

14       A    No.  I don't chase juvenile cases

15  anymore.  At one time, I used to, but I don't

16  anymore.

17       Q    Okay.  Roper v. Simmons is the case that

18  outlawed the death penalty for children.

19       A    Yes.  Okay.

20       Q    Do you disagree with that holding?

21       A    No.  I don't --

22            MR. CAMPBELL:  Object to the form.

23  Wait, wait, you got to let me get my objections

24  out.

25            THE WITNESS:  I'm sorry.



1   should.  If as part of that behavior they fall off

2   the car and they break their neck, should we

3   punish them for that?  No, the event probably took

4   care of that.

5              I mean, just because somebody has a

6   propensity in different directions, we don't

7   punish them for the propensity, but we may very

8   well punish them for the actions.  If -- if a

9   16-year-old child murdered somebody, you don't

10  say, "Oh, they're kind of reckless, so we won't

11  punish them."

12             You may -- the Supreme Couple may

13  tell you what you can do to punish them, but they

14  aren't going to tell you don't punish them.

15  BY MS. HASKELL:

16     Q    And they can tell you what you can do to

17  punish them is different than what you would do to

18  punish an adult?

19     A    They can set whatever limits they choose

20  to.  They are the Supreme Court.

21     Q    Well, they have.

22             Is there anything else on that opinion,

23  Mr. DeLand?

24     A    No.

25     Q    Okay.  At the end of your report you



1    have a section entitled, "Additional discussion."

2        A    Uh-huh, yes.

3        Q    All right.  And you write that, "The

4    design, general conditions, sight lines, lighting,

5    and support areas of the PCJ are not only superior

6    to those of the DJJ facility, there is virtually

7    no comparison between the two."

8        A    Absolutely.

9        Q    Tell me what you mean by that.

10       A    Well, I mean by that if you go into the

11   DJJ, what you find are not outstanding sight

12   lines.  You've got an older facility, which would

13   be much harder to manage in the sense of

14   supervising what is going on.  You've got only

15   really about two program areas that I noticed, one

16   fairly large room and another room across the hall

17   from it, and one single recreation yard that

18   everybody would have to share.

19            But a lot of it had to do with the

20   disrepair of the facility, the -- you know,

21   compare that to the facility they're in right now,

22   which are wide open dayroom spaces with much

23   improve sight lines, more -- you know, again, as

24   my recollection tells me there were two rooms

25   basically where you could do programming, school,



1    and other kinds of things.

2          Those limits don't exist in the Polk

3    County facility.  They had much more area and

4    resources to do that with.

5        Q    So in the -- in the DJJ facility, there

6    are only -- there were only two potential

7    classrooms?

8        A    There were -- yeah, when I asked the

9    fellow, you know, where do you do your

10   programming, where do you do your classes, he

11   showed me one very large room, and then right

12   across the hall was a second.  If there were any

13   others, I certainly missed it.  But also the

14   eating and kitchen facilities in the DJJ facility

15   were abysmal.

16       Q    Did you see those --

17       A    At best, abysmal, yes.

18       Q    Did you see those facilities at Polk

19   County Jail?

20       A    Yes.  Well, at the Polk County Jail,

21   I've been through on a previous occasion the

22   kitchen areas, but they eat in their cell areas.

23   They don't eat in this little jam-packed room that

24   they did at the DJJ.

25          I mean, there, I can't imagine that they



1   didn't have some fights just because people have

2   to walk on top of each other.  They had those

3   tables bolted in so tight, you know, it was hard

4   to even move between them with nobody sitting on

5   the benches.

6        Q    Right.  There were no people -- no

7   children there?

8        A    No.  That's my point, it was hard for

9   them to move without the kids even being in there.

10  But that was -- that was an abysmal-looking place,

11  frankly.

12       Q    Do you know if there are particular

13  cells in the DJJ facility where officers couldn't

14  see children from their station points?

15       A    Specific -- individual cells?

16       Q    Yeah.

17       A    Oh, yeah, several of them.  As you get

18  further out on the ends, the line of sight

19  diminishes how much you can see an individual

20  cell, and that's pretty much standard.

21       Q    Do you know if that's the case in the

22  Polk County Jail in Building 3?

23       A    Yeah, the far end, like I said, in

24  virtually any facility.  But the lines of sight

25  and what you can see from a central point in the



1   Polk County Jail -- and undoubtedly, you've been

2   through both, so you know what I'm talking

3   about -- are much easier.  You have a much easier

4   vantage point with which to watch that.

5           Plus, I don't know how many staff they

6   had at the DJJ, but like I said, there was a

7   control room person and five people there the day

8   I was there that appeared to be working that area.

9   So I know I've -- as I said in here, if -- if one

10  of my children were going to be in there and I got

11  a chance to pick, I would take the Polk County

12  Jail quite easily.

13      Q    Are the cells -- cell areas in the DJJ

14  facility one story or two stories?

15      A    The ones I saw were one-story.

16      Q    Are you -- excuse me.

17      A    I don't recall any two-story, but --

18      Q    Okay.  And you write that, "Based on

19  your work to date, you believe the Polk County

20  Jail to be well-staffed and supervised."

21      A    I commented specifically on one area,

22  and that's specifically where those juveniles were

23  being held.

24      Q    And how did you come to that opinion?

25      A    Observing how many were there when I



1    went through, seeing -- you know, basically asking

2    mostly Captain Marcum what their roles were, what

3    they did, why there were so many.  Because it's

4    staffed more heavily than the adult side.

5         Q    Having four people for the --

6         A    There were five people -- the day I was

7    there, there were five people outside the control

8    room.  There was one in the control room, there

9    were two that seemed to be supported by a desk on

10   each side, which made it, you know, four there.

11   The -- I don't know what the fifth person was

12   doing there, but there was a fifth person while I

13   was there.

14        Q    Okay.  And how did you -- how did you

15   come to the opinion that they were

16   well-supervised?

17        A    Because those numbers, given the amount

18   of space that they have to look at, the number of

19   prisoners that they would have to serve in that

20   role, that's a -- a much better staffing pattern

21   than I saw on the adult side, and the adult side

22   was not bad.

23        Q    Do you know what the average population

24   of Building 3 is?

25        A    I don't.

