Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CERTIFIED
COPY**

CHANDA HUGHES, as guardian
and on behalf of J.B., a
minor; BRENDA SHEFFIELD, as
guardian and on behalf of
J.D., a minor; FRANKY
JEAN-PIERRE; MICHELLE MINOR,
as guardian and of behalf of
J.P., a minor; LISA JOBE, as
guardian and on behalf of
K.J., a minor; AMY GAGE, as
guardian and on behalf of
B.G., a minor; CRYSTAL
CUYLER, as guardian and of
behalf of D.M., a minor;
NIKEYTA MATTHEWS, as guardian
and on behalf of K.G., a
minor; and ANITA NAVA, as
guardian and on behalf of
A.H., a minor; on behalf of
themselves and all others
similarly situated,

Case No.:
8:12-cv-00568-SDM-MAP

    Plaintiffs,

vs.

GRADY JUDD, Polk County
Sheriff, in his official
capacity; and CORIZON HEALTH,
INC.,
    Defendants.

Page 2

VIDEOTAPED DEPOSITION OF JUSTIN HESTER

Taken on Behalf of the Plaintiffs


DATE TAKEN:          Monday, July 23, 2012

TIME:               9:08 a.m. - 1:33 p.m.

PLACE:              Sclafani Williams
                    Court Reporters, Inc.
                    402 South Kentucky Avenue
                    Suite 390
                    Lakeland, Florida


STENOGRAPHICALLY REPORTED BY:
Julie Kelley, FPR
Florida Professional Reporter

Page 16

1    Q.   Is that in Polk County?

2    A.   No, ma'am.

3    Q.   Where is it?

4    A.   It's in -- I guess it would be considered

5    either Brandon or Riverview, Florida.

6    Q.   When did you move to Polk County?

7    A.   In the police -- when I was in the Police

8    Academy in 2010.

9    Q.   Did you graduate from the Police Academy?

10   A.   Yes, ma'am.

11   Q.   When was that?

12   A.   I think it was January 2011.  Yeah, I think so.

13   Q.   How long was your training at the Police

14   Academy?

15   A.   How long was the training, I think it was seven

16   months, five days a week, 8:00 to 5:00.

17   Q.   Did you graduate with any sort of certificate?

18   A.   Uh-huh, I got best physically fit and -- I

19   can't remember what the other one is.  I've got a paper

20   for it at home, but I can't remember.

21   Q.   Okay. And do they give you any sort of diploma?

22   I mean did you complete the Police Academy?

23   A.   Oh, yeah. Yes, ma'am.

24   Q.   All right. And when were you hired by the Polk

25   County Sheriff's Office?

Page 17

1   A.   Right when -- right -- right after we completed

2   -- we went in on a scholarship program, which means that

3   they paid for it and when we were done, we worked for

4   them.

5   Q.   Is this the whole -- when you say "we", do you

6   mean the whole group of students?

7   A.   Yes, ma'am, I'm sorry, the class that I went

8   through with.

9   Q.   How many people were in that class?

10   A.   I think close to 20, maybe 18.

11   Q.   So were you hired by the Polk County Sheriff's

12   Office before you attended the Police Academy?

13   A.   No, ma'am.

14   Q.   But you knew that you would be hired by them?

15   A.   If we completed it, if we passed then yes,

16   ma'am.

17   Q.   And why did you want to work for the Polk

18   County Sheriff's Office?

19   A.   I think I just wanted to do the police thing

20   like every other little boy. I wanted to -- you know, I

21   wanted to be a cop when I was a kid and I talked to my

22   cousin and he -- he told me it was a -- he told me it

23   was a good -- a good gig for him so I told him I would

24   give it a try.

25   Q.   Is this your cousin Joshua Hester?

Page 26

1    A.   I think it was October. I think it was maybe

2    the 14th.

3    Q.   What do you understand the word "juvenile" to

4    refer to?

5    A.   I would say -- well, I think that's just --

6    that's the way they classify them according to age.

7    Q.   Okay.  And when we talk about juveniles in this

8    conversation, are you referring to direct file children

9    and juveniles, the yellow uniforms and the blue

10   uniforms?

11   A.   Yes, ma'am.  If I don't, I'll specify which

12   side.

13   Q.   Okay, great.  So once the -- once the children

14   came to the Central County Jail, both the juvenile side

15   and the direct file side, at that point were you

16   assigned every night to -- to their units?

17   A.   Around that time, yes, ma'am.

18   Q.   Did you request to be assigned there?

19   A.   Yes, I did.

20   Q.   Why is that?

21   A.   Because I like working with kids.  I worked --

22   I hadn't worked, like got paid to work with kids, but I

23   helped out with youth groups that I was involved with

24   and VBS and stuff. I liked working with kids, or youth

25   I'm sorry.

Page 29

1    A.    Because I think -- I'm not sure.  I think maybe

2    just because those -- those youth were there for longer

3    and they didn't have -- I don't know.  I preferred to

4    deal with them because they seemed to be -- I don't

5    know.  They seemed to be older because they were -- you

6    know, they were there and they were acclimated to -- to

7    the situation that they had there and they -- a couple

8    of the other guys I worked with just preferred to work

9    on the other side.

10    Q.    You said there were typically four people on

11    duty?

12    A.    Yes, ma'am.

13    Q.    Were there ever days when there were fewer than

14    four?

15    A.    I think we had three one time because one of

16    the guys went home sick but he actually -- he came in

17    and then left, so they did everything they could to keep

18    us with four. And when we didn't have four, one of our

19    supervisors would come down and work with us so we

20    always had four.

21    Q.    When you were doing the checks, were -- was all

22    you were checking for the number match -- the numbers

23    matched up?

24    A.    No. No, we would --

25    Q.    What else?

Justin Hester, 7/23/2012
Hughes v. Judd

Page 34

1      Q.    Instead of who?

2      A.    Williamson.

3      Q.    Why did that change?

4      A.    His number was too high and somebody wanted the

5    position he had, so he essentially got bumped.

6      Q.    What does that mean, the number was too high?

7      A.    We have employee numbers and since we are the

8    new guys, our's are way up, you know, compared to some

9    people who have been there for five or six years.  They

10   can take our spot if they wanted it.

11     Q.    Is that the 7302?

12     A.    Uh-huh.

13     Q.    Okay.  So what happens after snack?

14     A.    They -- they straighten up their room and they

15   come out other than -- you know, we would - we would

16   turn the TV's on and if they needed a -- you know, if

17   they needed a broom in their cell or in the day room or

18   a mop or something, we would bring it to them. And

19   after they came out, it was -- we were pretty much in

20   the dorms every -- we tried to be in there closer to

21   every ten minutes so we -- from the time that they came

22   out close to 6:30 to -- I think it was 9:00 when they

23   went back up.  We tried to be in the dorms as much as we

24   could.

25     Q.    Were kids ever on lockdown after 6:30?

Page 35

1      A.    Were kids?

2      Q.    Yeah.

3      A.    What do you mean "lockdown"?

4      Q.    What does lockdown mean?

5      A.    It could mean -- it could mean plenty of

6   different things. Are we talking --

7      Q.    Right.  What does it mean to you?

8      A.    I'm asking what do you mean in this specific

9   question?

10     Q.    Is lockdown a term that's used at the Polk

11   County Sheriff's Office?

12     A.    Yes.

13     Q.    Okay. When you use it at the Polk County

14   Sheriff's Office, what does it mean?

15     A.    It can mean different things.

16     Q.    Tell me.

17     A.    Okay, if -- if we had a problem where somebody

18   didn't want to listen, we would put them in their room

19   and people would call that lockdown. That would only

20   normally last for 20 minutes or 15 minutes and then they

21   would come back out.  Now, if somebody was, you know,

22   constantly in fights and a supervisor decided to lock

23   them down in their cell, that normally lasted for 24

24   hours or a full day.

25     Q.    Any other uses of the word?

Page 36

1    A.    No, not that I can think of.

2    Q.    Would an entire dorm ever be on lockdown?

3    A.    At one time an entire dorm was.

4    Q.    What time are you referring to?

5    A.    When was that -- I don't remember the date, but

6  there was --in Echo dorm there was a fight between-- I

7  think there was like 15 or 16 kids in there and most

8  every one of them was involved with a pretty -- pretty

9  good sized fight.

10   Q.    So the entire dorm was put on lockdown as a

11  result?

12   A.    Yes, ma'am.

13   Q.    So when the kids are out in their -- in the

14  dayroom in the evening, what do they do?

15   A.    They would either play cards or they liked to

16  -- they sang a lot, a lot more than I thought they

17  would. They would just sing and sing each other songs

18  and watch TV or they would make -- they would put toilet

19  paper inside of a sock and throw it around or draw.   I

20  don't know.

21   Q.    Were they allowed to toss the sock around?

22   A.    There wasn't a rule against it.  We would only

23  stop it if it became -- if they started to, you know,

24  jump and knock each other down and, you know, tear --

25  tear running through the dayroom because, you know,

Page 37

1    there's tables and they can fall down and get hurt and

2    then -- and then it's -- you know, then it's our fault,

3    but we typically wouldn't stop them, I mean unless it

4    got out of hand. We -- they had to have something to do,

5    so we didn't -- we didn't stop them on our shift.

6        Q.    And what would they watch on TV?

7        A.    Whatever the supervisors put on.  I don't know.

8    It was normally educational stuff.

9        Q.    Yeah, that sort of circle of educational

10   programming?

11       A.    Oh, I don't -- I have no way of knowing if it

12   was the circle, but --

13       Q.    Well, I thought you said you were in the dorms

14   every ten minutes?

15       A.    Oh, we were.  We weren't watching TV.  We were

16   talking to the kids.

17       Q.    There is sound, right?

18       A.    Yeah, but it's -- it echos.  It's

19   unintelligible if you're not looking right at it and

20   listening.

21       Q.    Okay.  So unless you're paying attention, you

22   can't really understand what's on.  I've seen the TV's

23   up there.  They're small -- at that point they were

24   small TV's, sort of high up in the dorms, right?

25       A.    Yeah.  I guess they were probably normal size

Page 38

1    TV's and they were probably 12 feet up, but yeah.

2        Q.   I don't -- well, what do you think is a normal

3    size TV?

4        A.   Well, what do you think is a small TV?

5        MR. CAMPBELL: She gets to ask questions, sorry.

6        A.   I'm sorry. I'm sorry.  I'm not --

7        MR. CAMPBELL: I like the question and all, but

8    as a witness, she asks questions and you got to

9    answer.

10       A.   Okay.  I'm sorry.  I would say -- I would say

11   the TV's were maybe 24 inches.  I think you measure them

12   like diagonally.

13       Q.   Okay.  All right Justin, so how long in an

14   evening did the children stay in the dayroom?

15       A.   Like from the time they came out to about 9:30

16   and we would normally get them out of their -- I'm

17   sorry, till about 9:00.  We would normally get them out

18   of their cells close to 6:30, as quickly as we could

19   pass out mail and snack and anything else.  Sometimes

20   they would get Bibles or books or something, and that

21   might take a little longer.

22       Q.   Would they eat their snacks in their cells

23   before they came out?

24       A.   Yes, ma'am, typically.  I think most of them

25   would.  They didn't have to though.  They didn't have to

Page 39

1  eat it before they came out.  They could eat it when

2  they came out in another couple of minutes.  Most of

3  them did.  They just tore it up right there.

4        MR. HAYDEN:  I'd like interrupt, but I never

5     do, but just for clarification purposes, are we

6     talking about direct files or --

7        THE WITNESS:  I'm sorry, both.

8     Q.  Was there a difference in -- is there a

9  difference between direct files and juveniles in terms

10 of what they're doing in the evenings?

11    A.  No, not that I can think of.

12    Q.  And what happens at 9:00 p.m.?

13    A.  9:00 p.m. they go back in their cells for -- I

14 guess they call that lockdown too, from when they go in

15 their cells to go to sleep or for the night.

16    Q.  And when are showers?

17    A.  At any time when they're out in the dayroom.

18 I -- it was our understanding that they did showers and

19 uniform exchange during the day.  The day shifts took

20 care of a lot of that after they went out to rec.

21    Q.  So you weren't in charge of making sure they

22 had showers?

23    A.  Oh, no, we -- we turned on showers every night

24 and if they needed to take a shower and get a clean

25 uniform, we didn't -- we didn't give them a hard time

Page 40

1  about it.  If they said they needed a shower, we would

2  just cut on the showers and give them a uniform.  We had

3  the carts right there with the uniforms in it.  It

4  wasn't a big deal for us to do that.

5      Q.  Where were the carts?

6      A.  They were out in the -- out in the common area

7  on the back side of the control room.

8      Q.  When were children allowed to -- were children

9  allowed to use the phones?

10     A.  Yes, ma'am.

11     Q.  Okay. At what time?

12     A.  They came on at -- we turned them on.  Somebody

13  from our shift, normally the guy who was doing movement,

14  would turn them on right at the beginning of shift and

15  they could use them up until the time that they had to

16  go back in their cells.

17     Q.  Got it, okay.  So is it fair to say that they

18  were turned around -- between 6:00 and 6:30?

19     A.  Yes, ma'am.

20     Q.  And what do you mean by turned on?

21     A.  There's a switch between the outside of the

22  Buildings 3 and Buildings 2, 2 South, and there's a

23  switch in there and you can just turn on each individual

24  dorm's phones from those switches.

25     Q.  And before it's turned on, a child can't use

Page 41

1    the phone?

2        A.    No, ma'am.

3        Q.    Was that part of the night shift's

4    responsibility, to turn on the phones?

5        A.    Yes, ma'am, sometimes day shift would forget to

6    turn them off, but they would normally tell us if they

7    came right out and -- because a lot of them would come

8    right out and go straight to the phone and if they'd

9    pick it up and say the phones aren't on, one of us would

10   go -- just go turn them on.

11       Q.    What would happen if a child wanted to use the

12   phone during the day?

13       A.    During the daytime -- oh, they're on during the

14   day as well.  They turn them off at shift change.  I

15   don't know why, but they do.  Day shift turns them off

16   and we would just go turn them back on.

17       Q.    Okay.  What happens after 9:00?

18       A.    They go in their cells and they're supposed to

19   go to sleep I guess.  A lot of them wouldn't.  They

20   would just stay up and play cards or, you know, talk

21   with each other.  I don't know.  We would -- we would be

22   through there every 15 minutes looking at them, making

23   sure everybody was okay, making sure our counts were

24   right.  We had to do a count, a census count, once an

25   hour.  And whether it was, you know, 15 minutes into the

Page 42

1    hour or at the end of the hour, once in every hour we

2    had to do a census count and count and make sure

3    everybody was in the right room still and --

4        Q.    How is that different from the 15-minute count?

5        A.    I'm sorry?

6        Q.    How is that different from the count every

7    15 minutes?

8        A.    We didn't count every 15.  We would count at

9    the beginning, count when -- before we let them out of

10   their cells, count when we put them back in, and then

11   count every hour while they were in their cells, once an

12   hour.

13       Q.    Were the lights off when they went in their

14   cells?

15       A.    The lights in their cells, yes, ma'am.  They

16   were off, but they had -- they have little running

17   lights so we can still see in there.

18       Q.    What is a running light?

19       A.    It's -- when we turn the lights off, they're

20   still lights.  Like the lights in the cells are at the

21   top of the ceiling and they're shaped like this

22   (indicating), so they shine down on to the beds so we

23   can see them.  They're not bright, but we can -- they're

24   not bright so they can go to sleep, but we can still see

25   them and there's big glass paneling so -- and we all had

Page 44

1    weren't doing anything, getting them anything, we were

2    at those desks.  We weren't -- we weren't supposed to be

3    in the control room doing, you know, whatever unless we

4    were typing up a report we had to do or something.

5        Q.    Okay.  And Justin, just so you know, when I ask

6    where you were, I mean "you", not just --not all of the

7    guards who were on. So I know you're using word "we" a

8    lot --

9        A.    Okay.

10       Q.    -- but I want to know what you specifically

11   were doing.

12       A.    I sat at the desk.  I didn't go in the control

13   room other than the get food or something.

14       Q.    Okay.  So if you were assigned to the direct

15   file unit for the night, what desk would you sit at?

16       A.    The one between Echo and Fox.

17       Q.    And would there be another guard sitting there?

18       A.    Typically.

19       Q.    And what would you do while you were at the

20   desk?

21       A.    Just sit, just sit and talk.  They didn't

22   really -- we didn't -- I didn't really play on my phone

23   or anything.  We would just sit, either we would just

24   sit and talk -- there's typically not a lot of time

25   between the times when we got back, you know, because

Page 45

1   there's three dorms upstairs and downstairs and it takes

2   -- it takes, you know, to do a dorm round, it took me a

3   minute-and-a-half in each dorm or maybe two minutes

4   because I would walk slow and if somebody said something

5   I would stop and talk with them.  But, you know, by the

6   time I get back after that, I'm only sitting down for

7   six or seven minutes before I go back in.  There wasn't

8   time to, you know, read or do anything else.

9        Q.   When you were making those dorm rounds, were

10   the cell doors closed?

11        A.   Uh-huh, yes, ma'am.

12        Q.   So you said you might sit and talk with

13   someone?

14        A.   I wouldn't sit and talk with them.  If one of

15   them came up -- a lot of times if they were playing

16   cards and they're not going to sleep, they'd want -- you

17   know, when you walk by, they'd have a couple questions

18   for you.  I don't know.  They always used to ask us

19   weird things like what ZIP codes are for different

20   places if they were writing a letter or --

21        Q.   Through the cell door?

22        A.   Yes, ma'am.

23        Q.   All right Justin, I want to talk a little bit

24   about the different types of documents that you might

25   prepare at the jail.

Page 70

1      Q.    Justin, are there videocamera's in the juvenile

2   dorms?

3      A.    Yes, ma'am.

4      Q.    Okay.  Tell me where they are located.

5      A.    I believe they are in the corners facing the

6   cells.

7      Q.    And so do you mean the corners of the dayroom?

8      A.    Yes, ma'am.

9      Q.    Facing the cells.  And where would you go if

10  you wanted to see what was on the video?

11     A.    They have running videocamera panels in the

12  control room.

13     Q.    And on the video -- the video screens, tell me

14  what the view looked like or what you could see on the

15  screen?

16     A.    I'm sorry, what the view looked like?

17     Q.    Yeah, could you see -- what could you see on t

18  the screen, could you see the dayroom?

19     A.    Oh, you could see the dayroom.  You could see

20  the cells.  You could see the shower area.

21     Q.    Is that the case for every dorm?

22     A.    I believe so.

23     Q.    I ask that because I know that the shower areas

24  are in different locations in the different dorms.

25     A.    Uh-huh.

Page 71

1    Q.   Okay.   Is it possible that you wouldn't be able

2    to see the entire dayroom on some of the cameras?

3    A.   It's possible.

4    Q.   And when you say you can see the cells, what

5    part of the cells could you see?

6    A.   You could see obviously all of the -- all of

7    the faces of the cell, all of the big glass panels and

8    doors, and you could see into and to the back wall of

9    most of them.

10   Q.   Which ones could you not see into?

11   A.   The corners.

12   Q.   What do you mean by the corners?

13   A.   I'm sorry, in each -- in each dorm -- see, it's

14   different for each dorm.   I could tell you which cells

15   in each dorm.

16   Q.   You could list the cells?

17   A.   Uh-huh.

18   Q.   Sure.

19   A.   It is -- I'll just go from Alpha all the way

20   through.   In Alpha, you could not see Alpha 1 and Alpha

21   5.   That's the one farthest to the left on the bottom

22   floor and the one farthest to the left on the top floor.

23   Q.   Okay.

24   A.   In Bravo, you couldn't see Bravo 4 and Bravo 8

25   all the way to the back wall.   You could still see the

Page 72

1   face and through the window, but you couldn't see to the

2   back wall.  In Charley, it would have been 1 and 5.

3   Delta, it would have been 4 and 8.  Echo would be 1 and

4   5.  And Fox would be 4 and 8, if I remembering the --

5   the numbers and everything -- how it went correctly.  I

6   believe I am.

7       Q.   And when you say you could see to the back

8   wall, could you see the sides of the dorms -- or I'm

9   sorry, the cells?

10      A.   Most of it.

11      Q.   Were there videos anywhere else in Building 3?

12      A.   In Isolation.

13      Q.   And what could you see on that video?

14      A.   You could see the Isolation common area, like

15  the -- the Iso area is -- it's shaped kind of oddly and

16  you could see the entire Iso hallway.

17      Q.   But not into the cells?

18      A.   Not into the cells, no, ma'am.

19      Q.   And what about the area where master control

20  and the holding cells are, was there video there?

21      A.   No, ma'am, there's not.  There's no video in

22  the common area.

23      Q.   The common area.  So no video of those holding

24  cells or cages when you first walk into the dorm?

25      A.   No, ma'am.

Page 73

1    Q.   Do you know what I'm referring to?

2    A.   The holding cages, yes, ma'am, I do.

3    Q.   Okay.  Were the -- what were the videos used

4    for?

5    A.   I think they were just used for record, whether

6    it was record of anything that happened.  I think they

7    were talking -- they -- when they first got them, they

8    posted on the cell -- posted on the inside of every dorm

9    if you fight you will be prosecuted, something like

10   that, so I think they were using it to keep the youth

11   from fighting and if there was ever a question, if we

12   were walking around or if anybody claimed something

13   happened that didn't happen, there would be record.

14   Q.   Did you ever go back and look at a video?

15   A.   Did I?  I was present when the Lieutenant and

16   the Sergeant looked at one.

17   Q.   Okay.  And what video was that?

18   A.   I remember the youth's name was J   S!

19   (phonetic) and it was in I think Fox dorm, Cell 6.  I

20   think five other direct file juveniles went in and

21   basically jumped him and they -- they hurt him.  His

22   knee popped out of socket and went kind of sideways and

23   this was really the first incident of violence we had

24   since -- when the -- when the juveniles came and they

25   came down and we were able to pretty much figure out

Page 74

1  everybody who did it.

2       Q.   And that happened in a cell?

3       A.   Yes, ma'am.

4       Q.   So F-6 you said, right?

5       A.   Uh-huh.

6       Q.   Okay.  And were you present when that happened?

7       A.   I was there on that night, yes, ma'am.

8       Q.   Did it happen on night shift?

9       A.   Yes, ma'am.

10      Q.   Did you write an incident report?

11      A.   I did not.

12      Q.   Why not?

13      A.   Because I wasn't -- I wasn't right there.  I

14  think I was in Isolation hitting a log or something.  I

15  wasn't -- I wasn't near so I didn't witness anything.  I

16  saw him as he was being -- they put him on a gurney and

17  were -- and they carted him out and I saw him as he was

18  going out.

19      Q.   Who put him on a gurney?

20      A.   I don't know.

21      Q.   Was he taken out to the hospital, off site --

22      A.   Yes, ma'am.

23      Q.   He was taken off site?

24      A.   Uh-huh.

25      Q.   Do you know when he was brought back?

Page 75

1    A.    The same day -- the same night.

2    Q.    Do you know what hospital he went to?

3    A.    I would imagine Bartow, but I can't say for

4  sure.   That's the closest one.

5    Q.    And you said his knee popped out of its socket?

6    A.    It looked like it.   His knee -- yeah, it looked

7  like his -- it looked wrong.   His knee cap was not --

8  was not where it should be.

9    Q.    Do you remember when this happened?

10   A.    I don't, but it was early on, I would say

11 November.

12   Q.    What other officers were on duty that night?

13   A.    I don't remember.   It was probably the normal

14 guys who I worked with, but I don't remember if we had

15 anybody different there that night.

16   Q.    Okay.   So based on your prior testimony, that

17 would have been Lablanc, Reed, and Russell?

18   A.    More than likely.

19   Q.    How did you learn of what had allegedly

20 occurred in F-6?

21   A.    As -- as he was being carted out, he was -- he

22 was -- he was obviously in a lot of pain and he was

23 screaming and somebody asked him, I don't remember who

24 asked him, but somebody asked him what happened as he

25 was being carted out and he said something like they

Page 76

1    jumped me or they got me.  I don't know.  So I don't

2    remember who went through, but somebody walked through

3    the dorm and just, you know, was asking different people

4    about it and no one said anything and then we ended up

5    looking at the video and finding out who did it.

6        Q.   Do you know who called for medical attention?

7        A.   I don't.

8        Q.   Were you there when the call was made for

9    Medical?

10       A.   Like I said, I think I was in Iso and I don't

11   think they called over the radio because the medical

12   office was in the building, is right there by the

13   isolation area, right on the back side of the holding --

14   holding cage area, so if they would have yelled, she

15   would have heard them and she came right out.  When --

16   when I saw him, she was with him, the nurse was, so I

17   don't know if she was out there, but she was there.  And

18   I don't know who called.

19       Q.   Did this happen after lights out?

20       A.   No.

21       Q.   Do you know which guard first realized that

22   something was wrong with J ?

23       A.   No, ma'am.

24       Q.   Did you talk to J  about what happened that

25   night?

Page 77

1    A.    No.

2    Q.    What did you see on the video?

3    A.    You see -- as far as I can remember, you see

4    him walk in the cell and I think there was two guys in

5    the cell already and he walked in and then four or five

6    other youth walked right in right behind him, almost

7    single file.  And they brought him to the back call and

8    you could see them, you know, hitting him and kicking

9    him and, you know, beating him up pretty good.

10   Q.    Do you know why J   walked into that cell?

11   A.    That was his cell.

12   Q.    Do you know if J   had roommates?

13   A.    He did.

14   Q.    How many?

15   A.    I don't remember.

16   Q.    Who were his roommates?

17   A.    Oh, I don't remember.

18   Q.    Who were the children, the other children on

19   the video?

20   A.    The children who attacked him?  I remember -- I

21   only remember I think two of their names.  One of their

22   last names was S          , S-          t, and the

23   other one was T    G      T   , T        And

24   this was on the direct file side.

25   Q.    And when did you review the video?

Page 78

1    A.    At some point somebody must have called for the

2    supervisors because by the time they carted him out,

3    supervisors were in the building.  They had come down,

4    so somebody had obviously called for them and they went

5    right in and looked at the video, because apparently --

6    I guess they can pull it up on -- on the computers in

7    there.

8    Q.    Got it.  Now -- and when you came out of Iso

9    and saw J  coming out on the gurney and you said the

10   nurse was with him already?

11   A.    Uh-huh.

12   Q.    Was a supervisor down there already?

13   A.    Not to my recollection, no.

14   Q.    Okay.  So who was there with J  ?

15   A.    I don't remember.  I remember there -- there

16   was a deputy there, but I don't remember.  I can't say

17   for sure who it was because that was, you know, a long

18   time ago and I don't -- I don't remember.  It could have

19   been any of those three guys or somebody else who worked

20   in there instead.  I don't remember.

21   Q.    And where would the gurney have come from?

22   A.    We -- they would either keep a gurney -- the

23   classroom area that we have in Building 3 now used to be

24   a storage area and we always used to have gurneys back

25   there and we have a closet back there, a big, deep

Page 79

1   closet, and they used to keep gurneys and wheelchairs in

2   there and they would keep them out in the lower C area

3   before you went in Building 3, so we probably had one in

4   the building.  I don't know where they got it, but they

5   had it.  They had it quickly.

6       Q.   Okay.  And when you refer to that classroom

7   that used to be a storage area, are you talking about

8   the classroom that's on the direct file or the juvenile

9   side?

10      A.   Juvenile side.

11      Q.   That now has computers in it?

12      A.   Yes, ma'am.

13      Q.   Okay.  And I know you said you were probably --

14  you might have been hitting the log in Iso when this was

15  happening.  That seems like a long time to go without

16  realizing that all this is going on.  I mean that's

17  pretty serious for a child to be taken out on a gurney,

18  right?

19           MR. CAMPBELL: Object to the form.

20      Q.   Right?

21           MR. CAMPBELL: The question was it's pretty

22  serious to be taken out on a gurney?  Is that the

23  question or --

24           MS. HASKELL: I can rephrase.

25           MR. CAMPBELL: Okay.

Page 80

1    Q.   How long were you in the isolation area?

2    A.   Maybe a minute.

3    Q.   A minute, okay.  So in that minute, a guard was

4    alerted to what had happened to Joe or that Jo  had an

5    injury?

6    A.   Is that a question?

7    Q.   Yes.

8    A.   I would imagine, apparently, yeah.

9    Q.   And a nurse responded and someone brought a

10   gurney?

11   A.   (Witness nods head).

12   Q.   And -- yes?

13   A.   Yes.

14   Q.   And you learned of that when you came outside?

15   A.   Yeah.

16   Q.   Nothing on -- nothing went over on the radio?

17   A.   Uh-uh, not that I remember.  It could have.  I

18   don't -- I don't remember.

19   Q.   Would -- would an officer have had to radioed

20   to get the dorm door open?

21   A.   Not always because normally if you have a good

22   DSS, somebody who's in there that's really paying

23   attention, if they see something and they see people

24   going there, they just open the doors for you.

25   Q.   Is that what happened that night?

Page 81

1      A.   I don't know.  And I never said for sure that I

2   was in Iso.  I said I might have been in Iso because I

3   don't remember.  I know I was not there.  I wasn't

4   present for any of that, but I know that if I was

5   somewhere right there, I would have been there.

6      Q.   Got it.  When you watched the video, were you

7   able to tell how long this fight occurred?

8      A.   Yeah, there's a timer at the bottom of it.

9      Q.   How long?

10      A.   I don't remember, not long, not long.  I would

11   say -- if I had to guess, I would say 15 to 20 seconds

12   max.

13      Q.   If a DSS person had witnessed something like

14   kids going into a room --

15      A.   Uh-huh.

16      Q.   -- that was then connected to an incident like

17   this, would that DSS person write an incident report?

18      A.   Yes, ma'am.

19      Q.   So if that was how the guard in this instance

20   became alerted to this incident, there would be a report

21   written by a DSS officer?

22           MR. CAMPBELL: Object to the form.

23      A.   I have no idea because I don't know.  I was not

24   there.  I don't know how the door got opened.  They

25   could have yelled and I could have not heard them.  I

Page 82

 1    could have been in the restroom which is around the

 2    corner.  I have no idea.

 3        Q.   Okay --

 4        A.   I was not there.

 5        Q.   Would the correct protocol as you understand it

 6    be for a DSS person to write a report if they were

 7    somehow involved in an incident?

 8        A.   Yes, ma'am.

 9        Q.   All right.  Well, let's talk about protocol

10    generally.  What kind of training did you receive at the

11    Polk County Sheriff's Office, after the Police Academy

12    and while at the Polk County Sheriff's Office?

13        A.   We had to go through, I guess it was a couple

14    of weeks, I don't remember exactly how long, of -- we

15    were -- we were trained by another like senior officer,

16    senior deputy, and he just basically showed us how to

17    actually do everything that we -- that we're supposed to

18    do.

19        Q.   Who is that deputy?

20        A.   DTI Hively (phonetic).

21        Q.   Hively?

22        A.   Hively.

23        Q.   And what does DTI --

24             MR. CAMPBELL: What did you say again?  I'm

25    sorry.

Page 83

1          THE WITNESS:   DTI.   I'm sorry.

2     A.    It's like Detention Training something.

3     Q.    And Hively?

4     A.    Yeah.

5     Q.    Okay.  And was DTI Hively the only instructor?

6     A.    ·Yes, ma'am -- oh, no, we also did it at South

7  County and we did it -- we did two weeks I think at both

8  jails and the other one was Hernandez, DTI Hernandez.

9     Q.    And when was this?

10    A.    The very first thing we did when we got hired

11 on was go through that training.

12    Q.    Were you with a class of students --

13    A.    During the training?

14    Q.    Yeah.

15    A.    No, ma'am it was one-on-one.

16    Q.    Okay so you had one-on-one training with Hively

17 for two weeks at Central County Jail?

18    A.    (Witness nods head).

19    Q.    Yes?

20    A.    Yes.

21    Q.    Okay.  And then one-on-one training with

22 Hernandez for two weeks?

23    A.    Yes, ma'am.

24    Q.    Which -- which came first?

25    A.    Hernandez at South County.

Page 84

1    Q.   And what -- what was involved in that training?

2    A.   They literally walked us through every single

3   thing that we had to do, whether it was passing out mail

4   or dorm rounds.  They taught us how to do everything

5   that we're supposed to do, like we just stayed with them

6   for two full weeks and did everything with them.

7    Q.   Did you just shadow them?

8    A.   Oh, no, at first -- at first we shadowed them.

9   At fist we just walked around with them and watched what

10   they did.  And then a couple of days into it we would --

11   we would start to do it and then near the end, they were

12   just mainly shadowing us.

13    Q.   Okay. And again --

14    A.   To make sure we were doing things right.

15    Q.   And this is just one-on-one?

16    A.   Yes.

17    Q.   So when you say "we", you're referring to

18   what --

19    A.   Me and the DTI, yes, ma'am.

20    Q.   Okay. And then did you do the same thing with

21   Hively at Central County?

22    A.   Yes, ma'am.

23    Q.   How did those two trainings differ?

24    A.   They didn't.

25    Q.   Did they just teach you the same thing?

Page 85

1      A.    Uh-huh.

2      Q.    What is -- did you have any classroom training?

3      A.    Classroom training for -- oh, yes, we did.    It

4    was -- I don't remember what it was called, but it

5    was -- I think it was one week, 8:00 to 5:00.

6      Q.    And when was that?

7      A.    That was before we got assigned to a DTI.

8      Q.    Okay.  And who was in that class?

9      A.    My entire Academy class.

10     Q.    And who taught that class?

11     A.    Sergeant Reece (phonetic).

12     Q.    And what subjects were covered?

13     A.    I don't remember.

14     Q.    Okay.  During -- during either the two weeks at

15   South County, the two weeks at Central, or that

16   classroom training, did you receive any training on

17   working with juveniles?

18     A.    During that time, no, ma'am.

19     Q.    Did you receive any training on the use of

20   chemical agents?

21     A.    Yes, ma'am.

22     Q.    Okay.  And --

23     A.    We received that in the Academy, but they also

24   I think did a little more on that during that week.

25     Q.    Do you know which instructor taught you about

Page 86

1      chemical agents?

2          A.    In the Academy or --

3          Q.    No, among Hively, Hernandez, and Reece?

4          A.    I don't remember.  I'm sure -- I'm sure they

5      all spoke about it or...

6          Q.    Did you have any training during that period on

7      conflict resolution?

8          A.    I don't remember.

9          Q.    Did you have any training on proper responses

10     to a fight?

11         A.    I don't remember.

12         Q.    How about training in communicating with

13     inmates?

14         A.    Yes, we did do that.

15         Q.    Tell me about that.

16         A.    I don't remember who taught it or fully what

17     they covered, but the idea behind it was it's always,

18     you know -- the idea behind it was that talking, just

19     talking with people helps.  You know, you can -- most of

20     the time if somebody is really aggravated or really

21     adamant about -- about, you know, something, whether

22     it's not wanting to go back to their cell or not wanting

23     to eat this or wanting a different this, it's normally

24     for a reason.  It's normally not just for no reason.  So

25     we were kind -- we were taught to take an extra minute

Page 87

1    and speak with them and see if we can resolve it

2    without, you know, having to call in a supervisor to

3    speak with them or whatever.  And we also went through

4    crisis intervention training in case we were dealing

5    with somebody who was mentally impaired and -- yeah,

6    that was like a week long as well.

7         Q.   Well, let's talk about that.  What -- what does

8    it mean to you when you hear that someone has a mental

9    illness?

10        A.   What do you mean what does it mean to me?  Like

11   what would I define --

12        Q.   Does it change the way in which you interact

13   with them?

14        A.   I think so.  I think it does.

15        Q.   How so?

16        A.   Well, you have to me more -- more sensitive to

17   the fact that they might not -- they might not

18   understand something the way that you say it and you

19   might have to say something two or three times or you

20   might have to be more patient with somebody who has a

21   mental illness or a mental impairment than you would

22   with somebody who doesn't.

23             And the idea behind the training with dealing

24   with people is we don't have -- you know, I'm not -- I'm

25   not trained to say who's got a mental impairment and who

Page 88

1   doesn't, so we were kind of -- we were -- we were taught

2   to be patient and speak with everybody the way we would

3   like to be spoken to and, you know, take an extra minute

4   because we don't know who's mentally impaired.  We don't

5   have any idea who's a schizophrenic or bipolar.  We just

6   don't know, so we had to treat everybody like they could

7   have that.

8        Q.   You wouldn't be made aware of that if a person,

9   an adult or a child on the unit you were working on was

10  schizophrenic?

11       A.   If they were, if they were known to be mentally

12  ill, like I'm sure they have -- you know, if you're --

13  if you have this or this, they would put them in a

14  different area and that's what's called the Special

15  Needs Unit and we all had to go through training for

16  that as well.  I think that was a week long.  And they

17  all -- they house them together.

18       Q.   Was there a Special Needs Unit on the juvenile

19  side?

20       A.   No.

21       Q.   Why is that?

22       A.   I'm not sure.

23       Q.   Where would a child who was on the juvenile,

24  direct file side who was schizophrenic be housed?

25            MR. CAMPBELL: Object to the form.

Page 89

1        MR. VAZQUEZ: Joined.

2    A.    I don't know.

3        THE WITNESS:  When you say that, do I still

4    answer?

5        MR. CAMPBELL: Yes.

6        THE WITNESS:  Okay.  I didn't know.

7        MR. CAMPBELL: Sorry.

8    Q.    So I think you said that you might know -- when

9    you were talking about adults I think --

10   A.    Uh-huh.

11   Q.    -- that you might know that someone was

12   schizophrenic or had some sort of mental illness because

13   they're in the Special Needs Area --

14   A.    Uh-huh.

15   Q.    -- right?

16   A.    Yes.

17   Q.    Okay.  And then that -- and the juvenile,

18   direct file side, Building 3, there was no special needs

19   area?

20   A.    No.

21   Q.    Yes -- I mean that's correct?

22   A.    No, there was not -- there was not a special

23   needs area.

24   Q.    Okay.  So how, if at all, would you know if a

25   child was schizophrenic for example?

Page 90

1      A.    We wouldn't.

2      Q.    Okay.  Now, you said -- you said earlier that

3    you enjoy working with children?

4      A.    I do.

5      Q.    Now, why is that?

6      A.    Because -- I think it's because I had --

7    growing up I grew up in church and I grew up with -- in

8    youth groups and in children's groups, you know.  I grew

9    up -- there was -- there's some people who had a

10   specific role in my life, some good male role models and

11   they really -- they helped me to want to live the right

12   way and I think that it -- I want to be that.  I want to

13   be the guy who helps people live the right way and, you

14   know, shows -- you know, shows youth that, you know, you

15   can live this way and, you know, there are -- yet, you

16   know, it's not always easy to live right, but, you know,

17   living right does pay off and I enjoy it.  I enjoy

18   helping -- I enjoy helping youth.

19     Q.    And in your role as a youth minister, what are

20   your responsibilities?

21     A.    I have to -- my responsibilities are I prepare

22   Bible lessons on Sunday -- Sunday morning, Sunday night,

23   and Wednesday night for -- for the youth group there and

24   we do different youth activities and -- that's pretty

25   much it.  I follow up with them and I get together with

Page 91

1    them and help them through anything that they're going

2    through as best I can.

3        Q.   And how old are the children in your youth

4    groups?

5        A.   Anywhere from sixth grade to a senior in high

6    school.  Once they graduate, they have to move on to the

7    next class.

8        Q.   Do you think teenagers are different than

9    adults?

10       A.   Absolutely.

11       Q.   Okay.  In what ways?

12       A.   They're impulsive.  Adults normally do things

13   for a reason, youth don't.  They don't always do things

14   for the reasons -- sometimes they just do things.  I

15   mean that's my experience anyway.

16       Q.   Sure.  What -- what else?

17       A.   Just the maturity level and I don't know, they

18   don't have as much experience as adults.

19       Q.   What about in terms of decision making, is that

20   what you mean by impulsivity?

21       A.   Somewhat, yeah.

22       Q.   And what about in terms of understanding

23   consequences, are they different?

24       A.   I don't know.

25       Q.   Do you think children are generally more

Page 92

1      patient or less patient than adults?

2              MR. CAMPBELL: Object to the form.

3          A.    In -- in my opinion, there's -- I can't -- I

4      can't think of a difference.  I don't know if they're --

5      if they're any different at all.

6          Q.    I should have phrased it as more patient, less

7      patient, or the same.

8          A.    I would say the same.

9          Q.    But less mature?

10         A.    Yeah.

11         Q.    What do you think is the most effective way to

12     communicate with teenagers?

13         A.    One-on-one.

14         Q.    Why is that?

15         A.    I think teenagers, especially males in teen-age

16     years have to, you know, do the whole thing where they

17     prove they're tough and prove they're a man and they may

18     act out in front of friends when in actuality if you get

19     them one-on-one, you know, they're reasonable and they

20     listen.  And it always worked much better for me if I

21     was ever having a problem, I would just -- I would just

22     talk to them, pull them to the side and talk to them

23     one-on-one and it always seemed to work.  I don't think

24     I've ever had a problem after that.

25         Q.    All right.  So when kids are in a group

Page 93

1   together, they might be acting differently than

2   one-on-one?

3       A.   Yeah, but I would say that's not just kids.  I

4   would also say that's adults.  Adults are the exact same

5   way in my experience.

6       Q.   In your experience working with children

7   generally, how would you say teenagers relate to

8   authority?

9       A.   I think it depends.  I think it depends on the

10  way that the authority is represented.  I know for me I

11  didn't have many problems in --in the jail system or on

12  the outside because I don't -- I try to respond

13  correctly and I try to not be belittling with the things

14  that I say and I try to say things in the right way and

15  I had very few problems compared to most of the other

16  people.

17      Q.   Now, do you mean as a -- coming from a position

18  of authority you've had very few problems?

19      A.   Yeah, I've had very few.

20      Q.   Do you -- is there a difference between the

21  children in your youth group and the children at the

22  jail?

23      A.   No.

24      Q.   Really?

25      A.   Believe it or not, I would not say that there

Page 94

1    is.  I think ultimately yes, because, you know, they're

2    not in jail.  They're not acclimated to, you know, a

3    jail lifestyle.  But other than that, no, I think

4    they -- I think their minds work exactly the same.  You

5    see a lot of the same -- a lot of the same things

6    outside as you do inside.

7        Q.  What about in terms of trauma experienced,

8    would you say that the children in the jail generally

9    have experienced trauma?

10       A.  I don't know.  I mean I don't know -- I mean I

11   know that some of them have.  I know that some of them

12   have experienced extreme trauma, but I also know that

13   some haven't.  I also know that, you know, there's some

14   who, you know, just -- just do things, just steal or

15   something, just come in -- you know, we have -- I know

16   we had a few that had, you know, pretty -- pretty

17   intense background things that happened to them, but,

18   you know, all in all, I don't think it's that much --

19   that much different.  But I do think that in the jails

20   that they're probably more likely to have experienced

21   something like that.

22       Q.  How do you think that kind of trauma impacts a

23   child?

24           MR. CAMPBELL: Object to the form.

25       A.  I wouldn't know because I haven't -- I haven't

Page 95

1    experienced that.  I have no way of knowing.  I mean --

2         Q.    Have you ever counseled a child who has

3    experienced trauma?

4         A.    I mean I've talked with them.  I wouldn't say I

5    was -- I'm a counselor, but I mean I have spoken with

6    them and they seem to -- it seems to be something that

7    is difficult for them to deal with.

8         Q.    Okay.  How do you respond when you see a

9    conflict developing between children, verbal or

10   physical?

11            MR. CAMPBELL: Now, before, in jail, out of

12       jail?

13       Q.    Generally.

14       A.    Generally?

15       Q.    Yeah, you said that there was no difference

16   between children in the jail or --

17       A.    Well, there is no difference, but there's a big

18   deference in the way I relate to them.  If I see two

19   kids arguing on the side of the street, that's not me.

20   That's not my position.  That's not my business even.

21   Now, in the jail system, if we saw two kids arguing, we

22   would go.  We would go and try to help them either talk

23   it out while we were standing there so they could be

24   more civilized or -- or, you know, tell them to go their

25   separate ways or whatever.  Now, you know, if it's in my

Page 96

1   youth group, it would be close to the exact same way.

2   But if it's just general people out in the public, I

3   don't -- I mean I don't have any authority there.

4        Q.    Okay.  I don't think that -- there was any

5   question there -- or any confusion there.  I meant when

6   youth are interfering or intervening when you see

7   conflict developing with children, how do you intervene?

8   I'm not expecting you to --

9        A.    I got you.  --

10       Q.    -- run around and stop everyone, okay?

11       A.    Yeah.

12       Q.    Did you have any -- tell me about the training

13   that you received in terms of responding to conflict at

14   the jail?

15       A.    I don't remember.  I don't remember any

16   specific classes.  I don't remember.

17       Q.    Okay.  Well, where did you learn the techniques

18   that you've talked about?

19       A.    From -- from, you know, the DTI's because we

20   dealt with it even in -- even in the training we -- they

21   split up fights and did different things and we saw how

22   they did it and, you know, we would do it how they did

23   it.  I think -- I think I pretty much learned from them

24   and common sense.

25       Q.    Okay.  But you don't remember how they did it?

Page 97

1      A.    How who did it?

2      Q.    The DTI's.

3      A.    Yeah, it's different in every situation.  I

4    mean --

5      Q.    Well, I had asked you what sort of training you

6    received in responding to conflicts and you said you

7    didn't remember --

8      A.    Yeah, I don't remember -- I'm saying I don't

9    remember specific classes or a specific course that I

10   took for responding to conflicts.  That what's the

11   entire job is about, is, you know, responding to

12   conflicts because that's what we're there for.

13     Q.    So what techniques were you thought?

14     A.    They really put an emphasis on -- and they

15   being the DTI's, and they taught us in the Academy you

16   don't -- you want to avoid touching.  You don't want to

17   touch, you don't want to do anything, you want to be

18   able to speak with them and solve whatever you're trying

19   to solve by speaking because it's the most productive

20   way.  You know, you don't have to do -- you know,

21   there's not a danger of you getting hurt or them getting

22   hurt and it's just an easier situation to deal with if

23   you can talk it out rather than having to, you know, do

24   something differently.

25     Q.    Okay.  And the DTI training was the training

Page 98

1  that you referred to when you first came to the jail?

2      A.   Yes, ma'am.

3      Q.   And that related to adults?

4      A.   Yes, ma'am.

5      Q.   What did you learn in your training about the

6  point at which you would put your hands on someone

7  during a conflict?

8      A.   Are you asking what the point is?

9      Q.   Yeah, when would you do that?

10     A.   It was any time where they would be a danger to

11  us as staff, a physical danger to us as staff, other

12  inmates or themselves or the only other time I can think

13  of is when they refuse a verbal order and -- I mean I've

14  only been a part of one of those one time.  And normally

15  if they refuse a verbal order, what we're supposed to do

16  is we're supposed to call a supervisor and have the

17  supervisor come down and they give them the verbal order

18  and then if they don't comply -- they give it to them

19  multiple times and if they don't comply, then ultimately

20  we have to do something about it.

21     Q.   Got it, okay.  Is that any type of verbal

22  order?

23     A.   No, it's just things that they're supposed to

24  do, whether it's go to your cell or -- I think that's

25  the only one that I can think of that we ever had a real

Page 100

1   read it on my own or one of them may have said it or I

2   may have sat in a class about it.  I don't remember now.

3       Q.   Okay.  And you said something, and explain this

4   to me again because I don't recall exactly, but that

5   that might not be the best response?

6       A.   Uh-huh.

7       Q.   But that was -- that was a response, but that

8   might not be the best, what do you mean by that?

9       A.   Well, I mean at that point we are -- we have --

10  as far as policy, we have permission basically.  We are

11  allowed to go to that step.  We are allowed to use

12  chemical agent to get them to comply.  What I mean by it

13  might not be advisable is there could still be easier

14  ways of dealing with it.  You might be able to get

15  somebody else in there to talk with them who they might

16  respond a little better to or a supervisor who, you

17  know, has more authority.

18      Q.   Okay.  And was that the case with adults or

19  juvenile --

20      A.   Both, yes, ma'am.

21      Q.   That -- that was the procedure?

22      A.   Yes, ma'am.

23      Q.   Okay.  Tell me about the chemical agent

24  training you had at the Academy, what did that involve?

25      A.   If I remember, it was -- I think it was a full

Page 101

1    day of -- we learned all about the different chemicals

2    that are in it, how long it lasts, and how long to spray

3    it, how far you can spray it away from, and at the end

4    we had to get sprayed -- get sprayed in our face with

5    it.

6         Q.    And what did that feel like?

7         A.    That was painful.

8         Q.    Did it burn?

9         A.    Yeah.

10        Q.    Where did it burn?

11        A.    Everywhere that it touched.

12        Q.    Eyes?

13        A.    Uh-huh, eyes, face.

14        Q.    So it burns both -- it burns on your skin as

15   well as in your eyes?

16        A.    Yeah.

17        Q.    What did you do after you got sprayed?

18        A.    We had to -- I remember we got sprayed and then

19   we went and I think we hit a punching bag a couple of

20   times and then had to handcuff somebody and then we were

21   able to go and wash -- go and wash off.  I think we had

22   to like do a couple of knees or something on the

23   punching bag.  I don't remember.  It was -- the idea

24   behind it was if we are in a situation and we end up

25   getting sprayed, we need to be able to continue to do

Page 102

1    what we're supposed to do.

2        Q.    I see.  And do you know if the pepper spray --

3    I'm sorry, the chemical agent that you were trained in

4    using at the Police Academy is the same type of chemical

5    agent that was used at the Polk County Sheriff's Office?

6        A.    Same exact one.

7        Q.    Same brand?

8        A.    Same brand, same can, same size, same one.

9        Q.    Do you know what the name of that chemical

10   agent is?

11       A.    Oh, Freeze, Freeze -- like 2 K plus P or

12   something.

13       Q.    Okay.  What were you taught in training either

14   at the Police Academy or at the Sheriff's Office about

15   when to use pepper spray?

16       A.    That we were able to use it if they -- if we

17   give a verbal order, a clear verbal order, and they did

18   not comply or they refused.

19       Q.    Anything else?

20       A.    Yeah, like during a physical altercation --

21   like if we have two people fighting or something, we're

22   supposed to use it at that point.

23       Q.    Why is that?

24       A.    Because it's a hands-off thing for us still,

25   like we still don't have to grab them.  We can still

Page 103

1   stand three or four feet back.  And it's worked pretty

2   well.  It splits fights and stuff up pretty well.

3        Q.   Got it.  So rather than going in and physically

4   pulling people off?

5        A.   Uh-huh.

6        Q.   Yes?

7        A.   Yes, ma'am, sorry.

8        Q.   The proper protocol would be to use the pepper

9   spray instead of physically pulling them off or --

10       A.   The proper protocol is to first spray --

11  actually I don't know if that's protocol, but I do know

12  we've talked about it.  They told us to do that over and

13  over, to spray first before we put our hands on people.

14       Q.   Okay.  And when you say "they" taught you, do

15  you mean the Polk County Sheriff's Office?

16       A.   Yes, ma'am and the Academy.

17       Q.   Both?

18       A.   Yes, ma'am.

19       Q.   And why is spray first versus putting your

20  hands on them?

21       A.   Because like I said, it's still hands-off for

22  us because it keeps us more safe than if we run in and

23  grab somebody.  We run the risk of getting ourselves

24  hurt.

25       Q.   Got it.  So it keeps the detention deputies

Page 104

1   from getting hurt?

2       A.    Yeah, and potentially the inmates or whoever is

3   fighting, yeah.

4       Q.    Okay.  Why -- let me start over.  Were you

5   taught to spray in the face?

6       A.    Uh-huh.

7       Q.    And why is that?

8       A.    I think it's because it's the most effective

9   area because the target area was the eyes because it

10  seems to stop -- I mean if -- people don't seem to

11  continue to fight if they can't see, you know, if their

12  eye -- because it hurts pretty bad, but I mean it just

13  makes you close your eyes.  When you close your eyes, it

14  relieves it pretty well.

15      Q.    Okay.  Did you ever use pepper pray at the

16  jail?

17      A.    Yes.

18      Q.    How many times?

19      A.    I don't remember.  I would -- yeah, I don't

20  remember.

21      Q.    Do you remember if it was more than ten?

22      A.    No, it wasn't more than ten.

23      Q.    Do you remember if it was more than five?

24      A.    If I had to guess, if I had to place a number

25  on it, I would say probably close to five.

Page 105

1      Q.    Did you ever witness other guards use pepper
2    spray?

3      A.    Yes.

4      Q.    How many times?

5      A.    Twice that I can think of.

6      Q.    Okay.  When were those times?

7      A.    One time was in Charley dorm.  There was two
8    youth fighting, and I don't remember who it was -- I
9    think it was -- Russell ran in and yelled at them and
10   told them to stop fighting and they didn't and he
11   sprayed them and then they quit.  And the other one was
12   in Alpha dorm.  I don't remember what the youth's name
13   was, but he -- I think he was going on suicide watch and
14   he was refusing to move and then we called a sergeant
15   down and the sergeant and a couple -- and I think one
16   other guy ended up grabbing him by his arms and standing
17   him up and walking him over to the cell and then he
18   started to fight.  The rest of us weren't in there
19   because he was still calm when they picked him up.  They
20   just grabbed his arm because he just stood up and walked
21   with them and then he just decided he didn't want to go
22   in the cell and then they ended up tackling him and
23   pepper spraying him.

24     Q.    Did you witness that?

25     A.    Yes, ma'am.

Page 106

1    Q.   Do you remember who the sergeant was?

2    A.   Yes, ma'am, Sergeant McGraw.

3    Q.   And who was the other guy?

4    A.   John Reed.  I was there for that one.  I

5  actually went in on it.

6    Q.   This was one of the instances where you

7  actually pepper sprayed?

8    A.   I did not pepper spray, but I was there when

9  they got him on the ground.  I was there.

10   Q.   Do you remember who the child was?

11   A.   I don't remember his name.

12   Q.   Do you know his age?

13   A.   Yes, he was 17.  I think he was 17.

14   Q.   Was he black or white?

15   A.   He was black.

16   Q.   Do you remember what kind of hair he had?

17   A.   Short, short black hair.

18   Q.   And he was on the juvenile side?

19   A.   Yes, ma'am.

20   Q.   Do you recall when that was?

21   A.   It was early on as well.  I would say November,

22  November or December if I had to guess.

23   Q.   Were there other children in the unit at the

24  time?

25   A.   Yes, ma'am.

Page 107

1    Q.   How many?

2    A.   I don't remember, not more than five or eight.

3    Q.   And where in the area was he -- the child

4   tackled and sprayed?

5    A.   He was tackled right in front of Cell 3 in Alfa

6   dorm and that's where he was sprayed.

7    Q.   Okay.  Would camera's have covered that?

8    A.   Yes, ma'am, that's on camera.

9    Q.   Have you seen the video?

10   A.   I have not.

11   Q.   How do you know it's on camera?

12   A.   Because it's in the area that the camera

13  covers.

14   Q.   Okay.  Did you fill out an incident report?

15   A.   Uh-huh.  I actually think mine was a protective

16  action because I did end up touching him.

17   Q.   And how did you end up touching him?

18   A.   As -- I think either as they were tackling him

19  or once they got him to the ground, they picked him up

20  and put him on the ground on his front side and they

21  were on his arms and I ended up laying on top of like

22  the back of his torso to hold him down while they were

23  trying to get his arms behind his back so they could

24  handcuff him.

25   Q.   Okay.  Just give me one second, Justin.

Page 108

1    A.   Okay.

2    Q.   Was there a fight that related to that

3    incident?

4    A.   No, not that I can -- no, not that I can

5    remember.

6    Q.   They were just trying to place the child on

7    suicide watch?

8    A.   Yes, ma'am.

9    MS. HASKELL: All right.  Hank, I know that

10   Justin has identified that he wrote an incident

11   report, but I don't have that incident report in my

12   discovery from what I can tell, okay.  Can you check

13   on that?

14   MR. CAMPBELL: What do you mean?

15   MS. HASKELL: Let me know if you -- if your

16   client has it in his possession, an incident report

17   that relates to that incident.

18   Q.   Justin, do you know why that child was being

19   placed on suicide watch?

20   A.   To the best of my recollection, I think he

21   either said -- he either stated that he had suicidal

22   intentions to either the nurse or a staff member.

23   Q.   Now, are you saying that because --

24   A.   Or somebody at the Jacks Center (phonetic).

25   I'm sorry.

Page 109

1    Q.   No.   No, that's okay.   Are you telling me that

2   because you know that happened in this instance or

3   because that's generally how that --

4    A.   No, because I remember it happening in that

5   instance because somebody -- I think the sergeant told

6   him or said something to him about it later on that day

7   like well you -- we didn't -- you said that you were

8   suicidal to somebody.

9    Q.   Got it.   So are those the only two instances

10  that you can recall where you witnessed another guard

11  use pepper spray?

12   A.   Yes, ma'am, as best as I can recall.

13   Q.   Does a Detention Deputy have to get permission

14  before he uses pepper spray?

15   A.   No.

16   Q.   After pepper spray is used, is there a

17  particular form that has to be filled out?

18   A.   A form, it's a protective action.   Any time

19  that -- yes, ma'am.

20   Q.   Okay.   Nothing specific to pepper spray, but

21  just because that's a form of force?

22   A.   Yes, ma'am.

23   Q.   Got it --

24   A.   Yeah.

25   Q.   And who caries pepper spray?

Page 110

1      A.    All detention deputies and supervisors.  The

2  DSS's don't, but other than that.

3      Q.    Are there different size bottles of pepper

4  spray?

5      A.    In each control room they have a bigger bottle.

6      Q.    And when is that used, if ever?

7      A.    When?

8      Q.    Yeah.

9      A.    If -- I think -- I believe it's -- I believe

10  protocol for that one is if there were three or more

11  inmates fighting, then we can use that one.  And it's

12  the exact same chemical.  It just has -- it just shoots

13  further so you can stand further away.

14      Q.    I got it.  Who makes the decision whether to

15  use the bigger bottle?

16      A.    Any deputy.

17      Q.    Are the bottles ever weighed?

18      A.    Are they weighed?  No, I don't think so.

19      Q.    Was your bottle ever weighed?

20      A.    Mine was not.  That's why I said that, yes,

21  ma'am.

22      Q.    Did you ever use the larger canister of pepper

23  spray?

24      A.    No.

25      Q.    Did you ever see the larger canister be used?

Page 111

1    A.    Nope.

2    Q.    Do you remember the first time you ever used

3    pepper spray at the Polk County Jail?

4    A.    No, I don't remember which one was the first

5    time.  I do remember using it.  I just don't remember

6    which one is the first time.

7    Q.    Did you ever use it when you were working with

8    adults and not children at the jail?

9    A.    I don't think so, no.

10   Q.    And you were with adults from about -- when you

11   first arrived in January till approximately September or

12   October?

13   A.    Yes, ma'am --

14         MR. CAMPBELL: Object to the form.  Sorry.

15   A.    Yes, ma'am, somewhere around there.

16   Q.    So in approximately nine months, you never used

17   pepper spray?

18   A.    Uh-uh.

19   Q.    No?

20   A.    No.  I'm sorry.

21   Q.    I'm correct --

22   A.    No, ma'am, I have not -- did not.

23   Q.    All right.  What's the first -- what's the

24   first instance of using pepper spray at the jail that

25   you do remember?

Justin Hester, 7/23/2012
Hughes v. Judd

Page 112

1    A.   I don't remember which one is first.

2    Q.   Okay.  Well, tell me about one of them.

3    A.   There was an incident in Charley dorm and there

4  was two kids and they ended up -- one kid was sitting on

5  the floor by the phone and I just remember them getting

6  up and starting fighting -- and they started fighting

7  and Keith Russell and I ran in and we were both

8  yelling -- telling them to stop fighting, stop fighting,

9  and then they continued to fight so I sprayed -- I

10 believe I sprayed both of them because I sprayed kind of

11 right in the middle of them because it would break them

12 up pretty quickly and I grabbed one and he grabbed the

13 other I think, or another deputy grabbed the other.  I

14 don't remember because I was with the one youth.

15   Q.   Do you remember the other deputy who was

16 involved?

17   A.   Yes, Keith Russell.

18   Q.   I'm sorry, did you say another deputy grabbed

19 the other?

20   A.   I know there was another deputy in there, but I

21 don't remember if he grabbed him.  I think he ended up

22 just walking him out.  His name was Brian Lablanc.

23   Q.   Okay.  Do you remember the names of the

24 children involved?

25   A.   Yes, ma'am, it was K     J    and A

Page 113

1    S    .

2       Q.    Who was sitting by the phone?

3       A.    K    J

4       Q.    And where were you when this began?

5       A.    I don't remember.  I think I was in -- I think

6    Keith Russell and I were at the desk between Echo and

7    Fox and we heard -- we heard something.  We heard

8    something going on and looked over there and they --

9    they started fighting and I guess -- I don't remember

10   Kevin Jobe sitting by the phone, but I talked to him

11   afterwards and he told me he was just sitting by the

12   phone and the dude just ran up, but I hadn't seen the

13   video.

14      Q.    Do you remember when this happened?

15      A.    No, I don't.  I don't remember when -- the date

16   or anything.

17      Q.   ·Sure.  At what point did you become aware that

18   a fight was going on?

19      A.    I'm not sure what point during the fight that

20   it was.  As soon as -- typically you can tell because

21   when they start fighting out in the open like that,

22   everybody else in the dorm starts yelling and making a

23   lot of noise.  And, you know, we essentially heard the

24   noise, looked over, got up and ran in.  So it wasn't

25   very far into it.  The fight hadn't moved very far.

Page 114

1    Q.   And what did you do when you first ran in?

2    A.   Yelled at them to stop fighting.

3    Q.   What did Officer Russell do?

4    A.   He was doing the same thing.

5    Q.   Do you remember specifically what you said?

6    A.   Yeah, stop fighting.  That's what I -- yeah,

7 that's what we were taught to say.

8    Q.   How many times did you say that?

9    A.   At least three.

10    Q.   And it was K   J   and A   S   who

11 were fighting?

12    A.   Uh-huh.

13    Q.   And any other children involved?

14    A.   No, ma'am.

15    Q.   How do you know you said it at least three

16 times?

17    A.   Because I -- that's what they told us in the

18 Academy, to make sure you're saying it and saying it and

19 saying it and I remember yelling it a couple of times,

20 at least three times.

21    Q.   Okay.  And I know we talked earlier about the

22 use of pepper spray.  I mean why didn't you just -- why

23 didn't you immediately start pepper spraying?

24    A.   Because you don't want to.  It's a lot easier

25 to deal with if you can yell at them and say stop

Page 115

1   fighting and they just stop fighting.  It's a lot easier
2   to deal with.
3        Q.   Does that happen sometimes?
4        A.   Yeah.
5        Q.   Where you give a child an order to stop
6   fighting and they do stop?
7        A.   (Witness nods head).
8        Q.   Yes?
9        A.   Yes.  Sorry.
10       Q.   Would you or could you say that happens more
11  often than not?
12       A.   Oh, no, I would say it hardly ever happens.
13       Q.   That you give the order?
14       A.   No, that they stop when we give the order --
15  when I give the order.  I'm sorry.
16       Q.   Okay.  So what happened after you gave the
17  three orders?
18       A.   I just took out my pepper spray and sprayed --
19  I think I got them both because I just sprayed across
20  both of them just -- and I didn't spray for very long.
21  That may have been the first time I used it because I
22  don't remember well, but I just sprayed right across and
23  they stopped.  And I grabbed A      S.      and moved
24  him over to the wall and I think J     ended up just
25  walking around the stairs.  And I think Lablanc walked

Page 116

1  him out because I took J     from there to the holding

2  cage.

3      Q.   Did you tell them that you were going to spray

4  them before you did?

5      A.   No.

6      Q.   Why not?

7      A.   Because you don't have to and I mean they

8  weren't listening to us say stop, so I -- I mean -- I

9  guess we were just assuming they wouldn't hear it if we

10  said we're going to pepper spray you either.

11      Q.   Why did you take K    to the holding cage?

12      A.   I took A     S    .

13      Q.   I'm sorry?

14      A.   I don't know if I said K    .  Because protocol

15  after they get pepper sprayed is they have to be seen by

16  the nurse.  They have to be given a shower, given a new

17  set of clothes, and kept away from the kid who they were

18  involved with.  And I took him to the holding cell,

19  holding cage, to see if the nurse was in her office

20  before just walking him back there.

21      Q.   Where might the nurse have been?

22      A.   She could have been out of the building because

23  the Building 3 nurse also took -- also does the meds and

24  takes care of the inmates upstairs, the trustees.

25      Q.   How long did A     stay in the cage?

Page 117

1    A.   Not long, maybe -- just a few minutes, maybe

2    even two minutes or something because she was in there.

3    She was in there and I just briefed her really quickly

4    on what happened and brought him right in.

5    Q.   Okay.  And what about K    ?

6    A.   He was brought to the other holding cage and as

7    soon as the nurse was done with A      S    , we put

8    him into the dorm -- because we locked down their dorm.

9    We put him into the dorm to shower and get a new uniform

10   when we brought K____  J.  in to see the nurse.

11   Q.   Who brought K   , J   in to see the nurse?

12   A.   I don't remember.  I may have.  I don't

13   remember.

14   Q.   Did either A      , or K    have any injuries?

15   A.   I think K   J   might have had a busted lip.

16   Q.   Okay.  --

17   A.   Or maybe a little nick on his face.  I want to

18   say that he got something, but I don't remember well.

19   Q.   Okay.  All right Justin, I'm going to show you

20   a document.

21   A.   Okay.

22   Q.   I'll show it to the attorneys first.  That is

23   Bates stamp number 03702 and it's an incident report

24   from October 24th.

25   A.   Okay.

Page 118

1      MR. CAMPBELL: Is this our first exhibit?

2      MS. HASKELL: The first of this deposition, yes.

3    Q.   All right Justin, now that you've got that in

4  front of you, can you tell me what that is?

5    A.   This is witness to a protective action.

6    Q.   Okay.  And did you fill out that form?

7    A.   Yes, ma'am.

8    Q.   Okay.  And what's the date on the form?

9    A.   October 24, 2011.

10   Q.   And is that the incident that we were just

11 discussing?  Can you review that form and let me know.

12 Take your time.

13   A.   Yes, ma'am.

14   Q.   And how do you know that?

15   A.   I'm sorry?

16   Q.   How do you know that that's the incident that

17 we were discussing?

18   A.   Because I just read it.

19   Q.   Okay.  Is that an accurate copy of the incident

20 report that you filled out?  I know it has been

21 redacted.

22   A.   I mean I would imagine.

23   Q.   As you recall, okay.  Now, do you see halfway

24 down the -- about halfway down the page where certain

25 things have been whited out?

Page 121

1  Q.   All right.  And so when would you write the

2  report, did you wait until the nurse had seen the child

3  before filling out the form?

4  A.   Are you asking -- you're saying at what

5  point --

6  Q.   Let's start specifically -- I mean with this

7  one.  Did you wait until the nurse had seen the children

8  before you filled out your report?

9  A.   Yes, ma'am, I don't remember for sure, but I

10  would say yes, ma'am.

11  Q.   And why is that?

12  A.   Because we don't have all the information

13  because the nurse's noted information goes on reports.

14  Q.   Okay.  So you're supposed to wait until the

15  nurse sees the child and include that in your report?

16  A.   Yeah, but sometimes, you know, people will do

17  all of it besides what the nurse has noted and then put

18  what the nurse has noted in.

19  Q.   Okay, got it --

20  A.   I never did it that way just because it was

21  easier for me to understand the whole thing and then

22  just write it.

23  Q.   So you would wait until everything was done --

24  A.   I would wait.

25  Q.   All right.  What's another incident of pepper

Page 122

1   spray, when you used pepper spray, that you recall?

2       A.   I remember there was a fight in Fox dorm

3   with -- I believe it was G____J T___, D· M___·,

4   and A___ E        (phonetic).  And I don't remember

5   exactly what happened, but I do remember that it ended

6   up being T·    and M·  _ against E        and they

7   had -- E·    's back was up against the wall fighting

8   the other two kids and me -- Keith Russell and I ran in,

9   yelled for them to stop, and they didn't stop and we --

10  I know I pepper sprayed them.  I don't remember if he

11  did.  I pepper sprayed M·   _, D·   M·   .  And once

12  I started, he quit and went down on the ground.  And I

13  stopped pepper spraying him and I handcuffed him and

14  brought him out.  And when we were on our way out, he

15  tried to, I don't know, I guess squirm would be a good

16  word, squirm out of my hand and I just pushed him up

17  against the wall till he settled down for a second and

18  then just walked him to the cage.  He was just high

19  strung because he was just in a fight.  It wasn't

20  anything towards me.

21      Q.   Okay.  Do you remember when that occurred?

22      A.   I don't remember the date, no.

23      Q.   Okay.  I want to step back and go through that

24  point by point.

25      A.   Okay.

Page 123

1    Q.   When did you first become aware that a fight

2    was going on?

3    A.   I remember -- I don't remember which one.

4    T    or M   started fighting with him first.  It

5    started off as a one-on-one thing.  I remember seeing --

6    E       was standing on the wall with his back to the

7    wall and another one of them was coming down the stairs

8    and they were yelling back and forth and we were already

9    on the way to the door.  We saw it happening, Russell

10   and I, we saw it happening and we were getting up and

11   walking and then he ran off the stairs and they started

12   fighting one-on-one.  And somebody else, whether it was

13   T  _ or M       jumped up from a table and started

14   hitting E       as well.

15   Q.   And what was the order that you gave?

16   A.   I just told them to stop fighting.  I don't

17   remember exactly.  I just -- I would always just yell

18   stop fighting.

19   Q.   Okay.  And what happened then?

20   A.   I don't remember what T     did, but I do -- I

21   think T    might have stopped.  I don't remember well,

22   but as I was running in and yelling stop, stop fighting,

23   stop fighting, by the time I got there, by the time I

24   got right up on them, M     hadn't stopped or E _

25   hadn't stopped fighting and I ended up spraying M     .

Page 124

1   And he laid on the ground with his chest to the ground

2   and then I just handcuffed him and started walking him

3   out.

4       Q.   Okay.  So E       and T     , was that it --

5       A.   Yes, ma'am.

6       Q.   -- did stop fighting?

7       A.   I don't remember.  I just remember that by the

8   time I got there, it was -- I didn't see T     I don't

9   remember seeing T    by the time I got there.  He

10  wasn't hitting him anymore, or maybe I was just focused

11  on those two, but I don't remember seeing Tubbs by the

12  time I got there.

13      Q.   Okay.  And what were E       and M      doing

14  when you got there?

15      A.   Fighting, they were hitting each other throwing

16  punches.

17      Q.   Okay.  And what happened immediately after you

18  gave the order to stop fighting?

19      A.   They continued to fight.

20      Q.   Okay.  And then what did you do?

21      A.   I pulled out my pepper spray and I pepper

22  sprayed M    .  And I got him in the back of the head,

23  but I think when he realized that I was pepper spraying

24  him, he quit and jumped on the ground face down.  And

25  E       , I think Russell or somebody else grabbed him.

Page 125

1   My back was turned and I put M         in handcuffs and

2   brought him out.

3        Q.   Did Russell spray anyone?

4        A.   I don't remember.  He may have.

5        Q.   Okay.  Why did you feel it was necessary to

6   spray?

7        A.   Because they wouldn't stop fighting when we

8   were telling them to.

9        Q.   And you said you walked M       out.  And where

10  were you walking him to?

11       A.   The holding cage because any time there's a

12  fight, they have to be seen by the nurse as well to know

13  any injuries or --

14       Q.   Did you note any injuries at that point?

15       A.   Did I?

16       Q.   Uh-huh, on M      ?

17       A.   Uh-uh.

18       Q.   And you said -- I think you testified that he

19  was squirming?

20       A.   I don't know what a good word to use for what

21  he was doing.  He was handcuffed behind his back and he

22  kept -- he was pulling because he wanted to, I guess, go

23  back over there and continue to fight with his hands

24  behind his back.  I don't know.  But at one point -- and

25  I had him like here-ish (indicating) and I'm just

Page 126

1    escorting him out and he like jumped and tried to get my

2    arm off of him so he could -- whether it was run back

3    into the fight that wasn't even happening anymore or --

4    I don't know what he was trying to do.  I don't think he

5    was being hostile towards me.  I just think he was high

6    strung because he was just in a fight.  I don't know.

7        Q.   Okay.  And what did you do in reaction to that?

8        A.   I had a hold of him and when he -- he jumped

9    right on the way out of the door and when he did, I

10   wasn't expecting it and he ended up going forward and I

11   just followed him forward to the control room window and

12   just pushed him up against it for a second and told him

13   to calm down, calm down, it's over, whatever -- I don't

14   remember what I said.

15       Q.   Okay.

16       A.   And then he chilled out and I could tell his

17   body relaxed a little bit and then I just walked him

18   over to the cage and put him in there so he could wait

19   to be seen by the nurse.

20       Q.   How long did he stay in the cage?

21       A.   Not long.  Again, if I remember correctly, I

22   remember the nurse was in there again, so he wasn't

23   there for but a couple of minutes.  I don't remember the

24   order that they went in, but it wasn't more than a few

25   minutes.

Page 127

1    Q.   Okay.

2    A.   And when he went in the cage, we took the

3    handcuffs off of him.  He didn't have handcuffs on in

4    the cage if I remember correctly.  I'm pretty sure we

5    just took them off and put him in there.

6    Q.   Okay.  Justin, I'm going to show you another

7    incident report.  This is Bates stamped 587.  Let me

8    show it to the attorneys first.  All right Justin, what

9    is that?

10   A.   This is a fight report.

11   Q.   Okay.  Can you take some time and take a look

12   at it and let me know if you recognize that report?

13   A.   Uh-huh, yeah, I recognize it.

14   Q.   Did you write this report?

15   A.   Yeah.

16   Q.   Does this report refer to the incident we just

17   discussed?

18   A.   Yes, ma'am, I believe.

19   Q.   Are you not certain?

20   A.   Yeah, it does.

21   Q.   Okay, can I see it please.  All right Justin,

22   can you please -- just read the first portion of the

23   report until you get the part where inmate M        is

24   sprayed?

25   A.   Okay.

Page 128

1      Q.    Just let me know when you're done.

2      A.    I'm there.

3      Q.    Okay.  Now, you just testified that M        and

4    E       I believe were still fighting when you sprayed

5    them?

6      A.    Uh-huh.

7      Q.    Okay.  Is that different than what's in your

8    report?

9      A.    It seems to be.

10     Q.    Okay.  And why is that?

11     A.    Maybe because that was months ago and it's

12   difficult to remember every detail of these.

13     Q.    Got it.  And in the report that's in front of

14   you, can you read the first three sentences?

15     A.    In the report that's in front of me?

16     Q.    Yes.

17     A.    This one right here (indicating)?

18     Q.    Yeah, read it out loud.

19     A.    On the above date and time, I observed three

20   inmates fighting in Foxtrot Dorm.  I called over the

21   radio for Foxtrot Dorm to be opened.  DD Russell and I

22   entered Foxtrot Dorm and I ordered the inmates to stop

23   fighting.  DD Russell and I ordered inmate D

24   M       and the other two to get on the floor and

25   inmate --

Page 129

1    Q.   I understand they're redacted.  Go on.

2    A.   Yeah -- separated and lay down on the floor.

3    Q.   Okay.  Go on.

4    A.   Inmate M      took a few steps away from the

5    other inmates and did not comply with the order to get

6    on the floor.  I sprayed inmate M    with Freeze, blah

7    blah, blah.

8    Q.   Okay.  Thanks, Justin.  All right.  So

9    according to the report, the fight had stopped before

10   you used pepper spray; is that correct?

11   A.   Yes, ma'am.

12   Q.   Okay.  Do you recall at this point whether

13   that's accurate?

14   A.   If I wrote it here, then I'm sure it's accurate

15   and I'm sure my memory is not.

16   Q.   Okay.  Because -- and why is that?  I mean

17   because this was written soon after the incident?

18   A.   What do you mean?

19   Q.   Why is it that you trust the report and not

20   your memory?

21   A.   Because my -- yeah, I would say because my

22   report was right there after the incident.

23   Q.   Okay.  So why did you spray D    M     even

24   though the fight had ended?

25   A.   Because apparently he didn't get down on the

Page 130

1   floor.  I don't remember that part well, but if I have

2   it in this report, then this is what happened.  I

3   sprayed him -- he must not have complied with my verbal

4   order to get on the ground.

5        Q.   But he had complied with your order to stop

6   fighting?

7        A.   Well, I don't know if he complied.  I don't

8   know if the other kids even complied.  He can't fight by

9   himself.

10        Q.   According to the report the fight had ended,

11   right?

12        A.   Yeah, but that -- yeah.

13        Q.   Can I see that?

14             MS. HASKELL: If I didn't note that for the

15        record, I'd like to enter this as Exhibit 2.

16             (Exhibit No. 2 marked for identification.)

17        A.   I think I'm about ready for another restroom

18   break.

19             MR. CAMPBELL: Good deal.

20             MS. HASKELL: That's fine.

21             THE VIDEOGRAPHER:  We're off the video record

22        at 11:48 a.m.

23             (A short recess was taken.)

24             THE VIDEOGRAPHER:  We're on the video record at

25        11:59 a.m.

Page 136

1    other.

2         MS. HASKELL: All right.

3    Q.   All right Justin, I think we're done with

4    those.

5         MS. HASKELL: Could you mark this Exhibit 3

6    please.

7    Q.   Justin, do you remember any other instances

8    when you used pepper spray on a child?  We've gone over

9    two at this point.

10   A.   I remember there was -- I referred to it

11   earlier.  There was a bigger altercation in Echo dorm

12   with I think 14 to 16 kids and I sprayed at least one,

13   maybe two of them.  I don't remember well.

14   Q.   When did you first observe the fight in Echo

15   dorm -- did you observe the fight?

16   A.   I remember I was in Bravo dorm with Lieutenant

17   Palmer talking with Rubin Perez, one of the -- I guess

18   he's sort of a regular there.  He's in and out and he

19   was doing something he shouldn't have been doing.  I

20   don't remember.  And Lieutenant Palmer and I were in

21   there talking with him and I remember Jay Brown, Deputy

22   Brown, ran in and said that they were fighting in Echo

23   dorm and I ran out of Bravo dorm over towards Echo dorm

24   and they were hitting each other with mop ringers and

25   broom sticks and -- so they were all kind of just going

Page 137

1    at it.

2         Q.    Who was going at it?

3         A.    Everybody, seemingly everybody in the dorm.

4         Q.    Do you remember any specific children?

5         A.    Yeah.

6         Q.    Who do you remember?

7         A.    It would have been M____ H      , J, M

8    L       M    (all names phonetic).  I remember M

9    O'    (phonetic) was in there, but I don't remember if

10   he was involved.  There was a kid named J    or H

11   (phonetic).  I don't remember how to say his name.  He

12   was in there.  He got hit with a mop ringer.  S       ,

13   R(    S,     . (phonetic).  Yeah, I can't think of

14   anymore of their names.

15        Q.    Okay.  And when you entered the dorm, what was

16   happening?

17        A.    They were -- it seemed like everybody was

18   fighting.  It seemed like everybody was hitting somebody

19   or running or...

20        Q.    What guards were present?

21        A.    Just myself and Jay Brown at the beginning.

22        Q.    Okay.  What did you do?

23        A.    I ran in the dorm and I tried to -- I remember

24   running in, and I don't know what exactly I was

25   thinking, but I ended up just running into the dorm

Page 138

1   like -- and around to the other side yelling at them to

2   stop.  Because if there's two people, I mean I can't

3   really grab all of them or I can't really spray all of

4   them, so I remember I was yelling at them to stop.  And

5   then I think I grabbed L.     M .  I can't

6   remember, but I do remember H    , M'    H(   ', was

7   off in the -- off beside the wall and I told him to get

8   on the ground and he didn't and I sprayed him --

9        Q.   What was he doing beside the wall?

10       A.   He was running.  He was --

11       Q.   Running along the --

12       A.   Yeah, he was running either to go after

13  somebody or get away from somebody.  I don't know what

14  he was running to or from, but I kind of cornered him

15  and I just told him to get on the ground and he --

16  whether he said no or just continued to try to run, I

17  ended up spraying him and he dropped on the ground.  And

18  I think something else happened and he ended up getting

19  back up because the fight just continued on.  And I

20  don't remember, I think I might have sprayed another

21  kid, but by that time people started getting there and

22  it eventually stopped.

23       Q.   So when you sprayed M'   ', you said you

24  weren't sure where he was running to?

25       A.   No, I'm not sure.  Thinking about it now, no.

Page 139

1      Q.   And you said he might have been running to get
2   away?
3      A.   Oh, he might have been.  I don't know.  I
4   didn't see where he came from, but I know he was out in
5   the middle of it, you know, moving to or away from it.
6   I don't remember.
7      Q.   Okay.  And you -- so you ordered him to get on
8   the ground?
9      A.   Uh-huh.
10      Q.   And he --
11      A.   Whether he did or just didn't, I don't
12   remember, but he didn't.  He didn't get on the ground
13   when I told him to and I had my pepper spray in my hand
14   because, you know, they're afraid of it.  They're not
15   afraid of being grabbed because, you know, we're not
16   going to hurt them, so they're not afraid of that.  So
17   they're afraid of the pepper spray, so, you know, they
18   respond well to it.  But he didn't go down so I sprayed
19   him, didn't spray him a whole lot at all.  Once I
20   started, he hit the ground and then something else
21   happened.  I don't remember.  I think somebody threw
22   something at him actually and he jumped up and continued
23   to run and I didn't go after him.  I went after the guy
24   who threw something at him.
25      Q.   Do you remember who that was?

Page 140

1      A.    I think it was M·       I think it was I

2  M⟨

3      Q.    When did you have your pepper spray in your

4  hand?

5      A.    I don't remember when I pulled it out.

6      Q.    Do you remember if you pulled it out before you

7  came into the dorm?

8      A.    No, I don't remember.

9      Q.    All right.  And you said you might have sprayed

10  a second person?

11     A.    I might have.  I don't remember because like I

12  said, when I was -- when I first got in there, I ended

13  up -- I think I just ended up running through and

14  yelling and I think I had it in my hand then.  I don't

15  remember the situation well, especially not the

16  beginning of it because it was hectic and there was a

17  lot of things going on.

18          MS. HASKELL: Can we go off the record for just

19      one second?

20          MR. CAMPBELL: Sure.

21          THE VIDEOGRAPHER:  We're off the video record

22      at 12:15 p.m.

23          (Discussion held off the record.)

24          THE VIDEOGRAPHER:  We are on the video record

25      at 12:16 p.m.

Page 145

1    Q.    Okay.  Do you remember who Exhibit 4 refers to?

2    A.    This is M      H _ _ and the boy who threw

3    the mop ringer was L;      M

4    Q.    Okay.  I'm going to show you what's been Bates

5    stamped 3734 and 3735.

6          MR. CAMPBELL: Which exhibit is this?

7          MS. HASKELL: This will be 6.

8          MR. CAMPBELL: Okay.

9          MS. HASKELL: They were all in the stack that

10   you looked at.

11   A.    Okay.

12   Q.    Do you recognize that?

13   A.    Yes, ma'am, I do.

14   Q.    What is that?

15   A.    This is a protective action report from the

16   same incident on October 16, 2011.

17   Q.    And did you sign that?

18   A.    Yes, ma'am I did.

19   Q.    And is that a fair and accurate copy of the

20   report you produced?

21   A.    Yes, ma'am, it is.

22         MS. HASKELL: Okay.  I'd like to enter that as

23   Exhibit 6.

24         (Exhibit No. 6 marked for identification.)

25   Q.    Just to clarify, that was Bates stamped 3734

Page 146

1    and 3752.  Justin, what does the second page refer to if

2    you know?

3         A.    It looks like a different protective action.

4         Q.    Let me see.

5         A.    It's a different date at the top.

6         Q.    All right, you're right.  That's an error.

7    Thanks.  So I'm giving you back 3734, Exhibit 6.  Do you

8    recall what juvenile that --

9         A.    Yes, ma'am.

10        Q.    -- referenced?  Who?

11        A.    L        · · M

12        Q.    Okay.  After reviewing this incident report, do

13   you recall whether you pepper sprayed L        M     ?

14        A.    I don't recall.  I don't recall.

15        Q.    Okay.  Does your incident report detail that

16   you did pepper spray --

17        A.    Yes, ma'am, it does.

18        Q.    Okay.  Would you have written an incident

19   report about pepper spraying him if you had not?

20        A.    No, ma'am, I wouldn't have.

21        Q.    Okay.  I understand that you don't have any

22   independent recollection right now of pepper spraying

23   L      _    M     in this incident?

24        A.    No, ma'am, I do not.

25        Q.    Okay.  But do you believe that this incident

Page 147

1   report is accurate?

2       A.   Yes, ma'am, I do.

3       Q.   This is Exhibit 6.  Thank you.  Justin, who are

4   Billings and Griffin (phonetic)?

5       A.   Those are road deputies.

6       Q.   What does that mean?

7       A.   That means they don't work in the jail.  They

8   work out on the street.

9       Q.   Were they called to respond to this incident?

10      A.   Yes, ma'am, they were.

11      Q.   Why?

12      A.   I believe they were called in to file charges

13  against the people who were involved in the fight.

14      Q.   Did you call them?

15      A.   No, ma'am.

16      Q.   Do you know who called them?

17      A.   No, I don't.  I would imagine supervisors.

18  They normally take care of that.  That's not me.

19      Q.   Have you ever called road deputies to respond?

20      A.   Nope.

21      Q.   And --

22           MR. CAMPBELL: What did you say?  I didn't hear.

23           THE WITNESS:  No.  No, I haven't.  Sorry.

24      Q.   And these reports also reference a refusal to

25  sign a waiver of prosecution?

Page 149

1    explain to them what it was and if they wanted to

2    prosecute, we would tell them don't sign, just refuse to

3    sign and then you can prosecute.  But if you don't want

4    to prosecute them, then sign the waiver.

5         Q.   Were children required to sign the form?

6         A.   No.

7         Q.   Could refusal or signing of that form be

8    something that would be noted in the log book?

9         A.   I don't think so.  Are we talking about the log

10   book that is the pass-down log?

11        Q.   No, the activity log book in the dorm.

12        A.   No, ma'am, I don't think so.

13        Q.   Would it be noted in the pass-down log book?

14        A.   No, ma'am, I don't think so either.

15        Q.   Okay.  Justin, do you remember any other

16   instances where you used pepper spray on a child?

17        A.   No, ma'am.

18        Q.   Okay.  Nothing else?

19        A.   No, ma'am, I don't.

20        Q.   All right, Justin, is there anything that would

21   refresh your recollection as to when you used pepper

22   spray in another incident?

23        A.   If I saw a report of mine that had it, then

24   yes, ma'am, I would imagine that would.

25        Q.   All right.  I'm going to show you a document

Page 150

1    that's been Bates stamped 4032 and 4033.  I'll show it

2    to the attorneys first.

3        A.    Okay.

4        Q.    All right Justin, what is that?

5        A.    This is a protective action report from

6    February the 3rd, 2012.

7        Q.    Do you recognize that report?

8        A.    Yes, ma'am.

9        Q.    Okay.  Did you sign that report?

10       A.    Yes, ma'am.

11       Q.    Did you write that report?

12       A.    Yes, ma'am.

13       Q.    Is that an accurate copy of the report that you

14   wrote?

15       A.    Yes, ma'am.

16            MS. HASKELL: Okay.  I'd like to enter that as

17       Exhibit 7.

18            (Exhibit No. 7 marked for identification.)

19       Q.    Justin, having read that report, do you know --

20   do you recall any other incidence of using pepper spray

21   on a child?

22       A.    No, ma'am.

23       Q.    Okay.  Does that report detail an incident in

24   which you used pepper spray on a child?

25       A.    Yes, ma'am, it does.

Page 151

1     Q.   Okay.  Do you have any independent recollection

2     of that incident outside of that report?

3     A.   No, ma'am.

4     Q.   Okay, thank you.  Home stretch.  Justin, have

5     we covered all of the incidents of pepper -- your use of

6     pepper spray that you recall?

7     A.   Yes, ma'am.

8     Q.   Do you think it's possible that there are

9     incidents of pepper -- in which you used pepper spray

10    that you do not recall?

11         MR. CAMPBELL: Object to the form.

12    A.   There could be.  I don't remember.

13    Q.   Okay.  Justin, did you ever place a child on

14    suicide watch?

15    A.   Yes, ma'am.

16    Q.   Okay.  When was that?

17    A.   I don't remember.

18    Q.   How many times?

19    A.   I don't remember that either.

20    Q.   What would happen to prompt putting a child on

21    suicide watch?

22    A.   I would have to either hear them say something,

23    mention suicidal intentions, or see them do something

24    that is like harmful to themselves.

25    Q.   And what sort of training did you receive, if

Page 152

1    any, in terms of identifying suicidal ideations?

2         A.   We had a block of that I believe in our CIT

3    training, our Crisis Intervention Training, of how to

4    recognize it and how to deal with it.

5         Q.   Did that training relate to adults or children

6    or --

7         A.   Just people.  It was --

8         Q.   Did you have any training specifically in

9    children in suicide?

10        A.   Yes, ma'am.

11        Q.   When was that?

12        A.   Everyone who works with juveniles goes through

13   a -- I believe it's a 40-hour course.  It's either 40 or

14   80.  I can't remember.  And I remember one of the blocks

15   was like suicide issues.

16        Q.   What did they teach you about suicide?

17        A.   What do you mean?

18        Q.   What do you remember learning about identifying

19   suicidal ideations?

20        A.   We were taught just to be observant and

21   especially on the direct file side when we have -- you

22   know, those youths are in there for a good amount of

23   time, so we get to know their personalities.  And if

24   they are acting off, if they are acting strange or they

25   seem depressed or down, then, you know, we go talk to

Page 153

1  them.  We go talk to them and see if there's something

2  wrong, if they want to talk to a counselor or a nurse or

3  if they need to speak with somebody or come out of the

4  dorm, you know, and just catch some air in the holding

5  cage for a little while.  And they just taught us to try

6  to be proactive about it.

7      Q.   What else did you study in the juvenile

8  training?

9      A.   I don't remember now.

10     Q.   Did you go over use of chemical restraints

11 specifically in the juvenile training?

12     A.   Yes, ma'am, I believe we did.

13     Q.   Did you go over the rights that a child who's

14 detained has?

15     A.   Yes, ma'am.

16     Q.   Do you remember any of those rights?

17     A.   No, ma'am, I don't.

18     Q.   Okay.  Well, I want to go back to suicide then.

19 So what would happen if you identified or believed that

20 a child was suicidal?

21     A.   What we would do is we would remove the child

22 from wherever they were, whether it was in their cell or

23 just in their dayroom.  We would take them out, put them

24 in the holding cage again to see if the nurse was in her

25 office, and the nurse sees him because she has to do a

Page 154

1    report of some sort. And after that we will have them

2    get dressed out and go to the suicide area.

3        Q.   Does a nurse have to see every child before

4    they're placed on suicide watch?

5        A.   I believe so. I've never seen somebody go on

6    suicide watch without seeing a nurse.

7        Q.   And that nurse would always produce a report?

8        A.   Yes, ma'am.

9        Q.   Would you do an incident report?

10       A.   Yes, ma'am.

11       Q.   Okay. So you said that you had -- you remember

12   at least one time when you placed a child on suicide

13   watch?

14       A.   At least one, yes, ma'am.

15       Q.   There might be others?

16       A.   There might be, I don't remember.

17       Q.   And that one time you would have produced an

18   incident report for that?

19       A.   Yes, ma'am.

20           MS. HASKELL: All right, Hank, just for the

21   record, I don't think I have that incident report

22   either. If you or your client has it, I would like

23   it.

24       Q.   How long would a child typically stay on

25   suicide watch?

Page 155

1      A.   I don't know.  It wasn't up to me.  It was

2   Mental Health.

3      Q.   Who was it up to?  Who is Mental Health?

4      A.   I don't know who Mental Health was.  They were

5   just -- they had mental health staff.

6      Q.   So after you put the child in the holding cell

7   and alerted the nurse, then what happened?

8      A.   Then we would -- if it was a juvenile, we would

9   get the supervisors down there because if we're doing

10  anything like that, it's always more helpful to have

11  supervisors down there when we're dealing with juveniles

12  in any sort of circumstance like that.  So the specific

13  instance that I was involved with, I called the

14  supervisor down, took all the things that he had in his

15  room and inventoried them.  And then we took him to the

16  back classroom and had him change out in the classroom

17  by himself and then come back out.  And by that time it

18  was time for day shift to come on, so I don't know

19  whether they kept him in the holding cage or if they

20  put him in a cell.

21     Q.   What made you think this child was suicidal?

22     A.   He said it.

23     Q.   He said it to you?

24     A.   Yes, ma'am.  I was sitting in -- that specific

25  night I was sitting in Delta dorm because we already had

Page 156

1    two suicide watches.  We had one who had said he wanted

2    to kill himself blatantly and said how he was going to

3    do it to another deputy.  So he was placed on suicide

4    watch and placed into Delta 1.  And we had another kid

5    who came from the Jacks Center on suicide watch and I

6    was sitting in front of the cell and I think he was in

7    Delta Cell Number 3 or -- either 3 or 7 and he just

8    plain as day said my name and then told me he wanted to

9    kill himself.

10        Q.   But you said you already had two children on

11   suicide watch?

12        A.   Yes, ma'am.

13        Q.   Separate from the one we were talking about --

14        A.   Yes, ma'am.

15        Q.   So when you said you were sitting in front of

16   the cell in D-3 or D-7, that's the second child who was

17   on suicide watch?

18        A.   There was two in there.

19        Q.   Two in the same cell?

20        A.   Yes, ma'am.

21        Q.   Okay.  And why were you sitting outside the

22   room?

23        A.   I was sitting in the doorway in a chair.  The

24   door was open.

25        Q.   The door to the dorm?

Page 157

1    A.    The door to the cell.

2    Q.    Why were you sitting in the door to the cell?

3    A.    Because there is not supposed to be a barrier

4    between you and a person who is on a suicide watch if

5    you're watching them.

6    Q.    I'm sorry, what do you mean there's not -- were

7    you assigned to watch them?

8    A.    Yes, ma'am, I was.  I'm sorry.

9    Q.    Okay.  So you were watching that child

10   constantly?

11   A.    Uh-huh.

12         MR. VAZQUEZ: Is that yes?

13         THE WITNESS: Yes, I'm sorry.

14   Q.    When you were watching that child, were you

15   also doing rounds?

16   A.    No, ma'am.

17   Q.    Do you remember the name of child who was on

18   suicide watch in D-1?

19   A.    Before the -- I remember all their names.

20   Q.    Tell me the names of all the children.

21   A.    Devon Wattlington (phonetic) came from the

22   Jacks Center or Lakeland Regional on suicide watch.

23   J    , M   was the one who said that he was going to go

24   on suicide watch.  And J __    was his last time.  I

25   don't remember what his first name -- D       J

Page 158

1   (phonetic) was the one who said that he wanted to kill

2   himself.

3        Q.   So who were the two in the room that you were

4   watching?

5        A.   J    M    and D    W.

6        Q.   Why were they in a room together?

7        A.   Because they were direct files and when they're

8   direct files and they go on suicide watch, they're

9   treated -- that's just how they do it.  If there's

10  one -- I guess that wouldn't make sense.  If there's

11  two, they can go together because -- I don't know.  I

12  think it's just policy because that's the way they do it

13  with adults.

14       Q.   Okay.  And who was the child who was taken to

15  the classroom to dress down?

16       A.   J

17       Q.   And when you say "dress down", what do you

18  mean?

19       A.   He -- we sent him in and he had -- it's a green

20  suicide prevention smock and it essentially -- it

21  connects on the shoulders with Velcro and then around

22  the waist with Velcro.  And he had to take all of his

23  clothes off and put that on and give us all the clothes

24  that he had on so we could put it into the inventory of

25  all of his things.  And then he was given a suicide

Page 159

1   mattress and a suicide blanket -- suicide proof, I'm

2   sorry.

3        Q.    What makes those suicide proof?

4        A.    I think the seams are like -- I don't know how

5   they do it, but apparently they're just really tough and

6   can't be ripped or cut really easily and they're just

7   thick.

8        Q.    When children are on suicide watch, do they see

9   a medical or mental health professional?

10       A.    Every day.

11       Q.    Okay.  Who is that person?

12       A.    I'm not sure.  I don't work -- I didn't work on

13  day shift so I don't know who they were.

14       Q.    How do you know that they see that person every

15  day?

16       A.    They have to.  They have to and the nurses

17  would come and ask them if they were seen by anybody.

18       Q.    Did you ever see the mental health professional

19  interact with any child who was on suicide watch?

20       A.    No, ma'am, they weren't there at night.  They

21  were there during the daytime.

22       Q.    Okay.  Justin, how many times did you have to

23  sit and watch a child who was on suicide watch?

24       A.    I don't recall.

25       Q.    Okay.  More than that one instance?

Page 160

1      A.   Yes, ma'am.

2      Q.   Okay.  And during that instance that you do

3  recall, did you stay there your entire shift?

4      A.   No, ma'am.

5      Q.   Where else were you?

6      A.   In the building, just -- I don't remember which

7  side it was.  It would have been on the juvenile side or

8  the direct file side.

9      Q.   Doing what?

10     A.   The rounds, normal rounds.  We would rotate.

11 We found that it was easier to sit in the chair and

12 watch them for two hours or an hour at a time rather

13 than sitting there for 12 hours because I don't know of

14 anybody who can concentrate and just look at people

15 sleeping for 12 hours.  So we couldn't do it.  So we

16 would switch up.

17     Q.   Who would you switch off with?

18     A.   Any of the guys who was working down there with

19 me.

20     Q.   So you would watch for an hour?

21     A.   We normally did two hours I think.

22     Q.   You would watch for two hours and then you

23 would switch out?

24     A.   Yes, ma'am.

25     Q.   So when you were watching these two -- the

Page 161

1   children in the room sleeping, there were three officers

2   on the unit?

3       MR. CAMPBELL: Object to the form.

4       A.   No, ma'am, there was normally four.  The

5   supervisor would come down or we would get a movement

6   guy, but it was typically a supervisor because they --

7   no, it was always a supervisor.

8       Q.   So on any night when you were watching -- doing

9   one-on-one observation, a supervisor would be there?

10      A.   They would be there.  I think we had -- we may

11  have had one or two when we ran it with with three

12  deputies on the floor and one in the chair watching

13  them.  We may have ran it with three a couple of times,

14  but I don't remember.

15      Q.   Okay.  And when you had to have someone switch

16  out like the movement person or supervisor come in,

17  would that be noted on the personnel staffing sheets?

18      A.   No, ma'am.

19      Q.   Why not?

20      A.   Because it was on camera.  If anybody had a

21  question about it, they could look it up.

22      Q.   Are you aware that the supervisors prepare

23  staffing sheets every day that show who staffed a

24  particular dorm that day?

25      A.   They don't do dorms.  They do buildings.

Page 165

1     Q.   Okay.  So you can't recall ever being

2  short-staffed in Building 3?

3     A.   No, not our shift.

4     Q.   And by short-staffed I mean --

5     A.   Less than four.

6     Q.   Yeah, fewer than four.

7     A.   I can't --

8     Q.   Justin, where did juveniles, and by juveniles I

9  mean the pre-adjudicated juveniles, when they were

10  placed on suicide watch, where would they go?

11     A.   They went into Alpha Cell Number 3.

12     Q.   And why did they go in that cell?

13     A.   Because it was a designated suicide cell.  When

14  they made it, they -- or when they decided to designate

15  it a suicide cell, they removed the bunks, the metal

16  bunks, out of it.

17     Q.   Are children ever left sleeping in the dayroom?

18     A.   Sleeping in the dayroom?

19     Q.   Uh-huh.

20     A.   Yes, ma'am, but they're on -- we have metal

21  bunks that we take out and they get the same bedding as

22  everybody else.  The reason they are kept out is if

23  they -- I believe it's close or -- close observation or

24  something, if they have -- if a nurse or somebody thinks

25  that they need to be on a close observation, whether

Page 166

1   it's a supervisor or people from the Jacks Center, they

2   just put them on close observation status which

3   basically means they have to sleep in the dayroom with

4   their bunk up against the glass so it's easier for us to

5   see even if we're just sitting at the desk.

6       Q.   Is that different than suicide watch?

7       A.   Yes.

8       Q.   Why?

9       A.   Because they're not on suicide watch.  They're

10  not suicidal.

11      Q.   Do you know what reason a child might be placed

12  on close observation?

13      A.   We had -- I remember one time a kid, he was

14  sick.  He kept throwing up or something, so the nurse

15  just said it was -- he, you know -- it was nerves or

16  something.  She said it wasn't -- he wasn't like --

17  there was really nothing wrong with him and he said he

18  felt okay, you know, he just hated being there, so we

19  put him on close observation, the supervisor did, but I

20  can't think of any specific reasons why.  I know we had

21  one young kid who was there and because of his age, he

22  was put on close observation.

23      Q.   Okay.  What about the isolation rooms, what are

24  those used for?

25      A.   Isolation is used for when supervisors

Page 167

1   determine that any inmate needs to be isolated from

2   other inmates, whether they are continuously being a

3   problem or a physical threat to themselves or -- well, I

4   guess not themselves.  If they're a physical threat to

5   other inmates or staff, they go in isolation.

6        Q.   Did you ever place a child in isolation?

7        A.   Did I?  Like did I decide for them to go there

8   or did I walk them there?

9        Q.   Did you just ever make a decision?

10       A.   No.

11       Q.   Okay.  And why is that?

12       A.   Because that's above my pay grade.

13       Q.   Did you ever alert a supervisor that a child

14   might need to be in isolation?

15       A.   Uh-uh.

16       Q.   How would a supervisor become aware that a

17   child --

18       A.   They would like -- for disciplinary reasons

19   because they get all the reports.

20       Q.   Okay.  As far as you know, how would -- why

21   would a supervisor make a decision to put a particular

22   child in isolation?

23       A.   For disciplinary reasons, if they don't think

24   they can control them in a dorm or if they don't think

25   they could exist with other people, they put them in

Page 168

1    isolation.

2        Q.    And who physically places a child in isolation?

3        A.    Anybody, any deputy.  We just walk them there.

4    We don't really place them there.  We just walk.

5        Q.    How do you learn that a child needs to go to

6    isolation?

7        A.    The supervisor tells us.

8        Q.    Okay.  And when would you typically find that

9    out?

10       A.    I'm sorry?

11       Q.    When would you typically find that out?

12       A.    Find what out?

13       Q.    That a child needs to go to isolation, when is

14   that determination made?

15       A.    Whenever.  It's not on us.  It's on the

16   supervisor.  Whenever they tell us, we move them.

17       Q.    But you said earlier it's when a supervisor

18   sees a report?

19       A.    No, I said -- you asked me how they know, how

20   they know about it, and because they see all the reports

21   -- so if there's an incident and they decide that well,

22   this guy probably needs to be moved into isolation

23   because he's been in three fights in the last month, he

24   calls down to the building and says hey, put this guy in

25   isolation for whatever -- for fighting a few times.

Page 169

1    Q.    Got it.   As far as you know, does the

2    supervisor alone get to make that decision?

3    A.    As far as I know, yes, ma'am.

4    Q.    Who decides how long a child stays in

5    isolation?

6    A.    I think it's -- I think that might be the Major

7    or the Detention Captain.

8    Q.    And just to clarify, I'm talking about those

9    isolation rooms that you referenced earlier, are we

10   talking about the same thing?

11   A.    Yes, ma'am.

12   Q.    Okay.   What happens after a child is placed in

13   an isolation room?

14   A.    I'm not sure what you're asking.

15   Q.    Well, you testified earlier that you would walk

16   a child to the isolation room.   Then what happens next?

17   A.    They go in, we close the door.

18   Q.    What do they take with them to the isolation

19   room?

20   A.    All their things.

21   Q.    Everything?

22   A.    Uh-huh.

23   Q.    Are they allowed to have anything in the

24   isolation room that they had in their cell?

25   A.    Yeah, all of it.   They take it all, whether

Page 170

1   it's mats, books, personal property.

2        Q.   Pens?

3        A.   They don't have pens, but pencils.

4        Q.   Pencils?

5        A.   Yes, ma'am.

6        Q.   Pencils, letters?

7        A.   Uh-huh.

8        Q.   Blankets?

9        A.   Yeah, they take it all with them.

10       Q.   How many children have you walked to the

11  isolation rooms?

12       A.   I don't know.

13       Q.   When a child is in isolation, are they allowed

14  to go to recreation?

15       A.   I don't know, recreation is in the daytime and

16  I only worked at night.

17       Q.   Okay.   When a child is in isolation, are they

18  allowed to take a shower?

19       A.   Yes, ma'am.

20       Q.   When do they take a shower?

21       A.   They're supposed to take a shower during the

22  daytime, but if they weren't able to take a shower, day

23  shift would let us know and we would give them a shower.

24  Or if they walked back into isolation and they said hey,

25  we didn't get any showers, it wasn't a big deal for us

Page 171

1    to let them out and let them have their shower because

2    there's a shower area in the isolation area.

3        Q.    Okay.   And is there a log in the isolation

4    area?

5        A.    Yes, ma'am, there is.

6        Q.    Where is that kept?

7        A.    It sits on top of -- there's also a phone in

8    the isolation area and it sits on top of the casing for

9    the phone.

10       Q.    What is that log used for?

11       A.    It is the isolation common area log and there's

12   one individual log on each person in isolation.

13       Q.    And what do you document on that log?

14       A.    Whatever they're doing.   As far as the area log

15   or the common log, we would just write if everything was

16   okay.   We would just write inmates observed, area

17   secure.   And on their individual logs, we would write

18   what they were doing, whether it was reading or jumping

19   jacks or singing.   We would just literally write what

20   they were doing.

21       Q.    Okay.   How often would you write that?

22       A.    Every 15 minutes.   You got to be in there every

23   15 minutes.

24       Q.    Who had to be in there every 15 minutes?

25       A.    A deputy.

Page 172

1    Q.    Was there a specific deputy who would be

2    assigned to isolation?

3    A.    No.

4    Q.    How would you know who had to check?

5    A.    We would decide.  We rotated, like some nights

6    it would be me or some nights it would be another guy

7    and we would just tack it on to our -- whatever else we

8    were doing, the other dorms that we were responsible

9    for.

10    Q.    If you were responsible for isolation, would

11    you be the one guard who checked on isolation in a

12    night?

13    A.    No, ma'am.

14    Q.    How would that work?

15    A.    What do you mean how would that work?

16    Q.    Multiple guards would be checking on the

17    isolation rooms?  I thought you said a second ago that

18    you would decide earlier in the night who would check on

19    isolation.

20    A.    We would, but if I'm on break, another guy

21    would go in there.  Or if I'm doing a report, one of the

22    other guys would just walk through there and hit the

23    logs.

24    Q.    Okay.  If you were working on a report, how

25    would that guard know that it had been 15 minutes since

Justin Hester, 7/23/2012
Hughes v. Judd

Page 173

1    you had checked?

2         A.    Because we talk about it.  We talked about it.

3    We were doing it.  That was an every night thing.  Every

4    night we all understood that every 15 minutes somebody

5    has to be in each one of those dorms and we

6    flip-flopped.  You know, we all helped each other and

7    got in.

8         Q.    Got it.  How often were children in the

9    isolation rooms?

10        A.    Not often.  Actually, we had -- most of the

11   time there was nobody in there.

12        Q.    How long -- did a child ever stay longer than a

13   week?

14        A.    I don't know.

15        Q.    Longer than a month?

16        A.    I don't know.

17        Q.    Do you recall M    H    being in the

18   isolation rooms?

19        A.    Yes, ma'am, I do.

20        Q.    Do you know how long he stayed?

21        A.    I don't.

22        Q.    Do you know if he stayed longer than a month?

23        A.    I don't know.

24        Q.    Would the isolation logs reflect M    H

25   being in isolation?

Page 174

1      A.   Yes, ma'am, every day.  Every day that he was
2  in there, it would be on that log.
3      Q.   Okay.  Give me one second please.
4      A.   All right.
5      Q.   Were deputies ever stationed in the isolation
6  area?
7      A.   Not that I can remember.
8      Q.   Were multiple children ever placed in the same
9  isolation room?
10     A.   Yes, ma'am.
11     Q.   Tell me about that.
12     A.   We had three juveniles in isolation and they
13  all went on suicide watch at the same time.  I don't
14  know the circumstances that surrounded it.  We came on
15  one night -- the night previously they were all just in
16  isolation in separate cells and we came on and they were
17  all on suicide watch in the same isolation cell.
18     Q.   Do you remember the names of those children?
19     A.   It was Wattlington, H     ', and H
20     Q.   Had those children been on isolation
21  previously?
22     A.   I don't remember.
23     Q.   So you said you came in one night and when you
24  came in for your shift, they were all in one isolation
25  room?

Page 175

1    A.    If I remember correctly, yes, ma'am.

2    Q.    Okay.  Do you recall if the night before they

3    had been on isolation?

4    A.    I don't.

5    Q.    Okay.  So upon learning that there were three

6    children in one particular room, does that change your

7    responsibilities for the night?

8    A.    No, other than somebody has to sit -- somebody

9    has to sit there with them because they're on suicide

10   watch.

11   Q.    Okay.  So I want to make sure I understand

12   this.  The reason that a guard had to sit there with

13   them was because they were on suicide watch --

14   A.    Yes, ma'am.

15   Q.    Not because they were in isolation?

16   A.    Not because they were in isolation.

17   Q.    So if children were in the isolation rooms

18   simply because they're on isolation for whatever reason

19   the supervisor said, there would be no deputy placed out

20   there?

21   A.    Not posted, no, ma'am.

22   Q.    Okay.  Who was the officer who sat and watched

23   these three children on suicide watch?

24   A.    If I remember, we rotated, but I know I was on

25   them for a while.  I don't remember exactly how long.

Justin Hester, 7/23/2012
Hughes v. Judd

Page 176

1    Q.    Do you remember which of the four isolation
2    rooms they were in?
3    A.    I don't remember which number it was, but it
4    was the one farthest back.
5    Q.    Were there other children in the other rooms?
6    A.    No, ma'am.
7    Q.    Why were they placed in the one farthest back?
8    A.    I'm not sure.  I think that was the only one
9    that didn't have one of them in it previously. Like I
10   think we had them in -- I think it's 4 and we had them
11   in 1, 2 and 3.  And I think the idea was not to put them
12   in a cell that one of them had lived in in case they had
13   put something in there they wanted them all to have.  I
14   don't know.
15   Q.    Okay.  So those children had been in the
16   isolation room previously?
17   A.    Yes, ma'am, but not that cell, not Cell 4.  I
18   think it was Cell 4.
19   Q.    Okay.  What are the doors to the isolation
20   rooms like?  Can you describe them?
21   A.    They're big, metal, and green.
22   Q.    Is there a window?
23   A.    Uh-huh.
24   Q.    Is that window clear or is it sort of foggy?
25   A.    It's clear.

Page 177

1    Q.   How big is the window?

2    A.   I don't remember.

3    Q.   When you were stationed outside, where were you

4    stationed?

5    A.   Right in front of the door.

6    Q.   Were you sitting or standing?

7    A.   I was standing for the most part.  I think

8    there was a chair there and I think I sat down after a

9    while.

10   Q.   Do those rooms typically hold one child?

11   A.   Yes, ma'am.

12   Q.   Do you know how big those rooms are?

13   A.   I don't.

14   Q.   When M        , T       , and     , were all in

15   there that night when you were watching, were they

16   sleeping?

17   A.   No.

18   Q.   What were they doing?

19   A.   I don't -- I don't remember.  I remember they

20   weren't sleeping.  They were talking and being loud.  I

21   don't remember.

22   Q.   Is there room for three children to lie down in

23   the isolation rooms?

24   A.   Uh-huh.

25   Q.   What did they have --

Page 178

1          MR. CAMPBELL:  Is that a yes or no?

2          THE WITNESS:  Yes.  I'm sorry.

3     Q.    What did they have in the room?

4     A.    What did they have?

5     Q.    Uh-huh.

6     A.    They had their suicide prevention smock which I

7  described earlier, and each of them had a suicide mat,

8  mattress, and a suicide prevention blanket.

9     Q.    Anything else?

10    A.    Yeah.

11    Q.    What else?

12    A.    They had a roll of toilet paper in there.

13    Q.    Okay.  How do you know that?

14    A.    Because -- I don't remember which one, but one

15 of them did his best to throw the toilet paper through

16 the window at me.

17    Q.    Okay.  Do you remember them using the toilet

18 paper for anything else?

19    A.    No.  No, ma'am.

20    Q.    Do you remember them using the toilet paper to

21 cover the window?

22    A.    Yes, ma'am, I do.

23    Q.    Tell me about that.

24    A.    They were upset about something and they were

25 wetting the toilet paper and they were throwing it at

Page 179

1   the window because I was standing in the window --

2   because -- yeah, I was standing in front of the window

3   watching them and they were throwing the toilet paper.

4   I'm standing this far away from the window (indicating)

5   and they're throwing the toilet paper to try and block

6   my view.

7       Q.   Okay.  Did it block your view?

8       A.   Somewhat, but not enough to where we needed to

9   take it down.  I could still see around it.  They didn't

10  have enough toilet paper.

11      Q.   Did any of the guards suggest that you take it

12  down?

13      A.   No.  I called a supervisor and asked if we

14  should do something and he said as long as you can see

15  them, I wouldn't worry about it because they were acting

16  out.  They were acting a little crazy that night.

17      Q.   Who did you call?  What supervisor?

18      A.   I believe it was Sergeant McGraw or Lieutenant

19  Rimer.  I can't remember now.

20      Q.   All right.  So what happened after they threw

21  the toilet paper at you or attempted to throw the toilet

22  paper at you?

23      A.   I don't remember.  I don't recall the

24  situation.

25      Q.   Did you have any physical contact with any of

Page 180

1    the children?

2        A.    I can't remember.  I don't recall.

3        Q.    Did you open the door at any point?

4        A.    I believe I did.

5        Q.    Why did you open the door?

6        A.    I don't recall.  I don't remember the situation

7    well.  Could I review my report?

8        Q.    Yes, just give me one second.

9        A.    Okay.

10        MR. CAMPBELL:  And when you're ready for him to

11    do that, can we take a break?  He can review the

12    report during the break.

13        MS. HASKELL:  Yeah, I just need a few more

14    questions and then I'll give him the report.  I just

15    need to make sure I'm looking at the right one.

16        MR. CAMPBELL:  And what should I tell Major

17    Allen?

18        MS. HASKELL:  Should we go off the record for

19    one second?

20        THE VIDEOGRAPHER:  We're off the video record,

21    1:09.

22        (Discussion held off the record.)

23        (A short recess was taken.)

24        THE VIDEOGRAPHER: We're on the video record at

25    1:14 p.m.

Page 181

1    Q.   All right Justin, I'm going to show you that

2    incident report you asked for --

3    A.   Okay.

4    Q.   -- as soon as the attorneys look at it.   Okay,

5    this is Bates stamped 4055 and 4056.   Please take a look

6    at it.

7    A.   Okay.

8    Q.   Do you recognize that?

9    A.   Yes, ma'am, I do.

10   Q.   What is that?

11   A.   It's a protective action report from 3/4/12.

12   Q.   Did you write that report?

13   A.   Yes, ma'am, I did.

14   Q.   Did you sign it?

15   A.   Yes, ma'am.

16   Q.   Is it an accurate copy of the report that you

17   produced?

18   A.   Yes, ma'am, it is.

19        SPEAKER1:   All right.   I'd like to enter that

20   as Exhibit 8.

21        (Exhibit No. 8 marked for identification.)

22   Q.   Justin, does this report refer to the incident

23   we were just talking about?

24   A.   Yes, ma'am, it does.

25   Q.   Of the three children in the isolation room?

Page 182

1      A.    Yes, ma'am.

2      Q.    Okay.  You've had time to read this report?

3      A.    I looked over it.

4      Q.    Do you need more time to read it?  I'm going to

5   ask you some questions about it.

6      A.    No, I'm okay.  Thank you.

7      Q.    Okay.  I think when we had talked previously

8   before we broke I asked you if you opened the door at

9   any point?

10     A.    Yes, ma'am.

11     Q.    Do you remember opening the door?

12     A.    I still don't remember well, but I did open the

13  door.

14     Q.    Okay.  Do you know why you opened the door?

15     A.    My report states that I -- that I was

16  intervening.

17     Q.    Do you have any independent recollection of

18  that?

19     A.    No, ma'am, not much.

20     Q.    Okay.  And what do you mean by intervening?

21     A.    My report states that he was attempting to put

22  the smock around his neck and I thought he was going to

23  try to hurt himself, so I was going to intervene.

24     Q.    Do you recall who that child was?

25     A.    I don't.  His name is blotted out.  That's what

Page 183

1    I was looking for.

2        Q.    And --

3        A.    I don't recall.

4        Q.    Do you -- so he was placing the suicide smock

5    around his neck?

6        A.    Yes, ma'am.

7        Q.    And what are those suicide smocks made out of?

8        A.    I don't know.

9        Q.    Are they thick?

10       A.    Relatively.

11       Q.    And do you know how big they are?

12       A.    No, ma'am.

13       Q.    Enough to cover a large child?

14       A.    Yeah.  Yes, ma'am.

15       Q.    What did you think that this child was going to

16   do by wrapping it around his neck?

17       A.    I didn't know.  I thought he was going to try

18   and hurt himself.

19       Q.    Is it fair to say that the smocks are similar

20   in thickness to a blanket?

21       A.    I would say that's fair to say, similar, yes,

22   ma'am.

23       Q.    So is it essentially like he was wrapping a

24   blanket around his neck?

25       A.    I would say it's similar.  I wouldn't say

Page 184

1    essentially.

2         Q.    How do you think he was going to hurt himself?

3         A.    I didn't know.

4         Q.    And he was already on suicide watch?

5         A.    Yes, ma'am, he was.

6         Q.    Did you believe he needed additional

7    intervention?

8         A.    I did at that point, yes, ma'am.

9         Q.    Okay.  So it sounds like the suicide watch he

10   was on was not meeting those needs?

11        A.    Maybe, maybe not.

12        Q.    What did you do after you opened the door?

13        A.    I don't remember.

14        Q.    Okay.  I'm going to let you review your report

15   again.

16        A.    I still don't remember.  I've already reviewed

17   the report.

18        Q.    Okay.  --

19        A.    Are you asking me to give you an answer based

20   off the report or my memory?

21        Q.    Well, at this point, yes, tell me what you did

22   based on the report?

23        A.    Based off the report, I opened the door and he

24   took steps towards the door and I -- it says I executed

25   a palm heel strike to his upper chest.

Page 185

1      Q.    Why did you do that?

2      A.    To move him back in the cell.

3      Q.    What is a palm heel strike?

4      A.    It's -- are you looking for a demonstration or

5   an explanation?

6      Q.    Both I guess.

7      A.    A palm heel strike is when -- we were taught in

8   the Academy during defensive tactics that -- it's

9   essentially like a punch, but with an open hand.  It's

10  not --

11     Q.    Okay.  And you were taught this in the Academy?

12     A.    Yes, ma'am.

13     Q.    Were you taught this at the Polk County

14  Sheriff's Office?

15     A.    Yes, ma'am, we went over it.

16     Q.    All right.  And when were you taught that you

17  should use this?

18     A.    In a situation that is immediately dangerous

19  for us like -- whether that's moving somebody away from

20  us or when we feel it's a dangerous situation.

21     Q.    Did you feel this was dangerous?

22     A.    I did.

23     Q.    Why?

24     A.    I mean I don't remember.  It says here that he

25  came -- took an aggressive step and maybe that was why.

Page 186

1  I don't remember.

2      Q.    Okay.  Do you know why you didn't spray him?

3      A.    I don't remember.

4      Q.    And when you were sitting observing the

5  children on suicide watch, did you have your radio with

6  you?

7      A.    Yes, ma'am.

8      Q.    Did you call for assistance before you opened

9  the door?

10     A.    No, ma'am.

11     Q.    Why not?

12     A.    I don't remember.

13     Q.    Did you seek assistance from a medical

14  professional for this child who was at a risk of harming

15  himself according to your testimony?

16     A.    Not that I remember.

17     Q.    You talked a lot earlier about using physical

18  force as a last resort; is that a fair representation of

19  your testimony?

20     A.    Yes, ma'am.

21     Q.    Okay.  Why was physical force what you resorted

22  to here?

23     A.    Like I said, I don't remember, but if I felt

24  like I was in danger, then it was -- and then it was a

25  quick reaction.

Page 187

1     Q.   Do you think it was justified?

2     A.   Do I think it was, yes, ma'am.

3     Q.   Why do you say that?

4     A.   Because of my report here where it says he took

5 an aggressive step towards me and I'm not -- I mean I

6 can't jeopardize my safety.

7     Q.   Okay.  He didn't have -- let me rephrase that.

8 You testified earlier that the only things in the room

9 were the blankets, the mats, and suicide smocks?

10    A.   Yes, ma'am.

11    Q.   What exactly were you afraid this child might

12 do to you?

13    A.   I don't know, hit me, harm me, I mean I would

14 imagine that's what I was afraid of.

15    Q.   Did he have any weapons?

16    A.   No.

17    MS. HASKELL:  All right.  I'm going to

18 introduce this as Exhibit 8 if we haven't already.

19    Q.   Justin, what's the grievance procedure at the

20 jail?

21    A.   I guess I don't really -- all I know about the

22 grievance procedure is they -- an inmate, juvenile,

23 whatever, tells us that they want to write a grievance,

24 so we bring them an inmate request form and they write

25 it on there and we turn it in.

Page 192

1      A.    J͡   ͡ S͜

2      Q.    Yeah.

3      A.    I don't think so because apparently they were

4   after his T-shirt.  They wanted his -- he apparently had

5   a new, bright white T-shirt and they wanted it, so I

6   don't think that had anything to do with that type of

7   thing.

8      Q.    Do you recall other instances where you thought

9   test of heart had happened?

10     A.    I don't think -- I don't know that I have ever

11  seen or dealt with or even heard about a specific

12  instance of it.  I have heard the youth talk about it,

13  but I never witnessed it or --

14     Q.    Did you believe that it happened?

15     A.    I don't know.  I will say that I -- I've known

16  of fights that have happened that involved more than two

17  people, but there's no way for me to say if it's just

18  these kids testing heart.  I have no idea.

19     Q.    And did test of heart typically happen when a

20  new child arrived?

21     A.    I don't know.  That's what I was told.  That's

22  what their definition of it was.

23     Q.    Were any special security precautions put in

24  place when a new child arrived?

25     A.    Yes, ma'am, we began to hear about the test of

Page 193

1   heart stuff and payroll stuff.  We began to hear about

2   it and because of that, we closed off the cells in the

3   building that we could not see.  We closed off Fox 8 and

4   Fox 4, all the ones I told you earlier.  We closed those

5   and those weren't used for anything because we couldn't

6   see them.  We couldn't see when test of heart might have

7   been going on or payroll might have been going on.  So

8   we closed them off and didn't use them unless we

9   absolutely had to, but we didn't because we typically

10  only had 18 kids in a dorm and there was eight cells.

11          MS. HASKELL:  Okay.  Justin, I think I'm done

12       with you.  Hank, just so you know, we have not

13       received any isolation logs and any logs that relate

14       to what Justin and I had discussed in terms of the

15       desk logs and then the activity logs and then the

16       pass-down log.  So in terms those things and the

17       discovery that I previously mentioned that we

18       haven't received, I'll leave this deposition open to

19       inquire as to those if I have more questions for

20       Justin as it relates to those.

21          MR. VAZQUEZ:  I have a couple follow-up

22       questions --

23          MR. CAMPBELL:  I'm not agreeing to that, but I

24       hear you.

25