Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, as guardian
and on behalf of J.B., a
minor, BRENDA SHEFFIELD, as
guardian and on behalf of
J.D., a minor; FRANKY
JEAN-PIERRE; MICHELLE MINOR,
as guardian and on behalf of         Case No.:
J.P., a minor; LISA JOBE, as         8:12-cv-0 0568- SDM-MAP
guardian and on behalf of
K.J., a minor; AMY GAGE, as
guardian and on behalf of
B.G., a minor; CRYSTAL
CUYLER, as guardian and on
behalf of D.M., a minor;
NIKEYTA MATTHEWS, as guardian
and on behalf of K.G., a
minor; and ANITA NAVA, as
guardian and on behalf of
A.H., a minor; on behalf of
themselves and all others
similarly situated,
    Plaintiffs,
vs.
GRADY JUDD, Polk County
Sheriff, in his official
capacity; and CORIZON HEALTH,
INC.,
    Defendants.

VIDEOTAPED DEPOSITION OF JOSEPH R. CHOQUETTE
          Taken on Behalf of the Plaintiff
DATE TAKEN:          July 26, 2012
TIME:                9:05 a.m. to 1:3 8 p.m.
PLACE:               Sclafani William s
                     Court Reporters
                     402 South Kentuc ky Avenue,
                     Suite 390
                     Lakeland, Florid a
          Stenographically Reported by :
          Wendy Wyncoop, RPR, FPR

Page 6

1    A.    It was an inmate and we had a protective action

2    on him.

3    Q.    Well, I'll just remind you of two basic ground

4    rules for this deposition, please make sure you

5    understand the question before answering it.

6    A.    Uh-huh.

7    Q.    If you don't understand the question, please

8    tell me and I'll try to make the question more clear if

9    need be.  And if you would like to take a break at any

10   point, please let me know.  If there's a question

11   pending I'll ask you to complete the answer to the

12   question before we take a break.  And do you understand

13   that you're testifying under oath today?

14   A.    Yes.

15   Q.    I would like to start, Officer Choquette, by

16   asking you some basic background questions.  Could you

17   please state your age?

18   A.    I'm forty-four.

19   Q.    And your height, please?

20   A.    5'9".

21   Q.    Your approximate weight?

22   A.    255 pounds.

23   Q.    Where do you currently .reside?

24   A.    Bartow (address removed).

25   Q.    Thank you.  And are you married?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 8

1    A.    Twelve years.

2    Q.    When did you start at Central County Jail?

3    A.    In 2001.

4    Q.    And professionally what were you doing before

5  you started at the Central -- excuse me, at Polk County

6  Sheriff's Office?

7    A.    I worked for the state, Department of

8  Corrections.

9    Q.    And what role or capacity?

10    A.    Correctional officer.

11    Q.    So you were a correctional officer at a state

12  prison?

13    A.    Uh-huh, yes.

14    Q.    How about before that, what were you doing

15  professionally?

16    A.    Security.

17    Q.    Were you a private security guard?

18    A.    Yes.

19    Q.    And professionally before that what were you

20  doing?

21    A.    I was in the U.S. Army.

22    Q.    I see.  And what was your position in the Army?

23    A.    Infantry.

24    Q.    Have you ever been suspended or terminated from

25  a job?

Page 9

1       A.   No.

2       Q.   Were you honorably discharged from the Army?

3       A.   Yes.

4       Q.   Have you ever been convicted of a crime?

5       A.   No.

6       Q.   Have you ever been arrested?

7       A.   No.

8       Q.   Have you ever been reprimanded, suspended or

9    disciplined while working at Polk County Sheriff's

10   Office?

11      A.   Two reprimands.

12      Q.   Two reprimands, okay.  Officer Choquette, can

13   you please explain the circumstances of those two

14   reprimands one at a time?

15      A.   The first I one was hospital watch.  I was

16   reprimanded for watching the TV.

17      Q.   And I'm sorry, you said hospital watch.  What

18   does that mean?

19      A.   A hospital watch is an inmate at the hospital.

20      Q.   And what was the second reprimand, please?

21      A.   The second reprimand was for not using my

22   pepper spray.

23      Q.   You were reprimanded for not using your pepper

24   spray?

25      A.   That's correct.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 28

1    Q.   Do you remember which officer it was?

2    A.   No, I don't.

3    Q.   Do you remember anything else about that

4  specific grievance -- completed grievance form that was

5  returned to you?

6    A.   No.

7    Q.   And do you know the ultimate outcome of that

8  grievance -- completed grievance form that was returned

9  to you?

10    A.   No, I don't.

11    Q.   Have you heard the term test of heart before?

12    A.   Test of heart?

13    Q.   Yes.

14    A.   No.

15    Q.   I just want to be clear.  So at Central County

16  Jail you've never heard the term test of heart or a

17  similar term?

18    A.   Not being used by us, no.

19    Q.   Have you heard it used by juvenile inmates?

20    A.   No.

21    Q.   You've never heard the term before?

22    A.   No, no.

23    Q.   And similarly have you ever heard the word or

24  term payroll?

25    A.   Payroll, yes.

Page 29

1      Q.    What does that mean to you?

2      A.    The juveniles attempt to scare new juveniles

3   into giving them portions of their food.

4      Q.    And how did you come to have an understanding

5   of that term?

6      A.    Through the juveniles.

7      Q.    Have you ever been involved in an incident of

8   payroll -- protecting another juvenile for example?

9      A.    Yes.

10     Q.    Can you tell me about that incident?

11     A.    We had --

12     Q.    Or incidents?

13     A.    We had the juveniles returned to their cells

14   with their trays so that there would be no opportunity

15   for them to steal other -- other's foods.

16     Q.    And how did you come to learn that payroll was

17   a concern at that specific instance?  For example did

18   the juvenile come tell you?

19     A.    Yes.

20     Q.    And do you have an understanding of the term

21   snitch?

22     A.    Yes.

23     Q.    What does that mean to you?

24     A.    It's an informant.

25     Q.    Have you ever heard the term used at Central

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 30

1    County Jail?

2        A.    Amongst the juveniles, no.

3        Q.    Ever --

4        A.    No.

5        Q.    -- in the jail?

6              So you've never heard the term snitch used

7    either among staff or the juveniles --

8        A.    No.

9        Q.    -- at Central County Jail?

10             Have you ever used the term at Central County

11   Jail?

12       A.    For another juvenile?

13       Q.    Just using the term snitch in any fashion

14   whatsoever at Central County Jail?

15       A.    I can't recall.

16       Q.    Do you think you might have had occasion to?

17       A.    I might have.

18       Q.    Why is that?

19       A.    Describing it to somebody that had no idea what

20   it was I guess.

21       Q.    Any other reasons?

22             MR. MCKINLEY:   Object to the form.

23       Q.    I'm sorry, you can still answer the question.

24   Are there any other reasons you might have used the word

25   snitch at Central County Jail?

Page 31

1      A.    No.

2      Q.    Officer Choquette, did you ever witness any

3  fights among the juveniles at Central County Jail?

4      A.    Yes.

5      Q.    Could you please describe each incident that

6  you witnessed?

7      A.    Each incident?

8      Q.    Uh-huh.  Among juveniles?

9      A.    Okay.

10     Q.    Starting with the first one that you recall?

11     A.    The first one I recall involved at least eight.

12     Q.    At least -- you recall at least --

13     A.    Eight juveniles.

14     Q.    There were eight juveniles involved?

15     A.    Right, fighting each other in a brawl.

16     Q.    Do you recall any of the inmates' names?

17     A.    A few.  I would have to have my report to

18  remember all of them that were involved.

19     Q.    Can you tell me the names of the ones that you

20  do recall?

21     A.    I believe M ____ A ____.

22     Q.    Uh-huh.

23     A.    One whose last name was ( ). I can't

24  remember his first name.  D ____ M ____.  There was

25  another A ____.  I can't remember any.

Page 32

1    Q.  Okay.  And what were the circumstances of the

2  brawl?

3    A.  They started fighting each other in the day

4  room.

5    Q.  And which dorm was this in?

6    A.  This was in India dorm.

7    Q.  And approximately when was this?

8    A.  Shortly after we received them in October.

9    Q.  Okay.  And what was your involvement in this

10  brawl?

11    A.  I went in to stop them.  They refused to follow

12  verbal orders.  I used pepper spray on at least three of

13  the juveniles.  And once we had control of the situation

14  we placed those juveniles that weren't involved back

15  into their cells.  We handcuffed those juveniles that

16  were involved, and had them seen by the nurse and

17  showered and changed.

18    Q.  And you said that you were in India dorm.  How

19  did you notice that they were fighting?

20    A.  We watched them.  We saw them starting to

21  fight.

22    Q.  Where were you at the time?

23    A.  At the desk in the middle of the common area.

24    Q.  I see.  Was the fight ongoing when you noticed

25  it?

Page 33

1     A.    It started.

2     Q.    So when -- strike that.

3           Did you notice anything about those juveniles

4     that were generally involved before they were actually

5     exchanging blows or fighting?

6     A.    No.

7     Q.    You said that you were at the desk in the

8     commons area when you noticed them fighting.  Did you

9     notice them through a camera or did you notice them

10    through direct line of sight?

11    A.    Direct line of sight.

12    Q.    Could you hear anything from the fight?

13    A.    No.

14    Q.    Is that because of the glass separating the

15    dorm and the control room?

16    A.    Correct.

17    Q.    And you said that you sprayed at least three

18    juveniles?

19    A.    Yes.

20    Q.    Were all three of those fighting?

21    A.    Yes.

22    Q.    Do you think you may have sprayed any juveniles

23    that weren't fighting in that incident?

24    A.    No.

25    Q.    Was there another officer involved in this

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 34

1   incident?

2        A.   Yes.

3        Q.   Who was that?

4        A.   Deputy Franklin.

5        Q.   I might come back to this incident more later.

6        A.   Uh-huh.

7        Q.   But could you please describe the next incident

8   of fighting that you witnessed in the jail after this?

9        A.   I believe that would be juvenile in the rec

10  yard, two juveniles started to fight in the recreation

11  area and I intervened.

12       Q.   Uh-huh.  Okay.  Do you recall who the two

13  inmates were?

14       A.   I believe one was -- his last name was Young

15  and one's last name was Sinious.

16       Q.   And you said that they were in the rec yard.

17  What was going on in the rec yard?

18       A.   They were playing flag football.

19       Q.   You said they?

20       A.   Yes.

21       Q.   Approximately how many other inmates were in

22  the rec yard at the time?

23       A.   A total of ten.

24       Q.   Okay.  And were they all playing flag football?

25       A.   No.  I think there was only four or six

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 35

1    playing.

2        Q.    Was there another staff member with you --

3        A.    No.

4        Q.    -- out in the rec yard?

5              Okay.  You were out in the rec yard supervising

6    them?

7        A.    Yes.

8        Q.    And can you just describe generally the size of

9    the rec yard?  Is a 100 foot space or --

10       A.    It's approximately I would say 30 yards by 20

11   yards.  Maybe not that big.

12       Q.    And you said two juveniles started to fight.

13   How did you know that?

14       A.    I observed them.

15       Q.    Where were you when you observed them,

16   vis-a-vis them, with represent to them?

17       A.    Maybe no more than 12 or 15 feet away.

18       Q.    Did you hear anything spoken between these

19   juveniles before they started to fight?

20       A.    Yes.  One was taunting another one because of

21   his playing ability, and the other one started

22   responding in a negative fashion, and they started

23   arguing, and then they started fighting.

24       Q.    And what steps if any did you take as soon as

25   you noticed one was taunting the other?

Page 36

1      A.    I told them to stop and start playing.

2      Q.    You told them to stop.  Ultimately they did

3   start fighting?

4      A.    Yes.

5      Q.    And how did you intervene?

6      A.    I separated them.  I removed the younger one,

7   the smaller one, Young, and informed him that he needed

8   to go back inside.  And I called the officer in the OIC

9   that he was returning.

10      Q.    And when you say you removed the younger one

11   did you physically pull him off --

12      A.    Yes.

13      Q.    -- the larger one?  And that broke up the

14   fight?

15      A.    Yes.

16      Q.    So there was no other -- you didn't use a

17   chemical spray --

18      A.    No.

19      Q.    -- in that incident?

20            And you said you removed the younger one?

21      A.    Yes.

22      Q.    Was the younger one the aggressor in your

23   opinion or the victim?

24      A.    He was the aggressor.

25      Q.    And why did you choose that course of conduct

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 37

1    to separate them by pulling them apart -- or excuse me,

2    as you said removing the younger one?

3            MR. MCKINLEY:  Object to form.

4        Q.   You can still answer the question.

5        A.   That's what I choose to do.

6        Q.   Why did you chose to use -- strike that.

7            Why did you choose to pull the younger one back

8    as opposed to for example using a chemical spray?

9            MR. MCKINLEY:  Same objection.

10       A.   I didn't feel it was necessary.

11       Q.   Why didn't you think it was necessary?

12       A.   It was a judgment call.

13       Q.   And what factors went into that judgment call?

14       A.   I couldn't really say.  It was a judgment call.

15       Q.   Did you think that you could separate them

16   without yourself being injured?

17       A.   Yes.

18       Q.   I may come back to that incident, but I want to

19   move on to the next incident of fighting that you

20   witnessed after that.  Excuse me, Officer Choquette,

21   when approximately did that second incident occur?

22       A.   Towards the beginning of the year.  I'm not

23   quite sure the date.

24       Q.   Okay.  Early 2012?

25       A.   Yes.  It was warm out so it had to be in the

Page 38

1    spring.

2         Q.   Let's move on to the third incident then that

3    you witnessed.

4         A.   I recall two juveniles in Charlie dorm fighting

5    on the top tier.

6         Q.   Do you remember which juveniles?

7         A.   I believe one's name was K       and one's name

8    was W _____  W_____ .

9         Q.   You said you noticed them fighting on the top

10   tier --

11        A.   Tier.

12        Q.   -- of Charlie dorm?

13        A.   Yes.

14        Q.   And where were you at the time that you noticed

15   this?

16        A.   In the common area of building three.

17        Q.   What were you doing at the time?

18        A.   Supervising the juveniles.

19        Q.   Were you at the control desk there?

20        A.   I can't remember exactly where I was.

21             MR. MCKINLEY:   Object to the form.

22        Q.   You said that you noticed two juveniles

23   fighting at the top tier --

24        A.   Yes.

25        Q.   -- of Charlie dorm?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 39

1          At the time you noticed were you standing up?

2     A.    I believe so.

3     Q.    Okay.  Were you at or near the control desk

4    when you were standing up?

5     A.    Most likely.

6     Q.    When you said you noticed them in the top tier.

7    Did you notice them through direct line of sight or --

8     A.    Yes.

9     Q.    Not with cameras then?

10     A.    No.

11     Q.    And when you said you noticed them, you noticed

12    them through visual contact as opposed to hearing

13    anything from the fight?

14     A.    That's correct.

15     Q.    Were you the first to notice the fight?

16     A.    Yes.

17     Q.    First staff member?

18     A.    Yes.

19     Q.    And what did you do when you noticed it?

20     A.    I had the door open and I went in and

21    instructed them to stop fighting.

22     Q.    You had the door to the dorm --

23     A.    Opened.

24     Q.    -- opened?

25          How did you do that?

Page 40

1    A.   I called on my radio.

2    Q.   And you went in --

3    A.   Yes.

4    Q.   -- and what did you do next?

5    A.   Informed them to stop fighting, instructed

6  them.

7    Q.   Was there -- excuse me, was there another

8  officer with you at the time that you informed them to

9  stop fighting?

10    A.   I believe Deputy Franklin was behind me.

11    Q.   Was he saying anything as well?

12    A.   He was also instructing them to stop fighting.

13    Q.   How did the juveniles respond?

14    A.   They continued to fight.

15    Q.   And what happened next?

16    A.   I went up to the second tier and instructed

17  them to stop fighting again.

18    Q.   When you said that you instructed -- earlier --

19    A.   Uh-huh.

20    Q.   -- when you said that you instructed them to

21  stop fighting, that they continued fighting, had you

22  ever gone up to the second tier?

23    A.   As soon as I walked in.

24    Q.   At the ground level?

25    A.   (Witness nodding head.)

Page 41

1    Q.   So they heard you -- how did they hear you make

2  that instruction?

3    A.   I don't think they did hear me.

4    Q.   You said that you had opened the door?

5    A.   Yes.

6    Q.   So you informed -- you told them to stop

7  fighting?

8    A.   Yes.

9    Q.   So you were basically speaking to them through

10  the open door?

11    A.   I had stepped inside.

12    Q.   You had stepped inside, but not yet gone up to

13  the --

14    A.   And shouted stop fighting.

15    Q.   -- second tier?

16    A.   Correct.

17    Q.   I see.  And at that time was -- did you say at

18  that time when you were still at the ground floor was

19  Officer Franklin with you as well?

20    A.   I believe he was behind me.

21    Q.   Behind you, okay.  And you said that they

22  continued fighting and at that point you went --

23    A.   Walked up stars.

24    Q.   -- upstairs.  And when you got upstairs you

25  told them?

Page 42

1    A.   Told them to stop fighting.

2    Q.   Okay.

3    A.   And they continued.

4    Q.   Okay.  And what happened next?

5    A.   I deployed my chemical agent.

6    Q.   Okay.  Why did you choose to use a chemical?

7    A.   Because they were continuously fighting.

8    Q.   And at the time that you deployed your agent or

9    shortly before was Deputy Franklin with you?

10   A.   He was behind me.

11   Q.   Okay, behind you.  Was he using a spray as

12   well?

13   A.   I couldn't see.

14   Q.   Okay.  Did you consider not using the agent?

15   A.   No.

16   Q.   Why?

17   A.   They were both older.  They were seventeen.

18   Q.   Okay.

19   A.   They were of good size.

20   Q.   When you say good size --

21   A.   They were over 5'2", 5'3", nearly adult size.

22   Q.   Were they roughly greater than 5'2".  Were they

23   above six feet do you think?

24   A.   No.

25   Q.   Around 5'2" do you think?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 43

1        A.    I have no idea.

2        Q.    Okay.  Were they smaller than you in height,

3    shorter than you into height?

4        A.    I believe one was.  I think one was my height.

5        Q.    Were you able to -- strike that.  You said

6    after you informed them to stop fighting while you were

7    actually on the second floor?

8        A.    Yes.

9        Q.    They continued fighting?

10       A.    Yes.

11       Q.    Were you able to separate them at any time

12   before using the spray?

13       A.    No.

14       Q.    Did you try?

15       A.    Physically separating them, no.

16       Q.    Yes.  Again, I might come back to that more

17   later on.  Now, there was the third incident?

18       A.    Yes.

19       Q.    Could you describe the next incident of

20   fighting that you witnessed after that?

21       A.    I recall two juveniles in Alpha dorm fighting.

22       Q.    And Officer Choquette, I want to back up for a

23   second.  I think you said that the third incident

24   involved the Charlie dorm?

25       A.    Yes.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 44

1    Q.   And then you said this fourth incident involved

2    the Alpha dorm?

3    A.   Yes.

4    Q.   Are those dorms -- do the dorms primarily -- do

5    those dorms house, excuse me, pre-adjudicated inmates?

6    A.   Yes.

7    Q.   Do you work primarily with pre-adjudicated

8    inmates or do you work with both pre-adjudicated and

9    direct file inmates?

10   A.   I work with both, but usually I'm with the

11   pre-adjudicateds.

12   Q.   Why is that?  Why is it that you work primarily

13   with pre-adjudicated?

14   A.   It's what I chose.

15   Q.   Why do you chose to work primarily with

16   pre-adjudicated inmates?

17   A.   That's the side I pick.  I prefer the younger

18   kids.

19   Q.   I see.  So the pre-adjudicated inmates

20   generally are younger than the direct file inmates?

21   A.   Alpha dorm is usually younger.  Bravo houses

22   the thirteen to fifteen-year-olds.

23   Q.   Is there a specific reason why you prefer to

24   supervise the younger -- generally the younger kids as

25   opposed to the older kids?

Page 45

1    A.   No.

2    Q.   For example are they easier to supervise or --

3    A.   No.

4    Q.   Do you think you could have more effect on them

5    or more rehabilitative effect or any other reason?

6    A.   No.

7    Q.   Let's go back to the fourth incident then that

8    you were telling me about.  You said that there were two

9    juveniles in the Alpha dorm?

10   A.   Yes.

11   Q.   And what were those two juveniles doing?

12   A.   Fighting.

13   Q.   Fighting.  And when did you notice that they

14   were fighting?

15   A.   They were -- started fighting in front of -- in

16   front of the dorm door next to the phones.

17   Q.   And were you on the ground floor?

18   A.   Yes.

19   Q.   The common area at the time?

20   A.   Yes.  In fact I was standing in front of the

21   door, the dorm door.

22   Q.   Did anything catch your attention before they

23   physically start to fight?

24   A.   No.

25   Q.   Did the fight then happen spontaneously?

Page 46

1    A.    Yes.

2    Q.    Do you think you know why they started

3 fighting?

4    A.    After the fact.

5    Q.    And what was that reason?

6    A.    One said that the other one had taken something

7 off his bed.

8    Q.    Do you remember what it was that was taken?

9    A.    A towel I believe.

10    Q.    And who are the inmates?

11    A.    Last name for one was G⎯⎯⎯⎯⎯ and the other one

12 was I believe L

13    Q.    You said you were standing in front of the

14 door?

15    A.    Yes.

16    Q.    And was -- the door was open at the time?

17    A.    Yes.

18    Q.    And what were you doing at the time?

19    A.    I was moving juveniles who had gone to first

20 appearance from the receiving dorm which is also Alpha

21 into Bravo.

22    Q.    Do you remember those juveniles that you were

23 moving?

24    A.    No.

25    Q.    You were moving juveniles.  Do you remember how

Page 47

1    many juveniles you were moving?

2        A.    Two I believe.

3        Q.    Two.  And at that time you noticed these two

4    individuals who you think are G        and L       start

5    to fight.  What did you do?

6        A.    I told them to stop fighting.

7        Q.    Uh-huh.

8        A.    They refused to comply.  They started to

9    grapple with each other.  They fell onto the temporary

10   bunk that's next to the phones.  And one of the --

11   I      is a large boy of 250 pounds approximately, so

12   the bed started to collapse, the legs started to fold,

13   and I was afraid they would be hurt, and because of his

14   size I deployed chemical agent.

15       Q.    You deployed it on both of them?

16       A.    Yes.

17       Q.    Was there another officer with you --

18       A.    No.

19       Q.    -- at this time?  You said that there were two

20   other juveniles with you who you were moving.  What did

21   you do with those two other juveniles when you were

22   responding to this incident?

23       A.    I left them where they were standing.

24       Q.    Did they move away?

25       A.    I assume so.

Page 48

1      Q.   Did you instruct them to do anything when you

2    left them there?

3      A.   No.

4      Q.   At the time that you noticed them fighting,

5    G      and L____, did you have any understanding of

6    which one was the aggressor and which one was the victim

7    in the fight?

8      A.   G____     was the aggressor.

9      Q.   How did you understand that?

10     A.   He struck first.

11     Q.   So you said before that you didn't understand

12   how the fight actually started, but you saw who threw

13   the first punch?

14     A.   Yes.

15     Q.   Why did you spray L____

16     A.   He was on top, and he was 250 pounds.

17     Q.   He was not the aggressor though?

18     A.   No.

19     Q.   Did you call for any other officer to help you?

20     A.   No.

21     Q.   Why not?

22     A.   I was focused on trying to break their fight

23   up.

24     Q.   I may come back to this later, but I would like

25   to move on to the next incident, the next incident of

Page 49

1    fighting that you witnessed.  Actually I think we're

2    approximately at an hour point.  Why don't we take a

3    break for a couple of minutes.

4            THE VIDEOGRAPHER:  We're off the video record.

5            (Recess from 10:07 until 10:22 a.m.)

6            THE VIDEOGRAPHER:  We are back on the video

7      record.

8       Q.   Hello again, Officer Choquette.  Before our

9    break you were testifying about the fights that you had

10   witnessed among the juveniles --

11      A.   Yes.

12      Q.   -- in Central County Jail.  And before I

13   continue that I just want to make sure that we're clear

14   on one term.  When I refer to a juvenile I want to make

15   sure that you understand I'm referring to both a

16   pre-adjudicated juvenile as well as a direct file --

17      A.   Okay.

18      Q.   -- juvenile.

19      A.   Okay.

20      Q.   And before the break you had testified to four

21   incidents of fighting that you had witnessed.  What was

22   the next incident, the fourth being two juveniles

23   fighting in Alpha dorm.

24      A.   I recall two juveniles fighting in the

25   temporary holding cage in the common area.

Page 50

1    Q.    What were the names of the juveniles?

2    A.    I believe it was -- M        was one and G        was

3    another.

4    Q.    M        ?

5    A.    M        .

6    Q.    M        ?

7    A.    Yes.

8    Q.    And G        ?

9    A.    G

10   Q.    And which holding cage was that?

11   A.    It would be the left-hand as you looked at the

12   vestibule doors.

13   Q.    Was any other guard in that area when you

14   noticed this.

15   A.    No.

16   Q.    Where were the other two guards when you

17   noticed this?

18   A.    I don't recall.

19   Q.    At the time that you noticed them fighting did

20   you know what the fight was about?

21   A.    No.

22   Q.    Did you hear anything before they were

23   exchanging -- physically exchanging blows?

24   A.    They were talking amongst each other, and then

25   they started trying to communicate with the juveniles in

Page 51

1   Foxtrot dorm.

2       Q.   You said that they were talking amongst each

3   other.  What were they talking about?

4       A.   I have no idea.

5       Q.   Now, the cage -- the cage that does not have

6   solid walls like this room does.  It's a cage with bars

7   on it?

8       A.   Correct.

9       Q.   So you could hear what they were talking about?

10      A.   I could hear they were talking.  I couldn't

11  hear what they were talking about.

12      Q.   Why couldn't you hear what they are they were

13  talking about?

14      A.   It wasn't distinct enough.

15      Q.   Is that because of distance?

16      A.   I couldn't hear what they were talking about.

17      Q.   What were you doing at the time that they were

18  talking amongst each other?

19      A.   I think I was hitting the common area log.

20      Q.   You were at the control desk in the common

21  area?

22      A.   Yes.

23      Q.   And you said that the two juveniles were trying

24  to communicate with others in the dorm?

25      A.   Correct.

Page 52

1      Q.    How were they trying to communicate?

2      A.    They have their own form of sign language.

3      Q.    You saw them using sign language?

4      A.    Yes.

5      Q.    And how much time passed between you seeing

6    them use sign language and when you saw them actually

7    fighting?

8      A.    Roughly a minute.

9      Q.    Did anything -- strike that.

10           Did you continue to watch them during

11    that -- did you watch them during that minute interval?

12     A.    Yes.

13     Q.    What happened during that interval while you

14    were watching them?

15     A.    They talked amongst themselves and they were

16    signing to the juveniles in Fox dorm.

17     Q.    And approximately over the course of -- a

18    minute passed?

19     A.    Uh-huh.

20     Q.    And then you say they began fighting?

21     A.    Yes.

22     Q.    What happened next when they began fighting?

23     A.    I informed -- I instructed them to stop

24    fighting and they continued to fight.  I entered the

25    cage.  I attempted to pull the one closest to me away

Page 53

1    and instructed them to stop fighting.  They pulled --

2    both of them pulled out of my grasp and fell to the

3    floor, so I deployed chemical agent.

4        Q.    You said that you tried to pull the closer one

5    away.  Did you try to pull the other one away as well?

6        A.    No.

7        Q.    And I'm sorry, I didn't hear you clearly on

8    your last response.  What happened when you tried to

9    pull the closer one away?

10       A.    They continued to fight.

11       Q.    Do you know how this fight started?

12       A.    After the fact.  One was from I believe

13   Winter Haven and one is from Lakeland, and once they

14   found out that they came from those two separate cities

15   they started to fight.

16       Q.    Why were they in the holding cages?

17       A.    Support two, our transportation department had

18   brought them in from book in -- I believe it was

19   book-in.

20       Q.    You said that one juvenile was from

21   Winter Haven and one was from Lakeland?

22       A.    I believe so, yes.

23       Q.    You believe.  And after the fact you learned

24   that essentially that was the cause of the fight?

25       A.    Yes.

Page 54

1      Q.   Are you aware of other fights that had started

2   on the basis of the juveniles coming from different

3   cities or locations?

4           MR. MCKINLEY:   Object to the form.

5      A.   I don't really -- what exactly do you mean?

6      Q.   I mean you said that when -- you said that

7   after the fact --

8      A.   Uh-huh.

9      Q.   -- you learned that the fight had basically

10  started because one juvenile was from Winter Haven and

11  one was from Lakeland, and therefore there was some

12  animosity --

13     A.   Yes.

14     Q.   -- between them?  Has that been a reason for a

15  fight --

16     A.   Yes.

17     Q.   -- among juveniles before --

18     A.   Yes.

19     Q.   -- at Central County Jail?

20          How do you know that?

21     A.   We were informed after the fact.

22     Q.   Informed after the fact that this reason had

23  been the cause of fights between juveniles in previous

24  instances?

25          MR. MCKINLEY:   Object to the form.

Page 55

1      A.    (No response.)

2      Q.    Is there a cage that has a wall -- strike that.

3  Is there a cage that is separated in any way?

4      A.    I don't understand.  I mean --

5      Q.    Is there a cage that has a dividing wall within

6  the cage, dividing bars within the cage?  In other

7  words, is there a cage that's essentially split into two

8  that separates?

9      A.    No.  We have two individual holding areas.

10     Q.    So essentially you have two cages in building

11  three?

12     A.    Correct.

13     Q.    And they're not divided within each cage?

14     A.    Correct.

15     Q.    And Juvenile M    and G        were in one cage

16  at the time?

17     A.    Correct.

18     Q.    Was there -- were there juveniles in the other

19  cage at the time?

20     A.    No.

21     Q.    Was that other holding cage available then --

22     A.    Yes.

23     Q.    -- for use?

24           Why were M    and G        placed in the same

25  cage?

Page 56

1     A.    They were both direct file inmates.  They were

2    both coming in for intake.  They were placed in the same

3    holding cage.

4     Q.    So essentially then they were new to Central

5    County Jail for purposes of that detention, and they had

6    both just arrived --

7     A.    Correct.

8     Q.    -- at the jail?

9     Had they already been screened before coming to

10    the jail?

11     A.    They were at book-in.

12     Q.    I'm sorry?

13     A.    At booking.

14     Q.    At booking.  At booking they had been

15    classified and screened and were about to be assigned --

16    and after they were placed in the holding cells, they

17    were about to go to their respective cells --

18     A.    Correct.

19     MR. MCKINLEY:  Object to form.

20     Q.    -- in the jail?

21     And you said before that essentially -- correct

22    me if I'm wrong -- that juveniles from different cities

23    or locations in Florida -- excuse me, the fact that

24    juveniles had come from different cities within Florida

25    had been the cause of fights before?

Page 57

1      MR. MCKINLEY:   Form objection.

2      Q.   Have there been fights between juveniles from

3  Winter Haven and juveniles from Lakeland because one was

4  from juvenile -- excuse me, one was from Winter Haven

5  and one was from Lakeland?

6      A.   I can't recall any particular instance.

7      Q.   Why not place the two juveniles M[   and C_

8  in different separate holding cages?

9      A.   I didn't place them there.   Support two placed

10 them inside the cage and secured it.

11     Q.   Why didn't support two place one juvenile in

12 one holding cage and the other juvenile in the other

13 holding cage?

14     A.   Probably because they came down handcuffed

15 together, and they were both direct filed and had showed

16 no evidence of having any animosity.

17     Q.   Were they handcuffed while they were in the

18 holding cell?

19     A.   No.

20     Q.   Going back a little bit, Officer Choquette, you

21 said that -- I think you said that you deployed your

22 spray on both juveniles?

23     A.   Yes.

24     Q.   And what spray was that?

25     A.   Freeze + P 2K3.

Page 58

1    Q.   And going forward I'll just refer to that as

2    Freeze.   Is Freeze what you have on your person?

3    A.   Correct.

4    Q.   What happened when you deployed Freeze?

5    A.   They stopped fighting and separated.

6    Q.   Did you use one spray of Freeze or more than

7    one?

8    A.   One spray.

9    Q.   One spray for each juvenile?

10   A.   In the general area of where their heads were.

11   Q.   Did they immediately stop fighting?

12   A.   Yes.

13   Q.   And you said that they separated.  Did they lie

14   down?

15   A.   Yes.

16   Q.   And I think you said before that these holding

17   cages are in the common area in building three?

18   A.   Correct.

19   Q.   Would video have captured this?

20   A.   No.

21   Q.   Why not?

22   A.   There's no video cameras for the common area.

23   Q.   So I take it then that you didn't review any

24   video in connection with this fight?

25   A.   That's correct.

Page 59

1      Q.    Officer Choquette, I think this is the fifth

2    incident that you've just described.  And when

3    approximately was this?

4      A.    Again, I -- March, April maybe.

5      Q.    Of 2012?

6      A.    Yes.

7      Q.    Again, I may come back to that incident.

8    What's the next incident of fighting that you witnessed

9    among the juveniles?

10     A.    I'm attempting to recall.

11     Q.    Sure.  Please take your time.

12          MR. MCKINLEY:  Steven, for purposes of the

13          deposition, the flow, perhaps if he doesn't remember

14          the exact sequence he could go to the next one he

15          does recall if that works for you.

16     A.    I have to review my reports.  I can't really --

17    I know there's one, but I can't remember it.

18     Q.    Okay.  Well, the last one that you told me

19    about was approximately in March or April, spring of

20    2012?

21     A.    Uh-huh.

22     Q.    Do you remember witnessing any other fights

23    after that time, after March or April of 2012?  Even if

24    it's out of sequence are there any other fights that you

25    witnessed that you haven't told me about yet?

Page 60

1      A.    Witnessed, no.

2      Q.    Okay.

3      A.    No, I haven't witnessed any.

4      Q.    Okay.  So we went through five fights?

5      A.    Uh-huh.

6      Q.    And other than those five right now none other

7   has come to mind in terms of ones that you witnessed?

8      A.    I just can't recall.

9      Q.    You think there was one more?

10     A.    Involving G(____ ⌐ but I can't remember.  I

11   remember having two different incidences with him.  I

12   just can't recall the incident.

13     Q.    I see.  The first incident I see that you had

14   testified about G      in an earlier --

15     A.    L⌐  , right.

16     Q.    Do you know what happened with G       in the

17   second incident?

18     A.    I can't recall.

19     Q.    You said that -- I think you said that you had

20   heard about some other incidents of fighting.  What were

21   those incidents?

22     A.    I can only remember the dorms where the

23   incidents took place.  I know there was a fight in

24   Delta, and I know there was a fight in Echo just

25   recently.

Page 61

1      Q.    So let's start with the one in Delta.  When did

2  you hear about that?

3      A.    Two, three weeks ago maybe.

4      Q.    And when was the fight?

5      A.    Oh, I can't recall.

6      Q.    Okay.  You said that you heard about it two or

7  three weeks ago?

8      A.    Uh-huh.

9      Q.    Was this a fight that had taken place several

10 weeks before that or several days before that?

11     A.    It probably would have been before that,

12 several days before that.

13     Q.    Several days.  So relatively contemporaneous?

14     A.    Right.

15     Q.    Who told you about this fight?

16     A.    I think it was passed on from the next shift,

17 from the shift we were relieving.

18     Q.    When you start a shift is it general practice

19 to inform the staff that's coming on about any incidents

20 that had happened?

21     A.    Correct.

22     Q.    And those incidents would include fights?

23     A.    Correct.

24     Q.    So it would have happened either in the

25 proceeding shift, if not a couple days before that?

Page 62

1     A.    Correct.

2     Q.    And do you remember which inmate -- excuse me,

3   which officer told you about the fight?

4     A.    No, I don't recall.

5     Q.    What did the officer say about the fight?

6     A.    All I can recall is there was a fight in Delta.

7     Q.    Did the officer say how many juveniles were

8   fighting?

9     A.    I believe there was only two.

10    Q.    And what was -- how was the fight broken up?

11    A.    I have no idea.

12    Q.    Was sprayed used?

13    A.    I don't know.

14    Q.    You also said that you heard about a fight in

15   Echo dorm?

16    A.    Correct.

17    Q.    When did you hear about that?

18    A.    It would have been the next -- when we were

19   relieving a shift.

20    Q.    When you were leaving a shift or when you were

21   starting a shift?

22    A.    No, when we're starting a shift we're relieving

23   the prior shift.

24    Q.    Oh, when you were relieving the prior shift.  I

25   misheard you.  I apologize.  And approximately from

Page  63

1    today how long ago was that?

2        A.    A week maybe.

3        Q.    So then did the fight occur during the

4    proceeding shift?

5        A.    I believe so.

6        Q.    Which officer told you about this?

7        A.    I don't recall.

8        Q.    And what happened in the fight?

9        A.    I know that there was several inmates involved.

10   I don't recall who individually.  It was the direct

11   files.  I don't usually work that side so --

12       Q.    Several inmates meaning more than two?

13       A.    More than two.

14       Q.    Was it more than four?

15       A.    No, I don't believe so.

16       Q.    And what was the response to that fight?

17       A.    I believe that they were locked down for the

18   rest of the night.

19       Q.    They meaning the juveniles --

20       A.    Juveniles.

21       Q.    -- involved in the fight?

22       A.    Yes.

23       Q.    There was not a general lockdown --

24       A.    I don't believe.

25       Q.    -- in Echo dorm?

Page 64

1      A.   I know they had locked down those individuals

2  that were involved in the fight.

3      Q.   Who were the juveniles?

4      A.   I don't recall those.

5      Q.   And for the fight you just told me about in

6  Echo dorm you said ultimately the response was the

7  juveniles that were fighting were locked down?

8      A.   Uh-huh.

9      Q.   Would there be a log of that lockdown?

10     A.   Yes.

11     Q.   And how do you know that?

12     A.   The incidents are recorded on the common area

13  log.

14     Q.   What incidents are recorded?

15     A.   Any incidents involving the juveniles.

16     Q.   Including lockdowns?

17     A.   Including lockdowns.

18     Q.   Would that be in lockdown?

19     A.   Yes.

20     Q.   And any lockdown for any period of time?

21     A.   Yes.

22     Q.   Okay.  Officer Choquette, I've been asking you

23  about fights that you have heard about.  You told me

24  about one in Delta, one in Echo.  Any other fights that

25  you didn't witness but that you had heard about at

Page 65

1   Central County Jail?

2       A.    Nothing I can recall.

3       Q.    Officer Choquette, you were just telling me

4   about the log.  For a lockdown what is written down in

5   the log?

6       A.    It will be the incident that happened and

7   the -- whether there was a lockdown.

8       Q.    Uh-huh.

9       A.    In what cells.

10      Q.    Would the log say when the lockdown began?

11      A.    It should be noted, yes.

12      Q.    Does the log say when it -- when the lockdown

13  finished?

14      A.    No.

15      Q.    So the log would say when the lockdown began,

16  but it wouldn't contain a notation as to when the

17  lockdown ended?

18      A.    No.

19      Q.    Why?

20      A.    It doesn't.

21      Q.    Would the log say how long the lockdown is

22  supposed to be for?

23      A.    No.

24      Q.    Would the log say anything else about the

25  lockdown?

Page 66

1       A.    No.

2       Q.    I want to ask you some questions about pepper

3    spray.  When you use pepper spray does it leave a smell?

4       A.    Yes.

5       Q.    And how long does the smell remain?

6       A.    No more than a few minutes.

7       Q.    So if you sprayed a juvenile would you be able

8    to smell it on the juvenile?

9       A.    Yes.

10       Q.    And would the smell remain on the juvenile

11    until the juvenile takes a shower?

12       A.    Yes.

13       Q.    So at least for a couple of hours following a

14    spray the juvenile is going to smell of --

15       A.    No.

16       Q.    -- that spray if there's no shower?

17       A.    No.  It evaporates.

18       Q.    How long does it take to evaporate?

19       A.    A few minutes.  You won't smell anything.

20       Q.    Okay.  So if you spray a juvenile with

21    Freeze --

22       A.    Correct.

23       Q.    -- the Freeze evaporates within a couple of

24    minutes and therefore there would be no --

25       A.    Freeze is composed of two components; CS and

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 67

1    the OC.

2        Q.    Okay.

3        A.    The CS is the part that basically evaporates.

4    It forms a crystal.  The OC is a resin.  You won't be

5    able to smell it but it will be on the skin.

6        Q.    I see.  So -- I see.  So you would be able to

7    see the OC on the skin of the juvenile after the spray?

8        A.    No.

9        Q.    I might not be following.  You said that OC

10   composes the resin?

11       A.    OC.

12       Q.    Of the spray?

13       A.    That's the pepper part.

14       Q.    Uh-huh, so after it's sprayed how does the

15   resin show up?  How do you know there's a resin?

16       A.    When it's first deployed it has an orange

17   color.

18       Q.    When it's first deployed when it's coming out

19   of the canister?

20       A.    Correct.

21       Q.    What happens after this comes out?

22       A.    It starts to evaporate.

23       Q.    Does it lose its orange color?

24       A.    Yes.

25       Q.    And how shortly after it's sprayed does it

Page 68

1    begin to evaporate and disappear?

2        A.   A few minutes.

3        Q.   A few minutes, okay.  So you're saying that you

4    can't see it after a couple of minutes, after a few

5    minutes?

6        A.   You can't see the coloration.

7        Q.   Okay.

8        A.   You can't smell the coloration.

9        Q.   Nor can you smell it?

10       A.   But the CS and OC -- the crystals and the resin

11   are still on the skin.

12       Q.   I see.  And how did you come to know this?

13       A.   Through the training.

14       Q.   Okay.  How many times have you used spray at

15   Central County Jail?

16       A.   In my twelve years?

17       Q.   No.  Actually since September of 2011.

18   Actually strike that.  How many times have you used

19   spray on juveniles at Central County Jail?

20       A.   One, two -- six possibly that I can recall.

21       Q.   You said that you used it approximately six

22   times.  How many juveniles in total do you think you've

23   sprayed at Central County Jail?

24       A.   Ten.

25       Q.   And can you briefly described each incident?

Page 69

1    You said there were approximately six times, and I

2    understand that may overlap a little bit with the

3    testimony --

4         A.   Yes, those --

5         Q.   -- that you just gave?

6         A.   Mainly what I'm remembering are those

7    incidents.

8         Q.   Okay.  Are there any other incidents of

9    spray --

10        A.   Not that I can recall.

11        Q.   -- besides the six that you just -- besides the

12   ones that you just testified about?

13        A.   Not that I can recall.

14        Q.   So Officer Choquette, the incidences -- excuse

15   me, the incidents which you just described were fighting

16   before and shortly before the break.

17        A.   Uh-huh.

18        Q.   Have you ever used spray on a juvenile at the

19   jail when there wasn't a fight?

20        A.   Not that I can recall.

21        Q.   Have you ever used spray in response to a

22   juvenile being disrespectful?

23        A.   No.

24        Q.   Have you ever used spray in response to a

25   juvenile making a commotion or noise?

Page 70

1      A.    No.

2      Q.    Have you ever used spray in response to a

3  juvenile kicking a door or kicking a wall?

4      A.    No.

5      Q.    How many other incidents of spray have you

6  witnessed even if -- in which you did not actually use

7  the spray on juveniles at the jail?

8      A.    The only ones I witnessed are the ones I've

9  been involved in.

10     Q.    So you haven't witnessed a juvenile being

11 sprayed in which you didn't actually use the spray?

12     A.    That's correct.

13     Q.    How many times have you used other types of

14 force with juveniles at the jail?

15     A.    Could you be more specific?

16     Q.    Uh-huh.  So before we were talking about use of

17 spray.

18     A.    Uh-huh.

19     Q.    Have you used other types of force such as

20 pulling a witness -- excuse me, pulling a juvenile back

21 or pushing a juvenile, putting them in certain hold?

22     A.    In those attempts to separate them from those

23 fights that I described.

24     Q.    Can you estimate in total how many times you've

25 used other types of force?

Page 71

1    A.    Perhaps half a dozen.

2    Q.    Okay.  Can you describe the first one, please?

3  You said that there were roughly perhaps a half dozen?

4    A.    An occasion where I was assisting D/D Franklin

5  moving a juvenile out to the holding cage because he

6  refused to return to his room, and we had to use

7  physical force to get him off the floor and move him out

8  to the holding cage.

9    Q.    Who was the juvenile?

10   A.    I believe his name was H_____

11   Q.    Approximately when was this?

12   A.    May or April.

13   Q.    Of 2012?

14   A.    12, yes.

15   Q.    Please correct me if I'm wrong if I'm

16  misstating what you said, but I think you were saying

17  that he was refusing to --

18   A.    Return to his room.

19   Q.    -- return to room?

20         And how did you respond to that?

21   A.    I assisted in picking him up off the floor and

22  moving him out to the holding cage.

23   Q.    How did you pick him up off the floor?

24   A.    Taking him by his sleeve of his shirt and the

25  collar of his shirt and pulling him up.

Page 72

1      Q.   Did you do anything else?

2      A.   No.

3      Q.   I take it that got him off the floor?

4      A.   Between of two of us, yes.

5      Q.   What was Officer Franklin doing?

6      A.   He was lifting him by his other side, his arm.

7      Q.   You said that you were picking him up off the

8  floor.  Why was he on the floor in the first place?

9      A.   He sat down and he refused to go to his room.

10     Q.   Why did he need to go to his room?

11     A.   We were doing a lock down for chow.

12     Q.   Why was he refusing to get off the floor?

13     A.   I don't know.

14     Q.   How do you know that he was refusing?

15     A.   Because he wasn't moving to his room.

16     Q.   Was he saying anything?

17     A.   He said I'm not gonna go to my room.

18     Q.   Anything -- did anything else happen after you

19  and Officer Franklin picked him up off the floor?

20     A.   He attempted to pull away from our grasp.

21     Q.   Uh-huh.

22     A.   Prevent himself from being moved out.

23     Q.   And what happened next?

24     A.   Deputy Franklin took him by the waist and

25  lifted him out -- lifted him up off the floor so he

Page 73

1  didn't have his traction, stepped to the door, and then

2  I took his arm, set him down and we walked him to the

3  cage.

4      Q.    You said that D/D Franklin took him by the

5  waist.  How did he take him by the waist?

6      A.    A bear hug and picked him up.

7      Q.    Did you use spray in this incident?

8      A.    No.

9      Q.    Why not?

10     A.    There was two of us.  He was alone, and we had

11 already basically gone hands on and we could just --

12 continued from there.  We didn't use spray.

13     Q.    That was the first incident of other forms of

14 force.  What was the second incident?

15     A.    I can recall a juvenile, R_____ W(____

16 refusing to go back to his room for lockdown for chow --

17 or at the end of the day actually, and I and Deputy Gay

18 had to use force to take him back to his room.

19     Q.    What kind of force did you use?

20     A.    Deputy Gay grabbed him by his upper shirt

21 sleeve and walked him to the door of his cell.  I was on

22 his other side.  When we reached the door he grabbed

23 hold of the door frame and refused to let go.  So I took

24 him by the upper body, tried to pull him in, and he

25 continued to hang on.  So Deputy Gay struck his forearm

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 74

1    to break his grasp.  We moved him into the cell, placed

2    him on the floor and told him to stay there.  He tried

3    to jump up.  I put my leg against his torso so that he

4    had to basically sit back down and told him to sit there

5    until we exited the dorm.  I left.  Deputy Gay stood in

6    the doorway and basically lectured him.  I went out and

7    made an entry on the log of the incident.

8         Q.   Why was juvenile -- why was the juvenile

9    grabbing the door frame?

10        A.   He was trying not to --

11             MR. MCKINLEY:  Object to form.

12        A.   He was not going back to his room.

13        Q.   Was the juvenile saying anything at the time?

14        A.   He was saying I'm not going back to my room.

15        Q.   Why was he refusing to go on lockdown in the

16   first place?

17        A.   He wanted to have me bring him a bed roll.  I

18   told him I would bring him one after we had locked down.

19        Q.   Why did he want you to bring him a bed roll?

20        A.   I have no idea.

21        Q.   Did he have a bed roll in his cell?

22        A.   I was going to check when I brought him one.

23        Q.   Was he supposed to have a bed roll?

24        A.   Yes.

25        Q.   Did he have a bed roll?

Page 75

1     A.    No, he didn't.

2     Q.    And you said that you went into his -- you went

3     into his cell during this incident?

4     A.    Correct.

5     Q.    At the time did you notice if he did or did not

6     have a bed roll?

7     A.    Yes.

8     Q.    What did you notice?

9     A.    That he did not have one.

10    Q.    Why didn't he have one?

11    A.    I don't know.

12    Q.    So how was he sleeping at night without a bed

13    roll?

14    A.    I don't know how long he had not had a bed

15    roll.

16    Q.    Uh-huh.  I may come back to that later.  What

17    was the third incident of other uses of force?

18    A.    There was an individual named V_    J____ J.

19    He also refused to return to his sleeping cell.  And

20    Deputy Franklin had began walking him out to the holding

21    cage, and he sat down on the floor and refused to move.

22    And I assisted in getting him to his feet and moving him

23    to the holding cage.

24    Q.    Why were you taking him to the holding cage?

25    A.    Because he had refused to go to his cell.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 76

1      Q.    Why didn't you just take him to his cell?

2      A.    I don't know.   Deputy Franklin had brought him

3  out.

4      Q.    Brought him out from where?

5      A.    From the dorm.

6      Q.    You said that he was refusing to go to his

7  sleeping cell.   Deputy Franklin brought him out from the

8  dorm, and then you assisted to bringing him to the

9  holding cell?

10      A.    Correct.

11      Q.    How did you find out that he was refusing to go

12  to his sleeping cell?

13      A.    I believe Deputy Franklin had told me.

14      Q.    At the time that you were moving him --

15      A.    Yes.

16      Q.    -- to the holding cell?

17            And how did you assist in moving him to the

18  holding cell -- excuse me, to the cage?

19      A.    I took him by his shirt sleeve and collar of

20  his shirt and lifted him up to his feet.

21      Q.    What was Deputy Franklin doing at the time?

22      A.    He was also pulling him up to his feet on the

23  other side.

24      Q.    What was the juvenile doing?

25      A.    Struggling to get out of our grasp.

Page 77

1      Q.    What did you do?

2      A.    Took hold of his wrist once he was standing.

3   Deputy Franklin took the other side and we walked him

4   to -- actually I walked him.  Deputy Franklin -- I'm not

5   sure what he was doing.  I walked him to the nurse's

6   station so that he could be seen.  She was seeing

7   another individual, so I handcuffed him so that he

8   wouldn't become combative, and we waited and then she

9   saw him, did an examination.  And he was returned to his

10  dorm afterwards.

11     Q.    So he wasn't placed in the cage?

12     A.    If he was it wasn't for very long.

13     Q.    You said that he was -- you assisted in taking

14  him to the cage?

15     A.    Right.

16     Q.    But actually you took him to the nurse's

17  station --

18     A.    Uh-huh.

19     Q.    -- and then he returned to his cell?  During

20  that course of events did he go into the cage?

21     A.    I can't recall.  I know why.  He was involved

22  in a fight, and Deputy Franklin was bringing him out

23  because he was the aggressor.  That's why Deputy

24  Franklin went back to the dorm, to get the other

25  juvenile.  I can't remember who it was.

Page 78

1    Q.   Okay.  You said earlier that he was refusing to

2  return to his cell --

3    A.   That was a mistake.

4    Q.   That's incorrect?

5    A.   That's incorrect.

6    Q.   I understand.  Why did you take him to the

7  nurse's station?

8    A.   Two reasons.  One, he had been involved in a

9  fight.  All juveniles involved in a fight are seen by

10  the nurse.  He had been basically involved in a

11  protective action.  Once you go hands on that's

12  considered a protective action, so the nurse has to

13  examine him.

14    Q.   Okay.  So in the course of me asking you

15  questions about this incident I think more things came

16  to mind.

17    A.   Yes, I recalled more.

18    Q.   Let's go back to the beginning then.  This is

19  V___ ▬ J_____ ?

20    A.   Right.

21    Q.   And --

22    A.   He had been involved in a fight that Deputy

23  Franklin had witnessed.

24    Q.   Uh-huh.

25    A.   And he was moving him out to the holding cage

Page 79

1    for that, and then he sat down on the floor, and that's

2    when I became aware of the situation.

3         Q.   He was being moved to the holding cage, and

4    that's when he sat down on the floor?

5         A.   Floor.

6         Q.   Sat down on the floor --

7         A.   Of the common area.

8         Q.   -- of the common area?

9         A.   (Witness nodding head.)

10        Q.   Was he refusing to get up?

11        A.   Yes.

12        Q.   And that's when you assisted --

13        A.   Deputy Franklin.

14        Q.   You assisted Deputy Franklin in doing what?

15        A.   Moving him.

16        Q.   Moving him to where?

17        A.   Getting him to his feet and we went to the

18   nurse's station.

19        Q.   So you didn't take him to the holding --

20        A.   No.

21        Q.   Just to the nurse?

22        A.   Yes.   Afterwards I believe I put him in the

23   holding cage while the nurse saw the other juvenile.

24        Q.   First what dorm was in this?

25        A.   Charlie dorm.

Page 80

1    Q.   And approximately when was this?

2    A.   February.

3    Q.   Let's go on to the next incident of other uses

4    of force.

5    A.   I can't really recall too many other than those

6    and the reports that I've made.

7    Q.   So you told me -- you said that there may have

8    been approximately half a dozen?

9    A.   Half a dozen.

10   Q.   You told me about three.

11   A.   I think they overlap with the protective

12   actions that we -- I mean the fights.

13   Q.   Okay.  Have you ever slapped a juvenile across

14   the cheek?

15   A.   No.

16   Q.   Have you ever kicked a juvenile?

17   A.   No.

18   Q.   So you were telling me about other uses of

19   force that you were involved in?

20   A.   Uh-huh.

21   Q.   How many other incidents of use of force -- of

22   other uses of force have you witnessed but that you were

23   not actually involved in?

24   A.   The only ones I recall witnessing are the ones

25   that involve me and Deputy Franklin.

Page 81

1    Q.   Are those incidents where Deputy Franklin used

2    force but you didn't?

3    A.   No, just those fights.  That one occasion with

4    Deputy Gay.

5    Q.   I see.

6    A.   I can't recall any others.

7    Q.   So you're saying that you can't recall any

8    other uses of force in which you witnessed the use of

9    force but that you weren't actually applying -- involved

10   in.

11   A.   Usually if there's some kind of incident I'm

12   going to help out.  I'm going to be involved.

13   Q.   Have you ever placed a juvenile in one of the

14   isolation rooms?

15   A.   Yes.

16   Q.   How many times have you placed juveniles in

17   isolation rooms?

18   A.   At least three.

19   Q.   Who were the juveniles?

20   A.   One was -- his last name was A_____

21   Q.   Could you spell that please to the best of your

22   recollection?

23   A.   A_____

24   Q.   Uh-huh.

25   A.   One his last name was D_____

Page 82

1    Q.    Uh-huh.

2    A.    And I believe one last name was H__

3    Q.    Could you describe each incident?

4    A.    With A|    it was -- he is being disruptive

5  kicking his cell door.  We -- I told him to stop.  He

6  refused to stop.  He was inciting the other kids to

7  start kicking on their doors.  So I removed him and put

8  him in isolation to basically segregate him for a short

9  time so that the dorm would quiet down and he would calm

10 down.

11   Q.    You said that he was inciting other juveniles?

12   A.    Correct.

13   Q.    Were those juveniles just the juveniles in his

14 cell or --

15   A.    In the dorm.

16   Q.    How did you decide to place him in isolation as

17 opposed to using some other measure?

18   A.    I wanted to separate him so that he wouldn't be

19 able to basically lead by example.  Once he was

20 separated try to come the dorm down, try to calm him

21 down.

22   Q.    For example why did you chose to put him in

23 separation as opposed to -- excuse me, into isolation as

24 opposed to putting him in the holding cage?

25   A.    He was still visible from the holding cage.

Page 83

1    Q.    Let me go back for a second.   Do you remember

2    approximately when this occurred?

3    A.    Three weeks ago, two weeks ago.

4    Q.    Approximately two weeks ago?

5    A.    Two or three weeks ago, uh-huh.

6    Q.    And which dorm?

7    A.    Bravo.

8    Q.    And why was Juvenile A    kicking the cell

9    door?

10        MR. MCKINLEY:   Form.

11    A.    I have no idea.

12    Q.    In what ways was the juvenile being disruptive?

13    A.    He was shouting and kicking the door inciting

14    the other juveniles to do the same.

15    Q.    Did you say anything to him?

16    A.    I told him to stop.

17    Q.    Did you ask him why he was kicking the door?

18    A.    Yes.

19    Q.    What did he say?

20    A.    He said he wanted us to come to his door right

21    now.

22    Q.    Why did he say that?

23    A.    He wanted our attention.

24        MR. MCKINLEY:   Form.

25    Q.    Did he say what he wanted your attention for?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 84

1     A.    No.

2     Q.    Do you know what he wanted your attention for?

3     A.    No.

4     Q.    Did he say anything else?

5     A.    When he was told to stop he said he was going

6  to keep -- continue to do so.

7     Q.    So you placed Juvenile A___   in isolation.   Is

8  there a log of that?

9     A.    Yes.

10    Q.    Did you make the log entry?

11    A.    Yes.

12    Q.    What does the log say?

13    A.    That it was a disturbance and he was

14  segregated.

15    Q.    How long was he placed in isolation?

16    A.    I originally recommended for a 24 hour period

17  but he had only -- he was only in there for the one --

18  the rest of our shift and then he returned to his dorm.

19    Q.    How do you know that?

20    A.    He was in his cell the next morning.

21    Q.    So you had originally recommended 24 hours.

22  How many hours in total was he in isolation?

23    A.    Four.

24    Q.    Why was he removed from isolation?

25    A.    I don't know.

Page 85

1     Q.   Why did you recommend 24 hours?

2     A.   To cool off.

3     Q.   And you said that it was the -- he was in

4 isolation for approximately four hours.  How do you know

5 that if you left the shift?

6     A.   I don't.  That's why I said approximately four

7 hours.  He was approximately four hours on my shift.

8     Q.   Okay.  Does the log state how many hours he was

9 in isolation?

10    A.   I don't know.

11    Q.   Should the log state how many hours an inmate

12 is in isolation?

13    A.   The isolation log will have it recorded.

14    Q.   Have -- we've just been talking about the

15 isolation log.  Is there a separate log?

16    A.   No.  I was talking about the common area log.

17 The common area log is when I removed him I would make

18 an entry on the common area log, the juvenile is placed

19 in isolation, we'll start an isolation log on him.

20    Q.   Did you complete the isolation log?

21    A.   Yes.

22    Q.   Did you make an entry in the isolation log?

23    A.   Yes.

24    Q.   Did you make entries in the common log as well?

25    A.   Common area log.

Page 86

1    Q.   Once he was placed in isolation was a guard

2    stationed in isolation?

3    A.   No.  We perform 15 minute checks.

4    Q.   Did you check on him?

5    A.   Yes.

6    Q.   How frequently?

7    A.   Fifteen minutes.

8    Q.   Would either of the logs that you referred to

9    note the checks?

10   A.   Yes.

11   Q.   Would anything else note the checks?

12   A.   Just the one isolation would note the 15 minute

13   checks.  Once he's moved out of the dorm the common area

14   log won't notice -- make a note of the 15 minute checks

15   for that.

16   Q.   Was it your responsibility to perform these

17   checks or was anyone else assigned to the isolation

18   area?

19   A.   It would be all of our responsibilities.  If I

20   couldn't do it one of the other officers would do it.

21   Q.   How would they know that somebody in isolation?

22   A.   I inform them.

23   Q.   Let's go to the second incident in which you

24   placed a juvenile in isolation.  I think you said that

25   was D

Page 87

1      A.    D

2      Q.    When was that?

3      A.    Again, about two, three weeks ago.

4      Q.    What dorm?

5      A.    Bravo.

6      Q.    And what happened?

7      A.    He was attempting to stop the door from

8  closing, Bravo dorm.  He was holding it.  The gears were

9  started to strip.  I told him to step away from the

10 door.  He refused.  When I went to basically get up and

11 approach him he moved away from the door.  And then I

12 told him to stay away from the door, and he yelled an

13 obscenity at me.

14      So I opened the door again and told him you

15 need to go back to your cell, and he refused to go back

16 to his cell.  So I took him by his shirt sleeve and

17 escorted him to his cell.  He began to argue with me and

18 attempt to pull away saying that I couldn't touch him.

19      So I told him -- he started to make a

20 disturbance and his roommate became involved, so I

21 decided to remove him from the dorm and place him in

22 isolation to have him cool down.  And so I told him the

23 follow, and he -- I escorted him out to the isolation

24 area and placed him in the isolation dorm.

25      Q.    How long did you recommend he be in isolation?

Page 88

1     A.   I was only going to hold him in there for a few

2   hours until he calmed down and the dorm calmed down.

3     Q.   How long was he actually in isolation?

4     A.   About 40 minutes.

5     Q.   Why was that?

6     A.   After two checks, two or three checks he said

7   that he was ready to go back to the dorm and he

8   apologized.  And I talked to him and informed him why he

9   can't be behaving the way he was.  It was damaging to

10  the property.  And once we had finished our talk I put

11  him back in the dorm.

12    Q.   What happened after you put him back in the

13  dorm?

14    A.   He didn't make any problems for me.

15    Q.   Why was he attempting to keep the door from

16  closing?

17         MR. MCKINLEY:  Form.

18    A.   I have no idea.

19    Q.   Did he say anything while he was attempting to

20  keep the door from closing?

21    A.   No.  He was laughing.  I believe they think

22  it's funny.  I believe the juveniles think it's funny to

23  hold our doors open while they're trying to close.

24    Q.   So you're saying you think that he thought it

25  was funny --

Page 89

1      A.     Funny.

2      Q.     -- to try to keep the door from closing?

3      A.     I believe he was trying to aggravate me.

4      Q.     Why do you think he was trying to aggravate

5  you?

6      A.     That's the impression I got.

7      Q.     Had anything occurred between you and him

8  earlier in the day?

9      A.     No.

10     Q.     And was there a guard stationed at isolation

11 during this time?

12     A.     No.

13     Q.     Did you check on him --

14     A.     Yes.

15     Q.     -- while he was in isolation?

16     A.     Yes.

17     Q.     At what intervals?

18     A.     Fifteen minute intervals.

19     Q.     Is this incident recorded in the two logs that

20 you described earlier?

21     A.     It would be recorded in the common area log.  I

22 knew I wasn't placing him there, so I didn't start an

23 isolation log.  I was going to take him out.

24     Q.     So you didn't make an entry into the

25 isolation --

Page 90

1    A.    No.

2    Q.    -- room log?  Why is that?

3    A.    I knew he wasn't going to stay in there.

4    Q.    For a long period of time?

5    A.    Correct.

6    Q.    How many hours of isolation does it require to

7  put -- to make an entry into the isolation log?

8    A.    Once we decide he's going to be in there for 24

9  hours we'll start an isolation log.  If we're just

10  moving him in there to have him cool down to be

11  segregated we'll just make a notation on it that -- the

12  common area log that he was moved out.

13    Q.    Did anything happen with his -- with D_____'s

14  cellmate?

15    A.    No.

16    Q.    I think you mentioned that -- I may come back

17  to that one, but let's move on to the incident with

18  H___ ), please?

19    A.    Really I can't even recall that.  For some

20  reason I believe I remember placing him in isolation for

21  a time out.  I think -- I can't even remember what it

22  was about.  It was probably towards the beginning of the

23  year.

24    Q.    So early 2012 is when you think this may have

25  occurred?

Page 91

1    A.   Yes.

2    Q.   And what dorm?

3    A.   He probably would have been in Fox dorm.

4    Q.   You said that you placed him there for a time

5  out?

6    A.   Yes.

7    Q.   How long did you recommend?

8    A.   I didn't recommend anything.  I kept him in

9  there probably less than 30 minutes.

10   Q.   I see.  So would this be in the common area

11  log?

12   A.   It should be.

13   Q.   Is that the same thing as an activity log --

14   A.   Yes.

15   Q.   -- basically?  But it wouldn't be in an

16  isolation log?

17   A.   No.

18   Q.   It was just a time out.  So you just described

19  to me three incidents where you were involved in placing

20  a juvenile in isolation.  Are you aware of other times

21  where staff have put a juvenile in isolation?

22   A.   I know there's been a few, but I can't recall

23  who or when.

24   Q.   What's the longest that any juvenile has been

25  in the isolation room?

Page 92

1      A.    Could you be more specific?

2      Q.    Uh-huh.  What's the longest period of time that

3   you're aware of either through hearing about it from

4   somebody else or from your personal involvement that a

5   juvenile has been in the isolation room?

6      A.    I believe for about two weeks towards the

7   beginning of the year we had three direct file juveniles

8   in isolation.  They had been involved in an incident on

9   the night shift, and it was the captain's recommendation

10  to keep them in isolation while an investigation was

11  going on, so they were there for about two weeks.

12     Q.    How do you know this?

13     A.    I was -- when I showed up to work they were in

14  isolation.

15     Q.    I see.  So was it your job to check on them?

16     A.    Yes.

17     Q.    So over the course of approximately two

18  weeks --

19     A.    Two weeks they --

20     Q.    -- you were checking them?

21     A.    Yes.

22     Q.    Checking on them?

23     A.    They would be on an isolation log.  They would

24  be getting a 15 minute check.

25     Q.    I see.  And what was the incident which caused

Page 93

1   them to be on isolation?

2       A.   They had assaulted a fellow roommate in Fox

3   dorm.

4       Q.   You said that they were in there for two

5   weeks --

6       A.   Approximately.

7       Q.   -- approximately while the investigation was

8   going on?

9       A.   Correct.

10      Q.   Did it take two weeks to conduct the

11  investigation?

12      A.   I have no idea how long.

13      Q.   Who were the juveniles?

14      A.   It was H      , H      and V

15

16      Q.   Can you tell me about the isolation -- tell me

17  please about that period of isolation.  Did the

18  juveniles come out of the isolation room at all?

19      A.   Yes.  They have opportunity to shower, use the

20  phones.

21      Q.   Use the shower.  Do you know the temperature of

22  the shower in the isolation room?

23      A.   Warm to hot.  I don't know the exact

24  temperature.

25      Q.   Were those juveniles allowed to go to rec?

Page 94

1    A.    I don't believe so.

2    Q.    Did they go to school?

3    A.    Yes.

4    Q.    For how long?

5    A.    For the two weeks that they were in there

6    whenever they would go to school they went to school.

7    They had the opportunity.  If they refused we wouldn't

8    force them to go to school.

9    Q.    Were they refusing to go to school?

10   A.    I think on a few occasions they did.

11   Q.    On other occasions they went to school?

12   A.    Yes.

13   Q.    Do you know how long they went when they did

14   go?

15   A.    How long the class times are?

16   Q.    Uh-huh, how long they were out of isolation and

17   in school?

18   A.    Class times are an hour so twice a day.

19   Q.    And we were speaking about H(   ), H_   and

20   W(   ), and that was one hour of school for each

21   juvenile?

22   A.    Right.

23   Q.    Twice a day --

24   A.    Yes.

25   Q.    -- for each of them.  Okay.  How much time did

Page 95

1    they have to shower?

2         A.   We usually give them between half an hour and

3    45 minutes.

4         Q.   And how much time -- you said you didn't

5    believe they went to recreation.  Did they leave the

6    isolation room for other reasons?

7         A.   Only for medical or attorney booth visits.

8         Q.   And you said -- strike that.  Were these

9    juveniles allowed to have family visits while they were

10   in isolation?

11        A.   I can't recall if they had visitation or not.

12        Q.   And what were the times that they went to

13   school?

14        A.   They would go to school in the morning.  I'm

15   not sure exactly what the time frame would be, but the

16   way it's structured is there was a class in the morning

17   and there would be a class after lunch.  And I think

18   they rotated the dorms, and they would go during one of

19   those periods.

20        Q.   So if they went they would return to isolation

21   for their lunch?

22        A.   Right.

23        Q.   I see.

24        A.   Right.

25        Q.   But you don't remember -- do you know what time

Page 96

1      the morning class started approximately?

2          A.   Classes for direct files start around 7:30,

3      7:45.

4          Q.   Were these district files?

5          A.   Yes.

6          Q.   And what time did it run to approximately?

7          A.   The class?

8          Q.   Uh-huh.

9          A.   For an hour.

10         Q.   So would these juveniles either go to the

11     morning or the afternoon?

12         A.   Afternoon.

13         Q.   But not to both?

14         A.   Not both.

15         Q.   I see.

16         A.   It depended on what time, what --

17         Q.   Are there any other incidents of -- strike

18     that.

19              Were there any other occasions to be outside of

20     isolation that you were aware of for these three

21     juveniles besides what you've described to me?

22         A.   No.

23         Q.   I'm going to move into a new line of

24     questioning showing you some documents.  Do you want to

25     take a break before we do so?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 97

1          MR. MCKINLEY:  Short break?  This is probably a

2      good time.

3          THE VIDEOGRAPHER:  We're off the video record.

4          (Recess from 11:36 until 12:06 p.m.)

5          THE VIDEOGRAPHER:  We are back on the video

6      record.

7      Q.    Officer Choquette, we're well into our

8  deposition.  I don't have too much more.  I would like

9  to show you some exhibits.  I would like to start with

10 an exhibit Bates stamped 36 -- 03629 and that runs

11 through to 03677.  And I believe that they are

12 consecutively numbered all the way through, and I'm not

13 going to ask you about each document but feel free to

14 take a look.

15         MR. MCKINLEY:  Are you going to give this an

16     exhibit designation?

17         MR. CHASIN:  We'll call this Exhibit 1.

18         MR. MCKINLEY:  All right.

19         (Exhibit 1 was marked for identification.)

20 Q.    Officer Choquette, I would like to start by

21 asking you about the second page in that stack which is

22 Bates number 3630.

23 A.    Okay.

24 Q.    That's an incident report?

25 A.    Correct.

Page 98

1      Q.    Nature of incident, protective action.  Is this

2    the brawl that you had been describing earlier --

3      A.    Yes.

4      Q.    -- today.

5      A.    Yes, it is.

6      Q.    And you said that it was a brawl which involved

7    approximately 8 juveniles?

8      A.    Correct.

9      Q.    The version that I have as well as yours is

10   redacted?

11     A.    Uh-huh, yes.

12     Q.    What are the redacted names there in the first

13   three lines?

14     A.    I can't read them.

15     Q.    By looking at this report do you know who they

16   are by context?

17     A.    The only ones I can probably remember is

18   A    .    There was two A____   actually.  They

19   weren't related.

20     Q.    Any others?

21     A.    O|____|.

22     Q.    And this report -- if you turn to the second

23   page of this report --

24     A.    Uh-huh.

25     Q.    -- it has your member number 5165 on it.  It

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 99

1  says I swear or affirm this report is correct and true

2  to the best of my knowledge and belief?

3      A.   Uh-huh.

4      Q.   You authored this report?

5      A.   Yes.

6      Q.   And it was authored -- you signed it, excuse

7  me, on September 26, 2011.  On the first page of this

8  report there's an area that's been whited-out.

9      A.   Uh-huh.

10     Q.   Do you see that in the lower third --

11     A.   Yes.

12     Q.   -- of the document?  What did that say roughly?

13 Take your time looking at it.

14     A.   It would note if there was any injuries or --

15 injuries or whatever physical injuries from the

16 protective action or the fight.

17     Q.   What were the injuries?

18     A.   I don't think there were any injuries.  The

19 only results would have been red eyes from the spray.

20     Q.   Were there other injuries perhaps not as a

21 result of the fight but from the protective action

22 otherwise?

23     A.   No.

24     Q.   So you think the whited-out area simply says

25 that the juveniles that were involved had red eyes as a

Page 100

1    result of this incident?

2        A.    Yes.

3        Q.    And not other injuries?

4        A.    Yes.

5        Q.    Okay.   And I would like to direct your

6    attention to the second -- basically the second main

7    paragraph of this document.   It says towards the

8    right-hand side after being sprayed all inmates were

9    told to lie prone on the floor of India dorm.   Do you

10   see where I'm reading?

11       A.    Yes.

12       Q.    And remain there until told to move.   Some

13   individuals attempted to defeat our efforts to establish

14   control and attempted to run or move from their spots on

15   the floor.   They were sprayed again to gain compliance

16   and remain still.

17             Did I read that correctly?

18       A.    Yes.

19       Q.    So this says that the individuals had stopped

20   fighting?

21       A.    Correct.

22       Q.    But that they were still sprayed?

23       A.    Correct.

24       Q.    Why did you spray them?

25       A.    Because they were attempting to defeat our

Page 101

1    control.

2        Q.    And what's the consequence of attempting to

3    defeat your control?

4        A.    I have to establish the control to provide a

5    safe environment.

6        Q.    Where were they running to?

7        A.    I have no idea.

8        Q.    Which direction were they running in?

9        A.    Away from me.

10       Q.    Away from you further into the dorm?

11       A.    No.  We were in the day room, so they were

12   probably try to reach the doorway and get out of their

13   dorm.

14       Q.    Is that noted in your report?

15       A.    No.

16       Q.    Is that an important fact?

17       A.    I didn't think so.

18       Q.    Why didn't you think so?

19       A.    They were trying to defeat my effort of -- I

20   wasn't concerned where they were going.  The fact that

21   they were trying to move after they were told to stay

22   still and stay where they were at -- I had no idea

23   whether they were trying to organize some kind of attack

24   against me, present a threat.  I had no idea.  I have to

25   establish control, stay where you're at, don't move,

Page 102

1    they attempted to defeat that.

2        Q.    The things that you just mentioned --

3        A.    Uh-huh.

4        Q.    -- did you have any reason to believe that they

5    were actually going to do those things?

6        A.    There was eight of them involved in a fight.

7    They're capable of anything.

8        Q.    But did you have any reason to believe they

9    were actually going to do those things to you?

10       A.    Yes, I did.

11       Q.    Why did you believe that?

12       A.    Because like I said it was an organized fight.

13   There was eight of them.  That could have been a

14   distraction.  They could have been attempt to overpower

15   the two officers that were on duty.  Those things run

16   through your mind.

17       Q.    What do you mean by an organized fight?

18       A.    An organized fight, there was eight of them

19   involved.  It may not have been spontaneous.  It may

20   have been pre-concocted.

21       Q.    You say it may have been -- I think you said it

22   may have been pre-concocted.  Why do you think so?

23       A.    Because there was eight involved.

24       Q.    So you said that it was organized.  Did you

25   have any reason to believe it wasn't spontaneous?

Page 103

1    A.    No.  I said it could have been organized.  I
2  don't believe whether it was or wasn't, but the
3  possibility is there that it was an organized fight
4  meant to draw us in and overpower us.
5    Q.    Have you ever been in a situation where you
6  have been drawn in in an organized fight by juveniles?
7    A.    No.
8    Q.    Are you aware of any instances where there's
9  been an organized fight at the Central County Jail where
10  officers have been drawn in?
11    A.    Nothing specific that I can recall.
12    Q.    Officer Choquette, would this incident be
13  recorded on video?
14    A.    There were recording video in there.  I'm not
15  sure if at the time they were actually recording.  We
16  had just opened up the dorm two, three weeks before
17  that.  Recording video had been in place and was
18  operational.
19    Q.    Did you -- excuse me, did you review video of
20  this incident?
21    A.    Yes.
22    Q.    You did?
23    A.    Yes.
24    Q.    Do you know where that video is right now?
25    A.    No.

Page 104

```
 1        Q.    When did you review that video?
 2        A.    Three, four weeks afterwards I think.  I can't
 3   remember exactly when.
 4        Q.    Why did you review the video?
 5        A.    Supervisors had me review it.
 6        Q.    Did you review it -- you said three or four
 7   weeks afterwards --
 8        A.    I'm --
 9        Q.    -- approximately?
10        A.    Approximately.
11        Q.    So that would have been after you wrote your
12   report?
13        A.    Yes.
14        Q.    Did you take any steps after reviewing the
15   video?
16        A.    What do you mean?
17        Q.    Did you do anything in connection with this
18   incident after reviewing the video?
19        A.    No.
20        Q.    So looking at this incident report, says
21   officers present Officer Choquette, Officer Franklin.
22   Was there any guard inside of the dorm when this broke
23   out, what you described as a brawl earlier?
24        A.    No.  There were no deputies inside the dorm.
25        Q.    And at the time that you responded to this
```

Page 105

1   fight did you know what the fight was about?

2       A.   No, we didn't.

3       Q.   And why didn't you know?

4       A.   We didn't know.  I hadn't been informed what

5   the fight was about.

6       Q.   And you don't know how it started either?

7       A.   No.

8       Q.   So you only found out about it after the fact?

9       A.   About the reason.  There was two groups that

10  were feuding against each other.

11      Q.   Do you know why they were feuding?

12      A.   I believe it had something to do with where

13  they came from, their -- what city they lived in.  But I

14  can't recall if it was that or if it was just

15  individuals that had feuds with each other.

16      Q.   And you were -- you were outside the dorm when

17  this occurred at the desk?

18      A.   Yes, within line of sight.

19      Q.   And what were you doing at the time?

20      A.   Probably hitting the log.

21      Q.   And the door was closed before you responded?

22      A.   Correct.

23      Q.   And had to be opened?  And you used the spray

24  on your person --

25      A.   Correct.

Page 106

1    Q.   -- for this?  Were you able to hear the kids at

2    all before this started?

3    A.   No.

4    Q.   I want to go back a page please, Officer

5    Choquette, to -- you see the Bates number at the bottom

6    left 3629?

7    A.   Yes, uh-huh.

8    Q.   In the middle it has a summary of all

9    protective action.  It has some boxes checked.  What is

10   a restraint chair?

11   A.   A restraint chair is a device that we use for

12   inmates that refuse to be controlled or become extremely

13   violent or aggressive.

14   Q.   Do you have one at the Polk County -- at

15   Central?

16   A.   Yes.

17   Q.   Have you ever put a juvenile in the restraint

18   chair?

19   A.   No.

20   Q.   Are you aware of any incidents in which a

21   juvenile has been placed in the restraint chair?

22   A.   No.

23   Q.   Has a juvenile ever been placed in the

24   restraint chair?

25   A.   Not to my knowledge.

Page 107

1      Q.    And also in the bottom -- excuse me, going to

2   the next page where we were before.   In the bottom

3   left-hand corner it says was DR authorized?

4      A.    Disciplinary report.

5      Q.    What does that mean was a disciplinary report

6   authorized?

7      A.    Whether or not the lieutenant wanted me to fill

8   out a disciplinary report.

9      Q.    Okay.   Is that only for direct file juveniles?

10     A.    Yes.

11     Q.    Why is that?

12     A.    Because they have adult charges.

13     Q.    Why would a DR only be authorized for direct

14  file inmates juveniles instead of pre-adjudicated?

15     A.    I'm not sure of the specifics of it.   We only

16  do it for direct files.   Pre-adjudicateds we don't issue

17  DR's to.

18     Q.    You don't know why though?

19     A.    I believe that it's because direct files are

20  considered long term and pre-adjudicateds are less than

21  14 days, less than 21 days, so any kind of DR would be

22  ineffective.

23     Q.    And Officer Choquette, do you work primarily

24  the day shift?

25     A.    Yes.

Page 108

1      Q.   I would like to go next to a separate document

2  beginning with Bates number 3894, 03894.  We'll call

3  that Exhibit 2.

4           (Exhibit 2 was marked for identification.)

5           MR. MCKINLEY:  So it won't be this exhibit.

6  We'll try and keep up.

7           THE WITNESS:  Sorry.

8           MR. MCKINLEY:  That's okay.

9           MR. CHASIN:  Do you mind looking at -- I don't

10  have many questions about this.  It goes to 03896 so

11  it's just three pages long.

12           MR. MCKINLEY:  I'm just checking.  Ours has

13  03897 which appears to me to be a duplicate in

14  this -- on this page.

15           MR. CHASIN:  Okay.  I'll only go to 396.

16           MR. MCKINLEY:  It's up to -- so remove this one

17  for the exhibit then.

18           MR. CHASIN:  That's okay.

19           MR. MCKINLEY:  Yes?

20           MR. CHASIN:  Yes.

21           MR. VAZQUEZ:  I'm sorry, the reason I'm always

22  asking for them is because the disks that were

23  produced -- both disks are blank disks -- Bates

24  stamped 03595 up to 04119 are missing, and those the

25  ones that we've been using in these depositions.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 110

1           MR. MCKINLEY:  Just to circle back this is

2      Exhibit 2.

3           MR. CHASIN:  Yes.

4           MR. MCKINLEY:  Which is Bates stamped

5      numbers -- if you'll fill those in.

6           MR. CHASIN:  Right, 03894 to 03896.

7           MR. MCKINLEY:  Thank you.

8           MR. CHASIN:  Sure.

9      Q.    Officer Choquette, earlier you had testified

10     about a fight in connection with football?

11     A.    Uh-huh.

12     Q.    Is this the same incident?

13     A.    Yes.

14     Q.    And I think I just have one or two questions

15     about this.

16     A.    Uh-huh.

17     Q.    On the second page the incident report there's

18     a whited-out area?

19     A.    Uh-huh.

20     Q.    What did that say?

21     A.    Again, it would be if the nurse found any kind

22     of injuries, and I can't recall what they had said.  I

23     would have to read my original report.

24     Q.    Do you remember if the juveniles were injured

25     in any way?

Page 111

1        A.    I don't recall.  I can't -- it doesn't stick in

2    my mind.

3        Q.    But this area that was whited-out would have

4    said --

5        A.    Yes.

6        Q.    Would have noted what the injuries were?

7        A.    Right.

8        Q.    And just to establish for the record this was

9    the report that you had authored?

10       A.    Right.

11       Q.    That's all I wanted to ask about that one.

12            The next exhibit I would like to show you

13    begins with Bates number 3909.  It's an incident dated

14    January 3, 2012.

15            MR. MCKINLEY:  Sorry, the date again was

16       January --

17            MR. CHASIN:  January 3, 2012 begins on Bates

18       number 3909.

19            MR. MCKINLEY:  And I apologize, I think that's

20       one I don't have today with me.

21            MR. CHASIN:  Okay.  Well, let's see --

22            MR. MCKINLEY:  I'm not sure why.  3909?

23            MR. CHASIN:  Yes.  And actually the one that I

24       specifically wanted to ask about was 3911.  It's in

25       the same date.

Page 112

1      MR. MCKINLEY:  Thank you.  I have located that.

2      MR. CHASIN:  The last page is 3916.

3      MR. MCKINLEY:  So make this Exhibit 3 then?

4      MR. CHASIN:  Yes.

5      (Exhibit 3 was marked for identification.)

6      Q.   Officer Choquette, I would like to direct your

7   attention to what I think is the third page in that

8   beginning Bates number 3911?

9      A.   Okay.

10      Q.   It's called nature of incident protective

11   action involving yourself and D/D Franklin.  Is this the

12   incident which you testified about earlier today?

13      A.   Yes.

14      Q.   Or is it a different incident?

15      A.   This is the one I testified to.

16      Q.   Okay.  Which juvenile was this?

17      A.   I believe this was V      , J

18      Q.   Was V      J       injured at all in connection

19   with this incident?

20      A.   No, not that I recall.

21      Q.   In the middle of this narrative --

22      A.   Uh-huh.

23      Q.   -- it says I then -- sort of towards the

24   bottom -- I then placed Juvenile -- I presume that's

25   J      since it's redacted -- in the holding cage, LPN

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 113

1   Bennett noted, and then it appears to be whited-out?

2       A.   Correct.

3       Q.   What did that say?

4       A.   I can't recall.  It would have been whatever if

5   he had had an injury or -- that's where it would have

6   been.

7       Q.   I would like you to turn to the next page.

8       A.   Uh-huh.

9       Q.   There's some photos -- what I believe were

10  photos.

11      A.   Right.

12      Q.   But they're redacted.  Were these photos?

13      A.   Yes.

14      Q.   What did they show?

15      A.   They showed V⌐‾‾¬ J⌐     ⬛'s face and head.

16      Q.   Why did they show his face and head?

17      A.   Every protective action that we have or a fight

18  we'll take photographs of the juvenile's face and head.

19  Or if there's a specific area that has an injury we'll

20  take a photograph of that too.

21      Q.   On the first page it says a parenthetical ATW

22  same day?

23      A.   Correct, he left that same day.

24      Q.   He left where?

25      A.   He went home.  He went out.  He got out.

Page 114

1    Q.    Do you know what ATW stands for?

2    A.    Everybody says it stands for all the way.  I

3    doubt if that's the actual acronym for that but that's

4    what we say.  It's all the way.

5    Q.    Did you take these photos yourself?

6    A.    I can't remember.  Usually I do not because my

7    phone is not very particularly modern, and I have a hard

8    time sending the photographs to the sergeant's e-mail,

9    so normally it's not my phone.

10    Q.    So looking -- I know you had testified about

11    this incident generally before, but looking at this

12    report now was any guard inside the dorm?

13    A.    Deputy Franklin, yes, he was inside the dorm.

14    Q.    He was inside the dorm when the fight occurred?

15    A.    Correct, making a dorm round.

16    Q.    Right.  And at the time that you responded did

17    you know what this was about?

18    A.    No, I didn't.  I noticed it when he was walking

19    him out, and I saw them -- first saw them J_____ was

20    sitting on the floor.

21    Q.    And where were you at that time?

22    A.    It was one of the few days where I worked the

23    direct file side.  I think I was coming out of the Delta

24    dorm doing my dorm round, and that's when I saw him out

25    in the common area and I rendered assistance.

Page 115

1      Q.   Would video have captured this incident?

2      A.   It would have captured the fight and the

3   portion where Deputy Franklin escorts him out of the

4   dorm.  Once they're in the common area though there's no

5   video camera out there.

6      Q.   Did you review video for this incident?

7      A.   I didn't review any for that.  I don't know if

8   Deputy Franklin was shown video of the fight and his

9   portion of it.

10     Q.   Do you know that video exists for this incident

11  or existed at the time?

12     A.   I can strongly assume that it does.  I don't

13  know for that fact but --

14     Q.   I would like to move to the next exhibit which

15  is going to start on 3898 and run through to 3897.  Yes.

16  And I think these are consecutively paginated.

17          MR. MCKINLEY:  I'm sorry, 3898 through what?

18          MR. CHASIN:  Let me read them to you.  3898,

19      3899, the next one I assume is 3900 but it's blacked

20      out.  I can't see it.  The next one is 3901, 3902,

21      03, 04, 05, the next one is blacked out but I assume

22      it's 06, 07, 08.  So the starting document is 3898

23      and goes to 3908.  And I think I just have one or

24      two questions on this.

25          MR. MCKINLEY:  January 6, 2012?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 116

1           MR. CHASIN:  Yes.

2           (Exhibit 4 was marked for identification.)

3      Q.   Officer Choquette, is this the fight that you

4   were testifying about earlier in the cage?

5      A.   Yes, M____ and G(

6      Q.   And were either of those inmates injured?

7      A.   Not that I recall.  And from looking at it it

8   doesn't look like there was any note -- there's nothing

9   big enough to note any kind of injuries, so I don't

10  think they were injured from their fight, and from the

11  protective action there was nothing.

12     Q.   You don't remember any injuries?

13     A.   No.

14     Q.   That's all I have on that -- excuse me for a

15  second.  I would like to turn to the next exhibit which

16  begins on 3917 and runs to 3928.

17          MR. MCKINLEY:  This will be Exhibit 5 then?

18          MR. CHASIN:  Uh-huh.

19          MR. MCKINLEY:  Take a minute and have a look at

20     that.

21          (Exhibit 5 was marked for identification.)

22     Q.   Officer Choquette, who were the juveniles

23  involved in an incident?

24     A.   These would be W____ -- I believe it was

25  W____ and K(        ), K(_____

Page 117

1      Q.    Thank you.  You had testified earlier today

2   about an incident on the top tier.  Is this the same or

3   a different incident?

4      A.    Yes, this is it.

5      Q.    This is the same incident --

6      A.    Yes.

7      Q.    -- that you testified about earlier?  Okay.  So

8   looking at this -- and I'm sorry, I want to direct you

9   to the specific page that I'm at.

10      A.    Uh-huh.

11      Q.    I'm at 39 -- Bates number 3918.

12      A.    Yes.

13      Q.    In the middle of the narrative it says that

14   both juveniles then separated?

15      A.    Okay.

16      Q.    Juvenile -- it's redacted -- did not comply

17   with orders to lie prone on the floor but moved past me

18   and was intercepted by D/D Franklin --

19      A.    Correct.

20      Q.    -- who sprayed him to make him comply and lie

21   prone on the floor.  So that juvenile -- do you know

22   which juvenile is referred to here?

23      A.    I think it was K

24      Q.    So Juvenile K        had been separated and was

25   longer fighting --

Page 118

1      A.   Yes.

2      Q.   -- with the other juvenile?  And then this

3  sentence -- the next sentence after this, I approached

4  Juvenile -- is that K_____?

5      A.   No.  It would have been W_____   I believe it

6  was W_____

7      Q.   I approach Juvenile W____, and he dropped

8  prone to the floor without being sprayed a second time?

9      A.   Correct.

10     Q.   Why did you spray -- why did you spray K_____

11 I think the second time?

12          MR. MCKINLEY:  Object to the form.  I think the

13     testimony was that the other officer sprayed K____

14     a second time.

15     Q.   Yes, I apologize.  It says that deputy --

16 D/D Franklin intercepted the juvenile --

17     A.   Uh-huh.

18     Q.   -- and then sprayed him to make him comply?

19     A.   Right.

20     Q.   Why did he do that?

21     A.   Obviously he was trying to run past him.

22          MR. MCKINLEY:  Form.

23     A.   He wasn't complying with orders to get on the

24 floor and stay still.

25     Q.   In this incident there's just two juveniles

Page 119

1   fighting?

2      A.   Uh-huh.

3      Q.   They had already stopped fighting?

4      A.   Correct.

5      Q.   Why was it necessary to use spray a second time

6   after they had stopped fighting?

7      A.   Mainly because on the top tier it's only about

8   three feet wide and then there's stairs.  If he had

9   pushed past Deputy Franklin there's a chance he could

10  have fallen down the stairs.  Deputy Franklin was trying

11  to establish control immediately.

12     Q.   Who could have fallen down the stairs?

13     A.   K_____ .

14     Q.   Uh-huh.  It says that -- it says that D/D

15  Franklin intercepted --

16     A.   Yes.

17     Q.   -- the juvenile?  What does that mean?

18     A.   He intercepted him.  He was behind me.  K_

19  pushed past me.  Deputy Franklin intercepted him.  I

20  wasn't watching.  I have no idea how he intercepted him.

21     Q.   But that means that he was holding the

22  juvenile?

23     A.   He stopped him.

24     Q.   He stopped him?

25     A.   Yes.

Page 120

1    Q.   So how could he get to the stairs if he had

2   been stopped.

3         MR. MCKINLEY:   Object to the form.

4    A.   Because right --

5    Q.   I'm sorry?

6    A.   Right behind Deputy Franklin would have been

7   the stairwell.

8    Q.   Having intercepted the -- having intercepted

9   the juvenile already why was it necessary to spray him?

10   A.   To make him comply.

11   Q.   Couldn't Deputy Franklin make him comply

12  without using spray having intercepted him?

13   A.   I have no idea.  You would have to ask him.

14   Q.   Was this incident on video?

15   A.   Yes.

16   Q.   Did you review the video afterwards?

17   A.   I believe so.

18   Q.   When the fight started was a guard inside of

19  the dorm in this incident?

20   A.   No.  I don't believe there was a deputy inside

21  the dorm.

22   Q.   At the time that you responded to the fight did

23  you know what it was about?

24   A.   No.

25   Q.   Did you know how it started?

Page 121

1      A.    No.

2      Q.    Why didn't you know how it started or what it

3   was about?

4      A.    When I first observed it they were fighting.  I

5   didn't --

6      Q.    Is it because you can't hear through the glass?

7      A.    When I first noticed it they were already

8   fighting.

9      Q.    But you couldn't hear anything before that?

10     A.    No.

11     Q.    And that's because of the glass --

12     A.    Yes.

13     Q.    -- separating?  And how long had the fight been

14  going on before you saw what was happening?

15     A.    I have no idea.

16     Q.    You don't because you didn't notice it, you

17  couldn't tell how long --

18     A.    I hadn't seen it started.

19     Q.    Right -- it started?  And at the time that you

20  did notice it you were at your desk in the guard's

21  common --

22     A.    No.  I was in the common area.  I don't recall

23  what I was doing.

24     Q.    And you used the spray that was on your person?

25     A.    Yes.

Page 122

1     Q.   And was the dorm door closed --

2     A.   Yes.

3     Q.   -- when you responded?

4         Officer Choquette, that's all the questions I

5  have about that report.

6     A.   Okay.

7     Q.   The next report is just a single page.

8         MR. VAZQUEZ:  What exhibit number was the last

9  one?

10       MR. CHASIN:  What was the Bates number?

11       MR. VAZQUEZ:  No exhibit number.

12       MR. MCKINLEY:  Five.

13       MR. CHASIN:  That was five.

14       MR. VAZQUEZ:  Thank you.

15       MR. CHASIN:  Sure.  This is the next one that

16  is I have 04895.

17       MR. MCKINLEY:  Do you want to make that the

18  next exhibit in the order?

19       MR. CHASIN:  Yes.  That will be Exhibit 6.

20       MR. MCKINLEY:  I'm actually just doing this old

21  school.  I'm writing it myself so if you don't want

22  it done that way --

23       (Exhibit 6 was marked for identification.)

24     Q.   Okay.  Officer Choquette, this document says

25  nature of incident, witness to a protective action?

Page 123

1    A.    Correct.

2    Q.    Parenthetical aftermath?

3    A.    Correct.

4    Q.    And it says date of incident January 22, 2012?

5    A.    Correct.

6    Q.    And you signed it on February 14, 2012?

7    A.    Uh-huh.

8    Q.    Approximately three weeks after the incident?

9    A.    Correct.

10   Q.    And it says in the beginning of the narrative

11   on February 14, 2012 I was questioned about a protective

12   action that occurred on January 22, 2012 in Charlie dorm

13   of building three.  Why were you questioned?

14   A.    At the end of -- when I had come in they had

15   the juveniles in the cage and I showered them, and so I

16   was considered a witness to the protective action.  They

17   just wanted me to document what I had done.

18   Q.    Okay.  Why didn't you write -- if you were a

19   witness why didn't you write a report at the time?

20   A.    I didn't see the protective action.  I'm

21   documenting -- that's just a title, witness to

22   protective action.  I'm documenting my actions that day

23   that I was involved in.

24   Q.    Okay.  So you didn't see it, but why were you

25   asked to write a report after the fact then?

Page 124

1      A.    That's what I was asked to do by my

2    supervisors.

3      Q.    Do you know why you were asked?

4      A.    I have no idea.

5      Q.    Okay.  It then says about three lines down

6    D/D Hertel and D/D Gay were in the building 3 control

7    room typing reports from a protective action that had

8    occurred approximately 1650 hours?

9      A.    Correct.

10     Q.    What did those officers say about the

11   protective action to you?

12     A.    You know, I don't remember was if it was a

13   fight or if they were having problems with a juvenile.

14   I can't recall.

15     Q.    How did you find out that it was a protective

16   action --

17     A.    They told me they had --

18     Q.    -- at 1650 hours?

19     A.    They had told me that they had sprayed.

20     Q.    They had told you they had sprayed --

21     A.    Sprayed individuals and they were in need of

22   being showered.

23     Q.    Did they say anything else?

24     A.    If they did I can't recall.  I wasn't involved

25   so -- I caught the tail end of it.

Page 125

1      Q.   About a line or two down it says I entered

2   Charlie dorm in cell number four in which the juveniles

3   who had been sprayed in the common area of Charlie dorm

4   had run into during the protective action?

5      A.   Uh-huh.

6      Q.   How did you know that the juveniles had been

7   sprayed in the common area of Charlie dorm and that they

8   had run -- and that they had run into cell 4 as that

9   indicates?

10     A.   I believe I was told by either Deputy Hertel or

11  Gay.  I can't recall who.

12     Q.   So you have no personal knowledge --

13     A.   No.

14     Q.   -- of how or where or when they were sprayed?

15     A.   No, I don't.

16     Q.   And you had said earlier today --

17     A.   Uh-huh.

18     Q.   -- that the smell of the spray essentially

19  evaporates in a few minutes?

20     A.   Correct.

21     Q.   And you say I did not notice any sign -- I'm

22  continuing -- I did not notice any sign of orange

23  residue from chemical spray in the room where the four

24  juvenile -- when the four juveniles got ready for

25  showers?

Page 126

1      A.    Correct.

2      Q.    And before that you said I did not detect the

3  odor of chemical agent in the cell?

4      A.    Correct.

5      Q.    Would you have expected to detect the odor of

6  the chemical agent in the cell?

7      A.    Not really, no.

8      Q.    And why is that?

9      A.    Like I said after a few minutes you're not

10  going to smell.

11      Q.    Okay.  So it's possible that -- it's possible

12  that they had been -- excuse me.  It's possible then the

13  room had been sprayed but the smell evaporated; is that

14  correct?

15      A.    It's possible.

16      Q.    Okay.  And as we established you were writing

17  this report approximately three weeks after the

18  incident.  You say that I did not notice any sign of

19  orange residue.  Is that something that you would

20  typically look for when you enter a room?

21      A.    If it had been sprayed recently within the

22  first few minutes you will see the orange residue of the

23  chemical agent.

24      Q.    Did you have reason to think that it was -- did

25  you have reason to think that there would be orange

Page 127

1   residue in the room when you went up there?

2       A.   No.

3       Q.   So did you look when you went up into the room

4   for orange residue?

5       A.   Not specifically, no.  I was asked to put down

6   what I noticed when I went into the room.

7       Q.   And would the color of the spray have

8   dissipated the same way that the smell does after a

9   couple of minutes?

10      A.   Yes.

11      Q.   Who specifically asked you to write this

12  report?

13      A.   Lieutenant Borders.

14      Q.   Lieutenant Borders.  What did he say?

15      A.   To write what I noticed that day and what my

16  actions were.

17      Q.   And how did you respond?

18      A.   I told him I would do it.

19      Q.   Did you say anything else?

20      A.   No.

21      Q.   Did the lieutenant ask you to write

22  specifically about the pepper spray?

23      A.   He asked me if I had noticed and to put it in

24  my report if I had or not.

25      Q.   Okay.  And that's how you chose to write these

Page 128

1    details --

2        A.    Correct.

3        Q.    -- in the report?

4              And again, this is all based upon your

5    recollection?

6        A.    Correct.

7        Q.    From three weeks prior to the incident?

8        A.    After.

9        Q.    Three weeks after the incident?

10       A.    Correct.

11       Q.    Did you review a video?

12       A.    No, I didn't.

13       Q.    There is no video of what occurred in the room?

14       A.    If -- in the room, no.

15       Q.    Did you review anything else before preparing

16   this report?

17       A.    No, I didn't.

18       Q.    Did you speak to anybody else before preparing

19   this report?

20       A.    No.

21       Q.    Besides the lieutenant?

22       A.    Yes.

23       Q.    I have just a little bit more on documents,

24   Officer Choquette.  I would like to turn to Bates number

25   4087.  It runs from 4087 to 4104.  This will be

Page 129

1    Exhibit 7.

2         MR. MCKINLEY:   That's involving the March 21,

3    2012 incident?

4         MR. CHASIN:   Yes.

5         (Exhibit 7 was marked for identification.)

6    Q.   Officer Choquette, is this the incident which

7    you had testified about earlier today?

8    A.   Yes.

9    Q.   Could you look at the first page of that set.

10   At the very bottom there's a comments section.

11   A.   Uh-huh.

12   Q.   It says p-a-y, pay, and then there is a word

13   redacted.  What was the redacted word?

14   A.   I have no idea.  We never see this top document

15   unless it's something like this.

16   Q.   Who prepares this document then?

17   A.   The lieutenant, and it gets bumped up to the

18   captain.

19   Q.   So do you never -- do you ever see these

20   reports?

21   A.   Only in situations like this where we're

22   reviewing something.

23   Q.   I see.

24   A.   I have no involvement in the creation of this.

25   Q.   Then what is it based on?  The person that's

Page 130

1    drafting this protective action report --

2        A.    Uh-huh.

3        Q.    -- how do they draft it?  What is the basis for

4    writing the report?

5             MR. MCKINLEY:  Object to the form.

6        A.    You would have to ask them.  I don't have any

7    involvement with it.

8        Q.    Okay.  So I think you said that the lieutenant

9    would have drafted this report?

10       A.    Yes.

11       Q.    Do you give them the information to draft the

12   report?

13       A.    They go by our reports.

14       Q.    Okay.  So you would draft an incident report?

15       A.    Correct.

16       Q.    And then based upon that incident report they

17   would then draft the protective action report?  They

18   being the lieutenant.

19       A.    Correct.

20       Q.    Would they speak to you to get additional

21   information to draft the action report -- protective

22   action report?

23       A.    I can't think of anything extraneous outside of

24   the report that they would use.

25       Q.    So for example in the middle it says summary of

Page 131

1    all protective action used on this subject?

2        A.   Uh-huh.

3        Q.   It has the box verbal checked, physical checked

4    and then chemical checked.  How would they know those

5    are the correct boxes to check if the individual

6    drafting this wasn't actually involved in the incident?

7            MR. MCKINLEY:  Object to the form.

8        Q.   They -- go ahead.

9        A.   I don't understand what you mean.

10       Q.   Okay.  Let me ask again.  So I think you said

11   earlier that the lieutenant would have prepared this

12   report?

13       A.   Correct.

14       Q.   Would he have checked the three boxes in the

15   middle of this report?

16       A.   Yes.

17       Q.   On what basis would he have checked those

18   boxes?

19       A.   You would have to ask him.  I have no idea.

20       Q.   And a little bit below --

21       A.   Uh-huh.

22       Q.   -- there's a subject data section, and it has

23   the inmate juvenile -- it has several boxes, subject,

24   name, et cetera?

25       A.   Correct.

Page 132

1      Q.    Book-in number, subject resistance for example.

2    It says aggressive here?

3      A.    Uh-huh.

4      Q.    How would -- where would that information come

5    from?

6            MR. MCKINLEY:   Form.

7      A.    From the body of the report.

8      Q.    And how about -- let me ask about other

9    information in that section.   It gives -- it asks for

10   height -- there's a box for height and weight and sex

11   for example.   Where would that information come from?

12     A.    I don't know where he gets that information

13   from.

14     Q.    Okay.   And the word aggressive -- I don't think

15   aggressive is used in the narrative of the next page of

16   the incident report itself.   How would the person

17   drafting the protective action report decide to use the

18   word aggressive?

19           MR. MCKINLEY:   Same objection.

20     A.    You would have to ask him.

21     Q.    And going back to these other lines such as

22   race, sex, date of birth, where is that information

23   generally available at the jail?   For example is it

24   maintained on a computer, on logs or elsewhere?

25     A.    Multiple places.   We have that information on a

Page 133

1   locator card in the classification screen, in the

2   book-in screen.

3        Q.    Anywhere else?

4        A.    Not that I can think of.

5        Q.    And it says -- again, going back to the

6   comments at the bottom it says video attached.  Did you

7   see a video in connection with this incident?

8        A.    Yes.

9        Q.    Why did you see the video?

10       A.    I was involved in it.

11       Q.    Do you typically review video if you're

12   involved in an incident?

13       A.    Yes.

14       Q.    Do you review it before writing the incident

15   report or afterwards?

16       A.    Afterwards usually.

17       Q.    Did you do anything after reviewing the video?

18       A.    No.

19       Q.    And turning to the next page where the

20   narrative is who are the individuals whose names are

21   redacted?  It says juvenile redaction and juvenile?

22       A.    Is this the same -- I can -- I guess it was

23   B_____ G_____ and L_____

24       Q.    Were either of those juveniles injured in this

25   incident?

Page 134

1      A.    I don't believe so.

2      Q.    And at the time that -- at the time that this

3  fight occurred was any guard inside of the dorm?

4      A.    Yes.  I was at the dorm door.

5      Q.    Were you inside of the dorm or outside or --

6      A.    I was in the door.  I was in the doorway.

7      Q.    In the doorway?

8      A.    For all intents and purposes I was in the dorm.

9      Q.    The door was open and you were in the doorway?

10     A.    Yes.

11     Q.    What are you doing in the doorway?

12     A.    I was moving juveniles that had been to first

13 appearance to Bravo dorm.

14     Q.    So being situated in the doorway at the time

15 that the fight started did you know what it was about?

16     A.    No, I didn't.

17     Q.    Did you know how it started being there?

18     A.    Juvenile G_____ struck L    in the face.

19     Q.    And did -- you saw that at the time that you

20 were standing in the doorway?

21     A.    Yes.

22     Q.    Could you hear them before that occurred?

23     A.    I wasn't concentrating on what they were

24 talking about.  I was concentrating on my job, what I

25 was doing at the time.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 135

1      Q.    Was -- and this refers to yourself and Deputy

2    Hertel.   Was Deputy Hertel inside the dorm at the time?

3      A.    No.  He was at the desk outside of the door.

4      Q.    Was there any other -- was there another

5    officer inside of the door?

6      A.    No.

7      Q.    Officer Choquette, I would like to go to the

8    next exhibit.  This one is Bates number 4085, 04085.

9    It's for the March -- it's from March 22, 2012.

10         MR. MCKINLEY:  Okay.

11         MR. CHASIN:  I'm sorry and it ends on 4083.

12         MR. MCKINLEY:  I have one beginning 4083 and

13      beginning 4086.

14         MR. CHASIN:  Right.

15         MR. MCKINLEY:  Will that do?

16         MR. CHASIN:  Yeah, it actually begins on 4084.

17      I'm sorry, my pages were out of order.  It's goes to

18      4085 and 4086.

19         MR. MCKINLEY:  And the date being March 22.

20         MR. CHASIN:  March 22, right.

21         MR. MCKINLEY:  2012?

22         MR. CHASIN:  Uh-huh.

23         MR. MCKINLEY:  So we want to make this the next

24      exhibit in order which is Exhibit 8.  I'll give my

25      esteemed co-counsel defendant an opportunity.

Page 136

1      Sorry, Ramon.  I just wanted to use the term

2      esteemed.

3              MR. VAZQUEZ:  I appreciate it.

4              (Exhibit 8 was marked for identification.)

5      Q.    Officer Choquette --

6      A.    Uh-huh.

7      Q.    -- looking at the first page it says video

8   attached in the comments section?

9      A.    Yes.

10     Q.    JB -- can you make out what it says after that?

11     A.    No.

12     Q.    You don't know what that means?

13     A.    No idea.

14     Q.    Did you review the video in connection with

15  this?

16     A.    Yes.

17     Q.    And is this the same incident that you were

18  testifying about earlier today?

19     A.    Yes.  This is R_____ 'W_____ ◄.

20     Q.    And was R_____ W____ injured in this

21  incident?

22     A.    No.

23     Q.    And the next -- excuse me, the next page is a

24  picture?

25     A.    Yes, such as it is.

Page 137

1      Q.   There's a section that's blacked out underneath

2   of this photo?

3      A.   Uh-huh.

4      Q.   Do you know what that said?

5      A.   I believe it said his name, identified who it

6   was.

7      Q.   And I have a few more questions for you.  This

8   doesn't involve the exhibits for now.

9           Officer Choquette, earlier today you had

10  testified that you were deposed once by the state

11  attorney?

12     A.   Yeah.

13     Q.   Related to a protective action?

14     A.   I don't think it was a video deposition -- I

15  don't think -- it was for a protective action, and it

16  involved the state attorney and they asked me questions.

17  I'm not -- I don't think it was a deposition like this.

18  It was -- I don't know what it was but --

19     Q.   Do you remember when that was?

20     A.   Oh, God, maybe a year or two after I started,

21  2001, 2002.

22     Q.   What were the circumstances?

23     A.   An inmate refused to move from one cell to

24  another.  I was trying to relocate.  He said he wasn't

25  going to move.  So I called for backup.  I was new.  I

Page 138

1    wasn't sure.  And a sergeant responded and a lieutenant

2    responded, and we ended up deploying chemical agent and

3    there was -- I got hit in the face.

4         Q.   So was this in connection with an

5    investigation?

6         A.   No.

7         Q.   Was that inmate being charged with a crime?

8         A.   Battery on an officer.

9         Q.   Is that why you were being deposed then?

10        A.   Yes, yes.

11        Q.   Were you subpoenaed for that?

12        A.   I was but he pled out.

13        Q.   And earlier you had testified that you worked

14   for the Department of Corrections --

15        A.   Yes.

16        Q.   -- for the State of Florida.  How many years

17   did you do that for?

18        A.   I did it for one year.

19        Q.   One year?

20        A.   Yes.

21        Q.   That was with adults?

22        A.   Yes.

23        Q.   Did you have any -- did you ever work with

24   juveniles in a jail or prison capacity before working

25   at -- excuse me, before September, October of 2011?

Page 139

1    A.    No.

2    Q.    And earlier you had testified about grievance.

3    You stated that some juveniles gave you forms to be

4    turned in?

5    A.    Yes.

6    Q.    Did you -- were you ever given a form to be

7    returned to a juvenile that contained a response to a

8    grievance or a complaint?

9    A.    No.  I believe that the -- with the juveniles

10   the response would have been verbal.  They would have --

11   the lieutenant or the sergeant would have come down and

12   verbally responded to the grievance.

13   Q.    Have you ever seen a written response?

14   A.    With adults.

15   Q.    With adults.  But not with juveniles?

16   A.    No, I've never --

17   Q.    You're not aware of any written responses to

18   juvenile complaints --

19   A.    No.

20   Q.    -- or grievances?  And Officer Choquette, I

21   believe earlier that you said that you read the

22   complaint in this case --

23   A.    Yes.

24   Q.    -- in preparation for the deposition?

25         Having read the complaint do you now recall the

Page 140

1    term test of heart?

2         A.    That's where I first saw it is in the

3    complaint.   I've never heard it in the jail.

4         Q.    Were you aware of any other terms that refer to

5    a form of testing that were used in the jail?

6         A.    Payroll, that's it.

7         Q.    Payroll?   Any other terms?

8         A.    No.

9         Q.    Officer Choquette, since September of 2011 have

10   you worked with any adult inmates?   In other words,

11   since September 2011 while working -- since September

12   2011 you've been working with juveniles at Central

13   County Jail?

14        A.    Correct.

15        Q.    Have you -- since that time have you also had

16   occasion to work with adult inmates?

17        A.    While working with juveniles.

18        Q.    In other words, for example working a shift

19   with juveniles at the Central County Jail and then

20   another shift, separate shift --

21        A.    Yes.

22        Q.    -- working with adults?

23        A.    Yes.   This happened on a few occasions.

24        Q.    On a few occasions.   How frequently, once a

25   month or once a week?

Page 141

1      A.   Maybe once a month.

2      Q.   How many times all together do you think since

3  September 2011?

4      A.   Less than ten.

5      Q.   Why do you work those shifts with adult

6  inmates?

7      A.   That's really at the discretion of the

8  sergeant.

9      Q.   What do you mean by that?

10     A.   Job placement, you know, he rotates people in

11  their job placement, what buildings they are going to

12  work except for the juvenile officers.  If he's got

13  enough juvenile officers to staff the floor and there's

14  one extra then he tries to rotate us by placing us

15  outside of the juvenile dorms.

16     Q.   If a change like that occurs would it be

17  reflected on the assignment sheet --

18     A.   Yes.

19     Q.   -- for that day?

20          And Officer Choquette, earlier you had

21  testified about two reprimands I believe --

22     A.   Yes.

23     Q.   -- with Polk County Sheriff's Office?

24          Do you recall a reprimand involving a firearm

25  discharging?

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 142

1      A.    Oh, yes, yes, I forgot about that one.   It was

2  an accidental discharge.

3      Q.    Having recalled that one are there any others

4  that come to mind?

5      A.    No.   I believe that was it.

6      Q.    Have you ever used pepper spray in response to

7  a juvenile not obeying a command?

8      A.    No.

9      Q.    Have you ever used preparer spray in response

10  to a juvenile being disrespectful?

11      A.    No.

12      Q.    Since March 22, 2012 how many protective

13  actions have you been involved in?

14      A.    Since March?

15      Q.    Uh-huh, since March 22, 2012.   And the reason I

16  refer to that date, it's the last one that we discussed.

17      A.    Uh-huh.   I can't recall exact number.   More

18  than two, less than six.

19      Q.    Since September 2011 have you used pepper spray

20  for any occasion in which you did not write a report?

21      A.    No.

22      Q.    Since September 2011 have you used any other

23  form of force for which you did not write a report?

24      A.    No.

25      Q.    Since September 2011 have you participated in

Page 143

1    any protective action in which you did not write a

2    report?

3        A.    No.

4        Q.    Since September 2011 have you responded to a

5    fight with Sergeant Mitchell?

6        A.    Not that I can recall.  He works the opposite

7    shift of me.

8        Q.    What do you mean by opposite shift?

9        A.    He works Alpha platoon.  The days I'm off he

10   works.

11       Q.    Okay.  So you wouldn't be working together

12   then --

13       A.    No.

14       Q.    -- on the same shift?

15       A.    No.

16       Q.    Officer Choquette, thank you very much.

17             MR. CHASIN:  Counsel, do you have anything?

18             MR. VAZQUEZ:  I do.

19             MR. MCKINLEY:  I'm going to let Ramon start and

20       I'll see what I have in my notes.

21                       CROSS EXAMINATION

22   BY MR. VAZQUEZ:

23       Q.    Good afternoon, Deputy Choquette.  I represent

24   Corizon Health, the medical provider in the Polk County

25   Jail Central.

Page 144

1    A.    Uh-huh.

2    Q.    Just for clarity purposes Mr. Chasin has used a

3    date of September 2011.  When were the juveniles

4    transferred to Polk County Central, was it September or

5    October?

6    A.    It was October.  We received direct files I

7    believe it was first week of October.  We received them

8    about two weeks before we received the pre-adjudicateds.

9    Q.    Thank you.

10   A.    And then we received them -- it was the

11   beginning of the October.  I can't remember the exact

12   date.

13   Q.    Okay, I appreciate that.  Regarding my clients,

14   the medical provider at the jail, has there ever been a

15   time where -- to your knowledge where they have refused

16   to provide medical services to the juvenile inmates?

17   A.    No.

18   Q.    Have you ever seen them, meaning the medical

19   providers for the county jail, be deliberately

20   indifferent to the medical needs of the juveniles at the

21   county jail?

22   A.    No.

23         MS. GALLONI:  Object to the form.

24   Q.    I'm sorry, your answer is?

25   A.    No.

Page 145

1          MR. VAZQUEZ:  Thank you.  That's all I have.

2          MR. MCKINLEY:  You were quick.

3                    RECROSS EXAMINATION

4     BY MR. MCKINLEY:

5          Q.   I only have a couple of questions.  You were

6     asked about the -- Officer Choquette, you were asked

7     about any substantial differences between the care,

8     custody and control of juveniles and adults, and I just

9     want to -- and some of the things that were discussed

10    were as far as -- it was separated, care, nurses

11    addressing problems, adequate attention, custody -- and

12    I'm not suggesting this is comprehensive but keeping

13    people separated based on age and control, following

14    rules of the facility.  And I think one of the comments

15    was that potentially there was no substantial difference

16    between adults and the juveniles.  Do you find there's a

17    difference between the detention of juveniles and adults

18    however in total?  In other words, the rules are

19    different, aren't they?

20         A.   Yes.

21         Q.   And in terms of the means of how you can deal

22    with the juveniles for all those things there are some

23    differences, correct?

24         A.   Yes, some differences.

25         Q.   And you've been trained on those difference,

Page 146

1    correct?

2         A.    Yes.

3         Q.    There was a discussion about inmate request

4    slip, and I want to check with you, is that used for

5    things other than as a grievance form --

6         A.    Yes.

7         Q.    -- or not?  Yes, it is used for other purposes?

8         A.    The request slip is almost like a general

9    purpose document.  It has check boxes on the top for

10   different areas within the jail classifications,

11   counselor, trustee supervisor, public defenders and then

12   it says has a section on the bottom for the inmates to

13   write down what it is that they want, a request,

14   whatever it is.  And they just check off the pertinent

15   departments that they want it to go to, and they hand

16   that in.  And if it's a grievance they just write

17   grievance, and they check it off for administration, and

18   it gets turned in to the supervisors.

19        Q.    All right.  During your work in the juvenile

20   detention area do you ever work in -- strike that.  I'll

21   start with is there a control room that you refer to

22   with regard to the juvenile detention area?

23        A.    Yes.

24        Q.    Is that an area where you work as a general --

25        A.    No.

Joseph Choquette, 7/26/2012
Hughes v. Judd

Page 148

1    believe Inmates K_____ and V_____, and I think you

2    mentioned that you instructed them to stop fighting and

3    you don't think they heard you.  Do you think that was

4    because you weren't loud enough when you instructed them

5    not to fight?

6        A.   No.

7             MS. GALLONI:  Object to the form.

8        Q.   Why do you think maybe they didn't hear you?

9             MS. GALLONI:  Object.

10       A.   They were fighting.

11       Q.   Okay.  So they were distracted and didn't hear

12   you as a result of that if they didn't hear you?

13            MS. GALLONI:  Same objection.

14       Q.   You can answer.

15       A.   That's correct.

16       Q.   If you are giving an instruction to the inmates

17   to stop fighting, do you generally try to make it loud

18   enough so that they can easily hear you?

19       A.   Correct.

20       Q.   I think you described an incident between -- or

21   involving an Inmate G_____ and Inmate L_____.  And you

22   were asked I think why you might have sprayed -- and I

23   may have this wrong -- Mr. L_____ whether you sprayed

24   or maybe one of your associates sprayed Mr. L_____?

25       A.   No, I sprayed.

Page 149

1    Q.    You sprayed L███.  I think you were asked why

2    if he wasn't the aggressor, and you mentioned he was on

3    top and 250 pounds --

4    A.    He had G___  pinned.  He was on top and

5    G___  was on the bunk, and the bunk started to

6    collapse.  So the way the bunk is made there's a frame

7    that comes up over the surface of the bed.  When it

8    starts to close it will --

9    Q.    Okay.

10   A.    I didn't want his head to get caught in there.

11   Q.    Despite one inmate starting a fight or another

12   inmate starting a fight, it's not that that determines

13   whether you use spray.

14   A.    Correct.

15   Q.    It's an attempt to gain control?

16   A.    It doesn't matter who starts the fight.  If

17   inmates are fighting they all get sprayed.

18   Q.    Okay.  Until you've got control --

19   A.    Until I have control.

20   Q.    -- of the situation?  And your testimony

21   regarding the characteristics of pepper spray as a

22   general rule, that's based on what you heard and your

23   training I guess?

24   A.    Just my training and experience, twelve years

25   that's what I've observed.

Page 150

1          THE VIDEOGRAPHER:  Two minutes left on this

2      videotape.

3          MR. MCKINLEY:  All right.  You probably have a

4      couple after this.

5          MS. GALLONI:  I do have a couple.

6          MR. MCKINLEY:  Let's go ahead and switch the

7      tape.

8          THE VIDEOGRAPHER:  We're off the video record.

9              (Discussion off the record.)

10         THE VIDEOGRAPHER:  We are back on the video

11     record.

12         Q.   Officer Choquette, there was some discussion of

13     your experience or your -- what you had seen with regard

14     to some persons who were in isolation, three direct

15     files.  And I think you may recall that testimony

16     involved individuals I think named H          , H      and

17     W           .  With regard to your knowledge of their time

18     either in or out of isolation, that's based on your own

19     experience, correct?

20         A.   Correct.

21         Q.   So if there are other incidents where they are

22     outside of isolation or able to have other interaction

23     with other inmates or anyone for that matter, you may or

24     may not be aware of that based on the limit of your

25     interaction with them?

Page 151

1           MS. GALLONI:  Object to the form.

2       A.    If I'm not working, yeah.

3       Q.    Okay.  So if you're not working with them

4   you're not going to know about things that happen during

5   that time frame?

6       A.    Correct.

7       Q.    Is that fair?  Okay.  Which may include family

8   visits or attorney visits or other time; is that fair?

9       A.    Correct.

10          MS. GALLONI:  Object to the form.

11      Q.    There was some talk about grievance forms, and

12  your understanding at this point or what you've seen

13  thus far are only verbal responses to juvenile grievance

14  forms.  Do you know in fact if whether any written

15  responses are made to juvenile grievances or not?

16      A.    I don't know.

17      Q.    I think you testified about going from working

18  on the juvenile detention center to working adult

19  detention occasionally, once a month approximately; is

20  that fair?

21      A.    Once a month, once every three weeks maybe.

22      Q.    So you might go from working juvenile shift to

23  another shift working adults.  Do you have to have a

24  break before you work the juvenile shift again between

25  working the adult shift?

Page 152

1    A.   The same day -- the way it works is if I start

2    the day working with adults I can't go and work into the

3    juvenile dorm.

4    Q.   All right.

5    A.   If I start the day working with juveniles and

6    for whatever reason I'm taken out and moved to work with

7    adults I can't go back to the juveniles.

8    Q.   Okay.

9    A.   So if I start the day working transportation or

10   movement, then what that's what I do all day.

11   Q.   And don't move to the juvenile detention

12   facility?

13   A.   I won't -- no.

14   Q.   During that same day?

15   A.   During that same day.

16   Q.   Okay.

17        MR. MCKINLEY:   That's all the questions I have.

18                  RECROSS EXAMINATION

19   BY MS. GALLONI:

20   Q.   Officer Choquette, I just have a couple of

21   questions for you.  Mr. McKinley asked you about

22   different rules relating to the detention of adults and

23   juveniles.  What are those different rules?

24   A.   Mainly the programs that they have, the

25   recreation, the school requirements.

Page 153

1    Q.   When you say programs do you mean anything

2    other than the school?

3    A.   Mainly the school and the Church for Christ

4    comes in -- or Christ for Youth or -- I can't remember

5    the name.

6    Q.   So there's a church group that comes in?

7    A.   Yes.

8    Q.   Do they not go see the adults?

9    A.   They have their own separate kind of faith

10   based dorm.

11   Q.   So the adults have some faith based

12   programming?

13   A.   Yes.

14   Q.   And the juveniles -- you mentioned school.  Any

15   other programming that relates to any of the juveniles?

16   A.   Recreation, that's it.

17   Q.   Recreation.  Adults also have recreation?

18   A.   Yes.

19   Q.   So in terms of differences between the adults

20   and the children is school then the only programatic

21   difference?

22       MR. MCKINLEY:  Object to the form.

23   A.   Yes.

24   Q.   Were there any other differences -- I think

25   Mr. McKinley asked you relating to the custody, care and

Page 154

1    control of juveniles.  Are there any differences there

2    between adults and juveniles or is it the same rules

3    that apply there?

4        A.   The same rules.

5        Q.   Mr. McKinley also asked you about grievances

6    and you had testified earlier that as far as you know

7    for juveniles the responses are verbal rather than

8    written?

9        A.   That's from my experience, yes.

10       Q.   Do you know whether there is a written record

11   made anywhere of what the verbal response to a grievance

12   is?

13       A.   I can only assume it's with the administration.

14       Q.   Have you ever provided a verbal response to a

15   grievance?

16       A.   No.

17       Q.   And I assume then you've never provided a

18   written response to a grievance?

19       A.   No.

20       Q.   The inmate request form, does it have a check

21   box for grievance or does the --

22       A.   It has to be written out.

23       Q.   The juvenile has to write grievance?

24       A.   There's no grievance listing for it.

25       Q.   And there's no form that is titled grievance?