Jacques Franklin, 7/27/2012
Hughes v. Judd

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, as guardian and
on behalf of J.B., a minor;
BRENDA SHEFFIELD, as guardian
and on behalf of J.D., a minor;
FRANKY JEAN-PIERRE; MICHELLE        Case No.:
MINOR, as guardian and on behalf   8:12-cv-00568-SDM-
of J.P., a minor; LISA JOBE, as    MAP
guardian and on behalf of K.J.,
a minor; AMY GAGE, as guardian
and on behalf of B.G., a minor;
CRYSTAL CUYLER, as guardian and
on behalf of D.M., a minor;
NIKETYA MATTHEWS, as guardian
and on behalf of K.G., a minor;
and ANITA NAVA, as guardian and
on behalf of A.H., a minor; on
behalf of themselves and all
others similarly situated,

           Plaintiffs,

vs.

GRADY JUDD, Polk County Sheriff,
in his official capacity, and
CORIZON HEALTH, INC.,

           Defendants.
_____/


VIDEOTAPED DEPOSITION OF JACQUES FRANKLIN
Taken on Behalf of the Plaintiffs

Stenographically Reported by:
Donna L. Peterson, RDR, CRR
July 27, 2012

Page 5

1        THE VIDEOGRAPHER:  Would the court reporter

2    kindly swear in the witness.

3        JACQUES FRANKLIN, called as a witness by the

4    Plaintiffs, having been first duly sworn, testified as

5    follows:

6        THE WITNESS:  I do.

7                    DIRECT EXAMINATION

8    BY MR. CHASIN:

9        Q.   Good morning, Officer Franklin.

10       A.   How are you doing, sir?

11       Q.   Good, thank you.

12            Would you please state your full name for the

13    record.

14       A.   Jacques Franklin.

15       Q.   Thank you.

16            I'm Stephen Chasin, as I said before.  And

17    you're here today to have your deposition taken for

18    purposes of discovery in this lawsuit against the

19    sheriff's office and Corizon Health, Inc.

20            Have you ever been deposed before,

21    Officer Franklin?

22       A.   Post?

23       Q.   Deposed?

24       A.   Oh.  No, sir.

25       Q.   Have you ever been in a deposition before?

Page 6

1     A.    No, sir.

2     Q.    Okay.  Two basic ground rules.

3           First, please make sure you understand the

4     question that I'm asking you.  If you don't understand,

5     please let me know, and I'll try to make the question

6     clear to you.

7           And second, if you need a break at any point,

8     please let me know.  But if I'm in the middle of a

9     question, I'll ask you to answer the question first,

10    before we take the break.

11          Do you understand that you're testifying under

12    oath today?

13    A.    Yes.

14    Q.    And are you taking any drugs or medication that

15    would affect your ability to testify truthfully today?

16    A.    No, sir.

17    Q.    Thank you.

18          Officer Franklin, I'd like to start by asking

19    you some background questions.

20          What is your age?

21    A.    40.

22    Q.    Okay.  What is your height, approximately?

23    A.    5'9".

24    Q.    And your weight, please.

25    A.    230.

Page 9

1    Q.   And, Officer Franklin, was that Level 6 program

2  through the Department of Juvenile Justice?

3    A.   It was a private.  We got kids from department

4  of juvenile.

5    Q.   Okay.  Was it contracted with the Department of

6  Juvenile Justice?

7    A.   I believe so.  I don't --

8    Q.   Okay.  And what other jobs have you held since

9  graduating from high school?

10    A.   I was in the military.

11    Q.   Was that the Marine Corps?

12    A.   Yes.

13    Q.   How long were you in the Marines?

14    A.   Nine years.

15    Q.   And what was your position in the Marine Corps?

16    A.   I was a sergeant.

17    Q.   Officer Franklin, have you ever been suspended

18  or terminated from a job before?

19    A.   No, sir.

20    Q.   Okay.  Have you ever been reprimanded,

21  suspended, or disciplined while at Polk County Sheriff's

22  Office?

23    A.   No, sir.

24    Q.   Have you ever been arrested?

25    A.   No, sir.

Jacques Franklin, 7/27/2012
Hughes v. Judd

Page 10

1    Q.    Have you ever been convicted of a crime?

2    A.    No, sir.

3    Q.    And, Officer Franklin, at the Polk -- excuse

4    me, at Central County Jail, do you work primarily on the

5    direct-file side or on the pre-adjudicated side?

6    A.    Both.

7    Q.    Both.  Okay.

8          And, Officer Franklin, going forward, when I

9    refer to "the jail," I'm referring to Polk County --

10   excuse me, to Central County Jail.

11   A.    Yes, sir.

12   Q.    And also when I refer to juveniles, that could

13   include both direct-file juveniles as well as

14   pre-adjudicated.

15   A.    Yes, sir.

16   Q.    Okay.  And, Officer Franklin, do you go by any

17   nicknames?

18   A.    No, sir.

19   Q.    Your first name is Jacques.  Okay.

20         And are you aware of any names that the

21   juveniles at the jail call you, any surnames or --

22   A.    They -- sometime they cut my Franklin off to

23   Frank, but --

24   Q.    Okay.

25   A.    -- I correct them, the name's Franklin.

Page 14

1   them that you don't want to talk to them no more."

2       Q.   And which -- which children -- which juveniles,

3   excuse me?

4       A.   I can't recall which ones.  It's so long ago.

5   I can't recall their name.

6       Q.   How -- you said it was long ago.  How long ago

7   was it?

8       A.   I can't -- like, in -- let's see.  July.  About

9   four months ago.

10      Q.   Okay.  Without talking about -- without using

11  the term "Southern Poverty Law Center" or without

12  directly referring to this lawsuit, have you ever made

13  any remarks or comments in the jail insinuating Southern

14  Poverty Law Center --

15      A.   No.

16      Q.   -- or this lawsuit?

17           Officer Franklin, have ever -- has any juvenile

18  at the jail ever expressed an interest to you in filing

19  a grievance?

20      A.   Me personally, no.

21      Q.   Have you ever discussed grievances with any

22  juvenile at the jail?

23      A.   No, sir.

24      Q.   Has a juvenile ever asked you for a grievance

25  form?

Page 15

1    A.    Yes.

2    Q.    Which juvenile?

3    A.    I can't recall.  There's numerous of them.

4    Q.    And what did the juveniles say when they asked

5  you for a form?

6    A.    "Can I get a grievance form?"

7    Q.    What did you say in response?

8    A.    I would give them a form.

9    Q.    Uh-huh.

10   A.    And they'll take it and go.

11   Q.    Officer Franklin, going back to something you

12  said a second or -- a couple seconds ago, how many

13  children had asked you for -- how many juveniles had

14  asked you for forms?

15   A.    Over three.

16   Q.    Over three.  Could it have been over five?

17   A.    Possible.

18   Q.    Perhaps over ten?

19   A.    If it's over three, it's possible.

20   Q.    Okay.  Did you get a form for the children --

21  for the juveniles that had asked you for one?

22   A.    Yes, sir.

23   Q.    You gave it to them?

24   A.    Yes, sir.

25   Q.    Did you ever hear back from those juveniles --

Page 16

1    A.    No, sir.

2    Q.    -- about the grievance in any way?

3    A.    No, sir.

4    Q.    Did any of the juveniles complete the form and

5    return it to you?

6    A.    No, no.  Not to -- not to me personally, no.

7    Q.    Okay.  Have any others returned a completed

8    form to you, completed grievance form to you?

9    A.    No.

10   Q.    Okay.  And you said -- I think you said that

11   none of the juveniles had returned a completed form to

12   you.  Are you aware of juveniles returning completed

13   forms to other officers at the jail?

14   A.    Not -- no particular officer, but I have seen

15   grievance forms turned in as in the control room --

16   Q.    I see.

17   A.    -- where it's supposed to go.

18   Q.    Okay.  I may ask you some more questions about

19   that later.  I want to ask you a different question now.

20        Do you have a thumb drive or a flash drive or

21   any other form of portable computer memory device?

22   A.    Yes.

23   Q.    Okay.  Do you use that at work?

24   A.    Yes.

25   Q.    Are there any reports on it?

Page 22

1      Q.   Okay.   Officer Franklin, have you ever --

2 strike that.

3      Officer Franklin, I'd like to ask you some

4 questions about protective actions.

5      Were you involved in a protective action on or

6 around September 26, 2011, at the jail?

7      A.   Yes.

8      Q.   Okay.   What was that protective action?

9      A.   If -- I believe it was a fight.

10      Q.   Who was fighting?

11      A.   A bunch of juveniles.

12      Q.   Okay.   More than two?

13      A.   Yes.

14      Q.   Okay.   And where did this take place?

15      A.   In -- in India dorm.

16      MR. ARANDA:   Is there a way we can show it to

17 him?

18      MR. CHASIN:   I may get to that, Counsel.

19      MR. ARANDA:   Okay.   Be easier if you just

20 showed it to him.

21      MR. CHASIN:   I want to ask him some questions

22 first, and then I -- I will show him the document.

23      Q.   Officer Franklin, and where did that fight take

24 place?

25      A.   India dorm.

Page 23

1    Q.   Excuse me.  Where precisely within the dorm was

2   it in?  For example, did it take place in a cell?  In a

3   walkway?  On the first floor?  On the second floor?

4    A.   Took place in the common area.

5    Q.   In the common area in the dorm.  Okay.

6        You said that kid -- that juveniles were

7   fighting.  How were they fighting?

8    A.   How were they fighting?  Throwing fist -- fist

9   punches at one another.

10    Q.   Uh-huh.  Okay.  Were any weapons involved or --

11    A.   No.

12    Q.   What were some of the names of the juveniles

13   that were fighting?

14    A.   I couldn't recall the names.  If I had a

15   report, I could tell you.

16    Q.   Okay.  As you'll see, mine is redacted anyway.

17        S            W         was that one of the people

18   that was --

19    A.   I couldn't --

20    Q.   -- juveniles that was fighting?

21    A.   I couldn't recall.

22    Q.   Excuse me.  W         .  I mispronounced his

23   name.

24    A.   I couldn't recall who the fight on that.

25    Q.   And how did you respond to the fight?

Page 24

1   A.   If I had my report, I can tell you exactly how
2   I respond to the fight.
3   Q.   Okay.  Well, what -- what do you recall right
4   now, before you look at the report?  I'd like to ask you
5   some questions about what you remember before you look
6   at the report.
7   A.   Well, I would -- if I had the report, I can
8   tell you exactly what I did instead of me sitting up
9   here and fumbling through it.
10   Q.   Still I'm going to ask you a couple questions.
11   I just want to know what you recall right now, before
12   you look at the report.  I'm not trying to hide the ball
13   with you.  I just want to know what you recall be --
14   before you look at the -- the report.
15   Were there any injuries as a result of the
16   fight?
17   A.   I couldn't recall.  None that I recall.
18   Q.   Okay.  Well, where were you when you noticed
19   the fight?
20   A.   In the -- in -- at the desk.
21   Q.   At the desk in the -- in the guards' common
22   area?
23   A.   Yes.
24   Q.   Okay.  What were you doing at the desk?
25   A.   Observing the juveniles.

Page 25

1    Q.    Observing the juveniles in -- in that dorm, in

2    India dorm?

3    A.    Yes.

4    Q.    Was any guard inside the dorm when the fight

5    occurred?

6    A.    Not at that present time.

7    Q.    Was the dorm to India dorm closed before you

8    responded?

9    A.    Yes, it was closed.

10   Q.    Okay.  So you had to have somebody open it up

11   for you to go in?

12   A.    Right.

13   Q.    Okay.  And you're doing just fine right now,

14   Officer Franklin, in terms of answering my questions.

15         Do you know how long the fight had been going

16   before you saw what happened?

17   A.    No.

18   Q.    Why don't -- why don't you know how long they

19   had been fighting?

20   A.    Because we responded immediately.  So I

21   couldn't tell you how long.

22   Q.    I'm sorry, but I thought you just said that you

23   didn't know how long the fight had been going before you

24   saw what had happened.

25   A.    Well, we had to get -- I had to wait on my

Page 26

1   partner and we responded, so I couldn't tell you exactly

2   how long the fighting was going on.

3        Q.   You mentioned your partner.   Which partner?

4        A.   At that particular time, it was DD Choquette.

5        Q.   Okay.   Officer Choquette.   Where was

6   Officer Choquette at the time?

7        A.   I believe he was coming in towards the desk

8   from the gear locker, I believe.   I could recall exactly

9   what he was doing at the time.

10       Q.   You believe he was coming in --

11       A.   He was coming towards the desks.

12       Q.   Towards the desk.   Did you say where he was

13  coming from?   I had trouble hearing you.

14       A.   I believe he was coming from the gear locker,

15  the little -- we got a little gear locker.

16       Q.   Gear locker.   Is that in the common area?

17       A.   In officer common area.

18       Q.   The officer common area.   That's what I meant.

19            And just to be clear, that means the central

20  area -- officer central area in -- in this -- in

21  Building 3?

22       A.   No.   Building 2.

23       Q.   In Building 2.

24            At this time, and we're referring to

25  September 26, 2011, the juveniles were housed in

Page 27

1   Building 2, correct?

2        A.    Right.

3        Q.    The juveniles, the male juveniles?

4        A.    Yes.

5        Q.    The boys.

6              Could you hear the juveniles fighting --

7        A.    Could I hear?

8        Q.    -- before -- could you hear the juveniles

9   fighting before the door was opened?

10       A.    I can't recall.

11       Q.    Okay.  At the time that you responded to the

12  fight, did you know what the fight was about?

13       A.    No.

14       Q.    Do you know how it started?

15       A.    No.

16       Q.    Why -- why didn't you know?

17       A.    Because I -- I was at the desk.  I wasn't

18  actually at the fight.  So I couldn't know.

19       Q.    Okay.  But I thought earlier you said that you

20  were at the desk and you were observing India dorm?

21       A.    Correct.  But there was -- there was a barrier

22  between us and the kids.

23       Q.    What is that barrier?

24       A.    A glass.  A glass.

25       Q.    But you can see through --

Page 28

1       A.    You can see through.

2       Q.    How would that prevent you from knowing how

3    the -- the fight started or what the fight was about?

4            MR. ARANDA:   Objection to the form.

5       A.    I can't remember why -- who threw the first

6    blow, nor seeing it.

7       Q.    Okay.  How did you respond to the fight, and

8    once you entered the dorm?

9       A.    Giving commands to stop fighting.

10      Q.    And then what happened?

11      A.    At that point I can't recall exactly what

12   happened.  If I had my report, I can tell you exactly

13   what happened.

14      Q.    Uh-huh.  Did the juveniles respond to your

15   command?

16      A.    Some did.

17      Q.    What -- when they -- those juveniles that did

18   respond, what did they do?

19      A.    They went back to their cells.

20      Q.    Okay.  Officer Franklin, how many -- how many

21   juveniles were in the common area when you first noticed

22   the fight --

23      A.    I --

24      Q.    -- in India dorm, approximately?

25      A.    More than five.

Page 29

1   Q.   Perhaps more than ten?

2   A.   Possible.

3   Q.   How many were fighting?

4   A.   I couldn't tell you exactly amount that was

5   fighting.  To me at the time, it looked like all of them

6   was fighting.

7   Q.   And how many responded to your command, your

8   verbal command?

9   A.   At the time, it looked like none of them.

10   Q.   What did you do in -- what did you do to those

11   that did not respond to your verbal command?

12   A.   If -- I rather -- I rather read from my report

13   exactly what was said -- or exactly what I did, rather.

14   Q.   Okay.  Did you use spray?

15   A.   Yes.

16   Q.   Okay.  How did you use the spray?

17   A.   What do you mean, how do you use the spray?

18   Q.   Did you -- did you just -- did you spray --

19   strike that.

20        Is this -- is this the spray that you carry on

21   your person?

22   A.   Yes.

23   Q.   Okay.  And who did you spray?

24   A.   I can't recall.

25   Q.   Did you spray only juveniles that were

Page 30

1   fighting?

2       A.   Yes.

3       Q.   What happened to the juveniles that were not

4   fighting?

5       A.   If -- if they wasn't fighting, they went to

6   their room.

7       Q.   Okay.  Would video capture this -- this

8   incident?

9       A.   We had the cameras at the time.

10      Q.   What do you mean by that?

11      A.   It was cameras there, so if they -- yes.  I

12  would say yes.

13      Q.   Okay.  What -- what exactly would the video

14  camera capture?

15      A.   A fight.  A bunch of kids fighting.

16          MR. CHASIN:  Okay.  I'd like to mark as

17      Exhibit 1 the following document, which has one

18      break in Bates number, I believe.  It starts 00592

19      and goes to 00593 and then picks up at oh -- and

20      then resumes at 03629 and goes through 03677.  This

21      will be marked as Exhibit 1.

22          (Deposition Exhibit No. 1 was marked for

23      identification.)

24          MR. ARANDA:  Is that 9/26/2011?

25          MR. CHASIN:  Yes, yes.

Page 31

1        MR. ARANDA:  All right.

2     Q.   And all of these documents pertain, as your

3  counsel just said, to the incident on 9/26/11.

4        MS. GALLONI:  Steve, show it to Mr. Vazquez

5     first.

6        MR. CHASIN:  Sure.  Oh, you don't -- okay.

7        MS. GALLONI:  Although you have it now on your

8     CD, too, if you want Officer Franklin to look at it

9     at the same time.

10       MR. VAZQUEZ:  Yeah.  Well, he gave me the Bates

11    number.  I got it here.  3600 series.  I'm looking

12    for 500.

13    Q.   Officer Franklin, I know there's a stack of

14  papers there.  I'm primarily just going to ask you

15  questions about approximately the fourth or fifth page

16  in.  It's -- it's the one that begins -- that has a

17  Bates number in the bottom left corner, 3632.

18       MR. ARANDA:  Let me see if I can help you.

19       MR. CHASIN:  It's the incident report.

20       MR. ARANDA:  Is it the one he's authored?

21       MR. CHASIN:  Yes.

22       MR. ARANDA:  Is that what you're asking?

23       MR. CHASIN:  Yes.

24       MR. ARANDA:  It's these two pages, I think is

25    what he's going to refer to.

Page 32

1    Q.    Do you need a minute to -- to look at it?

2    A.    Yes.

3    Q.    Okay.  Sure.  Excuse me.

4          Are you ready, Officer Franklin?

5    A.    Sure.

6    Q.    Okay.  This is an incident report, date of

7    incident September 26, 2011; is that correct?

8    A.    Uh-huh.

9    Q.    And it has your signature on the second page,

10   number -- number 49 -- 4940; is that correct?

11   A.    Yes.

12   Q.    So you had prepared this report?

13   A.    Yes.

14   Q.    Okay.  Is this one of the documents that you

15   looked at in preparation for the deposition today?

16   A.    Yes.

17   Q.    Okay.  Officer Franklin, I'd like to direct

18   your attention to approximately -- approximately the

19   fifth -- the fifth line of the narrative -- or actually

20   it's the -- the fourth line.

21         "DD Choquette and I entered India dorm and

22   ordered all the inmates to stop fighting and return to

23   their cells or they would be sprayed with chemical

24   agent."

25         So, Officer Franklin, even if some of the

Page  33

1   juveniles had not been fighting at all, would you have

2   sprayed them if they did not obey your command?

3        A.   No.

4        Q.   And in the middle of the narrative it says,

5   "After all inmates left in the dayroom were lying prone

6   on the floor, I went around to each and determined if

7   they had been involved in the fight or had been

8   spectating."

9             Who were the juveniles that were lying prone on

10  the floor?

11            MR. ARANDA:  And I'm sorry.  I haven't gotten

12       to where you were.  My apologies.

13            MR. CHASIN:  That's okay.  I'm in --

14            MR. ARANDA:  I'm looking at your form only to

15       see where your pencil is.

16            MR. CHASIN:  That's okay.  I'm in basically the

17       middle of the narrative.  It says --

18            Do you see the second and the left margin?

19       Left-side margin, there's a second redaction sort of

20       in -- in the middle of the page.

21            MR. ARANDA:  Uh-huh.

22            MR. CHASIN:  If you go about four or five words

23       to the right of that, the sentence begins "after all

24       inmates left."

25            MR. ARANDA:  Got you.  Thank you.

Page 34

```
1              MR. CHASIN:  "All inmates left in the dayroom."

2      Q.   Who was lying prone on the floor?

3      A.   I couldn't tell you the names.

4      Q.   Were those juveniles that had been sprayed?

5      A.   Some, yes.

6      Q.   Were there some that had not been sprayed?

7      A.   Yes.

8      Q.   So having reviewed this report, do you recall

9  the names of any of the juveniles?

10     A.   D     · Mc        I knew a D      · Mc       --

11     Q.   Uh-huh.

12     A.   -- and -- and A?        .

13     Q.   Okay.

14     A.   That's all I can remember.

15     Q.   At the top of the form, at the top of the

16 narrative, there look like there are one, two, three,

17 four, five -- at least five or six black lines.

18     A.   Yeah.

19     Q.   Which look like redactions.

20     A.   Uh-huh.

21     Q.   Having seen that, do any other -- any other

22 names come to mind?

23     A.   D(     ____| M        .

24     Q.   Uh-huh.

25     A.   D(      . -- I mean A!      ¯    I can't recall
```

Page 35

 1    anyone else.

 2        Q.   Officer Franklin, you said that this was one of

 3    the -- I think you said this was one of the documents

 4    that you reviewed in preparation for today's deposition?

 5        A.   Right.

 6        Q.   Was the version of this document that you

 7    reviewed similarly redacted?

 8        A.   Yes.  It blacked out just like this.

 9        Q.   I see.

10             And in the middle of the narrative it says,

11    "DD Choquette sprayed the following inmates again," and

12    I see two black lines and "M(____," comma, "D

13             Having seen that, do you remember who -- any of

14    the other individuals, any of the juveniles or who those

15    black lines might represent?

16        A.   No.

17        Q.   So having reviewed the report,

18    Officer Franklin, can you tell me a little bit more

19    about how the juveniles were fighting?

20        A.   Now they were fighting.  They were hitting one

21    another with closed fists.  That's basically a fight.

22        Q.   Were they fighting in distinct clumps?

23        A.   No.  They were fighting all over the place,

24    sir.

25        Q.   Okay.  Were there distinct groups, for example,

Page 36

1   two juveniles fighting --

2        A.    I don't know.

3        Q.    -- in one area of the common room --

4              MR. ARANDA:  Let him -- let him finish asking

5        his question.  Okay?

6        Q.    -- and two juveniles fighting in another area

7   of the common room and two juveniles fighting in yet a,

8   as an example, a third area of the common room?

9        A.    Like I said, sir, they were fighting all over

10  the place.

11       Q.    And, again, having reviewed the report now,

12  what orders did you give, verbal orders?"

13       A.    "Stop fighting.  Return to your cell."

14       Q.    Officer Franklin, and do you see a white -- an

15  area that looks to have been whited out towards the

16  lower third portion --

17·      A.    Yes.

18       Q.    -- of the narrative?

19             What was whited out there in your report?

20       A.    Couldn't tell you.

21       Q.    It said, "The following inmates had injuries

22  noted by Nurse Wisman:  M·  ___  C     ."  Then there's an

23  area whited out.  "Not as a result of the protective

24  action," some more redaction, white out, and it

25  continues.

Page 37

1        Having seen that, does that -- does that

2   refresh your memory?

3        MR. ARANDA:  Objection; form.

4   A.   No, sir.

5   Q.   Having reviewed the documents, do you recall --

6   having reviewed the document, were any of the juveniles

7   injured in the incident?

8   A.   According to the notes, no, sir.

9   Q.   And, Officer Franklin, you prepared this

10  report.  Did Officer Choquette prepare a report as well?

11  A.   Yes, sir.

12  Q.   About the same incident?

13  A.   Yes.

14  Q.   Okay.  Did you prepare them independently?

15  A.   Yes.

16  Q.   Did you have any communications with

17  Officer Choquette in the process of preparing your

18  report?

19  A.   No.

20  Q.   So your report that we're looking at right now

21  would be in your words?

22  A.   Yes.

23  Q.   And Officer Choquette's report would be in his

24  words?

25  A.   Yes.

Page 38

1    Q.    Because they were prepared independently?

2    A.    Right.

3    Q.    And because you didn't have communications in

4    the process of writing the report?

5    A.    Right.

6    Q.    Okay.  And having reviewed this report, is

7    there anything else that you remember about this

8    incident?

9    A.    No, sir.

10   Q.    And then going a couple of pages into the

11   report, into the stack of documents that I gave you, for

12   example, Bates number 3636.  It looks like this.

13        MR. ARANDA:  It's one of the pictures.

14        You said 3636?

15        MR. CHASIN:  Uh-huh.

16   Q.    It's going to be about maybe six or seven pages

17   from the top of the report.  Okay.

18        MS. GALLONI:  That's it.

19   Q.    I think you just had your hand on it.

20        MR. ARANDA:  No, that's not it.

21        MS. GALLONI:  What's the number?

22        MR. CHASIN:  3636.

23        MR. ARANDA:  No.  This is 3669.  Go one more, I

24   think.

25        I think that's it.  Yeah, that's the one he

Page 39

1    wants you to look at.

2         Q.    What is that, that you're looking at?  Okay.

3    What is -- what is that a picture of?

4         A.    Look like a juvenile.

5         Q.    Which juvenile?

6         A.    It's Juvenile M.

7         Q.    Okay.  And why was he photographed?

8         A.    He was involved in the fight.

9         Q.    And then I'd like you to look at the next page,

10   3637.  It should be right after that one.

11             MR. ARANDA:  Yeah, that's the one he wants you

12        to look at.

13        Q.    Okay.  What is that a picture of?

14        A.    I'm assuming a juvenile.

15             MR. ARANDA:  Show for the camera what it is

16        that you're looking at.

17        Q.    You said it -- you said it looks like a

18   juvenile?

19        A.    I said I'm assuming it's a juvenile, picture of

20   a juvenile.

21        Q.    Assuming it's a juvenile.

22             Did you take this picture?  Did you --

23        A.    I can't recall if I did or didn't.

24        Q.    Did you take any pictures after this incident?

25        A.    I can't recall if I did or didn't.

Jacques Franklin, 7/27/2012
Hughes v. Judd

Page 40

1    Q.   Okay.  But the picture at the sheriff's --

2    excuse me.

3        The picture the jail have -- has would be

4    better than this picture in terms of --

5    A.   I --

6        MR. ARANDA:  If you know.

7    A.   I presume.

8    Q.   Is -- is this the quality of the picture --

9    quality of picture that you would expect to see

10   following a fight at the jail's office?

11       MR. ARANDA:  Objection to form.

12   A.   No.  I mean, I'm sure -- the pictures I done

13   took in the past didn't look like this, so.

14   Q.   Have you seen this picture before?

15   A.   I mean, I don't see a picture.  I just see

16   black writing on a paper.

17   Q.   Okay.  And, Officer Franklin, could you go a

18   couple pages further into the stack, approximately six

19   more pages, and go to this photo, which is marked 3645.

20       Yes.  What is that?

21   A.   That's a picture of a face, assuming a

22   juvenile.

23   Q.   Which juvenile?

24   A.   I couldn't tell you, sir.

25   Q.   Okay.  Looking at it doesn't refresh your

Jacques Franklin, 7/27/2012
Hughes v. Judd

Page 41

1    recollection?

2         A.   No, sir.

3         Q.   And, Officer Franklin, following this incident,

4    should pictures of every juvenile involved have been

5    taken?

6         A.   Following, like, any -- any other fights

7    besides this one?

8         Q.   After -- after this particular incident, should

9    photos of each juvenile involved have been taken?

10        A.   Yes.

11        Q.   Okay.  Could you please go about five more

12   pages further into the stack.  Bottom left-hand corner

13   is the Bates number 3653.

14             It was just a couple of pages.  I think that's

15   it in your left hand.  Yes.  Do you see a 36 -- 3653 in

16   the bottom corner of either of those?

17        A.   This is.

18        Q.   Okay.  Do you know what that is -- or excuse

19   me.

20             What -- what is this?  What is this document?

21        A.   It's black ink on a white piece of paper.

22        Q.   Do you know what's redacted in the bottom -- it

23   looks like there's a redaction in the corner of the

24   page.  Do you know what that would have said?

25        A.   No, sir.

Page 42

1      Q.   Okay.  For now that's all I have on this set of

2   documents.

3           Officer Franklin, were you involved --

4           MS. GALLONI:  Is that our exhibit copy?

5           MR. ARANDA:  Yes.  If you'll give me a sticky,

6      I'll put the exhibit number on.

7      Q.   Okay.  Officer Franklin, were you involved

8   in a separate protective action on December 28th,

9   2011?

10     A.   I can't recall that date.

11     Q.   Okay.  Do you recall a protective action, same

12  date, December 28th, 2011, involving Officers Gay and

13  Hertel?

14     A.   No.

15     Q.   Okay.

16     A.   Not by date, no.

17     Q.   Okay.  Do you recall a protective action, same

18  date, Officer Gay -- Officers Gay and Hertel in the

19  Bravo dorm day area or dayroom?

20     A.   I can't, no.

21     Q.   Okay.  And this protective action that I'm

22  referring to would have involved several juveniles,

23  more -- more than two?  Does --

24     A.   I can't recall it.

25     Q.   You can't.  Okay.

Page  43

1          And, Officer Franklin, this -- this protective

2     action that I'm referring to involved a fight.  So do

3     you recall a protective action involving a fight with

4     several juveniles on -- in Bravo dorm dayroom in which

5     off -- in which yourself, Officer Gay, and

6     Officer Hertel were involved?

7          MR. ARANDA:  Objection; asked and answered.  He

8          said he doesn't remember.

9     Q.    But --

10    A.    If I had the report, I could.

11    Q.    Uh-huh.  Okay.

12         MR. CHASIN:  Okay.  So I'd like to introduce as

13         Exhibit 2 the following document.  It starts on

14         Bates No. 03828, and I believe it runs consecutively

15         to 3838 -- strike that, actually.

16         It goes to 38 -- 3828 to -- to 3865, and then

17         goes 3872, 73, continuing to 3887, and it also

18         includes 3833, 3834, 3835, 3836, 37, and 38.

19         Here's a clean copy for you.

20         MR. ARANDA:  You got them now?

21         MR. VAZQUEZ:  I feel included now.

22         MR. ARANDA:  I'm going to put the exhibit

23         number on the right-hand corner of the front page.

24         Also apparently this was used in Exhibit 3 in Gay's

25         deposition.

Page 44

1          (Deposition Exhibit No. 2 was marked for

2     identification.)

3          MR. ARANDA:  There you go.

4     Q.    Officer Franklin, your counsel has just handed

5     you a stack of papers.  I'm going to ask you about the

6     second page, which is Bates No. 3829.

7          Officer Franklin, is this one of the documents

8     that you reviewed before the deposition today?

9     A.    I don't believe so.

10    Q.    Okay.  Having reviewed the document, does this

11    reflect -- refresh your recollection about the incident?

12    A.    Vaguely, yes.

13    Q.    What happened in the incident?

14    A.    Assuming, by the report, there was another

15    fight.

16    Q.    Okay.  Who was fighting?

17    A.    I don't know the juvenile's name.

18    Q.    Do you recall any of the juveniles' names?

19    A.    No, no, sir.

20    Q.    Okay.  This was in Bravo dorm dayroom, correct?

21    A.    Yes.

22    Q.    So these are pre-adjudicated --

23    A.    Yes, sir.

24    Q.    -- juveniles, correct?

25    A.    Yes, sir.

Page 45

1     Q.   Having said that, does that refresh your

2  recollection at all?

3     A.   No, sir, no, it doesn't.

4     Q.   Okay.  When you first noticed the fight, where

5  were you?

6     A.    I can't see where I was.  I could have been.

7  I -- I don't know if I was even working that side.  I'm

8  not aware where was I.

9     Q.   You're -- you're not even sure if you were

10  working that side?

11     A.   Yes.

12     Q.   This is a report that you authored, correct?

13     A.   Yes.

14     Q.   Okay.  And the first line of the narrative

15  says, "On the above date and time I witnessed

16  Juvenile" -- redaction.

17          Right?

18     A.   Yes, sir.

19     Q.   "One" or "I," "join in a multiple person fight

20  in the dayroom of Bravo room" --

21     A.   Yes, sir.

22     Q.   -- "involving the following juveniles."

23     A.   Yes, sir.

24     Q.   Does that help you remember if you were working

25  on that side?

Page 46

1      A.   No, not -- you can see Bravo dorm from the

2    other side.  So I don't know if I ran from the other

3    side to that side to help out or not.  So I -- I

4    couldn't tell you.

5      Q.   Okay.  And this says a multiple person fight.

6      A.   Yes.

7      Q.   What does that mean?

8      A.   More than one juveniles fighting.

9      Q.   Okay.  To have a fight, there has to be more

10   than one juvenile, so a fight -- excuse me.  There --

11   any fight would involve at least two juveniles, correct?

12     A.   Yes, sir.

13     Q.   Okay.  So by "multiple person fight," does this

14   mean at least three juveniles?

15     A.   It mean more than one.

16     Q.   How could one -- how could there be a fight

17   with only one juvenile?

18     A.   I said more than one.

19     Q.   Okay.  So --

20     A.   More than one can be four, five, six.

21     Q.   Officer Franklin, is there a difference between

22   a fight and a multiple person fight in a report?

23     A.   Is there a difference?

24     Q.   Uh-huh.

25     A.   A multiple person fight to me is more than one

Jacques Franklin, 7/27/2012
Hughes v. Judd

Page 47

1   fight.  So in my mind, multiple mean more than one, sir.

2      Q.   Okay.  What I'm getting at is:  This says a

3   multiple person fight, and I'd like to know if you think

4   there were at least three juveniles fighting.

5      A.   I'm -- yes, it -- it had to be more than three

6   juveniles fighting.

7      Q.   Right, because it says "multiple person fight."

8   Okay.

9           And you don't remember the names of any of

10  those --

11     A.   No, sir.

12     Q.   -- juveniles?

13          Okay.  Were -- were you at a desk when you

14  first noticed the fight?

15     A.   That, I don't recall.

16     Q.   Okay.  Was any guard inside the dorm when the

17  fight occurred?

18     A.   Don't recall.

19     Q.   Does -- does the report indicate whether any

20  guard was inside the dorm?

21     A.   No, it don't.

22     Q.   Okay.  Was the door to the dorm closed before

23  you responded?

24     A.   I don't recall that.

25     Q.   Do you recall if somebody had to open it?

Page 48

1      A.    I don't recall.

2      Q.    Do you know how long the fight had been going

3    on before you saw the fight?

4      A.    Don't, no.

5      Q.    Okay.  At the time you responded to the fight,

6    did you know what the fight was about?

7      A.    No, sir.

8      Q.    Okay.  Do you know how it started?

9      A.    No, sir.

10      Q.    Why didn't you know these things?

11            MR. ARANDA:  Objection to the form.

12      A.    I don't know -- didn't know.  Wasn't there.

13    Wasn't there in the dorm where the fight was at.

14      Q.    Did you find out after the fight what it was

15    about?

16      A.    I don't recall.

17      Q.    Okay.  The report says, about six lines down,

18    "DD Gay and I then moved from fight to fight using

19    chemical agent Freeze plus 2K3 on those who continued to

20    fight."

21            Did you spray any of the juveniles more than

22    once?

23      A.    No, no, sir.

24      Q.    And what does it mean, "I then moved from fight

25    to fight"?

Page 49

1     A.    One altercation to another.  That means several

2  fights.  Another fight was going on at the -- at the

3  same time as another fight was going on, basically.

4     Q.    Okay.  Does that mean that there must have been

5  at least four people fighting if there were two?

6     A.    Yes.

7     Q.    Okay.  Having read that, do you think that

8  there might have been three -- excuse me, at least six

9  juveniles fighting?

10     A.    Yes.

11     Q.    Having gone through this now, do you remember

12  the names of any of those six juveniles, six or more

13  juveniles?

14     A.    No, sir.

15     Q.    Would a video have captured this fight?

16     A.    Yes, sir.

17     MR. ARANDA:  Objection to the form.

18     Q.    What exactly would the video have captured?

19     A.    How it started, from the first -- from the

20  beginning to the end.

21     MR. ARANDA:  Same objection.

22     Q.    Officer Franklin, you said earlier that you

23  sprayed some of the juveniles.  Where did you spray

24  those juveniles?

25     A.    I couldn't -- I can't recall.

Page 50

1      Q.    Would you have sprayed them in the face?

2      A.    Possible, yes.

3      Q.    Would you have sprayed them in another part of

4  the body?

5      A.    Possible.

6      Q.    What would have determined that?

7      A.    The juvenile.

8      Q.    Did you spray juveniles in one sweeping motion?

9      A.    I don't recall.

10     Q.    Did you spray juveniles one by one?

11     A.    I don't recall.

12     Q.    Okay.  Did the juveniles say anything in

13  response to your verbal commands?

14     A.    I don't recall that.

15     Q.    Did the juveniles say anything?

16     A.    I don't recall.

17     Q.    Did you say anything other than the verbal

18  commands that you noted in your report?

19     A.    Other, no, sir.

20     Q.    So, Officer Franklin, again having looked at

21  this report, do you remember anything about how and when

22  or where you sprayed the juveniles in this incident?

23     A.    How?  No, sir.

24     Q.    Or where?

25     A.    No, sir.

Page 51

1    Q.   Officer, do you remember how many times you

2  dis -- discharged your spray during that incident?

3    A.   No, sir.

4    Q.   Did you have to get a new spray after the

5  incident?

6    A.   No, sir.

7    Q.   Officer Franklin, were you involved in a

8  protective action on January 3rd, 2012?  That's --

9  that's just the third day into the year, into this year.

10    A.   I can't recall.

11    Q.   Shortly after New Year's?

12    MR. ARANDA:  Are you done with this one?

13    MR. CHASIN:  Yes, I am.

14    MR. ARANDA:  You had a clip.  Can I --

15    MR. CHASIN:  Yeah.

16    MR. ARANDA:  Make sure we don't get them out of

17  order.

18    Q.   Officer Franklin, were you involved in a

19  protective action on January 3rd of this year involving

20  a two-person fight in C dorm, C as in Charlie?

21    A.   I -- I remember a fight, but as far as the

22  date, I can't recall.

23    Q.   Okay.  Do you remember if that fight involved

24  you breaking up a two-person fight that you had

25  witnessed while -- while standing in the Charlie dorm

Page 52

1   door?

2       A.   Vaguely, yes.

3       Q.   Okay.

4       A.   Yes, yes, yes.

5       Q.   Okay.  So having recalled that, what -- what do

6   you remember about it?

7       A.   I remember a juvenile, a kid, punch another

8   kid --

9       Q.   Uh-huh.

10      A.   -- in the face.

11      Q.   Uh-huh.  And who punched whom?

12      A.   That was Juvenile V    J    punch -- I

13  don't remember the other kid name.

14      Q.   And how did you know that Juvenile J

15  punched the other kid in the face?

16      A.   I was -- I was there at the door when it

17  happened.

18      Q.   Did you see anything before that?

19      A.   No, sir.

20      Q.   Did you hear anything before that?

21      A.   No, sir.

22      Q.   Did you hear anything before that?

23      A.   No, sir.

24      Q.   Before the punch?

25      A.   No, sir.

Page 53

1    Q.    Do you know why Juvenile J(        ) threw the

2  punch?

3    A.    No, sir.

4    Q.    Okay.  And when you first noticed the fight,

5  where were you?

6    A.    Standing at the door.

7    Q.    Okay.  What were you doing at the door?

8    A.    I believe I was talking to another juvenile at

9  the time.

10   Q.    Do you remember -- excuse me.

11         Talking to another juvenile.  Which juvenile?

12   A.    I don't recall the name.

13   Q.    Was any guard inside of the dorm?  You said you

14  were in the doorway.  Was another guard inside of the

15  dorm when the fight occurred?

16   A.    Not that I recall, no, sir.

17   Q.    Did -- did you find out what the fight was

18  about after the fact?

19   A.    I can't recall.

20   Q.    Did you talk to the juveniles after the fight?

21   A.    I believe I did, but I can't recall what was

22  said.

23   Q.    What -- what questions had you asked the

24  juvenile?

25   A.    I can't recall.

Page 54

1    Q.    Were either of the juveniles injured?

2    A.    I can't recall that.

3    Q.    And how -- how exactly were they fighting?

4    A.    It was more of a punch.

5    Q.    Uh-huh.

6    A.    Juvenile J  ____ punched juvenile, and other

7    juvenile didn't do nothing.

8    Q.    Okay.

9    A.    So it was more of a punch, one punch, and that

10   was it.

11   Q.    Okay.  Would video have captured this?

12   A.    Yes.

13        MR. ARANDA:  Objection to the form.

14        MR. CHASIN:  I'd like to introduce as Exhibit 3

15   documents Bates stamp beginning 3909, through 3911,

16   then starting up again at 3912 and ending at 3921 --

17   excuse me, 3922.

18        (Deposition Exhibit No. 3 was marked for

19   identification.)

20   Q.    Officer Franklin, I'm going to direct your

21   attention to the second page, which is an incident

22   report signed by you for -- for this incident

23   January 3rd, 2012.

24        Okay.  Having reviewed the document, do you

25   recall which juvenile was punched in the face?

Page 55

1    A.    No.

2    Q.    Do you recall anything else about the incident

3 which you haven't told me about?

4    A.    No, sir.

5    Q.    Officer Franklin, it says at the bottom,

6 Juvenile --

7          "Juvenile" -- redacted -- "signed a waiver of

8 prosecution?"

9          What's a waiver of prosecution?

10   A.    That's when a juvenile don't want to press

11 charges.

12   Q.    Okay.  Did you ask that juvenile to sign the

13 waiver?

14   A.    Yes.

15   Q.    Okay.  Why did you ask him to sign the waiver?

16   A.    That is the procedure.

17   Q.    Is that a written procedure in the jail?

18   A.    I can't recall.

19   Q.    Why is that a procedure?

20   A.    It's something that we do, do he want to press

21 charges.  It's...

22   Q.    And just above that, you see a whited-out area?

23 It says, "LPN Bennett noted," then there's an area

24 that's whited out.  Next line is also whited out.

25 Continuing, "from the assault."

Page 56

1          Seeing that, that sentence, does that refresh
2    your recollection about any injuries?
3          A.   No, sir.
4          Q.   Officer Franklin, moving forward a couple of
5    days, were you involved in a protective action -- and
6    excuse me.  I'm -- I'm done with that document now.
7          MR. ARANDA:  Do you have a clip for this one?
8    Did you?
9          MR. CHASIN:  I -- I --
10         MR. ARANDA:  We want make sure --
11         MR. CHASIN:  Sure.
12         Q.   Were you involved in a protective action on
13   January 11th, 2012, on the top tier of Charlie dorm?
14         A.   Yes.
15         Q.   Okay.  And what was that protective action?
16         A.   Fight.
17         Q.   Okay.  Who was involved in the fight?
18         A.   I don't know the names.  I can't recall the
19   names.
20         Q.   Okay.  Which officers were involved in the
21   fight?
22         A.   Myself and DD Choquette.
23         Q.   Okay.  How many people were fighting?
24         A.   Two.
25         Q.   Uh-huh.  Do you recall their names?

Page 57

1   A.   No, sir.

2   Q.   And it was on the second tier.  Was it in the

3   hallway, in the hallway or in a specific cell?

4   A.   On a -- in the hallway.

5   Q.   And where were you when you noticed that fight?

6   A.   I can't recall exactly where I was at.

7   Q.   Might you have been at a desk outside the dorm?

8   A.   Possible.

9        MR. ARANDA:  Objection to the form.

10  Q.   Were you at the desk outside the dorm?

11  A.   I can't recall.

12  Q.   Okay.  What were you doing at the time that you

13  first noticed the fight?

14  A.   I can't recall.

15  Q.   Was any guard inside the dorm when the fight

16  occurred?

17  A.   No, sir.

18  Q.   No.  Okay.

19       Was the door to Charlie dorm closed when --

20  before you responded?

21  A.   I can't recall.

22  Q.   Did somebody have to open the door?

23  A.   If it was closed.

24  Q.   Do you know how long the fight had been going

25  on --

Page 58

1      A.    No.

2      Q.    -- before you saw what happened?

3      A.    No, sir.

4      Q.    Why don't you know that?

5      A.    I can't recall what I was doing at that

6  particular time.

7      Q.    Could you hear anything from -- excuse me.

8            Could you hear anything from Charlie dorm?

9      A.    From where I was at?

10     Q.    Yes.

11     A.    I can't recall where I was at, so.

12     Q.    At the time that you responded to the fight,

13 did you know what the fight was about?

14     A.    No, sir.

15     Q.    Did you know how it started?

16     A.    No, sir.

17           MR. ARANDA:  Objection; asked and answered.

18     Q.    And why didn't you know how it started?

19           MR. ARANDA:  Objection; asked and answered.

20     A.    I wasn't there.

21           MS. GALLONI:  Sorry, I didn't hear the answer.

22     A.    I wasn't there.

23     Q.    Did you find out how the fight started

24 afterwards?

25     A.    No, sir.

Page 59

1          MR. ARANDA:  Objection; asked and answered.

2     Q.    How did you respond to the fight?

3     A.    I can't recall how.  Like how I arrived to the

4 door?

5     Q.    Uh-huh.

6     A.    I can't -- I'm assuming wherever I was, we -- I

7 ran up to the door.

8     Q.    And what did you do then?

9     A.    Proceeded upstairs, giving the commands to stop

10 fighting.

11    Q.    Uh-huh.

12    A.    And lay prone on the -- on the floor.

13    Q.    Uh-huh.  And what happened then?

14    A.    I can't actually say exactly what happened

15 without the report in front of me.

16    Q.    Does -- does that mean that you don't recall

17 anything else about the incident without the report in

18 front of you?

19    A.    That --

20          MR. ARANDA:  Objection; form.

21    A.    I mean, I don't know exactly what else I did.

22    Q.    For example, do you recall using spray in

23 the -- in this incident?

24    A.    Yes, we did.

25    Q.    You did.  Okay.  And whom did you spray?

Page 60

1     A.   I don't recall.

2     Q.   Okay.  What did Officer Choquette do in this

3  incident?

4     A.   I don't recall.

5     Q.   Do you recall -- you -- you said that

6  Officer Choquette was there?

7     A.   Yes.

8         MR. CHASIN:  Okay.  I'd like to mark as

9     Exhibit 4 the following document that begins Bates

10    No. 3923 and continues consecutively to 3928.

11        (Deposition Exhibit No. 4 was marked for

12 identification.)

13    Q.   Officer Franklin, I'm going to ask you

14 questions about the second page of this set of

15 documents.

16        MR. ARANDA:  Is that his --

17        MR. CHASIN:  Yes.

18        MR. ARANDA:  -- signature?

19        MR. CHASIN:  Yes.

20        MR. ARANDA:  All right.

21        MR. CHASIN:  Excuse me.  I meant the third

22    page.

23        MR. ARANDA:  Yeah, that's what I --

24        MR. CHASIN:  Yes.

25        MR. ARANDA:  He wants to know about the one you

Page 61

1     authored, and you had pulled it out already.

2         Q.    Okay.   Officer Franklin, I want to ask you

3     about the line -- the upper third of this document.

4             "Both juveniles then separated, and

5     Juvenile" -- redacted -- "moved past DD Choquette, and I

6     intercepted him and sprayed him with chemical agent

7     Freeze plus P2K3 because he would not comply with orders

8     to lie prone on the floor."

9             The -- when you say "both juveniles then

10    separated," at that point does that mean that they had

11    stopped fighting, from that point on?

12        A.    Yes.

13        Q.    Okay.   And in that same sentence you say that

14    you intercepted the juvenile.   What does that mean?

15        A.    That means I -- I made contact.

16        Q.    What -- what do you mean that you made contact

17    with him?

18        A.    I mean -- at that time that mean I -- after he

19    run out -- he ran towards me, I made contact and I

20    sprayed.

21        Q.    Do you mean that you were holding him?

22        A.    No.

23        Q.    By -- by "contact," you mean simply touching

24    him, or did you -- did -- were you able to stop him from

25    moving?

Page 62

1     A.   Contact, I mean sprayed, just sprayed him.  I

2  didn't touch him.

3     Q.   Okay.  So just to be clear, when you say that

4  you intercepted him --

5     A.   Uh-huh.

6     Q.   -- do you mean that you physically intercepted

7  him --

8     A.   No.

9     Q.   -- with your body, or do you mean that you used

10  the spray to intercept him?

11     A.   I used the spray to intercept.

12     Q.   I see.

13     So he was no longer fighting at that time?

14     A.   Right.

15     Q.   Okay.  And having looked at this report, do you

16  recall who the -- who the other juvenile was?

17     A.   No.

18     Q.   Okay.  Okay.

19     THE VIDEOGRAPHER:  We're off the video record.

20     (Recess from 12:23 p.m. until 12:33 p.m.)

21     THE VIDEOGRAPHER:  We are back on the video

22  record.

23  BY MR. CHASIN:

24     Q.   Officer Franklin, do you -- did you participate

25  in a protective action on February 18, 2012, involving a

Page 63

1    two-person fight in Bravo dorm?

2             MR. ARANDA:  We're done with January 11?

3             MR. CHASIN:  Yes.

4             MR. ARANDA:  Sorry.  Didn't mean to interrupt

5       you.

6       Q.   That's okay.

7       A.   I can't remember the date, but yes.

8       Q.   Okay.  What do you remember from that -- excuse

9    me.

10            What -- what happened in that incident?

11      A.   I believe that two juveniles about to fight.  I

12   don't know if they were fighting or about to fight.

13      Q.   Uh-huh.

14      A.   I can't recall which one it was right then.

15      Q.   Which -- which were the juveniles?

16      A.   I don't recall that.  Well, one name,

17   Juvenile G      .  G       .

18      Q.   Uh-huh.

19      A.   I don't know the other.

20      Q.   Okay.  And where in Bravo did this occur?

21      A.   In the common area, Bravo dorm.

22      Q.   Were there other juveniles present --

23      A.   Yes.

24      Q.   -- in the common area?

25            Who were those juveniles?

Page 64

1    A.    I can't recall their names.

2    Q.    Any of them?

3    A.    No.

4    Q.    What were the other juveniles doing?

5    A.    Standing there watching the -- standing there

6  watching the altercation.

7    Q.    Okay.  Where were you when you first noticed

8  the fight?

9    A.    I believe I was at the desk.

10   Q.    Okay.  What were you doing at the desk?

11   A.    I can't recall what I was doing.

12   Q.    Was any guard inside the dorm when the fight

13  occurred?

14   A.    None that I can recall.

15   Q.    Was the dorm (sic) to Bravo dorm closed?

16   A.    I can't recall.

17   Q.    Did somebody have to open it?

18   A.    If it was closed.

19   Q.    Did you hear anything when you noticed the

20  fight?

21   A.    No.

22   Q.    If the door was open, would you have heard

23  something?

24   A.    Yes.

25   Q.    So then do you have reason to believe the door

Page 65

1   was closed?

2       A.   I can't recall.

3       Q.   But if this occurred in the common area and

4   there were other juveniles present, and it was a fight

5   between two people, you would have heard what was going

6   on if the door was open when you were sitting at the

7   desk?

8       A.   It's possibly -- it's possible there could have

9   been no sign at -- you know, sometime they don't -- you

10  don't hear noise when they fight.

11      Q.   Why is that?

12      A.   Sometimes you just don't hear it.

13      Q.   Is that because there's a glass separating the

14  dorm and the common -- the guards' common area?

15      A.   Possible because that some fights you just

16  don't always hear ruckus going on when fights happen all

17  the times.  Sometimes just you got to visual see it.

18      Q.   What are other reasons why you couldn't hear a

19  fight?

20          MR. ARANDA:  Objection to form.

21      A.   Just not being -- being in the area for you to

22  hear.  You could be in another dorm.

23      Q.   Do you know how long the fight had been going

24  on before you saw what happened?

25      A.   No, sir.

Page 66

1   Q.   Why didn't you know that?

2        MR. ARANDA:   Objection to the form.

3   A.   I can't recall exactly what I was doing at the

4   time.

5   Q.   At the time that you responded to the fight,

6   did you know what the fight was about?

7   A.   No, sir.

8   Q.   Did you know how the fight had started?

9   A.   No, sir.

10  Q.   Okay.  Why didn't you know how the fight had

11  started?

12  A.   I wasn't in the dorm.

13       MR. ARANDA:   Objection; asked and answered.

14  Q.   Did you find out what the fight was about after

15  the fight occurred?

16  A.   No, sir.

17  Q.   Did you talk to either of the juveniles after

18  the fight occurred?

19  A.   I can't recall.

20  Q.   Typically would you have spoken to the

21  juveniles if you intervened in a fight, after the fight

22  occurred?

23  A.   Yes.

24  Q.   Okay.  Did you talk to any of the other

25  juveniles that were in the common area?

1    A.   No, sir.

2    Q.   And what was the resolution of the fight?

3    A.   I believe we -- we separated them.  I believe

4  we separated them in different rooms.

5    Q.   How did you separate them?

6    A.   We separated them?

7    Q.   How did you separate them, please?

8    A.   Put one -- told one to go in the room -- a

9  different room from one of the other.  There's room

10 assignments.

11   Q.   And you said, "We separated them."

12   A.   Well, "we" as -- when I say "we," I'm talking

13 about the agency but --

14   Q.   Okay.

15   A.   -- me.

16   Q.   Okay.  Okay.  Would video have captured this

17 incident?

18   A.   Yes.

19        MR. ARANDA:  Object to the form.

20   Q.   Okay.

21        MR. CHASIN:  I'd like to introduce as

22 Exhibit 5 -- strike that.

23   Q.   Before I do, is there anything else that you

24 remember about this incident?

25   A.   Not at this time, no.

Page 68

1          MR. CHASIN:  Then I'd like to introduce as

2     Exhibit 5 document Bates stamped 4013 continuing

3     through 4015.

4          (Deposition Exhibit No. 5 was marked for

5     identification.)

6     Q.    Officer Franklin, I'd like to direct your

7     attention to the second page, which is your incident

8     report.

9          Is this one of the documents that you reviewed

10    in preparation for today's deposition?

11    A.    Yes.

12    Q.    Okay.  Having looked at this now, do you

13    remember the names of the -- excuse me.

14         Do you remember the name of the other juvenile

15    that was involved?

16    A.    No, sir.

17    Q.    And having reviewed this, do you remember

18    anything else about the incident?

19    A.    No, sir.

20    Q.    Okay.  I'm done with Exhibit 5.

21         Officer Franklin, have you ever sprayed a

22    juvenile while on the ground before?

23    A.    Going, no, sir.  Just describe "on the ground."

24    Q.    While the juvenile was not on his feet.

25    A.    No, sir.

Page 69

1    Q.   Have you ever sprayed a juvenile that was not

2    fighting?

3    A.   Not fighting or have been in a fight?

4    Q.   Either.

5         MR. ARANDA:  Well, now I'm confused.

6    Q.   Okay.  Have you ever sprayed a juvenile that

7    had not been in a fight?

8    A.   No, sir.

9    Q.   Have you --

10        So then you never sprayed a juvenile that at

11   that moment was -- was not fighting?

12        MR. ARANDA:  Objection to the form.

13   A.   Like I said other before, I sprayed a juvenile

14   after the fight was over for not following commands.

15   Q.   What command was that?

16   A.   To stop -- to lie on -- lie down on the ground.

17   Q.   So the juvenile was not fighting at the time?

18   A.   At that time, no.

19   Q.   Have you ever broken up a fight with

20   Officer Gay before, besides the incident on

21   December 28th, 2012?

22   A.   I can't recall.

23   Q.   Have you ever sprayed anyone while they were in

24   the holding cage --

25   A.   No.

Page 70

1      Q.    -- at the jail?

2      A.    No, sir.

3      Q.    Okay.  Have you ever heard a juvenile, after

4   being sprayed, say something to the effect of "Why are

5   you spraying so much?"

6      A.    No, sir.

7      Q.    In instances -- are there instances when

8   juveniles don't go back to their cells when you tell

9   them to do so?

10     A.    Yeah.  Yes, there are, yes.

11     Q.    And how do you respond?

12     A.    I -- I never had that with -- done with me, so

13  I -- how would I respond?

14     Q.    Let -- let me -- let me make this more clear.

15           Have you ever had an instance where a juvenile

16  did not go back to his cell when you told him to do so?

17           MR. ARANDA:  He's asking you specifically.

18     Q.    You, Officer Franklin.

19     A.    Not that I recall, no.

20     Q.    Okay.  Officer Franklin, I'm sorry to ask this

21  question.  But at the jail, have you ever heard anyone,

22  a juvenile or staff or anyone else, use the "N" word

23  in -- in any fashion?

24     A.    I never heard a staff.  Kids, yes.

25     Q.    Okay.  Which kids?

Page 71

1    A.    Just about all of them.

2    Q.    Officer Franklin, have you ever used the "N"

3  word --

4    A.    No, sir.

5    Q.    -- at the jail?

6          Even casually?

7    A.    No, sir.

8    Q.    Officer Franklin, at the jail, do you hear

9  profanity?

10   A.    All the time.

11   Q.    Okay.  Have you ever used profanity at the

12 jail?

13   A.    No, sir.

14   Q.    Even casually or to yourself?

15   A.    To myself?  Not at the jail, or not out loud.

16   Q.    How about in the presence --

17   A.    No, sir.

18   Q.    -- or near juveniles?

19   A.    No, sir.

20   Q.    I think you said not -- not yourself.  Have you

21 heard any other deputy or staff person --

22   A.    No, sir.

23   Q.    -- use profanity in the jail?

24   A.    No, sir.

25   Q.    Okay.  Officer Franklin, the last protective

Page 72

1    action report we went through was for

2    February 18th, 2012, a couple of minutes ago.  Do you

3    remember that?

4         A.    February.  Yes, sir.

5         Q.    I showed you the protective action report for

6    February 18th, 2012.

7              How many protection -- protective actions have

8    you been involved in since then, since

9    February 18th, 2012?

10        A.    I can't recall.  It's safe to say I don't

11   believe none.

12        Q.    Did you review any protective action reports

13   besides those which I showed you today?

14        A.    No, sir.

15        Q.    Have there been any incidents for -- to which

16   you've responded to at the jail since

17   February 18th, 2012?

18        A.    Not that I can recall.

19        Q.    Okay.  So in the five-plus months since

20   February 18th, 2012, do you recall writing any incident

21   reports at all?

22        A.    I can't recall if I have.

23        Q.    So did you -- I'm sorry.

24              Did you just say you can't recall --

25        A.    Yes.

Page 73

1     Q.    -- without having them in front of you?

2     A.    No.  I said I can't recall if I have or not.

3     Q.    You have -- you cannot recall if you've written

4  any incident or protective action reports.

5           Have you written any reports at all since

6  February 18th, 2012?

7     A.    I can't recall if I did, sir.

8     Q.    You write protective action -- excuse me.

9           You write protective action reports following a

10 fight, correct?

11    A.    Yes.

12    Q.    Okay.  So the most recent fight that you've

13 been involved in was the protective action on

14 February 18th, 2012?

15          MR. ARANDA:  Objection; asked and answered.

16    A.    I believe so, sir.

17    Q.    Since September 2011, have you used spray,

18 meaning pepper spray or the spray that you carry on your

19 person, on any occasion for which you did not write any

20 type of report?

21    A.    No, sir.

22    Q.    Since September 2011, have you used force on

23 any occasion for which you did not write any type of

24 report?

25    A.    No, sir.

Page 78

1      Q.    Today, as of today, are there any work files on

2    your -- on your thumb drive or flash drive?

3           MR. ARANDA:  Objection; asked and answered.

4      A.    There's none on my -- as of today, no.

5      Q.    Are there any files on your computer that

6    you've written at work?

7      A.    No.

8      Q.    Earlier in the deposition, Officer Franklin, I

9    believe you testified that you had taken juveniles to

10   the attorney booth for visits with Southern Poverty Law

11   Center?

12     A.    No, I never -- no, I didn't say I take them.

13   They were sent there.  They -- you know, once they call

14   for them, we point them to the direction where to go.

15   We don't -- I don't visually take them.

16     Q.    You just point them to the direction of the

17   door?

18     A.    Yeah.  They -- yeah.

19          MR. ARANDA:  Objection to the form.

20     A.    Right.  We point them to the doors where to go

21   to meet the attorney.  The outside attorney is in that

22   office out there waiting.

23     Q.    Who will take the juvenile to -- to the -- to

24   the booth, then?

25     A.    They will walk out there.  We will call on the

Page 79

1  radio and ask the attorney officer if it's clear for

2  juvenile to come out.  She would -- she would then reply

3  yes or no.  If she say yes, we open the doors, have the

4  juvenile walk to the desk and meet her, and she instruct

5  them which way to go from there.

6      Q.   Before, I think you said you -- you would

7  direct the juvenile?

8      A.   Yeah.  We direct them to the door.  I can be

9  sitting at my desk and --

10     Q.   Okay.

11     A.   -- show them which way to go to the door.

12     Q.   Okay.  So do you -- the juvenile would come out

13 of the dorm through the guards' common area and go

14 towards the booth?

15     A.   Yes.

16     Q.   Okay.  And you would be directing them?

17     A.   Yes.

18     Q.   Okay.  Would you say anything to the juvenile?

19     A.   No, sir.

20     Q.   Okay.  So are you aware that over the past

21 several months many juveniles at the -- at the jail have

22 met with staff from Southern Poverty Law Center in the

23 attorney booth?

24     A.   Yes, sir.

25          MR. ARANDA:  Objection to the form.

Page 80

1    Q.   Do you remember any of those juveniles?

2    A.   Yes.

3    Q.   Which ones?

4    A.   Ones that there, that we have now, D̶

5    and -- who else?   W̶    ̶    ̶t.   W̶       .

6    Q.   Uh-huh.

7    A.   And B̶    G̶       Them the only three I can

8    remember.

9    Q.   Of juveniles that have been released, who do

10   you remember?

11        MR. ARANDA:   Objection to form; predicate.

12   A.   I can't -- I can't recall the ones that have

13   been released.

14   Q.   Uh-huh.   Let me make my question more clear.

15        Of -- of attorney -- excuse me.

16        Of juveniles that have met with staff -- excuse

17   me, that have met with staff at -- of juveniles that

18   have gone to the attorney booth to meet with

19   representatives of Southern Poverty Law Center, of those

20   juveniles that have been released, do you remember any

21   of their names?

22   A.   No, not -- no.   I remember faces, but I can't

23   remember names.

24   Q.   Do you remember a juvenile by the name of

25   J̶     P̶      ̶?

Page 81

1      A.    P           Yes.

2      Q.    Yes.  Okay.

3            Do you remember a youth by the name of

4    K      J

5      A.    Yes.

6      Q.    Okay.  Okay.  So, Officer Franklin, are you

7    familiar with the term "snitch"?

8      A.    Yes.

9      Q.    What does that mean to you?

10     A.    To me?

11     Q.    Uh-huh.

12     A.    It's -- a snitch is somebody who did the crime

13   with the person, and that the person who they did the

14   crime didn't get caught, but the person that did get

15   caught would tell on them.  That's my definition.

16     Q.    That's your definition.  Does it have another

17   definition?

18     A.    No.

19     Q.    Does it mean anything else to you?

20     A.    No, it don't mean nothing to me.

21     Q.    Do you think it means something else to the

22   juveniles at the jail?

23           MR. ARANDA:  Objection to the form.

24     A.    I couldn't tell you.

25     Q.    Okay.  Have you ever used that word at the

Page 82

1    jail?

2         A.    What, "snitch"?

3         Q.    Yes.

4         A.    As?

5         Q.    Have you -- have you ever used --

6         A.    Calling a kid a snitch or --

7         Q.    Have you ever used the term "snitch" in any

8    fashion whatsoever, even referring to the word "snitch"

9    at the jail?

10        A.    I can't recall.

11        Q.    Okay.  Have you ever used the word "snitch" in

12   talking with a juvenile at the jail?

13        A.    Possible.  Safe to -- yes.

14        Q.    Why is it possible?

15        A.    Because I'm sure it's come -- I'm sure that

16   the -- I have talked about that.  I don't know to which

17   kid, and then but I'm sure I have.

18        Q.    Okay.  Why are you sure you've talk -- you --

19   you've used the word "snitch" with a juvenile before?

20        A.    Because there's many occasions kids come to me

21   and -- and ask me, should they tell on -- on another

22   kid; would that leave them as being a snitch if he -- if

23   they tell on -- on another kid about a case or something

24   they did together or something.

25        Q.    And what would you say in response to that

Page 83

1    question?

2        A.    Admit it, it all depends.  Was you a part of

3    it?  If you was a part of it -- I can't recall what I

4    would exactly say, I mean.

5        Q.    You -- you used the word "snitch" in connection

6    with your answer to that question from a juvenile?

7        A.    Say again?

8        Q.    You used the word "snitch" when answering that

9    question from a juvenile?

10            MR. ARANDA:  Objection to form.

11       A.    I believe the kid would bring the word up to

12   me.

13       Q.    Okay.  But I think you said before that you --

14   you used the word "snitch" in talking with the juvenile?

15            MR. ARANDA:  Objection; mischaracterizes his

16       testimony.

17       Q.    Correct me if -- correct me if I'm wrong.  I

18   thought you said you had used the word "snitch" --

19       A.    Right.

20       Q.    -- at least in one incident talking --

21       A.    I'm not saying that I brung the word "snitch"

22   up.  The kid could have brung the word to me --

23       Q.    Uh-huh.

24       A.    -- about "snitch," about snitching.

25       Q.    So you've mentioned times when the juveniles

Page 84

1   may have broached the word "snitch."

2       A.   Yes.

3       Q.   Are there any other times when the word

4   "snitch" has arisen in -- when you've used the word

5   "snitch"?

6            MR. ARANDA:  Objection to the form.

7       A.   I can't recall, no.

8       Q.   Officer Franklin, is -- is being a snitch

9   considered a good thing or bad thing in a jail?  Excuse

10  me.

11           MR. ARANDA:  Objection to the form.

12      A.   It's all depending how you look at it.

13      Q.   Uh-huh.

14      A.   In my eyes, I think right is right.  If -- if

15  snitching going to get you out of trouble, I say snitch.

16  I say that's a good thing.

17      Q.   Would you say that to the juveniles?

18      A.   Yes.

19      Q.   Have you said that to juveniles?

20      A.   Yes, many times.

21      Q.   Okay.  So you have used the word "snitch" then?

22      A.   Yes.

23           MR. ARANDA:  Objection to the form.

24      Q.   To juveniles?

25      A.   I mean -- yes, yes.  I talk about it.

Page 85

1    Q.   Have you used it in any other way?

2    A.   There's no other way to use it.

3    Q.   Officer Franklin, did you see any of the news

4  coverage of this case, this lawsuit, when it was filed

5  in March?

6    A.   As far as on TV?

7    Q.   Yes.

8    A.   Not on TV, but on -- in the newspaper.

9    Q.   Okay.  Or any other form of media?

10   A.   Internet.

11   Q.   Okay.  Anything else?

12   A.   No.

13   Q.   Okay.  And what did you read in the newspaper

14  about the lawsuit?

15   A.   What we been challenged of taking -- well,

16  Grady Judd being challenged of taking kids in and

17  removing, what, spray or something, a chemical agent to

18  have -- I can't recall exactly what I read, but I'm just

19  trying to sum it up what I believe it said.

20   Q.   Uh-huh.

21   A.   I can't really recall exactly what the article

22  said.

23   Q.   What did you read in the internet about the

24  lawsuit?

25   A.   Same thing.

Page 87

1       A.    I'm assuming, yes.  I don't know the person.

2       Q.    Okay.  And after the case was filed, did you

3    ever say to K    ' J    that you had seen his mother in

4    the newspaper --

5       A.    No.

6       Q.    Let me finish the question, please.

7            MR. ARANDA:  Yeah, let him finish the question.

8       Q.    After the case was filed, did you ever say to

9    K     J    that you had seen his mother in the newspaper

10   and say that K    had been snitching?

11      A.    Absolutely not.

12      Q.    Did you say anything to that effect?

13      A.    No, sir.

14      Q.    Have you ever called J     P          a snitch?

15      A.    No, sir.

16      Q.    Have you ever referred to him as a snitch?

17      A.    No, sir.

18      Q.    Have you ever asked J     P           -- strike

19   that.

20            Have you ever used the term "snitch card"?

21      A.    No, sir.

22      Q.    Have you ever -- have you ever asked

23   J     P       if he had a snitch card ready?

24      A.    No, sir.

25      Q.    Have you ever called B     G     a snitch?

Page 88

1        A.    No, sir.

2        Q.    Have you ever referred to B██      G█      as a

3   snitch?

4        A.    No, sir.

5        Q.    Or addressed him as a snitch?

6        A.    No, sir.

7        Q.    Besides the juveniles that I've just mentioned,

8   have you ever called any other juvenile who meets with

9   Southern Poverty Law Center a snitch?

10       A.    No, sir.

11       Q.    Or have you ever referred to those juveniles as

12  snitching?

13       A.    No, sir.

14       Q.    Have you ever referred to the attorney booth at

15  the jail as the snitch booth?

16       A.    No, sir.

17       Q.    Have you ever used the term "snitch booth" in

18  any fashion?

19       A.    No, sir.

20       Q.    Have you heard that term before?

21       A.    No, sir.  First time hearing it.

22       Q.    Have you ever heard any other deputy at the

23  jail use the word "snitch"?

24       A.    No, sir.

25       Q.    Have you ever been counseled at the jail about

Page 89

1    using the word "snitch"?

2        A.    No, sir.

3        Q.    Has any other officer or staff member at the

4    jail spoken to you in any way whatsoever about the term

5    "snitch"?

6        A.    No, sir.

7        Q.    Has any supervisor at the jail ever

8    communicated with staff at the jail about using the word

9    "snitch" with regard to juveniles?

10       A.    No, sir, not that I recall.

11       Q.    Has there been any communication at all from

12   supervisors at the jail about juveniles' participation

13   or interaction with Southern Poverty Law Center?

14       A.    As far as?

15       Q.    Let me -- let me -- let me restate the

16   question.

17            Has there been any communication from the

18   supervisors at the jail about juveniles' interaction

19   with Southern Poverty Law Center?

20       A.    Not that I recall.  I mean, got to be more

21   specific, like as asked as what.

22       Q.    Has any supervisor at the jail ever spoken to

23   you about Southern Poverty Law Center?

24       A.    No.

25       Q.    Has any supervisor at the jail ever spoken to

Page 106

1       A.    I can't recall who L       S       is.

2       Q.    Did you ever place any juvenile in the

3   isolation cell with Officer Gay, with Officer Gay's

4   assistance or working with Officer Gay?

5       A.    Not that I recall.

6           MR. CHASIN:  That's all of our questions.

7           MR. VAZQUEZ:  I have a couple.  You want me --

8           MR. ARANDA:  You can go first, then.  I'll go

9   after you.

10                  CROSS EXAMINATION

11  BY MR. VAZQUEZ:

12      Q.    Good afternoon.  Good afternoon, Mr. Franklin.

13  I represented Corizon Health, the medical provider to

14  Polk County Jail.

15          You've been presented with several protection

16  action reports.  And I see that medical had been called

17  during those protective -- protection actions.  Is that

18  correct?

19      A.    Yes, sir.

20      Q.    In your experience, has there ever been a time

21  when medical has not responded or refused to provide

22  medical services to the juvenile inmates at the Polk

23  County Jail?

24          MS. GALLONI:  Object to the form.

25      A.    No, sir.

Page 107

1       MR. VAZQUEZ:  That's all I have.  Thank you.

2                   CROSS EXAMINATION

3   BY MR. ARANDA:

4       Q.   Officer Franklin, I have a few brief

5   follow-ups.

6            You were shown, I believe, five different

7   protective action reports, and they were gone over in

8   part with you.  Is that correct?

9       A.   Yes, sir.

10      Q.   The protection action reports that are marked

11  as Exhibits 1 through 5, are those written -- how long

12  after the incident occurs when you start writing the

13  protective action report?

14      A.   Within minutes.

15      Q.   Okay.  And is the purpose of writing the

16  protective action report to record at that time, within

17  minutes, the specific facts as to what happened and why

18  you were required to use any level of force?

19      A.   Yes, sir.

20      Q.   And you try to be as specific as you can in

21  those protective action reports so that in the future

22  you're able to -- were able to document what happened on

23  that particular occasion; is that correct?

24      A.   Yes, sir.

25      Q.   So for purposes of what occurred on each of the

Page 108

1    incidences that are recorded on the protective action

2    report, you rely on what you wrote at the time as

3    opposed to your memory now?

4         A.   Yes, sir.

5         Q.   You were asked some questions about whether you

6    have ever used a chemical agent on someone who was not

7    fighting.  Do you remember that?

8         A.   Yes, sir.

9         Q.   Okay.  The incidences in which you have used

10   pepper spray on a juvenile who was not fighting is in

11   connection with a fight that had just occurred and their

12   failure to stop fighting?

13        A.   Yes, sir.

14             MS. GALLONI:  Object to the form.

15        Q.   Does it also include after you -- the fight

16   stops but they do not follow your command to lay prone

17   on the floor or to get into a specific location?

18             MS. GALLONI:  Object to the form.

19        A.   Yes, sir.

20        Q.   The times in which you have used pepper spray

21   to stop a fight that is occurring, those fights, are

22   those fights that are happening where both juveniles or

23   multiple juveniles are using closed-fist punches?

24             MS. GALLONI:  Objection.

25        A.   Yes, sir.