UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, *et al.*,

      Plaintiffs,

      v.                     Case No. 8:12-cv-568-T-23MAP

GRADY JUDD, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

      Plaintiffs, legal guardians of juvenile detainees at the Polk County Jail, claim that

Sheriff Judd's deliberate indifference to the violence at the institution and to the harm caused

them by his pattern and practice of using pepper spray violates their guarantees under the

Eighth and Fourteenth Amendment.[1]  They now move for preliminary injunctive relief and

for class certification of their action under Fed. R. Civ. P. 23, matters the District Judge has

referred to me for a report and recommendation.[2]  After consideration, I recommend  that

---

[1] Plaintiffs' claim here is limited to Count Two of the operative complaint (Doc. 197). This count substantially mirrors the previous complaints (Docs. 3, 53).  Defendant Corizon is not named in Count Two.

[2]  The District Judge referred these matters for a report and recommendation: Plaintiffs' motion for preliminary injunction (Doc. 4) and brief in support (Doc. 117) and Defendant Judd's opposition (Doc. 138); Plaintiffs' motions to certify a class and two sub-classes (Docs. 5, 35, 137) and related documents (Docs. 44, 134) and Defendants' responses (Docs. 26, 48, 118, 145, 152).  Additionally, I visited the facility, held a week-long hearing in September 2012 on the motion for preliminary injunction with extensive oral arguments in November 2012, and reviewed the many exhibits the parties have filed.  Lastly, the parties unsuccessfully mediated their dispute on two occasions, including after oral argument on

the District Judge deny the motion for preliminary injunction because the Plaintiffs have failed to satisfy the subjective component under the deliberate indifference test and grant the Plaintiffs' motions for class certification.

## I.

> The Juvenile Court movement began in this country at the end of the last century. From the juvenile court statute adopted in Illinois in 1899, the system has spread to every State in the Union, the District of Columbia, and Puerto Rico . . . . The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was 'guilty' or 'innocent,' but 'What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career.'

*Application of Gault*, 387 U.S. 1, 14-15 (1967) (footnote omitted).

The notion that juveniles and adults are different is obviously not a new one. Indeed, the Supreme Court in a recent line of cases has reaffirmed this concept by recognizing that children are constitutionally different from adults for sentencing purposes. *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012); *Graham v. Florida*, ___ U.S. ___, 130 S.Ct. 2011, 2026 (2010); *Roper v. Simmons*, 543 U.S. 551, 569 (2005). These cases rely on three general differences between juveniles and adults. First, children have a "'lack of maturity and an underdeveloped sense of responsibility'" that leads to "recklessness, impulsiveness, and heedless risk-taking." *Miller*, 132 S.Ct. at 2464 (quoting *Roper*, 543 U.S. at 569). Second,

---

these motions.

children are more vulnerable to "negative influences and outside pressures," they have "limited contro[l] over their own environment" and are unable to "extricate themselves from horrific, crime-producing settings." *Id.* (alteration in original) (citation and quotations omitted). Third, a child's character is not as well formed as an adult's; thus, his actions are "less likely to be evidence of irretrievabl[e] deprav[ity]." *Id.* (alteration in original) (quotations omitted). These decisions rest "not only on common sense – on what 'any parent knows' – but on science and social science as well." *Id.* For example, in *Graham*, the Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" including in "parts of the brain involved in behavior control." 130 S.Ct. at 2026. In *Miller*, the Court pointed out that the science supporting its decisions has become even stronger. 132 S.Ct. at 2464 n.5.

Forty-six years after *Gault*, this case arises in an unsettling context – juveniles housed in an adult-type jail awaiting trial in an adult court or an adjudication in a juvenile court and managed using a continuum of force policy designed primarily for adults. How these juveniles got there, who they are, and how the Sheriff of Polk County oversees their custody are the undercurrents of the relevant facts. I am mindful that the Sheriff's task is difficult and his challenges complex. In the main, the juveniles in his charge have not responded to the behavioral modification efforts and interventions of family, schools, social agencies, and the courts. For these reasons, the overarching perspective a court applies when confronted with such constitutional challenges is to "refrain [during the course of its examination] from imposing our own theories of [juvenile justice] on the nation's [juvenile detention facilities]

and strive to inform our analysis with objective factors to the maximum extent possible." *Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010). But even with this circumspect view, the objective observation is that the use of pepper spray in a juvenile detention or juvenile correctional facility is controversial and unsettled. On the use-of-force continuum, some consider pepper spray to be benign and less harmful than physical force. Others, however, urge it should be prohibited in the juvenile detention context, a position the Plaintiffs notably do not take in their operative complaint.

Given the length of this report, an organizational overview is prudent. Part II covers the basics of Florida's juvenile system; the legislative move to allow counties to house juveniles in adult-type facilities; the differences regarding the use of pepper spray in detention facilities operated by under Florida's Department of Juvenile Justice ("DJJ") and those run by county or municipal jurisdictions; a sense of the jail's layout and day-to-day operations as those matters impact the use of pepper spray; and lastly Sheriff Judd's general orders governing the spray's use. All these topics serve as background information pertinent to the referred motions (but weighted more to the preliminary injunction motion). Part III sets out the legal standards applicable the preliminary injunction question, and Part IV details my findings on that issue. Part V addresses the class certification issues, and lastly Part VI concludes with my recommendations.

II.

*A.     Florida's Scheme*

Florida's juvenile justice scheme has twin aims: "to first protect the public from acts

4

of delinquency" and to rehabilitate the juvenile.  Fla. Stat. § 985.02(3).  As for a juvenile's

detention,  "[t]he Legislature intends that detention care, in addition to providing secure and

safe custody, will promote the health and well-being of the children committed thereto and

provide an environment that fosters their social, emotional, intellectual, and physical

development." *Id*.  To balance these potentially competing interests – protecting the public

and rehabilitating the juvenile – Florida poses rigorous checklists for deciding if a juvenile

should be detained.  Two groups of juveniles emerge from this process, direct file and

preadjudicated.  The direct file detainees are typically the oldest, most aggressive juveniles

as they are charged with having committed serious, violent offenses.  *See* Fla. Stat. §

985.557.  This group comprises two types: discretionary and mandatory direct file juveniles.

A juvenile, to be classified as a discretionary direct file, must be at least 14 at the time of his

offense, and the offense must be one that is specified in Fla. Stat. § 985.557 (for example,

robbery, sexual battery, aggravated battery, and murder).  *Id*.  A mandatory direct file

juvenile is someone 16 or 17 who has already been adjudicated delinquent for a violent act

or a use of a firearm and is charged with a second violent crime.  *Id.*  Mandatory waiver also

occurs when it is the juvenile's fourth felony act, one of which was violent or involved a

firearm.  *Id*.

As for a preadjudicated juvenile, at the time he is taken into custody until a formal

detention hearing, his probation officer makes an initial decision as to whether he should be

placed into secure detention care.  Fla. Stat. § 985.25.  The probation officer bases this

decision on a risk assessment that analyzes whether the juvenile is a flight risk, whether there

is a danger he will inflict bodily harm on others, has a history of committing offenses prior to adjudication, has committed contempt of court, or requests protection from imminent bodily harm.  Fla. Stat. § 985.24.  If the probation officer determines that detention is appropriate, a hearing must be held within 24 hours.  Fla. Stat. § 985.255(3)(a).  At this hearing, a judge decides whether the preadjudicated juvenile should continue to be detained.  This determination is based on the child's flight risk, whether the child is wanted in another jurisdiction, whether the child is charged with possessing or discharging a firearm on school property, and whether the child is charged with a capital felony, among other factors.  Fla. Stat. § 985.255(1).  But even when a juvenile meets the detention checklists, his or her incarceration is intended to be rehabilitative rather than punitive.  *See* Fla. Stat. §§ 985.02, 985.601(3)(a).

The average length of a preadjudicated juvenile's stay at the county jail is about 10 days, although this could extend to 30 days under the governing statute.  *See* Fla. Stat. § 985.26(2).[3]  Detention care after adjudication is limited to 15 days.  Fla. Stat. § 985.26(3).  If the court grants a continuance beyond the period authorized in sections 2 and 3 above, the trial court is required to conduct a hearing at the end of each 72 hour period "to determine

---

[3] Section 985.26(2) provides: "A child may not be held in secure, nonsecure, or home detention care under a special detention order for more than 21 days unless an adjudicatory hearing for the case has commenced in good faith by the court.  However, upon good cause being shown that the nature of the charge requires additional time for the prosecution or defense of the case, the court may extend the length of detention for an additional 9 days if the child is charged with an offense that would be, if committed by an adult, a capital felony, a life felony, a felony of the first degree, or a felony of the second degree involving violence against any individual."

the need for continued detention of the child and the need for further continuance of proceedings for the child or the state." Fla. Stat. § 985.26(4).  *See*, *e.g., R.N. v. State*, 30 So. 3d 725, 726 (Fla. 4th DCA 2010) (stating that the trial court must make a separate determination of the need for detention and the need for further detention).  Direct files are housed at the Polk County Jail while awaiting adjudication; after adjudication, or upon reaching the age of eighteen, they are transferred from the Polk County Jail to an adult facility.

The concept of housing juveniles in a county jail setting previously dedicated to adults is a recent development in Florida.  Historically, Florida's DJJ has been tasked with operating a statewide, regionally administered system of detention services for children, in accordance with a comprehensive plan for the regional administration of detention services in the state.  *See* Fla. Stat. § 985.688(9)(a).  But in 2011, Florida altered this landscape with the enactment of § 985.688(11).  This provision gave counties and municipal governments the discretion to opt for housing juvenile inmates in facilities outside DJJ's realm, such as a county or municipal jail-type facility, provided certain criteria are satisfied.[4]  Polk County promptly chose this approach for cost-saving reasons.  By October 1, 2011, with all Polk County's juvenile detainees housed at Polk County Jail, the county's state-operated detention center closed its doors.[5]

---

[4]  Notably, Plaintiffs do not challenge the law's constitutionality (*see* Doc. 43).

[5]  All references to the Polk County Jail are to the Central County Jail.  There is also a South County Jail, which is not at issue here.

Moving juveniles from the DJJ facility to the central jail facility involved more than just a change in venues. Policy considerations and organizational cultures changed too. For example, DJJ's Detention Standards, which incorporate Florida's Administrative Code, do not authorize the use of pepper spray on juvenile inmates. *See* Rule 63H-1.004(4), Fla. Admin. Code.; *see also* Fla. Stat. § 985.645(2)(a)(5) (requiring adoption of rules that establish a protective action response policy for DJJ that prohibits the use of chemical agents on youths). On the other hand, § 985.688(11) does not specifically incorporate DJJ's standards. Instead, the scheme requires the juvenile facility to meet the Florida Model Jail Standards ("FMJS"). *See* Fla. Stat. § 985.688(11)(a)(4). And those standards allow the applicable agency (here, Sheriff Judd) to adopt a force continuum based either on the Florida Department of Law Enforcement's ("FDLE") model or the one DJJ follows. *See* FMJS § 20.02(a) (Def. Ex. 23). Sheriff Judd applies FDLE's force continuum, one that has been primarily designed for adults (General Order 1.5(D)(2)(A); Doc. 179 at 60:23-25).

B.    *Polk County Jail*

Polk County's jail complex has a capacity for 800 detainees and inmates, both adult and juvenile, although the two groups are completely separated by sight and sound (Doc. 178 at 38:9, 44:24-45:11).[6] At any given time, between 70 to 80 juveniles are detained, including

---

[6]    Section 985.688(11)(c), Fla. Stat., requires this, and Sheriff Judd has taken extraordinary steps to meet his statutory obligations in that regard. Juvenile detainees wear different color uniforms from the adult population and are housed in a building separate from adults. The juveniles attend school, recreation, and personal and attorney visits away from the adult population. In fact, other than the adult staff at the jail and any visitors, the juvenile inmates never see an adult during their time at the jail. During my visit, I did not see an adult

between 2 to 12 females (*Id.* at 38:9-10).[7]   The direct files comprise approximately 55 percent of the juvenile population, and the preadjudicated make up the remaining 45 percent, although this ratio is probably a snapshot in time and subject to variation (Expert Report of Paul DeMuro, Doc. 117-5 at 4).[8]   For example, a May 21, 2012, census reported 74 juveniles in custody (Plf. Ex. 7).   The majority were direct files (41).   The remaining (33) were preadjudicated juveniles whose ages ranged from 11 to 18.   Of the preadjudicated group, 24% were ages 11 to 14; 48% were ages 15 to 16; and 27% were ages 17 to 18 (*Id.*).   Notably for this preadjudicated group, 67% were detained for non-violent or misdemeanor matters (*Id.*).

A risk assessment classification, medical and mental information, and alerts compiled by the Juvenile Assessment Center ("JAC") in Bartow are made available to jail authorities for preadjudicated juveniles (Doc. 178 at 15:24-16:11; 23:3).   Direct files, who are booked through central booking but separate from adults, arrive with similar information (*Id*. at 15:10-20; 20:10-13).   Any mental health or medical alerts are passed on to the medical staff (*Id*. at 19:7-13).   And deputies have access to information that the mental health staff and the medical staff make available, as well as other information consistent with database

---

detainee, much less hear one.

[7]   The jail can house 288 juvenile inmates, a capacity that makes it the largest juvenile detention facility in the state.

[8]   DeMuro's report is also a part of the preliminary injunction hearing record at Exhibit 3, but I include docket cites where available for ease of reference.

authorization policies (Doc. 178 at 30-31; *see* Defendant. Exs. 11F and 11G).[9]  Deputies receive additional intelligence at shift briefings and the information recorded about events or behavior in a pass-down log (Doc. 178 at 30:3-7; Hertel Depo. at 52:10-12, 54:15-18).

Each distinct sub group (male preadjudicated, male direct file, etc.) wears a different colored uniform making classification readily identifiable (*see* Doc. 178 at 45).  The male juveniles are housed in Building 3.[10]  This building is divided into 6 dorms (A through F, or Alpha through Foxtrot) situated around a control room.  Dorms A, B, and C house the pre-adjudicated juveniles, and dorms D, E, and F house the direct file inmates (Hertel Depo. at 56:19-23).  Placement also factors in the nature of the crime (violence or sex), mental functioning, mental health issues, size, and age (Doc. 178 at 29:4-17).  Each dorm is two stories and has eight cells – four on the bottom level and four on the top – and each cell has four bunks; thus, each dorm has the capacity for 32 inmates (*see* Doc. 117-5 at 5; Russell Depo. at 60:13-14).

The dorms have glass front walls and face a common area and control room.  Inside each dorm is a dayroom where the juveniles gather when they are permitted (Doc. 117-5 at 5-6).  The dayroom is separated from the common area by a door that locks automatically.

---

[9]  These exhibits are under seal.

[10]  At the time of the preliminary injunction hearing, Polk County was in the process of renovating Building 4 to house juveniles.  Planned improvements to Building 4 included installing cameras inside every cell.  The testimony was that once the renovations were complete, all of the male juveniles in Building 3 would be transferred to Building 4 (Doc. 179 at 75:6-13).

The juveniles cannot open the door from the inside, and the guards cannot open it from the outside unless they call to the guard inside the control room to open it. The cells inside the dorms also have glass front walls. When the dorm doors are closed, which is almost all the time, voices inside the dorm are muffled to the guards in the common area.

Outside the dorms is the guards' common area, the control room, and two holding cages (*see* Hester Depo. at 72:19-25; Cranor Depo. at 84:15-18). This area is not monitored by cameras (*Id.*). When the guards are not performing their duties, they supervise the juveniles from the common area. Despite that the dorm and cell fronts are made of transparent glass, a guard in the common area does not have a direct line of sight into every cell, and blind spots exist in each dorm. In Alpha, Charlie, and Echo dorms, the blind spots are against the back walls of cells 1 and 5; in Bravo, Delta, and Foxtrot dorms, the blind spots are against the back walls of cells 4 and 8 (Hester Depo. at 71:6-72:6). In these blind cells, a deputy "can't really see if something is happening, somebody is getting to be up, or anything like that." (Russell Depo. at 57:3-6). Fights between inmates have occurred in these blind cells. The juveniles call these "ToH" or "tests of the heart," a challenge to see if the newly admitted youth has what it takes to be a detainee in the eyes of the others (Doc. 117-5 at 17; *see* Hester Depo. at 192:23-193:10). On February 24, 2012, a juvenile was brutally beaten over the course of several hours while on lockdown in Foxtrot dorm, cell 8 (Plf. Ex. 9B). His three cell mates beat him to the point of unconsciousness before a deputy arrived (*Id.*). On June 13, 2012, juvenile inmate G.G. was assaulted in Echo dorm, cell 1 (Plf. Ex. 1B at 1; Plf. Ex. 11). A deputy (Samuel Gay) noticed the commotion in the

dayroom of the dorm and went inside approximately a minute after the fight began (*see* Plf. Ex. 11).  By that point, however, two other inmates had already jumped G.G. inside cell 1, placing him in a choke hold and hitting him.  The jail has since changed its policy; now inmates are housed in these blind cells only if necessary, and the doors to these cells are locked if unoccupied  (Doc. 178 at 47:5-19; Hester Depo. at 192:23-193:10).  Even when there are juveniles housed in the blind cells, jail staff keep the cell doors closed during school and recreation time (*Id.*).

Two holding cages are on the edge of the common area (Plf. Ex. 3, photos 2, 5-11). The deputies use the cages for juveniles who are awaiting transfer to court proceedings, awaiting release or processing, awaiting a visit to the nurse on site, or inmates who have been discipline problems (Doc. 178 at 68:13-22; Harrison Depo. at 119:14-120:4).  A juvenile confined in one of these "timeout" cages is visible to the guards in the common area and the juveniles inside the dorms (Doc. 117-5 at 6).[11]

The control room, a one-story room that sits in the middle of the building, affords the

---

[11]   Although the Sheriff's use of these cages is not the aim of the Plaintiffs' preliminary injunction efforts, I find their use and presence in a juvenile detention setting to be disturbing.  Plaintiff's psychiatric expert, Dr. Glindmeyer, who has extensive experience in juvenile detention matters, including engaging in compliance monitoring for the Department of Justice, some States, and private entities, testified that she had never seen such a cage in any juvenile institution she visited or inspected (Doc. 177 at 57:16-19). Neither had she seen anything similar used for suicide prevention in adult facilities (*Id.*).  She recalled one institution, one in northern California that housed youth (ages 17-25), that had used a cage for administrative detention, but authorities had discontinued the practice before her first visit (*Id*. at 58:3-16).  To some extent, and whether realized or not, the cage conveys a distinct culture about the place – one that is punitive.

monitoring guard a direct line of sight to portions of the dorms and cells (*Id*. at 6).  Cameras capture activity inside each dorm's dayroom and shower area.[12]  There are no cameras in the cells, the holding cages, the isolation cells, or the common area (the common areas and the holding cages are plainly visible from the control room).  The deputy in the control room monitors the video feed from the cameras inside the dorms and opens the dorm doors when requested (Gay Depo. at 34:10-13).   The control room staff does not leave the room except for breaks.

Down a hallway from the dorms and common area is the isolation area with four cells.  Each isolation cell has an opaque door with a small, rectangular food slot in the middle (Doc. 117-5 at 11).  Outside of the isolation cells is a common area with a shower.  Cameras record activity inside the common area, just outside the isolation cells, but do not capture activity inside the cells (*Id*.; Hester Depo. at 71:11-18).  To exit the isolation area, guards and inmates have to walk down a hallway and through a door into the main area of Building 3 (Doc. 117-5 at 11).  The guards in the common area have no direct line of sight to inmates in the isolation area (*Id*.).

Jail policy is to staff three or four juvenile detention deputies to Building 3 at all

---

[12]   The FMJS authorize the use of remote means to supervise juveniles.  A juvenile must always be "within sight and normal sound of an officer . . . .  This may be accomplished through means of electronic surveillance, provided that a certified officer is available to respond to calls for help."  FMJS § 2.01(a).

times, not including the guard inside the control room (Doc. 178 at 18-23).[13]  But no deputy

is stationed inside a dorm (Gay Depo. at 38:7-9).  Instead, the deputies supervise the inmates

remotely and through regular rounds of the dorms.  On every shift, one or two deputies are

assigned to supervise the direct file dorms and one or two are assigned to supervise the pre-

adjudicated side of the building (Hertel Depo. at 56:1-2).[14]  These deputies have completed

Polk County's 40-hour training course on how to treat juvenile inmates (Doc. 177 at 41:22-

42:2).[15]

    The detention deputies work 12 hour shifts.  At the beginning of each shift, the

deputies perform a head count round in each dorm:  One deputy enters each dorm and spends

approximately ten minutes counting the juveniles and answering any of their questions or

concerns.  Immediately afterwards, each deputy makes an entry into a log book (Russell

Depo. at 32:15-17).  From this point until the end of the shift, the deputies perform shorter

---

[13] Captain Marcum testified that three deputies is adequate staffing for the night shift, as less supervision is needed while the kids are sleeping, and that four are appropriate during the day (*Id.*).  There is no record evidence regarding how many shifts staff three deputies versus four.  There is no state mandate regarding the appropriate ratio of staff to juvenile inmates.

[14] Plaintiff's expert (DeMuro) puts Sheriff Judd's staffing ratio at 15 juveniles to one officer, which he considers insufficient and should be eight youth to one officer according to "widely accepted standards for secure juvenile detention centers."  (Doc. 117-5 at 12). He also contends that the inadequate supervision often leads to fights and violence in the cells and living units (*Id.*).

[15] This is in accordance with Fla. Stat. § 985.688(8), which requires a county that operates its own juvenile detention facility to self-train its employees to comply with state and federal regulations.

rounds every 15 minutes followed by a log entry (*Id.*).  Deputy Russell testified that a typical round entails, "go[ing] into each dorm, walk[ing] up to each cell, mak[ing] sure everybody is breathing, and just mak[ing] sure they're not playing or – just make sure they're in there." (*Id.* at 32:5-7; *see also* Hester Depo. at 45:14-20).  The rounds are essential to maintaining order; "[b]y being visible, you prevent [fights] from happening."  (Gay Depo. at 48:6-9). Once every hour, the round must include a head count (Hester Depo. at 42:8-12).

Each deputy is assigned to two or three dorms per shift.  Obviously, the time a deputy spends on rounds in one dorm necessarily decreases the time he spends in another.  Deputies are also required to do rounds of the isolation cells every 15 minutes and record the juveniles' activity on a separate isolation room log (*Id.* at 171:21-25).  These rounds, which occur 24 hours a day, are recorded and randomly watched by supervisors to determine if deputies are adhering to their monitoring requirements (Doc. 178 at 45:13, 46:16-23).

Between rounds, the deputies (depending on the shift and time of day) escort the nurse to each cell to distribute necessary medications, pass out laundry to juveniles in their dorms, pass out meals, write any necessary incident reports or log entries, and supervise the inmates from the common area by direct sight.  The guards may be able to sit down in the common area for about six or seven minutes between rounds (Hester Depo. at 45:5-8).  They communicate with each other and the employee in the control room constantly, either face-to-face or via walkie talkie, which each deputy carries.  And the facility provides education in classrooms for direct files and preadjudicated juveniles (Doc. 178 at 45:20-46:3).

The deputies cannot avoid face-to-face interaction with the juveniles during each

15

shift.[16] But the length of this interaction varies depending on the shift, the number of other tasks assigned to the deputy, whether there are juveniles in isolation or on suicide watch who require supervision as well, whether the juvenile is a direct file or a preadjudicated, and to some extent the relationship each deputy has with the juveniles (Doc. 178 at 49:8-50:4; Hertel Depo. at 46:9-11).[17]

From the Plaintiffs' perspective, a need exists for greater hands-on supervision by Sheriff Judd's personnel. More staff, and more face-to-face interaction with the juveniles in their dorms, so the Plaintiffs argue, would reduce fights among juveniles, which is the conduct occasioning the greatest use of pepper spray. Sheriff Judd strongly denies any suggestion that his deputies are not actively managing the juvenile population. But his officers are not all seeing (who could be). The sight lines do not allow a monitoring deputy to watch everything that happens in a dorm (*see* Doc. 117-5 at 13).[18] Nor can a deputy,

---

[16] The night shift guards have fewer minutes inside each dorm per round, because the juveniles are on lockdown inside their cells from 9 p.m. until 6 a.m. (Doc. 178 at 50:6-12). Nonetheless, rounds still occur during this time period.

[17] Captain Marcum testified that the deputies spend more time with the pre-adjudicated juveniles that the direct files (Doc. 178 at 39:1-10).

[18] Sheriff Judd emphasizes the sight lines at the jail are significantly better than those at the closed DJJ facility. I have no reason to doubt this assertion. But the distinction does not seem particularly material. No evidence was presented at the hearing documenting the number of fights at the DJJ-run facility or whether DJJ's management approach, as compared to Sheriff Judd's methods, resulted in more or fewer fights than at the Polk County Jail. And even that answer has limited value here as I am "mindful that [a court] must refrain from imposing [its] own theories of penology on the nation's prisons and strive to inform [the court's] analysis with objective factors to the maximum extent possible." *Thomas v. Bryant,* 614. F.3d at 1307.

unless inside a dorm, hear much of what is occurring among the juveniles (*Id*. at 12).  In the main, deputies respond to fights after they have erupted (*see* Plf. Exs. 1, 1B).  For most, they converge quickly, but for a few, their delay in responding has been significant (Plf. Exs. 1B at 1, 9B).

    C.      *Sheriff Judd's Policies*

The FMJS, the overarching guidelines for Sheriff Judd, authorize the availability of "chemical weapons" to "certified corrections officer" and approve the use of the spray in a juvenile facility when this "use of force is necessary, when this level of force is the least likely to cause injuries to staff or youths, and only if in compliance with and if authorized by the policy and procedures directive for the facility."  FMJS § 20.02(j), (k).  Notably, Sheriff Judd has not issued a directive that specifically addresses the use of force in juvenile detention settings.  But he has issued general orders and directives regarding the use of force, and chemical restraints in particular, that apply to all deputies and correctional personnel under his command.  A Polk County Sheriff's Office ("PCSO") General Order dated December 1, 2011, for example, informs deputies as to the use of force: "Members acting within their official capacity may use only that amount of protective action [use of force] which is reasonably necessary to affect lawful objectives.  Justifications for using protective action are those facts known or perceived by a member at the time protective action is utilized." (General Order 1.5(C), Def. Ex. 3B).  The December 15, 2011, PCSO Department of Detention Directive (Department Directive 11.13(C)(2), Def. Ex. 4B) sets the guidelines for the use of chemical agents in detention settings:  "It is not necessary to wait until an

17

inmate engages in physical force to use chemical agents.  Chemical agents may be used to subdue an inmate threatening a detention deputy or other individual."  A detention deputy may use spray in self defense, to prevent escape, to prevent injury to another person or property, to quell a disturbance, and "[w]hen an inmate exercises active physical resistance to a lawful command."  *Id*.  Active physical resistance is defined as "physically evasive movements directed toward the member, such as bracing, tensing, pushing, or pulling to prevent the member from establishing control over the subject."  General Order 1.5(D)(2)(c)(2).  This is in contrast to passive resistance, which is "verbal and/or physical refusal to comply with a member's lawful direction, causing the member to use physical techniques to establish control."  General Order 1.5(D)(2)(c)(1).

Each detention deputy carries a two-ounce can of pepper spray on his or her belt (Gay Depo. at 35:8-18).  A deputy does not need approval before spraying.  Additionally, a larger can of spray, designed for use to quell riots, is stored in the control room in a locked cabinet and may only be used "with authorization from a squad sergeant or higher ranking member."  Detention Directive 11.13(C)(8)(c).  However, jail deputies have deployed this larger can of spray without receiving authorization (Gay Depo. at 45:14-22).[19]

Deputies are specifically directed to avoid "hand-to-hand confrontations . . .

_____

[19]  Gay testified that this larger can is kept in a cabinet in the control room.  When asked if he needs authorization before using it, he responded, "[n]o ma'am, not – well, not to my knowledge."  (Gay Depo. at 45:22).  Deputy Harrison had access to the larger can as well: he had the larger can of spray in his pocket and used it in another instance (Harrison Depo. at 158:7-8).  Deputy Hester also confirmed that supervisor approval is not required before using the larger can (Hester Depo. at 110:14-16).

whenever possible" to avoid injuring themselves.[20]  General Order 1.5(D)(6)(b).  Sheriff Judd

contends compelling research supports this use of force continuum: spraying inmates to

control behavior results in fewer injuries to staff and inmates than physical encounters

(Deland Depo. at 141:16-23).  One deputy testified: "[t]he proper protocol is to first spray

– actually I don't know if that's protocol, but I do know we've talked about it.  They told us

to do that over and over, to spray first before we put our hands on people."  (Hester Depo.

at 103:10-13).  When using spray, guards deploy a short, one-to-two second blast of spray

in the direction of the juvenile inmate's face.

After a deputy uses pepper spray on a juvenile, the deputy must permit the inmate to

shower, change, and visit the nurse (Doc. 178 at 168:5-9; Hertel Depo. at 138:21-139:1).  It

is the practice for deputies to detain juveniles who are sprayed in a holding cell until the

nurse is available to see him.[21]  The deputy must also fill out an incident report (which is

approved by a supervisor who then completes a protective action report) detailing the

justification for the use of spray and the steps the deputy took to follow decontamination

---

[20]  Further, the reasonableness of a "particular response of protective action must be judged from the perspective of how a reasonable member on the scene might respond." General Order 1.5(D)(12).  The General Order acknowledges that "[t]he direction and result of most encounters with subjects can be controlled by good communication skills on the part of a member.  In most encounters, the mere presence of a member and proper verbal direction will be sufficient to resolve potential problems and allow a member to execute their duty."  General Order 1.5(D)(8).

[21]  For example, on November 8, 2011, three inmates were fighting in F Dorm. Deputies Hester and Russell sprayed the two inmates who did not comply with their order to stop fighting.  The inmates were escorted to separate holding cells and waited to be individually examined by the nurse (Doc. 117-1 at 19-22).

procedures afterwards.

III.

*A.        Preliminary Injunction Standards*

To prevail on their motion, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits of their claim; (2) that they will suffer irreparable harm if the court does not issue an injunction; (3) that the threatened harm to the Plaintiffs outweighs the potential harm to Defendant; and (4) that the injunction would not be adverse to the public interest. *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir. 1989) (*aff'd*, 498 U.S. 479 (1991)).  The first factor is usually the most critical, but the level of success on the merits can vary depending on the court's assessment of the remaining factors. *Schiavo ex rel. Schinkler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005).  In any event, substantial likelihood of success does not mean "*certain*"; it means "only *likely* or probable." *Id.* (emphasis in original).  And "[w]here the 'balance of the equities weighs heavily in favor of granting the [injunction],' the movant need only show a 'substantial case on the merits.'" *Id.* (citing *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).  A federal court has inherent authority to issue an injunction to remedy a violation of constitutional rights. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).  Yet, the exercise of that authority comes with the recognition that the issuance of a preliminary injunction is "an extraordinary and drastic remedy and is not to be granted unless the movant clearly establish[s] the burden of persuasion as to the four prerequisites." *Schiavo,* 403 F.3d at 1231 (citations and quotations omitted).  Here, Plaintiffs do not seek to ban the use of pepper

20

spray at the facility; instead, they move to preliminarily enjoin Sheriff Judd from using it except in exigent circumstances and for Sheriff Judd to develop and implement a staffing, supervision, and classification plan to ensure that all juveniles in Defendants' custody are adequately supervised and protected from violence (Doc. 22-1 at 2).

       B.     *The Constitutional Challenge – Conditions of Confinement*

          1.     *identifying the claim*

Claims involving the mistreatment of pretrial detainees are covered by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause. *Bozeman v. Orum,* 422 F.3d 1265, 1271 (11th Cir. 2005).[22]  But that distinction is without a material difference as the standards for both are the same, and the decisional law pertaining to inmates applies equally to detainees. *Id.*  A number of different types of claims arise under the Eighth Amendment's Cruel and Unusual Punishment Clause, each with different tests.  Plaintiffs have mixed these types in their pleadings without a discerning distinction.  For example, Count Two of the operative complaint (the third amended complaint) alleges "Dangerously Violent Conditions of Confinement" in violation of the Eighth and Fourteenth Amendments (Doc. 197 at 29).[23]  In contrast, the preliminary

---

     [22]  At the time of the filing of the complaint, one of the Plaintiffs (K.J.) was awaiting the imposition of a sentence making the Eighth Amendment conceivably applicable. *See* Doc. 43 at 4 (Order dated May 4, 2012, discussing the applicability of the Eighth Amendment to such a situation and concluding that "[u]nder the sounder logic, 'the critical juncture is conviction.'" ).

     [23]  Count Two of the operative complaint substantially mirrors the same count in the previous complaints (Docs. 3, 53).  Plaintiffs seek a preliminary injunction as to Count Two

injunction motion uses language more akin to an excessive force claim than one attacking the conditions of confinement. When pressed at the oral argument to identify the type of violation at stake, Plaintiffs' counsel stated they had decided to proceed under the substantial risk of harm argument, a position that comports with that taken in their pre-hearing brief (Doc. 117).[24] Thus, Plaintiffs' argument here is two-fold, and each addresses Sheriff Judd's purported indifference to their safety: he acted with deliberate indifference to the inmate-on-inmate violence; and his reliance on pepper spray to control the juveniles exposed them to a substantial risk of harm.

### 2. deliberate indifference standards

To prevail, Plaintiffs must show a substantial likelihood of meeting two distinct demands: an objective one – the condition (*i.e.*, the danger of violence and the use of pepper spray) is so serious that it presents a substantial risk of harm to them; and a subjective one – Sheriff Judd acted with deliberate indifference to their safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Several considerations factor in the analysis. Comfortable detention centers are not constitutionally mandated, but neither are inhumane ones countenanced. *Id*. at 832. Officials must take reasonable measures to guarantee the safety of their detainees and have a duty to protect them from violence at the hands of other detainees. *Id*. at 832-33. And

only.

[24] Plaintiffs' motion for preliminary injunctive relief is necessarily limited by the allegations in Count Two of the operative complaint. In sum, they must establish a relationship between the conduct it alleges and the injury their motion for preliminary injunction recites. *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).

while conditions may be harsh, gratuitously allowing the beating of one detainee by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.  *Id*. at 833.

Proving both aspects of the test, however, does not end the matter.  Plaintiffs will be entitled to injunctive relief only if the Court reasonably expects that the violation will recur and any policy changes implemented will not completely and irrevocably eradicate the effects of the alleged violations.  *See Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (a claim for injunctive relief may become moot if it can be said with reasonable assurance that there is no reasonable expectation that the alleged violation will recur and the interim relief or events have completely and irrevocably eradicated the effects of the alleged violation); *Thomas v. McNeil*, No. 3:04-cv-917-32JRK, 2009 WL 64616, at *21 (M.D. Fla. Jan. 9, 2009) (same in the context of an Eighth Amendment inquiry).  Furthermore, the consideration of Plaintiffs' preliminary injunction request must factor in the demands of the Prison Litigation Reform Act ("PLRA").  *Miller v. French*, 530 U.S. 327, 331 (2000) ("The PLRA establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions").  Hence, the court must give "substantial weight to any adverse impact on the public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity . . . in tailoring any preliminary relief."  18 U.S.C. § 3626(a)(2).  Any relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  *Id.*  Lastly, should the court grant

23

such injunctive relief, the order automatically expires 90 days after its entry, unless the court were to make required findings.  *Id.*[25]

IV.

To a large degree, Plaintiffs focused their attention at the evidentiary hearing on Sheriff Judd's use of pepper spray and its effects.  Perhaps this was because one is related factually to the other.  Fights occur and guards quell them with pepper spray, a cause and effect.  But the import of Plaintiffs' constitutional claims are not so factually narrow.  The juvenile-on-juvenile violence and Sheriff Judd's use of pepper spray present separate constitutional inquiries.  A constitutionally acceptable use of pepper spray does not mean Plaintiffs' concerns about the substantial risk of violence are without merit (and vice versa).

A.    *The Objective Inquiry – Serious Risk of Harm*

1.    *violence*

Fights occur at the jail with substantial frequency.[26]  My review of the incident reports

---

[25]    The PLRA encompasses detention facilities involving juveniles awaiting adjudication or trial.  18 U.S.C. § 3626(g)(3) and (5).

[26]    I recognize such a conclusion suggests that a certain number of fights is likely. How else could the number here be substantial?  As neither side presented any evidence pertaining to the experience of other similarly-sized juvenile facilities (comparators), what should be considered substantial?  *See e.g., Rizzo v. Goode*, 423 U.S. 362, 373-75 (1976) (The crux of *Rizzo* is the Court's disapproval of imposing liability for the official's failure to act in the face of a statistical pattern of misconduct absent proof that supervisory defendant's had direct responsibility for the action of those officers engaged in the misconduct); *see LaMarca v. Turner*, 995 F.2d 1526, 1536 n.21 (11th Cir. 1993) (noting *Rizzo's* admonition but finding that district court had not solely looked at the statistical evidence before granting injunctive relief.  The plaintiffs had "painted a dark picture of life" at the prison; one "that would be apparent to any knowledgeable observer, and certainly to

and protective action reports approximates 25 fights over a ten-month period.  At least one incident resulted in serious injuries demanding hospitalization (*see* Plf. Ex. 9B).  Several of the juveniles expressed their fear for their safety (*see* D.M. Depo. at 66:1-2; Plf. Ex. 2).  The clear majority of the fights occurred when deputies were not present.  Although deputies almost always responded to the fights quickly, significant injuries can occur in seconds.

On October 16, 2011, Deputy Hester responded to a fight in Echo dorm (Hester Depo. at 136:21-24).  He was outside the dorm at the time and was the first to respond.  He found the inmates "hitting each other with mop ringers and broom sticks and – so they were all kind of just going at it." (*Id*. at 136:24-137:1).  Deputy Hester testified that all of the inmates in the dorm were involved in the fight: "[E]verybody was fighting.  It seemed like everybody was hitting somebody...." (*Id*. at 137:18-19).  The fight involved "14 to 16 kids" (*Id*. at 136:12), and the incident report confirms that one inmate was trying to hit another with a mop (Doc. 117-1 at 15).  Deputy Hester sprayed at least one inmate who did not comply with his orders to stop fighting (*Id*.).[27]  Two deputies from PSCO investigated and charged all inmates involved in the fight with felony battery and criminal mischief.

A week later, on October 24, 2011, Deputy Hester responded to another fight, this

---

an an official in the [superintendent's] position.").

[27]  Deputy Hester testified that the situation was a complete melee.  The first inmate he sprayed "didn't get on the ground when I told him to and I had my pepper spray in my hand because, you know, they're afraid of it.  They're not afraid of being grabbed because, you know, we're not going to hurt them, so they're not afraid of that.  So they're afraid of the pepper spray, so, you know, they respond well to it." (Hester Depo. at 139:12-18).

one in Charlie dorm (Doc. 117-1 at 10).  Deputy Hester was in Echo dorm when he noticed

the fight and was the first deputy to respond.  He ordered the two inmates involved to stop

fighting and sprayed the juveniles when they did not comply (*Id.*).  After the fight was

contained, the inmates involved were locked in the holding cages until the nurse examined

them.  The rest of the dorm's inmates were on lockdown while a deputy cleaned blood from

the fight off of the dayroom floor (*Id.*).

According to a police report, on February 24, 2012, three juvenile inmates were on

lockdown in Foxtrot dorm, cell 8 (a blind cell dorm) when they beat a fourth cell mate, T.W.,

to the point of unconsciousness multiple times over the course of several hours (Plf. Ex. 9B).

The inmates first wrapped a pillowcase around T.W.'s neck and strangled him until he

passed out.  Then they hogtied him with a sheet and punched him in the head.  When T.W.

eventually regained consciousness, his cell mates were whipping him with wet towels.  The

perpetrators, anticipating that a deputy would make rounds soon, untied the victim while a

deputy walked past the cell (*Id.*).  The deputy did not notice anything out of the ordinary and

walked on.  T.W. was then urinated on, sprayed in the face with a cleaning substance, and

stripped of his clothes.  The perpetrators wrapped a sheet around his neck, tied the other end

around the bar on the window, and pulled the sheet tight until T.W. lost consciousness.  This

was repeated three times until a deputy finally noticed the commotion and broke up the

assault.  T.W. was hospitalized, and the inmates were arrested and charged with attempted

murder (*Id.*).[28]

On March 21, 2012, two inmates started fighting just inside the entrance to Alpha dorm, near an area where a steel bunk had been set up for a juvenile on direct observation (Doc. 117-3 at 35). They would not stop fighting despite Deputy Choquette's orders to do so. Still punching each other, the two inmates fell onto the bunk, which collapsed under their combined weight (*Id.*). Deputy Choquette, worried for the inmates' safety at this point, sprayed both juveniles in the face (*Id.*).

On June 13, 2012, another fight occurred in a blind cell, this time in Echo dorm, cell 1 (Plf. Ex. 1B). Upon noticing a commotion, Deputy Gay entered that dorm. Right away he noticed red marks around one inmate's neck. According to the incident report, three inmates were fighting; Deputy Gay sprayed one of them (who turned out to be the victim) in the face when he would not stop throwing punches. Deputy Gay's report states that two of the inmates had placed the victim in a choke hold and "hit him in the head and face area several times." (*Id.*) The victim had red marks around his neck but did not suffer serious injuries. The inmates reported it was a "payroll" fight over the victim's food plates for that day (*Id.*).

---

[28] Sheriff Judd maintains an event like this is unlikely to reoccur because he has shut down these blind cells and implemented quality assurance checks performed by a lieutenant in addition to the regular 15 minute rounds (Doc. 178 at 46:16-23). Additionally, the deputy involved in the incident has been removed from juvenile duties. While I agree the future probability of a like event taking place in one of these few cells is more remote than before Sheriff Judd's remedy, the fight signals concerns more than just the location. That deputies missed the commotion despite the purported regularity of their rounds questions the adequacy of the inspection. One event, however, does not make a trend.

"[T]he right to personal security constitutes a historic liberty interest protected substantively by the Due Process Clause. And that right is not extinguished by lawful confinement, even for penal purposes." *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). The "essence" of Plaintiffs' dangerous-condition claim against Sheriff Judd is his alleged failure to provide an atmosphere that assures their "reasonable safety." *Tittle v. Jefferson Cnty. Comm'n*, 10 F.3d 1535, 1543 (11th Cir. 1994) (Kravitch, J., concurring). It does not matter that some of the juvenile detainees have been unaffected by the violence or that only one juvenile has suffered severe injures at the hands of other detainees. It is enough that the violent conditions continue to pose a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. *See also Rodriquez v. Sec'y for Dep't of Corrections*, 508 F.3d 611, 617 n.12 (11th Cir. 2007) (gang-related threats made on inmate's life, which were reported to prison officials, triggered Eighth Amendment duty to act); *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005) ("We accept that an excessive risk of inmate-on-inmate violence at the jail creates a substantial risk of serious harm."). Fights at the jail are not infrequent; they are commonplace. Based on my review of the evidence, I find the Plaintiffs are likely to satisfy their objective demand that the level of violence poses a serious risk of harm.

### 2. pepper spray

OC spray, also known as pepper spray, is an aerosol spray made with the pepper derivative oleoresin capsicum. Designed to disable a subject, it produces "intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the

eyes, a gagging reflex, and temporary paralysis of larynx." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (quotations omitted).  The burning effects of the spray can last for several hours, particularly if the person is kept in a confined space and not allowed to decontaminate (Doc. 117, Ex. 5 at 6).[29]  For some, the spray can cause "disorientation, anxiety, and panic." *Danley*, 540 F.3d at 1309 (quotations omitted).  And for others – asthmatics or the mentally ill – the effects can be more severe.  Pepper spray constricts the bronchials, exacerbating respiratory issues.  It can make the mentally ill more paranoid, fearful, angry, and less trusting, all of which compromises the ability to treat their mental illness.  *Thomas v. McNeil*, 2009 WL 64616, at *4.  The spray's particular sensitivities to adolescents are less well known as the overwhelming majority of its use nationwide is directed at adults.  Plaintiffs' psychiatric expert (Dr. Glindmeyer) opined that an adolescent who experiences or witnesses a pepper spray episode is exposed to a traumatic event, and that traumatic events by their nature almost always produce adverse symptoms (Doc. 117-9 at 10-11).  While the symptomatology might not rise to the level of diagnostic criteria, the signs are nonetheless considered to be peritraumatic responses (an example would include the sense of being in a daze).  Adolescents can exhibit peritraumatic responses and maladjustment in the days and

---

[29]  The hotness in peppers is measured in Scoville units.  A jalapeno measures at 5,000 units; pepper spray routinely reaches 200,000, making pepper spray 400 times hotter than a jalapeno.  *United States v. Mosely,* 653 F.3d 859, 862 (6th Cir. 2011) (finding that Michigan conviction for shooting pepper spray at a person without justification constituted a "crime of violence" for career offender purposes under the federal sentencing guidelines).

weeks following the traumatic event, and some will continue to exhibit trauma symptoms that meet criteria for the diagnosis of Posttraumatic Stress Disorder (*see id.*).

The National Institute of Justice (NIJ) reviewed two unpublished NIJ-funded studies that used different methodologies to test pepper spray's effectiveness. *See* Nat'l Inst. of Justice, *The Effectiveness and Safety of Pepper Spray* (NCJ 195739) (April 2003). One looked at injuries to officers and suspects in jurisdictions in North Carolina after pepper spray had been introduced. That study showed declines in injuries to both groups (a fact that Sheriff Judd emphasizes) and a reduction in the filing of excessive force complaints. The other study examined the cause of death in 63 cases purportedly involving pepper spray. Of these deaths, pepper spray contributed to the death of two asthmatics. In contrast, a report issued by an advocacy group, the Texas Criminal Justice Coalition, commented that no study has recommended pepper spray as safe for use on children. *See* Leah Pinney, Tex. Crim. Justice Coal., *Pepper Spray in the Texas Youth Commission: Research Review and Policy Recommendations* (Nov. 2007). The authors opined that "[i]f juvenile corrections personnel are not proficient in primary control and de-escalation techniques, they may increasingly rely on pepper spray as an option of force," a proposition the Plaintiffs advance. *Id.*

All evidence points to Polk County as the only county in Florida where line staff at a juvenile detention facility carry pepper spray (*see* Doc. 117-5 at 7 n.4).[30] And Sheriff

---

[30] Detention direction 11.13 states that "[p]ersonal two (2) ounce chemical agent dispensers may be carried by detention deputies in secure areas, provided the dispenser is carried in an agency-issued web gear holster." Detention Directive 11.13(8)(e). Polk County Jail detention deputies have completed pepper spray training. As a part of this training, they

30

Judd's policy is not common elsewhere in the country.  Only 15 jurisdictions (this includes all 50 states, the District of Columbia, and Puerto Rico) have state agencies that authorize the use of chemical agents in juvenile detention settings.  Of these 15, only six agencies allow their line staff to carry pepper spray.[31]

How many pepper spray events have occurred is hard to pin down.  Both sides dispute the numbers during a given period, September 2011 through June 2012 (ten months).  The Plaintiffs count 37 instances, with the total number of juveniles sprayed at 71 (Plf. Ex. 1A).  Sheriff Judd figures 22 episodes with 36 juveniles sprayed (Defendant. Ex. 36).[32]

---

are sprayed and directed complete certain tasks.

[31]  This data was compiled by the Council of Juvenile Correctional Administrators in its May 2011 Issue Brief, *Pepper Spray in Juvenile Facilities*, available at cjca.net/attachments/article/172/CJCA.Issue.Brief.OCSpray.pdf.  When this research was published, the Florida legislature had not yet enacted Fla. Stat. § 985.688(11), which by requiring compliance with the FMJS gives line staff at county-run juvenile detention facilities the authority to carry pepper spray.  Only three Florida counties have opted to run their own detention facilities, Polk, Marion, and Seminole, and Marion follows the DJJ's use of force continuum, which does not authorize line staff to carry pepper spray.  The parties did not offer evidence about Seminole County.

[32]  The disparity between the two sides is attributable to the time frame charted and the sources examined.  Plaintiffs' time span extends into July 2012; Sheriff Judd's time frame ends in June 2012.  Plaintiffs relied on the incident reports provided in discovery and the testimony and the sworn statements juveniles gave about other pepper spray events for which the discovery documentation did not detail.  For example, Deputy Harrison sprayed around the perimeter of a holding cage with the larger can of spray to force the juveniles inside – who were on suicide watch – to stop singing a vulgar song.  (Harrison Depo. 115:6-15).  He did not fill out an incident report following this use of spray (Gay Depo. 137:11-12) and was reprimanded and taken off juvenile duties the following day (Harrison Depo. 115:24-116:6).  Another juvenile who testified at the hearing (K.G.) testified about the spraying of A.S. in April 2012.  No report exists for that event.  *See* Doc. 179:36-38.

Frankly, Sheriff Judd does not track pepper spray use.  His only data comes from protective action reports and incident reports, and these encompass the gamut of protective actions, including the use of pepper spray.  Supervisors monitor the reports to keep abreast of the reported behavior and to determine if the reporting officer needs management's intervention. But no matter the precise spray score, the reports reveal distinct patterns.  By my count after reviewing the evidence presented for the operative ten months, deputies used force in 35 instances.[33]  Of these, deputies applied pepper spray 29 times, and many events involved more than one burst.  My review shows: 19 involve fights between juveniles; two describe a need to protect an inmate from harming herself or others; five concern the use of spray for failure to obey a deputy's order; and three deal with the use of spray to quell a potential disturbance.  The  number of affected juveniles approximates 47, with some being sprayed multiple times.[34]  But my count is the likely minimum estimate for the period.  Plaintiffs have pointed to at least two instances without accountable documentation that I credit (*see* footnote 32).   Whether the juveniles, who have reported incidents for which no documentation can be found, are accurate historians, or whether they have confused some events with reported events is difficult to discern.  And to a large degree, the exact numbers are unimportant to the legal analysis.

---

[33]  I take this number from the incident reports, Plf. Exs. 1, 1B, and the testimony of two unrecorded incidents (*see* footnote 32 and Doc. 179 at 36-38).

[34]  If a fight involved six inmates and deputies used spray to break it up, all six inmates are included in this calculation.

Examining these events individually and then totally to see if Sheriff Judd's overall use of pepper spray creates a constitutionally unsafe condition of confinement is difficult, particularly when each incident is viewed from the deferential perspective afforded to jailers. Nonetheless, six considerations inform my analysis. Some of these are precedent-driven. Others are just commonsensical assumptions based on experience.

First, the Eleventh Circuit has repeatedly said that "[p]rison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Danley*, 540 F.3d at 1307 (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)). "And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders." *Id.* Indeed, the *Danley* court determined that Danley's second failure to obey a command to return to his cell was a sufficient reason to legally hit him with a dose of pepper spray, a method which the court considered "an accepted non-lethal means for controlling unruly inmates." *Id.* But juvenile detainees are "unruly" by nature. If *Danley's* language were strictly applied, each time a juvenile acted unruly an officer could chemically spray him without offending the Constitution (assuming the quantity administered was not excessive and the juvenile was allowed to promptly decontaminate). Such an extrapolation, particularly in a juvenile setting, conflicts with the circuit's other cases curbing the use of pepper spray. *See Vinyard v. Wilson,* 311 F.3d 1340, 1348 (11th Cir. 2002) (use of pepper spray is excessive force under Fourth Amendment where crime is minor, the arrestee surrenders, is

33

secured, is not violent or threatening officer safety).  Even the temporary pain pepper spray causes can be constitutionally impermissible if used unnecessarily.  *Id.*  Despite *Danley's* language, the guiding standard is whether the chemical agents were used unnecessarily and without penological justification.  *Thomas v. Bryant*, 614 F.3d at 1307.

Second, when reviewing the incident reports to evaluate the penological justification for the use of pepper spray, I am mindful of their institutional nature.  Deputies memorialize protective actions knowing superiors will review the reports.  The language of the force continuum expressed in the Sheriff's general orders will invariably appear in these documents unless another deputy (the one who did not use the force) gives a contradictory account.  This observation does not mean that I am suggesting that any of the officers whose reports I have reviewed misled superiors about his or her actions.  But a deputy's justification for deploying pepper spray is in many instances grounded on fleeting perceptions – that a juvenile balled his fist, or that he assumed a fighting stance, or that he took an aggressive posture.  Reasonable officers can often disagree about such matters and the need for force.  Furthermore, if the administrative culture promotes an officer's use of the spray as a preferred option over other techniques, that culture may also unwittingly promote the officer's rote recitation of the force continuum's justification for the spray.  That said, Sheriff Judd's deputies are undoubtedly tasked with a challenging population to oversee, one that requires skill and patience.

The third consideration is a cautionary reminder when evaluating a specific incident or report.  Focusing on a single event without regard to other pepper spray events can skew

the analysis.  A macro view of the protective action reports reveals more about patterns of the chemical's use and may put a singular event in context.  For example, almost all of the fights occur when an officer is not in a dorm.  Yet, even that observation may have limiting relevance as judges should be wary of wading into the minutiae of administering a detention facility.  *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

Fourth, a macro view of the reports also has its shortcomings.  Looking for patterns and then categorizing and labeling events into discernible boxes of conduct can be analytically deceiving.  A pattern suggests consistency in behavior and assumes an evidentiary relevance.  *See, e.g., Black's Law Dictionary*, 1149 (7th ed.1999) ("A mode of behavior or series of acts that are recognizably consistent"); Fed. R. Evid. 406 (evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with that habit or custom).  But how many events are needed to foretell a pattern?  And which pepper spray events are relevant for inclusion in the constitutional analysis?

Fifth, a significant portion of juvenile detainees suffer from mental illness.  Although the precise number of Polk County detainees in this category is not available, Dr. Glindmeyer noted the social science literature approximates that 65% of juveniles in a detention setting suffer from mental illness (Doc. 177 at 42:23-44:2).  Another study places the percentage higher, at 70%.  *See* Mark Soler, *et al.*, *Juvenile Justice: Lessons for a New Era*, 16 GEOJPLP 483, 513 (2009).  Many detainees are on psychotropic medications.  For some incidents, Sheriff Judd's staff may be responding inappropriately to mentally ill inmates who

may be suffering from symptoms of their illnesses that manifest in behaviors such as yelling, lashing out, or refusing to obey orders. *See Thomas v. McNeil*, 2009 WL 64616, at *24 (noting a warning issued by Florida's legislatively created monitoring body to the Department of Corrections ("DOC") regarding same and recommending DOC adopt procedures similar to the Federal Bureau of Prisons, which calls the intervention of mental health personnel to diffuse the situation).

Sixth, the overwhelming number of juvenile detention centers in the nation, and Florida in particular, do not use pepper spray.[35]  And the majority of the jurisdictions that do use pepper spray do not allow line staff to carry the chemical restraint.  Reasons must exist for this, and some seem obvious.  The national view, to the extent one can be garnered

---

[35]  As noted previously, Florida law does not authorize the use of pepper spray on juvenile inmates under DJJ custody.  *See* Fla. Stat. § 985.645(2)(a)(5); Fla. Admin. Code r. 63H-1.004(4).  Defendant Judd's position is that Fla. Stat. § 985.688(11) requires he comply with the FMJS; thus, relieving him from § 985.645(2)(a)(5)'s legislative mandate prohibiting the use of pepper spray in juvenile facilities.  Sheriff Judd's view seems at odds with Chapter 985's comprehensive statutory scheme governing juvenile justice and the plain wording of the statute he relies upon.  Section 985.688(11) states that a county-run juvenile facility is in compliance with the remainder of that *section* (*i.e.*, § 985.688) if the facility complies with the FMJS.  That *section* does not provide that a county sheriff is free to disregard the remainder of the *chapter* (*i.e.*, Chapter 985) relating to juveniles and their detention. *See*, *Daniels v. Florida Dept. of Health*, 898 So.2d 61, 64 (Fla. 2005) ("When the statute is clear and unambiguous, courts will not look behind the statute's plain language …").  FMJS does not appear to have the force of law.  When asked about this at the preliminary injunction hearing, defense counsel stated that the FMJS are "quasi-regulations" (Doc. 179 at 72:13).  Counsel then emphasized that compliance with the FMJS is mandatory for Sheriff Judd to operate the juvenile facility under Fla. Stat. § 985.688(11).  This is undoubtedly correct.  Nonetheless, the FMJS merely authorize Sheriff Judd *to permit* his deputies to access pepper spray, they do not *compel it*.  In any event, I doubt the FMJS trumps a contrary statute on point.  These matters, however, are state law issues and only add background to the controversy of the use of pepper spray in Florida's juvenile facilities.

through surveys, suggests that pepper spray is inappropriate in the juvenile setting; or, if used, the chemical restraint should be employed sparingly.   Restricting the spray to a particular location or a supervisor makes use of the spray a tool of last resort.   Not only do these restrictions make the line officer's application for the use of the spray institutionally more inconvenient, it likely adds another layer of review, perspective, and control.   I also suspect the regulators who decided against arming line staff with pepper spray had a more basic concern – the undesired effect of making their personnel increasingly reliant on pepper spray to end a conflict and less apt to diffuse the situation through de-escalation techniques. Pepper spray offers the officer a quick fix to the problem he or she faces.   But the tool's utility is not always synonymous with its constitutionally permissible use.

With the above considerations in mind, my review of 29 pepper spray incidents reveals what would be expected: deputies at the jail spray to stop fights, quell disturbances, protect themselves or others, and force compliance with orders.   Some guards resort to the spray before putting their hands on a juvenile to control his behavior.   Some events stand out and are detailed below.   In looking at these events, it is helpful to borrow the DOC's parlance.   The first two examples represent the "spontaneous" use of force to end the immediate danger the inmates presented to each other and the staff.   The remaining four events are non-spontaneous uses of force.   No immediate danger was apparent; instead, the aim was to force compliance with an order, a matter that permitted a more deliberative pace for deciding the appropriate official response.   *Thomas v. McNeil*, 2009 WL 64616 *2 n. 10 (discussing DOC policies).

On January 22, 2012, a group of juveniles circled an unsuspecting detainee named J.P around the food station cart in Charlie Dorm.  Without warning one punched him, landing a blow to the side of his head.  The rest piled on swinging away (video of incident, Plf. Ex. 13A; Doc. 117-2 at 5-11).  Deputy Hertel and Deputy Gay, who was armed with the large can of spray he had grabbed from the control room, quickly entered the dayroom and sprayed the melee (Hertel Depo. at 122:13-14).  Of the six involved in the fight, J.P. and another immediately dropped to the floor face down (Gay Depo. at 102:3-7).  Deputy Gay knelt closely over J.P. and told him to remove his hands from beneath his body.  J.P. refused according to Gay.  Gay next recounted that J.P.'s "right elbow came out from beneath him quickly and aggressively." (Doc. 117-3 at 5; Gay Depo. at 103:9-12).  Gay said he felt threatened, and so he sprayed J.P. in the face (Gay Depo. at 104:12-13).  This fight is emblematic of the fights that occur at the facility, although the numbers of juveniles participating in this brawl is not the norm.  Deputies typically respond after the fight starts and pepper spray to quell the disturbance.  The initial bursts of spray are objectively justifiable.  This one stands out from the rest because of Deputy Gay's actions after the initial spraying had immobilized J.P.  Having viewed the video, I do not credit Deputy Gay's account that J.P. posed a threat to either officer.  J.P. offered no resistance after being initially sprayed, nor did he make any furtive gestures once on the floor.  Yet, Deputy Gay administered a dose of spray inches from J.P.'s face (Plf. Ex. 13A).  The video clearly shows J.P. writhing; indeed, he testified that the pepper spray burned and made it difficult to breath (he is an asthmatic).  After the event, an officer put him in the cage briefly, and then took him

38

to the isolation room to shower and visit the nurse.[36]  He continued to feel the effects of the spray the next day.  I consider Deputy Gay's second administration of spray to J.P. unnecessary and without penological justification.

On November 3, 2011, Deputy Gay, from his vantage point in the common area, noticed a fight break out in Charlie dorm between two juveniles (Doc. 117-1 at 17).  The juveniles did not stop fighting once Deputy Gay entered the dorm and ordered them to do so (Gay Depo. at 63:16-17).  Consequently, Deputy Gay sprayed both inmates in the face (*Id.* at 65:11-13), which immediately stopped the fight.  One of the juveniles dropped to the ground in a prone position (*Id.* at 65:16-17).  The other juvenile, however, "started walking toward the restroom area or the shower area. . . .  And I gave him an order to lay prone on the floor." (*Id.* at 65:17-19, 24-25)  When he still did not comply and "continued toward the shower," Deputy Gay sprayed the inmate in the face again (Doc. 117-1 at 17).  After this second spray, the juvenile complied with the order to get on the ground (*Id.*).  As with the above example, this second spray occurred after the danger of the fight had passed.

B.G., no novice to the juvenile justice system, was a particularly difficult detainee.  Charged with sexually assaulting a female with a weapon, he repeatedly fought other

---

[36]  The decontamination of pepper spray works best using a cold shower. Every juvenile who testified at the preliminary injunction hearing commented that their showers were not cold enough, which exacerbated the spray's effect.  I do not credit this testimony for two reasons.  First, the juveniles may not have known to use cold water instead of hot. And second, I note that at least one juvenile (B.G.) complained to his family about the lack of hot water.  That complaint prompted B.G.'s sister to write the governor about the living conditions at the facility including the lack of "hot water."  *See* Def. Ex. 11G (under seal; Bates # 10th supplement 05110)

detainees, damaged or tried to damage the facility's property on a couple of occasions, and generally made himself a nuisance to the staff and probably his fellow detainees (Def. Ex. 11F (under seal)). He also suffers from mental illness – bipolar, oppositional defiant disorder, and attention deficit hyperactivity disorder (Doc. 175 at 187). On February 12, 2012, sometime after the evening lockdown, B.G. and another juvenile named K.J. made some comments that deputies interpreted to be self-harming in nature. Both were placed in a cage, fitted with suicide smocks, and observed.[37] Both then became disruptive, beating the cage's plexiglass lining and incessantly rapping a vulgar song despite being ordered to cease (Plf. Ex. 12). Deputy Harrison sprayed the floor around one of the holding cages to quiet the two. (Harrison Depo. at 115:6-7, 123-24). Deputy Harrison, however, did not complete an incident report after spraying, an infraction for which he was removed from juvenile guard duties indefinitely (Plf. Ex. 12 at 3). Had Deputy Harrison spayed the two in the face, he would not have been disciplined because the use of force policy justified the administration of pepper spray to quell the disturbance and to protect jail property (Plf. Ex. 12 at 2). Admittedly, this scenario is likely not to reoccur given Sheriff Judd's disciplinary action against his deputy. Nonetheless, the episode is remarkable for another reason – Deputy Harrison would have been justified in spraying B.G. directly for failing to abide by his order even though B.G. did not exhibit any active physical resistance, a message that is more

---

[37] A suicide smock is a heavy, padded suit resembling a butcher's apron that is designed to make it difficult for a juvenile to harm himself or herself. Once a deputy determines that a juvenile should be placed on suicide watch, it is jail policy that the juvenile change into the smock.

punitive than rehabilitative.  Other options were available.

Another incident occurred involving juvenile T.H. on April 1, 2012 (Doc. 117-3 at 33-34).  T.H. had been confined in isolation for an unspecified period of time for reasons that are not apparent from the record.  He had flooded his isolation cell with water from the sink and thrown his food and tray (Hertel Depo. at 105:19-24).  Deputy Hertel asked T.H. to pass his tray through the slot in the door (Doc. 117-3 at 33).  T.H. did not comply (*Id*.).  Deputy Hertel then ordered T.H. to walk to the rear of the isolation cell and face the wall so he could enter and retrieve the tray (*Id*.).  T.H. again refused to comply (*Id*.).  At this point, Deputies Hertel and Sanders entered the cell and asked T.H. again to move against the rear wall (*Id*.).  Deputy Hertel testified that T.H. eventually complied but then "turned around and took a fighting stance." (Hertel Depo. at 119:12).  Deputy Hertel sprayed T.H., who immediately collapsed onto his cot.  Hertel testified that he sprayed because he felt threatened, even though he had Deputy Sanders with him as back up and even though T.H. was confined to an isolation room (*Id*. at 118:13-119:23).  Deputy Hertel is approximately seven inches taller and 150 pounds heavier than T.H. (*Id*. at 109:3, 118:18-19).

On January 16, 2012, and again on January 24, 2012, juvenile D.G. was sprayed.  D.G. had threatened to kill herself several times while at the jail and was on suicide watch both times she was sprayed.  In fact, Deputy Cranor testified that D.G. talked about killing herself daily and had "[c]onstant mood swings" (Cranor Depo. at 159:1; 163:16).  D.G. "ha[d] a lot of strange behaviors" – she had tried to pull her hair out once, she talked to herself regularly, and on one occasion had attempted to cut her wrist with a piece of paint she

41

had peeled off the wall (*Id*. at 159:4-11, 164:5-7).   The first time she was sprayed, she was on direct observation and confined to a bunk, which was placed in the dayroom of her cell against the glass front wall (Doc. 117-2 at 20-21).   She refused to stay there, once even starting to climb the stairs to the dorm's second level.   She was screaming profanities (Cranor Depo. at 98:24-25).   Deputies Bell and Cranor threatened to shackle her to the bunk because they were afraid she would jump from the second level (Doc. 117-2 at 20).   Deputy Cranor called her supervisor (Sergeant McGraw), who arrived and authorized the deputies to shackle D.G. (*Id*.).   But rather than return to her bunk, D.G. sat down at a table in the dayroom and put her head down (Cranor Depo. at 106:21-23).   At this point, McGraw ordered Deputy Cranor to spray D.G. (Doc. 117-2 at 20).   Deputy Cranor tried to spray D.G. in the face, but she put up her hands up (*Id*.).   Deputy Cranor then "grabbed the back of her suicide smock and pulled her back and sprayed her again." (Cranor Depo. at 109:6-7).   The second incident where D.G. was sprayed was eight days later (Doc. 117-3 at 17).   D.G. was on suicide watch again.   She refused to return to her bunk and, when deputies attempted to guide her there and ultimately threatened with shackles, she "kicked and squirmed" to break free (*Id*.). D.G. was sprayed (Doc. 117, ex. 3 at 17).   She was allowed to shower and was then shackled to her bunk (*Id*.).   All concede D.G. actively suffers from mental illness, as these events suggest.   Yet, no mental health personnel intervened; no decision was apparently considered, at least from the record before me, as to whether she should be involuntarily committed under Florida's Baker Act.   Instead, deputies controlled her behavior through pepper spray.

42

On February 25, 2012, three inmates, including M.H., were in the holding cages being evaluated for suicidal thoughts (Doc. 117-3 at 23).[38]  When all three refused to change into suicide smocks, the deputies called Captain Marcum to assist them (*Id*.).  Once she arrived, two of the inmates agreed to change right away (Harrison Depo. at 153:4-12).  M.H., after first refusing, confirmed that he indeed felt suicidal, and he too agreed to change into the suicide smock (Doc. 117-3 at 23).  Deputies Harrison, Brown, and Galloway opened the holding cage door to hand M.H. the smock and take his clothes.  At this point, M.H. changed his mind, refused to undress, and "did not move."  (*Id*.)  From inside the cage, the three deputies ordered M.H. to take off his clothes numerous times.  M.H. refused and took two steps to his right (*Id*.).  Deputy Galloway ordered him one more time to undress.  When he did not, Deputy Harrison sprayed him with the larger can of spray (Harrison Depo. at 158:7-8, "I had the big can in my pocket, and that's what I used.").  At this point, M.H. dropped to the ground, where he was undressed and given a suicide smock.  Whether M.H. suffers from mental illness is not clear from the record before me.  And, I recognize that whether he does or not is beside the point as the deputies take each threat, whether real or faked, seriously.  Nevertheless, other options were available.  M.H. presented no immediate danger to himself while under the officer's observation.

Although not all these calls are easy, I find Plaintiffs are likely to show the deputies in these events applied the chemical restraint without penological justification as no

---

[38]  M.H. had been involved in the incident involving T.W. the previous day that resulted in T.W.'s hospitalization.

immediate threat to the safety of anyone was apparent.  Yet, if these few episodes were all that mattered, I would find that they do not equate to a condition of confinement that poses a serious risk to their future health or safety.  *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).  However that is not the case.  Plaintiffs' central tenet is that Sheriff Judd's pepper spray use covers up shortcomings in staffing.  Fights occur because no one is available to intercede before the fights begin.  And spraying to end a fight that could have easily been avoided with more staffing does not justify the application of force to make up for the deficiency.  The violence of the spray just adds to the violence of the fights.  Staffing is not the only concern.  Before a juvenile is sprayed, no evident regard is made as to whether he or she suffers a mental or physical illness and whether the administration of the chemical will exacerbate the condition.

In addition, whether the deputies' use of pepper spray – and its effects on the juveniles – is sufficiently serious to satisfy the objective prong is based on "evolving standards of decency."  *Thomas v. Bryant*, 614 F.3d at 1307 (citation and quotations omitted).  Polk County is one of a very small number of jurisdictions nationwide that permit juvenile detention deputies to carry pepper spray on their holsters.  I am charged with balancing the need to keep the jail safe against the evolving standards of decency.  *Id*.  The evidence above convinces me that the deputies' reliance on the spray to maintain order and discipline has become systemic.  Here, there are enough instances of unnecessary infliction of pain through pepper spray with no penological justification for me to conclude that the balance weighs in Plaintiffs' favor as to the objective prong.

I recognize the deference to be given Sheriff Judd's charge.  His is not an easy task. Divining which juvenile is recalcitrant and which is mentally incapable of obeying a command is difficult for the best trained mental health experts.  And, at times, his deputies do not have the luxury of time to act with more deliberation.   Their task though is clear: "[t]he Legislature intends that detention care, in addition to providing secure and safe custody, will promote the health and well-being of the children committed thereto and provide an environment that fosters their social, emotional, intellectual, and physical development." Fla. Stat. § 985.02(3)*.*  Sheriff Judd's use of the spray is not in keeping with this intent.  I find Plaintiffs are likely to meet the objective component of the deliberate indifference test.

B.      *Subjective Component*

Again, the applicable standard is wantonness and obduracy – proving that the official was deliberately indifferent to a serious risk of harm to the detainee.  *Thomas v. Bryant*, 614 F.3d at 1312.   The analysis is multi-factored.   Plaintiffs must show Sheriff Judd had subjective knowledge of a risk of serious harm; he disregarded that risk; and he did so by conduct that is considered more than gross negligence.  *Id.*  Or, stated another way: Sheriff Judd had to have knowledge of the infirm condition and knowingly or recklessly declined to take action that would have improved the condition.  *Id.*  The Plaintiffs may attempt to prove this through "the usual ways," including inferentially via circumstantial evidence or from "the very fact that the risk was obvious."  *Id.* at 1313 (quoting *Farmer*, 511 U.S. at 842).  *Farmer* is particularly instructive here:

45

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.'

511 U.S. at 842-43 (citation omitted).

The evidence before me tracks about ten months. This is a short period. Fluctuations from month to month in the data may or may not portend a dangerous trend. Sheriff Judd has taken steps to eliminate the places of the more egregious fights – the blind cells. And he informs that he is taking steps to install equipment to monitor individual cells, which may further reduce the number of fights. This suggests that Sheriff Judd has knowledge of the infirm condition and has taken action to address some of the violence. From the evidence presented to me, I cannot find Plaintiffs, at least at this juncture, are likely to meet the subjective component regarding the level of juvenile-on-juvenile violence.

As to Sheriff Judd's use of pepper spray, the call is closer because the pattern of its use is clear, the institutional reliance on it is apparent, and Sheriff Judd's belief in its efficacy and utility is consistently deliberate despite its uncommon use elsewhere in Florida and the rest of the nation. But that alone is not enough. The standard here is "stringent, requiring proof that [Sheriff Judd] disregarded a known or obvious consequence of his action." *Connick*, 131 S.Ct. at 1360 (quoting *Board of Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 410 (1997)). Plaintiffs do not mount a facial constitutional challenge to Sheriff Judd's policies; on the contrary, they concede the force-continuum's legality. This consequence is

46

not without significance.   The Eleventh Circuit has repeatedly dictated that "supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert v. Lee County*, 510 F.3d 1312, 1332 (11th Cir. 2007); *see also Thomas v. Bryant*, 614 F.3d at 1317 n.29; *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007) (the violations must be of continued duration rather than isolated occurrences).   That is not yet the case.   As stated, the reporting period is short, the number of flagrant instances are few, and Sheriff Judd's appreciation of the risk for serious harm debatable.   For these reasons, I conclude the Plaintiffs have not yet met the subjective component as to the danger pepper spray presents.[39]

V.

Plaintiffs ask the court to certify a class of "all children under the age of 18, and all individuals who are under jurisdiction of the juvenile court regardless of age, who are or will in the future be incarcerated at the Polk County Jail." (Doc. 5 at 1).   Plaintiffs request class certification as to all five counts included in their third amended complaint (*see* Docs. 5, 137).   Count One is against Judd only and alleges he failed to provide rehabilitative services to preadjudicated detainees in violation of the Eighth and Fourteenth Amendments.   In Count Two Plaintiffs allege that Judd's policies and practices have created unconstitutional

---

[39]   Plaintiffs do not meet the first requirement of injunctive relief, that of substantial likelihood of success on the merits of their claim.   Therefore, I do not discuss the remaining three factors.

conditions of confinement as to all of the juvenile detainees, in violation of the Eighth and Fourteenth Amendments. Plaintiffs allege in Count Three that Judd has violated the Eighth and Fourteenth Amendments through deliberate indifference to the mental health needs of juvenile detainees on suicide watch. Count Four is against Judd and Corizon and alleges they have been deliberately indifferent to Plaintiffs' mental illnesses in violation of the Fourteenth Amendment. Finally, Count Five alleges that Defendants' allegedly punitive use of isolation violates the Eighth and Fourteenth Amendments (Doc. 197).

Plaintiffs also request that the Court certify two subclasses, one subclass of pre-adjudicated juveniles at the jail as to Count One only and one subclass as to mentally ill juveniles at the jail (Docs. 5, 35). After considering the requirements of Fed. R. Civ. P. 23 and the evidence, I recommend that the court find class certification appropriate as to the main class and both subclasses.

A.     *Legal Standard*

Although Plaintiffs' preliminary injunction motion is only addressed to Count Two, in analyzing the class certification issues, I must consider each of the five counts in Plaintiffs' third amended complaint. Courts have broad discretion in determining whether to certify a class. *Miles v. Am. Online, Inc.*, 202 F.R.D. 297, 301 (11th Cir. 2001). There is a presumption in favor of maintaining a class action, because class certification is always subject to modification later in light of case developments. *Prado-Steiman v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000). Nonetheless, the court must engage in a "rigorous analysis" of the requirements of Fed. R. Civ. P. 23 before certifying a class. *Vega v. T-Mobile USA, Inc.*,

564 F.3d 1256, 1266 (11th Cir. 2009) (citation and quotations omitted).

Pursuant to Fed. R. Civ. P. 23, the party seeking certification must demonstrate, first, that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Second, the proposed class must meet one of the requirements of Fed. R. Civ. P. 23(b). *See Wal-Mart Stores, Inc. v. Dukes, et al.*, ___ U.S. ___, 131 S. Ct. 2541, 2548 (2011). Plaintiffs rely on Fed. R. Civ. P. 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); Doc. 5 at 8.

Additionally, Fed. R. Civ. P. 23(c)(5) provides that "when appropriate, a class may be divided into subclasses that are each treated as a class." Fed. R. Civ. P. 23(c)(5). Subclasses are deemed appropriate when there is "intraclass conflict." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 864 (1999). Specifically, a court may divide a class when differences exist in the alleged interests of class members or when class members target different aspects of the defendants' conduct. *Prado-Steiman*, 221 F.3d at 1281. As with class certification, the court has the ultimate discretion in determining whether subclasses are appropriate. *Id*. Subclasses must meet the same requirements as a class. *See id.*

B.      *Standing*

As a threshold matter, before certifying a class the court must ascertain whether the individual named plaintiffs have constitutional standing to raise their claims.  *Miles*, 202 F.R.D. at 302.  It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."  *Id.* (quoting *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)).

The named Plaintiffs are the guardians of juveniles K.J., B.G., D.M., T.H., K.G., and J.P., and Jeremiah Davis and Frankie John-Pierre (who were juveniles when this case was filed but are now 18).  All of the named Plaintiffs have standing to challenge the conditions of their confinement at the jail (Count Two), because they have all been detained at the jail and subjected to the same conditions, policies, and procedures.  Plaintiffs have demonstrated that named Plaintiffs Frankie John-Pierre, Jeremiah Davis, T.H., and K.G. have standing to challenge the provision of rehabilitative services (Count One), because they are all under the jurisdiction of the juvenile court and allegedly were denied educational and health services.  Named Plaintiffs B.G., K.J., and D.M., and T.H. have standing to challenge the use of isolation rooms at the jail (Counts Three and Five):  according to Plaintiffs, they were confined to isolation rooms at the jail for an extended period of time and/or multiple times.  Regarding Defendants' provision of mental health services (Count Four), Plaintiff K.G. is incarcerated at the jail (or was when Plaintiffs filed their class certification motion) and

suffers from mental illness. Thus, there is at least one named Plaintiff with standing to bring each claim.

Nonetheless, Defendants argue the named Plaintiffs lack standing because some of them are not presently incarcerated at the jail, rendering their claims moot. Standing and mootness are two separate doctrines that must be analyzed separately. Mootness is "premised on the policy that the courts should determine only 'live' controversies, [and] it requires that the plaintiff's grievance continue throughout the entire litigation process." Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1785.1 at 2-3 (3d ed.). Defendants' mootness argument overlooks the category of disputes that are "capable of repetition" while "evading review." *Turner v. Rogers*, __ U.S. __, 131 S. Ct. 2507, 2514-15 (2011) (citation and quotations omitted). A dispute falls into this category and remains live if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Id*. (citation and quotation omitted).

This is such a case. The jail population is constantly in flux; the average length of pretrial confinement is about 10 days (*see* Doc. 44 at 3). Indeed, the Supreme Court has found that imprisonment for up to 12 months is "in its duration too short to be fully litigated." *Turner*, 131 S. Ct. at 2515. Further, class members by definition will at some point age out of the juvenile justice system. In other words, this case is particularly suitable for class certification since Plaintiffs' claims are "inherently transitory" yet there is a "constant class of persons suffering" from the conduct. *Olson v. Brown*, 594 F.3d 577, 583

(7th Cir. 2010).  Plaintiffs therefore satisfy the "capable of repetition, yet evading review" mootness exception.[40]

### C.      Numerosity

For a class size, "one may say that less than twenty-one is inadequate, more than forty is adequate, and numbers falling in between are open to judgment based on other factors." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266-67 (11th Cir. 2009) (citation and quotation omitted).   The Court has the discretion to make assumptions when determining the numerosity of a class.   *See Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983).  It is not necessary that the precise number of class members be known.  *Fuller v. Becker & Poliakoff, P.A.*, 197 F.R.D. 697, 699 (M.D. Fla. 2000).  Plaintiffs must make reasonable and supported estimates as to the size of the proposed class.  *Id.*

Although the exact number of class members is uncertain, Plaintiffs satisfy the numerosity prong as to the main class.  Captain Markham testified that at any given time, there are between 70 and 80 juveniles detained at the jail (Doc. 178 at 38:9-10). The juvenile wing of the jail actually has the capacity for up to 200 male and female juveniles.  This is

---

[40]  To the extent Defendants contend that class certification is improper because some of the named Plaintiffs' claims were mooted prior to this order, under these circumstances – where the named Plaintiffs had standing at the time Plaintiffs filed their class certification motion – class certification can "relate back" to the filing of the complaint.  *See Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004).  The Eleventh Circuit recognized this principle in *Tucker v. Phyfer*, 819 F.2d 1030, 1034 (11th Cir. 1987).  In *Tucker*, the court denied the class certification motion when the only named plaintiff waited years after filing suit to move to certify a class, at which point he no longer had standing.  *Id.* at 1032-33. *Tucker* acknowledged, however, that moot claims can "relate back" if the named plaintiff had standing at the time he moved for class certification.  *Id.* at 1035.

sufficient for numerosity purposes.  *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).  Additionally, joinder is impracticable because the juveniles may by law be incarcerated for varying lengths of time, the jail population is constantly in flux, and the proposed class includes future members whose identities are unknown.  *See Kilgo v. Bowman Transp. Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (finding joinder impracticable where class included future and deterred job applicants who could not be identified).

Plaintiffs also ask the Court to certify a sub-class of juveniles who are under the sole jurisdiction of the juvenile court for the purposes of Count One, which alleges that Defendant Judd has failed to provide Plaintiffs with constitutionally-required rehabilitative services (Doc. 44 at 7).  Detainees under the sole jurisdiction of the juvenile court comprise approximately 45 percent of the jail population of approximately 70-80 juveniles (or approximately 31-36 juveniles) (Doc. 117-5 at 4).  Plaintiffs contend the class is actually much larger because it includes those who in the future will be detained at the jail under the sole jurisdiction of the juvenile court.  Given the transitory and fluid nature of class membership, I find this number is sufficient to justify subclass certification.

Plaintiffs have not offered hard data specific to Polk County showing the number of Plaintiffs comprising the subclass of mentally ill juveniles.  A plaintiff "bears the burden of making *some* showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement."  *Vega*, 564 F.3d at 1267.  To that end, Plaintiffs contend "upon information and belief" the subclass of mentally ill juvenile inmates at the jail has approximately 35 members at any given time

(Doc. 35 at 4), and their complaint identifies five juvenile inmates at the jail who suffer from mental illness (Doc. 197 at 17, 30) .  Plaintiffs' mental health expert mentions her review of 14 sets of medical records for mentally ill juvenile inmates (Doc. 263-1 at 4), and approximates based on national research that 65% of juveniles in detention settings suffer from mental illness.  I am mindful that the numerosity requirement is not to be applied in a "yardstick fashion."  *Armstead v. Pingree*, 629 F.Supp. 273, 279 (M.D. Fla. 1986).  Thus, Plaintiffs satisfy the numerosity prong as to the subclass of mentally ill juveniles.

  D. *Commonality*

  Commonality "measures the extent to which all members of a putative class have similar claims."  *Cooper v. Southern Co.*, 390 F.3d 695, 714, *overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  The proof of commonality will necessarily overlap with the merits of Plaintiffs' Eighth and Fourteenth Amendment arguments.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551-52.  My discussion of Plaintiffs' preliminary injunction motion details some of the conditions of confinement that are common to all juvenile inmates, both direct file and preadjudicated.  With the exception of Counts One and Four (discussed in the next two paragraphs) Plaintiffs' claims related to these conditions are capable of class-wide resolution:  Plaintiffs seek permanent injunctive and declaratory relief that would enjoin allegedly unconstitutional behavior as applied to the entire class.  Importantly, the questions of law are applicable in the same manner to each potential class member.  *See Miles*, 202 F.R.D. at 302.  Defendants emphasize the fact-specific instances Plaintiffs include in their complaint.  Commonality may be satisfied,

however, despite factual differences between the claims of the named plaintiffs and the claims of the class at large.[41]   *Prado-Steiman*, 221 F.3d at 1279 n. 14.   Each class member, if proceeding separately against Defendants, would need to meet the same test under the Eighth and Fourteenth Amendments to prevail.   Moreover, Plaintiffs mention specific instances to illustrate Defendants' patterns and practices at the jail.

Regarding Count One, which pertains to Defendant Judd's alleged failure to provide rehabilitative services, certification of a subclass of detainees under the sole jurisdiction of the juvenile court is appropriate.   Named Plaintiffs T.H., J.D., Franky John-Pierre, and K.G., who were under the jurisdiction of the juvenile court when Plaintiffs filed their class certification motion, seek to represent the subclass.   The interests of the main class and this subclass are divergent as to this count.   Florida's statutory scheme for its juvenile justice system stresses rehabilitation rather than punishment (*see* Fla. Stat. § 985.601), and direct file inmates (who are prosecuted and sentenced as adults) are not guaranteed the same rehabilitative services.   Both groups support the claims that Defendants have subjected them to various unconstitutional conditions of confinement.   The proposed subclass, however, also targets a different aspect of Defendant Judd's conduct.   The subclass asserts that Defendant Judd is failing to provide them with the rehabilitative educational and treatment programs that are required under Florida's statutory scheme.   *See Prado-Steiman*, 221 F.3d at 1281 (noting that classes may be divided when differences exist in the alleged interest of class

_____

[41]   Thus, Judd's argument that class certification should be denied because the class definitions are overbroad and refer to a "wide variety of circumstances and conduct" lacks merit (*see* Doc. 26 at 2).

members or when class members target different aspects of defendant's conduct).  The members of the subclass satisfy the commonality requirement because they all seek to enjoin the allegedly unconstitutional provision of rehabilitative services.  The relief the subclass seeks will necessarily be different than the relief sought by the main class.  Thus, subdivision of the class is appropriate.

As for the subclass of mentally ill juveniles, named Plaintiff K.G. seeks to represent the subclass as to Count Four, which alleges Defendants violated the Fourteenth Amendment by failing to provide juveniles with necessary mental health treatment.  The common issues to this subclass include whether the policies and practices regarding the treatment of children with mental illness are unconstitutional.  This subclass targets both Judd's and Corizon's provision of mental health services and focuses on the conditions of confinement particular to those suffering from mental illness.  The type of mental illness each class member suffers from is irrelevant.  Thus, subdivision of the class is appropriate as to mentally ill class members as to Count Four.

E.     *Typicality*

Typicality is satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Brown v. Sec'y, Dep't of Corrections*, No. 2:03-CV-526-FtM-29DNF, 2005 WL 1473817, at * 8 (M.D. Fla. June 21, 2005) (citation and quotations omitted).  Typicality may be satisfied despite "substantial factual differences" when there is a "strong similarity of legal theories." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (citation and quotations

omitted); *see Miles*, 202 F.R.D. at 302. "Although commonality and typicality constitute two distinct limitations on class certification under Rule 23, they tend to merge in practice." *Miles*, 202 F.R.D. at 303. Typicality "refers to the individual characteristics of the named plaintiff in relation to the class." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).

Here, the named Plaintiffs of the main class have established that their claims are "typical" of other class members, namely those juveniles who have been detained at the jail and treated in accordance with same policies and practices there. Both direct file and pre-adjudicated juveniles are made to endure the same allegedly unconstitutional conditions of confinement. The named subclass Plaintiffs as to Count One also satisfy the typicality requirement, because their claims against Defendant Judd all refer to the rehabilitative treatment scheme. That there may be some factual differences between the exact conditions particular class members endured does not destroy typicality. The named subclass Plaintiff as to Count Four satisfies the typicality requirement as well. Although there are differences between subclass members as to the individual provision of mental health services, the policies and practices apply equally to all members of the subclass.

F.   *Adequacy of Representation*

Rule 23(a)(4) requires that the parties representing a class fairly and adequately protect the interests of the class. This requirement applies to both the named plaintiffs and counsel. *London v. Wal-mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003). The purpose of the adequacy of representation requirement is to protect the legal rights of

unnamed class members.  This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation and quotations omitted).  Plaintiffs have been subjected to the same allegedly unconstitutional conditions of confinement at the jail as the rest of the class, and their interests are not adverse to those of other class members.  Plaintiffs' counsel has demonstrated that they are adequately skilled and experienced to act as counsel for the class and subclass.  Defendants do not dispute this.  Accordingly, named Plaintiffs and their counsel are adequate representatives.

      G.     *Fed. R. Civ. P. 23(b)(2)*

Plaintiffs also must satisfy one of the requirements of Fed. R. Civ. P. 23(b).  Plaintiffs rely on Fed. R. Civ. P. 23(b)(2), which permits a class action to be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The requirements of Fed. R. Civ. P. 23(b)(2) are "almost automatically satisfied in actions primarily seeking injunctive relief."  *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) (citation omitted).  In fact, "[t]his subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate."  Fed. R. Civ. P. 23(b)(2), Adv. Comm. Notes (1966 Amendments).  The class

and subclasses both satisfy this requirement.   I therefore recommend that the class and subclass certification motions be granted.

## VI.

This is a hard case.  And my report does not mark an end of this litigation.  Whether the evidence of fights and pepper spray events presented at the trial will dramatically change one way or the other from June 2012, which marks the approximate end of the proof period before me, is unclear.  As of now,  aside from the intense pain they suffered when exposed to the spray, an experience not to be minimized, none of the juveniles *seem* to have been substantially harmed except one.   But that consequence should be of little solace to Defendants, for Plaintiffs need not show that a tragic event must occur before injunctive relief is appropriate.  *Farmer,* 511 U.S. at 845.  The governing standard in prison condition jurisprudence, as the Supreme Court recently underscored in *Miller v. Alabama*, a case treating juveniles differently than adults, is the "'evolving standards of decency that mark the progress of a maturing society.'" 132 U.S. 2455, 2463 (2012) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  The overwhelming view in Florida and the rest of the nation regarding the use of pepper spray in juvenile settings is at odds with Sheriff Judd's practice. He would be wise to develop a plan for reducing the juvenile-on-juvenile violence and limiting the use of pepper spray (or adopt DJJ's force continuum).  *See Farmer*, 511 U.S. 846-47 (1994) ("a district court should approach issuance of injunctive orders with the usual caution . . . and may, for example exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction") (internal citation omitted).

Despite these comments, for the reasons stated in Part IV of this report, I recommend the District Judge deny the motion for preliminary injunction (Doc. 4).

And for the reasons stated in Part V of this report, I recommend that Plaintiffs' motion to certify a class, a subclass of juveniles under the jurisdiction of the juvenile court, and a subclass of mentally ill juveniles (Docs. 5, 35, 137) be granted.  I recommend the following class and subclass definitions:

*Primary Class* (as to all counts).  All children under the age of 18, and all individuals who are under the jurisdiction of the juvenile court regardless of age, who are or will in the future be incarcerated at the Polk County Jail.

*Subclass One* (as to Count One).  All individuals under the sole jurisdiction of the juvenile court who are or will in the future be incarcerated at the Polk County Jail.

*Subclass Two* (as to Count Four).  All individuals who are under the age of 18, and all individuals who are under the jurisdiction of the juvenile court regardless of age, who suffer from mental illness and who are or will in the future be incarcerated at the Polk County Jail.

IT IS SO RECOMMENDED at Tampa, Florida on March 27, 2013.


_____
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

60

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).