UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHANDA HUGHES, et al.,

      Plaintiffs,

v.                              CASE NO. 8:12-cv-568-T-23MAP

GRADY JUDD, et al.,

      Defendants.

_____/

## CONCLUSIONS OF LAW AND FINDINGS OF FACT

> [U]nder the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution . . . .

*Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

      This is an action by several juveniles, as representatives of other juveniles similarly situated, asserting that Grady Judd, in his capacity as Sheriff of Polk County, Florida, and Corizon Health, Inc., a health care provider retained by the Sheriff, violated the juveniles' rights under the Fourteenth Amendment during the juveniles' detention at the Central County Jail (CCJ) in Bartow, Polk County, Florida.  The action began in March 2012 with a complaint (Doc. 1), an amended complaint (Doc. 3) a few days later, and a simultaneous motion for preliminary

injunction, which was denied after an evidentiary hearing before the magistrate judge (Docs. 332 and 364).

The bench trial of this action began on November 18, 2013, and concluded on December 18, 2013.  The action was tried on the five counts appearing in the third amended complaint (Doc. 197).  Each count alleges a violation of the Fourteenth Amendment.  Count I alleges a constitutional violation based on the Sheriff's allegedly failing to provide the juveniles in detention with "rehabilitative services." Count II alleges a constitutional violation based on the Sheriff's alleged failure to protect the plaintiffs from harm, the Sheriff's alleged application to the plaintiffs of "unlawful force," the Sheriff's alleged subjection of the plaintiffs to "unreasonable restraints," and the Sheriff's alleged creation of "dangerously violent conditions of confinement."  Count III alleges a constitutional violation based on the Sheriff's alleged placement of juveniles on "suicide watch" into "punitive isolation without penological justification" and based on the Sheriff's alleged "deliberate indifference" to the "mental health needs" of juveniles in detention.  Count IV alleges a constitutional violation based on the Sheriff's and Corizon's alleged failure to provide the plaintiffs "necessary mental health treatment," the alleged subjection of the plaintiffs to "punitive, harmful conditions of confinement," and the alleged "deliberate indifference to serious medical needs."  Count V alleges a constitutional violation based on the Sheriff's and Corizon's subjection of the plaintiffs to isolation in a disproportionately punitive manner with "deliberate indifference."  The third

amended complaint concludes with a demand for class certification, for a declaration of the unconstitutionality of the defendants' conduct, for temporary and permanent injunctive relief, and for an award of an attorney's fee and statutory costs.  In the order recommending denial of the preliminary injunction, the magistrate judge recommended certifying a "primary class" for all counts of the complaint, a sub-class for Count I, and a sub-class for Count II.  With modifications, the district judge certified the recommended primary class and the two sub-classes (Docs. 364 and 500).

Each claim in the complaint asserts a violation of the Fourteenth Amendment. The complaint includes no state constitutional claim, no federal or state statutory claim, and no state law tort claim.  The plaintiffs present five federal constitutional claims, each governed solely by the federal constitutional standards that govern a claim under the Fourteenth Amendment.

Therefore, in the concluding minutes of the month-long bench trial in this action and with an acute awareness that the parties harbored distinctly different and probably irreconcilable understandings of the constitutional standard governing the disposition of the plaintiffs' five claims under the Fourteenth Amendment, the parties were directed to explain in their post-trial proposed findings of fact and conclusions of law precisely their respective understanding of the governing constitutional standard:

> I need you to tell me exactly . . . each applicable constitutional standard that . . . has been violated or infringed . . . by a defendant. And I need you to identify . . . the accepted means or method or test to

ascertain compliance with that standard. In other words, articulate the standard and articulate the test. And I would urge you to include your strongest citations of authority to support those standards.

## SOME PRELIMINARY OBSERVATIONS

The parties submitted lengthy proposed findings of fact and conclusions of law, in sum comprising more than 450 pages, divided more or less evenly between the plaintiffs and the two defendants. This order begins with an evaluation of the plaintiffs' proposed findings of law, which consume only twenty pages in the plaintiffs' initial proposed findings but which require an analysis of nearly ninety pages in this order (the reply contains a few miscellaneous citations but the content fails to warrant extending this already brutally lengthy paper).

In general, although acceptance of the plaintiffs' proposed constitutional standard is essential to the plausibility of the plaintiffs' claims, the plaintiffs' proposed legal standards are decidedly and demonstrably not the law of the land and constitute an aggressive and novel undertaking to insert the federal judiciary forcefully into the administration of a county's juvenile detention in a manner and to an extent without warrant, without precedent, and without bounds. The plaintiffs offer in defense of this proposed intervention both a flawed interpretation of the pertinent precedent and a nearly uniform reliance on decisions that are either not binding, not applicable, not persuasive, or not — for example, in the citation as authority of a settlement — precedent at all. Although the law of the Supreme Court and the Eleventh Circuit is

plentiful, accessible, and precisely governing, the plaintiffs largely choose to look elsewhere for guidance.

The discussion of the plaintiffs' view of the law is followed in this order by a discussion of the Sheriff's and Corizon's view of the law.  The plaintiffs' view of the law is generally wrong, and the defendants' view is generally right.  This order's discussion of the law exceeds a hundred pages but serves to vividly detail the basis for the conclusion offered in the preceding sentence and serves to illustrate unmistakably the circumstances — the history, the particulars, the tangibles — in which and to which the Fourteenth Amendment requires remedial action by the judiciary.  Stated differently, the following discussion includes an illustrative summary of the facts in many of the cases discussed, and these summaries serve to exemplify correctly the circumstances that trigger (or not) the force of the Fourteenth Amendment.  To encapsulate the conclusion of this order, the circumstances at CCJ are comfortably and distinctly outside the circumstances that implicate the Fourteenth Amendment.

* * *

After the extended discussion of the law, this order includes an extended finding of fact, including findings pertinent to the "expert" testimony received at trial. Again, in general, this order finds facts consistent with the defendants' proposed findings and inconsistent with the plaintiffs' proposed findings.

However, in one sense, a resolution of many of the conflicts between the proposed findings of fact is unnecessary because, once the proper constitutional

standard is understood and the facts necessary to prompt remedial action by the

judiciary under the Fourteenth Amendment are properly appreciated, the

insufficiency of the plaintiffs' presentation — although lengthy and tenacious and

inclusive of every arguable episode, great and small — becomes manifest and

dispositive.  In fact, the conditions of juvenile detention at CCJ are not consistent

with the plaintiffs' dark, grim, and condemning portrayal.

* * *

The plaintiffs insist that the level of fighting in juvenile detention at CCJ, say,

two "fights" per week, is unconstitutional.  But even after immense and determined

discovery, litigation assistance by "experts," and weeks of trial, the plaintiffs'

characterization of the level of violence at CCJ remains wholly impressionistic

because the plaintiffs offered no data from comparable facilities.  For all that the

evidence in this action proves, the two "fights" per week among eighty to a hundred

teenage detainees living in close quarters at CCJ might constitute a historic high or a

historic low.  From the record, one cannot know; the omission by the plaintiffs is

purposeful.

The plaintiffs' failure to adduce comparable data is curious, indeed.  If

comparable data exists, a purposeful failure to introduce the data is most suggestive.

If the data is non-existent, the plaintiffs' hypothesis is without foundation.  And, of

course, the data would depend on what counts as a "fight," especially when the

count of "fights" occurs in an action attempting to invoke the force of the

Constitution.  This order is not required to define what counts as a constitutional "fight," but this order finds that the plaintiffs' have established no definition, proffered no reliable count for CCJ, and provided no comparable data from elsewhere.

This absence of empirical substance in the plaintiffs' presentation on "fights" leaves the court in the posture of a hypothetical person who has no knowledge of baseball; who is told that a player, say, Babe Ruth, failed to hit successfully in about seven of every ten at-bats; and who is asked to decide what quality of batter Ruth was.  Absent comparable data, the hypothetical person is without a rational means to judge, and the fact of seven outs in every ten at-bats is intrinsically neither a "Hall of Fame" performance nor a pathetic flop.  Similarly, considered in isolation, the occurrence of two "fights" per week (however defined or if not defined at all, as in this instance) permits no informed and rational conclusion.  (This judge's impression is that two "fights" per week is an admirably low to typical number among a large group of teenagers, almost all male, who qualify in Florida for juvenile detention.)

\* \* \*

The plaintiffs suggest at times that the constitutional standard governing the detention of a juvenile is more demanding than the constitutional standard governing the detention of an adult.  Although that generalization enjoys an initial appeal and although a few cases say something akin to that, a moment's reflection (and attention to the governing precedent) confirms that the constitutional standard for the

detention or incarceration of an adult and a juvenile is the same.  Of course, if some condition (one does not readily suggest itself) that might not present a substantial risk of serious harm to an adult in detention nonetheless presents a substantial risk of serious harm to a juvenile in detention, the Fourteenth Amendment might require the reduction of the risk until the risk is no longer substantial or might require the mitigation of the prospective harm until the harm is no longer serious.  In sum, although (arguably) the conditions of confinement necessary to create a substantial risk of serious harm for an adult might differ from the conditions of confinement that create a substantial risk of serious harm to a juvenile (again, an example is elusive), the stated constitutional standard is constant.  Between the confinement of an adult and the confinement of a juvenile, the specific facts necessary to meet the constitutional standard might change, but the expression of the constitutional standard remains the same.  No disinterested and authoritative observer contends otherwise.

* * *

The Sheriff has argued from the start and has maintained convincingly that, although each purports to allege a violation of the Fourteenth Amendment, the plaintiffs' claims never acknowledge or account to the governing constitutional standard for the conditions of juvenile detention.  The Sheriff argues, again convincingly, that the plaintiffs strive to avert the Constitution by substituting for the governing constitutional standard an impromptu, improvised standard equivalent to

"best practices" as understood at and for the moment by persons who are, in effect, professional advocates and critics, that is, persons other than the corrections and detention professionals whose professional judgment receives under the governing constitutional law a strong presumption of correctness and whose supervision is subject to judicial intervention under the Fourteenth Amendment only in the extraordinary circumstance.  Suffice to say that, if the Fourteenth Amendment requires intervention into the management of the juvenile detention facility that the Sheriff operates at CCJ, the Fourteenth Amendment requires a wholesale intervention into detention and incarceration at most of the facilities in the United States, an intervention possible only by an unprecedented and precipitous lowering of the constitutional threshold.

* * *

On March 15, 2012, less than six months after the Sheriff for the first time opened a juvenile detention facility and for the first time managed juveniles in detention, the plaintiffs sued and alleged the Sheriff's violation of the Fourteenth Amendment rights of every inmate — past, present, and future — by his allegedly deliberate indifference to a widespread and pervasive pattern of substantial risks of serious harm to the juveniles.  Throughout the litigation, the plaintiffs have conceded that the present operation of juvenile detention at CCJ improves on the operation of CCJ during the first few months.  But the plaintiffs — often obliquely, sometimes bluntly — claim that this litigation, not the Sheriff's management at the facility, was

the motive force behind the improvements implemented at CCJ during the interval

between March 2012 and November 2013.

However, with a new facility, with a new staff, and with a new set of policies,

the Sheriff's undertaking a new responsibility inevitably led to a time of trial and

error, adjustment and re-adjustment, experiment and improvement.  A litigant who

chooses to sue an incipient enterprise — an enterprise with no discernible patterns

and no established culture — always can launch a colorable claim to credit for every

improvement that occurs during the pendency of the litigation, even if the

improvement would otherwise have occurred (possibly even sooner).  The potential

of this colorable claim offers an unhealthy incentive to a litigant to sue an incipient

enterprise preemptively and before the natural course of events leads to a better, more

efficient, more responsive operation.  Throughout the entire life of juvenile detention

at CCJ, minus the first few months, anything the Sheriff might change was

susceptible to the claim that without this litigation the change would not have

occurred.

In the instant case, the evidence shows that the Sheriff has engaged in a

prudent, steady course of management, including a series of changes that have

improved the operation of the facility in accord with experience and the

recommendations of those with hands-on responsibility for juvenile detention.

Except for the accident of timing and the seductive appeal of the fallacy of false

cause — *post hoc ergo propter hoc* — nothing in the credible evidence supports the

notion that any improvement that has occurred was motivated by an attempt to evade liability in the litigation or that any improvement will disappear if the litigation terminates.

A suit against an incipient enterprise typically implies competing inferences. One can infer that every improvement at the facility was a disguised defense to liability. But, on the other hand, one can infer that inquiring lawyers, probing "monitors," and consulting psychiatrists, all of whom interview juveniles, examine records, conspicuously tour the facility, and generate "talk" among the juveniles, create an adversarial atmosphere between inmates and deputies and add an additional edge to each episode of disobedience or disruption in the facility. Although both inferences are "in the air" in this action, the evidence justifies neither and this order rejects both.

* * *

Lastly, as anyone who has visited a jail or prison well knows, the lamentable sight of humans deprived of liberty and confined together in a facility — the sight of humans whose life has gone wrong for some reason or reasons and whom the community must restrain or, at least, detain — triggers a strong emotional response. The sight of a person under eighteen in detention, wearing a prisoner's gown, awaiting a trial, and coming to grips with consequences and circumstances almost always beyond their effective capacity, triggers an even stronger visceral response, including an impulse to rescue the juvenile from the circumstance and from the

juvenile's own poor, even destructive, choices (or those of others).  No one wants any of these juveniles to be where they are, to have done what they have done (probably), and to continue on the course they are on.  That some are defiant, aggressive, and enduringly turbulent or, at least, mischievous and provocative, renders their safe and peaceful management complex.  Of course, a few are introverted, withdrawn, and often vulnerable, which complicates safe and peaceful detention even further.  No one — certainly no one whose words appear in this record (or whose words this judge has seen or heard) — knows demonstrably the best balance of results and resources between the field of "corrections" (broadly construed — in this one instance — to include juvenile detention) and other fields of government responsibility (for example, care for wounded veterans; care for the disabled, including innocent children with special needs; care for the aged; the provision of housing; the improvement of education).  Nor is the best formula for the allocation of public resources discernible (or even "discoverable") in the Fourteenth Amendment. Viewed from one vantage, the plaintiffs' objective in this action is to focus the court's attention on the juveniles in CCJ, to divert the court's attention from the balance of the many other acute and competing needs of society, to induce the court to focus fixedly on a single need, and to provoke a command — all other prospective and deserving recipients aside — that additional public resources accrue to the juvenile detention facility run by the Sheriff in Bartow.  The call is for more and better supervision; more and better deputies; more and better psychiatrists and

psychologists; more and better nurses and social workers; more and better teachers and counselors; more and better record-keeping, reporting, and compilation; and, in all other respects, more and better and more and better — "for the children."

But the allocation of public resources is the solemn business of the legislative branch, which can balance, appropriate, assess, balance again, appropriate again, assess again and so forth — in pursuit of the optimum feasible accommodation of competing demands.  The courts and the Fourteenth Amendment can preempt the legislative branch only if a challenged circumstance falls demonstrably below a constitutionally permissible minimum.  The juveniles deserve and should have more — perhaps, quite a bit more — than the constitutionally permissible minimum. Nonetheless, the Fourteenth Amendment is reserved for the protection of a detainee whose circumstance is below the constitutionally permissible minimum, which is patently not the case in juvenile detention at CCJ — despite any intermittent flare-ups, any episodic delays in medical or mental health treatment, any occasional over-reaction or inattention by deputies, and the like.  In design and implementation, the overall regulatory program by the Sheriff at CCJ is well above the constitutionally permissible minimum (and safely below perfection).  As explained in *Reno v. Flores*, 507 U.S. 292, 304–05 (1992), in connection with a circumstance involving the care of youthful immigrants:

> "The best interests of the child" is . . . not an absolute and exclusive
> constitutional criterion for the government's exercise of the custodial
> responsibilities that it undertakes, which must be reconciled with many
> other responsibilities. Thus, child-care institutions operated by the
> State are not constitutionally required to be funded at such a level as to

provide the *best* schooling or the *best* health care available . . . .
Minimum standards must be met, and the child's fundamental
rights must not be impaired; but the decision to go beyond those
requirements — to give one or another of the child's additional
interests priority over other concerns that compete for public funds
and administrative attention — is a policy judgment rather than a
constitutional imperative.

## THE PLAINTIFFS' DISCUSSION
## OF THE CONSTITUTIONAL STANDARD

The plaintiffs begin their discussion of the constitutional standard in paragraph

304 of the proposed findings and conclusions (Doc. 529 at 110) by offering the

undisputed notion that the Fourteenth Amendment protects a person's "'historic

liberty interest' in personal safety, freedom from unreasonable restraints, and such

services as are required to safeguard those interests" during a term of detention.

Also, the plaintiffs stipulate that the state lacks "the power to punish . . . until after

[the state] has secured a formal adjudication of guilt in accordance with due process

of law."  The parties' common understanding of the applicable constitutional

standard ends there.

Paragraph 305 asserts one of the plaintiffs' basic principles, the claimed

authority for which is *Youngberg v. Romeo*, 457 U.S. 307 (1982).  The plaintiffs say:

Under the Fourteenth Amendment analysis, when conditions
of confinement reflect a "substantial departure from accepted
professional judgment, practice, or standards," they violate the
Constitution. *Youngberg*, 457 U.S. at 323.

(Doc. 529 at 110, ¶ 305)

- 14 -

A complementary principle immediately follows in the plaintiffs'

paragraph 305, which cites *Trop v. Dulles*, 356 U.S. 86, 101 (1958), to the effect that

the "scope" of the constitutional protections afforded to a detainee "draws its

meaning from the evolving standards of decency that mark the progress of a maturing

society."  Because the plaintiffs, directed to provide the "strongest citations of

authority," cite only *Youngberg* and *Trop* to support the plaintiffs' expression of the

governing constitutional standard, a close inspection of *Youngberg* and *Trop* provides

not only an assay of the plaintiffs' constitutional hypothesis but a graphic example of

the plaintiffs' technique, recurrent in their discussion of constitutional principle, of

plucking words from the defining context in a pertinent authority and transporting

the words to a more expansive, more pliable, and more favorable setting, free of the

defining context.  First to *Youngberg*, next to *Trop*.

As stated above, the plaintiffs in the proposed conclusions of law cite

*Youngberg* for the proposition that the Fourteenth Amendment:

> protects a person's "historic liberty interest" in personal safety,
> freedom from unreasonable restraints, and such services as are
> reasonably required to safeguard those interests when one is detained
> against his will by the State for reasons other than punishment.

(Doc. 529 at 110, ¶ 304)  More precisely, the plaintiffs cite to two pages in *Youngberg*,

415 U.S. at 315 and 324.  A telling glance first at page 315 reveals words that echo

the principle that the plaintiffs attribute to *Youngberg*.  However, the words — "a

constitutionally protected liberty interest in safety, freedom of movement and

training within the institution" — follow the phrase "he argues," which means "he

[Romeo] argues . . . ."   The principle for which the plaintiffs cite *Youngberg* is not the court's statement of the law but the court's summary on page 315 of Romeo's argument.   Also on page 315, another sequence of words appears that echos the principle that the plaintiffs attribute to *Youngberg*.   However, the words — "liberty interests also exist in safety, freedom of movement, and training" — follow the phrase "We must decide whether . . . ."   Needless to say, the plaintiffs' conclusions of law critically omit "he [Romeo] argues . . ." and "We must decide whether . . . ."   Perhaps obscured by the plaintiffs, the actual holding in *Youngberg* warrants a close explication.

In *Youngberg*, the detainee, Nicholas Romeo, was a "profoundly retarded," thirty-three-year-old with "the mental capacity of an 18-month-old child," with an I.Q. in the range of 8 to 10, without speech, and without the ability to care for himself.   His mother asked a Pennsylvania court to commit him permanently to a "state facility" because of her inability to care for him and because of his persistent violence toward her and toward himself.

Under Pennsylvania's "mental retardation" statute, the trial court involuntarily and permanently committed Romeo to the Pennhurst State School and Hospital, at which Romeo "suffered injuries on sixty-three occasions" as a result of "his own violence and by the reactions of other residents to him."   457 U.S. at 310.   Later, after beginning a lawsuit against Pennhurst's administrators, Romeo was moved "from his ward to the hospital for treatment of a broken arm."   While Romeo

recuperated in the hospital, one of his doctors ordered Romeo restrained for the protection of both Romeo and other patients, some of whom were quite vulnerable. Even after his arm healed, Romeo was retained in the hospital and routinely restrained.

After a jury returned a verdict against him, Romeo appealed and a panel of the Third Circuit reversed because of prejudicially inaccurate jury instructions on the applicable constitutional standard.  The Third Circuit *en banc* reversed the panel and fashioned a constitutional standard that only "compelling necessity" justifies the application of a restraint, a constitutional standard that only "substantial necessity" justifies a failure to provide effective security, and a constitutional standard that requires medical care "acceptable in the light of present medical or other scientific knowledge."  457 U.S. at 313.

Vacating the Third Circuit's *en banc* opinion and remanding, the Supreme Court in *Youngberg* "consider[ed] for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment."  In response to Romeo's specific claims for relief, *Youngberg* begins by acknowledging the right, established in earlier Supreme Court precedent, "to safe conditions" and to "freedom from bodily restraint."  457 U.S. at 316.  *Youngberg* also considers Romeo's claim of "a constitutional right to minimally adequate habilitation," defined as "training and development of needed skills."  Because no amount of training would advance Romeo's release, *Youngberg* finds the broader

"training and skills" question "not present" and "conclude[s] that [Romeo's] liberty interests require the state to provide minimally adequate training to ensure safety and freedom from undue restraint." 457 U.S. at 319.

*Youngberg* concludes that the "liberty interests in safety and freedom from bodily restraint . . . are not absolute" and that the interests "to some extent . . . are in conflict." *Youngberg* alludes to several tests for resolving a confined person's substantive and procedural due process claims, each of which balances the confined person's liberty interest against "the demands of organized society," "the State's asserted reasons for restraining individual liberty," "the legitimate government objectives . . . not tantamount to punishment," and the "legitimate interests of the State, including the fiscal and administrative burdens . . . ." 457 U.S. 320–21.  In the concluding Part IV (457 U.S. at 324), *Youngberg* emphasizes the state's willing concession of a constitutional obligation "to provide adequate food, shelter, clothing, and medical care" and, as well, "the unquestioned duty to provide reasonable safety for all residents and personnel within the institution."

Although the constitutional standard identified in *Youngberg* is uncontested and incontestable, even this expression of the duty is too amorphous to serve alone as a tool of decision in litigation.  What quality and quantity of food, shelter, clothing, and medical care is "adequate" and how safe is "reasonable safety"?  Who decides and based on what?  Although the plaintiffs advance generalities, *Youngberg* supplies more:

> We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 644 F.2d, at 178.

457 U.S. at 321–22.

*Youngberg* presents primarily a question about the training that the Constitution requires for an involuntarily and civilly committed person.  *Youngberg* finds that the answer to the question is the "minimally adequate training" that is "reasonably" consistent with both the liberty interest of the committed person and the "deference due to the judgment exercised by a qualified professional."  457 U.S. at 322. *Youngberg* reasons that, because "there is no reason to think judges or juries are better qualified than appropriate professionals," "interference by the federal judiciary . . . should be minimized."

> For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability.

457 U.S. at 323.  And *Youngberg* tellingly adds:

> In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to

> enable institutions of this type — often, unfortunately, overcrowded and understaffed — to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day.

457 U.S. at 324.  *Youngberg* clarifies the definition of a "'professional' decisionmaker":

> By a "professional" decisionmaker, we mean a person competent, whether by education training, or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care — including decisions that must be made without delay — necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

457 U.S. at 323.

*Youngberg* undertakes to clarify the constitutional standard applicable to a "profoundly retarded," permanently civilly committed, and intermittently violent adult who was incapable of maintaining himself or defending himself against himself or others.  Even in the instance of the pervasively vulnerable and dependent inmate in *Youngberg*, the Supreme Court declined to impose a constitutional standard of care as demanding and inflexible as the standard the plaintiffs aspire to impose on the Sheriff's management of a typical group of juvenile detainees.  More to the point, the "profoundly retarded" person institutionalized for a lifetime in *Youngberg* is not comparable to the typical juvenile detained temporarily by the Sheriff in the present action.  And the standard the plaintiffs attribute to *Youngberg* is dramatically more demanding and inflexible than the standard *Youngberg* prescribes.

The plaintiffs next cite *Trop v. Dulles*, 356 U.S. 86, 101 (1958), to the effect that "these constitutional principles" (Doc. 529 at 100) — referring to the preceding sentence about the Fourteenth Amendment — "draw meaning from the evolving standards of decency that mark the progress of a maturing society," 356 U.S. at 101, a phrase readily recognizable from repetition in recent years in the Supreme Court's interpretation of the Eighth Amendment's prohibition against "cruel and unusual punishment." Of course, the parties agree that the administration of "punishment" has no application to a pretrial detainee, whether juvenile or adult, who is by definition not yet adjudicated guilty of a crime and who is perforce not subject to "punishment," as the word "punishment" is used in the Eighth Amendment.

In *Trop*, a general court-martial convicted an army private, stationed in French Morocco during World War II, of desertion and sentenced him to three years at "hard labor" and a dishonorable discharge. Later he applied for a passport, which was rejected because under the Nationality Act of 1940 he had "lost" his United States citizenship by force of his conviction for desertion. *Trop* determines that under the Eighth Amendment Congress lacks the power to expatriate a citizen as punishment for desertion (even though, the Supreme Court concedes, Congress can require the death penalty for the same offense by the same offender). The plaintiffs' citation to *Trop* is peculiar because *Trop* includes no discussion of the constitutional standard of care owed to a deserter or anyone else in a state prison, a county jail, a military brig, or any other facility for confinement. The plaintiffs have, again,

plucked a phrase from a case about the Eighth Amendment's prohibition against cruel and unusual punishment and mischievously planted the phrase out of context and disguised as Supreme Court precedent controlling the standard of care for juvenile detention, to which — all agree — the concept of "punishment" is wholly inapplicable.

At this point, after paragraph 305 and before paragraph 306, the plaintiffs feature the heading "**CHILDREN ARE CONSTITUTIONALLY DIFFERENT FROM ADULTS**." To begin this section of the plaintiffs' proposed findings, the plaintiffs in paragraph 306 cite *Application of Gault*, 387 U.S. 1 (1967), as authority for the premise that "evolving standards of decency have long recognized society's duty toward children given their unique vulnerabilities and capacity for change." Although the preceding quotation originates in the plaintiffs' proposed findings (Doc. 529 at 111, ¶ 306) and not in *Gault*, the plaintiffs attach to their formulation a cite to *Gault*, 387 U.S. at 14–15, which contains in content or meaning nothing similar to the plaintiffs' quotation. Pages 14–15 of *Gault* discuss the history of informal juvenile proceedings and the former unavailability to a juvenile of the procedural rights available to an adult, including the right to an indictment by a grand jury, to bail, to a jury trial, to counsel, to the Fifth Amendment privilege against self-incrimination, and to the rights to notice, to a hearing, to confrontation, to cross-examination, and the like. *Gault* says nothing at pages 14–15 (or, apparently,

elsewhere) about "evolving standards," "unique vulnerabilities," or "capacity for change."  The citation to *Gault* appears bravely imaginative.

The plaintiffs next repair for authority to three recent Supreme Court decisions, each a decision based on the Eighth Amendment's prohibition against "cruel and unusual punishment" and each a decision about criminal sentencing. Although each case involves a juvenile, none involves detention.

*Roper v. Simmons*, 543 U.S. 551 (2005), holds that the Eighth Amendment forbids imposition of the death penalty on a juvenile offender.  *Graham v. Florida*, 560 U.S. 48 (2010), holds that the Eighth Amendment forbids imposition of a life-without-parole sentence on a juvenile who commits a "non-homicide" offense.  The third and most recent of the trio of decisions is *Miller v. Alabama*, 132 S. Ct. 2455 (2012), which extends *Graham* and holds that a mandatory life-without-parole sentence imposed on a juvenile violates the Eighth Amendment's prohibition against cruel and unusual punishment.

The plaintiffs first cite *Roper*, *Graham*, and *Miller* for the assertion that "evolving standards of decency . . . recognize that children are constitutionally different from adults."  The plaintiffs next cite *Miller* and *Graham* for the explanation that the constitutionally pertinent distinction arises from differences in "brain development" and the consequences of those differences.  However, *Miller*'s statement is somewhat less than the plaintiffs suggest.

Justice Kagan for the majority in *Miller* states — with more precision than the plaintiffs — that *Roper* and *Graham* establish "that children are constitutionally different from adults for purposes of sentencing," but the plaintiffs slyly omit the "for purposes of sentencing" qualifier.  132 S. Ct. at 2464.  Justice Kagan explains that the "constitutional differences" she perceives are physiological and psychological:

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

(citations omitted).

Justice Kagan explains in *Miller* that, because of the "distinctive" physiological and psychological "attributes of youth," the "penological justifications for imposing the harshest sentences" are "diminished."  Justice Kagan finds that these distinctive differences diminish the prospects of successful retribution, deterrence, and incapacitation but enhance the prospects of rehabilitation.  Of course, *Miller* addresses a discrete Eighth Amendment issue, the imposition of life-without-parole; *Miller* says little, if anything, about the constitutional standard applicable to juvenile detention.

The declaration that "children are constitutionally different for the purpose of sentencing" is neither a pervasive rule of law nor a pre-emptive finding of fact with indiscriminate application to, or with supervening effect in, every circumstance in

which a juvenile appears; the statement neither pretends nor aspires to general application. This somewhat ethereal utterance in *Miller* about the difference between a child and an adult is more a shorthand summary of "common sense" and of what "every parent knows," as Justice Kagan phrases the matter, refined by the present state of the pertinent science and, much less so (if at all), by the social sciences. Even if Justice Kagan had said "children are constitutionally different," as the plaintiffs suggest, that catchy but insubstantial phrase would resolve as little or less than the similarly catchy but equally insubstantial phrase that it echoes: "death is different," a line from *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). In point of fact, as both common sense and metaphysics confirm, everything is different from everything else.

Next, the plaintiffs state the more interesting thesis that "conditions for detained children must meet a higher standard of care than that required for adults." (Doc. 529 at 112, ¶ 309). In support, the plaintiffs cite *AJ by LB v. Kierst*, 56 F.3d 849 (8th Cir. 1995), and the plaintiffs add a parenthetical quote that "the due process standard" is "more liberally construed" for juveniles than adult detainees.

But *Kierst* is not the case that the plaintiffs suggest. The trial court in *Kierst* ruled entirely against the plaintiffs, and the circuit court affirmed, except on a discrete issue of the attorney's fee. Although *Kierst* confirms that the "more protective" Fourteenth Amendment, not the Eighth Amendment, governs the status of a pretrial detainee, *Kierst* observes that "the Supreme Court has not yet articulated the appropriate federal standard by which to judge conditions in state juvenile facilities."

56 F.3d at 854. *Kierst* confirms the rudimentary and unremarkable premise that because a detainee has incurred no adjudication of guilt, more scrutiny is applied to the conditions of detention. Quoting *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir. 1983), *Kierst* states:

> Juveniles . . . who have not been convicted of crimes, have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals.

*Kierst*'s discussion of the standard concludes with the statement quoted by the plaintiffs:

> [W]e conclude that, as a general matter, the due process standard applied to juvenile pretrial detainees should be more liberally construed than that applied to adult detainees.

In discussing the due process standard, the earlier quote from *Kierst* uses the phrase "closer scrutiny"; discussing the same standard, the latter quote uses the phrase "more liberally construed." What, if anything, is intended by the conjunction of "closer scrutiny" and "more liberally construed" remains unclear, especially a couple of paragraphs after *Kierst*'s stipulating that the Supreme Court has left the applicable standard unspecified. Whatever *Kierst* says about the standard, *Kierst* finds that "overcrowding alone" is "insufficient to create a due process violation" and that no violation existed with respect to the center's use of floor mattresses, which *Kierst* finds not to "amount[] to a deprivation of such severity as to deprive plaintiffs of their due process rights."

The plaintiffs in the present action pluck a clause from *Kierst* and feature the clause as probative of the applicable constitutional standard, but *Kierst* actually says something quite different from the plaintiffs' isolated quote.  And the plaintiffs say nothing about one of *Kierst*'s only adjudications on the subject of conditions of detention, that is, *Kierst* found a lack of constitutionally cognizable "severity" in the challenged conditions of detention of the juveniles.  In their mention of *Kierst*, the plaintiffs say nothing about "severity," a word that provides an accurate hint of *Kierst*'s essential constitutional concern.

For the notion that the Constitution requires "rehabilitative" services for a detainee, the plaintiffs next cite (introduced by "*see, e.g.*") *Swansey v. Elrod*, 386 F. Supp. 1138 (N.D. Ill. 1975), a forty-year-old, succinct, little-cited order without an ascertainable subsequent history.  In *Swansey*, a district judge in Chicago preliminarily enjoined the Sheriff of Cook County from transferring thirteen-to-seventeen-year-olds from a juvenile housing facility to an adult housing facility after the juvenile judge approved prosecuting the juveniles as adults.  The adult facilities were overcrowded (about twice the design capacity), and the population included both federal and state felons.

*Swansey* is resolved on both Eighth Amendment and Equal Protection Clause grounds.  The two holdings are instructive and serve to distinguish *Swansey* from the present action.  First, the district court finds "a likelihood of success" on the Eighth Amendment claim and concludes:

> Under the Eighth Amendment children who remain unconvicted of
> any crime may not be subjected to devastating psychological and
> reprehensible physical conditions, and while other juvenile law cases
> are not strictly on point, they recognize that juveniles are different and
> should be treated differently. Thus, the evolving standards of decency
> that mark the progress of a maturing society require that a more
> adequate standard of care be provided for pre-trial juvenile detainees.
> Plaintiffs therefore have demonstrated that there is a likelihood of
> success on their Eighth Amendment claim.

386 F. Supp. at 1144.  The district judge's reference in *Swansey* to "devastating" and

"reprehensible" conditions sounds much like the "severity" findings in *Kierst*, which

demand something sufficiently severe, something sufficiently threatening serious

harm, to trigger an Eighth Amendment consequence.  The juvenile detainees in

*Swansey* eating, sleeping, working, and lounging in intimate contact with adult felons

evidences a circumstance sufficiently severe and sufficiently threatening of serious

harm to trigger a constitutional remedy.

Finally, the district court in *Swansey* decisively invoked the Equal Protection

Clause.  The district judge held that, because in this circumstance both a juvenile

convicted as an adult and an unconvicted juvenile in detention receive rehabilitative

services, the Equal Protection Clause required that a detained juvenile approved for

prosecution as an adult but still in detention and unconvicted must receive the same

services unless Illinois shows that the disparate treatment is "rationally related" to a

legitimate governmental purpose, which Illinois in *Swansey* could not show.

Needless to say, the facts in the present action fail to present, and the plaintiffs

fail to advance, a claim based on the Equal Protection Clause.  And the juveniles in

the present action neither eat nor sleep nor work nor lounge in the company of, or

even in sight of or within the sound of, an adult felon or even an adult detainee.  The role of the absence of rehabilitative services in *Swansey* is, at best, tertiary.  Although *Swansey* might stand (weakly) for the premise that the absence of rehabilitative services for a juvenile detainee can reinforce evidence of a constitutional violation based on another deprivation, *Swansey* cannot support — by a wide margin — the notion that the Constitution requires rehabilitative services for a juvenile detainee.  If *Swansey* says that, *Swansey* is wrong.

Employing a "*see also*" signal in the same paragraph as the citation to *Swansey*, the plaintiffs cite *Baker v. Hamilton*, 345 F. Supp. 345 (W.D. Ky. 1972), a little-cited decision three years older than *Swansey* and also without an ascertainable subsequent history.  Similar to *Swansey*, *Baker* presents the grisly (but inapposite) fact of housing juvenile detainees together with adult felons in a "decrepit" 1907 structure, plagued by extreme heat and cold, broken windows, inoperable locks, five-foot by nine-foot cells with "two bunks" and a one-bulb ceiling light for illumination, and a history of one suicide and three prison deaths in a year, as well as an "act of perversion" perpetrated in the presence of a juvenile.  A grand jury called the jail a "disgrace" and an expert testified that the facility was "deplorable" and "the worst he had ever seen."  *Baker* concludes that:

> [T]here are sufficient elements present in the Jefferson County Jail to hold that confinement therein as to juveniles constitutes cruel and unusual punishment. Specifically, these elements are as follows — cramped quarters, poor illumination, bad circulation of air, broken

> locks, no outdoor exercise or recreation, and no attempt at
> rehabilitation, in addition to the condition of the "hole", which Judge
> Thompson described as horrible.

345 F. Supp. at 353.

*Baker* gives no definition of "rehabilitation" but, however defined, the lack of

rehabilitation manifestly played only a secondary role in the (obvious) conclusion

that a juvenile's confinement with adults in this hellish Kentucky jail violates the

Eighth Amendment.  Again, a fair reading of *Baker* confirms that the lack of even an

"attempt at rehabilitation" contributed to the overall unconstitutional condition at

the facility.  But *Baker* stands only weakly, if at all, for the notion that the Fourteenth

Amendment requires a particular form or extent of "rehabilitative services" for a

juvenile detainee.

On page 113, the plaintiffs boldly assert — without a citation of authority and

unjustified by the authority cited elsewhere — that providing a juvenile in detention

with a "rehabilitative environment" (an entirely new term, unmentioned in any

citation and wholly undefined) and with "rehabilitative services" (also undefined)

"defines the difference between juvenile and adult detention."  (Doc. 529 at 113,

¶ 311).  The plaintiffs' identification of this supposedly defining (but undefined)

"difference" in a discussion of the constitutional standard applicable to juvenile

detention is an aggressive and imaginative *ipse dixit*, which is followed by another,

which is equally aggressive: "A searching inquiry must be made to ensure that

conditions for children satisfy accepted practices and standards in juvenile

detention." For this, the plaintiffs again cite *Youngberg*, which, notwithstanding the plaintiffs' formulation, requires (as elaborated earlier) a "balance between the legitimate interests of the state and the rights of the involuntarily committed," 457 U.S. at 322, which warns that "it is not appropriate for the courts to specify which of several professionally acceptable choices should have been made," 457 U.S. at 322, and which requires only "minimally adequate training."

The plaintiffs persistently mistake — by increments but with consistency — the constitutional standard. For example, the plaintiffs again in the discussion adjoining the *Youngberg* citation, begin with Justice Kagan's observation about certain attributes of juveniles that imply constitutional differences "for the purposes of sentencing" and promiscuously elevate the observation into a "fundamental constitutional difference between children and adults." (Doc. 529 at 113, ¶ 312) The plaintiffs' cagey looseness with words plagues the plaintiffs' papers and, in part, compels this lengthy evaluation of applicable law.

The plaintiffs next (Doc. 529 at ¶¶ 313–14) assemble a list of constitutional offenses allegedly committed by the Sheriff and undertake to elucidate with legal authority the content of each pertinent constitutional principle. The discussion begins with the heading after paragraph 313 (Doc. 529 at 114), which heading states: "**CHILDREN'S PROTECTION FROM VIOLENCE AND THE THREAT OF VIOLENCE**."

Paragraph 314 (Doc. 529 at 114) begins with a citation to *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994), to support a claim that "the Eighth and Fourteenth Amendments protect prisoners from a substantial risk of harm, including harm from other prisoners." An examination of *Farmer* at the cited pages (and elsewhere) reveals something noticeably and distinctly different from the plaintiffs' claim. First, *Farmer* begins with the unequivocal statement, "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." 511 U.S. at 829. In other words, the plaintiffs again (in accord with a persistent pattern) select some words from a court's ruling but selectively exclude others to re-cast and lower the constitutional threshold, a little at a time (but with occasional jolts), while retaining a few familiar words that lend a false air of verisimilitude to the plaintiffs' newly-minted and lesser formulation.

As stated in the first paragraph of *Farmer*, the decision defines "deliberate indifference." Farmer was a transsexual who "project[ed] feminine characteristics" and who was transferred by the Bureau of Prisons from FCI Oxford, Wisconsin, to USP Terre Haute, Indiana, a facility with the "more bothersome prisoners," and placed in the general population. Within two weeks he was beaten and raped, after which he was placed in segregation. Farmer sued the BOP and alleged deliberate indifference by officials to his safety. Noting that the Constitution neither mandates "comfortable prisons" nor permits "inhumane ones," *Farmer* finds that the Eighth Amendment requires "reasonable measures to guarantee the safety of the inmates,"

511 U.S. at 832, and "to protect prisoners from violence at the hands of other prisoners."  511 U.S. at 833.

Because the plaintiffs carefully exclude reference to "reasonable measures" and to "serious harm," the plaintiffs likewise exclude the balance of *Farmer*'s governing formulation:

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious"; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases[,] that state of mind is one of "deliberate indifference" to inmate health or safety, a standard the parties agree governs the claim in this case.

511 U.S. at 834 (citations omitted).

The plaintiffs next cite *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986), for the premise that "incarcerated people have 'a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates.'" *Zatler* alleged that he was raped in eight Florida prisons because he was "a young, white, slightly built man" and that he was denied "reasonable protection." *Zatler* contains the words quoted by the plaintiffs, but — unsurprisingly — the sentence after the sentence quoted by the plaintiffs begins, "However, . . ." and continues:

> "[t]his does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials." "'In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature.'"

(citation omitted).

Conforming to the "deliberate indifference" line of decisions, *Zatler* elaborates the requirement of "causal connection" between the acts of a prison official and a constitutional deprivation. *Zatler* is a damages action under the Eighth Amendment but, to the extent pertinent to the present action, *Zatler* says much less than the plaintiffs' presentation implies. In fact, *Zatler* iterates the sensible constitutional perspective that "[t]he mere fact that an assault occurs, however, does not establish the requisite indifference to a prisoner's constitutional rights" or, stated differently, "a constitutional right is not violated every time a prisoner is injured." 802 F.2d at 403.

The plaintiffs next cite *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*), another decision under the Eighth Amendment, for the proposition that "a constitutional violation is established when officers are "aware of a substantial risk of serious harm to the inmates and do not take reasonable measures to alleviate that risk." Of course, this echoes the standard of *Farmer*, discussed above, which includes "deliberate indifference" toward a serious risk of serious harm. As *Marsh* states elsewhere:

> An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not "respond[] reasonably to the risk."

268 F.3d at 1028.   So, *Marsh*'s formulation includes both "subjective awareness" of, and a "reasonable response" to, the serious risk of serious harm.   Because *Marsh* finds the allegations by the plaintiffs about the jail in Butler County, Alabama, sufficient to defeat the defendants' motion for summary judgment, a detailed description of the conditions in the facility is instructive:

> The Jail was an old building that had become extremely dilapidated by the summer of 1996. Inmates were able to obtain makeshift weapons by cannibalizing parts of the decaying building. Lack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked. Locks to the doors of the inmates' cells did not work, resulting in the inability of the guards to lock down the prisoners. Because prisoners were never locked down, jailers were afraid to conduct visual inspections of inmate cells on the second floor; most of the inmate population was kept on the second floor. No visual or audio surveillance system was in place on the second floor, nor, did prisoners have means to contact guards other than by screaming or banging on the walls. Jailers never conducted prisoner headcounts.

> Often, only one jailer was on duty at the Jail at a time. This single jailer was responsible for controlling the entire inmate population, administering inmate intake and release, controlling the gate and fence surrounding the Jail, supervising visitation and outdoor exercise, handling mail, coordinating food service, dispensing medication, supervising trustees, answering the Jail telephone, and (at times) answering calls to the Butler County Sheriff's Department and operating the dispatch radio. Because the Jail was understaffed, inmate trustees were given many responsibilities for taking care of other inmates and maintaining the operation of the Jail.

> In August 1995, the jail inspector for the Alabama Department of Corrections recommended that all Butler County jailers be trained in jail-management seminars. By the time of the incidents underlying the complaint, few jailers had been so trained. Written procedures did not govern the Jail's operations.

> Inmates entering the Jail were not screened for mental impairments or for whether they had conflicts with other inmates in the Jail. No system of classification existed at the Jail: pretrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health. Never were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers. The Jail contained four eight-person cells, one four-person cell, trustee cells, two holding cells, one isolation cell and a cell for female inmates; but sometimes more than 50 inmates were imprisoned at the Jail.

268 F.3d at 1024–25.

One plaintiff in *Marsh* was "struck in the head with a metal pipe, beaten for several minutes, and cut with a screwdriver" and remained helpless until a jailer arrived in "10 to 15 minutes." He suffered a broken bone and permanent eye and nerve damage. The attackers were not disciplined. Another plaintiff was "kicked, stomped, stabbed and beaten for 30 minutes to an hour" but remained helpless because only one jailer was "on duty." When summoned, the Sheriff and the Jail Administrator "refused" to respond. The victim was released on "his own bond" and allowed to wander, injured and barefooted, in the streets. These life-threatening, atrocious, unconscionable conditions in *Marsh* decisively present a substantial risk of serious injury, evidence the comprehensive failure and refusal of management to manage, and depart dramatically from the civilized and regulated conditions prevailing at CCJ.

*Marsh* reverses the summary judgment granted in district court on the "jail conditions" component of the plaintiff's claims and discusses, among other things, the Sheriff's qualified immunity from the "personal capacity" claim.

The plaintiffs next cite *Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010), for the notion that "[w]hether a condition is objectively serious for purposes of the analysis turns on the evolving standards of decency."  That concept, although present in *Bryant*, is surrounded by a startling amount of directly relevant and explanatory Eleventh Circuit law.  What have the plaintiffs omitted?

The plaintiffs in *Bryant* were inmates at Florida State Prison who suffered from a "serious mental illness," who were "unable to conform their behavior to previous standards due to their mental illness," and who became subject to the prison's "non-spontaneous use-of-force policy"[1] when, for example, an inmate was uncontrollably "banging, kicking, yelling, throwing feces, or refusing to remove his arm from the food flap in his cell"; attempting to hang himself; "banging his head on a steel bunk and cell door"; "jumping down a flight of eight stairs, head first"; or the like.

The plaintiffs in this action omit *Bryant*'s more specific explications of the Eighth Amendment claims.  For example, *Bryant* states that the Eighth Amendment permits a claim challenging conditions of confinement, use of excessive force, or deliberate indifference to a serious medical need, and *Bryant* explains that:

---

[1] *Bryant* explains that:

> Non-spontaneous force, as the name implies, is premeditated force, i.e., force that is only available as a disciplinary tool after corrections officers have complied with a series of preliminary procedures. These procedures include the requirement that an officer first confer with a direct supervisor, DOC medical personnel (though not mental health staff), and the Warden of FSP for authorization to use chemical agents in the particular instance on the specific inmate at issue.

614 F.3d at 1297.

> Each of these claims requires a two-prong showing: an objective
> showing of a deprivation or injury that is "sufficiently serious"
> to constitute a denial of the "minimal civilized measure of life's
> necessities" and a subjective showing that the official had a
> "sufficiently culpable state of mind."

614 F.3d at 1304.  The plaintiffs in this action mention "evolving standards" but not

"minimal civilized measure of life's necessities" or a "culpable state of mind."

Admittedly, *Bryant* stipulates that each claim is "contextual" in the sense that

each claim is "responsive to contemporary standards."  614 F.3d at 1304.  But *Bryant*

instructs that the necessary proof varies among the three Eighth Amendment claims.

*Bryant* states that an "unconstitutional condition of confinement" claim requires

proof of "extreme deprivations."  614 F.3d at 1304.  The plaintiffs in this action never

mention "extreme deprivations."  For example, the principal plaintiff in *Bryant* was

pepper sprayed thirty-six times, often on consecutive days and sometimes when

"decompensated" and unable to control his conduct.  *Bryant* finds that McKinney

and others, owing to their serious mental illness, were subject repeatedly and for a

prolonged time to pepper spray "without penological purpose."

The plaintiffs next cite *Goebert v. Lee County*, 510 F.3d 1312, 1332 (11th Cir.

2007), for the premise that "supervisory liability for deliberate indifference based on

implementation of a facially constitutional policy requires the plaintiff to show that

the defendant had actual or constructive notice of a flagrant, persistent pattern of

violations."  *Goebert* was a pregnant inmate in Lee County, Florida.  Goebert's child

was stillborn two days after a prison official hospitalized her and eleven days after

she began leaking amniotic fluid.  *Goebert* is primarily about a prisoner's obligation to

exhaust her administrative remedies before her resort to court, but the district court in the alternative granted the Sheriff qualified immunity and found Goebert's "deliberate indifference" claim deficient.  *Goebert* affirms the summary judgment in favor of the Sheriff and notes that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action" and that "widespread abuse" was "obvious, flagrant, rampant, and of continued duration, rather than isolated instances."  510 F.3d at 1332.

The plaintiffs next cite again to *Bryant* but only quickly to add a reference to a footnote in *Bryant* that quotes *Goebert* on the "flagrant, persistent pattern of violations" requirement.  And the plaintiffs cite to *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007), briefly for the requirement of "continued" (perhaps the plaintiffs intend "continual") rather than "isolated" occurrences.

The plaintiffs next cite *Engelleiter v. Brevard County Sheriff's Department*, 290 F. Supp. 2d 1300, 1309 (M.D. Fla. 2003), the district court's succinct adoption of a magistrate judge's report and recommendation, for the idea that "to establish a policy or custom" a plaintiff must "show a persistent and widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well-settled as to constitute a custom or usage with the force of law.'"  Again, the plaintiffs cite a "deliberate indifference to a serious medical need" decision under the heading about "children's protection from violence," but *Engelleiter* properly stands

for the fragment that the plaintiffs cite. But, once again, standing for much more

than the plaintiffs suggest, *Engelleiter* recalls that "deliberate indifference" contains

both an objective and a subjective component. *Engelleiter* explains how exactly the

components differ:

> The objective component is "contextual and responsive to 'contemporary standards of decency.'" To establish that a health care provider's acts constitute deliberate indifference to a serious medical need, treatment must be so grossly incompetent, inadequate, or excessive as to shock conscience or to be intolerable to fundamental fairness. The subjective component requires knowledge of the need for medical care and intentional refusal to provide that care.

290 F. Supp. 2d at 1307 (citations omitted). Engelleiter's claim was that the Sheriff's

staff administered only one insulin shot instead of four shots within forty-eight hours

and caused Engelleiter to incur a three-day hospitalization. Noting that, even if the

events constituted medical malpractice, the events alleged were not a constitutional

violation, *Engelleiter* explains the difference:

> An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay.
>
> Deliberate indifference may also be established where treatment is shown to be grossly inadequate or based on a decision to take an easier but less efficacious course. When the need for treatment is obvious, medical care which is so cursory as to amount to no care at all may also amount to deliberate indifference. However, matters for medical judgment, such as whether to order an X-ray or like measure, does not represent cruel and unusual punishment even if the action or lack thereof evinces medical malpractice.

290 F. Supp. 2d at 1308 (citations omitted).

At paragraph 318, the plaintiffs claim that — in the plaintiffs' words — "[w]hen jails fail to provide adequate staff to supervise, monitor, and manage inmates in their custody, they create an unacceptable risk of harm," for which the plaintiffs cite *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993).  The plaintiffs' statement and attribution to *LaMarca* is superficially innocuous — if prisoners are ungoverned, danger exists and injury might follow.  But, at the same time, the plaintiffs' statement is so indefinite and generalized that neither a meaningful standard nor a useful measure of compliance emerges.

A look at the facts of *LaMarca* immediately informs the generality.  The original plaintiff and a class representative, LaMarca was an inmate at Glades [County] Correctional Institute (GCI) and was threatened and assaulted by other inmates "because [he] refused to participate in homosexual activities, or pay protection to be left alone."  995 F.2d at 1531.  Additionally, the court found (1) that GCI comprised four dorms with three rows of twenty bunk beds with a shower at one end of the dormitory and an officer's "wicket" in the middle for observation; (2) sheets and towels blocked the officer's view across the dorm and to the shower; (3) officers were assigned "to patrol the interiors of the dorms regularly" but "they did not"; (4) "the cells lacked adequate ventilation, had poor lighting, and were infested with roaches and vermin"; (5) prisoners received "little or no exercise, only three showers a week, [and] no canteen privileges"; (6) the protective confinement facility was easily accessible by inmates in order to attack a "protected"

inmate; and (7) inmates regularly possessed contraband, including weapons, alcohol, and drugs.  As *LaMarca* concludes:

> The presence of contraband (weapons, alcohol, and drugs), corruption of GCI's staff, inmate violence, and homosexual activity were accepted as part of prison life.
>
> While a minimal level of contraband may be an unavoidable aspect of prison life, excessive quantities of contraband flowed freely into and within the prison. Prison officials made "little or no effort . . . to control illicit activity at GCI, resulting in readily-available contraband." Inmates carried knives and openly used drugs. The contraband problem was compounded by staff corruption, as prison officials contributed to, and apparently profited from, the contraband, and utilized prisoners to "control" and punish other prisoners.

995 F.2d at 1532 (citation omitted).  The GCI staff regularly permitted "unsupervised showings of hard core pornographic movies."  Referring to LaMarca and other members of the plaintiff class, *LaMarca* summarizes other undisputed facts:

> A group of inmates, one brandishing a bush ax, made an unsuccessful attempt sexually to assault LaMarca in a dorm. Inmates raped Saunders in a small bathroom adjacent to the confinement area; he reported the incident but officials did not investigate and refused his request for a medical examination. Inmates repeatedly attacked Johnson while he was in protective confinement. Inmates raped Aldred and Durrance in shower areas. Aldred reported the incident to an officer, but there was no investigation. Bronson was sexually assaulted with the handle of a baseball bat on GCI's recreation field. Cobb was stabbed by an inmate who, because of his cooperation with guards in conducting illicit activities, was protected.

995 F.2d at 1533.  *LaMarca* includes another iteration of the proof required to prove a violation of the Eighth Amendment:

> First, the condition must have inflicted unnecessary pain or suffering upon the prisoner. This objective standard "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .,'" but must be balanced against competing penological goals. . . .

Second, the plaintiffs must show the defendant's deliberate
indifference to the conditions. The Supreme Court recently held
that the Eighth Amendment contains a subjective component:
whether the defendant wantonly permitted the constitutionally
infirm condition to persist.

To be deliberately indifferent, a prison official must knowingly or
recklessly disregard an inmate's basic needs so that knowledge can
be inferred. Because the Eighth Amendment requires a subjective
standard, to demonstrate an official's deliberate indifference, a
plaintiff must prove that the official possessed knowledge both of the
infirm condition and of the means to cure that condition, "so that a
conscious, culpable refusal to prevent the harm can be inferred from
the defendant's failure to prevent it." Thus, if an official attempts to
remedy a constitutionally deficient prison condition, but fails in that
endeavor, he cannot be deliberately indifferent unless he knows of,
but disregards, an appropriate and sufficient alternative.

995 F.2d at 1534–35 (citations omitted). *LaMarca* finds that the district court

erroneously applied a negligence standard ("knew or should have known") to the

proof of "deliberate indifference" and reverses on the issue of "causation." 995 F.2d

at 1526. *LaMarca* presents life at a jail that is effectively a lawless, brutal, malignant

jungle; the plaintiffs generalize and reduce *LaMarca* to a case about "adequate staff."

That is not an uncharacteristic maneuver by the plaintiffs — to attempt to reduce a

constitutional condemnation of deadly neglect and brutal malfeasance to a mere

disagreement about trivial differences in staffing ratios or the provision of a happy

selection of recreational activity.

The plaintiffs next cite *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991), for

the notion that "inadequate staff may rise to deliberate indifference as to prisoner

safety." This is a remarkable premise for which to cite *Harris*, which is an action

"involving the [Alabama Department of Corrections'] policy of uniformly

segregating from the general prison population those prisoners who test positive for exposure to [the HIV virus]." 941 F.2d at 1498. In discussing whether the DOC was "deliberately indifferent to the serious medical needs of seropositive inmates," *Harris* notes that both "[f]ederal and state governments have a constitutional obligation to provide minimally adequate medical care" to a prisoner and that "mere incidents of negligence or malpractice do not rise to the level of constitutional violations," although a "series of incidents closely related" or "repeated examples" may constitute a "pattern of conduct amounting to deliberate indifference."

*Harris* is about medical care for a seropositive inmate and, although the plaintiffs in *Harris* lose the Eighth Amendment claim (the district court is affirmed), the plaintiffs cite *Harris* at page 1505 on inadequate staffing, which is not a topic of decision in *Harris*. The plaintiffs say that *Harris* means that "inadequate staff may rise to deliberate indifference as to prisoner safety." In fact, *Harris* states about staffing:

> Deliberate indifference to inmates' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."

941 F.2d at 1495. Unfortunately, the plaintiffs' pattern of semantic inflation continues. The plaintiffs say "inadequate staffing may rise to deliberate indifference," but *Harris* says "systemic and gross deficiencies in staffing" that result in "effectively denied access to adequate medical care" constitute "deliberate indifference." The one is not the other; the one is not fairly equivalent to the other.

(More about *Harris* will appear later in this order.)  In fact, *Harris* notes that "[i]t is not constitutionally required that mental health care be perfect, the best obtainable, or even very good," 941 F.2d at 1510, another observation omitted from the plaintiffs' account.

The plaintiffs provide a "*see also*" citation to *Alexander S. v. Boyd*, 876 F. Supp. 773, 786, 797–98 (D.S.C. 1991), an unappealed decision (a later attorney's fee order was appealed) about practices by the South Carolina Department of Juvenile Justice. Review of the cited pages, 786 and 797–98, of *Alexander S.* reveals that page 786 of *Alexander S.* discusses the use on juveniles of CS gas, "a potent form of tear gas used primarily for riot control."  876 F. Supp. at 785.  *Alexander S.* concludes unsurprisingly:

> that the indiscriminate use of CS gas violates the juveniles' constitutional rights under the Due Process Clause. Based upon the testimony presented on this issue, the court finds that gas should be used only when a genuine risk of serious bodily harm to another exists and other less intrusive methods of restraint are not reasonably available.

876 F. Supp. at 786.

Also, *Alexander S.* concludes that padlocks on cell doors create an unreasonable risk of serious injury from fire.  The plaintiffs, in mentioning "freedom from unreasonable bodily restraints," might usefully refer not to pages 797–98 but to pages 787–88, at which *Alexander S.* — in discussing the need for proper classification of juveniles, the "appropriate level of restraint for each juvenile," and the "liberty

interest in being free from unreasonable threats to their physical safety" — proposes a remedy:

> For these reasons, juveniles in [Department of Juvenile Justice] facilities should be screened and classified, so that the aggressive juveniles are identified and separated from more passive juveniles. The level of restraint to be used for each juvenile should be based upon some rational professional judgment as to legitimate safety and security needs. Inherent in this right is a system of periodic review of the initial placement to evaluate whether subsequent events demonstrate the need for a reclassification of the juvenile's security requirements.

Perhaps the plaintiffs intended to cite to *Alexander S.* at pages 797–98. Page 797 is a footnote about competing theories of confinement, except for a single line at the top of the page (and continuing to the next page), which cites *Youngberg* for the premise that:

> The Due Process Clause guarantees to juveniles who are incarcerated the right to reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and minimally adequate training to protect those interests. *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).

876 F. Supp. at 797–98. More useful is the district court's observation that the standards of the American Correctional Association, although instructive, neither supersede nor define the applicable constitutional standard. Similarly, the district court finds that an "expert's" view as to "desirable prison conditions" neither supersedes nor defines the applicable constitutional standard.

The plaintiffs next formulate an essentially defensive position, which is that "Plaintiffs need not demonstrate that a harm has occurred" because "the Constitution prohibits such unsafe conditions." For this, the plaintiffs again cite

*Marsh*, discussed earlier and featuring the dilapidated, dangerous, and chaotic jail in Butler County, Alabama, at which, for example, one inmate was "kicked, stomped, stabbed, and beaten for 30 minutes" or more without response by the sole jailer on duty.  One might reasonably ask why *Marsh*, a case in which injurious brutality by inmates and sadistic neglect by officials was the firmly established tradition, might discuss the issue of whether proof of actual injury is necessary for a plaintiff's Eighth or Fourteenth Amendment claim based on "substantial risk of serious injury."  The answer is that *Marsh* discusses the Sheriff's claim of "qualified immunity."  At 268 F.3d at 1031–34, *Marsh* discusses whether a legal precedent in which brutality and injury occurred is so "materially similar" to a circumstance in which no brutality or injury has occurred that the former precedent "clearly establishes" controlling law and informs a reasonable official in the latter circumstance of the applicable requirements of the law.

The plaintiffs correctly state that the law requires no proof of actual injury. However, *Marsh* cites *Helling v. McKinney*, 509 U.S. 25, 34 (1993), to the effect that the Eighth Amendment protects against "sufficiently imminent dangers" and cites *Gates v. Collier*, 501 F.2d 1291, 1300–01 (5th Cir. 1974), to the effect that, even absent proof of injury, the obvious and imminent danger of "exposed electrical wiring, deficient firefighting measures and mingling of inmates with contagious diseases constituted an Eighth Amendment violation."  Again, the plaintiffs extract an unwarranted and ethereal generality from an essential and defining context,

including a list of several, illustrative examples of a qualifying danger.  The plaintiffs speak loosely of an "unsafe condition" that supposedly warrants an Eighth Amendment injunction; on the other hand, *Marsh* speaks of conditions of imminent, proximate, and catastrophic consequence, such as imminent electrocution, incineration, or contagion.  Again, one is not — fairly and objectively assessed — even nearly equal to the other.

Next, the plaintiffs again cite *Bryant*, 614 F.3d at 1318, discussed earlier, for the premise that an injunction is "appropriate to prevent a substantial risk of serious injury from ripening into actual harm."  (Doc. 529 at 116, ¶ 319)  However the surrounding text adds important meaning and requires both "a real or immediate threat that the plaintiff will be wronged again" and confirms that "the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that further injury is imminent."  614 F.3d at 1319.

The plaintiffs next again cite *Youngberg* for the requirement of "adequate staffing" and "adequate services" and "reasonable training" without any reference to *Youngberg*'s fortifying and explanatory context, discussed earlier in this order.  The plaintiffs seem to suggest by this truncated and isolated citation to *Youngberg* that any "inadequacy" in staffing, services, or training creates a constitutional consequence, a notion negated by the whole of the applicable law.

Next (Doc. 529 at 116, ¶ 321) the plaintiffs cite *Wilson v. Seiter*, 501 U.S. 294, 304 (1991), for the premise that a "constellation of conditions of confinement" (the

plaintiffs' phrase, not *Seiter*'s) can violate the Eighth Amendment.  Here is the part of

the sentence from *Seiter* that the plaintiffs quote:

> Some conditions of confinement may establish an Eighth Amendment
> violation "in combination" when each would not do so alone, but
> only when they have a mutually enforcing effect that produces the
> deprivation of a single, identifiable human need . . . .

501 U.S. at 304.  Here is the balance of the sentence in *Seiter* and the two sentences

that follow (less the intervening citation):

> . . . such as food, warmth, or exercise — for example, a low cell
> temperature at night combined with a failure to issue blankets. . . . To
> say that some prison conditions may interact in this fashion is a far cry
> from saying that all prison conditions are a seamless web for Eighth
> Amendment purposes. Nothing so amorphous as "overall conditions"
> can rise to the level of cruel and unusual punishment when no specific
> deprivation of a single human need exists.

Whether the standard is phrased as "a constellation of conditions" or, more plainly,

as "overall conditions," *Seiter* says that "nothing so amorphous" violates the Eighth

Amendment, a violation of which requires the "deprivation" of a "human need."

Of course, *Seiter*'s signal contribution to the law is not the plaintiffs'

impermissibly "amorphous" "constellation of conditions" hypothesis.  *Seiter*

famously and avowedly determines "what state of mind applies in cases challenging

prison conditions."  501 U.S. at 302.  *Seiter* decides the "deliberate indifference"

standard, applied with respect to medical care, applies also to prison conditions,

rather than the "wantonness" standard ("acting maliciously and sadistically for the

very purpose of causing harm") of *Estelle v. Gamble*, 429 U.S. 97 (1976), which applies

to a "response to a prison disturbance."

The plaintiffs' final citation in the "protection [of children] from violence" section of the proposed findings is *Haley v. Ohio*, 332 U.S. 596, 599 (1948), an opinion by Justice Douglas that decides the validity of the confession, the consequent conviction, and the life sentence of "a Negro boy age 15," who was the lookout during an armed robbery that resulted in a murder.  Without counsel and without advice about his rights, Haley signed a confession after five hours of interrogation by successive pairs of officers.  Interestingly, *Haley* nowhere mentions, as the Court of Appeals of Ohio mentioned in *State v. Haley*, 72 N.E.2d 785, 787 (Ohio App. 1946), that the three robbers were looking for "easy money," that the three robbers convened at Haley's house, that Haley produced the gun, that Haley produced the bullets, that the three robbers searched the streets for a favorable target, and that one of the two other robbers — not Haley — immediately upon entering the store shot the shopkeeper through the heart.  Neither does *Haley* mention that the robbers buried the gun in a nearby brickyard but that the police found and identified the gun as stolen during a previous burglary by the same three "lads," as Justice Douglas called them.

For the most part, *Haley* is irrelevant, except perhaps that Justice Douglas in the plaintiffs' quotation (Doc. 529 at 117, ¶ 322) remarks *en passant* the frailty Justice Douglas perceives in "a lad in his early teens" (but, decidedly, not too frail to plan and execute with other "lads" a cold-blooded murder).

The next section of the plaintiffs' proposed conclusions of law is

"**CHILDREN'S FREEDOM FROM UNREASONABLE RESTRAINTS**,"

which begins with another citation to *Youngberg*, in this instance for the premise

that the Constitution prohibits "unreasonable restraints." (Doc. 529 at 117, ¶ 324).

However, *Youngberg*, 457 U.S. at 324, much more helpfully states:

> The State also has the unquestioned duty to provide reasonable safety
> for all residents and personnel within the institution. And it may not
> restrain residents except when and to the extent professional judgment
> deems this necessary to assure such safety or to provide needed
> training.

In other words, if the professionals — the director, staff, and others — at a facility

conclude that an inmate presents a risk of self-injury or jeopardizes the safety of

another inmate or the staff, the Constitution permits a reasonable and effective

restraint to "assure" — not "help" or "improve" or "attempt" but to "assure" — the

safety of an endangered person (any doubts, presumably, resolve in favor of safety

and the application of restraint).

The plaintiffs' next proposed finding of law (Doc. 529 at 117, ¶ 325) is not a

conclusion of law at all; the plaintiffs proffer a fact-finding wholly without a basis

in the record of this action.  Paragraph 325 purports to measure the comparative

"hotness" of pepper spray and a jalapeno pepper.  The plaintiffs cite *United States v.

Mosley*, 635 F.3d 859 (6th Cir. 2011), which cites a North Carolina medical journal

about the measurement of hotness in "Scoville units," a 1926 invention to measure

the hotness of chili peppers.  *Mosley* contains a "parade of horribles" about pepper

spray, but none of these horribles is established by the evidence in this case, no actual

instance of the occurrence of one of these horribles is cited in *Mosley*, no specific

identification of the pepper spray in question or the mode of application is provided

in *Mosley*, and the array of actual instances of spray evidenced in the present case

emphatically gravitates against the probability of the "parade of horribles" listed in

*Mosley* (not to mention that every United States Marshal at every federal courthouse

in the United States has been sprayed directly in the face at point blank range with

pepper spray — without the occurrence of these "horribles").  The plaintiffs' citation

to *Mosley* is an attempt to establish a "fact" not supported (or even mentioned) in the

evidence (and, in fact, heavily countered by the evidence) and based upon a reference

in a judicial opinion to an article the particulars of which are unknown and, more to

the point, are both unsworn and un-cross-examined.

Paragraph 326 features another fact-finding, lifted from *Danley v. Allen*,

540 F.3d 1298, 1309 (11th Cir. 2008), a more recent precedent featuring a detailed

opinion by now-Chief Judge Ed Carnes.  The plaintiffs cite *Danley* in the proposed

findings of law for the proposed finding of fact that pepper spray is "designed to

incapacitate" through "intense pain," "a burning sensation," "gagging," and

"temporary paralysis of the larynx."  (Doc. 529 at 117, ¶ 326).  But, as a closer

look — and a balanced and inquiring look — reveals, the plaintiffs again deceptively

pluck a phrase from an important and binding precedent but ignore the main thrust

of the precedent.  In the first paragraph of *Danley*, Chief Judge Carnes confirms that,

although subject to excess and abuse (as is any means of restraint or force), "pepper

spray is an accepted non-lethal means of controlling unruly inmates."  540 F.3d
at 1303.

Danley was arrested for driving drunk and was jailed in Lauderdale County,
Alabama.  Danley objected vehemently to the unsanitary toilet, after which he and
the staff had a lengthy and heated exchange.  (Danley demanded "some f***ing toilet
paper" and demanded to know why the staff was "f***ing with him."  540 F.3d at
1304.)  A staff member told Danley to comply with orders to enter a cell or he would
"spray him."  When Danley asked what "spray" meant, the staff member
demonstrated by spraying him "at close range for three to five seconds," pushed him
into a small cell, closed the door, and left him for twenty minutes before permitting
him two minutes to shower.  Although Danley complained of aggravated symptoms,
the staff permitted him to remain for thirteen hours without adequate ventilation, a
decent shower, or medical attention.

Because *Danley* reviews orders on only pre-trial motions, the plaintiffs'
allegations are presumed true.  Danley's complaint alleged that:

> the three jailers "intentionally did not comply with jail policy and
> procedure and manufacturer instructions regarding ventilation and
> decontamination in order to inflict unnecessary and wanton pain and
> suffering on" him.

540 F.3d at 1305.  In fact, in light of the plaintiffs' persistent opposition on putative
constitutional grounds to the use of pepper spray, *Danley* includes a most instructive
passage:

> If there were nothing before us but the initial use of pepper spray
> following Danley's second failure to obey Allyn's order to return to

> the cell, we would readily conclude that there was no Fourteenth Amendment violation. "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." . . . Pepper spray is an accepted non-lethal means of controlling unruly inmates. . . .
>
> . . . .
>
> And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders.
>
> A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders.

540 F.3d at 1307 (citations omitted).  Needless to say, this observation by Chief Judge Carnes in *Danley* appears nowhere in the plaintiffs' papers discussing pepper spray.

In citing *Danley*, the plaintiffs list the potential effects of pepper spray, including pain, a burning sensation, closing of the eyes, and others, but omit *Danley*'s observations, including, "Pepper spray 'is designed to disable a suspect without causing permanent physical injury'" or that "pepper spray is a very reasonable alternative to escalating a physical struggle."  More than anything else, *Danley* stands opposed to disproportionate and gratuitous force, including pepper spray that is administered for only an impermissible reason, such as malice, sadism, punishment, terrorism, or humiliation.  As *Danley* concludes:

> When jailers continue to use substantial force against a prisoner who has clearly stopped resisting — whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated — that use of force is excessive.

540 F.3d at 1309.

Next, in paragraph 327 of the proposed findings, the plaintiffs cite *Thomas v. McNeil*, 2009 WL 64616, at *4 (M.D. Fla. 2009), the district court's order affirmed in *Thomas v. Bryant*, already discussed. *Thomas* begins memorably with the demonstrably true statement, "This is a hard case." Judge Corrigan found the case especially "hard" because the plaintiffs were persons with "long documented histories of serious mental illness" who engaged in extreme conduct — throwing feces, attempting to hang themselves, jumping down stairs head first, and the like.

Paragraph 327, which cites *Bryant* and *McNeil* about the consequences — including fear and anger — of pepper spray on the "mentally ill," cunningly changes the persons under discussion from a person, serving a lengthy sentence in a state prison, with a "long history" of "serious mental illness" such that the person cannot conform to prison rules of conduct — the persons discussed in *Bryant* — and attempts to apply *Bryant*'s and *McNeil*'s "finding" to the present case, which involves a typical group of juvenile detainees. The plaintiffs' characteristic semantic shift first reduces "serious mental illness" to "mental illness" and next broadly defines "mental illness" to include almost any diagnosable symptom, including, ADD, ADHD, and "defiance disorder," none of which is a "serious mental illness" in the sense used in *Bryant* or *McNeil* (or anywhere else, except in the plaintiffs' advocacy). Finally, the reference by the plaintiffs to page four of *McNeil* reports Judge Corrigan's summary of Gibbs's "expert" testimony and not Judge Corrigan's finding of fact. A review of Judge Corrigan's history of plaintiffs Thomas, McKinney, Ward, Echols, Williams,

and Frazier will convince the fair observer that events in the "supermax" facility at issue in *Bryant* and *McNeil* have little or no pertinence to juvenile detention in Polk County.

But, in *Bryant* and *McNeil*, the plaintiffs successfully challenged the conditions of their confinement.  In *Thomas*, Judge Corrigan provides an admirably succinct but thorough (and affirmed) statement of the applicable standard:

> A two-prong analysis governs Eighth Amendment challenges to conditions of confinement. "First, under the 'objective component,' a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment." Minimally, the condition must be one that "'poses an unreasonable risk of serious damage to [the inmate's] future health' or safety." The risk must be of a kind that is "so grave that it violates contemporary standards of decency." Thus, it must be an "extreme deprivation[ ]", something far more than the "routine discomfort" which is "'part of the penalty that criminal offenders must pay for their offenses against society.'"

> The second component is subjective: "the prisoner must show that the defendant prison officials 'acted with a sufficiently culpable state of mind' with regard to the condition at issue.""The proper standard is that of deliberate indifference." While a showing of mere negligence is not enough, a prisoner need not show that an official purposely caused him harm or knew that harm would result. Rather, an official's deliberate indifference is demonstrated where the official "knows of and disregards an excessive risk to inmate health or safety" caused by the denial of humane conditions. Plaintiffs may demonstrate a causal connection between the officials and the inhumane conditions where a prison's "custom or policy results in deliberate indifference to constitutional rights." Liability based on a custom or policy can result from either a facially unconstitutional custom or policy or from a facially constitutional custom or policy that is implemented in an unconstitutional manner. To show deliberate indifference based on the latter, the violations must be flagrant, widespread and continuous such that the defendant has actual or constructive knowledge of the pattern. Thus, a policy that can be humanely and properly applied — one that is facially constitutional — cannot lead to liability based on a single incident of deprivation. Rather, liability will only attach where, notwithstanding the otherwise facially constitutional policy, a pattern of unconstitutional conduct is so obvious as to put the official on

notice that the implementation of the policy results in constitutional violations.

2009 WL 64616, at *20–21 (citations omitted).  Similarly, Judge Corrigan includes

another admirably succinct and clarifying conclusion about "pepper spray":

> [T]he use of chemical agents as a means of force against a recalcitrant prisoner who refuses to obey an order generally does not, in itself, violate the Eighth Amendment. This is true even though chemical agents, by their very nature, are "designed to disable a [person] by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," and, occasionally, "disorientation, anxiety, and panic in the person sprayed." Thus, this degree of pain is constitutional because the effects are temporary — or at least are intended to be.

2009 WL 64616, at *22 (citations omitted).  That latter observation places *McNeil* and

*Bryant* nicely in context; each opinion says much more and speaks much differently

than the plaintiffs suggest.

In paragraphs 328 through 333 the plaintiffs re-visit *Youngberg* and *McNeil*,

which are already evaluated and explained in this order.  But paragraph 333

(Doc. 529 at 120) mentions *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), an

action governed by the Fourth Amendment, not the Eighth Amendment, but which

is nonetheless instructive.  *Vinyard* features the allegation of excessive force by an

officer on an arrestee during the drive in a patrol car from the scene of the arrest to

the jail.  The arrestee claims that the officer stopped the patrol car on a "dark

secluded road," exited the front door, opened the rear door, pulled back her hair,

and "sprayed her in the face with two to three bursts of pepper spray" while she

remained handcuffed in the back seat.  Presuming the truth of the plaintiff's

allegations (although noting the officer's sharply conflicting allegations), the

Eleventh Circuit found genuine issues of material fact that precluded the summary

judgment entered in favor of the officer.  The Eleventh Circuit assumed the truth

of the plaintiff's allegations that the plaintiff was "under arrest and secured with

handcuffs and in the back seat of the patrol car" when pepper sprayed by the officer.

Distinguishing the plaintiff's circumstance from a circumstance involving resistance

or disobedience, *Vinyard* concludes:

> Courts have consistently concluded that using pepper spray is
> excessive force in cases where the crime is a minor infraction, the
> arrestee surrenders, is secured, and is not acting violently, and there
> is no threat to the officers or anyone else. Courts have consistently
> concluded that using pepper spray is reasonable, however, where the
> plaintiff was either resisting arrest or refusing police requests, such
> as requests to enter a patrol car or go to the hospital. Furthermore,
> "'as a means of imposing force, pepper spray is generally of limited
> intrusiveness,' and it is 'designed to disable a suspect without causing
> permanent physical injury.'" Indeed, pepper spray is a very reasonable
> alternative to escalating a physical struggle with an arrestee.

311 F.3d at 1348 (citation omitted).  That the Eleventh Circuit in *Vinyard* finds

pepper spray a "very reasonable alternative" to an escalated physical struggle

is nowhere mentioned by the plaintiffs.  But, further distinguishing a Fourth

Amendment circumstance from an Eighth Amendment circumstance, the Eleventh

Circuit concludes:

> Although we have discussed pepper spray cases in the Fourth
> Amendment context of an arrest, we do not discuss the use of pepper
> spray in the prison setting because the Eighth Amendment controls
> such cases, and force does not amount to a constitutional violation in
> that setting if it is applied in a good faith effort to restore discipline and
> order and not "maliciously and sadistically for the very purpose of
> causing harm."

311 F.3d at 1349 n.15.  Of course, that the Eleventh Circuit in *Vinyard* finds pepper spray "in the prison setting" a constitutional means to "restore discipline" is nowhere mentioned by the plaintiffs.

After the citation in paragraphs 334 through 336 of certain Florida and Texas administrative regulations, the plaintiffs in concluding this section of the proposed findings on "unreasonable restraints" return briefly to *Mosley* to emphasize that pepper spray is "designed to cause intense pain."  As far as it goes, this statement is inarguably true.  But as Chief Judge Carnes and others have explained at length and repeatedly, pepper spray is designed to cause a tolerable and temporary but intense pain, to cause a burning sensation (not an actual burn, such as caused by fire), and otherwise to supersede the energy and impulse from a prisoner's anger or aggression, which impels the prisoner into the violence or resistance that endangers himself and others.  Pepper spray is designed and deployed to inflict a temporarily overwhelming discomfort that focuses the prisoner's attention on the pepper spray and abruptly ends the prisoner's focus on causing injury to himself or another or creating some threatening disruption or persisting in some provocative defiance.  Pepper spray is designed as a lesser force, deployed to avoid the deployment of a greater force.

The plaintiffs' next section in the proposed findings of law is entitled "**The Constitution Prohibits the Placement of Children in Isolation for Extended Periods of Time or Without Due Process of Law**."

The plaintiffs first cite *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986), for the proposition that "children are particularly vulnerable to the risk of serious harms caused by isolation, such as mental anguish." (Doc. 529 at 121, ¶ 338).  In *Hewett*, the plaintiff Ogletree, a juvenile and a pre-trial detainee, was slammed into a wall and injured by the facility's irate superintendent, placed in isolation, shackled, and for several days denied medical care for a conspicuous and painful injury (for which Ogletree later visited the emergency room).  Although the superintendent attacked him, Ogletree was a "mere bystander," 786 F.2d at 1085 n.6, who was "only giggling" at another inmate's behavior.  The circuit court found "no indication whatsoever" of a need to subdue Ogletree or use any force at all against him.  Accordingly, because Ogletree violated no rule, created no disturbance, and warranted no discipline, the circuit court agreed with the district court that the force used against Ogletree was "punishment," although as a detainee, Ogletree was not lawfully subject to "punishment."  But *Hewett*, which is principally about an award of nominal damages, carefully distinguishes between employing force to maintain discipline among detainees, which is essential, and employing force gratuitously and spitefully to punish a detainee, which is unconstitutional:

> In light of the needless imposition of force, the subsequent shackling and denial of medical care, and the district court's conclusion that length and conditions of isolation "amounted to punishment in violation of the due process clause," we conclude that Wade's shoving of Ogletree was one of a series of acts intended to punish Ogletree rather than maintain discipline.

786 F.2d at 1086.  The observation from *Hewett* cited by the plaintiffs in paragraph 338 is merely an aside.  However, the fundamental and useful distinction, explained in *Hewett*, between "punishment" and "discipline" informs the heartland issues in the present action.

Next, in paragraph 339, the plaintiffs again cite *Hewett* and successively cite a 1970 district court order from New York, a 2006 district court order from Hawaii, and a 1982 district court order (but not the circuit court's opinion partially vacating) from Puerto Rico, each cited on the subject of "isolation."  The first cited case, *Lollis v. New York State Department of Social Services*, 322 F. Supp. 473 (S.D.N.Y. 1970), an unappealed order granting a preliminary injunction, carefully stipulates that "I do not mean to intimate that the isolation of children under any circumstances is unconstitutional, but merely that the treatment of Lollis in this case violated permissible bounds," a stipulation absent from the plaintiffs' account.  Lollis was a fourteen-year-old, the victim of parental neglect, and civilly committed under New York law as a "person in need of supervision."  Lollis was neither convicted of a crime nor accused of a crime nor awaiting a court appearance.  In the facility, Lollis became "abusive and aggressive" and started a "fracas."  As a result, she was confined in a "strip room" in isolation, was left completely "unoccupied" (that is, having nothing to occupy her attention), and was wearing only pajamas until discovered by a New York family court judge, who procured her release.  The result in *Hewett*, involving a person civilly committed for an indefinite term and avowedly

based in part on New York law and the views of several local "experts," is factually distinguishable from the present case and is, in all events, of little, if any, persuasive value.

*R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006), another unappealed order on a preliminary injunction, is cited by the plaintiffs as "recognizing expert testimony" that "long-term segregation or isolation of youth is inherently punitive," and, "except in extreme circumstances, is a violation of due process." In *Koller*, at a youth correction facility, characterized by the district court and the Department of Justice as "in a state of chaos," juveniles "perceived as" or "identified as" lesbian, gay, bi-sexual, or transgender, after their subjection to a bizarre, pervasive, and relentless array of sordid aggression, verbal abuse, and threats, were subjected to "long-term" segregation and isolation "for their protection," despite the LGBT juveniles' having violated no rule and having created no disturbance. Because the juveniles were detainees and, therefore, not subject to "punishment" within the meaning of the Eighth Amendment, the district court found the imposition of "long-term" isolation was "punishment" prohibited by the Fourteenth Amendment. As *Koller* states in summary:

> Consistently placing juvenile wards in isolation, not to impose discipline for violating rules, but simply to separate LGBT wards from their abusers, cannot be viewed in any reasonable light as advancing a legitimate nonpunitive governmental objective. [Hawaii Youth Correctional Facility] has attempted to remedy one harm with an indefensible and unconstitutional solution.

415 F. Supp. 2d at 1156.  *Koller* presents extraordinary and repellent facts that

comfortably warrant the result achieved.  But the distinction — remarked and

observed in *Koller* — between regulatory isolation and punitive isolation remains

a central distinction in evaluating a claim in a constitutional "conditions of

confinement" action.

Next, the plaintiffs cite *Santana v. Collazo*, 533 F. Supp. 966 (D.P.R. 1982), as

"enjoining the use of isolation against all pretrial juvenile detainees."  (Doc. 529

at 122, ¶ 339).  *Santana* addresses conditions of confinement at Puerto Rico's

Mayaguez "maximum security" facility, the residents of which the district court

described:

> There are thus four basic groups of juveniles at Mayaguez: mentally
> retarded juveniles, psychiatrically ill juveniles, those with minor
> psychological problems and serious social difficulties, and serious
> offenders. The first three groups comprise the majority of the
> population; mentally retarded juveniles are the most numerous.

533 F. Supp. at 980.  The district court found that "pre-trial detainees" were present

at Mayaguez "at times" despite institutional policy and that:

> Pre-trial detainees often spend long periods in the institution and in all
> cases are confined to isolation without access to any of the institution's
> programs.

533 F. Supp. at 981.  In other words, every pre-trial detainee assigned to Mayaguez

was placed in isolation as a means to separate the "mentally retarded" and other

troubled residents from the pre-trial detainees (or vice versa or both), although the

pre-trial detainees had violated no rule, created no disturbance, and defied no

instruction.  The plaintiffs next attest that *Santana* was "rev'd on other grounds" by

*Santana v. Collazo*, 714 F.2d 1172, 1181 (1st Cir. 1983), a review of which reveals that no reversal occurred but, after discussing precisely the issue of the constitutionality of isolation, the circuit vacated the district court order on isolation and remanded for further proceedings, especially in light of *Youngberg*, which appeared after the district court's opinion (the district court had the benefit of only the circuit court's mistaken opinion in *Youngberg*, which the Supreme Court reversed, as explained earlier).

The First Circuit in *Santana* first agreed with the district court that the juveniles at Mayaguez (who under Puerto Rico's Minors Law are not "criminals" but only "undisciplined" juveniles in detention) "have no constitutional right to . . . rehabilitative training." *Santana* notes that "the conditions of juvenile confinement . . . are subject to more exacting scrutiny than conditions imposed on convicted criminals" and observes that:

> The distinction between conditions imposed for the legitimate purpose of maintaining institutional order and safety and those that amount to retribution is a fine one.

714 F.2d at 1180.  The First Circuit next cites *Ingraham v. Wright*, 430 U.S. 651 (1977), for the distinction "between disciplinary punishment, which requires no Eighth Amendment scrutiny, and retributive punishment, which requires a criminal conviction."  714 F.2d at 1180.  The First Circuit in *Santana* concludes with respect to isolation of the LGBT detainees:

> [W]e would be unwilling to say, on the record before us, that the practice [of isolation] was unconstitutional. On the other hand, when a juvenile is confined in isolation for an extended period of time — sometimes months — with little attention from camp administrators or counselors, no exercise and no contact with other juveniles, it seems

> likely that the experience accomplishes nothing more than the
> unnecessary infliction of pain. Whatever the constitutional legitimacy
> of such practices in a prison, we consider ourselves charged by the
> Supreme Court's due process analysis in *Youngberg* and *Bell v. Wolfish*
> to ask whether this significant restriction of the juveniles' liberty
> interests is reasonably related to a legitimate government objective, or
> simply adds to the punishment already imposed by incarceration.

714 F.2d at 1181.  The First Circuit remanded for further consideration, which

presumably the district court supplied (in an order not available).  However, the

unavailable order was later appealed and again vacated and remanded for additional

further proceedings.  Apparently, the district court entered an order and yet another

appeal occurred.  The First Circuit's second opinion, *Santana v. Collazo*, 793 F.2d 41

(1st Cir. 1986) (*Santana II*), presents another vacated order and another remand, after

which the history of this action disappears.

Noting that isolation of pre-trial detainees at Mayaguez permitted only eating,

sleeping, and one shower per day, *Santana II* repeats that *Santana I* "declined to find

that isolation in these circumstances was *per se* unconstitutional."  Instead, *Santana II*

adopts a sensible, moderate, fact-based evaluation derived from *Youngberg*:

> [J]uveniles who have not been convicted of crimes have "a due
> process interest in freedom from unnecessary bodily restraint which
> entitles them to closer scrutiny of their conditions of confinement than
> that accorded convicted criminals". *Id. See Youngberg v. Romeo*, 457
> U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (restrictions on
> liberty of involuntarily confined mentally-retarded patients must be
> reasonably related to legitimate government interests). Moreover,
> because the Commonwealth has no legitimate interest in punishing
> such juveniles as retribution for past misdeeds (as may be permissible
> in the case of convicted criminals), restrictions on their liberty must be
> justified on the basis of other objectives — rehabilitation, safety, or
> internal order and security. 714 F.2d at 1180.

> We recognized, however, that administrators of a juvenile home must
> be allowed to punish residents for the purpose of discipline.

793 F.2d at 43.

Although the district court's order on remand is unavailable, *Santana II* reports that the district court found "that isolation as used at Mayaguez meets constitutional requirements," 793 F.2d at 41, based on an explicit finding by the district court that is restated in full by the circuit court (but not identified by the plaintiffs):

> "[I]t now appears that juveniles held in the Special Treatment Unit
> are given a daily exercise/recreation period, are permitted more
> reading materials than previously, and receive educational and
> tutoring services. In addition, written Mayaguez policy now limits
> isolation to a maximum of 10 days for first offenses, and 20 days in
> instances of multiple or recurring disciplinary offenses." *Santana v.*
> *Collazo*, No. 75–1187, slip op. at 7 (D.P.R. Oct. 30, 1984).

793 F.2d at 44.

In remanding again for further findings by the district court, *Santana II* tasked the district court to determine "whether this improved system of isolation is sufficiently related to the Commonwealth's legitimate objectives," described earlier in *Santana II* as rehabilitation, safety, or internal order and security.  To expedite the inquiry, the First Circuit directed the district court (1) to examine "not isolation in the abstract but the congeries of conditions attending the precise kind of isolation imposed on juveniles in the case at bar," 793 F.2d at 44–45, (2) to determine whether a "reasonable relationship" existed between the "isolation practiced at Mayaguez and the Commonwealth's interests in ensuring the safety of staff, public, and inmates and rehabilitating those placed in isolation," 793 F.2d at 45, while remembering that

"the least restrictive alternative" is not constitutionally required but that a "rational relationship" is required, and (3) to defer to the determination of a "professional decisionmaker," "competent . . . by education, training, or experience," whose decision is "presumptively valid."  *Santana II*, echoing *Youngberg*, reminds the district court that:

> It is not the court's task to choose from among several professionally acceptable choices, but only to determine whether defendants' system of isolation is supported by some professional judgment. A court need not accept a professional judgment, however, if it is "a substantial departure from accepted professional judgment, practice, or standards."

793 F.2d at 45 (citations omitted).  This is nowhere near "enjoining the use of isolation against all pretrial juvenile detainees," as the plaintiffs' paper claims.

Next, the plaintiffs assert that "many courts have imposed limitations on the use of isolation in juvenile settings."  (Doc. 529 at 122, ¶ 340).  For this, the plaintiffs cite a 1982 Tenth Circuit opinion, cite a "stipulation" entered in federal district court in New York (Judge Scheindlin), cite *Santana v. Collazo* (discussed above) again, cite a 1984 West Virginia state case, and three district court cases, two from 1976 and one from 1977.  So, the inquiry recurs, to what extent have courts "imposed" restrictions on isolation, as the plaintiffs assert?

Obviously, the Tenth Circuit case, *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), cited first by the plaintiffs and entitled to at least some precedential value, warrants attention.  The plaintiffs in a parenthetical following the citation say, "[I]solation allowed only to contain boy who is physically violent."  (Doc. 529

at 122, ¶ 340).  *Milonas* involves the Provo Canyon School, a "privately owned and operated" boys' school that received government money.  *Milonas* describes the boys at the school:

> All of the boys admitted to the school have problems of one sort or another, including physical, psychological, and emotional problems, and are handicapped by a general inability to conform to normal behavioral standards.

691 F.2d at 935.  *Milonas* notes that the Provo Canyon School is not a school in the traditional, ordinary, or classical sense" but a "last resort" for the children of parents who encountered "extensive disciplinary problems" and were "unable to control their child."  691 F.2d at 936.  *Milonas* reports that the district court enjoined four challenged practices and refused to enjoin nine.  *Milonas* describes the school's use of isolation "at the time of this suit":

> As indicated, the Provo Canyon School maintained and used so-called "isolation rooms," also referred to as "prescription rooms," or "quiet rooms," or "time-out rooms." These rooms were approximately 4′ X 8′ X 9′, were carpeted, contained no furniture, and had one small window in the door. Individual students were placed in these rooms as punishment for the violation of school rules or when the boys were believed to be emotionally or physically out of control. Boys placed in the isolation rooms were checked periodically by school authorities. As of the time this suit was commenced, the boys were not kept in the isolation room for more than 24 hours.

691 F.2d at 941.  Because the exact terms of the injunction are unavailable, the extent to which the injunction contracted or merely preserved the school's isolation practice is unclear.  The constitutional standard applied in *Milonas* conforms to and cites the "reasonable relationship" test of *Youngberg*.  *Milonas*'s precise holding (other than to affirm the district court) is unclear with respect to isolation but *Milonas* attempts to

follow *Youngberg* and *Bell v. Wolfish*, 441 U.S. 520 (1979), the two principal

precedents at the time.  In this event, no "imposed" limitation appears.

The plaintiffs, still under the heading of "limitations" supposedly "imposed"

by "many courts," next cite the parties' unpublished stipulation of settlement entered

in *Peoples v. Fischer*, an action in the Southern District of New York.  The plaintiffs

say this stipulation "limits" isolation.  Yes, but the stipulation, although signed by

Judge Scheindlin, was not "imposed" or even enforced by the court.  Section 1(B)

of the stipulation confirms that the obligations are "voluntarily" undertaken, "that

none of the terms of this Stipulation . . . shall constitute 'So Ordered' prospective

relief enforceable in any court," and that if the Plaintiffs become dissatisfied, the

court will vacate the stipulation and the litigation will resume.  No. 1:11-cv-2694,

Doc. 124 at 2.  Although the stipulation is difficult to interpret (but distinctly not

an "imposition" or an adjudication of any kind), the Department of Correction

apparently agreed to five-days-a-week "out-of-cell programming and outdoor

exercise" for someone in isolation, except in exceptional circumstances," and other

concessions, as well.  Failing to contain the judicial imposition of a constitutional

limitation on isolation, the parties' voluntary stipulation of settlement in *Fischer* lacks

pertinence in evaluating the Polk County juvenile detention center.

The plaintiffs next cite *Santana II*, in this instance for the statement:

> Finally, courts that have considered isolation for juveniles have with
> near unanimity limited such confinement to twenty-four hours, with
> only rare exceptions allowed.

793 F.2d at 41.  In a footnote to this quote, *Santana II* cites in support of this "observation" the same cases next cited by the plaintiffs in the proposed findings, each of which warrants a brief examination.

First, the plaintiffs cite *State ex rel. J.D.W. v. Harris*, 319 S.E.2d 815 (W. Va. 1984), which involves two juveniles allegedly subject to abuse.  J.D.W. allegedly was attacked by a guard and beaten in his "security room"; for being "out of control," K.R. allegedly was "locked down" for an "extended" time in a room with no light, no furniture, a "bare mattress," and no toilet.  Finding the record "insufficiently developed," the court remanded for further proceedings to determine whether J.D.W. was the attacker or the attacked and to determine whether K.R. was "out of control."  Citing *State ex rel. K.W. v. Werner*, 242 S.E.2d 907 (W. Va. 1978), the court notes this unremarkable finding with respect to J.D.W.:

> J.D.W.'s rights would have been violated if, in fact, his allegation of an unprovoked attack by the correctional officer is true. . . . "Punitive practices such as . . . beating, slapping, kicking or otherwise physically abusing juveniles . . . is cruel and unusual punishment forbidden by the state constitution, and every person subjected to any of them absent exigent circumstances, shall be entitled to redress."

319 S.E.2d at 821.  Similarly, assuming K.R. was not "out of control" and invoking a West Virginia statute, the court notes:

> In addition, with respect to K.R., the respondent has admitted to this Court that the relator was locked alone in his room for an extended period of time during which the relator was not "out of control." W. Va. Code, 49–5–16a(3) [1978], clearly states: "Except for sleeping hours a child in a state facility shall not be locked alone in a room unless such child is out of control . . . ."

319 S.E.2d at 821.  Contrary to the plaintiffs' assertion, *Harris* "imposes" no federal

constitutional "limitation" on isolation.

The plaintiffs next cite, in support of the premise "limiting isolation to

24 hours and only when there is an immediate threat to safety," *Morgan v. Sproat*,

432 F. Supp. 1130 (S.D. Miss. 1977), which arose under the arcane Mississippi

Youth Court Act, which permitted the imposition of an adjudication of

"delinquency" on a juvenile from ten to eighteen "upon the petition of a 'reputable

person.'"  Mississippi defined a delinquent child as:

> any child "whose occupation, behavior, environment or associations
> are injurious to his welfare or the welfare of other children," and
> includes children who have run away from home, who are "habitually
> disobedient to or beyond the control" of their parents, who violate
> school rules or are willfully truant, or who deport themselves so as to
> injure or endanger the morals or health of themselves or any other
> person. § 43–21–5. The conduct for which juveniles may be
> incarcerated need not constitute a violation of any of the state's
> criminal laws.

432 F. Supp. at 1134.

In other words, the statute permitted the prolonged confinement — including

for a term of years until age twenty — of a wide array of troubled or at-risk juveniles,

who had committed no criminal act, were charged with no crime, and were not

awaiting trial.  *Morgan* deals with the involuntarily, civilly committed juveniles,

confined solely for "treatment and rehabilitation and incarcerated" without affording

the full panoply of due process safeguards.  432 F. Supp. at 1136.  The legal analysis

of the conditions of confinement of a long-term, civilly committed juvenile is

different, of course, from the analysis of the conditions of confinement of a pre-trial

juvenile detainee.  In *Morgan*, even if the juvenile only "behaved inadequately" or was merely "disrespectful," the "school" officials used grim conditions of isolation purportedly to "provide intensive counseling and treatment and to enable students to adjust to institutional life."  *Morgan* predictably finds the Mississippi "school" program violative of the Eighth Amendment.

Next, the plaintiffs cite, adjoining the parenthetical "limiting isolation to six hours except in 'the most extreme circumstances,'" *Pena v. New York State Division for Youth*, 419 F. Supp. 203 (1976), which again features an unappealed district court opinion.  *Pena*, a companion case to *Lollis*, involves the Goshen Annex Center, a training school for teenage boys adjudicated civilly "delinquent," involuntarily committed under a New York statute, and transferred to a "maximum security" facility because of "behavior problems" elsewhere.  *Pena* holds, quite unsurprisingly, that the Fourteenth Amendment guarantees to an involuntarily, indefinitely, and civilly committed youth a program of rehabilitation.  *Pena* resolves a claim about whether practices at Goshen were punitive and "anti-therapeutic," which at a school for the civilly committed is unwarranted.  *Pena* "accepts," however, placement in isolation for boys "because their violent behavior represents a threat to themselves or others," so long as "they might be released as soon as their violent mood subsided." Again, *Pena* is inapposite to the Polk County juvenile detention center, although *Pena* recognizes a place for isolation, even in a school for civilly committed youth.

The plaintiffs' final cite in paragraph 340 is *Gary W. v. State of Louisiana*, 437 F. Supp. 1209 (E.D. La. 1976), which again involves Louisiana children civilly committed in Louisiana but confined in Texas.  As Judge Rubin explained:

> The children who are plaintiffs have widely differing characteristics. Some are normal children who have been abandoned by their parents; some are normally intelligent but socially delinquent; some are emotionally disturbed; some are mentally retarded; and some are physically handicapped in varying degrees. Many of the children suffer from a combination of afflictions; for example a single child may suffer from physical disability, emotional disturbance and mental retardation. Some children in their teens are hydrocephalic, have never been toilet trained, are unable to walk and have IQ's under 20. The characteristics all the plaintiffs share are that all are children from Louisiana; all are in Texas institutions; and the State of Louisiana has played some part in their placement.

437 F. Supp. at 1213.  The analytical framework for this group of civilly confined persons differs importantly from the analytical framework applicable to the Polk County juvenile detention center.  In *Gary W.* the juveniles are civilly committed indefinitely for treatment and rehabilitation; in Polk County, after a due process hearing before a state court judge, the juvenile detainees are briefly detained to await trial for a crime.  Finally, the plaintiffs in paragraph 340 cite page 1229 of *Gary W.* as "limiting isolation" to twelve hours.  A vigorous search of page 1229 and the balance of *Gary W.* reveals nothing about isolation; page 1229 discusses restricting "physical restraints" to twelve hours.

Paragraph 341 of the plaintiffs' proposed findings purports to define "isolation," although the purpose for the definition remains unclear.  The plaintiffs first cite a stipulation for injunction entered in the Southern District of Ohio

(incorrectly cited by the plaintiffs as the Eastern District) and appearing on the

Southern District of Ohio's docket at Doc. 108 (a reference unhelpfully omitted by

the plaintiffs).  To say the least, a stipulated definition of "isolation" found in an

Ohio district court case is unhelpful.  Also, paragraph 341 cites the definition of

"isolation" used in *Koller* and *Pena*, both of which are already discussed.

Paragraph 343 claims that *Diamond v. Thompson*, 364 F. Supp. 659 (M.D.

Ala. 1973), affirmed by the Fifth Circuit (and, if so, binding precedent in the

Eleventh Circuit), holds that "any imposition of isolation beyond an immediate and

brief time-out requires procedural due process" — a startling and clarifying holding,

if the plaintiffs' report is correct.

Written by the distinguished jurist Judge Frank Johnson (in ten pages) and

affirmed by the Fifth Circuit (in five paragraphs), *Diamond* begins with a singular

description of the plaintiffs:

> Most of the named plaintiffs in this suit are troublemakers,
> knowledgeable in manipulating and maneuvering others to their
> advantage. They are experienced in filing charges and in litigating
> against prison officials. They, and other inmates, have adopted the
> position that this Court stands ready to intervene in the administration
> of the prison system whenever they complain, regardless of the charge.
> The named plaintiffs and others continually attempt to coerce prison
> employees by threatening to file suit in this Court.

364 F. Supp. at 662.  Judge Johnson next notes the "resentment" of Alabama prison

officials at supposedly "improper interference" with prison administration.

Nonetheless, because "troublemaking" prisoners remain entitled to due process of

law and because disgruntled prison officials remain empowered and obligated to

administer the prison system, the case continued.

"Work stoppage" and "sit down" demonstrations occurred at a prison and

twenty-five prisoners "believed" responsible for the incidents were transferred to

another institution and placed in "administrative segregation" without a hearing.

*Diamond* explains that a new prisoner receives temporary quarantine before

classification and after classification receives either "general population,"

"administrative isolation," or "primitive isolation."   The result in *Diamond* is simple

and incontestable:

> Procedural due process is required whenever an individual will be
> "condemned to suffer grievous loss." It is widely recognized that, in a
> prison context, withdrawal of privileges or the imposition of more
> burdensome conditions of confinement may constitute a grievous loss
> calling for procedural safeguards. . . .
>
> Defendants in this case admit that loss of good time is a sufficient
> deprivation to warrant a prior due process hearing.

364 F. Supp. at 664 (citation omitted).   The question in *Diamond* was whether this

"administrative measure" effected a "grievous loss" when occurring "in the prison

context."   No reading of *Diamond* permits the conclusion that "any imposition of

isolation" requires a hearing, even in a prison.   As Judge Johnson said in *Diamond*:

> The touchstone, as in other areas, is reasonableness. For example, if
> an inmate has escaped from prison, there appears to be no reason to
> conduct a hearing prior to placing him in the security of administrative
> segregation. Similarly, an admitted homosexual can be segregated for
> his safety or the safety of other inmates without elaborate procedural
> safeguards. These examples, however, are in marked contrast to the
> transfer from Atmore. Prison officials, with justifiable cause,
> transferred inmates in an attempt to break the strike by removing the
> leadership. They had the right to do this summarily in such an

> emergency situation. It was not certain, however, whether all those who had been so hastily removed were in fact leaders of, or even strong supporters of, the strike. Under the circumstances reasonable investigation into the relevant facts could not be made without a due process hearing. This hearing should have been conducted within a reasonable time after transfer. Absent unusual circumstances, 48 hours would constitute a reasonable time.

364 F. Supp. at 665 (citation omitted).  Decided in the context of adults serving a lengthy prison sentence, *Diamond* has little, if any, pertinence to the management of a juvenile detainee.

In paragraph 344, which along with paragraph 345 completes the section of the plaintiffs' proposed findings of law on the subject of isolation, the plaintiffs cite *Morales v. Turman*, 569 F. Supp. 332 (E.D. Tex. 1983), and *Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir. 1987), for this premise:

> Constitutionally required procedural due process includes written notice of the reasons for placement in isolation, review by an impartial administrator, an opportunity for the child to present his position, with assistance upon request, a written statement of the decision provided to the child, and an appeals process.

(Doc. 529 at 124, ¶ 344)  Actually, *Morales* is the approval of a settlement agreement and not the adjudication of a dispute; *Morales* "holds" nothing and "permits" nothing.  *Morales* was the conclusion of a lengthy and tortuous dispute about civilly committed "delinquents" in the care of the Texas Youth Council.  Again, the facts are not comparable to the conditions of the temporary detention of juveniles awaiting trial and detained after a due process hearing before a judge.  In fact, *Morales* approves a settlement that installs a regime of much greater strictness and in much greater detail than the Fourteenth Amendment requires.

*Gary H.* vacates and remands an order by the district court that "finally adopted as a remedial order virtually the entire wish list of the plaintiffs" for the conditions affecting "adolescent wards of the juvenile court," a status found "noncriminal and nonpenal" and "educational and reformatory."  831 F. 2d at 1432. *Gary H.* adopts the theme of a "reasonable balance" that recurs after *Youngberg*:

> The court appeared to be of the opinion that any treatment falling short of standards adopted by various professional associations was suspect, and probably violated the United States Constitution. . . . The Constitution requires only minimally adequate training, and reasonable balance between liberty interests and the institution's operational needs. *See Youngberg*, 457 U.S. at 322–23, 102 S. Ct. at 2461–62.

831 F.2d at 1432.

The plaintiffs' final section addresses the proposition that "**Children are Entitled to Adequate Mental Health Care**."  The argument begins with a reference to *Youngberg* for the requirement of "adequate medical care."  Earlier, this order outlines *Youngberg*'s holding that, in the instance of a severely "mentally retarded" and indefinitely, civilly committed juvenile, the state must "provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 318.  These words, which — fairly construed — require training (for example, in personal hygiene) and care (for example, psychotropic medication) so that a totally dependent, indefinitely committed, impaired person might avoid complete isolation or total restraint, apply only awkwardly, if at all, to the conditions of a juvenile detainee in Polk County.

The plaintiffs next cite *Brown v. Plata*, 131 S. Ct. 1910 (2011), a suit about prison overcrowding in California, in support of the requirement for "basic sustenance, including adequate medical care," a requirement that is uncontested in this action.  The plaintiffs next cite *Estelle v. Gamble*, 429 U.S. 97 (1976), for the "deliberate indifference" standard applicable to medical care.  After reiterating that the Eighth Amendment forbids "the unnecessary and wanton infliction of pain," *Estelle* elaborates the practical meaning of the standard:

> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration.
>
> . . . .
>
> This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain.
>
> . . . .
>
> Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

429 U.S. at 104–06.  The Supreme Court in *Estelle* exonerates Gamble's doctor after a series of medical mishaps more serious by far than anything alleged in this action

about juvenile detention at CCJ, but *Estelle* repeats that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."  429 U.S. at 105.

In paragraph 347, the plaintiffs cite three opinions from the Eleventh Circuit for the unqualified assertion that:

> Deliberate indifference is established where Defendants have provided grossly inadequate medical care, select an easier but less effective course of treatment, or provide medical care "so cursory as to amount to no treatment at all . . . ."

(Doc. 529 at 125, ¶ 347).

The plaintiffs' first citation, *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985), is an appeal from a dismissal of the complaint under the pre-*Iqbal*[2] and pre-*Twombly*[3]  pleading standard that required the defendant to show "that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  769 F.2d at 702.  Ancata alleged that in detention he suffered an array of symptoms ("including swelling of the ankle, inability to sleep, chills, lower back pain, tingling and numbness of his hands, hyperventilation, severe pain in his back and right leg, double vision, and other serious problems," 769 F.2d at 702), that the defendants "did little or nothing," that the defendants refused to permit a doctor to diagnose or treat him without a court order, and that the defendants demanded payment even for the services provided under the court order.  After a second court

---

[2] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[3] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

order, Ancata was hospitalized and diagnosed with leukemia, soon after which he

died from respiratory failure.

Unsurprisingly, *Ancata* holds that a claim for relief is stated by a complaint

alleging a knowing and defiant refusal to permit diagnosis and treatment of a serious

medical condition, promptly resulting in death. *Ancata* finds three "overlapping

aspects" to the defendants' "deliberate indifference."  First, the defendants failed to

provide "even that level of diagnostic care that they themselves believed necessary."

Second, the defendants refused medical attention to Ancata "because he would not

pay."  Third, as the plaintiffs acknowledge, the defendants' attention to Ancata's

medical needs "was so cursory as to amount to no treatment at all."  769 F.2d at 704.

The plaintiffs' second citation is *McElligott v. Foley*, 182 F.3d 1248 (11th Cir.

1999), in which Elmore, when "incarcerated on August 4," reported five months of

"abdominal pains"; promptly exhibited "severe abdominal pain, vomiting, and

nausea"; and reported abdominal cramping and "fire" in his stomach.  Although

Elmore received only a "liquid diet" and "pepto-bismol," his symptoms worsened,

which he reported.  The doctor saw Elmore for the first time on September 3, noted

the hyper-sensitivity of Elmore's stomach to touch, but prescribed only "anti-gas

medication" and "ordered blood work."  The doctor noted that Elmore's feces

emitted a "foul smell."  On October 22, Elmore reported that his pain was "stronger,

harder, and more frequent."  By December 1, Elmore's pleas for help ("NEED

HELP IN SEVERE PAIN") heightened in urgency.  By January 27, Elmore reported

to the doctor, "I feel like I'm dying."  On February 2, Elmore was still vomiting and pale and weighed only 128 pounds.  The doctor testified that Elmore had "deteriorated considerably."  On February 10, "weak and emaciated" and after a CT scan and chest x-ray, Elmore was admitted to the hospital, but he was released within two days from both jail and the hospital because of the prospective cost of his treatment.  Several days later, admitted to the VA hospital, Elmore was diagnosed with terminal colon cancer.

Certainly *McElligott* is an example of protracted, deliberate, and injurious indifference to Elmore's "serious medical needs," which were obvious, understood, and ignored; the unnecessary and wanton infliction of pain; and the gratuitous exposure of an inmate to a serious risk of serious injury or death.  Because the district court granted summary judgment for the defendants, *McElligott* reverses and remands for trial.

*Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989), cited third by the plaintiffs, much like *Ancata* and *McElligott*, presents egregious facts, in all respects dissimilar to the facts of juvenile detention at CCJ.  To a charge of armed robbery, Waldrop pleaded "guilty but mentally ill."  His initial classification in prison was "manic depression," which was controlled by medicine.  Soon after Waldrop's medicine was discontinued, his condition "deteriorated rapidly."  Suffering from nightmares and insomnia, Waldrop slashed his forearm, "gouged out" his left eye, cut off his testicles with a razor blade, and "while under restraint" managed to damage and blind his

right eye.  Waldrop's guardians sued, among others, the prison psychiatrist and the "staff physician," both of whom claimed qualified immunity, which *Waldrop* disallows.

*Ancata*, *McElligott*, and *Waldrop* exemplify deliberate indifference to a serious medical need and the wanton exposure of an inmate to substantial risk of serious harm — in fact, to a high risk of death; nothing in the evidence of this action that has occurred at CCJ to a juvenile detainee approaches within a million miles the abhorrent conduct in *Ancata*, *McElligott*, and *Waldrop*.

In paragraph 348 of the proposed findings (Doc. 529 at 125), the plaintiffs again cite *Goebert*, already discussed, for the premise that the objective component of "deliberate indifference" requires a "serious medical need."  Although the plaintiffs omit the definition, *Goebert* defines a "serious medical need":

> A medical need that is serious enough to satisfy the objective component "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

510 F.3d at 1326.  In other words, not every medical need, not every injury, not every wound, and not every discomfort or indisposition presents a serious medical need, the neglect of which exposes a prisoner or a detainee to a substantial risk of serious harm resulting in the "unnecessary and wanton infliction of pain."  510 F.3d at 1330.

Also, *Goebert* discusses the "subjective component" of "deliberate indifference" to a "serious medical need," which requires a plaintiff to prove the prison officials' subjective knowledge of a substantial risk of serious harm to an inmate, the disregard

by the prison officials of that substantial risk of serious harm, and conduct by the

prison officials that exceeds gross negligence.  510 F.3d at 1312.  And, of course, a

"causal connection" must exist between a "constitutional harm" and the defendant.

510 F.3d at 1312.

In *Goebert*, as in the present action, the Sheriff was sued "in his official

capacity," which prompted *Goebert* to include the explanation that:

> In order to establish that a defendant committed a constitutional
> violation in his supervisory capacity, a plaintiff must show that the
> defendant instituted a "custom or policy [that] result[s] in deliberate
> indifference to constitutional rights or . . . directed [his] subordinates
> to act unlawfully or knew that the subordinates would act unlawfully
> and failed to stop them from doing so."

510 F.3d at 1312.  *Goebert* defines a "custom" as "an unwritten practice that is

applied consistently enough to have the same effect as a policy with the force of law."

510 F.3d at 1332.  Similarly, *Goebert* defines a "policy" as a "decision that is officially

adopted by the municipality or created by an official of such rank that he or she could

be said to be acting on behalf of the municipality."  *Goebert* adds, "Demonstrating a

policy or custom requires showing a persistent and widespread practice."  510 F.3d

at 1332.  Encapsulating the Eleventh Circuit's precedents, *Goebert* concludes:

> Our decisions establish that supervisory liability for deliberate
> indifference based on the implementation of a facially constitutional
> policy requires the plaintiff to show that the defendant had actual or
> constructive notice of a flagrant, persistent pattern of violations. "The
> deprivations that constitute widespread abuse sufficient to notify the
> supervising official must be obvious, flagrant, rampant and of
> continued duration, rather than isolated occurrences."

510 F.3d at 1332 (citation omitted).

In paragraph 349 of the proposed findings (Doc. 529 at 125), the plaintiffs cite *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003), for the premise that a "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Equally important to note is, as explained in the next sentence of *Farrow*, that not every diagnosed or obvious medical need qualifies as a "serious medical need." As *Farrow* says of both the diagnosed and the obvious medical condition:

> In either of these situations, the medical need must be "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'"

The inmate Farrow had only two teeth and needed dentures. Farrow's gums were bleeding, his gum pain was persistent, he "improvised" for himself a "soft diet" (consumable by pressing his tongue to the roof of his mouth), and he suffered dramatic weight loss. Fifteen months elapsed from the medical diagnosis to Farrow's receipt of his dentures. Reversing the summary judgment recommended by the magistrate judge and entered by the district judge, *Farrow* finds that Farrow's allegations present a genuine issue of material fact because, "[i]n certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm." 320 F.3d at 1243–44. *Farrow*'s importance is confirming that in a sufficiently egregious circumstance a prison official's deliberate indifference to dental needs can present at least a triable claim of an Eighth Amendment violation.

Because *Farrow* announces no new standard, perhaps the most useful and informative component of *Farrow* is footnote 14 that juxtaposes circumstances that are violative of the Eighth Amendment with circumstances that are not:

> Compare *Adams v. Poag*, 61 F.3d 1537, 1539–41, 1543 (11th Cir. 1995) (asthma, with continual breathing problems and with intermittent wheezing, coughing, and hyperventilating, can constitute a serious medical need), and *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (painful broken foot can be serious medical need), and *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (evidence showing that plaintiff's leg collapsed under him, was deteriorating, caused pain when moved, and that he was virtually unable to walk, supported jury's conclusion that plaintiff had serious medical need), and *Aldridge v. Montgomery*, 753 F.2d 970, 972–73 (11th Cir. 1985) (one-and-a-half-inch cut over detainee's eye bleeding for two and a half hours was a serious medical need), with *Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (inmate's "pseudofolliculitis barbae" or "shaving bumps," even if shaving required by prison officials when physician ordered otherwise, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"), and *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978) (inmate's high blood pressure presented no "true danger" or "serious threat" to his health; he also had full range of motion in his shoulder despite continuing pain from a three-year old injury).

320 F.3d at 1243 n.14.  Of course, a condition, including many dental conditions, that presents a substantial risk of serious harm during a lengthy prison sentence might not present a substantial risk of serious harm during a brief, pre-trial detention.

In paragraph 350 (Doc. 529 at 126), a series of mere conclusions more factual than legal and without citation, the plaintiffs assert that mental health care for Polk County juvenile detainees was "grossly inadequate" and the like.  Similarly, in the first sentence in paragraph 351 the plaintiffs assert another conclusion, purely factual and without citation, that the defendants were "aware" of "mental illness" among

juvenile detainees.  The second sentence of paragraph 351 asserts, again an assertion in the nature of a fact, not law, that because the defendants know that some detainees have a "mental illness," the defendants "therefore" have a "subjective awareness of the relevant risk."  (As explained below, in discussing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092 (11th Cir. 2005), applicable law soundly refutes this notion.)

For this latter factual conclusion about the state of mind of the officials at the Polk County juvenile detention center, the plaintiffs cite *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996), which reverses a summary judgment and remands for "further proceedings" (although on remand the district court immediately granted another summary judgment for Shah).  A long-time addict with a history of suicide attempts, Steele alleged that he was sentenced to twenty-five years' imprisonment and incarcerated in Polk County, where he was diagnosed, treated, and medicated with psychotropic drugs by the prison's psychiatrist and "psychological specialist"; "remained within normal psychological limits"; and was "slowly improving." 81 F.3d at 1267.  Upon Steele's transfer to Orange County, Shah — according to Steele — abruptly and without meaningful evaluation discontinued Steele's psychotropic medication after a "one minute" meeting in a "glass-walled conference room."  Steele's condition reportedly deteriorated severely, despite Steele's filing grievances about his treatment and despite "concerns" expressed by the Polk County psychiatric team.  Steele's action under Section 1983 alleged that for his 182 days in

Orange County Shah maintained a "deliberate indifference" to Steele's suffering from "insomnia, anxiety, and various bodily pains," as well as "feelings of hopelessness and helplessness" that might trigger suicidal ideation.  Quite apart from "the prevalence of mental illness among incarcerated children," which the plaintiffs offer as a lesson of the case, *Steele* clearly and succinctly explains itself:

> A jury accepting Steele's account of his encounters with Shah and of Shah's conduct would be entitled to find that Shah discontinued Steele's medication on the basis of one cursory interview and without having reviewed any medical records beyond the Treatment Plan sent over from the Polk facility. It could thus "conclude that [Shah] knew of a substantial risk from the very fact that the risk was obvious" and that Shah deliberately disregarded that risk. It could further find that in ample time to make a different medical judgment or at least to reconsider that made, Shah was aware from Polk personnel that Steele was considered by them to be a potential suicide risk, and that that was one basis for their prescription of the psychotropic drugs. We do not hold that such findings would compel an ultimate finding of deliberate indifference under *Greason* and *Farmer*, only that they would support such a finding. That suffices to demonstrate that on the summary judgment record there were genuine issues of material fact.

87 F.3d at 1270.

The next sentence in paragraph 351 of the plaintiffs' proposed findings of law states that the plaintiffs need only show — say the plaintiffs — "a risk of future harm," which is a critically diminished version of the governing principle that the plaintiffs need not show an actual serious harm — but need to show "a substantial risk of serious harm" — not just "any risk of any harm."

The plaintiffs next cite *Helling v. McKinney*, 509 U.S. 25, 33 (1993), for their claimed "any risk of any harm" standard.  In *McKinney*, a procedurally contorted case, the plaintiff shared a prison cell with an inmate who smoked five packs of

cigarettes each day.  During the jury trial, the magistrate judge directed a verdict but the plaintiff appealed.  After the case traveled twice back and forth from the Supreme Court to the Ninth Circuit, the Supreme Court affirmed, remanded, and explained:

> The Court of Appeals has ruled that McKinney's claim is that the level of [environmental tobacco smoke] to which he has been involuntarily exposed is such that his future health is unreasonably endangered and has remanded to permit McKinney to attempt to prove his case. In the course of such proof, he must also establish that it is contrary to current standards of decency for anyone to be so exposed against his will and that prison officials are deliberately indifferent to his plight. We cannot rule at this juncture that it will be impossible for McKinney, on remand, to prove an Eighth Amendment violation based on exposure to [environmental tobacco smoke].

509 U.S. at 35.  Although of only narrow application, *McKinney* finds that deliberate indifference to the prospect of a substantial risk of serious harm from second-hand cigarette smoke, because not logically "impossible," was sufficient to warrant a trial in the instance of a five-pack-a-day smoker in a single prison cell with a suitably susceptible cellmate.  In discussing the claim, *McKinney* analogizes environmental tobacco smoke usefully, first, to unsafe drinking water that threatens dysentery and, second, to inmates, some of whom have venereal disease, crowded together in an isolation cell; each analogue offers a substantial risk of a serious harm.  *McKinney* decides that the trial judge cannot preempt the plaintiff's attempt to prove that a five-pack-a-day barrage of cigarette smoke presents a comparable risk of a comparable harm, a determination that is singularly fact-dependent.

In paragraph 352, the plaintiffs cite *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1115 (11th Cir. 2005), for the premise that the

right of a pre-trial detainee to medical treatment for an injury or illness that creates a

substantial risk of a serious harm includes mental health treatment for a condition

that creates a substantial risk of suicide.  In explanation, *Cook* also states, but the

plaintiffs omit, that:

> Under this Circuit's precedent, in a prison suicide case, deliberate
> indifference requires that the defendant deliberately disregard "a
> strong likelihood rather than a mere possibility that the self-infliction
> of harm will occur." "[T]he mere opportunity for suicide, without
> more, is clearly insufficient to impose liability on those charged with
> the care of prisoners."

402 F.3d at 1115 (citation omitted).  Equally interesting (but unmentioned by the

plaintiffs) is *Cook*'s explanation of the elements of "deliberate indifference" and

"foreseeability" in demonstrating a Sheriff's liability:

> Foreseeability, for the purpose of establishing deliberate indifference,
> requires that the defendant have had "subjective knowledge of a risk of
> serious harm," meaning, in a prison suicide case, knowledge of "a
> strong likelihood rather than a mere possibility that the self-infliction
> of harm will occur. . . ."
>
> The record in this case is utterly devoid of any evidence that the
> Sheriff had any such knowledge. As we have explained previously,
> "[n]o matter how defendants' actions might be viewed, the law of this
> circuit makes clear that they cannot be liable under § 1983 for the
> suicide of a prisoner who never had threatened or attempted suicide
> and who had never been considered a suicide risk."

402 F.3d at 1116 (citations omitted).

       This discussion of *Cook* recalls the plaintiffs' theory, advanced in paragraph

351, that because the defendants "are both aware of the prevalence of mental illness

among incarcerated children . . . [the defendants] have a 'subjective awareness of the

relevant risk.'" (Doc. 529 at 126, ¶ 351).  The plaintiffs' theory that "knowledge of

one equals knowledge of all" or "knowledge of a possibility equals knowledge of a

fact" or "knowledge of anything equals knowledge of every similar thing" stands

radically athwart the scope of applicable law, as *Cook* explains:

> [A]s we have explained previously, under our precedent, the
> defendant must have had "notice of the suicidal tendency of *the*
> individual whose rights are at issue in order to be held liable for
> the suicide of that individual." *Tittle*, 10 F.3d at 1539 (emphasis in
> original). Deliberate indifference, in the jail suicide context, is not
> a question of the defendant's indifference to suicidal inmates or
> suicide indicators generally, but rather it "is a question of whether
> a defendant was deliberately indifferent to an individual's mental
> condition and the likely consequences of that condition." *Id.*
> (emphasis added). For this reason, "[a]bsent knowledge of a
> detainee's suicidal tendencies, [our] cases have consistently held
> that failure to prevent suicide has never been held to constitute
> deliberate indifference." *Popham*, 908 F.2d at 1564. Thus, even if
> Cook had established the Sheriff's deliberate indifference toward
> suicidal inmates in general — and, on this record, precious little
> evidence points to such a conclusion — this would not suffice to
> demonstrate the foreseeability of Tessier's suicide and to hold the
> Sheriff liable under § 1983.

402 F.3d at 1117.

Paragraph 353 begins a series of paragraphs containing quite specific claims

by the plaintiffs about the components of "deliberate indifference."  The first sentence

of paragraph 353 says that "inadequate psychiatric" care amounts to deliberate

indifference" if the care "deviates substantially from the accepted standard of care."

The plaintiffs cite *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) (citing *Greason*).

Somewhat different from the plaintiffs' formulation, *Steele* says exactly this:

> In this circuit, it is established that psychiatric needs can constitute
> serious medical needs and that the quality of psychiatric care one
> receives can be so substantial a deviation from accepted standards as
> to evidence deliberate indifference to those serious psychiatric needs.
> *See Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). In *Greason*,

> reviewing the denial of summary judgment on qualified immunity grounds, we held that there exists a "clearly established right to have [one's] psychotropic medication continued if discontinuation would amount to grossly inadequate psychiatric care."

87 F.3d at 1269. What *Steele* actually says is that the psychiatric care administered to an inmate to treat a serious psychiatric need (that is, one that, if untreated or treated inadequately, exposes the inmate to a substantial risk of serious injury) can depart so "grossly" from the standard of care that the departure evidences "deliberate indifference."

The next sentence in the plaintiffs' paragraph 353 says that a "cursory assessment" of a mental health patient "may also constitute deliberate indifference." First, "deliberate indifference" is an alleged fact about a defendant, in this case an allegation about the Sheriff and Corizon, that the plaintiffs must prove; "deliberate indifference" is not a fact about medical care. Second, in an Eighth Amendment case, inadequate medical care exposing an inmate (or, in this case, a class of inmates) to a substantial risk of serious harm is a fact about which a defendant might manifest "deliberate indifference" (if proven) but the fact of an episode or a scattering of episodes of sub-standard care is not "deliberate indifference" and alone does not establish "deliberate indifference."

Paragraph 354 echoes the misconceived formula of paragraph 353 and asserts that a failure to provide suicide precautions constitutes "deliberate indifference." The plaintiffs' statement is so unjustifiably over-generalized and so sweeping that the statement becomes meaningless. For example, if no person of demonstrated or

diagnosed suicidal propensity is present, the absence of the plaintiffs' unspecified suicide "precautions" is not "deliberate indifference."

In presumed support of the claim for constitutional suicide precautions, the plaintiffs cite *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980) (a 125-page opinion), *aff'd in part and rev'd in part*, 679 F.2d 1115 (5th Cir. 1982) (a 69-page opinion), *amended in part, vacated in part, and rehearing denied*, 688 F.2d 266 (5th Cir. 1982). Describing the mental health care in Texas's system as "rudimentary at best," *Ruiz* finds that Texas attempted no genuine treatment of mentally ill inmates other than to attempt the use heavy medication to control behavior and, if that failed, to transfer the inmate to a mental health unit to medicate more heavily.  The Texas system used no screening for mental health, the system employed "virtually no professional staff," the "visiting" psychiatrists spent less than one day per month at the prison, and the system's mental health unit was a "warehouse" offering little or no treatment (with about 25% of the inmates isolated more than twenty-three hours each day).  Texas employed the equivalent of five, full-time psychiatrists to serve 26,000 inmates, about 17,000 of whom "suffer from mental disorders of some type," 503 F. Supp. at 1337, and the lack of qualified personnel resulted in "psychiatric records which are poor in quality and haphazardly compiled" with privacy "unnecessarily compromised."  In paragraph 355 of the proposed findings, the plaintiffs report more or less correctly the six components the district judge found necessary for a "minimally adequate mental health treatment program."  503 F. Supp. at 1339.

However, unmentioned by the plaintiffs is the Fifth Circuit's different view of the district court's role (and, of course, the Prison Litigation Reform Act was not yet enacted). Although not mentioned by the plaintiffs, the Fifth Circuit concluded that the district court's injunction "administers a massive curative dose when it is not yet demonstrable that a lesser therapeutic measure would not suffice . . . the remedy should begin with what is absolutely necessary." 679 F.2d at 1145. Precisely what happened to the district court's prescription for mental health is unclear from these lengthy, confused opinions (perhaps the parties arrived at an agreement), but that the district court's six-point plan for mental health describes both a constitutional minimum and the only satisfactory constitutional minimum is very far from clear (especially since the best supporting citation available is apparently a partially reversed 1980 district court case in Texas). In all events, the details of a constitutionally compliant program for mental health diagnosis and treatment for inmates in a prison with terms of imprisonment measurable in years or decades is quite different from the details of a constitutionally compliant program for juvenile detainees in Polk County, most of whose detention is measurable in days.

Paragraph 356 begins with the declaration that "delays in treatment alone may constitute deliberate indifference." Of course, a widespread, persistent, and flagrant pattern of critical delays in medical care that exposed inmates to a substantial risk of serious harm and to which the jailer was deliberately indifferent might constitute a violation of the Eighth Amendment. However, a delay in medical care might exist

outside the knowledge of the jailer, the jailer might try honestly but without result to remedy the delay, the jailer might accept the wrong recommendation for avoiding the delay, or the inmate's medical need might be trivial.  For these or any number of other reasons, delay might not equal deliberate indifference.  The plaintiffs' simplistic formula is dead wrong — not every delay of treatment is actionable under the Eighth Amendment or the Fourteenth Amendment.  Again, the plaintiffs' statement casually but fundamentally misstates the legal concept of "deliberate indifference," although the concept is defined, explained, and illustrated repeatedly in cases cited by the plaintiffs.

The plaintiffs in paragraph 356 cite *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), for the premise that "delay alone" may constitute "deliberate indifference." Again, the plaintiffs' burden of proof to show that the Sheriff or Corizon was "deliberately indifferent" requires more than proof of "delay" because "deliberate indifference," if proven, is not an attribute of medical care but an attribute of the prison officials, an attribute the proof of which — as the many cases cited demonstrate — requires more than proof of "delay."  Of course, widespread, persistent, and flagrant "delay" can evidence "deliberate indifference," and "delay" is one form of conduct that a prison official can commit with "deliberate indifference" if the inmate is exposed to a substantial risk of serious harm or gratuitous suffering.

Paragraph 357 includes another over-generalized, sweeping claim that when "children" are "deprived of medication or counseling that eases their suffering," the

"children" suffer "unnecessary pain" and the Eighth Amendment and the Fourteenth

Amendment are violated.  That statement might prove valid in a circumstance

depending on the facts, such as the severity of the juvenile's problem, the persons

who knew about the problem and when, the persons who knew and when they knew

about the availability of a palliative, the duration of the pain, the severity of the pain,

the long-term effect, and the like.  The well-established constitutional standard,

repeated in the precedents of the Supreme Court and the Eleventh Circuit, prescribes

exactly the questions to ask, the measures to apply, and the proof to require from a

plaintiff to establish a violation of the Eighth and Fourteenth Amendments.

### THE DEFENDANTS' DISCUSSION
### OF THE CONSTITUTIONAL STANDARD

The Sheriff's explanation of the applicable constitutional standard is not

consolidated in a single presentation but is scattered throughout the Sheriff's

proposed findings of fact and conclusions of law (which are designated as a "post-

trial brief").[4]  Corizon's explanation of the law, although stated separately, is entirely

compatible with the Sheriff's.

The Sheriff begins by suggesting that the plaintiffs' entire presentation is

"flawed from the outset" because the premise on which the plaintiffs depend is a

---

[4] Also, the Sheriff's "post-trial brief" employs an elsewhere unknown and thoroughly
unhappy device, the intended purpose of which is baffling: a table of contents utterly without the
pertinent page numbers. While not completely useless, a table of contents without page numbers
equals in utility a bank statement that lists only the day of each deposit or a telephone book that lists
only the name of each subscriber.

"non-existent constitutional basis."  The Sheriff summarizes the error as an attempt to substitute a new, unprecedented standard of "any risk of any harm" for the established constitutional standard of "substantial risk of serious harm."  The Sheriff asserts that the plaintiffs offer a "best practices case" rather than demonstrate that the conditions of juvenile detention under the Sheriff's administration fall below the constitutional minimum.  The Sheriff and Corizon are correct.

The Sheriff's first citation appearing on page 9 of the proposed findings (Doc. 539 at 9) is *Bell v. Wolfish*, 441 U.S. 520 (1979), a leading precedent that involves the pretrial detention of juveniles.  *Bell* is an essential and compelling pillar of any informed discussion of the precedent that establishes the applicable constitutional standard.  (The plaintiffs' only mention of *Bell* in the proposed findings is a "*see also*" citation in paragraph 304.  (Doc. 529 at 110))

Justice Rehnquist begins *Bell* by mentioning the Supreme Court's several recent decisions considering "constitutional challenges to prison conditions" and confirms that *Bell* requires an examination of "the constitutional rights of pre-trial detainees."  441 U.S. at 523.  Although *Bell* involves federal detainees and not state juvenile detainees, *Bell* proceeds as a class action challenging the conditions of confinement.  The plaintiffs in *Bell* succeeded in the trial court and in the Second Circuit but, as in *Youngberg*, the lower courts' determinations were reversed in the Supreme Court, which found no constitutional authority for lower courts' "interven[ing] broadly into almost every facet of the institution," 441 U.S. at 523,

including the facility's practices of "double-bunking," prohibiting the receipt of books

and magazines from a source other than a publisher, prohibiting the receipt of

packages of food or personalty (except one food package at Christmas), searching

inmate living areas at "irregular intervals," conducting a body cavity search after a

"contact visit," and the like.

In broadly rejecting the Second Circuit's "compelling necessity" standard

for justifying a restriction on a detainee's liberty, *Bell* explains that whether a

particular condition of confinement impinges liberty sufficiently to offend the

Constitution depends on "whether those conditions amount to punishment of the

detainee," 441 U.S. at 535, that is, whether the condition is a "punitive measure" or a

"regulatory restraint."  To define that distinction, in turn, *Bell* explains:

> Absent a showing of an expressed intent to punish on the part of
> detention facility officials, that determination generally will turn on
> "whether an alternative purpose to which [the restriction] may
> rationally be connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned [to it]." Thus,
> if a particular condition or restriction of pretrial detention is reasonably
> related to a legitimate governmental objective, it does not, without
> more, amount to "punishment." Conversely, if a restriction or
> condition is not reasonably related to a legitimate goal — if it is
> arbitrary or purposeless — a court permissibly may infer that the
> purpose of the governmental action is punishment that may not
> constitutionally be inflicted upon detainees *qua* detainees. Courts must
> be mindful that these inquiries spring from constitutional requirements
> and that judicial answers to them must reflect that fact rather than a
> court's idea of how best to operate a detention facility.

441 U.S. at 538–39 (citations omitted).

*Bell* quotes approvingly from Justice Frankfurter, who wrote, "The fact that

harm is inflicted by government authority does not make it punishment."  441 U.S.

at 539.  *Bell* stipulates that the "legitimate governmental objectives" and "alternative

purposes" justifying a "particular condition or restriction" include insuring the

detainees presence at trial, effectively managing the detention facility, maintaining

order and security, excluding weapons and drugs, and others.  441 U.S. at 540.  *Bell*

speaks, as well, to whose judgment prevails if a question arises about whether

particular restrictions are "reasonably related" to legitimate objectives:

> In determining whether restrictions or conditions are reasonably
> related to the Government's interest in maintaining security and order
> and operating the institution in a manageable fashion, courts must
> heed our warning that "[s]uch considerations are peculiarly within the
> province and professional expertise of corrections officials, and, in the
> absence of substantial evidence in the record to indicate that the
> officials have exaggerated their response to these considerations, courts
> should ordinarily defer to their expert judgment in such matters."

441 U.S. at 540 (citation omitted).

*Bell* elaborates "the teaching" of Supreme Court precedent, 441 U.S. at 548,

that is, elaborates "several general principles" to guide the evaluation of restrictions

on detainees.  First, a detainee undeniably retains constitutional protection during

detention.  441 U.S. at 545.  Second, despite the detainees' retention of rights, "the

withdrawal or limitation of many privileges and rights" necessarily accompanies any

term of detention.  441 U.S. at 545–46.  Third, the need for "institutional security" is

"central" and "essential":

> [M]aintaining institutional security and preserving internal order and
> discipline are essential goals that may require limitation or retraction
> of the retained constitutional rights of both convicted prisoners and
> pretrial detainees.  "[C]entral to all other corrections goals is the
> institutional consideration of internal security within the corrections
> facilities themselves."  Prison officials must be free to take appropriate

> action to ensure the safety of inmates and corrections personnel and to
> prevent escape or unauthorized entry.

441 U.S. at 546–47 (citations omitted).  Fourth, mindful that the district court and the

Second Circuit in concert had "trenched too cavalierly into areas that are properly

the concern of [jail] officials," 441 U.S. at 554, especially in the area of security

interests and "the means required to further those interests," 441 U.S. at 554, *Bell*

warns sternly about "this sort of unguided substitution of judicial judgment for that of

the expert prison administrators."  441 U.S. at 554.

This remark in *Bell* about "expert prison administrators" evokes *Youngberg*'s

deference to the judgment of "professionals," referring in each instance to the same

corrections officials.  In reference to the regime of jail administration imposed by the

district court and the circuit court in the name of the Fourteenth Amendment, *Bell*

concludes:

> We do not doubt that the rule devised by the District Court and
> modified by the Court of Appeals may be a reasonable way of coping
> with the problems of security, order, and sanitation. It simply is not,
> however, the only constitutionally permissible approach to these
> problems. Certainly, the Due Process Clause does not mandate a
> "lowest common denominator" security standard, whereby a practice
> permitted at one penal institution must be permitted at all institutions.

441 U.S. at 554.

The Sheriff next cites (Doc. 539 at 12) *Bozeman v. Orum*, 422 F.3d 1265

(11th Cir. 2005), in which a pre-trial detainee is subdued by officers in his second-

floor cell after flooding his cell with toilet water that caused urine and feces to float

about the area and that caused a waterfall from the second to the first floor; after

pacing naked in his cell; after "yelling religious phrases," such as "see the blood of Jesus on me"; after drinking the overflowed toilet water; after vomiting; and after trying to hang himself.  422 F.3d at 1268.  Officers arrived and threatened to "kick his ass," so he covered himself with "grease . . . to make himself slippery."  After a twenty-minute struggle in the cell with four officers, the detainee was moved, limp and motionless, from his cell toward an isolation cell on the first floor, but the detainee was "set . . . on the ground" while the isolation cell was prepared.  422 F.3d at 1270.  The officers noticed that the detainee "appeared unconscious."  The officers summoned the nurse, who immediately began resuscitation efforts, but the detainee was dead.  The district court granted summary judgment for the Sheriff but denied the officers' claim of qualified immunity.

*Bozeman* offers a recent and authoritative statement of the law governing a claim by a detainee of excessive force and a claim by a detainee of deliberate indifference to serious medical needs.  Consistent with other controlling precedent, *Bozeman* notes that whether a plaintiff is a prisoner or a detainee "makes no difference," 422 F.3d at 1271, because the same constitutional standard applies to each:

> Under this standard, "whether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm."

422 F.3d at 1271 (citations omitted).  *Bozeman* specifically delineates the standard

applicable in the Eleventh Circuit to a claim for deliberate indifference to a serious

medical need:

> First, the plaintiff must prove an objectively serious medical need.
> Second, the plaintiff must prove that the prison official acted with
> deliberate indifference to that need.
>
> . . . . To satisfy the subjective element of deliberate indifference to
> Haggard's serious medical need, Plaintiff must prove three things:
> "(1) subjective knowledge of a risk of serious harm; (2) disregard of
> that risk; (3) by conduct that is more than [gross] negligence." . . .
>
> Demonstration of the level of subjective knowledge necessary to
> impute to the Officers a sufficiently blameworthy state of mind
> consists of two steps: the Officers "must *both* be aware of facts from
> which the inference could be drawn that a substantial risk of serious
> harm exists, and [ ] must also draw the inference." . . . Whether the
> Officers had this level of subjective knowledge . . . "is a question of
> fact subject to demonstration in the usual ways, including inference
> from circumstantial evidence, and a fact finder may conclude that a
> prison official knew of a substantial risk from the very fact that the
> risk was obvious."
>
> . . . .
>
> . . . . "The tolerable length of delay in providing medical attention
> depends on the nature of the medical need and the reason for the
> delay."
>
> . . . .
>
> "[A]n official acts with deliberate indifference when he intentionally
> delays providing an inmate with access to medical treatment, knowing
> that the inmate has a life-threatening condition or an urgent medical
> condition that would be exacerbated by delay."

422 F.3d at 1272–73 (citations omitted).

The Sheriff next (Doc. 539 at 13) cites *Hudson v. McMillian*, 503 U.S. 1 (1992),

for the premise that the Eighth Amendment's prohibition against cruel and unusual

punishment "admits of few absolute limitations" because the amendment draws meaning from society's "evolving standards of decency." Of course, the meaning and effect of an ethereal generalization such as that must, in turn, "draw meaning" from the facts and the legal explanation of the decision in which the generalization appears.

In *Hudson*, after an "argument" a guard withdrew Hudson from his cell and walked him toward an "administrative lockdown area." According to Hudson, the guard repeatedly "punched" Hudson in the face and stomach while Hudson was restrained by another guard. Hudson received "minor bruises and swelling of his face, mouth, and lip." The blows "loosened Hudson's teeth and cracked his partial dental plate," which became "useless" for months. 503 U.S. at 4. Hudson sued, prevailed, and recovered $100.00 in the district court on his excessive force claim under the Eighth Amendment. Finding any use of force completely unwarranted and therefore in the circumstance constitutionally "excessive" and finding Hudson's injuries "minor" and not "significant," the Fifth Circuit reversed. The Supreme Court reversed the Fifth Circuit and addressed the question whether an application of excessive force can result in an Eighth Amendment violation "if the inmate does not suffer serious injury." 503 U.S. at 4. *Hudson* expressly holds that:

> [W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

503 U.S. at 7. *Hudson* prescribes that to discover the purpose for an application of force and to assess whether the force is excessive requires consideration of "the extent of injury suffered by the inmate" and, as well:

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and "any efforts made to temper the severity of a forceful response." The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

503 U.S. at 7 (citation omitted).

*Hudson* explains that a successful excessive force claim requires proof of both a "sufficiently culpable state of mind" and an injury "harmful enough to establish a constitutional violation." In other words, an excessive force claim under the Eighth Amendment, although not requiring a "significant injury," nonetheless requires an injury "serious enough" to trigger the Eighth Amendment, which "malicious and sadistic" force will trigger. *Hudson* attempts to ensure reasonableness and moderation in the trial courts by adding that neither "every malevolent touch" nor "every push or shove" nor every "*de minimus* use of physical force" triggers the Eighth Amendment but only that force "repugnant to the conscience of mankind." 503 U.S. at 9–10.

At page 28 (Doc. 539 at 28), discussing judicial deference to prison officials, the Sheriff cites *Whitley v. Albers*, 475 U.S. 312 (1986), mentioned repeatedly in *Hudson*. (Justice O'Connor writes for the majority in both *Whitley* and *Hudson*.) In *Whitley*, a group of drunk and defiant prisoners held a guard hostage, threatened the guard's life, and began "breaking furniture and milling about." 475 U.S. at 315.

- 103 -

After negotiation failed and after the prisoners severely beat a fellow prisoner, prison officials resolved to issue shotguns to guards for a "forceful intervention," which the officials found "necessary to protect the life of the hostage and the safety of the inmates who were not rioting."  475 U.S. at 316.  After the rioting prisoners refused a last request from officials to stand down, the intervention began with a "warning shot" and orders to the armed guards to "shoot low."  The intervention successfully freed the hostage, although several rioting prisoners were shot but without loss of life. The respondent "sustained severe damage to his left leg and mental and emotional distress."  475 U.S. at 317.  In the respondent's trial, the district judge directed a verdict for the prison officials.  The Ninth Circuit reversed in part and remanded for a trial in an opinion summarized in *Whitley* as follows:

> The court held that an Eighth Amendment violation would be established "if a prison official deliberately shot Albers under circumstances where the official, with due allowance for the exigency, knew or should have known that it was unnecessary," or "if the emergency plan was adopted or carried out with 'deliberate indifference' to the right of Albers to be free of cruel [and] unusual punishment." The Court of Appeals pointed to evidence that the general disturbance in cellblock "A" was subsiding and to respondent's experts' testimony that the use of deadly force was excessive under the circumstances and should have been preceded by a verbal warning, and concluded that the jury could have found an Eighth Amendment violation.

475 U.S. at 318 (citations omitted).

The Supreme Court reversed the Ninth Circuit, which had "effectively collapsed the distinction between mere negligence and wanton conduct" and observed that these facts presented a triable issue "only [i]f ordinary errors of

judgment could make out an Eighth Amendment claim." 475 U.S. at 323. *Whitley*

states both the governing question and the considerations that resolve the question.

First, the question:

> Where a prison security measure is undertaken to resolve a
> disturbance, such as occurred in this case, that indisputably poses
> significant risks to the safety of inmates and prison staff, we think the
> question whether the measure taken inflicted unnecessary and wanton
> pain and suffering ultimately turns on "whether force was applied in a
> good faith effort to maintain or restore discipline or maliciously and
> sadistically for the very purpose of causing harm." As the District
> Judge correctly perceived, "such factors as the need for the application
> of force, the relationship between the need and the amount of force
> that was used, [and] the extent of injury inflicted," 481 F.2d, at 1033,
> are relevant to that ultimate determination.
>
> . . . .
>
> But equally relevant are such factors as the extent of the threat to the
> safety of staff and inmates, as reasonably perceived by the responsible
> officials on the basis of the facts known to them, and any efforts made
> to temper the severity of a forceful response.

475 U.S. at 320–22 (citation omitted).

> *Whitley* also expresses the "special weight" owed to the "discretion of prison

administrators" in deciding matters affecting "a prison's internal security," which

includes the "internal order and discipline necessary to maintain institutional

security." 475 U.S. at 321–22. As *Whitley* explains, this "wide ranging deference"

extends to both measures in response to a present disruption and measures in

preparation for a prospective disruption:

> That deference extends to a prison security measure taken in response
> to an actual confrontation with riotous inmates, just as it does to
> prophylactic or preventive measures intended to reduce the incidence
> of these or any other breaches of prison discipline. It does not insulate
> from review actions taken in bad faith and for no legitimate purpose,

> but it requires that neither judge nor jury freely substitute their
> judgment for that of officials who have made a considered choice.

475 U.S. at 322.

Another instructive aspect of *Whitley* is the treatment of the testimony of the injured inmate's experts, one of whom testified that "prison officials gave inadequate consideration of less forceful means" and that "deadly force" was unnecessary," despite the fact of a prison guard held hostage and reports of a dead inmate.  475 U.S. at 323.  Another expert testified that prison officials were "possibly a little hasty" in deploying force.  475 U.S. at 323.  *Whitley* forcefully iterates that the germane inquiry is not whether an expert concludes that prison officials "arguably erred" but whether a "plausible basis" existed for the prison officials' order to shoot.

In *Whitley*, the injured inmate claimed that a "verbal warning" was necessary before the final use of force.  *Whitley* disposes of the argument in an instructive manner:

> As petitioners' own experts conceded, a verbal warning would have
> been desirable, in addition to a warning shot, if circumstances
> permitted it to be given without undue risk. While a jury might
> conclude that this omission was unreasonable, we think that an
> inference of wantonness could not properly be drawn. First, some
> warning was given in the form of the first shot fired by Officer
> Kennicott. Second, the prison officials could have believed in good
> faith that such a warning might endanger the success of the security
> measure because of the risk that it would have allowed one or more
> inmates to climb the stairs before they could be stopped. The failure
> to provide for verbal warnings is thus not so insupportable as to be
> wanton. Accordingly, a jury could not properly find that this omission,
> coupled with the order to shoot, offended the Eighth Amendment.

475 U.S. at 324 (citation omitted).  In short, *Whitley* requires malice or wantonness and not negligence or mistaken judgment.

The Sheriff next (Doc. 539 at 30) cites *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997); *Marsh v. Butler County, Alabama*, 268 F.3d 1014 (11th Cir. 2001); *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and *Engelleiter v. Brevard County Sheriff's Department*, 290 F. Supp. 2d 1300 (M.D. Fla. 2003), for the requirement (undisputed — in fact, unmentioned — by the plaintiffs) that a Sheriff is not liable in his official capacity for the wrongs of his subordinates unless the wrongs are consequent upon an official policy or practice of the Sheriff that directly causes an injury.

As did the plaintiffs, the Sheriff cites (Doc. 539 at 31) *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), discussed earlier, in which the Eleventh Circuit finds the Sheriff liable in his official capacity for violation of the Eighth Amendment but in circumstances immeasurably different and worse in quality and quantity than any circumstance in juvenile detention at CCJ.  Nonetheless, *LaMarca* reverses parts of the injunctive relief because the injunction "unnecessarily intrudes on [Glades Correctional Institution's] operations."  995 F.2d at 1543.  Citing *Milliken v. Bradley*, 433 U.S. 267 (1977), *LaMarca* emphasizes that:

> While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong. "[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation . . . ."

995 F.2d at 1526 (citation omitted).  In other words, proof of a constitutional wrong necessarily precedes the district court's grant of relief, which is limited to those steps necessary to achieve constitutional compliance — and nothing less but nothing more.

The Sheriff next (Doc. 539 at 42) cites *Craig v. Floyd County, Georgia*, 643 F.3d 1306 (11th Cir. 2011), in which Craig, a pre-trial detainee, claimed a violation of the Fourteenth Amendment based on the failure of the Georgia Correctional Institute (GCI) to diagnose his condition and for waiting nine days to administer a CT scan that revealed "air, bleeding, and fractures in his head that required neurological surgery."  643 F.3d at 1308.  Craig later sued under the Fourteenth Amendment and alleged GCI's deliberate indifference to his serious medical needs.  The district court granted a summary judgment for the defendants because, even assuming some problem with the diagnosis, the evidence — based on a single episode — failed to create a genuine issue of "whether a policy, practice, or custom of [GCI] had violated Craig's constitutional right."  643 F.3d at 1309.  Because GCI had no express policy or practice requiring a failure to diagnose, Craig relied on proof of a "custom," which necessarily failed because Craig lacked proof of a pattern of unconstitutional conduct by GCI:

> "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality. "A pattern of similar constitutional violations . . . is 'ordinarily necessary.'" "A single incident would not be so pervasive as to be a custom," because a custom must be such "a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." This requirement of proof "prevents the imposition of liability based upon an isolated incident," and "'ensures that a municipality is held liable only for those

> deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.'"

643 F.3d at 1310 (citations omitted).  Because the record includes no evidence of any express and unconstitutional policy promulgated and enforced by the Sheriff, the plaintiffs' claims under the Fourteenth Amendment necessarily depend on proof of a prevailing custom, proof of which requires evidence of an established pattern of unconstitutional deprivation.

The Sheriff next (Doc. 539 at 34) cites *Lewis v. Casey*, 518 U.S. 343 (1996), in which a class of inmates alleged — successfully in the district court and the Ninth Circuit — a deprivation of rights by the Arizona Department of Corrections under the First, Sixth, and Fourteenth Amendments.  The inmates claimed that only inadequate legal material was available to them in the prison library, an inadequacy that allegedly deprived them of access to the courts, access required by *Bounds v. Smith*, 430 U.S. 817 (1977).  *Lewis* reverses the Ninth Circuit because the inmates could show no "widespread actual injury" but showed only "isolated instances of actual injury."  518 U.S. at 349.  *Lewis* explains the injury requirement in terms of constitutional standing and the separation of the branches of government:

> The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: It is for the courts to

> remedy past or imminent official interference with individual inmates'
> presentation of claims to the courts; it is for the political branches of
> the State and Federal Governments to manage prisons in such fashion
> that official interference with the presentation of claims will not occur.

518 U.S. at 350 (citations omitted).  *Lewis* also emphasizes that an inmate enjoys a

constitutional right to access to the courts and not a right to a law library.  A state

might choose to protect access to the courts by implementing alternatives other than

the maintenance of law libraries, which "are not ends in themselves, but only the

means for ensuring 'a reasonably adequate opportunity'" to assert a constitutional

claim.  518 U.S. at 351.  Both in this instance and in others, the Constitution

prescribes no exclusive, obligatory means to achieve compliance with a constitutional

standard.

　　*Lewis* remarks that the only two examples of "actual injury" appearing in the

evidence were the inability of illiterate or Spanish-speaking inmates to access the

courts and the impaired capacity of inmates on lockdown to access the courts.  With

respect to the latter, *Lewis* emphasizes the "principle of deference" in *Turner v. Safley*,

482 U.S. 78 (1987), and concludes:

> [The district] court concluded that [Arizona Department of
> Corrections'] restrictions on lockdown prisoners' access to law
> libraries were unjustified. *Turner*'s principle of deference has
> special force with regard to that issue, since the inmates in
> lockdown include "the most dangerous and violent prisoners in
> the Arizona prison system," and other inmates presenting special
> disciplinary and security concerns. The District Court made much
> of the fact that lockdown prisoners routinely experience delays in
> receiving legal materials or legal assistance, some as long as 16 days
> but so long as they are the product of prison regulations reasonably

> related to legitimate penological interests, such delays are not of
> constitutional significance, even where they result in actual injury
> (which, of course, the District Court did not find here).

518 U.S. at 363.

The Sheriff next cites *Farmer v. Brennan,* 511 U.S. 825 (1994), discussed earlier

in this order, although the Sheriff mentions *Farmer* to accent the requirement for a

plaintiff inmate to prove, as an essential part of a constitutional claim, that a

defendant official was "knowingly and unreasonably disregarding an objectively

intolerable risk of harm" and "will continue to do so." 511 U.S. at 846.

The Sheriff responds to the plaintiffs' legal assertion, based on Section 985.02,

Florida Statutes, that a juvenile pre-trial detainee is subject to "rehabilitation." Of

course, the "intent" of Florida's juvenile system, as a whole, includes rehabilitation

for a convicted juvenile, who presumably needs rehabilitation. But, the Sheriff cites

Justice Stevens' dissenting opinion in *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978),

which includes the admonition that "[c]ertain penological objectives, i.e.,

punishment, deterrence, and rehabilitation, which are legitimate in regard to

convicted prisoners, are inapplicable to pretrial detainees." This is inarguably true

because a pretrial detainee is presumed innocent of the pending charge; a pretrial

detainee within the contemplation of the law has committed no act warranting

punishment, threatens nothing that requires deterrence, and suffers from nothing that

requires rehabilitation.

Although this action is not about the statutes of Florida and the Florida

legislature's intent in an enactment, the statutes of Florida control the reasons for

which a juvenile is subject to detention.  To detain a juvenile, Section 985.02(4)(a),

Florida Statutes, requires:

> clear and convincing evidence that a child presents a risk of failing
> to appear or presents a substantial risk of inflicting bodily harm
> on others as evidenced by recent behavior; presents a history of
> committing a serious property offense prior to adjudication,
> disposition, or placement; has acted in direct or indirect contempt
> of court; or requests protection from imminent bodily harm.

Neither the state of Florida nor the Sheriff is empowered to assume command

of a detainee's life and mold the detainee's beliefs, objectives, and behaviors into

those approved by the Sheriff.  A juvenile detainee's parents, guardians, and the like,

along with the juvenile, retain the preeminent role in determining the juvenile's

beliefs, objectives, and behaviors.  The Sheriff is charged to implement reasonable

measures to prevent a juvenile's exposure during detention to a substantial risk of

serious harm.  The governing reality with which the Sheriff contends in securing

those in detention is that the juveniles in detention are not a random sample of

"children" but an unrepresentative group, every one of whom — clear and

convincing evidence establishes — qualifies for detention under Section 985.02, that

is, presents a "substantial risk of inflicting bodily harm," has a history of "serious

property offenses," committed a "contempt of court," or "requested protection from

imminent bodily harm."  In short, the court sends to the Sheriff for detention three

groups that are a threat and a fourth (and much less frequent) group that is

vulnerable.  Hence, as the courts uniformly affirm, institutional security is essential

both to pacify the aggressive and to insulate the vulnerable.  The use of force as

punishment to the ends of retribution, deterrence, or rehabilitation plays no part in detention.  On the other hand, the episodic use of force, if reasonably chosen and reasonably administered, to achieve and maintain institutional security is an integral part of detention.

In discussing the Fourteenth Amendment and conditions of confinement, the Sheriff first discusses *Whitley*, *Farmer*, *McKinney*, *Thomas*, and *Wilson*, each discussed earlier in this order.  The Sheriff highlights that "obduracy and wantonness," that the "unnecessary and wanton infliction of pain," and that deprivation of "basic human needs" offend the Constitution.  The Sheriff cites *McKinney* and *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004), to support the requirement that a plaintiff, asserting an unconstitutional condition of confinement, must establish both (1) an "objectively unreasonable risk of serious damage to . . . health or safety" and (2) the Sheriff's subjective "deliberate indifference" to the "unnecessary and wanton infliction of pain."

*Chandler* is a class action by inmates on Florida's "death row" in Raiford.  The inmates alleged that temperatures in the "death row" cells in the summer climbed sufficiently to cause their confinement to violate the Eighth Amendment.  The inmates' cells lacked air conditioning or circulating fans.  Fresh air was pulled through two windows across the hall from each cell by "exhaust fans located in the back wall of each cell."  As summarized in *Chandler*:

> Each prisoner is confined to his own individual cell. Generally
> speaking, the inmates may only leave their cells for the following

> reasons: (1) outdoor recreation, twice per week, for two hours each
> time; (2) showers, three times per week; (3) attorney and media visits;
> (4) personal visits; (5) use of the prison library; and (6) medical and
> mental health appointments. The visiting areas, prison library, and
> medical and mental health offices are air conditioned.

379 F.3d at 1284.  Summer cell temperatures ranged from eighty degrees at night

to eighty-six degrees during the day ("a relatively constant temperature").  After

surveying both "heat" cases and "cold" cases, *Chandler* concludes (1) that heat and

cold are among the prison conditions to which the Eighth Amendment applies,

(2) that the "severity and duration" of a condition are among the factors pertinent

to an Eighth Amendment assessment, and (3) that "a prisoner's mere discomfort,

without more, does not offend the Eighth Amendment."

Invoking the leading authorities, including *Farmer*, *McKinney*, and *Wilson*,

Judge Tjoflat in *Chandler* iterates the familiar elements of proof required in a

constitutional challenge to conditions of confinement, including the "objective

component," which prescribes that the challenged condition must be "extreme,"

that is, "sufficiently serious to violate the Eighth Amendment."  379 F.3d at 1289.

*Chandler* concludes that the Eighth Amendment "guarantees that prisoners will not

be 'deprive[d] . . . of the minimal civilized measure of life's necessities.'"  379 F.3d

at 1279.

The Sheriff also cites *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004), in

which McDowell, a detainee, reported lower back pain about two weeks after arrest.

The jail's nurse sent McDowell to the hospital for an examination, which occurred,

and McDowell returned to jail the same day.  The next day McDowell worsened and

- 114 -

the nurse again directed the staff to transport him to the hospital.  However, another inmate was injured seriously and the staff transported the other inmate, instead of McDowell, to the hospital.  Later, the staff completed several "mental health transports," instead of transporting McDowell.  At about 9:00 a.m., McDowell complained "that he had no feeling in his legs" and a nurse classified him as "emergent."  392 F.3d at 1287.  McDowell arrived at the hospital at 12:20 p.m. and entered the operating room about 10:20 p.m. — more than twenty-four hours after first seeing the nurse — for correction of a spinal epidural abscess.  McDowell "remains an incomplete paraplegic" who "needs assistance to walk."  392 F.3d at 1287 n.2 and accompanying text.

McDowell asserted against the county a Section 1983 claim under the Eighth Amendment.  *McDowell* emphasizes that in a Section 1983 action against the county, the law requires a plaintiff to show a "persistent and widespread practice" that is "so settled and permanent that it takes on the force of law," a requirement that "prevents the imposition of liability based upon an isolated incident" or "random acts."  392 F.3d at 1290.  Finding an absence of evidence of a "'persistent' or 'widespread' policy of understaffing the Jail so as to delay the transfer of inmates" to the hospital, *McDowell* finds for the county.  An important facet of *McDowell* is that to prove that a policy is maintained with the "requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences" a plaintiff must prove

more than, for example, "a generalized policy of understaffing" and must prove "a 'deliberate intent' to inadequately staff."  392 F.3d at 1291.

The Sheriff cites *McDowell* for a principle of "deliberate indifference" that is a characteristic requirement for a claim, such as the plaintiffs' claims in this action.  To establish liability in a governmental policy maker, such as the Sheriff, a plaintiff must show that a constitutional violation is a "highly predictable consequence" of a particular policy and not just an event that is traceable in part to the policy when reviewed in retrospect.  In other words, a policy-maker's "deliberate indifference" cannot occur unless a particular, seriously injurious result was the "highly predictable consequence" of a policy.

The delay in treatment for McDowell resulted from the unlikely convergence of exigent demands on prison resources rather than from a purposeful plan to deprive the facility of personnel sufficient to accomplish foreseeable requirements.  As *McDowell* concludes:

> In the instant case, the record is barren of any evidence of implementation of an intentionally malevolent or impermissible policy by the Board so as to authorize a cause of action against Dekalb County under 42 U.S.C. § 1983. The fact that the Board's budget practices resulted in understaffing does not amount to a purposeful disregard which would violate any citizen's constitutional rights. McDowell "may not infer a policy merely because harm resulted from some interaction with a governmental entity."

392 F.3d 1293.

On the requirements of a claim for excessive force, the Sheriff begins with *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007), which predictably conforms

- 116 -

to *Whitley* and *Bozeman* in identifying excessive force as a use of force that "is so egregious that it shocks the conscience" and that occurs when force is used "maliciously and sadistically for the very purpose of causing harm." 510 F.3d at 1311. As *Cockrell* states:

> Under this standard, we look at "the need for the application of force; the relationship between the need and the amount of force that was used; and the extent of the injury inflicted upon the prisoner." Additionally, we consider "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." Not only that, but we must also give a "wide range of deference to prison officials acting to preserve discipline and security," including when considering "[d]ecisions made at the scene of a disturbance."

510 F.3d at 1311 (citations omitted).

In *Cockrell*, the prison guard responded to a drunk inmate's shouting, banging on the cell door, and demanding release. The guard "opened Cockrell's door, told him to 'shut the hell up' and gave Cockrell an open-handed shove. Cockrell fell, broke his hip and wrist, and lacerated his ear." 510 F.3d at 1310. Finding that the severity of the injury was not "reasonably anticipated," *Cockrell* affirms the summary judgment for the guard and concludes:

> In both Fourteenth and Eighth Amendment excessive force claims, whether the use of force violates an inmate's constitutional rights "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" If force is used "maliciously and sadistically for the very purpose of causing harm," then it necessarily shocks the conscience. If not, then it does not.

510 F.3d at 1311 (citations omitted). *Cockrell* affirms that a guard "may use force when necessary to restore order and need not wait until disturbances reach dangerous

proportions before responding." 510 F.3d at 1311. *Cockrell* finds that the open-handed push was "not disproportionate to the need" and that an open-handed push's causing broken bones was not foreseeable. Finally, *Cockrell* concludes with a sound, common sense, contextual observation:

> Finally, the fact that King and Ballew immediately summoned medical assistance for Cockrell, "temper[ed] the severity of [the] forceful response" and makes it less likely that either of them was acting sadistically instead of in good faith.

510 F.3d at 1312.

The Sheriff next turns to the plaintiffs' claim that the Sheriff's policies create a general level of violence "so high" that the policies violate the Fourteenth Amendment. The Sheriff notes that to establish a Fourteenth Amendment violation *LaMarca* requires proof of an "unjustified, constant, and unreasonable exposure to violence."

The Sheriff cites *Gullate v. Potts*, 654 F.2d 1007 (5th Cir. 1981), a well-known "snitch" case, in which a prisoner, who identified for prosecutors the participants in a "mass homosexual rape of his cellmate," was transferred for his safety to a minimum security facility. However, he was returned later to a maximum security facility without consideration for his safety, and he was murdered the first day.

*Gullate* reverses and remands the district court's dismissal of the action, but a procedural problem based on the district judge's "correcting" — without an evidentiary hearing — the magistrate judge's fact finding accounts in part for the reversal. Also, both judges failed entirely to consider the subjective component of the

qualified immunity inquiry.  Finally, although certain Fifth Circuit precedent is binding in the Eleventh Circuit, the more recent *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003), notes that prison officials' use of an inmate as a "snitch" creates both an increased explicit awareness and a specially heightened obligation for protection from the resulting risk.  352 F.3d at 1350 n.9.  Otherwise, knowledge of a generalized, non-specific risk is insufficient to create Eighth Amendment liability, a point *Carter* vividly illustrates.

In *Carter* the inmate was placed in administrative segregation because of participation in an investigation of computer misuse.  Carter was a medium-security inmate.  Carter's cellmate in segregation was known to officials as a "problem inmate" designated for maximum security.  The cellmate informed Carter that he planned to fake a hanging to provoke his transfer to a medical facility and that he planned for Carter to "help" in some unstated manner with the fake hanging, which Carter took as a threat.  Carter reported this threat and reported that his cellmate acted "crazy" and "paced the cell like 'a caged animal.'" 352 F.3d at 1348. Although Carter sought a transfer, the officials refused the transfer until completion of the computer investigation.  Carter's cellmate later stabbed Carter in the stomach with a "shank."  352 F.3d at 1348.

The district court granted the officials a summary judgment against Carter's claim under the Eighth Amendment, and the Eleventh Circuit affirmed after

considering the required specificity of the threat of serious harm that is necessary to

trigger Eighth Amendment liability.

> Even assuming the existence of a serious risk of harm and
> legal causation, the prison official must be aware of specific facts
> from which an inference could be drawn that a substantial risk of
> serious harm exists — and the prison official must also "draw that
> inference." . . .
>
> . . . .
>
> Defendants arguably should have placed Plaintiff elsewhere but
> "merely negligent failure to protect an inmate from attack does not
> justify liability under section 1983. . . ." Defendants only possessed
> an awareness of Inmate Barnes's propensity for being a problematic
> inmate; to find Defendants sufficiently culpable would unduly reduce
> awareness to a more objective standard, rather than the required
> subjective standard set by the Supreme Court. Such a generalized
> awareness of risk in these circumstances does not satisfy the subjective
> awareness requirement.

352 F.3d at 1349–50 (citation omitted).[5]

At page 91 of the proposed findings (Doc. 539), the Sheriff discusses the

requirements of a claim for deliberate indifference to the serious mental health care

needs of a juvenile detainee.  The Sheriff first cites the admonition in *Estelle* that to

trigger the Eighth Amendment a detainee must establish "acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs."

---

[5] *But see Rodriguez v. Secretary for Dep't. of Corr.*, 508 F.3d 611, 621 (11th Cir. 2007) ("Here unlike in *Carter* [the inmate] told [a prison official] the following specific information: (1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound . . . was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody. These are the things that the inmate in *Carter* did not do.")

Next the Sheriff cites *Evans v. St. Lucie County Jail*, 448 Fed. Appx. 971

(2011), in which Evans tripped over mattresses placed on the floor of his cell to

accommodate an over-crowded jail.  Evans hurt his back in the fall.  Evans claimed

an unconstitutional delay in treatment and "indifferent and uncaring" treatment.

448 Fed. Appx. at 975.  Evans claimed that three requests for a doctor were ignored

and that his examination was both delayed and perfunctory.  *Evans* finds that the

allegations fail to identify "an objectively serious medical need, one that, if left

unattended, poses a substantial risk of serious harm," 448 Fed. Appx. at 976, and

concludes:

> Separately, we also note that the complaint does not allege sufficient
> facts to show that the level of care exercised by those were in charge of
> processing medical requests, and by the doctor who saw Evans, was
> worse than "accidental inadequacy, negligence . . . or even medical
> malpractice actionable under state law." Assuming, as we must, that
> Evans's allegations are true, we readily acknowledge that the delay in
> arranging a medical visit and the doctor's conduct during that visit
> leave much to be desired. This is not enough, however, to support a
> claim of unconstitutional conduct.

448 Fed. Appx. at 976 (citations omitted).

Finally, the Sheriff cites a district court opinion that, in turn, cites the

frequently-cited *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000), in which

a shoplifter was chased by employees for several blocks, apprehended, and held

to the ground until police arrived.  The shoplifter denied the need for medical

assistance, and the police transported him to the jail in a paddy wagon.  When

police arrived at the jail and opened the paddy wagon, the shoplifter was unconscious

and unresponsive after attempts to revive him.  Immediately upon arrival, a nurse

ordered him transferred to the hospital, but he died *en route*.  The deceased's estate

sued everyone involved, including the sheriff.  Although the issue arises in the

context of qualified immunity, *Taylor* finds the applicable Eighth Amendment law

"clearly established" and finds no claim under the Fourteenth Amendment.  After

restating:

> In the context applicable here, denial of medical care, each of these
> minima has been more specifically described as encompassing two
> subsidiary requirements. To show an objectively serious deprivation,
> it is necessary to demonstrate, first, an objectively "serious medical
> need [ ]," one that, if left unattended, "pos[es] a substantial risk of
> serious harm," and second, that the response made by public officials
> to that need was poor enough to constitute "an unnecessary and
> wanton infliction of pain," and not merely accidental inadequacy,
> "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical
> malpractice" actionable under state law, (internal quotation marks
> omitted). Similarly, to show the required subjective intent to punish,
> a plaintiff must demonstrate that the public official acted with an
> attitude of "deliberate indifference," which is in turn defined as
> requiring two separate things: "aware[ness] of facts from which the
> inference could be drawn that a substantial risk of serious harm exists
> [ ] and . . . draw[ing of] the inference." Ultimately, there are thus four
> requirements: an objectively serious need, an objectively insufficient
> response to that need, subjective awareness of facts signaling the need,
> and an actual inference of required action from those facts.

221 F.3d at 1258.

Recognizing the familiarity of the governing legal principles and undertaking

to further illustrate facts relevant to a claim of unconstitutional police conduct, *Taylor*

cites *Hill v. DeKalb County Regional Youth Detention Center*, 40 F.3d 1176 (11th Cir.

1994), in which a sixteen-year-old detainee complained of stomach pain.  The

detainee, Hill, was seen by a nurse, reported that he was urinating blood, examined

at a hospital after a delay of several hours, returned to detention, ate a meal but

vomited blood, was medicated and sent to bed, was sexually assaulted by members of the staff, again reported bleeding, was returned to the hospital, and was finally diagnosed and treated.

The detailed opinion in *Hill* carefully identifies and illustrates categories of claims of delay or denial of medical attention to those in custody. *Hill*'s first category comprises cases of "medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem," 40 F.3d at 1187, a category exemplified in *Hill* by these examples:

> *See, e.g., Brown*, 894 F.2d at 1538 (six-hour delay in medical treatment for "a serious and painful broken foot was sufficient to state a constitutional claim"); *Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988) (automobile accident where the individual was "'in obvious need of immediate medical attention,'" because of his "'medically emergent and deteriorating . . . condition'"); *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086–87 (11th Cir. 1986) (three-day delay in medical treatment for shoulder injury was "'reckless disregard'" for detainee's serious medical need and was a constitutional violation); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 702 (11th Cir. 1985) (valid constitutional claim where inmate died of leukemia four months after complaining of "serious" medical problems, including swollen ankles, inability to sleep, chills, hyperventilation, severe pain in back and right leg, and double vision, and county jail defendants made no arrangements for a doctor's examination until compelled to do so by two court orders); *Aldridge*, 753 F.2d at 972 (one-and-a-half-inch cut over detainee's eye bleeding for two and a half hours before sutured at a hospital); *Hughes v. Noble*, 295 F.2d 495, 496 (5th Cir. 1961) (per curiam) (following automobile accident, individual jailed for thirteen hours with broken neck and forced to endure "severe pain" despite "repeated requests for medical attention"); *see also Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir. 1987) (detainee's gunshot wound required immediate medical attention and delay in providing it caused shock and extensive internal bleeding).

40 F.3d at 1188 n.21.

*Hill* next identifies another category of claims of delayed or denied medical care, specifically, those "superficial, non-serious physical conditions" for which a "delay or even denial" of treatment will not violate the Eighth Amendment. *Hill* illustrates this category, also:

> See, e.g., *Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (per curiam) (state inmate's "'pseudofolliculitis' or 'shaving bumps,'" even if shaving required by prison officials when physician ordered otherwise, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"), *cert. denied*, 479 U.S. 1011, 107 S. Ct. 655, 93 L.Ed.2d 709 (1986); *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1986) (per curiam) (county inmate's high blood pressure presented "'no true danger' or 'serious threat' to his health," and he also had full range of motion in his shoulder despite continuing pain from a three-year-old injury; further, he obtained a medical examination the day after he requested it), *cert. denied*, 439 U.S. 897, 99 S. Ct. 259, 58 L.Ed.2d 244 (1978); *see also Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (state prisoner's swollen, bleeding wrists from handcuffs that were too tight "do not constitute such a 'serious medical need' that any minor delay caused by [prison officials] in delivering [inmate] to the care of medical personnel could be construed as 'deliberate indifference'"); *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (while sliver of glass in detainee's palm "was no doubt uncomfortable," it nevertheless "was not a serious injury" and fourteen-hour delay in medical treatment "did not violate his constitutional rights" because cuts and bruises were "minor" and "did not require either stitches or painkiller").

40 F.3d at 1188 n.22.

Also, *Hill* illustrates that the "seriousness of an inmate's medical needs" includes consideration of the "effect of delay" and that a serious medical need includes a circumstance in which delay causes "a life-long handicap or permanent loss," a conclusion illustrated by these examples:

> See, e.g., *Ancata*, 769 F.2d at 702 (death); *Matzker v. Herr*, 748 F.2d 1142, 1147–48 (7th Cir. 1984) (following a prison fight, inmate's denial of medical treatment for eye injury and three broken teeth

- 124 -

for three months was an Eighth Amendment violation); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (alleged intentional delay in emergency medical care for pregnant inmate who miscarried); *Ramos*, 639 F.2d at 576 (delay in providing state prisoner's oral surgery caused "continued and unnecessary pain and loss of teeth"); *see also Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) ("[A] prisoner states a proper cause of action when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury.").

40 F.3d at 1188 n.23.

*Hill* illustrates also that a party who claims a violation of the Eighth Amendment based on denial or delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Again, *Hill* offers fortifying illustrations of the principle applied:

Compare *Czajka v. Caspari*, 995 F.2d 870, 872 (8th Cir. 1993) (per curiam) (no evidence that delay in inmate's orthopedic surgery "'so deviated from professional standards that it amounted to deliberate indifference'" (citation omitted)); *Ervin v. Busby*, 992 F.2d 147, 150–51 (8th Cir. 1993) (per curiam) (although inmate was deprived of prescription anti-depressant medication for approximately a month, during which time he incited a riot, doctor testified that suddenly stopping medication should not have caused undue agitation; prison officials' negligence in not refilling prescription was not deliberate indifference), *cert. denied*, 510 U.S. 879, 114 S. Ct. 220, 126 L.Ed.2d 176 (1993); *Gaudreault*, 923 F.2d at 208 (although hospital records showed that arrestee displayed multiple bruises to the forehead, left and right orbits of his eyes, nasal area, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with alleged assault by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the slightest"); *Martin*, 849 F.2d at 871 (police officers did not violate arrestee's constitutional rights by fourteen-hour delay in obtaining medical treatment for cut under his eye that had stopped bleeding and removal of quarter-inch piece of glass embedded in his palm because there was "no suggestion that the delay in taking him to the hospital exacerbated his injuries in

> any way") *with Wellman*, 715 F.2d at 273–74 (medical expert testified
> that five hours delay between time inmate went into cardiovascular
> shock and the time he was taken to the hospital caused his death).

40 F.3d at 1188 n.24. The record in this action wholly lacks the "verifying medical

evidence" required by *Hill*.

At page 102 of the proposed findings, the Sheriff discusses the plaintiffs' claim

that placement of a juvenile detainee in isolation requires a due process hearing. The

Sheriff first cites *Rodgers v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998), which

affirms the district court's summary judgment finding that sixty days in

"administrative confinement" for a disciplinary reason failed to deprive the inmate

of a "protected liberty interest" and, accordingly, failed to trigger the right to a due

process hearing.

At the heart of *Rodgers* and the more recent precedent cited in *Rodgers*'s

decisive footnote 1 is *Sandin v. Conner*, 515 U.S. 486 (1995), in which an inmate,

when moving within a maximum security prison from a cell to a program area, was

subject to a "strip search," including a rectal "inspection." The inmate subjected the

guard to "angry and foul language" and drew a disciplinary citation for "high

misconduct" for "physical interference" with the officer and for "low misconduct"

for foul language and harassment. At the disciplinary hearing, the inmate was

refused the opportunity to call staff witnesses because the staff was needed elsewhere.

Found guilty, the inmate served thirty days in "disciplinary segregation." Later, a

review board found the inmate "not guilty" of the "high misconduct" that drew the

thirty-days in segregation.  The inmate sued but the district court granted summary

judgment for the defense.  *Conner v. Sakai*, 15 F.3d 1463 (9th Cir. 1993), reverses

and holds that the inmate enjoyed a protected "liberty interest" in not serving

"disciplinary segregation" without adequate protection of his due process rights,

including the right to call witnesses.

   *Sandin* reverses the Ninth Circuit.  *Sandin* discusses several earlier Supreme

Court decisions and notes the difficulty often encountered in a prison case:

> In a series of cases since *Hewitt*[ *v. Helms*, 459 U.S. 460 (1983)], the
> Court has wrestled with the language of intricate, often rather routine
> prison guidelines to determine whether mandatory language and
> substantive predicates created an enforceable expectation that the State
> would produce a particular outcome with respect to the prisoner's
> conditions of confinement.

515 U.S. at 480–81.  *Sandin* finds that this laborious process, arising from the earlier

cases, unwholesomely "creates disincentives" to the codification of state prison

practices and licenses intrusion by the federal courts into the "day-to-day

management of prisons often squandering judicial resources with little offsetting

benefit to anyone."  515 U.S. at 482.  The Supreme Court notes some earlier

unfortunate and unrewarding intrusions by the federal judiciary into the day-to-day

management of prisons; resolves, except in a narrowly constrained realm, to refrain

from intruding on prison officials' necessary management flexibility; explains the

problem; and provides examples:

> Such flexibility is especially warranted in the fine-tuning of the
> ordinary incidents of prison life, a common subject of prisoner claims
> since *Hewitt. See, e.g., Klos v. Haskell*, 48 F.3d 81, 82 (CA2 1995)
> (claiming liberty interest in right to participate in "shock program"— a

type of boot camp for inmates); *Segal v. Biller*, No. 94–35448, 1994 WL 594705, 1994 U.S.App. LEXIS 30628 (CA9 Oct. 31, 1994) (unpublished) (claiming liberty interest in a waiver of the travel limit imposed on prison furloughs); *Burgin v. Nix*, 899 F.2d 733, 735 (CA8 1990) (claiming liberty interest in receiving a tray lunch rather than a sack lunch); *Spruytte v. Walters*, 753 F.2d 498, 506–508 (CA6 1985) (finding liberty interest in receiving a paperback dictionary due to a rule that states a prisoner "'may receive any book . . . which does not present a threat to the order or security of the institution'") (citation omitted); *Lyon v. Farrier*, 727 F.2d 766, 768–769 (CA8 1984) (claiming liberty interest in freedom from transfer to a smaller cell without electrical outlets for televisions and liberty interest in a prison job); *United States v. Michigan*, 680 F. Supp. 270, 277 (WD Mich.1988) (finding liberty interest in not being placed on food loaf diet).

515 U.S. at 483.

Announcing the "abandonment of *Hewitt*'s methodology," 515 U.S. at 483 n.5, *Sandin* holds that the due process clause grants to an inmate protectible interests in freedom from a restraint that, while not in excess of the imposed sentence, "imposes atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

Of course, *Sandin* concerns prisoners, and the plaintiffs in the present action are juvenile detainees. Nonetheless, *United States v. Salerno*, 481 U.S. 739 (1987), finds that the regime of pre-trial detention codified in the Bail Reform Act of 1984 "is regulatory in nature and does not constitute punishment before trial in violation of the Due Process Clause." 481 U.S. at 748. *Salerno* holds that "the punitive/regulatory distinction turns on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it and whether it appears excessive in relation to the alternative purpose assigned.'" 481 U.S. at 747.

Quite obviously, this reasoning directly applies to Florida's system of detention.  The management of a detention facility and the preservation of safety and security at the facility present a compelling "alternative purpose" for regulatory measures, including temporary suspension of a privilege or the imposition of administrative confinement, however denominated, without implicating the Due Process Clause and without requiring an adversary hearing before every enforcement of the rules.

## FINDING OF FACT

On October 1, 2011, the Sheriff assumed new statutory responsibility for juvenile detainees and transferred them from the facility operated by the Department of Juvenile Justice (DJJ) to the Juvenile Detention Facility, a self-contained, newly refurbished section of CCJ.  The first group of juveniles moved were the "pre-adjudicated juveniles," charged as juveniles and ordered into detention by a state court judge.  The "direct-filed juveniles," charged criminally as adults, moved on September 1, 2011, from South County Jail to the Juvenile Detention Facility.  Since October 2011, the pre-adjudicated juveniles and the direct-file juveniles have lived at CCJ but in separate dorms.  The juveniles are separated — out of "sight and sound" — from the adult inmates, who are housed in a separate building across a large field at the adjoining adult campus of CCJ.

In general, the plaintiffs failed to prove that the Sheriff's policies or practices violate the Fourteenth Amendment, the gravamen of each count of the complaint.  At most, the plaintiffs show only that two persons, each of whom qualifies to testify

as a Rule 702 "expert," disfavor some of the Sheriff's past or present managerial policies and practices and advocate the adoption of other policies and practices that these "experts" feel are superior for one reason or another (although the evidence does not demonstrate that superiority).

A constitutional inquiry into the Sheriff's management of CCJ must focus on whether his "particular system violates any prohibition of the Constitution" — not on whether a consultant, an "expert," an academic, or another advocate harbors a vision of a better way to manage juvenile detention. *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). Because the "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," the Sheriff is "accorded wide-ranging deference in the adoption and execution of policies and practices that in [his] judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. at 547.

Detention for pre-adjudicated juveniles is almost always brief — an average in the range of ten to fourteen days. (Allen, XII 20:3–21:8)[6] Glindmeyer's and McRae's estimate of an overall juvenile average length-of-stay was fourteen to eighteen days. (VIII 77:1–12, XVIII 192:22–193:5) A term of detention of more than twenty-one days requires a hearing before a Florida state judge, who is authorized to extend detention for "good cause" to a maximum of sixty-three days. Fla. Stat. § 985.26(2); (XVII 25:11–26:10) A direct-file juvenile is housed at CCJ until

---

[6] Citations to trial transcripts will feature the volume number followed by the page and line numbers, preceded by the witness's name, if necessary for clarity.

adjudication or until eighteen, upon the occurrence of which Florida law requires a transfer to adult housing.  In all events, the plaintiffs' calculation that the average length-of-stay in detention for a juvenile is a hundred days is erroneous and decidedly tendentious for several reasons, including that the plaintiffs' numbers combine the average stay for pre-adjudicated juveniles and direct-filed juveniles both before and after adjudication.  (XVII 27:17–28:8, 153:4–154:23)

CCJ is governed by the Florida Model Jail Standards (FMJS).  Chapter 20 of the FMJS was added after the enactment of Section 985.688(11), Florida Statutes, to apply specifically to pre-adjudicated juveniles housed in juvenile facilities, including CCJ.  Chapter 20 contains requirements regarding pre-inspections and annual inspections, use of force, classification, suicide prevention, case-record management, behavior management, activities and programming, housing, transportation, and medical care.  The FMJS governs sheriffs and counties and expresses the legislature's intent to distinguish DJJ's program from a county-administered program under Section 985.688(11).  The FMJS acquires the effective, if not the express, force of law.

Section 20.02(a) of the FMJS permits the development and application to juveniles of a use of force continuum that complies with the Florida Department of Law Enforcement's use of force continuum.  Sections 20.02(j) and (k) of the FMJS authorize certified correctional officers trained in the use of pepper spray to use

pepper spray in juvenile detention facilities when necessary and when unlikely to cause injuries to the staff or the juvenile.

The plaintiffs' claim that CCJ, owing to location and origin, is managed as an adult facility.  However, the evidence establishes that CCJ is "not run as an adult model" but rather "with a juvenile focus or juvenile-specific focus." (XXII 31:12–14)  The plaintiffs also attempt to prove, contrary to the predominant and clearly convincing evidence, that juveniles are left "unsupervised" and observed only remotely through cameras, that deputies interact with the juveniles only to physically abuse them, that the deputies do "nothing" to prevent the "inevitable conflict" between juveniles, that "jail-house justice" rules apply, and that punishment is the "default."  The evidence soundly refutes each of the plaintiffs' claims, notwithstanding several episodes to the contrary.  Consistent with the Sheriff's constitutional mandate to maintain security, safety, and control (XVII 134:20–135:16), discipline of juveniles occurs only after violation of a facility rule or after disobedience of a detention deputy's lawful order.  Discipline in this circumstance is not punishment in the constitutional sense, *Bell*, 441 U.S. at 537, but is discipline on the "regulation" side of the "punitive/regulatory" dichotomy in *Salerno* and later cases.

Tension episodically occurs between juveniles and authority figures in general, whether teachers, parents, or other adults, wherever situated.  In a detention setting such as CCJ, tension becomes episodically heightened.  Some juveniles at every

detention facility (and every other station in life), including at CCJ, have trouble following, or choose to defy, the institutional rules.  However, the testimony in this case establishes that the deputies and supervisors maintain the overall respect and confidence of most juveniles, and the evidence demonstrates that the detention staff overall interacts confidently and evenly with the juveniles — with the exception of the occasional and inevitable skirmish.

Although she is the commander of the entire jail, Captain Marcum spends the majority of her time with juveniles, visiting juvenile housing, speaking to the detainees, and advising and supervising the deputies.  (IV 107:14–108:24)  Captain Marcum has observed "a lot of positive interaction" between the juveniles and the deputies, many of whom are "coaches, fathers, [or] former teachers"; who have "worked in the juvenile field for a long time"; and who admirably "coach and mentor" the juveniles during the typical day.  (IV 109:14–20)  For example, Sergeant Mitchell, who supervises the detention deputies who work directly with the juveniles and who has an extensive background working with youth (XV 100:9–101:18), interacts with the four on-duty deputies "constantly," "loves" being on the floor with the juveniles, and spends about eight hours of a twelve-hour shift on the floor. (XV 102:24–103:14)  Part of Sergeant Mitchell's duty as a supervisor is the "care, custody, and control of all who [are] there."  (XV 102:17–18)  Sergeant Mitchell testified to the importance of the deputies' knowing the juveniles, knowing whether the juveniles are conducting themselves properly, and knowing whether anything is

"going on." (XV 103:15–25)  Sergeant Mitchell also testified that some of the younger juveniles viewed one of the nurses as a maternal figure.  (XV 118:4–119:14)  Similarly, Deputy Gay testified that he counseled juveniles about their actions "every day."  (XII 118:18–21)  D.M. testified that Deputies Terry Brown and Reed spoke to the detainees "like men."  (X 32:4–10)

The Sheriff's expert, Penn, observed on a tour of CCJ that the deputies' interactions with the juveniles were very professional.  (XXII 25:22–26:24)  When one of them noticed juveniles gambling, the deputy handled the violation professionally and in a "light" manner.  (XXII 25:22–26:24)  While Captain Marcum showed him the facility, Penn observed her positive interactions with the juveniles.  (XXII 21:2–24:13)

When B.G., who was detained at CCJ for over a year as a direct-file, was asked by the plaintiffs' counsel on direct examination what was "not good" about the conditions at CCJ, he testified, "We had a little bit of rec, little bit of school, the food was not that good, they pepper sprayed.  I think that's about it."  (VII 51:22–25)  N.H. testified that the one thing she would change about the conditions at CCJ is that she would permit physical contact with family during visitation and offer free telephone calls.  (VII 21:7–10)  Although some juveniles at CCJ engage in "payroll" to force others to relinquish their food (that is, to "pay" the demanding juvenile), the evidence demonstrates that the deputies, when aware of the prohibited "payroll,"

administer proportionate discipline and constructively meet the circumstance.

(XII 164:4–176:19)

The layout of each section of the facility is designed so that the two deputies on duty in the common area of each half have a clear view of the three dorms, which are arranged in an L-shape and enclosed by glass.  (XVII 39:6–40:10; Ex. 87–584, 87–818, 87–821)  Each dorm has an open center area, called the dayroom.

Both the evidence and my first-hand inspection of the facility establish that CCJ is brightly lit and features "good sightlines," which is an issue "in any correctional environment pretty much that's ever been built."  (XV 198:22–199:1) The "glassed fronts of the various housing units provide for quite good visibility" and with the addition of "extra camera angles and monitors" and the radio frequency identification (RFID) system "the accountability and overall supervision of the juveniles is quite good."  (XV 199:2–11)  The facility is conspicuously clean, orderly, and free of any unpleasant odor.  (Penn, XXII 18:3–15)  Observation of the dayroom through the glass is "as good as it gets" for detainees on direct observation.

(XXII 19:4–20:21)

CCJ is inspected annually for compliance with the Florida Model Jail Standards, including the standards for pre-adjudicated and direct-filed juveniles. (Allen, XVII 82:19–83:2)  Every three years, CCJ is inspected and accredited by the Florida Corrections Accreditation Commission (FCAC).  (XVII 83:3–8)  In addition, CCJ is inspected every year for compliance with the federal regulations regarding

"sight and sound" separation from adults.  (XVII 83:9–13)  CCJ has passed each inspection.  (XVII 83:18–25)  CCJ has been accredited by the National Commission on Correctional Healthcare (NCCHC), which establishes guidelines for correctional facilities.  (Penn, XXI 235:20–23)

The evidence also demonstrates that a structured schedule is important to CCJ's management.  (Allen, XVII 223:21–23)  The daily schedule includes breakfast and medication rounds from 4:00–4:30 a.m.; time to sleep after breakfast; time from 6:30–7:00 to prepare for school; school from 7:30–2:30, which includes lunch, recreation, showers, and laundry from 2:30–3:30 and dinner and lockdown for the shift change and in-cell recreation, including time to use the telephone, until bedtime and lockdown at 9:00 p.m.  (Marcum, IV 116:1–118:17)  The detention staff has found that some free time benefits the juveniles, who, after several hours of classes, are permitted discretionary time in the dayroom as long as they remain constructive and good-spirited.  (XVII 90:11–22)

Several issues initially raised by the plaintiffs are moot because the policies and procedures at CCJ have evolved since the facility opened to juveniles in September–October 2011.  The changes include elimination of the "holding cage," elimination of the holding area for even temporary suicide watches, installation of cameras in each sleeping cell with monitors posted above each dorm, updating the physical facility, re-location of the classrooms, a forty-eight-hour review for juveniles in isolation, and installation of an RFID system.  Although the plaintiffs credit these

changes to the present litigation, for the reasons explained earlier in this order, the evidence negates that inference in this instance.

The plaintiffs launched no challenge against the constitutional propriety of CCJ's written policies and offered neither evidence nor argument that the written policies offend the Constitution.  Further, the plaintiffs offered no evidence of a widespread, persistent pattern of constitutional violations.  The plaintiffs' main contention depends upon an alleged pattern of excessive, dangerous fighting among the juveniles.  But the evidence fails to establish that the frequency or ferocity of fighting at CCJ exceeds the intrinsic frequency or ferocity observable anywhere or, in fact, exceeds the practical minimum in a facility of comparable size, configuration, resources, and population.  The plaintiffs fail in their attempt to transform unconnected, random episodes of characteristic, institutional misbehavior by juvenile detainees into a widespread, persistent pattern of deliberate indifference by the Sheriff, a pattern resulting in a substantial risk of serious harm.

Because "the status of being subject to a governmental institution that was not organized or managed properly" is alone insufficient to "invoke intervention of the courts," the plaintiffs — to prove a claim — must prove actual or imminent, serious harm.  *Lewis v. Casey*, 518 U.S. 343, 350 (1996).  Absent proof of an actual serious harm or even an imminent serious harm, the plaintiffs employed such expedient devices as attempting to define "serious medical need" with impermissible breadth by inflating the definition of "serious mental illness" to encompass almost every mental

or emotional issue and by failing to differentiate between a mild, manageable instance of a "serious mental illness" and a dangerous, unmanageable instance of the same "serious mental illness."  Also, the plaintiffs generalized about the failure to dispense medicine to detainees, but in every, or almost every instance, the evidence establishes a benign explanation, such as that the detainee discontinued the medication before detention began, that the detainee refused the medication, or that the detainee requested no medication.  Even the plaintiffs' detainee witnesses confirmed receipt of their medication.

The Sheriff's conditions of confinement and use of force expert was Richard Hough, a professor of criminal justice and criminology since 1996, who was a director for a law enforcement and corrections academy at Manatee County Sheriff's Office, including implementing their first juvenile boot camp; the Director of Corrections in Manatee County and later for Santa Rosa County; and the Director of Law Enforcement for Santa Rosa County.  (XV 140–51)  In 1998, Hough began working for DJJ as superintendent for Okaloosa Regional Detention Center, where he recruited and trained seventy staff members.  (XV 152:3–23)  DJJ asked him to assume control over the Escambia DJJ Center.  (XV 153:11–25)  At the end of 2002, Hough was promoted by DJJ to Chief of Support Services and was also a quality assurance inspector on a team that inspected DJJ centers for state compliance. (XV 154:15–19, 155:16–20)  He is a certified instructor on use of force and during his career has trained hundreds of officers on the use of pepper spray.  (XV 160:8–11,

182:8–22)  Hough also has a master's degree in public administration from Harvard University and a doctorate in education with a concentration in public administration from the University of West Florida.  (XV 145:15–25, 147:18–24)

The Sheriff's pepper spray and facility security expert, Gary DeLand, started his law enforcement career as a dispatch officer for a sheriff's office, was later transferred to the juvenile division, worked in jail administration, became Director of the Utah Department of Corrections in 1985, and was later hired to be head of the Utah Sheriff's Association.  (XIV 17–26)  Through his positions, he gained extensive experience supervising, evaluating, and designing corrections facilities. (XIV 25:20–26:2, 34:3–37:10)  Although the plaintiffs attempt to discredit DeLand's testimony because he stated that juveniles are not his specialty (XIV 27:9–12), DeLand was referring to general juvenile corrections issues and not the subject about which he testified, the use of force, specifically pepper spray, and detention security issues.  Indeed, one of the main points of DeLand's testimony is that the effectiveness and safety of pepper spray does not hinge upon whether someone is eighteen — "our job is to do what we can to protect and the fact that you turned eighteen or didn't turn eighteen has very little effect on the danger to yourself or others that you may present given your present circumstances."  (XIV 28:21–24)

The plaintiffs' conditions of confinement and use of force expert, Paul DeMuro, has two degrees in English but has never worked in law enforcement or corrections.  DeMuro has worked in juvenile detention and considers himself a

"practitioner" and "technical assessment expert" in helping people improve force and last used force himself about twenty years ago, when he assisted an officer who used force. (V 35:11–39:11)  His "methodology" of assessing CCJ included reviewing documents, performing on-site observation, and interviewing juveniles. (V 21:11–22:20)  DeMuro is not qualified to opine on the need for, the quality of, or the effectiveness of either medical health care or mental health care.

DeMuro tended toward sweeping generalization about the typical conditions of confinement in juvenile detention in the United States.  However, the lack of an articulable and pertinent factual basis for DeMuro's generalizations eroded his and their credibility.  DeMuro's relevant knowledge derives primarily from "consent decree" cases, in which he serves as a monitor or consultant and which are neither comparable nor instructive for an array of reasons (not the least of which is the sometimes lack of a *bona fide* adversarial relation between the plaintiffs and the defendants, each of which stands to gain from the litigation).  A consent decree adjudges nothing for anyone except the parties.  DeMuro's explanation for his and the plaintiffs' failing to provide comparable data from elsewhere during their effort to show excessive violence at CCJ — the explanation, for example, that the standards for the several institutions' compilation of data would not precisely compare — is a transparent and evasive contrivance, which again erodes his and its credibility.  (Of course, if the data on, say, violence that is at DeMuro's disposal is not informative, instructive, and useful, even if not precisely comparable, on what are DeMuro's

sweeping generalizations based?  On the other hand, what "adjustments" has DeMuro impressed on the data in arriving at his conclusion, say, that violence at CCJ is comparatively "alarming"?)  Like Glindmeyer, DeMuro was often unpersuasive because, among other reasons, he was too much the advocate who attempts to substitute the force of his professional authority (not as great as he supposes) for the authority of data, method, and learned deliberation (and cross-examination).

The Sheriff's mental health expert, Penn, is board certified in general psychiatry, child psychiatry, and forensic psychiatry.  (XXI 192–98)  Penn has considerable experience working in juvenile corrections, including his current position as head of juvenile corrections for Texas, where he has overseen, from a mental health perspective, the use of pepper spray on juveniles.  (XXI 199–206)  Penn has trained juvenile staff on psychiatric issues and has clinical involvement with juveniles.  (XXI 214:4–14, 221:5–24)  He also serves as the psychiatric director for the Texas Juvenile Justice Department, oversees services for two county jails, and teaches at the University of Texas.  (XXI 218:16–220:23)  Penn's correctional mental health career has included developing and implementing mental health policies and procedures on correctional issues, including segregation and the use of pepper spray. (XXI 222:8–226:12)  He has written peer-reviewed articles, been a member of several professional committees and organizations, and is a surveyor for the NCCHC. (XXI 231:4–235:19; XXII 4:15–5:17)

The plaintiffs' mental health expert, Daphne Glindmeyer, is a Southern Poverty Law Center consultant.  (IX 131:3–13)  Her experience with juvenile corrections is that she has been on teams that monitor compliance with consent decrees (VII 198:1–3) and was a director of operations for a juvenile correctional program established in a settlement agreement.  (VII 202)  Glindmeyer has never published articles on juvenile detention, the use of pepper spray, or the psychiatric effects of pepper spray or isolation on juveniles.  She has never been involved in developing policies or procedures for juvenile detention.  She has never treated a juvenile for mental health issues caused by the use of pepper spray or the placement of a juvenile in isolation.  Glindmeyer's opinions regarding pepper spray and isolation were based solely on a literature review.

Glindmeyer's cross-examination demonstrated her lack of objectivity in formulating expert opinions.  For example, her initial report cited as a basis for her opinions condemning the use of pepper spray an article from the Texas Criminal Justice Coalition.  This article advocated against pepper spray in the juvenile population based upon research regarding the underdeveloped pre-frontal cortex of individuals less than twenty-two and a half.  Although initially Glindmeyer cited to the article as "scientific literature," she subsequently acknowledged that the article was a policy paper authored by an advocacy group against the use of pepper spray. (Glindmeyer, VIII 62:20–63:5; 64:4–15)  Glindmeyer's citation to an advocacy group's position statement as a basis for an expert medical opinion typifies her lack of

professional detachment and judgment and her assumption of the role of advocate. When pressed, Glindmeyer acknowledged that she is personally opposed to the use of pepper spray in any detention setting, regardless of the inmate's age.  Also, Glindmeyer uncritically accepted the reports of juvenile detainees without reviewing the testimony of the deputies about the same incidents.

In general, Glindmeyer was unpersuasive.  She is apparently sincere, even passionate, and certainly committed in her views, but she is much too much the advocate for a point of view, and she too easily and too frequently confuses her personal worldview and beliefs with the professional assessment offered in her role as an "expert" witness.  Like some other health care providers who testify, she too readily and too often becomes an advocate, aiming to advance the interests of her patient or constituency, and not an expert analyst, providing reliable, detached, and learned assistance to a finder of fact.  Neither her demeanor as a witness nor her bearing as a professional was reassuring (and was garnished with occasional flippancy).  Finally, Glindmeyer displayed a propensity for the sly use of words.  For example, plaintiffs' proposed findings (Doc. 529 at 81, ¶ 219) cite Glindmeyer for the contention, "Holding a child in isolation even for a relatively short period of time is harmful."  That is hyperbole — misleading, provocative, and calculated to appeal to emotion rather than reason.  In fact, unless "harmful" includes some unspecified, elusive, and trivial or abstract "harm," the statement is also untrue.  If the truth of the statement depends on including some trivial or abstract "harm" that putatively

attaches — but only immaterially or potentially — during every isolation, despite the brevity of the isolation or the attentiveness of the jailor, the statement is inexcusably misleading and, consequently, discrediting — but not atypical of Glindmeyer.  The record in this action contains many other words — "injury," "fight," "violence," "physical force," "mental disorder," "mental illness," "suicidal," "encounter" (between juvenile and medical staff), "traumatic" — that become similarly misleading to the disinterested observer when used by a witness to include immaterial, trivial, abstract, or merely potential incidents or exemplars of the kind. Featuring other words of elastic definition, such as "isolation," the meaning of which varies dramatically from time-to-time and from place-to-place in this action and elsewhere, the evidence contains a legion of planted word traps for the unwary.

The Sheriff has no constitutional obligation to provide "rehabilitative services" to a juvenile detainee.  The purpose of secure detention is to keep both the detainee and the community safe and to deliver the detainee safely and reliably to the court for hearings and trial.  Fla. Stat. § 985.02(4)(a).  The plaintiffs' claim is based on statutory language including "rehabilitation" as one of the purposes of the juvenile justice system as a whole, but the plaintiffs fail to establish that the Sheriff is statutorily or constitutionally required, or even permitted, to "rehabilitate" a juvenile not convicted of any crime.  *See Houchins v. KQED, Inc.*, 438 U.S. 1, 37–38 (1978) (Stevens, J., dissenting) ("Certain penological objectives, i.e., punishment,

deterrence, and rehabilitation, which are legitimate in regard to convicted prisoners, are inapplicable to pretrial detainees.").

Not only did Hough testify that rehabilitation is not appropriate for a short-term facility, such as CCJ (XVI 82:15–83:22), DeMuro conceded that "rehabilitation" in juvenile justice occurs "post-adjudication" and thus the Sheriff is not required or permitted to "rehabilitate" a pre-trial detainee.[7] (VI 76:4–77:11)

The plaintiffs failed to present predominant and convincing evidence at trial that a custom or policy led to any extreme deprivations, any inhumane conditions, the deprivation of any basic human needs, a lack of the minimal civilized measure of life's necessities, or any other unconstitutional condition.  The clear and convincing evidence established that — in the typical and predominant circumstances — force was used only in response to juveniles attempting to harm each other, to harm the staff, to display or otherwise affirmatively convey resistance, or to destroy property.

The plaintiffs argue that the fights and other violence are caused by the Sheriff's policies.  According to the plaintiffs, fights occur because deputies are not stationed in the dorms, because deputies are insufficient in number or training,

---

[7] At trial, the plaintiffs' claim apparently dissolved to a claim for failure to provide "habilitative" services, a claim never pleaded and a term introduced by DeMuro, who testified that the Sheriff has a "positive responsibility to provide a habilitative positive environment for young people." In this amorphous and unauthorized version of the claim in Count I, DeMuro defines habilitation as receiving "appropriate interaction, role modeling activities" and "a variety of programs reaching out" to the juveniles. (V 57:21–58:1) No such obligation to a juvenile detainee at CCJ exists under the Constitution. DeMuro's inspiration apparently arises primarily from post-adjudication detention centers operating under consent decrees he has monitored, where, according to DeMuro, there are "robust interactive programs." (IV 210:10) In any event, the plaintiffs pleaded no "habilitation" claim, however defined.

because the cell cameras do not record, and because the environment is insufficiently "nurturing."  For example, when testifying about Deputy Hillyard being lifted off the floor, violently spun, and slammed into a concrete pillar by a juvenile, DeMuro did not fault the juvenile but instead noted that "we don't know how long he was locked up," that the incident might have been caused by the "quality of their interrelationship that morning," that two deputies should have been present, and that Deputy Hillyard should have been replaced.  (V 116:5–118:23; VI 167:15–170:6) DeMuro also suggested implausibly that A.A.'s aggressive behavior should have been treated differently, if, for example, he had received bad news from home. (V 130:4–13)

The plaintiffs argue that the frequency of fighting at CCJ is unconstitutional. The plaintiffs argue without persuasive evidence that the fights identified in the evidence equate to a substantial risk of serious harm and that the Sheriff is deliberately indifferent to this risk.  With only speculation to support the hypothesis that the number of fights among the juveniles at CCJ is materially reducible and regardless of whether the frequency and severity of fights at CCJ is normal, above normal, or below normal for a comparable juvenile detention facility (and the evidence remains stunningly silent on this heartland issue), the plaintiffs assert that the Constitution requires that the Sheriff follow their experts' favorite prescriptions for juvenile detention.  But the plaintiffs presented no convincing evidence that the episodic fights at CCJ over two years present a substantial risk of

serious harm to the juveniles, that the level of fighting is above normal, or that the experts' ideas would reduce the fighting in any respect.

DeMuro opined speculatively and unpersuasively that utilizing a certain staffing ratio, implementing "robust programming," and posting deputies in the dorms "would help reduce the violence." (V 91:5–17)  Although DeMuro claimed that the number of fights at CCJ is "alarming" (V 175:5–14), DeMuro lacked any convincing basis in fact for his conclusion and could not document whether the number of fights at CCJ for its population was normal, above normal, or below normal (in fact, no party or witness attempted to define "normal" in the context of a juvenile detention center).  (VI 113:16–20)  DeMuro claimed that he did not even attempt to determine the "normal" data (VI 113:16–119:8) and had no factual basis for his opinion that the number of fights was "alarming," which amounts to a meaningless conclusion without probative value.

On the other hand, Hough testified that the fighting at CCJ is below average and that the numbers are not "startling." (XVI 89:5–9)  Hough provided the only comparative data in the record, when he directly compared the number of fights requiring protective action at the Polk County DJJ facility the year preceding the pre-adjudicated juveniles transfer to CCJ.  The DJJ fight rate was higher than at CCJ the following year, despite the fact that DJJ stationed deputies in the dorms and used no pepper spray — two measures claimed by DeMuro to reduce fighting. (XVI 130:21–131:8)  Even according to the plaintiffs' numbers,

which reflect 200 fights over a 102-week period, the average number of fights is only two per week.  Of course, the plaintiffs define "fight" in an implausibly broad manner to incorporate the routine, the trivial, and the otherwise inconsequential spat.  The plaintiffs' 200-number includes the broad array from a juvenile's hitting someone who insulted his mother, a scrap during an athletic contest, and "horse play" to a planned assault by several juveniles on another.

The plaintiffs failed to prove that the remote and speculative risk of harm based on the level of fighting at CCJ "is not one that today's society chooses to tolerate," *McKinney*, 509 U.S. at 36, and the plaintiffs assume — but failed to prove — that the level of fighting poses a substantial risk of serious harm.  Further, the evidence fell very far short of proving that the Sheriff is deliberately indifferent to the risk of fighting, however the risk is characterized.

The evidence at trial established that pepper spray combines a "low level of force"; an alternative clearly safer for both staff and inmates than achieving a forceful, physical submission; a significantly lower level of injury; a relatively short recovery time; and an effective means "for restoring and maintaining order." (DeLand, XIV 37:19–38:1, 65:1–2)  Pepper spray achieved wide use in the 1980s and replaced CN and CS gas, which have potentially harsher effects than pepper spray, which is a transient inflammatory.  (DeLand, XIV 38:5–24)  In detention, pepper spray serves as a distraction (XIV 39:15), creates a temporary but intense discomfort instead of injury (XIV 40:14–15), and provides time for a deputy to control a detainee

without a fight.  (XIV 40:14–23)  The most intense effects of pepper spray resolve in twenty minutes or so, although residual effects can linger for an hour or two. (XIV 40:10–13)  The use of pepper spray is safer than a fight.  (XIV 73:21–24)  Even Glindmeyer testified that she found no evidence of any juvenile who suffered any mental health complication, including post-traumatic stress disorder, following the use of spray.  (IX 182:22–25)  Pepper spray is not used during a protective action with a juvenile known to be pregnant or with a juvenile in obvious respiratory distress.  (Choquette, XII 145:1–6)

In sum, pepper spray is effective for quickly stopping a fight without inflicting an injury, and nearly every use of pepper spray at CCJ is to stop a fight.  (Allen, XVII 105:8-17)  In one memorable example, with pepper spray Deputy Gay alone stopped a fight among six juveniles; no one was hurt.  (XII 112:10–114:14)

Penn testified, and the evidence confirms, CCJ is in substantial compliance with the standard of care for mental health care after a juvenile is sprayed. (XXII 11:7–15:21)  Specifically, as Penn confirmed and the evidence establishes, CCJ's policy and practice of allowing juveniles to shower, receive a clean uniform, and visit the nurse after an administration of pepper spray conforms with sound practice.  (XXI 232:5–21)  Penn also found that the prompt nursing examination adequately accounted for the juveniles' mental health because of the availability of a referral to mental health, if warranted.  (XXII 82:14–87:14)  Despite his twenty-five

years of experience in juvenile corrections, Penn was unaware of any instance of mental health injury from the administration of pepper spray.  (XXII 75:12–83:11)

The evidence contains no evidence of a lasting, negative effect from pepper spray.  The plaintiffs' expert, Glindmeyer, testified that studies show hands-on uses of force increase the chance of physical injury by 15–30%.  (IX 210:17–20)  She further testified that no scientific study has established that pepper spray is more traumatic for a juvenile's mental health than hands-on techniques and that hands-on techniques could cause the same level of traumatic experience as spray. (IX 209:9–210:6)  Whether to use spray or another type of force depends on the juvenile's size, strength, and apparent tension level.  (Choquette, XII 195:8–196:8) No consensus exists among detention specialists on whether on the use-of-force continuum hands-on techniques or pepper spray is a greater use of force.  (Hough, XV 192:8–20)

A fight requires the immediate exercise of control to stop the fight, prevent injury, and prevent escalation.  (Hough, XV 209:5–8)  Pepper spray is effective, precise, and safe but transiently painful.  Physical force is occasionally necessary but imprecise and dangerous.  (Allen, XVII 55:7–22, 181:2–183:22)  For example, when S.J. engaged him, Deputy Cranor first attempted physical techniques but resorted to spray when those attempts failed to control S.J.

Acknowledging at trial that the Constitution permits the use of pepper spray when managing juveniles (XIII 139:11–140:7), the plaintiffs shifted to a theory

(1) that the use of spray would occur less often if there were fewer fights, which —
according to the plaintiffs — are caused not by juveniles *qua* juveniles but by the
Sheriff's policies and (2) that the force chosen was unconstitutional because "less"
force could have been used.  But the evidence did not prove that one "penological
theory yields superior results to the other" or whether, if there is a difference, "that
difference is of constitutional proportion." (XIII 132:22–133:25)

The predominant, persuasive evidence demonstrates that every time (or at
worst, almost every time) the staff administered pepper spray, the sprayed juvenile
was examined by a nurse, issued a clean uniform, and offered the opportunity to
shower.  (Marcum, III 45:11–13; Choquette, XII 186:24–187:3; Cranor,
XII 249:10–23)  Although he claimed unpersuasively that he was neither offered a
shower nor examined by a nurse after a spraying, T.H.2 admitted to rinsing his eyes
and experiencing no long-term problems from the spray.  (XI 84:8–11, 109:7–23)
Even assuming the accuracy of T.H.2's version, pepper spray presents no risk of
serious harm even without the "after spray" protocols (Penn, XXII 81:20–83:11), and
the clearly predominant evidence demonstrates that decontamination protocols are
consistently and reliably followed, as uniformly directed by the Sheriff and the
supervisors.  (XXII 81:23–82:4)  Even Glindmeyer admitted that CCJ's records
showed that juveniles saw a nurse each time spray was used.  (IX 214:2–15)

The several, specific incidents of the use of pepper spray presented at trial
demonstrate that pepper spray is used efficiently, effectively, and safely to stop fights

and to protect detainees, staff, and property.  In the few isolated incidents in which pepper spray was used in violation of the Sheriff's policies, the offending deputy was firmly disciplined.  The predominant evidence of a reliable, direct, disciplinary response by the Sheriff to an instance of rule violation by the staff strongly contravenes any inference of deliberate indifference.

The plaintiffs' excessive force claim was often blended indistinctly into their conditions of confinement claim.  The plaintiffs' central claim, that force is used despite the availability of more pacific alternatives, presents more a difference in penological approach than a claim of unconstitutionality.  For example, DeMuro testified for the plaintiffs that, when a juvenile is defiant and verbal de-escalation fails, an officer should walk away and let the confrontation defuse naturally. (VI 15:8–13)  However, the Sheriff's staff and experts adopt the view that security and order require that detainees disobey neither rules nor commands and that a detainee rarely stops misbehavior when asked meekly.  (DeLand, XIV 47:8–17)  The Sheriff's policies and the deputies' perceptions receive constitutional deference, that is, as *Youngberg* and later precedent requires, a corrections and detention professional's choice of penological approach receives constitutional deference.

Every detention deputy at CCJ is trained in the use of pepper spray and the use of force continuum (Allen, XVII 47:3–14), which begins with officer presence, including eye contact; progresses to verbal de-escalation and commands and pressure point controls for passive resistance; proceeds to an intermediate weapons stage for

active resistance, which includes pepper spray; and concludes at the highest level, if a detainee remains aggressive and violent.  (XVII 47:15–50:9)  The type of force deployed depends on the environment; the detainee's demeanor, potential for harm, and size; and the presence of a weapon.  (XVII 56:10–59:14)  After each use of force a deputy must submit to supervision a Protection Action Response report.  (XVII 50:10–51:21)  If untruthful on the report, a deputy is fired — a fact well-known by the staff at CCJ.  (XVII 51:22–52:1)

The predominant evidence establishes that CCJ is adequately staffed.  Much more important to the resolution of the present action is the plaintiffs failure by a comfortable margin to demonstrate that the Sheriff is deliberately indifferent to the staffing needs of CCJ.  Also, not a scintilla of evidence supports the notion that the Sheriff has a "deliberate intent" to inadequately staff CCJ or that any allegedly deliberate understaffing proximately caused constitutional harm to anyone.  The predominant evidence supports Hough's testimony that, in the hundred-plus videos that he reviewed, no incident involving a juvenile resulted from the Sheriff's staffing policy.  (XV 199)

The plaintiffs' theory that the Sheriff's policy governing the number and deployment of staff causes constitutional injury because another policy might result in fewer fights and fewer uses of pepper spray is speculative (perhaps even fanciful) and unsupported by the evidence in this action or any reliable and germane report from elsewhere.  The plaintiffs failed to prove that the level of fighting or the use of

pepper spray creates a substantial risk of serious harm.  In fact, the predominant evidence established that the deputies' response time for a fight was uniformly excellent — reliably prompt (that is, measurable in seconds, not minutes) and often immediate — and that peace was typically restored promptly and without a material or lasting injury.

DeMuro testified in a conclusory and unpersuasive manner that the "norm" for juvenile detention centers is that officers work "inside the living areas," interact with the youth, and organize activities, such as discussions of current events, letter writing, and spelling bees.  Neither the claimed scope of DeMuro's notion of "interactive juvenile justice" nor data, if any exists, to support the claimed results — in juvenile detention or elsewhere — appears in the evidence.  (IV 210:16–20, 67:23–68:12)  Similarly, DeMuro could not name a juvenile detention facility in the Eleventh Circuit that utilizes the staffing ratio he claims is a "norm."  (VI 123:6–14)  No persuasive evidence establishes the existence of DeMuro's claimed "norm" and, in any event, the Fourteenth Amendment is not a brute force mechanism to quash any departure from a perceived penological "norm"; the Fourteenth Amendment is a mechanism to prevent cruel and unusual punishment, to prevent deliberate indifference to a substantial risk of serious harm, and not a mechanism to enforce the latest fashion in penological theory or the latest aspiration of the consultants.

The evidence demonstrates, at the very least, that the staffing at CCJ is adequate and, in all events, that the Sheriff's staffing policies and custom create no

substantial risk of serious harm.  (Hough, XV 198:15–19)  Not only are there

normally six deputies directly supervising juveniles at CCJ, as well as a DSS in each

control room with a clear view of every dorm, but other juvenile-trained staff,

including sergeants, lieutenants, the school resource officer (who is a certified

detention deputy), transportation deputies, and the captain regularly spend

significant time in the juvenile housing units.  (IV 112:21–116:9)

The relation between the presence of officers and the incidence of fighting

is not inevitably and smoothly inverse.  In fact, the evidence reveals instances in

which an officer's presence encourages or, more frequently, enables a fight because

the instigator of the fight knows the officer will intervene and stop the fight before

the object of the attack retaliates against the instigator of the attack.  (Hough,

XV 213:2–17)  Deputy Gay acknowledged that "sometimes they'll fight right in

front of you."  The videos in evidence depict vividly the common occurrence of a

fight that begins in the immediate presence of a deputy (XII 52:22–53:4); in almost

every instance more than one deputy arrives at the fight scene in seconds.  In Deputy

Choquette's experience, a juvenile will fight even if deputies are in the dorm.

(XII 178:22–24)

Understanding the calculus of juvenile fighting exceeds the scope of this

action (and exceeds the competence of the witnesses).  But, however actuated,

instigated, or induced, the fighting at CCJ is not shown by the evidence to exceed

the typical, intractable rate — the evidence fails to establish that rate.  Further, the

fighting at CCJ is not — by a long shot — shown by the plaintiffs to create a

persistent, widespread pattern that creates a substantial risk of serious harm to the

detainees, to all of which the Sheriff is deliberately indifferent.  The plaintiffs' claim

that fighting at CCJ is unconstitutionally fierce, frequent, and dangerous is wholly

impressionistic, conclusory, and outside the scope of the evidence.

An alleged deficiency in training is not itself a constitutional violation.  The

plaintiffs must prove that any alleged deficiency reaches constitutional severity and

causes some constitutional "harm."  However, the plaintiffs presented no persuasive

evidence that the training at CCJ is deficient or that the training creates any

constitutional harm.  The plaintiffs' expert DeMuro could not testify to a material

deficiency in the deputies' training and apparently had reviewed neither the forty-

hour juvenile training curriculum nor the crisis intervention training received by each

deputy, although after his review of a summary of the curriculum DeMuro concluded

that the topics were appropriate.  (VI 69:6–70:18)

Every detention deputy who works with a juvenile is certified in corrections,

which includes training specific to juveniles.  (Allen, XVII 43:5–14)  Also, the

deputies receive crisis intervention training (CIT).  (XVII 47:21–48:2)  Before

working in the juvenile unit, each deputy completes a forty-hour training course

specifically geared to juveniles, although the training is not required by statute or

otherwise.  (Marcum, XIV 90:6–11, 99:18–23)  The training topics include juvenile

behavior, communicating with a juvenile, behavior modification, benefits of a

structured environment, suicide prevention, hospital watch requirements, admission and medical process, the Juvenile Assessment Center's risk assessment instrument, concepts related to the authority to treat juveniles, and the classification system for pre-adjudicated juveniles. (XIV 93:4–94:24, 99:5–17)  Deputies also receive in-service training and daily shift briefings.  (XIV 101:23–104:12; IV 111:13–112:20) Hough and Penn both testified, and the evidence establishes, that the training is adequate.

Corizon nursing staff receive training — on initial hire and annually — on identifying mental health needs and suicidality of youth.  (Scott, XX 100:12–16)  The training includes identifying symptomatology that requires referral to medical or mental health and includes instruction on suicidality, suicide prevention, and suicide watch.  (Allen, XVII 43:5–17, 46:21–47:2; Judd Ex. 68:2–51; Marcum, XIV 162:4–12; Scott, XX 100:20–24)  Also, Corizon mental health staff provides corrections staff with annual suicide prevention training.  (Marcum, XIV 103:22–104:2)

Corizon's nurses, who care for the juveniles at CCJ, work twenty-four hours, seven days a week.  Each nurse is licensed by the State of Florida and, as part of their training and licensure, attend classes and clinical rotations on mental health issues. (Jennings, XVIII 7:14–9:19; Bender, XIX 126:24–127:10)

The goal of the grievance system at CCJ is prompt resolution of a detainee's complaint.  (Marcum, XIV 112:3–113:2; Choquette, XII 172:11–174:2)  The detainee

orientation packet discloses the grievance system.  (Marcum, XIV 117:9–23)  No

detainee has complained that the disclosure is confusing.  Also, notice of the

grievance system is posted in the dorms.  (XIV 231:13–24)  The plaintiffs present no

evidence that juveniles were unaware of the grievance system or that grievances were

not addressed.  T.H.2 testified that he knew that he could file a grievance and that the

two times he completed and submitted the form, the deputies accepted the form for

processing.  (XI 115:5–20)  CCJ's grievance system appears lightly used and not

vigorously advertised, but the system appears available in a good faith and well-

intentioned manner in the typical circumstance.  A reasonable inference from the

evidence is that Captain Marcum and the staff, dealing with a population of

detainees only about half of capacity, typically are aware of complaints and manage

them informally.

   The plaintiffs presented no evidence of a substantial risk of serious harm

resulting from the Sheriff's policies and customs regarding record keeping.  The

evidence shows a consistent pattern of adequate recordkeeping, demonstrated by the

thousands of pages of incident reports and protective action reports produced in

discovery.  Of course, record keeping at CCJ, as at every office everywhere, is

inevitably imperfect — at CCJ primarily because of inescapable human error and

distractions inherent in minding several dozen juvenile detainees.  The evidence

reveals occasional errors and omissions but no policy, pattern, practice, or the like of

indifference.  (XVI 79:15–18)

Deputies are disciplined for improper reporting, such as when Deputy Harrison was disciplined for not creating an incident report after spraying around the holding cage (another incident, on the whole regrettable, in which no serious harm occurred). (III 69:19–25) Captain Marcum tracks the report of every fight, every assault, and every protective action that occurs at CCJ. The reports are compiled into monthly reports. (III 65:11–17; IV 147:12–148:5) The monthly reports are submitted to Major Allen, the security division major, who compiles them into annual reports. (III 65:18–23) Shift supervisors keep track of each incident, such as a suicide watch, that contributes to the monthly and annual reports. (Allen, XVII 109:6–25) An early intervention program tracks whether a deputy participates in five protective actions within twelve months, which initiates a captain's assessment of whether a troubling pattern exists and requires intervention; in turn, the captain's supervisors review the captain's assessment. (IV 148:6–14; XVII 111:16–113:19)

From his initial assumption of responsibility for juvenile detainees in the fall of 2011, the Sheriff has continuously improved the policies and practices and the facilities at CCJ. Some changes were to comply with the Florida Model Jail Standards — for example, each camera in the living area must record. (Allen, XVII 34:7–36:11) Other changes have responded to experience and advice. For example, after realizing that juveniles were using the "wing rooms" to fight, the Sheriff installed a camera in every cell. (XVII 122:8–14) Each camera displays on a large flat screen monitor above the door of each dorm. (XVII 120:13–24; Judd's

Exs. 92-34, 92-22, 92-26)  The Sheriff also installed a camera in the isolation cells.

The cell cameras increase the deputies' ability to observe the juveniles.  (Allen,

XVII 122:25–124:2)

Another improvement, the RFID system permits CCJ to better monitor the

detention deputies to ensure each deputy reliably completes the deputy's periodic

rounds.  (XVII 125:4–126:15; Judd's Exs. 92-40, 92-47)  The RFID system comprises

a device strategically placed on the wall in each dorm.  The deputies must submit an

identifying device to a scan during each round.  This permits CCJ to monitor

whether the deputies during their rounds walk to every corner of the dorm and

examine each cell.  (XVII 127:4–24)

Another change was that the holding area earlier consisted of two large screen

structures with a long bench inside, called the "holding cages."  (XVII 121:9–21)

Although not inhumane, unconstitutional, or cruel, these holding areas projected a

grim appearance and were perceived by some as inappropriate to a juvenile setting.

CCJ's supervisors removed the structures and substituted an improved holding area.

(Marcum, XIV 140:7–22; Allen, XVII 128:6–130:20; Ex. 89.1)

The evidence at trial demonstrates that the Sheriff continuously tries to

improve the policies, practices, and facilities at CCJ.  Deputy Brown testified that

the behavior of the direct-filed juveniles has improved from the time they transitioned

in September 2011 to CCJ from the South County Jail, which was a "more

constricted environment."  (XV 39:6–13)  The combination of the RFID system and

the camera monitoring system frees the deputies' time and permits them more time in the dorms.  (XV 39:14–40:14)  The reward system has also improved relations between the juveniles and the staff, and the enforcement of consequences has improved the juveniles' behavior.  (XV 39:14–40:14, 54:2–12)  The atmosphere at CCJ has relaxed noticeably over the two years, and the juveniles feel "calm enough" to talk constructively to staff.  (XV 40:16–41:9)

In addition, the Sheriff voluntarily submits CCJ to several accreditation processes.  As noted earlier, CCJ is accredited by both the FCAC and by the NCCHC.  (Penn, XXI 235:20–23)

The Sheriff's management and staff at CCJ are professional and adequately trained; deputy misconduct is rare and isolated.  (IV 160:20–24)  When a staff member violates a policy, supervision responds.  Again, as an example, Deputy Hester was removed from duty and resigned pending administrative investigation into a report he wrote that — he admitted — included false information.  (Hester, XI 6:15–17; Marcum, IV 41:20–49:21)  Hester resigned because he knew that "if you tell something that's not true . . . you're basically done."  (Hester, XI 60:4–22)  Similarly, Deputy Harrison was removed from working with the juveniles after he improperly used pepper spray and failed to create a report after the incident involving B.G. and K.J.  (III 69:19–73:13; IV 35:23–36:12)  The other three deputies involved were counseled.  (III 69:19–73:13; IV 35:23–36:12)  Deputy Brown was suspended from duty after failing to make rounds in the T.W. incident.  (XV 21:5–12)  Deputy

Cannon was disciplined for having incorrect contact (using his hand to move L.S.'s face) when attempting to prevent L.S. from removing his suicide smock.  (Marcum, IV 55:11–56:9)

Upon admission to CCJ, each juvenile is screened by the nursing staff, and the presence of suicidal ideation will govern the juvenile's housing.  (IV 163:7–164:1) Although any staff member may place a juvenile on suicide watch, only mental health staff may approve removal from suicide watch.  (IV 162:12–163:6)  In other words, the Sheriff's and Corizon's policy sets a low standard to begin a suicide watch but a high standard to end a suicide watch.

The temporary holding area is no longer used for suicide watch.  A juvenile on suicide watch is normally kept in the dorms, which decreases the frequent manipulative effort by the juveniles to feign suicide to achieve a housing assignment away from the dorm.  (XIV 140:23–141:7)  The procedures for suicide watch at CCJ are in line with prevailing national standards and pose no substantial risk of serious harm. (Penn, XXII 42:3–47:3)  Penn testified, and the evidence establishes, that the Sheriff follows the prevailing standard of care in his suicide prevention policy and practice.  (XXII 7:9–8:23, 33:6–34:14)  In accord with the prevailing standard, the Sheriff and his staff credit every suicide threat, even if highly suspect or likely contrived.  (XXII 41:4–6)

The suicide watch policy is the same for pre-adjudicated juveniles and direct-files — only those who commit an act in furtherance of a suicide receive the "full

treatment."  A juvenile who states a suicidal intention but who commits no act in

furtherance of the stated intention receives only one-on-one observation.  (Marcum,

IV 78:13–20)  Although she testified that the "turtle suit" worn by an actively suicidal

person is perhaps seen as "punitive," Glindmeyer acknowledged that "when a person

is experiencing suicidal ideation, the rule of thumb for a clinician is you do whatever

you think you have to do in order to protect that person from themselves" by any

necessary means, while acknowledging that "you can't overprotect someone."

(VIII 45:5–16)  She also confirmed that CCJ no longer uses the "turtle suit" in the

manner that previously concerned her.  (VIII 45:17–46:10)

     The Sheriff's management of the risk of suicide after a juvenile's entry into

CCJ accords with the prevailing standard.  (Penn, XXII 42:3–44:2)  Even if they

suspect manipulation, the deputies act for the juvenile's safety.  (Marcum,

IV 153:12–154:6)  D.W. testified that every time he told a deputy he was suicidal,

the deputy credited his statements and placed him on suicide watch.  (D.W.,

XI 163:14–21)  D.W. also testified that each time he was on suicide watch, he was

interviewed by a mental health counselor.  (XI 164:18–20)  CCJ employs a safety net

against juvenile suicide, and several opportunities are available for nursing staff and

mental health staff to examine and counsel a suicidal youth.  (XXII 44:3–53:4)

     Shackling D.G. to her bed was an exigent and "immediate response to control

her from possibly killing herself."  (XIV 144:12–145:10)  She had threatened to run

up the stairs and jump.  (XIV 144:12–145:10)  Medical staff was informed

immediately after the deputies shackled D.G.  (XIV 144:12–145:10)

L.S. was sent to the hospital after engaging in self-injurious behavior at CCJ.

Before L.S. returned, the detention staff consulted with mental health to forge a plan

to secure L.S. in a hospital bed using soft leather restraints.  (Marcum, XIV 146:4–21)

The staff had to "find a way to accommodate [L.S.] and keep him from hurting

himself" because L.S. kept trying to remove his sutures.  (XIV 147:1–6)  The soft

shackles were a solution appropriate to the critical situation — L.S. was kept in the

hospital bed "long enough for his sutures to heal and mental health to assess that his

self-injurious behavior had ceased."  (XIV 205:19–25)

The Sheriff treats suicide threats seriously, although knowing that juveniles

sometimes manipulate suicide watch.  The plaintiffs failed to present any persuasive

evidence that the Sheriff is deliberately indifferent to any substantial risk of serious

harm arising from the management of any suicidal juvenile — first, because no

deliberate indifference was shown and, second, because no substantial risk of serious

harm was shown.

Glindmeyer testified unconvincingly that the NCCHC standards are "sort

of the floor for the provision of physical health care and mental health care in

facilities."  (VIII 56:22–57:6; IX 240:11–22)  Penn, who is a surveyor for NCCHC,

testified convincingly that the standards are "best practices," that very few facilities

apply for NCCHC accreditation, and that fewer receive accreditation.

(XXII 4:15–6:10)  Only about twenty percent of the facilities across the nation are NCCHC certified; CCJ is one of those facilities.  (XXI 235:20–22; XXII 96:17–25)  Even though not constitutionally required, CCJ successfully seeks to attain "best practices" in many areas.

Glindmeyer testified — with some detectable but unpersuasive emphasis — that some studies show that on average sixty percent of juvenile detainees have "some type of mental health disorder."  (VIII 10:24–11:11)  When asked for a more specific definition of the "mental health disorder" to which she alluded, Glindmeyer admitted that the sixty percent average includes anyone with "some type of mental health disorder," that is, with any diagnosable condition ranging from grief over a death in the family to psychosis, from ADHD to bi-polarity, from hyperactivity to severe mental illness.  Glindmeyer failed to provide (and the evidence fails to provide) a reliable and reasonably specific assessment of the typical number of persons in detention with a serious mental illness or, more to the point, a reliable and reasonably specific assessment of the typical number of persons, if any, in detention with a serious mental illness that might result in a "substantial risk of serious harm" if untreated during detention or treated in the manner typical of CCJ (not every person, to say the least, diagnosed with a "serious mental illness," especially those on the milder side of the normal distribution of cases of a particular malady, presents a substantial risk of serious harm if untreated or treated in the manner typical of CCJ during a brief detention).  Also, Glindmeyer admitted that she did not know if the

occurrence of self-injurious behavior or exacerbation of pre-existing mental illness is higher at CCJ than for the general juvenile population or, more directly, that any juvenile had suffered an exacerbation of a mental illness while at CCJ. (IX 76:7–78:7)

Corizon provides a more realistic, better sourced, and more persuasive definition and assessment than Glindmeyer.  According to Corizon, a "serious mental illness," as that term is defined by the Society for Correctional Physicians, includes disorders of psychosis (such as schizophrenia, schizo-affective disorder, delusional disorder), bipolar I and bipolar II, major depressive disorder, mental "retardation," and severe recurrent disorders.  Nationally, the seriously mentally ill constitute 15.8% of the juvenile inmate population.  (Scott, XX 59:16–60:9, 185:16–186:3; XXI 88:16–22)  As stated earlier, ADHD is the most common condition seen in juveniles at the Polk County Jail (McRae, XVIII 186:14–22), but the general psychiatric community regards ADHD, by itself, as not a "serious mental illness."  (Scott, XX 186:5–7)  Again, the record contains no reliable assessment of the number of juveniles, if any, in detention with a "serious mental illness" and who present a substantial risk of serious harm if untreated or if treated in the manner typical of CCJ.

Of course, the order (Doc. 500) certifying the class and subclass for this action specifies the definition of a "person who suffers from a serious mental disorder" as a person:

(a) who reports or whose guardian reports to a responsible official within the Polk County Jail a diagnosis by a licensed medical professional qualified to diagnose and treat mental illness or a mental disorder or

(b) who either reports to a responsible official within the Polk County Jail the person's own signs and symptoms or himself or herself manifests to a responsible official within the Polk County Jail signs and symptoms that a reasonable lay person would recognize as signs and symptoms that require prompt diagnosis and treatment by a qualified mental health care provider or

(c) who asks a responsible official within the Polk County Jail for, or is referred by a responsible official within the Polk County Jail for, mental health diagnosis or treatment and who, after the request for, or referral for, mental health diagnosis or treatment, is either diagnosed with a serious mental disorder or presents signs and symptoms that a reasonable lay person would recognize as signs and symptoms that require prompt diagnosis and treatment by a qualified mental health care provider

and who, in either (a), (b), or (c), if untreated during the foreseeable term of the person's detention, incurs or poses a substantial risk of serious harm to the person himself or herself or to another detainee in the Polk County Jail.

In other words, for the purposes of the pertinent sub-class in this action a person is regarded as suffering from a serious mental illness only if a failure to treat that person during detention causes the person or another person to incur serious harm or poses to the person or another person a substantial risk of serious harm. The evidence in this action identified no such person — that is, no person who went untreated during detention despite actual or imminent serious harm or a substantial risk of serious harm. Glindmeyer could identify no one (certainly not enough to constitute a class). During the approximately two years at issue in this action, no

juvenile died; only two hospital cases occurred, each treated promptly; and no evidence exists of any serious harm to anyone or any substantial risk of serious harm to anyone owing to any policy or practice or any deliberate indifference to that policy or practice by the Sheriff or Corizon.

The plaintiffs completely failed to prove that the mental health care at CCJ amounts to cruel and unusual punishment. Through Glindmeyer, the plaintiffs insist that at CCJ mental health care resembles a "crisis assessment service" and that "there's not a whole lot of mental health treatment ongoing at the facility." (VII 231:1–2) Glindmeyer based this assessment on a review of thirty randomly selected records and on her interviews with some juveniles. (VII 227:3–16) As Glindmeyer admitted, her record review was inadequate and unreliable based on the sample size and her interviews, which were not "clinical" in accord with prevailing standards for forensic psychiatry. (IX 139:1–141:8, 180:10–182:4) Penn confirmed persuasively that Glindmeyer's methodology in the evaluations was "fundamentally flawed." (XXII 27:21–31:7)

Penn and Glindmeyer agreed that the standard of care for a juvenile detention center is the standard of care for a community mental health center (VII 219:8–14) and that the pertinent difference in juvenile detention is the scope and duration of care. (*See* XXI 206:5–17) Penn observed persuasively that CCJ is practicing the two components of the nationally recognized model for mental health care in juvenile detention. The two components are (1) crisis intervention and management and

(2) continuity of care.  (XXI 206:18–207:19)  The goal of the crisis intervention and management is to identify the "acute precipitating factor for why somebody is in distress when they come into a correctional facility."  (XXI 206:7–10)  The process for continuity of care is that mental health staff screen and evaluate detainees and perform further assessments if indicated.  (Penn, XXI 206:18–207:4)  Jennifer Allen, the licensed clinical social worker (LCSW), testified that she provides a level of individual therapy to juveniles on an as-needed basis.  (XIX 19:16–21, 37:23–38:19)  LCSW Allen and Penn confirmed that group therapy during pretrial juvenile detention is unworkable because the necessary level of confidentiality and continuity is unachievable in the available interval.  (XIX 37:6–22)  Even Glindmeyer acknowledged that the juveniles are in detention only briefly, when compared with patients in a private setting, and that the administration of therapy is impractical in the available days of detention.  (VIII 194:11–22)  Glindmeyer admitted that the average length of stay of eighteen days, which she calculated based on the approximately sixty charts that she reviewed, is a much shorter time for a physician-patient relationship than a community health care provider would encounter.  (Glindmeyer, VIII 194:18–22)

In the administration of the mental health service, CCJ follows national guidelines, and the customs and practices at CCJ create no substantial risk of serious harm to a juvenile detainee's mental health.  (Penn, XXII 10:5–17)  The Sheriff arranged for service from a health care provider before assuming custody of the

pre-adjudicated juveniles to ensure the availability of mental health care, including full-time nursing staff, a pediatrician, and a child psychiatrist on site and on call. (Allen, XVII 137:8–140:13)  Improvements continue.  For example, when CCJ opened, each juvenile received a mental health screening at admission, but only those with a positive result received a comprehensive mental health evaluation.  (Penn, XXII 97:10–101:1)  Now each juvenile receives a mental health evaluation within a few days after admission — normally within twenty-four hours.

More specifically, before arriving at CCJ, juvenile detainees are screened at the Juvenile Assessment Center, which screens for both physical and mental health issues.  (Scott, XX 90:3–12)  Thereafter, juvenile inmates are screened by a nurse immediately upon entry into CCJ using a medical history form and a mental health screening form.  From this screening, a juvenile inmate will receive referral either for additional mental health assessment or to the general juvenile population, which indicates that no mental health follow-up is required immediately.  (Scott, XX 88:23–90)  In any event, each juvenile is screened by a mental health professional on the first business day after arrival at the jail.  (Allen, XIX 25:24–27:18)  Newly admitted juvenile inmates receive an orientation package that includes detailed instructions on available care.  (Scott, XX 90:16–24; Marcum, IV 74:24–75:3)  Additionally, an informational posting is contained in the dormitories describing available care.  Juvenile inmates routinely submit forms (i.e., "sick call requests") requesting both medical and mental health care.

For an inmate placed on suicide watch immediately after entry to CCJ, a mental health professional conducts a comprehensive mental health evaluation and completes a "Suicide Watch Initial Progress Note" (Scott, XX 98:2–13), which ensures that the inmate on suicide watch receives greater access to a mental health professional than other juvenile detention inmates.  (Scott, XX 99:10–15)  The progress of a juvenile on suicide watch is recorded in progress notes and in a "Suicide Watch Flow Sheet."

The medical records at CCJ establish that the psychiatric evaluation of a juvenile at CCJ includes an assessment of the juvenile's initial chief complaint, the presenting illness, and information about the juvenile's pertinent social and psychiatric history, including suicide attempts, psychiatric hospitalizations, medication trials, physical or sexual abuse, medications, family drug or alcohol use, appearance, orientation, behavior problems, speech, observed emotional status, thought process, suicidal ideation, homicidal or assault ideation, and diagnostic assessment (using the then-current version of the Diagnostic and Statistical Manual of Mental Disorders).  (Scott, XX 112:6–113:24)

LCSW Allen has been employed by Corizon at CCJ since 2010 as a licensed clinical social worker.  She possesses a master's degree in social work and completed 2,500 hours of face-to-face therapeutic contact with patients while serving as a child case manager at the local community mental health center, the Peace River Center.  LCSW Allen screens, evaluates, assesses, and provides counseling and therapy to

juveniles at CCJ. LCSW Allen performs the comprehensive mental health evaluation administered to each juvenile within a day after entry into CCJ. LCSW Allen is on-call for a mental health emergency at all times and has responded to calls and conducted an examination on the weekend. When appropriate, LCSW Allen refers the juvenile to the attending psychiatrist, Timothy McRae, MD, a board-certified, child and adolescent psychiatrist. McRae sees a juvenile receiving psychiatric services as needed or at a scheduled interval in the range of 90 to 120 days or more frequently, as ordered by McRae. McRae is LCSW Allen's clinical supervisor, and Derek Zimmerman is merely the administrative supervisor to assist LCSW Allen on non-clinical issues.

Obtaining parental consent is often awkward, delayed, or impossible because, among other reasons, a parent or guardian might fail for many reasons to respond to inquiries from the medical staff. (Mangarella, X 94:11–19) However, in accord with policy, Corizon (X 94:20–96:11) "tries everything" to obtain parental consent in each case. (X 114:6–12) Improvements to the documentation process have occurred. (X 97:10–98:2) Corizon has implemented an entirely new medication verification system. (X 109:5–110:1) Although other issues might arise, the administration of needed medication or other necessary care in the absence of parental consent certainly fails to qualify as cruel and unusual punishment.

Perhaps the most vivid example offered by the plaintiffs of their claim of deficient mental health assessment is that G.H. was admitted on a Saturday,

kept safe on direct observation through the weekend, and seen by mental health on Tuesday — at most, a one-day delay, which occurred because the mental health staff is not normally present on the weekends (absent an express need). (XXII 121:14–123:17)  Glindmeyer acknowledged that no standard requires a mental health staff in the facility "24/7."  (VIII 192:2–14)  Also, although CCJ has a policy of performing comprehensive mental health examinations within twenty-four hours after admission, the NCCHC "best practice" standard requires only that an examination occur within fourteen days after admission.  (XXII 123:18–124:2; VIII 209:20–210:11)

G.H., who for two years before admission had sold his medication on the street and abused Xanax (XXII 125:6–11, 158:20–159:7), was seen by mental health staff (during this particular detention) on May 7, 13, 16, 17, 20, and 21. (XXII 137:2–6)  G.H. was also seen by nursing staff twice per day from May 10–22 while on suicide watch.  (Penn, XXII 246:1–25)  On Sunday, May 12, 2013, the nurse performing his suicide watch observations noted suicidal ideation.  G.H. was seen by mental health staff on Monday, May 13, 2012; received mental health care in accord with the NCCHC standard; and was kept safe.  (Penn, XXII 137:11–138:3) G.H. was kept on suicide watch, although the assessments suggested that he manipulated the system in order to be housed with his brother.  (XXII 89:11–25)

Glindmeyer was unable to identify a documented instance of the refusal of health care after a request by a juvenile.  (IX 23:3–15)  She never attempted to verify

whether, for any claimed delay or denial of health care, the claimed delay or denial actually occurred.  Of course, Glindmeyer never established any substantial risk of serious harm caused by a delay or denial of health care to a juvenile detainee. (IX 26:22–27:10)

Glindmeyer could not identify any juvenile detained at Polk County Jail who suffered post-traumatic stress disorder as a result of mental health care while in the facility.  (Glindmeyer, IX 13:23–14:4)  Similarly, she was unable to identify a juvenile who sustained any harm from suicide watch, isolation, or pepper spray. (Glindmeyer, IX 182:13–25)  In fact, Glindmeyer has never treated a juvenile for a mental health illness or exacerbation of a mental health illness caused by isolation or exposure to pepper spray.  (Glindmeyer, IX 134:14–22)  Glindmeyer could not state within a reasonable degree of medical probability that any juvenile who came to CCJ with a mental illness suffered an exacerbation of that underlying mental illness as a result of a delay in care.  (Glindmeyer, IX 77:5–13)

Glindmeyer cited a few examples of what she considered a delay of care.  She testified that K.B. was referred to mental health on December 8, 2012, and again requested to see mental health on December 10, 2012, after witnessing L.S. cut himself in his cell.  K.B. was not seen until December 12, 2012, at which time he had a comprehensive mental health examination.  (VIII 81:13–86:4)  K.B. had been given mental health treatment upon his admittance to the facility on December 5, 2012, at which time he was placed on a medical watch for benzodiazepine detox.

(VIII 81:20–21)  K.B. was seen by the psychiatrist three weeks after the incident and was prescribed medication, with a follow-up appointment to assess the prescribed medication four months afterwards.  (VIII 87:2–22)  Glindmeyer was unable to point to any harm sustained by K.B. (or by any other juvenile) or any substantial risk of serious harm to K.B. (or to any other juvenile) at the facility.  (IX 182:5–12)  Penn confirmed persuasively that, even assuming a delay, no substantial risk of serious harm existed because immediate care was available, if needed.

The second episode Glindmeyer cited was that D.M. was prescribed medication and seen by McRae for a follow-up appointment five months later but was not referred to McRae in the interim despite refusing medication three times in a row.  (VIII 106:6–9, 107:12–108:11)  Again, even accepting that their delay was too lengthy, no harm or imminent harm was established.

The third episode that Glindmeyer cited was M.D., who was admitted to the facility on Friday, April 12, 2013, and given a mental health evaluation on Monday, April 15, 2013.  (VIII 118:21–25)  Also, M.D. received a psychiatric evaluation, a prescription, and a schedule for follow-up in four months.  (VIII 120:10–121:7)  M.D. requested a mental health visit on July 2, 2013, because he was feeling more depressed and because he claimed his medications were not working.  M.D. was seen by McRae on July 16, 2013.  (VIII 21:8–12 and 123:18–19)  On August 7, 2013, M.D. had a nose bleed and was seen the next day by the pediatrician, who ordered an immediate, complete blood count.  (VIII 126:9–17)  Although Glindmeyer

speculated that this could signal thrombocytopenia, M.D.'s medical records report nosebleeds, more commonly resulting from sinus issues, before his coming to CCJ. (IX 86:5–87:18)  M.D. began to refuse his medications and was referred to mental health again after his placement on suicide watch.  (VIII 127:15–25)  M.D. was sprayed with pepper spray during incidents on August 16 and on August 19, during a time when he was not on his medication.  (VIII 128:3–10)  McRae again saw M.D. on September 3, 2013.  (VIII 128:13–14)

Neither these examples nor the balance of the record constitutes a recurrent and widespread pattern or practice of deliberate indifference to detainees' serious medical needs.  No harm resulted and no substantial risk of serious harm occurred because, had a serious medical or mental health need arisen, the juvenile would have had immediate access to care.  (XXII 39:20–40:3, 42:10–43:20)  Glindmeyer was unable to opine that any juvenile sustained serious harm to the juvenile's mental health as a result of any practice at CCJ.  (IX 182:5–183:3)  As noted earlier, only two instances of hospitalization occurred at CCJ — the juvenile whose knee was dislocated and L.S. after attempting suicide.  (VIII 212:10–213:7)

The testimony by the plaintiffs' juvenile witnesses negated any inference of the Sheriff's deliberate indifference to their serious mental health needs or of any other constitutional violation.  The examples abound.

B.G. testified that he had no problem accessing medical care or mental health care when needed.  (VII 109:24–110:16)  B.G. believes his anger management

improved during his detention at CCJ. (VII 137:3–8) J.P. was evaluated by a nurse upon arrival at CCJ on January 20, 2012. (I 90:14–21) D.M. testified that, during his initial screening at CCJ in May, he did not tell the nurse about his history of hallucinations because D.M. did not think she should know. (XIX 146:18–24) Although initially not disclosing his hallucinations in May at his entry screening, in November, D.M. requested and received the necessary medication. (XIX 147:5–20) During his first and fourth visits to CCJ, T.H.2 declined his Adderall for his ADHD, but he accepted the Adderall on his third visit because he was detained longer; his medicine, when requested, was received. (XI 112:3–113:16) D.W. chose to stop his medication for a while after arriving at CCJ in January 2012 but completed a mental health request form on June 4, 2012, saw the psychiatrist, and received his medication. (XI 153:1–155:1) Also, D.W. was seen by LCSW Allen, the social worker, during his first week at CCJ after claiming suicidal ideation. (XI 156:3–24) After a sick call request "related to sleeping, depression, and ADHD," B.G.2 within two days saw the psychiatrist and received medication. (XIII 30:22–31:5) B.G.2 testified that he had no trouble accessing medical care, which would "take a few days." (XIII 75:4–14) N.H. testified that, when she claimed suicidal ideation, the deputies immediately took her to the nurse for evaluation. (VII 33:16–24) LCSW Allen saw N.H. the next day. (VII 35:6–8) When B.G. claimed that he was suicidal, the nurse placed him on suicide watch and called the doctor for further instructions. (VII 53:14–54:6) After remaining on suicide watch throughout the weekend, both

B.G. and K.J. were seen by mental health on Monday, released from suicide watch, and checked by mental health staff every week for three weeks.  (B.G., VII 89:2–24) Mental health staff checked on B.G. every day while he was on suicide watch and continued to check on him afterwards.  (VII 170:8–175:2)

The plaintiffs failed to produce evidence at trial that the Sheriff has a policy or custom of placing juveniles in isolation "punitively" or without due process and failed to prove any substantial risk of serious harm.  The evidence establishes overwhelmingly that the Sheriff employed isolation only as a means to enforce institutional security and order — in a regulatory manner — and never as a matter of policy or practice in a punitive manner.  The administrative isolation employed by the Sheriff implicates neither the Eighth Amendment nor the right to a due process hearing.  In other words, as employed by the Sheriff, exclusively in response to the violation of a detention rule, isolation neither altered the detainee's term of confinement nor "imposed an atypical and significant hardship in relation to the ordinary incidents of prison life."

The Sheriff employs three forms of isolation — the most restrictive on the adult side is the secure housing unit (SHU), followed by the less restrictive administrative segregation, followed by a mere "timeout."  (Penn, XXII 60:16–62:6) For confining or controlling a detainee's movement, CCJ has other options, which include cell confinement, "timeout" in the temporary holding area, temporary placement in isolation, and longer-term placement in isolation, which requires

supervisory approval.  (Marcum, XIV 133:19–134:25)  At CCJ "isolation" means placement in one of the four isolation cells.  (XIV 118:6–14)

If isolation is used for more than twenty-four hours, the facility captain, Captain Marcum, must approve.  (XIV 124:12–25)  Captain Marcum receives an administrative confinement report, and medical staff is notified.  (XIV 124:12–25)  As Penn stated, isolation at CCJ is less restrictive than isolation elsewhere.  (XXII 68:1–22)  "Segregation" is a term more frequently used when the purpose is removal of a juvenile from the audience of other juveniles in order to remove the stimulus that is provoking or extending bad behavior.  (Allen, XVII 80:2–81:13)  However, even if CCJ practice is properly denominated as "isolation," CCJ uses safeguards, including a fifteen-minute check by a deputy, twice daily checks by nursing staff, immediate access to medical and mental health, and crisis intervention, if necessary.  (XXII 70:15–71:24)

CCJ has substantially improved isolation policy since the opening in the fall of 2011.  (Penn, XXII 63:2–17)  Segregation for longer than three hours requires a supervisor's approval, and segregation for longer than twenty-four hours requires the captain's approval.  The principal change in isolation policy is that every forty-eight hours the captain must evaluate and approve the reason for a juvenile's isolation.  (XIV 135:1–15)  Captain Marcum recalls no juvenile's isolation for more than twenty-four hours on any occasion since the beginning of 2013 — and the record discloses none.  (XIV 137:3–23)

Because isolation or segregation as practiced at CCJ neither constitutes solitary confinement nor presents an "atypical and significant hardship" in the ordinary incidents of detention life, no due process hearing or the like is required.

As elaborated in the findings of law, a detainee is not subject to "punishment" within the meaning of the Eighth Amendment. But the safety of staff, inmates, and property requires the Sheriff to maintain security and order — requires the maintenance of control — at CCJ. Inmate separation is often necessary. For example, the glass holding areas in the dorms are effective to separate a disruptive juvenile from others, especially at "lights out" as others begin to sleep. (XV 30:11–36:13)

A disruptive detainee is episodically placed in segregation briefly to "cool off" or to prevent further disturbance in the dorms. (XV 30:11–36:13) Other detainees are segregated for a medical reason, such as an entering detainee having a wound (or L.S. being monitored until his sutures healed) or, temporarily, if suspected of a contagious illness. (Marcum, XIV 119:18–120:7) The most obvious but also the most atypical example of longer-term isolation at CCJ was D.W., T.H., and M.H.'s placement in isolation for two months after assaulting T.W. in his cell. (IV 127:7–129:25) Placement in the general population was unacceptably risky because the three had brutally attacked another detainee. The three were removed from the dorm after wrapping towels around their necks in order to secure placement on suicide watch. (IV 127:7–129:25) The three used isolation "to be as disruptive as

they could," and a return to the general population would have been manifestly premature.  After November 2011, no other juvenile was in isolation for any comparable time.  (XIV 167:16–21)

DeMuro's testimony that juveniles in isolation at CCJ were not permitted to attend school (VI 8:24–9:1) was refuted by other testimony, including the juveniles' testimony.  A juvenile in isolation is not deprived of human contact, a deputy checks them every fifteen minutes, and they attend school if they choose and if they are not misbehaving.  (XIV 120:8–121:1)  The nurse visits daily with a juvenile in isolation.  (VII 157:22–158:2)  A juvenile receives daily time outside the isolation cell to shower, walk around, talk to other juveniles, and use the telephone.  (B.G., VII 80:3–13; D.W., XI 138:6–141:15)

The juveniles' mental health needs are not ignored during or after they are in isolation.  T.H.2 testified that he heard "blowing" in his ear during one of the four times he was in isolation but did not tell a deputy and did not develop any long-term problem from his time in isolation.  (T.H.2, XI 89:17–90:18, 106:9–109:5)  In another example, as soon as D.M. told detention staff he was hearing voices, staff immediately alerted mental health, and D.M. promptly received several mental health evaluations by LCSW Allen and McRae.  (Penn, XXII 71:25–74:3)  Penn observed that McRae proceeded with caution and treated D.M., who reported near the end of his confinement that the voices had stopped.  The evidence negates any inference of the Sheriff's deliberate indifference and establishes the absence of any

substantial risk of serious harm to a detainee because of time in "isolation," such as it is.[8]

## CONCLUSION

Because the plaintiffs failed to prove that either the Sheriff or Corizon was deliberately indifferent to any substantial risk of serious harm, and because the plaintiffs failed to prove that the Sheriff's or Corizon's policies or customs effect any other constitutional violation, the Clerk is directed to enter judgment for the defendants and against the plaintiffs on Counts I through V and to close the case.

ORDERED in Tampa, Florida, on April 16, 2015.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[8] As result of proceedings on the last day of trial, admission into evidence of the Sheriff's proposed exhibits 45C through 45I remain under advisement. Applying again the standard applied throughout the trial (a standard explained at XII:30–36, exhibits 45C (except for the color-coded characterization of the "injury"), 45D, 45G, 45H, and 45I, each a mere enumeration, are admitted.

Exhibits 45E and 45F, which purport to chart a distinction between "spontaneous" and non-spontaneous" use of pepper spray (a distinction found in *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010)), are excluded.

The objection to any other exhibit remaining "under advisement" is sustained.